15.A.1

COPY

UNITED STATES DEPARTMENT OF COMMERCE
National Oceanic and Atmospheric Administration

RECEIVED
'97 OCT 20 A9:57
WESPAC

# MEMORANDUM

To: WPFMC - Kitty M. Simonds

From: GCSW - Judson J. Feder *Judson J. Feder*

Date: October 17, 1997

Subject: Fishery Management Jurisdiction over waters off Midway Atoll, Palmyra Island, and Kingman Reef

This responds to your September 4, 1997, letter to me about fishery management jurisdiction in the ocean around Midway Atoll, Palmyra Island, and Kingman Reef.

The Secretary of Commerce has delegated to the Assistant Administrator for Fisheries, National Marine Fisheries Service (NMFS), the Secretary's Magnuson-Stevens Act[1] fishery management authority in the EEZ.[2] Since the Federal government has not transferred the submerged lands adjacent to Midway Atoll, Palmyra Island, or Kingman Reef to a state or local government or private entity, the shoreward boundary of the EEZ around those areas is the "baseline" from which the territorial sea is measured, i.e., the low-water mark. See, the Territorial Submerged Lands Act, 48 U.S.C. § 1704 et seq., which applies to Guam, the U.S. Virgin Islands, and American Samoa, but not to Midway Atoll, Palmyra Island, or Kingman Reef.

---

[1] 16 U.S.C. § 1801 et seq.

[2] According to Presidential Proclamation 5030 of March 10, 1983, the U.S. EEZ encompasses the 200 nautical mile zone from the baseline of United States overseas territories and possessions, as well as states. Under the Magnuson-Stevens Act, the shoreward boundary of the EEZ is the seaward boundary of each of the coastal states. **16 U.S.C. § 1802(11)** Under the Magnuson-Stevens Act, the U.S. territories and possessions of the Western Pacific fall within the definition of "state." **16 U.S.C. § 1802(36)**

EXHIBIT "25"

## Midway Atoll

E.O. 13022, signed by President Clinton on October 31, 1996, directed the U.S. Fish and Wildlife Service (FWS) to assume jurisdiction over Midway Atoll National Wildlife Refuge. As noted in your letter, the Refuge is bounded by 28°5" N. latitude, 177°70" W. longitude, 28°25" N. latitude, and 177°30" W. longitude. The Refuge covers about 302 square statute miles, much of which encompasses ocean waters; only about 1600 acres of the Refuge is emergent land. Although most national wildlife refuges do not encompass ocean waters, the President is not precluded by law from designating ocean waters as part of a refuge. Under 16 USC § 778dd(c), no one may take or possess fish within a refuge "... unless permitted either under subsection (d) of this section or by express provision of the law, proclamation, Executive order, or public land order establishing the area ...." Although NOAA has authority under the Magnuson-Stevens Act to regulate fishing within the EEZ around Midway Atoll, it is my legal opinion that the FWS has *concurrent* statutory authority to regulate activities within Refuge boundaries.

16 USC § 460k authorizes the Secretary of the Interior to allow recreational activities within Refuge boundaries "... only to the extent that is practicable and not inconsistent with other previously authorized Federal operations or with the primary objectives for which each particular area is established ...." Under 16 USC § 768dd(d)(1), the Secretary of the Interior may "permit the use of any area within the System for any purpose, including ... fishing ...." From conversations with the director of the Midway Atoll Refuge, I understand FWS allows regulated recreational fishing within Refuge boundaries pursuant to an "Interim Public Use Program." The FWS might supplement the regulations, in turn, by written policy. Presumably, such policy would be given to Refuge visitors. No commercial fishing is allowed within the Refuge boundaries. Details about fishing restrictions in the Midway Atoll National Wildlife Refuge may be obtained from the FWS at P.O. Box 50088, Honolulu, HI 96850; telephone (808) 541-2749.

## Palmyra and Kingman

The Fullard-Leo family owns Palmyra Island and Kingman Reef, and may claim ownership or jurisdiction over ocean resources and/or submerged lands seaward of the low-water mark.[3]

Palmyra Island and Kingman Reef are not part of the State of Hawaii, they are not surrounded by "state" waters, and Federal submerged lands around these areas were not conveyed to the Fullard-Leo family. It is the position of the Federal Government that the EEZ around Palmyra and Kingman extends shoreward to the low-water mark.

---

[3] The exact extent of the Fullard-Leo claims is not clear, probably extending to the lagoons and reefs surrounding the islands, and perhaps extending to the breadth of the "territorial" waters.

United States General Accounting Office

GAO

Report to the Chairman, Committee on Resources, House of Representatives

November 1997

# U.S. INSULAR AREAS

## Application of the U.S. Constitution

UNITED STATES GENERAL ACCOUNTING OFFICE

GAO/OGC-98-5

EXHIBIT
"26"

GAO

United States
General Accounting Office
Washington, D.C. 20548

Office of the General Counsel

B-271897

November 7, 1997

The Honorable Don Young
Chairman
Committee on Resources
House of Representatives

Dear Mr. Chairman:

More than 4 million U.S. citizens and nationals live in insular areas[1] under the jurisdiction of the United States. The Territorial Clause of the Constitution authorizes the Congress to "make all needful Rules and Regulations respecting the Territory or other Property" of the United States.[2] Relying on the Territorial Clause, the Congress has enacted legislation making some provisions of the Constitution explicitly applicable in the insular areas. In addition to this congressional action, courts from time to time have ruled on the application of constitutional provisions to one or more of the insular areas.

You asked us to update our 1991 report to you on the applicability of provisions of the Constitution to five insular areas: Puerto Rico, the Virgin Islands, the Commonwealth of the Northern Mariana Islands (the CNMI), American Samoa, and Guam. You asked specifically about significant judicial and legislative developments concerning the political or tax status of these areas, as well as court decisions since our earlier report involving the applicability of constitutional provisions to these areas. We have included this information in appendix I.

[1]As we did in our 1991 report on this issue, Applicability of Relevant Provisions of the U.S. Constitution (GAO/HRD-91-18, June 20, 1991), we use the phrase "insular areas" to include all territories over which the United States exercises sovereignty. Each of these areas has a unique historical and legal relationship with the United States.

[2]U.S. Const. art. IV, § 3, cl. 2.

Figure 1: Pacific Ocean Insular Areas




Midway Island
(U.S.)

Figure 2: Western Caribbean Insular Areas








FWS 00936

In addition, you asked us to report on the status of, and provide background information pertaining to, nine insular areas on which we have not previously reported.[3] These nine are small islands or atolls, most of which are uninhabited. We summarize the constitutional status of, and provisions applicable to, the nine smaller insular areas.[4] We also provide answers to a number of specific questions from your staff concerning these areas. Detailed information about the histories and current status of each of the smaller insular areas appears in appendix II.

To develop our report, we obtained information from the Coast Guard, the Departments of the Interior, State, Navy, and Justice, the Congressional Research Service, the Parliamentarian of the House of Representatives, and a representative of the owners of Palmyra Atoll. We also reviewed court decisions and federal legislation, both proposed and enacted, from 1991 to the present, and examined other relevant published materials, including executive orders, the legislative histories of federal laws, books, and articles in law reviews and other journals. Ruth Van Cleve, formerly Special Assistant, Office of the Solicitor, Department of the Interior, reviewed a draft at our request and provided comments.

## Results in Brief

No significant change has occurred since 1991 in the application of the Constitution to, and the legal status of, the five insular areas on which we reported at that time. Some, however, are actively seeking greater political autonomy. Referendums were held in Puerto Rico and the Virgin Islands on political status options and, in February 1997, a bill concerning Puerto Rico's political status was reintroduced in the 105th Congress. A bill that would have granted the CNMI a non-voting delegate to the U.S. Congress was considered but not enacted in the 104th Congress. In January 1997, a bill to grant commonwealth status to Guam was reintroduced in the 105th Congress.

A tax credit previously available for corporations doing business in insular areas is being phased out. The Puerto Rico and Possessions Tax Credit (section 936 of the Internal Revenue Code), as originally enacted, allowed corporations to receive a tax credit for business income earned in the territories in an amount equal to their full U.S. income tax liability. A 1993

[3]Baker Island, Howland Island, Jarvis Island, Johnston Atoll, Kingman Reef, Midway Atoll, Palmyra Atoll, Wake Island, and Navassa Island.

[4]For convenience in distinguishing between the two groups of insular areas, we sometimes refer in this report to the nine insular areas we have not previously reported on as the "smaller insular areas," and to the five areas that were the subject of our earlier report as the "larger insular areas."

amendment limited the amount of the credit. In 1996, the law was amended further to provide that, after a 10-year transition period, the credit will no longer be available.

Several court decisions during the last 6 years have addressed the applicability of constitutional provisions to individual insular areas. Two decisions discuss, in the context of the Territorial Clause of the Constitution, the relationship of an insular area with the United States. In a case involving the CNMI, the court looked for guidance to the Covenant,[5] the agreement which establishes the legal relationship between the CNMI and the United States and which has been approved by federal statute. Although acknowledging that the CNMI remains subject to the Territorial Clause, the court emphasized that the provisions of the Covenant, as approved by the Congress, "define the boundaries" of the relationship between the United States and the CNMI. In the second case, the court concluded that, while the Congress has granted the right of local self-government to Puerto Rico, there has been no fundamental alteration in Puerto Rico's constitutional relationship to the United States: Puerto Rico remains subject to the Territorial Clause.

Of the nine smaller insular areas not addressed in our earlier report, eight are unincorporated and unorganized territories of the United States to which only "fundamental" personal rights under the Constitution apply.[6] In 1900, in a law that remains in force, the Congress extended the Constitution in its entirety to the ninth area, Palmyra Atoll. Palmyra was once part of the Territory of Hawaii, but was expressly excluded when Hawaii became a state. While no definitive determination has been made concerning the current status of Palmyra, it seems likely that a court would conclude that the Constitution continues to apply in its entirety.

## Background

The larger insular areas have come under the sovereignty of the United States in various ways. Puerto Rico and Guam were ceded to the United States by treaty at the end of the Spanish-American War in 1898. The Virgin Islands were purchased from Denmark in 1917. Following the renunciation by Great Britain and Germany of their claims to what is now American

[5]Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, approved by Pub. L. No. 94-241, 90 Stat. 263 (1976), 48 U.S.C. § 1801 note.

[6]In general, fundamental rights, applicable to all individuals subject to the sovereignty of the United States, are "inherent, although unexpressed principles which are the basis of all free government." Dorr v. United States, 195 U.S. 138, 147 (1904); Downes v. Bidwell, 182 U.S. 244, 282-83 (1901). The Supreme Court has not defined precisely which parts of the Constitution establish fundamental rights. Reid v. Covert, 354 U.S. 1, 13 (1957). See appendix I for further discussion.

Samoa and the cession by the Samoan chiefs to the United States of these islands, the Congress, in 1929, ratified the instruments ceding the islands to the United States.[7] The United States was responsible for administering the Northern Mariana Islands after World War II under a United Nations trusteeship agreement. Ultimately, a covenant between the United States and the Northern Marianas established the islands as a commonwealth under the sovereignty of the United States.[8]

At present, general federal administrative responsibility for the CNMI, Guam, the Virgin Islands, and American Samoa is vested in the Department of the Interior. Under terms of its covenant, the CNMI consults regularly with the United States on all matters affecting the relationship between them. All departments, agencies, and officials of the executive branch treat Puerto Rico administratively "as if it were a state;" any matters concerning the fundamentals of the U.S.-Puerto Rican relationship are referred to the Office of the President.[9]

Since the United States established sovereignty over the five larger insular areas, each has pursued greater self-government. Initially, military governors had responsibility for Puerto Rico, Guam, the Virgin Islands, and American Samoa; governors were later replaced by civilian administrators, most of whom were appointed by the President. The CNMI, as a United Nations Trust Territory, was administered by the United States acting through the Navy. Eventually, each of the five larger areas was authorized to elect its own governor. In addition, the Congress authorized all of the larger areas to adopt their own constitutions. Puerto Rico, American Samoa, and the CNMI have internal self-government under locally-adopted constitutions. Guam and the Virgin Islands have not adopted local constitutions and remain under organic acts approved by the Congress.

People born in Puerto Rico, Guam, the CNMI, or the Virgin Islands are American citizens; those born in American Samoa are American

[7]Convention in Respect to the Samoan Group of Islands, Dec. 2, 1899, 31 Stat. 1878 (1900); Act of February 20, 1929, ch. 281, 45 Stat. 1253 (1929), 48 U.S.C. § 1661.

[8]See GAO/HRD-91-18, June 20, 1991, for more detail concerning each of these areas.

[9]Memorandum of the President, Nov. 30, 1992, 57 Fed. Reg. 57,093 (1992).

nationals.[10] The residents of all five of the larger insular areas enjoy many of the rights enjoyed by U.S. citizens in the 50 states. But some rights which, under the Constitution, are reserved for citizens residing in the states have not been extended to residents of the insular areas. For example, residents of the insular areas cannot vote in national elections, nor do they have voting representation in the final approval of legislation by the full Congress.

Most of the nine smaller insular areas you asked about were discovered by adventurers in the late 18th and early 19th centuries and were claimed by representatives of the United States in the latter part of the 19th century under the 1856 Guano Islands Act.[11] The act provides legal and military protection for American entrepreneurs mining guano, or bird droppings, for use in the United States; most of these nine insular areas were used by private companies as sources of guano, which they sold as fertilizer.

None of the smaller insular areas has a native population or local government. Midway Atoll and Baker, Howland, and Jarvis Islands are administered by the Fish and Wildlife Service of the Department of the Interior as wildlife refuges. Johnston Atoll is administered jointly by the Defense Nuclear Agency and the Fish and Wildlife Service. Kingman Reef is administered by the Navy.[12] Wake Island is being used by the Army Space and Missile Defense Command. Since January 1997, the Department of the Interior's Office of Insular Affairs has been responsible for the civil administration of Navassa (the Coast Guard having ceased its use and administration of Navassa Island in 1996.) Palmyra Atoll is privately owned, but is also administered by the Office of Insular Affairs of the Department of the Interior.

[10]An American national is either a citizen or someone who "owes permanent allegiance to the United States." 8 U.S.C. § 1101(a)(21), (22). Citizenship is derived either from the Fourteenth Amendment to the Constitution ("All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States . . . .") or from a specific statute that confers citizenship on the inhabitants of an area that, although not a state, is under the sovereignty of the United States. Such legislation has been enacted for Puerto Rico (8 U.S.C. § 1402); the Virgin Islands (8 U.S.C. § 1406); Guam (8 U.S.C. § 1407); and the CNMI (sec. 303 of the Covenant, as approved by the Congress). (Under section 302 of the Covenant, authority exists for certain CNMI residents to have elected to become nationals but not citizens of the United States.)

No such legislation conferring citizenship has been enacted for American Samoa. The Samoans, therefore, are not citizens of the United States but, having been born in an area under sovereignty of the United States, are non-citizen nationals owing permanent allegiance to the United States. As such, they are not entitled to benefits for which only citizens qualify. On the other hand, they are not aliens and consequently cannot be excluded or deported.

[11]48 U.S.C. §§ 1411-19.

[12]Kingman Reef has been claimed by the Fullard-Leo family. See appendix II for further discussion.

## Observations on the Applicability of the U.S. Constitution to Smaller Insular Areas

Of the nine U.S. insular areas not addressed in our earlier report, eight are unincorporated and unorganized territories of the United States[13] to which constitutional rights have not been extended by law; therefore, in general, only "fundamental" personal rights under the Constitution apply.[14] Most of these islands were claimed under the Guano Islands Act.[15]

The question of what constitutional provisions apply to Palmyra Atoll is not settled, but it seems likely that the courts would conclude that the Constitution continues to apply in its entirety.[16] The Constitution was extended in 1900 by statute to the Territory of Hawaii.[17] At the time, Palmyra was part of that territory. However, Palmyra was specifically excluded from the area subsequently designated by law as the State of Hawaii. The provision of law extending the entire Constitution to Palmyra when it was part of the territory of Hawaii has never been amended or repealed and it is not clear that doing so could change the current status of Palmyra. The Supreme Court has suggested, although without squarely deciding the question, that once the Constitution has been extended to an area, its coverage is irrevocable.[18]

The status of Navassa recently has come under the scrutiny of a number of federal agencies, all of which agree that it has been and remains an unincorporated and unorganized territory of the United States. In August 1996, the Coast Guard, which had been administering Navassa, dismantled its light and removed its signs indicating the area was restricted. Subsequently, an American salvager filed a claim to the island with the Department of State under the Guano Islands Act. The claim was

[13]The eight insular areas are Navassa Island, Johnston Atoll, Baker Island, Howland Island, Jarvis Island, Kingman Reef, Midway Atoll, and Wake Island. Legislation introduced in the 104th Congress would have included Baker Island, Jarvis Island, Johnston Atoll, Kingman Reef, Howland Island, the Midway Islands, and Palmyra Atoll as part of the state of Hawaii. H.R. 602, 104th Cong. (1995). Another bill would have included Baker, Jarvis, and Howland Islands as part of American Samoa. H.R. 3721, 104th Cong. (1996). No formal action was taken on either bill, following their referral to committee.

[14]See appendix I for a discussion of fundamental rights.

[15]The act provides that an island on which guano is discovered by a U.S. citizen and which is not claimed by another government may be considered, at the discretion of the President, as "appertaining to the United States." 48 U.S.C. § 1411.

[16]See appendix II for more detail.

[17]Act of April 30, 1900, ch. 339, § 5, 31 Stat. 141-42 (1900).

[18]Downes v. Bidwell, 182 U.S. 244, 261 (1901), commenting on an earlier Supreme Court decision, Loughborough v. Blake, 18 U.S. (5 Wheat.) 317 (1820); Rasmussen v. United States, 197 U.S. 516, 529-530, 536 (1905)(concurring opinions of Justices Harlan and Brown).

rejected.[19] In January 1997, the Secretary of the Interior delegated to the Office of Insular Affairs responsibilities for the civil administration of Navassa.[20]

## Agency Comments

The Departments of Interior, Justice, and State, as well as the United States Coast Guard, and the offices of the representatives from Puerto Rico, Guam, and the Commonwealth of the Northern Mariana Islands provided comments on our draft report. Each of these agencies and offices generally agreed with the information and issues discussed in our draft report and offered technical comments, which we incorporated in the report as appropriate. (Written comments from the Coast Guard, the Department of the Interior, the Resident Commissioner of Puerto Rico, and the Resident Representative of the Commonwealth of the Northern Mariana Islands are reproduced in appendices III-VI.) The office of the representative from American Samoa reviewed the draft and had no comment. The office of the representative from the Virgin Islands did not provide comments.

We are providing copies of this report to the Secretaries of State, Transportation, and the Interior, the Attorney General, and the offices of the representatives from the five larger insular areas.

If you or your staff have any questions about this report, please call me at (202) 512-8203. Other major contributors to this report are listed in appendix VII.

Sincerely yours,

Barry R. Bedrick

Barry R. Bedrick
Associate General Counsel

[19]Under the Guano Islands Act, the discoverer of a guano island has to give notice of discovery, occupation, and possession, and provide "satisfactory evidence" that the island was not "in the possession or occupation of any other government or the citizens of any other government" before the claim can be perfected. 48 U.S.C. § 1412. See appendix II for more detail.

[20]Secretary's Order No. 3205, Department of the Interior, January 16, 1997.

# Contents


| | |
|---|---|
| Letter | 1 |
| Appendix I<br>Five Insular Areas - An Update | 14 |
| Appendix II<br>Relationship With the United States of Nine Small Insular Areas | 39 |
| Appendix III<br>Comments From the United States Coast Guard | 64 |
| Appendix IV<br>Comments From the Department of the Interior | 65 |
| Appendix V<br>Comments From the Resident Commissioner of Puerto Rico | 67 |

Appendix VI Comments From the Resident Representative of the Commonwealth of the Northern Mariana Islands 69

Appendix VII Major Contributors to This Report 71

Figures

Figure 1: Pacific Ocean Insular Areas 2
Figure 2: Western Caribbean Insular Areas 4
Figure I.1: Puerto Rico 14
Figure I.2: Commonwealth of the Northern Mariana Islands 16
Figure I.3: Island of Guam 18
Figure I.4: U.S. Virgin Islands 20
Figure I.5: American Samoa 22
Figure II.1: Palmyra Atoll 41
Figure II.2: Hawaii 43
Figure II.3: Navassa Island 46
Figure II.4: Johnston Atoll 50
Figure II.5: Baker, Howland, and Jarvis Islands 53
Figure II.6: Kingman Reef 57
Figure II.7: Midway Atoll 59
Figure II.8: Wake Atoll 62

**Abbreviations**

| | |
|---|---|
| CNMI | Commonwealth of the Northern Mariana Islands |
| FSC | foreign sales corporation |
| NAFTA | North American Free Trade Agreement |

# Five Insular Areas - An Update

## Efforts to Enhance Self-Government and Economic Development

Since our 1991 report, efforts of the five larger insular areas—Puerto Rico, the Commonwealth of the Northern Mariana Islands, Guam, the Virgin Islands, and American Samoa—to pursue greater self-government and economic development have continued. See maps of these areas in figures I.1 through I.5.

Figure I.1: Puerto Rico




**Puerto Rico:** A referendum was held, in November 1993, in which the commonwealth option—maintaining the current political status of Puerto Rico—did not receive a majority of votes cast but prevailed by a slim margin over the statehood option.[1] In 1995, hearings were held on the results of the 1993 referendum, on the basis of which Representative Don Young, Chairman of the Committee on Resources, introduced H.R. 3024, 104th Congress, the "United States-Puerto Rico Political Status Act." The bill was reported to the House in July 1996 by the Committee on Resources, but was not voted on in the 104th Congress. In February 1997, Representative Young introduced H.R. 856, 105th Congress, a bill that is substantially similar to H.R. 3024. That bill was reported to the House by

[1]The commonwealth option received 48 percent of the votes, the statehood option 46 percent, and the independence option 4 percent. Rafael Matos, Commonwealth a Winner with 48.4% of Vote, San Juan Star, November 15, 1993, at 3. However, results of the referendum were difficult to interpret due to the manner in which the three options were presented to the voters. H.R. Rep. No. 104-713, Pt. 1, at 16 (1996).

the Committee on Resources on June 12, 1997.[2] As of October 10, 1997, no further action has been taken.

The pending bill would establish a three-stage process for enhancing self-government in Puerto Rico, should that be the choice of the Puerto Rican people. In the first stage, a referendum would be held in Puerto Rico no later than December 31, 1998. The ballot must provide three options—commonwealth, separate sovereignty, or statehood—as each is defined in the bill. In the second (transition) stage, if the referendum choice is for either statehood or separate sovereignty, the bill, as reported, would require the President to develop and submit to the Congress legislation for a transition plan of not more than 10 years duration. If enacted by the Congress, the transition plan would be submitted to the Puerto Rican electorate for approval in another referendum. Assuming the plan was approved, the final stage would begin with the President's submission to the Congress of proposed legislation to implement the form of self-government consistent with Puerto Rico's choice, including a proposed date for implementation. If this were enacted by the Congress, it would be presented to Puerto Rican voters for approval by referendum, and the results certified to the President.

With regard to economic development, the North American Free Trade Agreement (NAFTA),[3] which came into effect in 1994, specifically applies to Puerto Rico. NAFTA defines the term "territory" with respect to the United States to encompass U.S. customs territory, which includes the 50 states, the District of Columbia, and Puerto Rico, as well as foreign trade zones located in the United States and Puerto Rico. NAFTA also covers areas beyond U.S. territorial seas within which the United States may exercise rights over the seabed and subsoil and their natural resources.

[2]H.R. Rep. No. 105-131, Pt. 1, at 45. The bill was placed on the Union Calendar for consideration by the Committee of the Whole (see infra note 32).

[3]32 Int'l Legal Materials 296-456 (1993).

Figure I.2: Commonwealth of the Northern Mariana Islands






FWS 00947

**Northern Mariana Islands:** The CNMI continues to be represented in the District of Columbia by a Resident Representative who serves as a liaison with the federal government. However, the CNMI does not have a representative in the Congress. In September 1996, a bill to grant the CNMI a nonvoting delegate to the U.S. Congress was favorably reported by the Committee on Resources, but no further action was taken during the 104th Congress.[4]

In another development, in August 1997, the CNMI government filed suit against the United States in federal district court. The CNMI is suing to determine who holds title to the submerged lands within a 12 mile radius surrounding all the islands in the Commonwealth.[5]

**Guam:** Proposed legislation to grant commonwealth status to Guam, first introduced in the 100th Congress by former delegate Ben Blaz in 1988,[6] was introduced in each subsequent Congress, but no formal action, beyond referral to committee, was taken on any of the bills.[7] Delegate Underwood again has introduced in the 105th Congress the bill to grant Guam commonwealth status.[8] Upon approval by the Congress, the act would be submitted to the registered voters of Guam for ratification. The United States would agree that no provision of the act would be modified, nor any subsequently passed federal law, rule, or regulation made applicable to Guam, except with the mutual consent of Guam and the United States.

[4]H.R. 4067, 104th Cong. (1996), introduced by Rep. Gallegly; H.R. Rep. No. 104-856 (1996).

[5]Commonwealth of the Northern Mariana Islands v. United States, No. CV 97-0036, (D.N.M.I. Aug. 21, 1997).

[6]H.R. 4100, 100th Cong. (1988).

[7]H.R. 98, 101st Cong. (1989); H.R. 98, 102d Cong. (1991); H.R. 1521, 103d Cong. (1993); H.R. 1056, 104th Cong. (1995); to be known if enacted as the Guam Commonwealth Act.

[8]H.R. 100, 105th Cong. (1997).

Figure I.3: Island of Guam



The proposed legislation sets forth requirements for a constitution to be drafted and adopted by Guam, including a provision permitting the Chamorro people — the indigenous people of Guam — to exercise the right of self-determination. The bill would permit the President to delegate to the Governor of Guam the total or partial performance of functions currently handled by federal agencies. The bill would require the United States to consult with Guam on specific foreign relations and defense matters affecting Guam. In addition, the United States would assist Guam in becoming a member of or participate in regional and international organizations, and would permit Guam to enter into reciprocal trade and tax agreements with other countries. Under the bill, Guam would remain outside the customs territory of the United States and would continue to have duty-free access to U.S. markets. Also, the bill would grant Guam, subject to coordination with federal agencies, control over immigration and, generally, would authorize it to enact and enforce all laws regulating or affecting local employment. In addition, the bill would create a commission to study and propose modification to existing federal statutes and regulations applicable to Guam.

**Virgin Islands:** A referendum on the political status of the Virgin Islands was held in October 1993.[9] Voters were asked to choose among the following options: complete integration with the United States, continued or enhanced territorial status, or removal of U.S. sovereignty. Of those who voted, 80 percent selected continued or enhanced territorial status. However, only 27.5 percent of the electorate voted.

Legislation pending in the 105th Congress would establish a commission to report and make recommendations to the President and the Congress on the policies and actions necessary to provide a self-sustaining economy for the Virgin Islands through 2020.[10]

[9]The referendum was conducted under the authority of the Virgin Islands Organic Act. 48 U.S.C. § 1593(b).

[10]S. 210, 105th Cong. (1997), which passed the Senate on June 12, 1997. Nearly identical language passed the House in 1996. H.R. 1332, 104th Cong. (1996).

Figure I.4: U.S. Virgin Islands






FWS 00951

**American Samoa:** American Samoa's main focus in relation to the United States currently is economic development. In 1992, we reported on deficiencies in American Samoa's fiscal management and budget capabilities.[11] In response, the American Samoan government has developed a plan which it is implementing in cooperation with federal agencies and others to improve its fiscal management and budget capabilities and to attract investment. In addition, legislation pending in the 105th Congress would establish a commission to report and make recommendations to the President and the Congress on the policies and actions necessary to sustain American Samoa's economy through 2020. As part of its report, the commission would include an overview of American Samoa's history and its relationship to the United States, with emphasis on actions affecting future economic development.[12]

In another development, an assessment team from the Department of Justice visited American Samoa in 1994. In a December 1994 report, the team concluded that the absence of a federal court in American Samoa contributed to difficulties in curbing white collar crime.[13] In October 1996 and again in 1997, the Department of Justice submitted to the Congress a draft legislative proposal to establish a federal district court of limited jurisdiction in American Samoa.

[11] American Samoa: Inadequate Management and Oversight Contribute to Financial Problems (GAO/NSIAD-92-64, April 17, 1992).

[12] S. 210, 105th Cong. (1997) passed the House on June 12, 1997. Bills were also introduced in previous Congresses to create a study commission to review American Samoa's political relationship with the United States. H.R. 3351, 102d Cong. (1991); H.R. 187, 103d Cong. (1993); H.R. 3721 and H.R. 1332 (as it passed the House), 104th Cong. (1996).

[13] The report, noting that American Samoa's court system is not part of the federal judicial structure, cited difficulties encountered in issuing and enforcing federal subpoenas. The Dep't of Justice Report on American Samoa White-Collar Crime Assessment Which Highlights Some Serious Problems and Suggests Possible Resolutions: Hearing Before the Subcomm. on Native American and Insular Affairs of the House Comm. on Resources, 104th Cong. (1995).

Figure I.5: American Samoa






FWS 00953

# Applicability of Constitutional Provisions to U.S. Insular Areas

## "Fundamental" Constitutional Rights Apply to All Territories

The Constitution does not apply in its entirety to territories solely by virtue of the fact that those territories have come under the possession and control of the United States.[14] Whether rights under the Constitution apply to a territory and, if so, to what extent depends essentially on either of two factors, according to a series of Supreme Court decisions called the Insular Cases.[15] The first is whether the right in question is considered to be "fundamental" or not; the second is whether the Congress has taken legislative action to extend the Constitution to the territory.

Most of the Insular Cases, which comprise the first extensive consideration of the application of constitutional and statutory rights within United States territories, date from 1901 to 1904, following a period of territorial expansion by the United States. In these cases, the Supreme Court developed the idea that, without any action by the Congress, constitutional rights that are considered to be "fundamental" are available in all areas under the jurisdiction of the United States,[16] but that other rights apply only when extended to such areas by law. The Court pointed out that even though some of these fundamental rights may not be

[14] "It is not open to us in light of the Insular Cases to endorse the view that every constitutional provision applies wherever the United States Government exercises its power." United States v. Verdugo-Urquidez, 494 U.S. 259, 268-69 (1990).

[15] The Supreme Court cases that are often identified as the first Insular Cases are: De Lima v. Bidwell, 182 U.S. 1 (1901) (Puerto Rico not a foreign country within the meaning of the generally applicable tariff law); Downes v. Bidwell, 182 U.S. 244 (1901) (tariff imposed by the Congress on goods imported from Puerto Rico into the United States did not violate the Uniformity Clause); and Dooley v. United States, 182 U.S. 222 (1901) and Armstrong v. United States, 182 U.S. 243 (1901) (presidentially-imposed war tariff on goods exported from the United States to Puerto Rico ended upon ratification of the peace treaty under which Puerto Rico became subject to U.S. sovereignty).

Some later decisions that are also described as Insular Cases are: Hawaii v. Manikichi, 190 U.S. 197 (1903) (Fifth Amendment requirement for indictment by grand jury and Sixth Amendment right to jury trial inapplicable in Hawaii); Dorr v. United States, 195 U.S. 138 (1904) (Sixth Amendment right to jury trial inapplicable in the Philippines); Ocampo v. United States, 234 U.S. 91 (1914) (Fifth Amendment grand jury provision not included in the guarantees of due process and not applicable in the Philippines); Balzac v. Porto Rico, 258 U.S. 298 (1922) (Sixth Amendment right to jury trial inapplicable in Puerto Rico).

[16] "[E]ven in cases where there is no direct command of the Constitution which applies, there may nevertheless be restrictions of so fundamental a nature that they cannot be transgressed, although not expressed in so many words in the Constitution." Downes v. Bidwell, 182 U.S. at 290-291.

expressly stated in the Constitution, it would be wholly inconsistent with the principles that underlie our government not to preserve them in the territories. Thus, in one of the Insular Cases, Downes v. Bidwell, the Court said that the Congress, in creating governments for the territories, could not do so in such a way as to abridge fundamental rights.[17]

The question whether particular rights are fundamental has been answered only as specific cases come before the Supreme Court. The Court has identified the Fifth Amendment privilege against self-incrimination as a fundamental right.[18] On the other hand, the Court has said that the Sixth Amendment right to trial by jury and the Fifth Amendment right to indictment by a grand jury "are not fundamental in their nature, but concern merely a method of procedure . . . ."[19]

Under the Insular Cases and subsequent decisions, rights other than fundamental rights, even though they may be stated in the Constitution, do not apply to the territories or possessions unless the Congress makes them applicable by legislation.[20] The Congress can by law extend the coverage of the Constitution in part or in its entirety to a territory or possession, and has done so with respect to some territories. In the absence of such congressional action, however, only fundamental rights apply. The Insular Cases use the term "incorporated" to distinguish territories where all constitutional rights apply, because a statute has made them applicable, from "unincorporated" territories, where fundamental rights apply as a matter of law, but other constitutional rights are not available.

[17] "Whilst, therefore, there is no express or implied limitation on Congress in exercising its power to create local governments for any and all of the territories . . . there may . . . be inherent, although unexpressed, principles which are the basis of all free government which cannot be with impunity transcended." Id.

[18] Malloy v. Hogan, 378 U.S. 1 (1964).

[19] Dorr, 195 U.S. at 144-45.

[20] Although the Insular Cases remain authoritative, an opinion in a later case questions the concept of fundamental rights derived from those cases. In an opinion for himself and three of the five other justices who concurred in the result in Reid v. Covert, 354 U.S. 1 (1957) (holding that the law that made civilian citizens accompanying the armed forces overseas subject to court-martial was unconstitutional to the extent it denied the defendants Fifth and Sixth Amendment protections), Justice Black said: "[I]t is our judgment that neither the [Insular Cases] nor their reasoning should be given any further expansion. The concept that the Bill of Rights and other constitutional protections against arbitrary government are inoperative when they become inconvenient or when expediency dictates otherwise is a very dangerous concept . . . ." Id. at 13-14.

However, the Court has subsequently relied on the Insular Cases to support its holding that the Fourth Amendment right against unreasonable search and seizure does not protect a nonresident alien whose seized property is located in another country. Verdugo-Urquidez, 494 U.S. at 268-69 (1990).

## Territorial Clause

Under what is commonly known as the Territorial Clause of the Constitution, the Congress has the "power to make all needful Rules and Regulations respecting the Territory or other Property" of the United States.[21] Pursuant to this power, and in response to local desire for greater political autonomy, the Congress in 1950 approved a process for local self-government for Puerto Rico, under which its residents could establish, subject to congressional approval, their own constitution.[22] Separately, negotiations between the Northern Marianas and the United States culminated in a law approving a mutually binding agreement, the Covenant to Establish a Commonwealth of the Northern Mariana Islands, which permitted local constitutional self-government and went into effect on November 3, 1986.[23]

A 1993 decision of the Court of Appeals for the Ninth Circuit discussed the relationship between the United States and the CNMI in the context of the applicability of the CNMI Covenant and the Territorial Clause. A federal district court had enforced a subpoena of the Inspector General of the Department of the Interior, pursuant to statutory audit authority, for records related to the CNMI's administration of its income tax system. On appeal, the court of appeals agreed that the subpoena was valid, but rejected the Inspector General's reliance on the Territorial Clause as support for the federal audit. The court emphasized that, although the Territorial Clause applies to the CNMI,[24] it is the provisions of the Covenant, as approved by the Congress, that "define the boundaries" of the relationship between the United States and the CNMI: "The applicability of the Territorial Clause to the CNMI . . . is not dispositive of this dispute. Even if the Territorial Clause provides the constitutional basis for the Congress' legislative authority in the Commonwealth, it is solely by the Covenant that we measure the limits of Congress' legislative power."[25]

[21] U.S. Const. art. IV, § 3, cl. 2.

[22] The 1950 law, "adopted in the nature of a compact," authorized Puerto Rico to draft its own constitution, subject to ratification by Puerto Rican voters and subject to the approval of the U.S. Congress. Pub. L. No. 81-600, 64 Stat. 319 (1950). The constitution, ratified by Puerto Rican voters in a March 1952 referendum, was approved by the Congress in July 1952 with minor changes. Pub. L. No. 82-447, 66 Stat. 327 (1952).

[23] Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, approved by Pub. L. No. 94-241, 90 Stat. 263 (1976), 48 U.S.C. § 1801 note.

[24] See also Micronesian Telecomms. Corp. v. NLRB, 820 F.2d 1097, 1100, n.2 (9th Cir. 1987); Wabol v. Villacrusis, 958 F.2d 1450, 1459 and n. 17 (9th Cir. 1990); cert. denied, 506 U.S. 1027 (1992).

[25] United States v. De Leon Guerrero, 4 F.3d 749, 754 (9th Cir. 1993).

Looking to the provisions of the Covenant, the court rejected the CNMI's argument that local affairs are immune from federal legislation. Section 105 of the Covenant expressly recognizes the authority of the United States to enact legislation applicable to the Northern Mariana Islands, but it goes on to say that the United States agrees not to override unilaterally certain specific provisions of the Covenant that are identified as "fundamental," including the right of local self-government in section 103. The court read the Covenant as meaning that the Congress may legislate with respect to the internal affairs of the CNMI if the United States has an identifiable federal interest that will be served by the legislation and that outweighs the degree of intrusion into the internal affairs of the CNMI.

In deciding the validity of the subpoena at issue in this case, the court concluded first that there was a federal interest in monitoring the CNMI's collection of taxes, in part because the efficacy of the CNMI's revenue collection would have an effect on the amount of federal assistance needed for the CNMI. The court went on to say that, because "a substantial portion of the CNMI budget is comprised of direct and indirect federal financial assistance," the audit requirement did not impermissibly intrude on the internal affairs of the CNMI.[26]

In the most recent case to discuss the Territorial Clause with regard to Puerto Rico,[27] the Court of Appeals for the Eleventh Circuit held that the Congress' decision to permit self-governance in Puerto Rico did not remove Puerto Rico from application of the Territorial Clause. The court concluded that there has been no fundamental alteration in Puerto Rico's relationship to the United States: "Puerto Rico is still constitutionally a territory, and not a separate sovereign."[28]

## Congressional Representation

The Constitution establishes the House of Representatives and the Senate, comprising representatives elected by the citizens in each state.[29] Although the insular areas cannot elect representatives or senators, the Congress

[26] Id. at 755.

[27] United States v. Sanchez, 992 F.2d 1143 (11th Cir. 1993). The case concerned the application of the Double Jeopardy Clause of the Constitution to Puerto Rico.

[28] Id. at 1151-52. Finding that Puerto Rico still derives its powers from the U.S. Congress, the court said: "Congress may unilaterally repeal the Puerto Rican Constitution or the Puerto Rican Federal Relations Act and replace them with any rules or regulations of its choice. Despite passage of the Federal Relations Act and the Puerto Rican Constitution, Puerto Rican courts continue to derive their authority to punish from the United States Congress. . . ." Id. at 1153.

[29] U.S. Const. art. I, §§ 2-3.

has created a form of representation for them. Statutes permit four of the larger insular areas to elect officials who have a role in the House of Representatives, and the fifth to elect a representative to the United States. Puerto Rico elects a resident commissioner to the United States Congress for a 4-year term. Guam, the Virgin Islands, and American Samoa elect delegates to the Congress for 2-year terms. The Covenant and the CNMI constitution provide for the CNMI to have an elected resident representative to the United States who, under the CNMI constitution, currently serves for a 4-year term. Were the Congress to authorize the CNMI representative to serve in the Congress, the CNMI constitution provides that the representative's term will conform to the term of office required by the authorizing statute.

From 1900 through 1970, under rules of the House of Representatives, territorial delegates were permitted to participate in floor debate and to be members of committees but were not allowed to vote either in committee or on the floor. In 1971, House Rule XII was changed to allow the resident commissioner from Puerto Rico the right to vote in standing committees and otherwise to possess in those committees the same powers and privileges as members of the Congress.[30]

In 1975, Rule X of the House Rules was amended to authorize the speaker to appoint the resident commissioner and delegates to serve on conference committees considering legislation reported from a committee on which they served. In 1993, the rule was further amended to permit the speaker to appoint the resident commissioner and delegates to serve on any conference committee.[31] This rule remains in effect.

In 1993, the House again amended House Rules to give the resident commissioner and delegates, representing the insular areas (and the District of Columbia), the additional authority to vote in the Committee of the Whole as long as such votes were not decisive on a question.[32]

[30]H. Res. 5, 92d Cong. (1971). The rule gave the same status to the delegate from the District of Columbia. These privileges were extended to the delegates from Guam, the Virgin Islands, and American Samoa, when they were authorized representation in the Congress. Pub. L. No. 92-271, § 5, 86 Stat. 118, 119 (1972); Pub. L. No. 95-556, § 5, 92 Stat. 2078 (1978).

[31]H. Res. 5, 103d Cong. § 7(b) (1993).

[32]H.R. Res. 5, 103d Cong. § 9 (1993). "Committee of the Whole" is a procedure used by the House of Representatives during floor debate. When this procedure is invoked, the House uses committee markup procedures, rather than the more formal procedures applicable to floor proceedings. Once the Committee of the Whole reports a bill to the House of Representatives, the House votes on the bill in the usual fashion.

However, this authority lasted only until the next Congress.[33] In January 1995, the House eliminated the authority for the resident commissioner and delegates to vote in the Committee of the Whole. They continue to be authorized to serve in the same manner as other members on standing committees. Starting in January 1995, the resident commissioner and delegates are counted for purposes of calculating the ratio of Republican to Democrat members within a committee.

None of the smaller insular areas has a native population or local government. None is represented in any way in the Congress.

## Commerce Clause

Interstate commerce and foreign trade are regulated by the Congress through the Commerce Clause. [34] The Clause is an affirmative grant of power to the Congress "to regulate Commerce with foreign Nations, and among the several States . . . ," but also has a "dormant" or "negative" aspect. [35] This dormant side "limits the power of the States to erect barriers against interstate trade."[36] Two cases have recently considered whether the dormant aspect of the Commerce Clause applies to the Virgin Islands and Puerto Rico, respectively.[37]

[33]Several members of the Congress challenged the constitutionality of permitting the resident commissioner and delegates to vote in the Committee of the Whole. They argued that the provision diluted their votes and violated Article I of the Constitution, providing that the House "shall be composed of Members chosen every Second Year by the People of the Several States." The Court of Appeals for the First Circuit found that the additional authority provided by the rule change was largely symbolic because the House had, at the same time, also amended Rule XXIII, c. 2(d), to require the House to revote without including the insular representatives on any vote in the Committee of the Whole in which the votes of the resident commissioner or the delegates were decisive. The court held that the rule was constitutional, and that the power it conferred was not significantly greater than that already enjoyed by the resident commissioner and delegates in serving and voting on the standing committees. Michel v. Anderson, 14 F.3d 623 (D.C. Cir. 1994).

[34]U.S. Const. art. I, § 8, cl. 3.

[35]See Cooley v. Board of Wardens, 53 U.S. (12 How.) 299, 318 (1851).

[36]Lewis v. BT Inv. Managers, Inc., 447 U.S. 27, 35 (1980).

[37]As we said in our earlier report, the Court of Appeals for the Ninth Circuit held in 1985 that the Commerce Clause does not apply to Guam because Guam is not a state. Sakamoto v. Duty Free Shoppers, Ltd., 764 F.2d 1285 (9th Cir. 1985). But see Duty Free Shoppers, Ltd. v. Tax Commissioner, 464 F. Supp. 730 (D. Guam 1979), which found that the Commerce Clause did apply to Guam, apparently through the Territorial Clause. There have been no cases on the applicability of the Commerce Clause to American Samoa or the CNMI.

In 1993, the Court of Appeals for the Third Circuit, following the reasoning of its earlier decision,[38] held that the Commerce Clause, through the Territorial Clause, limits the authority of the Virgin Islands to regulate commerce. Under federal law, domestic corporations can set up "foreign sales corporations" (FSCs) in U.S. possessions. The income of an FSC that meets the requirements of the Internal Revenue Code is exempt from federal tax. FSCs incorporated in the Virgin Islands challenged local statutes imposing taxes and fees on their operations.

The FSCs argued that the Virgin Islands tax constituted a barrier to interstate trade and therefore offended against the dormant aspect of the Commerce Clause. The court agreed, relying on its earlier decision that "Congress has comprehensive powers to regulate territories under the Territorial Clause . . . and that Congress' Commerce Clause powers 'are implicit' in that clause."[39] The court reasoned that, if the Virgin Islands were not subject to the dormant aspect of the Commerce Clause and could therefore pass laws that would interfere with interstate trade, then "an unincorporated territory would have more power over commerce than the states possess."[40] Because it found that Commerce Clause principles are implicit in the Territorial Clause, the court found it unnecessary to decide whether the Commerce Clause applies directly to the Virgin Islands.

In a 1992 case, the Court of Appeals for the First Circuit went a step further with respect to Puerto Rico, concluding that, apart from the Territorial Clause, "Puerto Rico is subject to the dormant Commerce Clause doctrine in the same fashion as the states."[41] The plaintiff, Trailer Marine, transported goods to Puerto Rico on trailers that could be rolled off a ship and then attached to local tractors for delivery. It contended that the imposition by Puerto Rico of a motor vehicle fee on its trailers unduly burdened or discriminated against interstate commerce.[42] A 1980 district

[38] JDS Realty Corp. v. Government of the Virgin Islands, 824 F.2d 256, 260 (3d Cir. 1987), vacated and remanded to consider mootness, 484 U.S. 999 (1988), vacated, 852 F.2d 66 (3d Cir. 1988) (noted in GAO/HRD-91-18, June 20, 1991, page 21). In JDS Realty, the Court of Appeals had held that Commerce Clause powers are implicit in the Territorial Clause, but that decision was vacated for other reasons.

[39] JDS Realty, 824 F.2d at 260.

[40] Polychrome, 5 F.3d at 1534-35, quoting JDS Realty, 824 F.2d at 259.

[41] Trailer Marine Transp. Corp. v. Rivera-Vazquez, 977 F.2d 1, 7 (1st Cir. 1992); United Egg Producers v. Dep't of Agric., 77 F.3d 567, 569 (1st Cir. 1996); Starlight Sugar, Inc. v. Soto, 114 F.3d 330, 331 (1st Cir. 1997).

[42] To protect individuals injured in motor vehicle accidents, Puerto Rico had instituted a no-fault compensation plan funded by vehicle fees. Puerto Rican legislation aimed directly at transitory trailers required either an annual fee or a fee for each visit of such a vehicle if remaining in Puerto Rico less than 30 days.

court decision had applied the Commerce Clause to Puerto Rico through the Territorial Clause "as an implied corollary of congressional powers thereunder."[43] After examining Puerto Rico's constitutional history, "a skein of statutes and precedents as tangled as any in our history,"[44] the court of appeals concluded that, "[w]hatever the ultimate source of its authority or its exact constitutional status, Puerto Rico today certainly has sufficient actual autonomy to justify treating it as a public entity distinct from Congress and subject to the dormant Commerce Clause doctrine."[45] The court held that the fee imposed by Puerto Rico unduly burdened interstate commerce.

## Elections

American citizens who reside in the insular areas may not vote for President. The Constitution provides for the election of the President by electors appointed by the states.[46] Guam attempted unsuccessfully in 1984 to have this provision interpreted to permit its citizens to vote in U.S. presidential elections.[47]

Residents of Puerto Rico recently litigated the issue, with the same outcome. In 1994, American citizens in Puerto Rico filed suit contending that "Puerto Rico['s] present political status has evolved in such a way from a Territory in 1898 to that of a 'de facto' state" that it should be considered a state entitled to electoral votes.[48] The federal district court, noting the constitutional requirement for state appointment of electors who then vote for the President, held that only states (and, through the Twenty-Third Amendment, the District of Columbia)[49] may cast electoral votes in presidential elections.[50] The plaintiffs' argument that Puerto Rico

[43]Sea-Land Serv. Inc. v. Municipality of San Juan, 505 F. Supp. 533, 545 (D.P.R. 1980).

[44]Trailer Marine, 977 F.2d at 6.

[45]Id. at 8.

[46]U.S. Const. art. II, § 1, cl. 3

[47]The Attorney General of Guam argued that American citizens residing in Guam had a right to participate in presidential elections. The Court of Appeals for the Ninth Circuit disagreed, stating that the Constitution "does not grant to American citizens the right to elect the President. . . . Since Guam is not a state, it can have no electors, and plaintiffs cannot exercise individual votes in a presidential election. There is no constitutional violation." Attorney Gen. of Guam v. United States, 738 F.2d 1017, 1019 (9th Cir. 1984), cert. denied, 469 U.S. 1209 (1985).

[48]de la Rosa v. United States, 842 F. Supp. 607, 608-09 (D.P.R. 1994), aff'd sub. nom. Igartua De La Rosa v. United States, 32 F.3d 8 (1st Cir. 1994), cert. denied, 514 U.S. 1049 (1995).

[49]Amendment XXIII of the Constitution provides that the District of Columbia shall appoint electors who "shall be considered, for the purposes of the election of President and Vice President, to be electors appointed by a State . . . ."

[50]de la Rosa, 842 F. Supp. at 608-09.

has evolved into a "de facto" state was, the court said, a "political question" not suitable for judicial resolution.[51]

Although residents of the insular areas cannot vote in presidential elections, four of the five larger insular areas participate in the nominations process, which is governed by party rules and local law rather than by the Constitution. Puerto Rico holds primary elections to nominate presidential candidates, and sends delegates to the Republican and Democratic national conventions. Guam sends delegates to the conventions and also places the names of the presidential and vice presidential candidates on the general ballot in November to find out who would have been popularly elected in Guam.[52] American Samoa and the Virgin Islands send delegates to the national conventions. The political parties in the CNMI are not affiliated with the U.S. Republican or Democratic parties and do not participate in the presidential nomination process.

With respect to local elections, an appeal pending in Puerto Rico's supreme court asks that court to decide whether Puerto Rico's electoral law can restrict voting in local elections to U.S. citizens. The lawsuit had been filed in an attempt to prevent voting in Puerto Rican elections by an individual who formally renounced his U.S. citizenship and declared himself a citizen of Puerto Rico. A lower court, finding that the individual is a citizen of Puerto Rico, ruled that restricting local voting to U.S. citizens is contrary to Puerto Rico's constitution.[53]

The claim of Puerto Rican citizenship apparently is based, in part, on the Foraker Act, which provides that the inhabitants of Puerto Rico are "citizens of Puerto Rico and entitled to the protection of the United States."[54] The State Department takes the position that the citizenship of

[51] Id.

[52] Guam Code, Title III, ch. 7, § 7107. The provision placing the names of the nominees for president and vice president on the ballot became effective with the 1980 presidential elections.

[53] Court Ruling Paves Way For Mari Bras to Vote, The San Juan Star, October 22, 1996, at 3.

[54] Act of April 12, 1900, § 7, ch. 191, 31 Stat. 77, 79 (1900). This provision applies to all inhabitants of Puerto Rico who were Spanish subjects on April 11, 1899, with the exception of those individuals born in Spain who elected to retain Spanish allegiance.

Puerto Rico provision of the Foraker Act has no legal effect today, having been superseded by later law.[55]

## Fourth and Fifth Amendments

The Fourth Amendment protects against unreasonable searches and seizures. No search or arrest warrant may be issued except with probable cause and the warrant must specifically describe the place to be searched and persons or things to be seized.[56]

The rights provided by the Fourth Amendment are generally considered to be "fundamental,"[57] which means that they apply of their own force to all individuals subject to the sovereignty of the United States. No statute is necessary to extend them to U.S. territories and possessions. However, in addition, legislation or local constitutional provisions of each of the larger insular areas either explicitly apply the Fourth Amendment, or offer equivalent protections under local law, to insular area residents. The CNMI Covenant specifically states that the Fourth Amendment is applicable to the Northern Marianas.[58] The Fourth Amendment has been held to apply to Puerto Rico; Puerto Rico's Constitution also provides these same protections.[59] The Fourth Amendment is extended to the Virgin Islands

[55]There has been a succession of laws. Under section 5 of Puerto Rico's organic act, known as the Jones Act, 39 Stat. 951, 953 (1917), all citizens of Puerto Rico, as defined under the Foraker Act, and all native Puerto Ricans temporarily absent on April 11, 1899, are deemed to be U.S. citizens, but any individual could elect to retain the political status prior to the act by filing, within 6 months, a declaration in district court. In 1934, all persons born in Puerto Rico, on or after April 11, 1899, "and not citizens, subjects, or nationals of any foreign power," were deemed U.S. citizens. Act of June 27, 1934, 48 Stat. 1245. The Nationality Act of 1940, 54 Stat. 1139, extends U.S. citizenship to all persons not already U.S. citizens under another law, who are subject to U.S. jurisdiction, born in Puerto Rico on or after April 11, 1899, and residing in territory of the United States on January 13, 1941. Section 302 of the Immigration and Nationality Act of 1952, classified to 8 U.S.C. § 1402, generally restates the 1940 act and adds that persons born in Puerto Rico on or after January 13, 1941, are U.S. citizens by birth.

[56]U.S. Const. amend. IV.

[57]Precisely which constitutional rights are fundamental has been left to a case-by-case determination. The Supreme Court described fundamental rights as "inherent, although unexpressed principles which are the basis of all free government . . . ." Dorr v. United States, 195 U.S. 138, 147 (1904). These fundamental rights appear to correspond roughly to the "natural rights" earlier described by Justice White, in a concurring opinion in Downes v. Bidwell, 182 U.S. 244, 282-83 (1901). Justice White included among "natural rights" the right to one's own religious opinion as well as "the right to personal liberty and individual property; to freedom of speech and of the press; to free access to courts of justice; to due process of law and to an equal protection of the laws; to immunities from unreasonable searches and seizures, as well as cruel and unusual punishments . . . ." Id. at 282.

[58]Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, § 501(a), 48 U.S.C. § 1801 note.

[59]Torres v. Puerto Rico, 442 U.S. 465, 471 (1979); Buenrostro v. Collazo, 973 F.2d 39 (1st Cir. 1992); Constitution of the Commonwealth of Puerto Rico, art. II, § 10.

and Guam through their Organic Acts.[60] Protections against unreasonable search and seizure apply to American Samoa through its Revised Constitution.[61]

The Fifth Amendment includes the right to indictment by a grand jury; protection against double jeopardy; the right against self-incrimination; the right not to be deprived of life, liberty, or property without due process of law; and the right to just compensation for public takings of private property.[62] The Organic Act of the Virgin Islands explicitly extends the Fifth Amendment to the Virgin Islands, but provides that the right to a grand jury does not extend to cases prosecuted under Virgin Islands' law unless required by that law.[63] Although an amendment to Guam's Organic Act specifically extends Fifth Amendment rights to Guam,[64] the Court of Appeals for the Ninth Circuit found that this did not deprive the legislature of Guam of the power to determine whether offenses should be prosecuted by grand jury indictment or by the less formal process known as an information.[65] The CNMI Covenant, as approved by the Congress, provides that the Fifth Amendment is applicable to the CNMI, implicitly including indictment by grand jury, but states that grand jury indictments are not required for cases based on local law except where required by local law.[66] American Samoa has no specific provision in its Revised Constitution or local law regarding a right to indictment by grand jury, and federal law has not extended this right.[67] Puerto Rican law does not provide a right to grand jury indictment.[68]

[60]48 U.S.C. §§ 1421b(c),(u) and 1561. See also United States v. Douglas, 854 F.Supp. 383, 385 n.1 (D.V.I. 1994) ("The Fourth Amendment is fully applicable to the Virgin Islands.")

[61]Revised Constitution of American Samoa, art. I, § 5.

[62]U.S. Const. amend. V.

[63]48 U.S.C. § 1561. Indictment by grand jury or information does apply to crimes prosecuted under federal law.

[64]48 U.S.C. § 1421(u).

[65]48 U.S.C. § 1421b(e), (f), (u); Guam v. Inglett, 417 F.2d 123, 124 (9th Cir. 1969).

[66]Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, § 501(a), 48 U.S.C. § 1801 note.

[67]Revised Constitution of American Samoa, art. I, § 6 (Fifth Amendment rights); Am. Samoa Code Ann. § 46.0502 (1988) (rights of defendants).

[68]Torres v. Puerto Rico, 442 U.S. 465, 469 (1979); see also Balzac v. Porto Rico, 258 U.S. 298, 306 (1922). Puerto Rico does empanel grand juries for federal crimes.

The Fifth Amendment protection against double jeopardy[69] has been discussed in recent cases pertaining to Puerto Rico and the Virgin Islands. In United States v. Sanchez,[70] the Court of Appeals for the Eleventh Circuit found that the Double Jeopardy Clause would prevent separate prosecutions under Puerto Rican law and federal law for the same offense. The defendants in Sanchez, after having been acquitted in a Puerto Rican court of multiple criminal charges, were convicted in federal court in Florida on charges arising out of the same circumstances. On appeal, they claimed that the Florida prosecution violated the Double Jeopardy Clause. The United States contended that the first prosecution was undertaken not by the government of the United States, but under the authority of a separate sovereign, the Commonwealth of Puerto Rico, and therefore that the Double Jeopardy Clause did not apply.

The Court of Appeals said that the "crucial question" in determining whether two entities are separate sovereigns is whether the two derive their authority to punish from distinct sources of power.[71] It concluded that the Congress' decision to permit self-governance in Puerto Rico did not make Puerto Rico a separate sovereign: "Puerto Rico is still constitutionally a territory, and not a separate sovereign. As a territory, Puerto Rico remains outside an exception to the Double Jeopardy Clause which is based upon dual sovereignty."[72] The court concluded that, since Puerto Rico continues to derive its judicial authority from the federal government, the Double Jeopardy Clause precludes prosecutions for the same offense in both a state and Puerto Rico.[73] However, the Court of Appeals for the First Circuit which, as the appellate court for the federal

[69]The Double Jeopardy Clause states: "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb . . . ." U.S. Const. amend. V.

[70]992 F.2d 1143 (11th Cir. 1993), modified, 3 F.3d 366 (11th Cir. 1993), cert. denied, 514 U.S. 1038 (1994).

[71]Sanchez, 992 F.2d at 1149 . The court cited the Supreme Court's discussion of the dual sovereignty doctrine: "The dual sovereignty doctrine is founded on the common law conception of crime as an offense against the sovereignty of the government. When a defendant in a single act violates the 'peace and dignity' of two sovereigns by breaking the laws of each he has committed two distinct 'offenses'. Heath v. Alabama, 474 U.S. 82, 88 (1985). There, the Supreme Court upheld separate prosecutions by Alabama and Georgia of a man whose single crime was the hiring of two men to kill his pregnant wife.

[72]Sanchez, 992 F.2d at 1151. The court reasoned: "The development of the Commonwealth of Puerto Rico has not given its judicial tribunals a source of punitive authority which is independent of the United States Congress and derived from an 'inherent sovereignty.' . . . Despite passage of the Federal Relations Act and the Puerto Rican Constitution, Puerto Rican courts continue to derive their authority to punish from the United States Congress and prosecutions do not fall within the dual sovereignty exception to the Double Jeopardy Clause." Id. at 1152-53.

[73]Sanchez, 992 F.2d at 1150. However, the court found that none of the charges in the Florida prosecution were for the same crimes that had been prosecuted in Puerto Rico, and upheld the convictions.

district court in Puerto Rico, hears most federal cases involving Puerto Rico considers Puerto Rico to have a degree of autonomy sufficient to make it a separate sovereign for the purpose of permitting successive criminal prosecutions by the United States and Puerto Rico.[74]

A 1995 district court decision pertaining to the Virgin Islands reached a similar result concerning double jeopardy and dual sovereignty.[75] The court concluded that the Double Jeopardy Clause of the Fifth Amendment, because it is a fundamental right that automatically extends to the residents of any U.S. territory, applies to the Virgin Islands. With respect to dual sovereignty, the court noted that, "as an unincorporated territory of the United States, the Virgin Islands has no inherent or independent sovereign power."[76] Accordingly, a defendant could not be tried for the same offense in federal court and in a Virgin Islands court.

## Due Process and Equal Protection Clauses

Among the rights guaranteed by the Constitution are due process and equal protection. Both rights apply to the five larger insular areas. The Due Process Clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law."[77] The Equal Protection Clause requires that people under like circumstances be given the same protection of the law in the enjoyment of personal rights, liberties, and property.[78]

The Congress, through legislation, has explicitly extended due process and equal protection rights to the Virgin Islands.[79] In 1976, the Supreme Court held that residents of Puerto Rico are accorded the protections of the Due Process Clause of the Fifth Amendment[80] or, alternatively, the Due Process and Equal Protection Clauses of the Fourteenth Amendment,

[74]See United States v. Lopez Andino, 831 F.2d 1164 (1st Cir. 1987), cert. denied, 486 U.S. 1034 (1988); United States v. Bonilla Romero, 836 F.2d 39 (1st Cir. 1987), cert. denied, 488 U.S. 817 (1988); United States v. Perez-Perez, 72 F.3d 224 (1st Cir. 1995).

[75]Government of Virgin Islands v. Schneider, 893 F. Supp. 490 (D.V.I. 1995).

[76]Id. at 494. The court noted further that "the 'single sovereign' in the Virgin Islands is allowed only one bite of the apple—whether acting as the United States or the Government of the Virgin Islands . . . ." Id. at 495.

[77]U.S. Const. amend. XIV, § 1, sent. 2, cl. 2.

[78]U.S. Const. amend. XIV, § 1, sent. 2, cl. 3.

[79]48 U.S.C. § 1561.

[80]U.S. Const. amend. V, cl. 3.

although the court declined to decide which.[81] American Samoa's constitution provides for due process protection.[82] In addition, the High Court of American Samoa has stated that "the constitutional guarantees of due process and equal protection are fundamental rights which do apply in the Territory of American Samoa."[83]

The due process protections of the Fifth Amendment as well as the Due Process and Equal Protection Clauses of the Fourteenth Amendment were extended to the CNMI through the Covenant, as approved by the Congress.[84] In a case pertaining to the CNMI, the Court of Appeals for the Ninth Circuit upheld a restriction on transfers of land that had been challenged on equal protection grounds. The CNMI Constitution makes unlawful certain long-term transfers of CNMI real estate to people not of Northern Mariana Islands descent.[85] The court reasoned the right to hold long-term interests in CNMI real estate is not a fundamental constitutional right and, therefore, did not apply of its own force to the CNMI.[86] Thus, although fundamental equal protection rights apply in the CNMI, those rights must "narrow to incorporate the shared beliefs of diverse cultures."[87] The court found that the Congress had the power under the Territorial Clause to limit

[81]Examining Bd. v. Flores de Otero, 426 U.S. 572, 600 (1976). The Supreme Court struck down as violative of equal protection or due process guarantees a Puerto Rican law which restricted the licensing of civil engineers to those who were U.S. citizens. Id. at 606. The Court has never found it necessary to determine whether the Fifth Amendment applies to Puerto Rico directly or by operation of the Fourteenth Amendment. See also Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 668 n. 5 (1974).

[82]Revised Constitution of American Samoa, art. I, § 2.

[83]Craddick v. Territorial Registrar, App. No. 10-79, 3-5 (H.Ct. App. Div. Apr. 23, 1980). The court found that due process and equal protection apply to American Samoa through the Fifth Amendment. The court held constitutional a provision of the American Samoa Code that prohibits the sale of land to non-Samoans, finding that, although the provision discriminates on the basis of race, the government of American Samoa had demonstrated a compelling interest in preserving the lands of American Samoa for Samoans and in preserving Samoan culture, and that the use of a racial classification was necessary to safeguard those interests. Cf., American Samoa Gov't v. Falefatu, No. CR63-89, note 9 (H.Ct. Tr. Div. Dec. 5, 1990), quoting Macomber v. American Samoa Gov't, 12 A.S.R.2d 29, 30 (1989) ("The extent to which the equal protection clause of the Fourteenth Amendment applies in the territory is unclear."); American Samoa Gov't v. Whitney, No. CR26-91 (H.Ct. Tr. Div. Nov. 1, 1991).

[84]Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, § 501(a), 48 U.S.C. § 1801 note.

[85]Id. § 805.

[86]Wabol v. Villacrusis, 958 F.2d 1450, 1462 (9th Cir. 1990), cert. denied, 506 U.S. 1027 (1992): "The Bill of Rights was not intended . . . to operate as a genocide pact for diverse native cultures. . . . Its bold purpose was to protect minority rights, not to enforce homogeneity. Where land is so scarce, so precious, and so vulnerable to economic predation, it is understandable that the islanders' vision does not precisely coincide with mainland attitudes toward property and our commitment to equal opportunity in its acquisition." Id. at 1462.

[87]Id. at 1460.

nonfundamental rights to accommodate the social and cultural values of the CNMI.[88]

In another case, the court, finding an absence of express authorization from the Congress in the Covenant or federal statutes, held that there is no right to bring an action for money damages against the CNMI based solely on the Fourteenth Amendment. The court also rejected the argument that direct suit under the Fourteenth Amendment should be permitted because the CNMI, unlike the states, is not entitled to immunity under the Eleventh Amendment, which bars suits in federal court for money damages against a state.[89]

Both due process and equal protection apply to Guam through a 1968 amendment by the Congress to Guam's Organic Act.[90] In 1992, a federal appeals court rejected the contention of the government of Guam that the 1968 amendment did not extend substantive due process guarantees to Guam. The local government had argued that there was no clear congressional intent in the amendment to extend due process. The court strongly disagreed.[91]

## Taxation in the Insular Areas

The Congress has authority to impose income taxes on the worldwide income of U.S. citizens and corporations, including income from the insular areas. However, federal individual and corporate income taxes as such are not currently imposed in the insular areas.[92]

[88]Id.

[89]The suit was brought by a Filipino nurse alleging discrimination on the basis of race or national origin at the CNMI government-operated health center where she was employed. Magana v. CNMI, 107 F.3d 1436, 1440 (9th Cir. 1997).

[90]48 U.S.C. § 1421b(u).

[91]Guam Society of Obstetricians & Gynecologists v. Ada, 962 F.2d 1366, 1370 (9th Cir.), cert. denied, 506 U.S. 1011 (1992): "It may be true, as Guam argues, that the Supreme Court requires a clear indication of congressional intent before interpreting a congressional action as extending a right to the people of Guam. . . . We can scarcely imagine, however, any clearer indication of intent than the language of the [1968 amendment]." The court affirmed a decision invalidating Guam's anti-abortion statute, as violative of substantive due process rights under the Supreme Court's decision in Roe v. Wade, 410 U.S. 113 (1973).

[92]The Congress is vested with power "to lay and collect Taxes" under Article I, sec. 8, of the Constitution. Individuals in the insular areas may be subject to Federal income tax laws if they have U.S. or foreign source income. The Congress authorized Puerto Rico in 1919 to create its own income tax system, which it has done. Of the other insular areas, only American Samoa has enacted its own income tax laws. See GAO/HRD-89-104FS, August 9, 1989, and GAO/HRD-91-18, June 20, 1991, for more detail on taxation in the insular areas.

A key feature of federal income tax structure affecting U.S. corporations doing business in the insular areas has been the Puerto Rico and Possession Tax Credit (section 936 of the Internal Revenue Code.)[93] Enacted in 1976,[94] section 936 was for the purpose of assisting "the U.S. possessions in obtaining employment-producing investments by U.S. corporations."[95] The section 936 tax credit, as originally enacted, was equal to the full amount of the U.S. income tax liability on territory-source business income earned by qualified firms.[96] In addition, the provision exempted from federal taxation the income from qualified investments of profits earned in the insular areas by section 936 firms. This tax credit was limited by legislation approved in 1993 by the 103d Congress[97] and was repealed in the 104th Congress by the Small Business Job Protection Act of 1996,[98] subject to a 10-year transition period beginning in 1996.[99]

[93]26 U.S.C. § 936.

[94]Tax Reform Act of 1976, Pub. L. No. 94-455.

[95]S. Rep. No. 94-938, Part I, at 279 (1976).

[96]Firms qualified for the credit if, over a 3-year period, 80 percent or more of their gross income was derived from sources within a territory and 75 percent or more was derived from the active conduct of a trade or business within a territory.

[97]The administration in 1993, as part of its comprehensive economic plan, proposed to reduce the amount of the credit. The Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, § 13227(a), provided that, after 1993, firms were to calculate the credit as under prior law, but the credit would be capped.

[98]Pub. L. No. 104-188, § 1601.

[99]Credits under section 936 attributable to qualified possessions-source investment income are eliminated for income earned after June 30, 1996.

# Relationship With the United States of Nine Small Insular Areas

The United States claims sovereignty over nine small insular areas,[1] with land masses ranging in size from less than one acre to somewhat more than two square miles. The nine are Palmyra Atoll, Navassa Island, Johnston Atoll, Baker Island, Howland Island, Jarvis Island, Kingman Reef, Midway Atoll, and Wake Atoll.[2] All but Navassa Island, in the Caribbean Sea, are in the Pacific Ocean. Many are natural atolls, which are coral reefs with exposed islands that enclose a central lagoon. (We often refer to these insular areas collectively or individually as islands.)

Except for Midway and Wake Atolls, all the islands were claimed for the United States under the Guano Islands Act of 1856.[3] Guano is seabird droppings; rich in phosphates and minerals, it is used in fertilizer. The act provides for the discoverer of a guano island, if the island is uninhabited and not within the jurisdiction of any other government, to receive the exclusive right to mine the guano for use by U.S. citizens. Rights under the act extend not just to the discoverer of a guano island but to his or her surviving spouse or heirs, or to anyone to whom he or she has assigned rights to the discovery.[4]

[1]U.S. sovereignty over two other insular areas, Serranilla Bank and Bajo Nuevo (Petrel Island) is disputed. Serranilla Bank and Bajo Nuevo are in the Caribbean Sea, located approximately 180 miles southwest from the southern coast of Jamaica. Serranilla Bank is a roughly circular coral bank; on its southeast side are three small coral-and-sand keys, or low islands, the largest of which is a half mile in length. Bajo Nuevo, an oval-shaped coral bank situated northeast from Serranilla Bank, has two reefs; at both ends of each reef are small keys, the largest of which is about 300 by 50 yards in size. The United States has long maintained claims to both Serranilla Bank and Bajo Nuevo under the Guano Islands Act. Both areas are claimed by Columbia and Jamaica. Serranilla Bank is also claimed by Honduras. Nicaragua has not claimed these areas by name, but has stated that it claims all islands and cays located on its continental shelf; however, there is no agreed maritime boundary between Nicaragua and Columbia, or between Nicaragua and Honduras, in the Western Caribbean. Currently, the United States conducts maritime law enforcement operations in and around Serranilla Bank and Bajo Nuevo consistent with U.S. sovereignty claims.

[2]Some residents of the Stewart Islands in the Solomon Islands group, which is located northeast of Australia and east of Papua New Guinea, claim that they are native Hawaiians and U.S. citizens. (See figure 1.) They base their claim on the assertion that the Stewart Islands were ceded to King Kamehameha IV and accepted by him as part of the Kingdom of Hawaii in 1856 and, thus, were part of the Republic of Hawaii (which was declared in 1893) when it was annexed to the United States by law in 1898. The 1898 law identifies the islands being annexed only as the "Hawaiian Islands and their dependencies." However, the annexation was based on the report of the Hawaiian Commission which did not include the Stewart Islands among the islands it identified as part of the Republic of Hawaii. Report of the Hawaiian Commission, S. Doc. No. 16, 55th Cong., at 4 (3d Sess. 1898). In 1996, some Stewart Islands residents applied to register to vote in a plebescite limited to Native Hawaiians. Their requests for ballots, however, were rejected by the Hawaiian Sovereignty Election Council.

[3]The Guano Islands Act appears at 48 U.S.C. §§ 1411-19. Although claims were made to Palmyra Atoll and Kingman Reef under the act, the presence of guano in either area is doubtful. Legal Adviser's Office, U.S. Department of State, The Sovereignty of Islands Claimed Under the Guano Act and of the Northwest and Hawaiian Islands, Midway, and Wake at 612-15, 624-25 (1933) [hereinafter Sovereignty].

[4]48 U.S.C. §§ 1411-13. See generally Johnson's [sic] Islands, 9 Op. Att'y Gen. 364, 367 (1859) (discussing the conditions that must be satisfied under the act to establish a claim to a guano island); Duncan v. Navassa Phosphate Company, 137 U.S. 647 (1891).

The Guano Islands Act authorizes the President to determine, on application, that a guano island is to be "considered as appertaining to the United States."[5] Once that determination is made, the President may use U.S. military forces to protect the rights of the discoverer, or of those who derive their rights from the discoverer. However, the law does not obligate the United States to retain possession of a guano island after the guano has been removed.[6]

The application of the Constitution to islands claimed under the Guano Islands Act is to be determined under the general law governing U.S. territories and possessions. The Guano Islands Act does not discuss the application of the Constitution to the islands claimed under its authority; its only reference to the application of federal law is to provide that criminal acts on the islands are to be treated as if they were committed on U.S. vessels on the high seas.[7]

All nine small insular areas are "unorganized." That is, no legislation exists providing for organization of a local government. Indeed, these insular areas have no native population to form a government, they lack any source of fresh running water, and are otherwise inhospitable to self-sustaining habitation.

[5] 48 U.S.C. § 1411.

[6] 48 U.S.C. § 1419.

[7] 48 U.S.C. § 1417.

Figure II.1: Palmyra Atoll




## Palmyra Atoll

Palmyra is an atoll in the Pacific, approximately 1,000 miles south of the main Hawaiian group of islands. It consists of about 50 islets in an atoll grouping covering an area, including water, approximately 6 miles wide and 1 mile long. Figure II.1 shows the geography of Palmyra. The atoll is privately owned and generally is uninhabited except for a caretaker.[8]

Discovered in 1802 by the captain of the American ship *Palmyra*, the atoll was not claimed until 60 years later, by Captain Bent, for the Kingdom of Hawaii.[9] Captain Bent conveyed whatever interest he had in Palmyra by

[8]The Department of Interior has responsibility for Palmyra under executive order. Exec. Order No. 10,967, 26 Fed. Reg. 9667 (1961).

[9]Palmyra previously had been claimed in 1860 under the Guano Islands Act. The claim, however, does not appear to have been accepted as valid. It is unlikely that the claimant landed on the island or that there was ever any guano on it. Sovereignty, supra note 3, at 612-15, 875.



FWS 00972

deed in 1862. Palmyra was later purchased by the Fullard-Leo family of Hawaii.[10]

The Navy sought, beginning in 1938, to lease Palmyra from the Fullard-Leos, but negotiations were never completed.[11] In 1939, the Congress authorized the construction of naval aviation facilities on Palmyra to serve military purposes in the Pacific,[12] and the United States filed suit to establish its title to Palmyra. It argued that the atoll, having been annexed by it in 1898, belonged to the United States and not to the Fullard-Leos. After a protracted legal battle, the Supreme Court ruled in favor of the Fullard-Leo family in 1947.[13]

[10]The deed of conveyance of Captain Bent was recorded in 1885. Rights to Palmyra were sold to the Pacific Navigation Company (which paid taxes to the Kingdom of Hawaii for Palmyra from 1885 to 1888). The company's rights were conveyed by 1911 to Judge Henry Cooper. Judge Cooper petitioned the Land Court of the Territory of Hawaii to confirm his title. The Attorney General of the Territory disclaimed any territorial interest in the land and, in 1912, the Land Court decreed that Judge Cooper was the owner of Palmyra. Judge Cooper sold parts of the atoll to Leslie and Ellen Fullard-Leo, parents of the current owners, in 1922, for $15,000. Over the next few years, the Fullard-Leos acquired all of the atoll, except for two of the atoll's islets, which were retained by Judge Cooper's heirs.

[11]A letter from the Department of the Navy, dated April 1, 1953, indicates that the Navy suspended negotiations after a 1939 Attorney General opinion concluded that Palmyra was U.S. public land and that the Fullard-Leo claim was invalid. S. Rep. No. 83-886 at 37 (1954).

[12]The Act of April 25, 1939, ch. 87, 53 Stat. 590, authorized the Secretary of the Navy to establish, develop, or increase naval aviation facilities at various locations, including Midway, Wake, Johnston, and Palmyra Islands.

[13]United States v. Fullard-Leo, 331 U.S. 256 (1947). While the suit was pending during World War II, the Navy occupied Palmyra and built a runway and several buildings. In December 1940, President Roosevelt ordered Palmyra placed under the control and jurisdiction of the Navy and used for naval purposes. In 1941, the President included it in the naval defensive sea area established to protect Hawaii. Exec. Order No. 8682, 6 Fed. Reg. 1015 (1941); corr'd, Exec. Order No. 8729, 6 Fed. Reg. 1792 (1941).

Figure II.2: Hawaii




## Palmyra Not Included in State of Hawaii

The Republic of Hawaii was annexed by the United States in 1898 through a treaty ratified by the Hawaiian Senate and accepted by the U.S. Congress.[14] At that time, Palmyra had been identified as part of the Republic of Hawaii.[15] In April 1900, the Congress extended the Constitution to the Territory of Hawaii and declared its residents to be U.S. citizens.[16] On March 18, 1959, the Hawaiian Statehood Act was passed and, on August 21, 1959, Hawaii became the 50th state of the Union. The act said that the "State of Hawaii shall consist of all the islands . . . included in the Territory of Hawaii on the date of enactment of this Act,

[14]Act of July 7, 1898, ch. 55, 30 Stat. 750.

[15]U.S. Senate, Report of the Hawaiian Commission, S. Doc. No. 16, 55th Cong., at 4 (3d Sess. 1898).

[16]Act of April 30, 1900, ch. 339, §§ 4-5.

except the atoll known as Palmyra Island."[17] (The act also provided that the state of Hawaii "shall not be deemed to include the Midway Islands, Johnston Island, Sand Island (offshore from Johnston Island), or Kingman Reef . . . .[18])

We have found several explanations for the exclusion of Palmyra from the state of Hawaii. The Senate report on the Hawaii Statehood Act recommended that Palmyra not be made part of the state. That report suggests that distance was the primary factor; it acknowledged that Palmyra had historically been part of the Republic of Hawaii but noted that Palmyra is separated from the nearest island on the Hawaiian Archipelago "by more than 800 miles of open ocean."[19] A somewhat related reason emerges from the Senate hearings on Hawaiian statehood:

> Palmyra . . . is technically today a part of the city limits of the city of Honolulu. . . . [We] excluded [Palmyra from the state] in deference to my friend from California who felt that Los Angeles might be discriminated against. That would have been the longest city limits in the world of any incorporated city, extending 1,500 miles to Palmyra.[20]

Another account adds that in addition to its distance from Honolulu, Palmyra is uninhabited and separated from the Hawaiian chain by many miles of international waters.[21]

---

[17]Pub. Law No. 86-3, § 2, 73 Stat. 4 (1959). Pearl and Hermes Reef, an atoll in the northwestern part of the Hawaiian chain near Midway Atoll, was included in the state of Hawaii in 1959 as part of the Territory of Hawaii, although it was not listed among the islands comprising the Republic of Hawaii by the Hawaiian Commission in 1898, when Hawaii was annexed by the United States. This may have been an oversight. Pearl and Hermes Reef was included in a list of the Hawaiian Islands and dependencies prepared in 1893 by the Commissioner of the Hawaiian Provisional Government. Sovereignty, supra note 3, at 914. In 1909, the U.S. government designated the area as a wildlife refuge (Exec. Order No. 1019 (1909)).

[18]Id. The legislative history of Hawaii's statehood act indicates there was some doubt, particularly with respect to Johnston and Midway, as to which islands had been part of the Territory of Hawaii. A 1953 interagency conference to discuss this issue favored including all islands within a described perimeter; the Interior Department suggested excluding Johnston and Kingman Reef, but including Palmyra; the Navy, which had sole control of Midway, proposed specifically excluding that island from the new state. S. Rep. No. 83-886, at 38 (1954).

[19]S. Rep. No. 83-886, at 16 (1954). Ocean (Kure) Island, part of the Territory of Hawaii, was included in the state of Hawaii, although it is further from Honolulu than is Palmyra. Ocean Island, however, is within the Hawaiian island chain.

[20]Statehood for Hawaii, Hearings on S.50 Before the Subcomm. on Territories and Insular Affairs, 86th Cong. 59 (1959) (statement of Sen. Jackson).

[21]100 Cong. Rec. 3485-91 (1954) (statements of Sens. Jackson, Stennis, Anderson, and Daniel).

## Does the United States Constitution Apply in Full to Palmyra?

It is not at issue that the Constitution applied in its entirety to Palmyra between 1900 and 1959. There is no clear reason why the Constitution would not continue to apply today.[22]

Palmyra was part of the Territory of Hawaii to which the Congress specifically extended the Constitution in 1900.[23] Thus, Palmyra became an incorporated territory at that time. The Supreme Court has suggested, in similar circumstances, that once the benefits of the Constitution in its entirety have been extended to an area, the Congress may not withdraw them.[24] The Court, noting that land was carved from Maryland and Virginia to form the District of Columbia, observed that: "This District had been a part of the States of Maryland and Virginia. It had been subject to the Constitution, and was a part of the United States. The Constitution had attached to it irrevocably. There are steps which can never be taken backward."[25] Because this question was not before the Court, those remarks do not constitute a binding precedent.

In any event, the case for continued application of the Constitution to Palmyra is strong without reference to this Supreme Court decision. The Constitution was extended to Palmyra by law. As discussed above, Palmyra was excluded from the state of Hawaii and the law extending the Constitution to Palmyra remains in effect. It seems likely, therefore, that the courts would conclude that the Constitution continues to apply to Palmyra.

---

[22]Section 4 of the 1900 law which extended the Constitution to the Territory of Hawaii, of which Palmyra was then part, has never been amended or repealed. Palmyra's exclusion from the state of Hawaii left it as the only area remaining in the Territory of Hawaii after the rest achieved statehood. While this designation is not legally authoritative, Palmyra is listed in the Central Intelligence Agency's World Fact Book (1996 ed.) as an incorporated territory of the United States.

[23]Act of April 30, 1900, ch. 339, § 4.

[24]See Rasmussen v. United States, 197 U.S. 516, 529-530 (1905) (Harlan, J., concurring) ("Congress cannot suspend the operation of the Constitution in any territory after it has come under the sovereign authority of the United States."); id. at 536 (Brown, J., concurring) (The Congress can deal with the territories as it pleases until it extends to them the provisions of the Constitution, "which, once done, in my view, is irrevocable.")

[25]Downes, 182 U.S. at 261, commenting on an earlier Supreme Court decision, Loughborough v. Blake, 18 U.S. (5 Wheat.) 317 (1820). In Loughborough, the Court found that the Congress could impose a direct tax for general purposes on the District of Columbia. Downes involved a dispute over whether customs duties imposed on goods imported from Puerto Rico had to be uniform with those imposed on goods traveling between the states. The Court held that the Uniformity Clause of the Constitution, at Article I, § 8, did not apply to unincorporated territories and, therefore, that different duties could be applied.

Figure II.3: Navassa Island



## Navassa Island

Navassa is a pear-shaped island in the Caribbean Sea between Haiti and Jamaica about 100 miles south of Guantanamo Bay, Cuba. The land area of Navassa exceeds two square miles and the island is marked by imposing limestone cliffs on all sides, rising 10 to 150 feet above sea level. It is almost completely surrounded by a reef that impedes access to it except through a narrow gap. Figure II.3 illustrates the geography of Navassa.

Navassa was discovered by Peter Duncan, who claimed the island for the United States in 1857, under the Guano Islands Act of 1856.[26] Navassa is also claimed by Haiti, Cuba, Columbia, Jamaica, Mexico, and Honduras. Haiti has claimed the island in its constitution and in documents describing its official boundaries. However, the United States has viewed Navassa as its possession since 1857, and has disputed the claims of Haiti and all the other claimants since then.

Navassa Island has come to the attention of the Supreme Court through two cases, the better-known of which, Jones v. United States,[27] involved the question of whether a federal court in the United States had jurisdiction over a crime committed on Navassa. The defendant Jones, a laborer employed by the Navassa Phosphate Company, took part in a riot on Navassa in 1889 in which one of the company officers was killed.[28] Jones was tried and convicted in federal court in Baltimore for the murder.

The Guano Islands Act provides that guano islands claimed on behalf of the United States may "be considered as appertaining to the United States," and that any crime committed on such an island would be deemed as having been committed on the high seas on board a U.S. vessel and be punished according to the laws of the United States.[29] The Supreme Court found that the Secretary of State had properly proclaimed Navassa as a possession of the United States based on Peter Duncan's petition filed under the Guano Islands Act, and that the district court in Baltimore had proper jurisdiction.[30] In reaching its decision, the Court observed:

[26] 48 U.S.C. §§ 1411-19.

[27] 137 U.S. 202 (1890).

[28] Jones, 137 U.S. at 204. The testimony at trial and in later accounts indicated that conditions on the island for the workers were grim. The officers that supervised the laborers meted out severe discipline, rations were poor, and living conditions were brutal. Jimmy M. Skaggs, The Great Guano Rush at 175-77 (1994). The workers' contracts stated that they could be kept on the island at the company's pleasure for up to 15 months. Jones, 137 U.S. at 207.

[29] 48 U.S.C. §§ 1411, 1417.

[30] Jones, 137 U.S. at 211.

By the law of nations, recognized by all civilized States, dominion of new territory may be acquired by discovery and occupation, as well as by cession or conquest; and when citizens or subjects of one nation, in its name, and by its authority or with its assent, take and hold actual, continuous and useful possession, (although only for the purpose of carrying on a particular business, such as catching and curing fish, or working mines,) of territory unoccupied by any other government or its citizens, the nation to which they belong may exercise such jurisdiction and for such period as it sees fit over territory so acquired.[31]

In the second case, Peter Duncan's widow claimed profits from the Navassa Phosphate Company or, in the alternative, possession of part of the island. Peter Duncan's interest in Navassa had been assigned to the Navassa Phosphate Company. Duncan's widow based her claim on her dower right, the interest in her husband's property that a widow had under the law at that time.

In holding that Mrs. Duncan had no property right to the island,[32] the Supreme Court observed that nothing in the Guano Islands Act obliges the United States to retain possession of islands claimed under the act after the guano is removed. With respect to the discoverer, the only right the act confers is "a license to occupy the island to remove the guano; this right cannot last after the guano is removed."[33] Moreover, by the express terms of the act, this right can be terminated at any time "at the pleasure of the Congress."[34]

In 1913, the Congress provided funds to build a lighthouse on Navassa to safeguard the increased number of ships passing the area following the opening of the Panama Canal.[35] President Woodrow Wilson proclaimed in 1916 that, pursuant to the United States' original claim under the Guano Islands Act of 1856 and subsequent congressional action in the Appropriation Act of 1913 providing for the construction of a lighthouse, Navassa was reserved for "lighthouse purposes . . . deemed necessary in the public interest."[36]

---

[31] Id. at 212.

[32] Duncan v. Navassa Phosphate Company, 137 U.S. 647 (1891).

[33] Id. at 651-652.

[34] Id.

[35] Appropriations Act of 1913, ch. 32, 38 Stat. 208, 224 (1913).

[36] Presidential Proclamation, No. 1321, Jan. 17, 1916. The lighthouse later was converted to an unmanned beacon, which remained in operation until 1996.

The status of Navassa has recently come under scrutiny. In August of 1996, after determining that a light on Navassa was no longer needed in view of advances in electronic navigation, the Coast Guard deactivated the light and removed signs indicating the island was a restricted area. On January 16, 1997, the Secretary of the Interior delegated responsibility for the civil administration of Navassa to the Office of Insular Affairs.[37]

Following the removal of the light and the signs by the Coast Guard in August 1996, an American salvager presented a claim to Navassa to the Department of State under the Guano Islands Act. On March 27, 1997, the Department of the Interior, having in the meantime assumed administrative jurisdiction over Navassa, denied the claimant's application for an exclusive permit to mine guano on the island. The Department concluded that the Guano Islands Act applies only to islands which, at the time of the claim, are not "appertaining to" the United States. The Department's opinion said that Navassa is and remains a U.S. possession "appertaining to" the United States and is "unavailable to be claimed" under the Guano Islands Act. The opinion also concluded that, even if the Guano Islands Act could be construed to permit the federal government to grant patents to mine guano on islands already within the possession of the United States, the Department would reject such an application on policy grounds.

[37]Secretary's Order No. 3205, Department of the Interior, Jan. 16, 1997. Formal transfer of the island from the Coast Guard to the Department of Interior is in process. The Secretary of the Interior bases jurisdiction on 43 U.S.C. § 1458, which authorizes the Secretary to exercise all the powers and perform all the duties in relation to the territories which, prior to March 1, 1873, were carried out by the Secretary of State, either by law or custom.

Figure II.4: Johnston Atoll






FWS 00981

## Johnston Atoll

Johnston Atoll is located about 700 miles west-southwest of Honolulu. It consists today of two natural islands, Sand and Johnston, and two manmade islets, North and East (also known as Akau and Hikina), enclosed by an egg-shaped reef approximately twenty-one miles in circumference. Figure II.4 shows the geography of Johnston Atoll.

Although first discovered in 1796, the atoll was not formally claimed for the United States until March 1858 by the captain of the schooner *Palestine*. The schooner had been chartered by two Americans, William Parker and R. F. Ryan, specifically to find Johnston and Sand Islands and, if guano were discovered, to claim them under the Guano Islands Act. The atoll was located, the presence of guano was confirmed, a flag was raised, and signs were erected stating that the entire area was claimed for the United States and for the owners and charterers of the schooner.

The American claim was at first disputed. In June 1858, Samuel Allen, sailing on the *Kalama* under the Hawaiian flag and representing the Kingdom of Hawaii, tore down the U.S. flag and signs on Johnston Atoll and raised the Hawaiian flag. On July 27, 1858, the atoll was declared part of the domain of King Kamehameha IV. However, several months later, King Kamehameha revoked the lease on guano he had granted to Allen when he learned that the atoll had been claimed previously by the United States.

A large amount of guano was removed from the atoll during the next 50 years,[38] but by 1920, Johnston and Sand Islands had been abandoned. As a result of a biological survey conducted by the U.S. Department of Agriculture and the Bernice Paushi Bishop Museum of Honolulu in 1923, President Calvin Coolidge designated Johnston and Sand Islands a bird refuge.[39] In 1934, President Franklin Roosevelt placed Johnston, Sand, and Wake Islands and Kingman Reef under the control of the Secretary of the Navy.[40] Johnston and Sand Islands remained under the additional jurisdiction of the Department of Agriculture for purposes of serving as a bird refuge.

With the advent of World War II, the airspace above and the waters within the three-mile marine boundaries of Johnston and Sand Islands were

[38]The Attorney General ruled in 1859 that Parker, who claimed the atoll for the United States under the Guano Islands Act, had made the claim on behalf of the Pacific Guano Company, in which he was a shareholder, and that Pacific Guano had exclusive rights to the guano. 9 Op. Att'y Gen. 364 (1859).

[39]Exec. Order No. 4467 (1923).

[40]Exec. Order No. 6935 (1934).

designated a naval defensive area by President Roosevelt.[41] During the course of the war, Sand and Johnston Islands were developed as a military air base and also served as a submarine refueling base. The atoll was heavily used during the war and, as use of the atoll increased, so too did the land area; the military dredged coral from the lagoon to increase the length of the runways.

In 1948, the Secretary of the Navy transferred operational control of the atoll to the Air Force.[42] Over the next 10 years, the atoll was used by the Coast Guard as well as the Air Force and continued coral fill construction expanded the atoll by 25 acres. In 1958, two high-altitude nuclear tests were launched from the atoll. Nuclear testing resumed in 1962 with an agreement granting control of the atoll to the Atomic Energy Commission for the Pacific Atomic Tests.

Between 1963 and 1964, the actual acreage of Johnston and Sand islands was increased from 198 acres to 591 acres; additionally, two man-made islands were created—North (Akau) and East (Hikina)—adding another 24 and 17 acres respectively. At that time, the decision was made to refer to the area collectively as Johnston Atoll.

Between 1964 and 1973, the Air Force was an active presence on the atoll. In 1973, the Air Force agreed with the Defense Nuclear Agency that the latter would assume operational control of the atoll.

Johnston Atoll remains under the operational control of the Defense Nuclear Agency. It is a storage and disposal site for chemical munitions and a standby test site for atmospheric nuclear weapons testing. It remains a bird refuge, with the Fish and Wildlife Service of the Department of the Interior having taken over the duties previously assigned to the Department of Agriculture.

[41] Exec. Order No. 8682, 6 Fed. Reg. 1015 (1941); Exec. Order No. 8729, 6 Fed. Reg. 1792 (1941).

[42] Order of the Secretary of the Navy, Op24B, Serial 349P24, 15 July 1948, as reprinted in LTC Lawrence R. Bauer, A History of Johnston Atoll: 1796-1964, at fig. 7 (1965).

Figure II.5: Baker, Howland, and Jarvis Islands




FWS 00984

## Baker Island

Baker Island is approximately one mile long and 1500 yards wide, surrounded by a narrow reef. This small uninhabited island is located near the equator, about 1,650 miles southwest of Honolulu. Figure II.5 illustrates the geography of Baker Island.

Baker Island was first sighted by the captain of an American whaling ship, Michael Baker, in 1832. He marked it on a map and named it New Nantucket. In 1839, Captain Baker returned to the area and landed on Baker to bury a crew member. While there, he claimed the island and raised an American flag. In 1855, Baker sold his interest in Baker Island to a group who later formed the American Guano Company. American Guano claimed Baker Island in 1856 under the Guano Islands Act, and mined guano there until the 1880s, after which the island was abandoned.

In 1936, President Roosevelt placed Baker Island, along with nearby Jarvis and Howland Islands, under the jurisdiction of the Secretary of the Interior.[43] An interest in developing these islands for commercial aviation stop-overs, as well as in firmly establishing an American presence, resulted in military personnel and Hawaiian employees being placed at each of the islands for several months at a time. In 1942, however, following threat of sea and air attacks by Japanese forces, civilians were evacuated.

In July 1943, American troops built a new airstrip on Baker Island as a forward area defense post. In September of that year, the base was occupied and the original landing strip was lengthened to permit bombers to land. The island housed 120 officers and 2,000 men. In March 1944, considered no longer necessary to the war effort, it was evacuated. The U.S. Fish and Wildlife Service was given administrative responsibility for Baker Island in 1974, and the island became a wildlife refuge. Public use is restricted to scientists and educators, by special permit.

## Howland Island

Howland Island, a small coral island near the equator, lies 36 miles northwest of Baker Island. It is about two miles long, with an average width of a half mile, and is surrounded by a narrow reef. Howland's land area is approximately 400 acres. Figure II.5 shows the geography of Howland Island.

Howland was discovered in 1842 by a New England whaler, George Netcher, who named it after the look-out who spotted it. Howland was uninviting, with no natural anchorages and overrun with rats from an old

[43]Exec. Order No. 7368, 1 Fed. Reg. 405 (1936).

shipwreck. However, the guano deposits, when analyzed, were richer than those on either Baker or Jarvis Islands. Netcher and a friend contacted Alfred Benson who was, at the time, employed by the American Guano Company as its president. In 1857, Benson sent his son Arthur on a voyage to inspect and claim guano islands. Arthur Benson sailed to Howland and claimed it for Alfred Benson and some associates, not for the American Guano Company. Shortly thereafter Alfred Benson resigned from American Guano and formed his own guano company.

A legal battle ensued over the guano rights on Howland Island between the American Guano Company and Alfred Benson, who by then was its competitor. Alfred Benson landed on Howland Island in 1861 and expelled employees of American Guano who were mining there. The State Department refused to intervene to determine the rights of the parties. The court that heard the dispute found that mere discovery did not convey title and that, while American Guano had spent money and erected buildings, it could not exclude Benson's company from similarly exploiting the island.[44] The two companies were forced to co-exist. By 1878, however, Howland's guano reserves were largely depleted and the island was abandoned.

In 1936, Howland Island was placed under the jurisdiction of the Secretary of the Interior, and military personnel and Hawaiian civilian employees were brought there. The island had a role in the ill-fated round-the-world flight attempt of Amelia Earhart. An airstrip and a lighthouse were constructed on Howland as a refueling site for the flight. Earhart and her navigator left Papua New Guinea on July 2, 1937 for Howland, but were never seen again. The lighthouse was partially destroyed during World War II, but has been rebuilt in memory of Earhart. Civilians were evacuated from Howland Island in 1942 following sea and air attacks by Japanese forces.

Howland Island has been administered since 1974 by the Department of the Interior, Fish and Wildlife Service, as a wildlife refuge. Access is restricted by permit from the Fish and Wildlife Service.

## Jarvis Island

Jarvis Island is about two miles long and a little over one mile wide, with a narrow fringing reef. This uninhabited island lies just below the equator about 1,350 miles south of Honolulu. Figure II.5 shows the geography of Howland Island.

[44] American Guano Co. v. U.S. Guano Co., 44 Barbour's Reports 23 (N.Y. 1865).

The island was first sighted in 1832 by the American whaler, Michael Baker, who also discovered Baker Island. Baker found guano on Jarvis Island and claimed the island for the United States. In 1855, Baker sold his interest in Jarvis to a group who later formed the American Guano Company. The company claimed Jarvis as a guano island in 1856 under the Guano Islands Act. Guano was mined there intermittently into the 1880s after which, most of the guano reserves having been depleted, the island was abandoned by the company.

In 1936, President Roosevelt placed Jarvis Island under the jurisdiction of the Secretary of the Interior.[45] A small group of military personnel and Hawaiian civilians occupied Jarvis until 1942 when they were removed in anticipation of a possible Japanese attack.

Administrative responsibility for Jarvis Island was transferred from the Department of the Interior's Office of Territorial Affairs to its Fish and Wildlife Service in 1974. Today, Jarvis is a wildlife refuge to which access is restricted by permit from the Fish and Wildlife Service.

[45]Exec. Order No. 7368, 1 Fed. Reg. 405 (1936).

Figure II.6: Kingman Reef




## Kingman Reef

Kingman Reef is a small, low-lying, roughly triangular atoll approximately 900 miles south of Honolulu and 35 miles north of Palmyra. Kingman Reef has a maximum elevation of about one meter and is awash most of the time. It has a deep interior lagoon that occasionally has been used by seaplanes, but its reef is a maritime hazard and the atoll is unusable for practical purposes. Kingman remains uninhabited. It is currently administered by the U.S. Navy. Figure II.6 illustrates the geography of Kingman Reef.

First discovered in 1798 by an American whaler, Kingman Reef was claimed in 1860 by the U.S. Guano Company, although there is no evidence that guano existed or was ever mined there. The atoll was claimed again in

1922 by Lorrin Thurston on behalf of the Palmyra Copra Company for use as a fishing base.[46]

The State Department concluded in 1933, in a study of islands claimed under the Guano Islands Act, that claims made under the act to Kingman Reef were not valid.[47] However, an American had initially discovered Kingman and no other nation claimed it. In 1934, President Franklin Roosevelt placed the reef under the control of the Navy, formally asserting American rights to it.[48] During World War II, Kingman was included in a naval defensive area established by President Roosevelt.[49] In 1950, the Congress enacted a law making Kingman Reef, along with several other insular areas, subject to the jurisdiction of the U.S. District Court in Honolulu for purposes of any criminal or civil cases that might arise there.[50]

[46]The president of the Palmyra Development Company, which holds a long-term lease on Palmyra, told us that the Palmyra Copra Company, in 1922, ceded all rights to Kingman Reef to Leslie and Ellen Fullard-Leo. He said that the Fullard-Leo family of Hawaii paid property taxes on the atoll to the city and county of Honolulu from 1922 to 1959, when Hawaii achieved statehood. Navy personnel searching Hawaiian land records in 1986 were unable to find any formal record of a conveyance of Kingman Reef to the Fullard-Leos.

[47]Sovereignty, supra note 3, at 876.

[48]Exec. Order No. 6935 (1934).

[49]Exec. Order No. 8682, 6 Fed. Reg. 1015 (1941).

[50]Act of June 15, 1950, ch. 253, 64 Stat. 217, 48 U.S.C. § 644a. The other U.S. insular areas currently subject to the court's jurisdiction are the Midway Islands, Wake Island, Johnston Island, Sand Island, Palmyra Island, Howland Island, Baker Island, and Jarvis Island.

Figure II.7: Midway Atoll




## Midway Atoll

Midway is a coral atoll located 1,200 miles northeast of Honolulu. It consists of two main islands, Sand and Eastern. Figure II.7 shows the geography of Midway. It was originally discovered in July 1859, by Captain N.C. Brooks and named "Middle Brook Islands." However, Captain Brooks never officially claimed the island. In 1867, the U.S. Navy sent Captain

William Reynolds to claim the islands for the United States in order to establish a Pacific coaling station.[51] In 1869, the Congress appropriated $50,000 for making Midway Island into a naval station and for enlarging the channel through the reef into the lagoon.[52]

In 1903, President Theodore Roosevelt issued an executive order that placed Midway under the jurisdiction and control of the U. S. Navy.[53] Construction of a naval air station began in 1940, and the station was commissioned on August 1, 1941. On December 7, 1941, the day Pearl Harbor was bombed, Midway was attacked by a Japanese raiding party of four ships. In June 1942, a Japanese naval task force approached Midway. In the ensuing battle, a U.S. carrier group and aircraft from Midway withstood the all-out attack by a numerically-superior Japanese group and sank four Japanese aircraft carriers. One American carrier was lost, but this defeat of the Japanese is considered the turning point of the war in the Pacific.

Following World War II, the Navy continued to have jurisdiction over Midway and maintained it as an air base. In the 1970s and 1980s, the Navy began the phase-out of operations on the atoll. In 1993, the decision was made to close the military facility at Midway.[54] To permit closure and new use of the atoll, environmental impact studies were carried out. The studies indicated widespread contamination from a variety of man-made materials to the environment and the native wildlife.

The Navy transferred administrative control of the atoll to the Fish and Wildlife Service on October 31, 1996.[55] The Fish and Wildlife Service oversaw the clean-up of the island by the Navy. Clean-up was completed in June 1997, and the Navy departed on July 1, 1997. The Fish and Wildlife Service now has sole federal responsibility for the atoll and has decided to open the island for limited eco-tourism. A lease has been granted to the

[51]Apparently, the Kingdom of Hawaii did not claim Midway. In 1887, the Hawaiian Foreign Minister, in a note sent to the United States informing the Secretary of State that formal possession had been taken of Ocean Island in the name of the King of Hawaii, stated that the King claimed all the islands and islets which form the chain of the Hawaiian group extending from the Island of Nihoa to Ocean Island, except Midway Island. The United States did not formally respond. Sovereignty, supra note 3, at 924.

[52]Navy Appropriations Act for 1870, ch. 48, 15 Stat. 276, 279 (1869); S. Rep. No. 194, 40th Cong. (3d Sess. 1869).

[53]Exec. Order No. 199-A (1903).

[54]Pursuant to the Defense Authorization Amendments and Base Closure and Realignment Act of 1988, 10 U.S.C. § 2687 note, the Secretary of Defense recommended that the mission of the Naval Air Station on Midway be eliminated. In 1993, the Base Closure Commission agreed with the Secretary's recommendation and operations to close the facility began.

[55]Exec. Order No. 13,022, 61 Fed. Reg. 56,875 (1996).

Midway Phoenix Corporation to run small-aircraft flights to the island, where visitors can view the wildlife, take diving tours, and fish. Midway Sport Fishing, Inc. has already begun its service. Legislation is pending to study the feasibility and advisability of establishing Midway Atoll as a national memorial to the Battle of Midway.[56]

[56]S. 940, 105th Cong. (1997). Hearings were held on October 1, 1997, by the Subcommittee on Parks, Preservation, and Recreation, Senate Committee on Energy and Natural Resources.

Figure II.8: Wake Atoll






FWS 00993

## Wake Atoll

Wake Atoll is 2,300 miles west of Honolulu. It consists of three islands with a land area of 2 and one-half square miles. Figure II.8 illustrates the geography of Wake. Wake is also claimed by the Republic of the Marshall Islands. The U.S. has never recognized this claim and has remained in exclusive control of the atoll since the end of World War II.

Wake is not a guano island and was not claimed under the Guano Islands Act of 1865. It is named for a British sea captain who landed there in 1796. Brigadier General Francis Greene stopped at Wake in 1898 enroute to the Philippines during the Spanish-American War and raised the American flag on the island. The following year, Commander Taussig of the U.S. Navy landed on Wake and took possession of the island for the United States.

Wake Atoll was annexed for use as a cable station, but its main use came in the 1930s as a refueling base for early trans-Pacific air flight. In 1935, a Pan American Airways refueling base was set up and a 48-room hotel was opened. By the outbreak of World War II, Wake had been developed into a major air and submarine base.

After the war, Wake was administered by the U.S. Navy until 1962 when jurisdiction was vested in the Secretary of the Interior.[57] It is currently being used by the U.S. Army Space and Missile Defense Command.

[57] Exec. Order 11,048, 27 Fed. Reg. 8851 (1962).

Appendix III

# Comments From the United States Coast Guard

U.S. Department of Transportation
United States Coast Guard

Commandant (G-LGL)
United States Coast Guard

2100 Second Street, S.W.
Washington, DC 20593-0001
Staff Symbol: G-LGL
Phone: (202) 267-1553
FAX: (202) 267-4287

11011
07/02/97

Mr. Barry Bedrick, Associate General Counsel
Office of the General Counsel
U. S. General Accounting Office
Washington, D.C. 20548

Dear Mr. Bedrick:

Thank you for the opportunity to review your proposed report entitled U.S. Insular Areas: Application of the U.S. Constitution. Overall we found the report to be an excellent product and we compliment you and your staff. We offer the following minor comment with respect to the discussion of Navassa Island for your consideration.

See p. 49.

On page 6, you state, "The Coast Guard recently transferred responsibility for administration of Navassa Island to the Department of the Interior." This is not entirely correct. While the Department of the Interior has assumed administrative responsibilities for Navassa per Secretary's Order No. 3205, Department of the Interior, Jan. 16, 1997, the Coast Guard has yet to complete the formalities for transferring the Island to the Department of the Interior. We believe an Executive Order revising the 1916 Presidential Proclamation is the correct vehicle for doing so. My office expects to begin discussing the matter with the Department of the Interior later this month.

It was a pleasure working with you and especially with Mary Reich on the Navassa island issues.

Sincerely,

R. R. KELLY
Commander, U.S. Coast Guard
Acting Chief, Office of General Law
By direction



FWS 00995

Appendix IV

# Comments From the Department of the Interior

Note: GAO comment supplementing those in the report text appears at the end of this appendix.

United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, D.C. 20240

JUL 3 1997

Mr. Barry Bedrick
Associate General Counsel
Office of the General Counsel
U.S. General Accounting Office
441 G Street, NW, Room 7466
Washington, D.C. 20548

Dear Mr. Bedrick:

Thank you for your letter of June 5, 1997, transmitting a copy of the draft report, U.S. Insular Areas: Application of the U.S. Constitution, (GAO/OGC-97-47).

See comment 1.

We commend you on the report's content and accuracy. Enclosed are comments from the Office of Insular Affairs and the Fish and Wildlife Service.

Sincerely,

Brooks Yeager
Deputy Assistant Secretary - Policy and International Affairs

Enclosures

The following is GAO's comment on the Department of the Interior's letter dated July 3, 1997.

## GAO Comment

1. We have modified the report to reflect the Department of the Interior's comments. The enclosures have not been reproduced.

# Comments From the Resident Commissioner of Puerto Rico

Note: GAO comment supplementing those in the report text appears at the end of this appendix.


CARLOS A. ROMERO-BARCELO
PUERTO RICO

WASHINGTON OFFICE
☐ 2443 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-5401
(202) 225-2615

DISTRICT OFFICES:
☐ P.O. BOX 9023958
OLD SAN JUAN, PR 00902-3958
(787) 723-6333

☐ MARVESA BUILDING
OFFICE 404
ROAD 14
PONCE, PR 00731
(787) 841-3300


Congress of the United States
House of Representatives
Washington, DC 20515-5401

COMMITTEES:
EDUCATION AND THE WORKFORCE
SUBCOMMITTEE:
POSTSECONDARY EDUCATION, TRAINING, AND LIFE-LONG LEARNING

RESOURCES
SUBCOMMITTEES:
NATIONAL PARKS AND PUBLIC LANDS
ENERGY AND MINERAL RESOURCES
RANKING MEMBER

August 15, 1997

97-1561

Mr. Barry R. Bedrick
Associate General Counsel
U. S. General Accounting Office
Washington, D.C. 20548

Dear Mr. Bedrick:

Thank you for the opportunity to comment on the General Accounting Office (GAO) draft report entitled "U.S Insular Areas: Application of the U.S. Constitution." We appreciate this opportunity because the question of whether a provision of the Constitution applies to the territories of the United States is a matter of great importance. We believe your report will be of value to the territories and to the U.S. Congress.

See comment 1.

In compliance with your request we attach a list of comments and suggested changes to particular parts of the draft report. We hope our comments are useful and we look forward to receiving the final report.

Sincerely,

Carlos Romero Barceló

Carlos Romero Barceló

CRB/AJ

Enclosure: Comments to the GAO Draft Report "U.S. Insular Areas: Application of the U.S. Constitution"

The following is GAO's comment on the letter from the Resident Commissioner of Puerto Rico.

## GAO Comment

1. We have modified the report to reflect the Resident Commissioner's comments. The enclosure has not been reproduced.

Appendix VI

# Comments From the Resident Representative of the Commonwealth of the Northern Mariana Islands

Commonwealth of the Northern Mariana Islands
Office of the Resident Representative to the United States
2121 R Street, NW, Washington, D.C. 20008 • Phone: (202) 673-5869 • FAX: (202) 673-5873
Juan N. Babauta
Resident Representative

June 11, 1997

Mr. Barry R. Bedrick
Associate General Counsel
Office of the General Counsel
General Accounting Office
441 G Street, N.W.
Washington, D.C. 20548

Dear Mr. Bedrick:

Thank you for the coutesy to comment on GAO' s proposed report entitled U.S. Insular Areas: Application of the U.S. Constitution (GAO/OGC-97-47).

Now on p. 33.

Our review of the report and our comments will be limited to the treatment relative to the Commonwealth of the Northern Mariana Islands (CNMI). Generally, we find that the discussion on the political update and the legal analysis on the applicability of the various provisions of the U.S. Constitution to the CNMI is accurate. However, a clarification on the applicability of the Fifth Amendment right to indictment by a grand jury under the Covenant is in order. On page 18 of the report, the reference that "The CNMI Covenant does not require grand jury indictment unless required by local law" is partially correct. Section 501 of the Covenant provides "that neither trial by jury nor indictment by grand jury shall be required in any civil action or criminal prosecution based on local law, except where required by local law. The limitation here is on civil action or criminal prosecution base on local law. Federal case, however, will have to be brought after an indictment by a grand jury as is required in the States and elsewhere, and federal cases will have to be tried before juries when required under federal law.



FWS 01000

Mr. Barry R. Bedrick
June 11, 1997
Page two

A minor suggestion is also offered for footnote6 on page 3. The relevant public law for the Covenant is U.S. Public Law 94-241 (90-Stat. 263), 48 U.S.C. Sec. 1801 note.

See p. 7.

I appreciated the opportunity to make comments on your draft proposed report.

Sincerely,

JUAN N. BABAUTA
Resident Representative

# Major Contributors to This Report

## Office of the General Counsel

Dayna K. Shah, Assistant General Counsel
Mary W. Reich, Senior Attorney

## Ordering Information

The first copy of each GAO report and testimony is free. Additional copies are $2 each. Orders should be sent to the following address, accompanied by a check or money order made out to the Superintendent of Documents, when necessary. VISA and MasterCard credit cards are accepted, also. Orders for 100 or more copies to be mailed to a single address are discounted 25 percent.

Orders by mail:

U.S. General Accounting Office
P.O. Box 37050
Washington, DC 20013

or visit:

Room 1100
700 4th St. NW (corner of 4th and G Sts. NW)
U.S. General Accounting Office
Washington, DC

Orders may also be placed by calling (202) 512-6000 or by using fax number (202) 512-6061, or TDD (202) 512-2537.

Each day, GAO issues a list of newly available reports and testimony. To receive facsimile copies of the daily list or any list from the past 30 days, please call (202) 512-6000 using a touchtone phone. A recorded menu will provide information on how to obtain these lists.

For information on how to access GAO reports on the INTERNET, send an e-mail message with "info" in the body to:

info@www.gao.gov

or visit GAO's World Wide Web Home Page at:

http://www.gao.gov

PRINTED ON RECYCLED PAPER

DEPARTMENT OF THE N[AVY]
OFFICE OF THE ASSISTANT SECRETARY
(INSTALLATIONS AND ENVIRONMENT)
1000 NAVY PENTAGON
WASHINGTON, D.C. 20350-1000

AUG 25 2000

The Honorable M. John Berry
Assistant Secretary of the Interior
for Policy, Management and Budget
The United States Department of the Interior
1849 C Street, N.W.
Washington, DC 20240

Dear Assistant Secretary Berry:

Control over and administrative jurisdiction of Kingman Reef, together with all reefs surrounding such island, located approximately 925 miles southwest of Honolulu, Hawaii, have been identified as excess to the Department of Defense requirements. The United States Department of the Interior has indicated that it will accept restoration of its administrative jurisdiction of Kingman Reef and all reefs surrounding such island.

Pursuant to the authority vested in the Administrator of General Services by the provisions of 40 U.S.C. 483 and delegated to the Secretary of Defense by 41 CFR 101-47-601 and redelegated to the Secretary of the Navy by DOD Directive 5160.63, I hereby relinquish and transfer to the Department of the Interior, without reimbursement, custody and accountability for Kingman Reef. Further, it is understood that the Secretary of the Interior, pursuant to 43 U.S.C. 1458, will exercise all the powers and perform all the duties in relation to this territory of the United States.

Administrative jurisdiction and control of Kingman Reef and the reefs and territorial waters surrounding such island are currently under the jurisdiction of the Department of the Navy, as provided and described in Executive Order No. 6935, dated December 29, 1934 and can only be revoked by the President of the United States or by Act of Congress. Thus, administrative jurisdiction and control shall remain with the Department of the Navy until the entry by President of an Executive Order revoking Executive Order No. 6935 as it pertains to Kingman Reef. The enclosed proposed Executive Order would accomplish that revocation and also disestablish the Kingman Reef Naval Defense Sea Area and the Kingman Reef Naval Airspace Reservation established by Executive Order 8682, as amended by Executive Order 8729.

I have enclosed a map of Kingman Reef and copies of the existing Executive Orders. The Navy has determined that there are no environmental concerns with Kingman Reef and that this property is suitable for transfer to another Federal agency.

EXHIBIT 50

EXHIBIT "27"

The Pacific Division of the Naval Facilities Engineering Command will be responsible for implementing the relinquishment and transfer of the Kingman Reef to your agency. The Commanding Officer of the Pacific Division may be reached at the following address:

Rear Admiral Charles R. Kubic, CEC, USN
Commander, Pacific Division
Naval Facilities Engineering Command
Building 258, Makalapa
Pearl Harbor, Hawaii 96860-7300
Telephone: (808) 474-1141

I request that you acknowledge the Department of the Interior's acceptance of transfer of custody and accountability for Kingman Reef by return of a copy of this letter with an original signature for the below acknowledgement of your acceptance. Upon receipt of your acceptance, the Department of the Navy will submit the proposed Executive Order to the Office of Management and Budget in accordance with 1 CFR Part 19.

Sincerely,

Duncan Holaday
Deputy Assistant Secretary
(Installations and Facilities)

Attachments
1. Executive Order No. 6935 dtd 29 Dec 34
2. Map of Kingman Reef
3. Executive Order No. 8682 dtd 14 Feb 41
4. Executive Order No. 8729 dtd 2 Apr 41
5. Draft Executive Order

**Acknowledgement of the Acceptance of Transfer for Custody of and Accountability for the Kingman Reef.**

Assistant Secretary of the Interior
For Policy, Management and Budget

Date 9/1/2000



TOTAL P.03

FWS 00515

10/27/00 10:06 FAX 2022284[redacted] SENATE INTERIOR SUBCO[redacted] 002

Oct-26-00 04:07pm From-INTERI[redacted]PPRO SUBCOMMITTEE +20222590[redacted] T-181 P.02/09 F-264

TED STEVENS, ALASKA, CHAIRMAN

AD COCHRAN, MISSISSIPPI
LEN SPECTER, PENNSYLVANIA
TE V. DOMENICI, NEW MEXICO
RISTOPHER S. BOND, MISSOURI
ADE GORTON, WASHINGTON
TCH McCONNELL, KENTUCKY
ONRAD BURNS, MONTANA
CHARD C. SHELBY, ALABAMA
JDD GREGG, NEW HAMPSHIRE
OBERT F. BENNETT, UTAH
EN NIGHTHORSE CAMPBELL, COLORADO
ARRY CRAIG, IDAHO
AY BAILEY HUTCHISON, TEXAS
ON KYL, ARIZONA

ROBERT C. BYRD, WEST VIRGINIA
DANIEL K. INOUYE, HAWAII
ERNEST F. HOLLINGS, SOUTH CAROLINA
PATRICK J. LEAHY, VERMONT
FRANK R. LAUTENBERG, NEW JERSEY
TOM HARKIN, IOWA
BARBARA A. MIKULSKI, MARYLAND
HARRY REID, NEVADA
HERB KOHL, WISCONSIN
PATTY MURRAY, WASHINGTON
BYRON L. DORGAN, NORTH DAKOTA
DIANNE FEINSTEIN, CALIFORNIA
RICHARD J. DURBIN, ILLINOIS

STEVEN J. CORTESE, STAFF DIRECTOR
JAMES H. ENGLISH, MINORITY STAFF DIRECTOR

United States Senate

COMMITTEE ON APPROPRIATIONS

WASHINGTON, DC 20510-6025

October 26, 2000

The Honorable Bruce Babbitt
Secretary of the Interior
U.S. Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

Dear Mr. Secretary:

The Congress provided an additional $179 million for high priority land acquisitions as part of Title VIII of the Department of the Interior and Related Agencies Appropriations Act, 2001. The Congress directed that $130 million of this amount be provided to the Department of the Interior, and that allocation of these funds to specific projects be determined at a later date by the House and Senate Committees on Appropriations. Attached you will find the project lists.

Of the appropriations provided for Timucuan Ecological & Historic Preserve in Florida, the City of Jacksonville has committed to match on a dollar for dollar basis the first $1,000,000. Additionally, the City of Jacksonville has committed to match on a two for one dollar basis the second $1,000,000.

As for Sleeping Bear Dunes NL in Michigan, the funds provided in Title I of the Act combined with the $3,000,000 of the Title VIII funds are to be used to purchase both the Laporte property and the Barratt property.

The funds provided for Silvio Conte NWR are to be distributed as follows: $500,000 for land in Massachusetts and $255,000 for land in Vermont.

Within previously appropriated funds for land acquisition at Stewart B. McKinney NWR, the Committees direct the Fish and Wildlife Service to reprogram $1,600,000 from Ram Island to Calves Island. The Committees expect that these funds, combined with past appropriations for Calves Island, charitable contributions, and the $400,000 provided for the refuge under Title VIII, will complete the Calves Island purchase.

The Committee understands that a private corporation currently holds a license agreement for a fish transhipment operation in the Palmyra Atoll and that the purchase of the atoll by the Fish and Wildlife Service and by The Nature Conservancy will not terminate the current license. The Committees understand that the sale of the land is subject to the license agreement and expect the land owners to fulfill the terms of the agreement. The corporation is entitled to the full benefits of its current license. Additionally, the Committees stress that the corporation shall be treated by federal agents in the same professional manner as The Nature Conservancy or other entities operating on the atoll.

EXHIBIT

Furthermore, the Committees understand that a formal request has been made to the Department of Interior's Inspector General to initiate a criminal and civil investigation regarding alleged Migratory Bird Treaty Act violations on the atoll. These allegations should, at a minimum, receive a preliminary review by the Inspector General within the next two months.

Of the $5,000,000 provided for the Nisqually NWR in Washington, $2,000,000 is to be provided for the East Bluff. Improved protection of the lower Nisqually watershed and Delta is greatly needed to maintain habitat quality at Nisqually NWR. Land protection of the forested and riparian bluffs on the eastern boundary of Nisqually NWR is needed to maintain wildlife corridors and protect water and habitat quality. These lands border the eastern shore of the Nisqually River and Salmon Creek. Forested bluff habitat is available to be purchased from Weyerhauser to provide permanent protection of the slope and top of the bluff, similar to what has been done on the western boundary of the Refuge. Protection is urgently needed, because these forested habitats are planned for development in the near future, unless they are purchased for land protection purposes.

The remaining $3,000,000 for the Nisqually NWR is to be used for the Black River Unit. The Black River lies south of Olympia, Washington on the edge of the densely populated Puget Sound region. The Black River Unit of the Nisqually NWR provides high quality habitat for coho and chinook salmon, steelhead trout as well as migratory birds and a diversity of other species. In addition, it provides recreational and wildlife-viewing opportunities to the growing population of Olympia. The Fish and Wildlife Service is currently working with eleven willing sellers owning over 500 acres along the Black River. These properties are adjacent to the Black River and are under the threat of being subdivided and developed as housing tracts unless they are purchased for land protection purposes.

We appreciate your suggestions with regard to the allocation of Title VIII funds and have provided funding for many of the projects on the list that you submitted. Other projects on your list have not been included, either because purchase deals have not been completed or because the limited funds available are required for other high priority projects.

We look forward to working with you to implement these acquisitions.

Sincerely,

Robert C. Byrd
Ranking Minority Member
Subcommittee on Interior
and Related Agencies
United States Senate

Slade Gorton
Chairman
Subcommittee on Interior
and Related Agencies
United States Senate

Ralph Regula
Chairman
Subcommittee on Interior
and Related Agencies
U.S. House of Representatives

Norm Dicks
Ranking Minority Member
Subcommittee on Interior
and Related Agencies
U.S. House of Representatives

**FWS**

| *Area (State)* | *Amount* |
|---|---|
| Attwater Prairie (TX) | $500,000 |
| Balcones Canyonlands NWR (TX) | 750,000 |
| Canaan Valley NWR (WV) | 7,000,000 |
| Centennial Valley NWR (MT) | 1,100,000 |
| Don Edwards SF Bay NWR (Cargill) (CA) | 8,000,000 |
| Great Meadows Complex (MA) | 2,000,000 |
| Great Swamp NWR (NJ) | 1,000,000 |
| Hakalau Forest (HI) | 500,000 |
| Harris Neck (GA) | 400,000 |
| J.N. Ding Darling NWR (FL) | 3,000,000 |
| Lake Umbagog NWR (NH) | 3,000,000 |
| Minnesota Valley NWR (MN) | 1,000,000 |
| Montezuma NWR (NY) | 500,000 |
| Nisqually NWR (WA) | 5,000,000 |
| Ottawa NWR (OH) | 1,000,000 |
| Palmyra Atoll/Kingman Reef (HI) | 8,250,000 |
| Patoka River Islands NWR (IN) | 500,000 |
| Pelican Island NWR (Montgomery tract) (FL) | 2,800,000 |
| Prime Hook NWR (DE) | 700,000 |
| Rachel Carson NWR (ME) | 2,000,000 |
| Rappahannock River NWR (incl. Mt. Landing Creek) (VA) | 2,000,000 |
| Rhode Island NWR Complex (RI) | 2,000,000 |
| San Diego NWR (CA) | 1,500,000 |
| Silvio Conte NWR (MA/VT) | 755,000 |
| Stewart McKinney NWR (CT) | 400,000 |
| Waccamaw NWR (SC) | 1,000,000 |
| Walkill River NWR (NJ) | 2,000,000 |
| Subtotal | $58,655,000 |

THAD COCHRAN, MISSISSIPPI
ARLEN SPECTER, PENNSYLVANIA
PETE V. DOMENICI, NEW MEXICO
CHRISTOPHER S. BOND, MISSOURI
SLADE GORTON, WASHINGTON
MITCH McCONNELL, KENTUCKY
CONRAD BURNS, MONTANA
RICHARD C. SHELBY, ALABAMA
JUDD GREGG, NEW HAMPSHIRE
ROBERT F. BENNETT, UTAH
BEN NIGHTHORSE CAMPBELL, COLORADO
LARRY CRAIG, IDAHO
KAY BAILEY HUTCHISON, TEXAS
JON KYL, ARIZONA

ROBERT C. BYRD, WEST VIRGINIA
DANIEL K. INOUYE, HAWAII
ERNEST F. HOLLINGS, SOUTH CAROLINA
PATRICK J. LEAHY, VERMONT
FRANK R. LAUTENBERG, NEW JERSEY
TOM HARKIN, IOWA
BARBARA A. MIKULSKI, MARYLAND
HARRY REID, NEVADA
HERB KOHL, WISCONSIN
PATTY MURRAY, WASHINGTON
BYRON L. DORGAN, NORTH DAKOTA
DIANNE FEINSTEIN, CALIFORNIA
RICHARD J. DURBIN, ILLINOIS

STEVEN J. CORTESE, STAFF DIRECTOR
JAMES H. ENGLISH, MINORITY STAFF DIRECTOR

# United States Senate

COMMITTEE ON APPROPRIATIONS
WASHINGTON, DC 20510-6025

October 26, 2000

The Honorable Dan Glickman
Secretary of the Department of Agriculture
U.S. Department of Agriculture
14th St. & Independence Ave., S.W.
Washington, D.C. 20250

Dear Mr. Secretary:

The Congress provided an additional $179 million for high priority land acquisitions as part of Title VIII of the Department of the Interior and Related Agencies Appropriations Act, 2001. The Congress directed that $49 million of this amount be provided to the Forest Service, and that allocation of these funds to specific projects be determined at a later date by the House and Senate Committees on Appropriations. Attached you will find the project list for the Forest Service funds.

We appreciate your suggestions with regard to the allocation of Title VIII funds and have provided funding for many of the projects on the list that you submitted. Other projects on your list have not been included, either because purchase deals have not been completed, or because the limited funds available are required for other high priority projects.

We look forward to working with you to implement these acquisitions.

Sincerely,

Robert C. Byrd
Ranking Minority Member
Subcommittee on Interior
and Related Agencies
United States Senate

Slade Gorton
Chairman
Subcommittee on Interior
and Related Agencies
United States Senate

Ralph Regula
Chairman
Subcommittee on Interior
and Related Agencies
U.S. House of Representatives

Norm Dicks
Ranking Minority Member
Subcommittee on Interior
and Related Agencies
U.S. House of Representatives

EXHIBIT
"29"

FWS

| Area (State) | Amount |
|---|---|
| Attwater Prairie (TX) | $500,000 |
| Balcones Canyonlands NWR (TX) | 750,000 |
| Canaan Valley NWR (WV) | 7,000,000 |
| Centennial Valley NWR (MT) | 1,100,000 |
| Don Edwards SF Bay NWR (Cargill) (CA) | 8,000,000 |
| Great Meadows Complex (MA) | 2,000,000 |
| Great Swamp NWR (NJ) | 1,000,000 |
| Hakalau Forest (HI) | 500,000 |
| Harris Neck (GA) | 400,000 |
| J.N. Ding Darling NWR (FL) | 3,000,000 |
| Lake Umbagog NWR (NH) | 3,000,000 |
| Minnesota Valley NWR (MN) | 1,000,000 |
| Montezuma NWR (NY) | 500,000 |
| Nisqually NWR (WA) | 5,000,000 |
| Ottawa NWR (OH) | 1,000,000 |
| Palmyra Atoll/Kingman Reef (HI) | 8,250,000 |
| Patoka River Islands NWR (IN) | 500,000 |
| Pelican Island NWR (Montgomery tract) (FL) | 2,800,000 |
| Prime Hook NWR (DE) | 700,000 |
| Rachel Carson NWR (ME) | 2,000,000 |
| Rappahannock River NWR (incl. Mt. Landing Creek) (VA) | 2,000,000 |
| Rhode Island NWR Complex (RI) | 2,000,000 |
| San Diego NWR (CA) | 1,500,000 |
| Silvio Conte NWR (MA/VT) | 755,000 |
| Stewart McKinney NWR (CT) | 400,000 |
| Waccamaw NWR (SC) | 1,000,000 |
| Walkill River NWR (NJ) | 2,000,000 |
| Subtotal | $58,655,000 |