FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

NOV 17 2000

at 4 o'clock and 30 min. P.M.
WALTER A. Y. H. CHINN, CLERK

# DEED

KNOW ALL MEN BY THESE PRESENTS:

That LESLIE VINCENT FULLARD-LEO, Trustee under that certain unrecorded Living Trust of Leslie Vincent Fullard-Leo dated February 12, 1986, as amended, with powers to sell, mortgage, lease, etc., whose mailing address is c/o Palmyra Development Co., Inc., 931 University Avenue, Suite 105, Honolulu, Hawaii 96826, AINSLEY A.K. FULLARD-LEO, Trustee of the Ainsley A.K. Fullard-Leo Revocable Living Trust, as amended in its entirety on April 30, 1992, with powers to sell, mortgage, lease, etc., whose mailing address is c/o Palmyra Development Co., Inc., 931 University Avenue, Suite 105, Honolulu, Hawaii 96826, and DUDLEY LEINANI FULLARD-LEO, Trustee of The Dudley Leinani Fullard-Leo Palmyra Trust dated December 29, 1995, with powers to sell, mortgage, lease, etc., whose mailing address is c/o Palmyra Development Co., Inc., 931 University Avenue, Suite 105, Honolulu, Hawaii 96826, hereinafter collectively called the "Grantor", in consideration of Ten Dollars ($10.00) and other valuable consideration to them paid, the receipt of which is hereby acknowledged, do hereby sell, remise, release and forever quitclaim unto KINGMAN REEF ATOLL INVESTMENTS, LLC, a Hawaii limited liability company, whose principal place of business and post office address is 1030 Kamehame Drive, Honolulu, Hawaii 96825, hereinafter collectively called the "Grantee":

> All of the Grantor's right, title and interest in and to that certain property situate in the Pacific Ocean more particularly described in Exhibit A attached hereto and made a part hereof (hereinafter called the "Property"), subject, however, to all recorded and unrecorded encumbrances.

And the reversions, remainders, rents, issues and profits thereof, together with all buildings, improvements, tenements, rights, easements, privileges and appurtenances to the same belonging or appertaining or held and enjoyed therewith, and all of the estate, right, title and interest of the Grantor both at law and in equity therein and thereto.

TO HAVE AND TO HOLD the same unto the Grantee, subject, however, as aforesaid.

This Deed may be executed in counterparts, each of which when executed shall, irrespective of the date of its execution and delivery, be deemed an original, and said counterparts together shall constitute one (1) and the same Deed.

Grantor and the Grantee are executing this Deed solely in their respective capacities as Trustees aforesaid, and are not assuming any personal liability in their individual capacity hereunder.

EXHIBIT
"30"

IN WITNESS WHEREOF, Grantor and Grantee have executed these presents this 17th day of November, 2000.

Leslie Vincent Fullard-Leo, Trustee

Ainsley A.K. Fullard-Leo, Trustee

Dudley Leinani Fullard-Leo, Trustee

City and County of Honolulu )
) ss:
State of Hawaii )

On this 13th day of November, 2000, before me personally appeared Leslie Vincent Fullard-Leo, Trustee under that certain unrecorded Living Trust of Leslie Vincent Fullard-Leo, dated February 12, 1986, as amended, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed, as Trustee.

LB

(Signature)

Loreen Kawakami
(Print/Type Notary's Name)

Notary Public, State of Hawaii
My Commission Expires: 12/04/2002

City and County of Honolulu )
) ss:
State of Hawaii )

On this 13th day of November, 2000, before me personally appeared Ainsley A.K. Fullard-Leo, Trustee of the Ainsley A.K. Fullard-Leo Revocable Living Trust, as amended in its entirety on April 30, 1992, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed, as Trustee.

lg

(Signature)

Loreen Kawauchi
(Print/Type Notary's Name)

Notary Public, State of Hawaii
My Commission Expires: 12/04/2002

City and County of Honolulu )
) ss:
State of Hawaii )

On this 13th day of November, 2000, before me personally appeared Dudley Leinani Fullard-Leo, Trustee of The Dudley Leinani Fullard-Leo Palmyra Trust dated December 29, 1995, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed, as Trustee.

(Signature)

Loreen Kawewehi

(Print/Type Notary's Name)

Notary Public, State of Hawaii
My Commission Expires: 12/04/2002

EXHIBIT A

ALL of those certain parcels of land situate in the Pacific Ocean, described as follows:

The atoll commonly referred to as "Kingman Reef", located 162 degrees 18 minutes West Latitude and 6 degrees 23 minutes North Longitude, Central Pacific Ocean, Line Islands Group, described as TMK 391-38 in the Territorial Tax Office 1936, State of Hawaii, including the land, reef platforms, lagoons and territorial waters thereof.

Kingman Reef was annexed to the United States of America on May 10, 1922 and ownership of Kingman Reef was claimed on behalf of the Island of Palmyra Copra Company, by its agent Lorrin A. Thurston. The formal annexation document was sent by the Island of Palmyra Copra Company to the State Department in Washington D.C. and was duly acknowledged. A copy was also filed in the Territorial Archives in Honolulu, Hawaii, and was published in the local Honolulu newspapers, and is attached hereto.

Kingman Reef was subsequently ceded to Mr. and Mrs. Leslie Fullard-Leo on August 14, 1922, by the directors of the Island of Palmyra Copra Company. On December 29, 1934, Kingman Reef was placed under the jurisdiction of the Secretary of the Navy, by Executive Order No. 6935 signed by President Franklin D. Roosevelt, a copy of which is also attached hereto.

# LEASE
# (KINGMAN REEF)

THIS LEASE is made and entered into this 17th day of November, 2000, effective as of the "Commencement Date" described in Section 1.04 below, by and between **KINGMAN REEF ATOLL INVESTMENTS, LLC**, a Hawaii limited liability company, whose principal place of business and post office address is 1030 Kamehame Drive, Honolulu, Hawaii 96825 ("**Lessor**"), and **KINGMAN REEF ATOLL DEVELOPMENT, LLC**, a Hawaii limited liability company, whose principal place of business and post office address is 931 University Avenue, Suite 105, Honolulu, Hawaii 96826 ("**Lessee**"),

## WITNESSETH:

## ARTICLE 1

## DEMISE AND TERM

Section 1.01. Demise. Lessor, in consideration of the rent reserved and of the covenants herein contained and on the part of Lessee to be observed and performed, and upon and subject to the terms and conditions set forth, does lease to Lessee and Lessee does lease from Lessor, all that certain property more particularly described in Exhibit A annexed hereto and made a part hereof ("the Property").

TO HAVE AND TO HOLD the same unto Lessee upon the conditions hereinafter set forth.

Section 1.02. Lessor's Covenant. Upon payment by Lessee of the rent and upon observance and performance of the covenants by Lessee herein contained, Lessor shall permit Lessee to peaceably hold and enjoy the Property for the term demised without hindrance or interruption by Lessor or any person or persons lawfully or equitably claiming by, through, or under Lessor.

Section 1.03. Term. The term of this lease shall begin on November 17, 2000 (the "Commencement Date") and shall expire on the seventieth (70th) anniversary of said Commencement Date, unless sooner terminated.

## ARTICLE 2

## RENT

Section 2.01. Time, Manner and Place of Payment. Lessee shall pay to Lessor semi-annually within ninety (90) days after January 1 and July 1 throughout the term, rent in an amount equal to seventy-five percent (75%) of the net income (as hereinafter defined) derived from the Property.

Section 2.02. Gross Income; Net Income. The term "gross income" as used herein shall be construed to mean the entire amount of actual income, whether received in cash, in kind, on credit or otherwise, from all business conducted upon or from the Property, including all rent and other income received from any permitted sublessee, concessionaire, or licensee of all or any portion of the Property. No reduction shall be allowed for dishonored checks or for uncollected or uncollectible credit accounts.

EXHIBIT "31"

The term "net income" as used herein shall be construed to mean an amount equal to gross income less all of Lessee's legitimate and actual expenses incurred in the development, maintenance and operation of the Property and any business activities thereon.

Section 2.03. Records. Lessee shall submit with each payment of rent a complete statement in reasonable detail satisfactory to Lessor showing the gross income of the immediately preceding semi-annual period. Contemporaneously with the filing of any general excise tax return or report covering any part of gross income, Lessee shall furnish Lessor with a true copy of such return or report. Lessee shall keep complete and accurate books of account. For at least two (2) years after the end of every calendar year, Lessee shall keep at Lessee's principal place of business, all sales and inventory records for the Property.

Section 2.04. Audit. Lessor and its agents shall be entitled to inspect and audit, upon reasonable notice and at any reasonable time during Lessee's ordinary business hours, the books of account, all bookkeeping records of Lessee pertaining to gross income and net income. Lessee shall cooperate and assist in any audit made by or for Lessor. If any inspection or audit by Lessor at Lessor's expense discloses any error in Lessee's statement of gross income to Lessor's detriment, Lessee shall immediately pay to Lessor any deficiency in the rent resulting from such error, plus interest on such deficiency at the rate of one percent (1%) per month from the date or dates when such rent should have been paid to the date of payment of the deficiency. If such deficiency equals or exceeds two percent (2%) of the rent paid for the period covered by such audit, Lessee shall pay the costs of Lessor's audit. The acceptance by Lessor of any payment hereunder shall be without prejudice to the right of Lessor to perform such inspection and audit and to receive payment of any such deficiency.

Section 2.05. Interest on Past Due Amounts. In addition to the late charges specified in this lease, all amounts which shall become due and payable under this lease from Lessee to Lessor shall bear interest payable to Lessor at the rate of one percent (1%) per month from the due date or dates until paid; PROVIDED that this section shall not be construed to authorize delay in payment of any amounts becoming due hereunder.

Section 2.06. Late Charges. Lessee acknowledges that late payment by Lessee to Lessor of rent and other sums due will cause Lessor to incur costs not contemplated by this lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges incurred by Lessor. Accordingly, if any installment of rent or any other sum due from Lessee shall not be received by Lessor or Lessor's designee within five (5) days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall pay to Lessor a late charge equal to five percent (5%) of such overdue amount. The parties agree that the late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of late payment by Lessee. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's default with respect to such overdue amount, nor prevent Lessor from exercising any of the other rights and remedies granted under this lease.

Section 2.07. Tax on Rent. In addition to rent, Lessee shall also pay over unto and reimburse Lessor on each rental payment date during the term of this lease an amount equal to that portion of any general excise or gross income tax assessed against Lessor by any governmental authority and measured by or attributable to the rent and any other payments, made by or on behalf of Lessee under the terms of this lease, and Lessee shall also pay all and any increases in such taxes from time to time; provided, however, that Lessee shall not be liable for the payment of Lessor's federal or state income taxes.

Section 2.08. Additional Rent. Lessee shall pay to Lessor as additional rent any money required to be paid by Lessee to Lessor under any provision of this lease, whether or not the same be designated "additional rent." If such money is not paid at the time provided in this lease, it shall nevertheless be collectible as additional rent with any installment of rent thereafter falling due. Nothing in this lease shall be deemed to suspend or delay the duty of payment of any such money at the time the same becomes due and payable, or limit any other remedy of Lessor.

## ARTICLE 3

## LESSEE'S BUSINESS AND OPERATION

Section 3.01. Use. The Property may be used and occupied for any legal use, subject to the conditions contained in this Section. The Property shall not be used for the storage, disposal, processing, transfer or repackaging of garbage, nuclear and/or toxic materials or waste products, nor shall the Property be used for any noxious industry or other use that would be detrimental to the environment of the Property, or any of its inhabitants. Without limiting the generality of the foregoing, Lessee shall not (1) engage in any quarrying activities unless approved by Lessor or (2) discharge any materials into the ocean. If any portion of the Property is filled by Lessee, only natural materials shall be used. It is intended that the Property be used for commercial uses (including copra cultivation, diving, sea farming, sport fishing, commercial fishing, supply centers and refueling) and hotel and resort activities (including tennis and marine sports). Therefore, nothing in this Section 3.01 shall prohibit Lessor from disposing of sewage and other human waste matter in conformance with reasonable health standards. Every effort will be made to be sensitive to and preserve the flora, fauna, natural beauty and environment of the Property. Lessee shall not commit or allow to be committed any waste upon the Property. No improvement shall exceed thirty (30) feet in height, except for water towers, radio towers, navigational aids and other improvements necessary for the uses contemplated herein. Lessee will advise Lessor in writing three (3) months prior to commencing the activities contemplated by this Section.

Section 3.02. Master Plan; Construction. Attached hereto as Exhibit B is a master plan prepared by Lessee for the development of the Property and which has been approved by Lessor. Any rules and regulations promulgated by Lessee under such master plan shall be subject to Lessor's reasonable approval. All plans and specifications for the construction of any improvements on the Property, the cost of which exceeds $75,000.00 ("Improvements"), shall be submitted to Lessor for its approval. If Lessor fails to approve or disapprove in writing such plans and specifications within sixty (60) days after receipt, such plans and specifications shall be deemed approved by Lessor. Prior to commencement of construction of any Improvements, Lessee will deliver to Lessor copies of all construction contracts and obtain and furnish to Lessor, a 100% performance and a 100% labor and material payment bond if obtainable at reasonable cost, naming Lessor and Lessee as co-obligees, in form and amount satisfactory to Lessor, guaranteeing the completion of the Improvements, free and clear of all mechanics' and materialmen's liens. If Lessee is unable to obtain such bond at reasonable cost, Lessee shall have the right to self-insure in accordance with reasonable standards prescribed by Lessor.

Section 3.03. Best Efforts. Lessee shall employ its best judgment, efforts and abilities to produce from the Property the maximum gross income and net income.

Section 3.04. Compliance with Law and Insurance Requirements. Lessee will observe, perform and comply with all laws, statutes, ordinances, rules and regulations of the health and other governmental authorities and of all insurance policies at any time duly issued or enforced,

which are applicable to the Property or to the conduct of Lessee's business on the Property.

## ARTICLE 4

## MAINTENANCE AND REPAIRS; CONSTRUCTION

Section 4.01. Acceptance of Property; Maintenance and Repairs by Lessee. Lessee agrees by taking possession of the Property that the Property is in a tenantable and good condition. Lessee therefore accepts the Property in "AS IS" condition "WITH ALL FAULTS". Lessor makes no representations concerning the condition of the Property, including the presence or absence of hazardous materials on the Property. Lessee acknowledges and accepts all risks in connection with the condition of the Property, including the risk that hazardous materials may be located on the Property. Lessor and Lessee acknowledge and agree that Lessee shall not be liable for any expenses that may be incurred in the correction of any condition resulting from the presence of hazardous materials on the Property as of the commencement of this lease or incurred in the removal of any such hazardous materials from the Property, such expenses being the sole responsibility of the United States government.

Lessee will keep the Property in good order and condition. All damage or injury done to the Property by Lessee or by any of Lessee's employees, agents or invitees shall be repaired and paid for by Lessee.

Section 4.02. Access of Lessor to the Property. Lessee shall permit Lessor and its agents to enter into and upon the Property at all reasonable times to inspect and examine the same and determine the state of repair and condition thereof, without any rebate of rent or liability to Lessor for any loss of occupation or quiet enjoyment of the Property.

## ARTICLE 5

## INSURANCE

Section 5.01. Comprehensive General Liability Insurance. If required by Lessor, Lessee shall at Lessee's expense procure and maintain during the entire term of this lease comprehensive general liability insurance with respect to the Property for injuries and deaths with such reasonable minimum limits as shall be prescribed by Lessor, but initially with minimum limits not less than $5,000,000.00 per occurrence for combined bodily injury and property damage for the airfield and $1,000,000.00 per occurrence for combined bodily injury and property damage for the rest of the Property.

Section 5.02. Fire and Extended Coverage Carried by Lessee . If required by Lessor, Lessee will procure at its own expense and will keep in force during the entire term of this lease a policy or policies of fire and extended coverage insurance on all construction, alterations, additions and improvements made on the Property by Lessee and on all personal property, by whomever owned, situated on the Property in an amount as near as practicable to the full insurable value thereof, and will pay all premiums on such insurance when due.

Section 5.03 Form and Copies of Policies. Wherever Lessee is required to insure against any risk, the insurance shall name Lessor and such other persons, firms or corporations as Lessor shall designate as additional insureds and an executed copy of such policy or certificate thereof shall be delivered to and approved by Lessor and such other additional insureds designated by Lessor, together with a commitment from the insurance carrier endorsed thereon providing that

the policy shall remain in full force and effect until Lessor and such additional insureds designated by Lessor be given at least thirty (30) days prior written notice of any change or cancellation.

Section 5.04 Self-Insurance. If the insurance policies described in this Article are not available to Lessee at a reasonable cost, Lessee shall have the right to self-insure in accordance with reasonable standards prescribed by Lessor. In the event that Lessee cannot obtain insurance or Lessor is not reasonably satisfied with Lessee's self-insurance for any of the permitted uses provided for in Section 3.01, Lessor may prohibit Lessee from engaging in such uses.

## ARTICLE 6

## DAMAGE OR DESTRUCTION

Section 6.01. Damage or Destruction; Option to Terminate. In the event of any damage or destruction to the Property, any insurance proceeds derived from insurance policies described in Article 5 shall be immediately available to and used as soon as reasonably possible by Lessee for rebuilding, repairing or otherwise reinstating any improvements constructed by Lessee in a good and substantial manner according to the plan and elevation of any improvements so destroyed or damaged; provided, however, that in case a substantial portion of the improvements on the Property shall be destroyed by any casualty during the last twenty (20) years of the term hereof or if such damage is caused by a casualty not covered by the insurance required under this lease, Lessee may at its option cancel this lease by giving written notice thereof to Lessor within thirty (30) days after such casualty, on condition that, before such cancellation becomes effective, Lessee shall remove all remains of the damaged improvements and pay to Lessor a sum of money equal to all rent due and payable as of the termination of this lease. In case such improvements shall be destroyed by any casualty at any time during the term of this lease, if such restoration thereof shall be prevented by law, Lessee may at its option cancel this lease by giving written notice thereof to Lessor at any time thereafter on condition that Lessee shall before such cancellation becomes effective remove all remains of the damaged improvements and pay to Lessor all rent then accrued hereunder. Upon cancellation all insurance proceeds shall be payable to and be the property of Lessor.

## ARTICLE 7

## CONDEMNATION

Section 7.01. Taking of Property. In case at any time or times during the term of this lease the Property or any part thereof shall be required, taken or condemned by any authority having the power of eminent domain, then and in every such case, the estate and interest of Lessee in the Property so required, taken or condemned shall at once cease and determine. All compensation and damages payable for or on account of any land and improvements erected on the Property by Lessor during the term of this lease, shall be payable ninety percent (90%) to Lessor and ten percent (10%) to Lessee; provided, however, that in case only part of the Property shall be so required, taken or condemned, the rent payable for the remaining period of the term of this lease shall be reduced in the ratio that the land area of such part bears to the total area of the Property immediately prior to such event, and all compensation and damages payable for or on account of any improvements erected on the Property by Lessee during the term of this lease shall be used promptly by Lessee to the extent necessary for restoring or replacing such improvements on the remaining Property; provided, further, that if such requirement, taking or

condemnation shall render the remaining Property unsuitable for the purposes described in Section 3.01, Lessee may, at its option within thirty (30) days of such taking or condemnation, remove the remains of such improvements and restore the Property to good and orderly condition and even grade, using the proceeds of condemnation to the extent necessary therefor, and Lessee may thereupon surrender this lease and thereby be relieved of any further obligations hereunder. In the event the Property is completely condemned, Lessee may, at its option, surrender this lease to Lessor and thereby be relieved of any further obligation hereunder. In addition to the rights of Lessee set forth above, Lessee shall also be entitled to claim and recover from the condemning authority, but not from Lessor, such compensation as may be payable separately to Lessee for any furniture, furnishings, equipment and trade fixtures on the Property, or the cost of relocation or removal thereof, or for any loss or damage to its business thereon.

## ARTICLE 8

## ASSIGNMENT

Section 8.01. No Assignment. Lessee agrees not to sell, assign, transfer, sublease, mortgage or otherwise encumber its interest in this lease, without Lessor's prior consent. Any attempted sale, assignment, transfer, sublease, mortgage or encumbrance without Lessor's consent is void and of no effect and Lessor can terminate this lease.

Notwithstanding the foregoing, any assignment of this lease to the immediate family members of the stockholder of Lessee, whether voluntary or due to the death of the stockholder or for estate planning purposes of the stockholder, shall be deemed a permitted assignment and shall not require Lessor's consent; provided, however, that should such family members assign this lease to any third party, the restrictions of this Article 8 shall apply.

Upon any sale, transfer or assignment of this lease requiring Lessor's consent, Lessor shall be paid a consent fee of $1,000,000.00.

Any dissolution, merger, consolidation, or other reorganization of Lessee, or the sale or other transfer of a controlling percentage of the capital stock of Lessee, or the sale of at least fifty-one percent (51%) of the value of the assets of Lessee shall be deemed an assignment. The phrase "controlling percentage" means the ownership of, and the right to vote, stock possessing at least 51% of the total combined voting power of all classes of Lessee's capital stock issued, outstanding, and entitled to vote for the election of directors. This subsection shall not apply to transfers of stock described in the second paragraph of this Section 8.01.

## ARTICLE 9

## INDEMNITY AND ATTORNEYS' FEES

Section 9.01. Lessee's Liability. Lessee shall indemnify and hold Lessor harmless against and from any and all claims, damages, fines, costs, expenses reasonable attorneys' fees and liability for injury to property or persons, including wrongful death, arising from the operation of the business conducted by Lessee in the Property, or arising from any default by Lessee in the performance of any of the covenants, conditions or provisions of this lease, or from any act or omission to act of Lessee, its agents, contractors, servants, employees, licensees, or those claiming by, through, or under Lessee in or about the Property in connection with this lease. In case Lessor shall, without fault on its part, be made a party to any litigation commenced

by or against Lessee, its agents, contractors or employees, by reason of any such claim or in case suit shall be brought for recovery of possession of the Property for the recovery of rent or of any other amount due under the provisions of this lease, or because of the breach of any other covenant, condition or provision of this lease, on the part of Lessee to be kept or performed and a breach shall be established, Lessee shall pay to Lessor all expenses incurred in connection therewith, including reasonable attorneys' fees, and any judgments or settlement of claims secured against Lessor by reason of such action or proceeding.

## ARTICLE 10

## DEFAULT

Section 10.01. Events of Default. The following events shall constitute events of default:

a. Any failure by Lessee to pay rent or other charges due under this lease within thirty (30) days after the same is due and payable; or

b. Without limitation to other provisions of this section, any material failure by Lessee to perform or comply with any terms or provisions contained in this lease which failure shall continue for thirty (30) days after notice from Lessor particularly describing such failure; provided, however, that such 30-day grace period shall be extended by the time reasonably necessary to cure or correct the default if corrective measures are begun immediately and diligently prosecuted by Lessee within the 30-day grace period; and provided, further, that such 30-day grace period shall not apply to any failure which cannot be corrected or remedied; or

c. Any material representation or warranty by Lessee contained herein concerning the financial condition or credit standing of Lessee which proves to be false or misleading; or

d. Any final order or decree is obtained by any person in any court of competent jurisdiction enjoining Lessee or Lessor from performing this lease due to the action or inaction of Lessee and such proceedings are not discontinued, or such order or decree is not vacated or stayed within ninety (90) days after the granting thereof; or

e. Any sale, assignment, transfer, license, mortgage or other encumbrance of this lease or any interest therein by Lessee, without Lessor's consent; or

f. The making of an assignment by Lessee for the benefit of its creditors or admitting in writing its inability to pay its debts as they become due; or

g. The filing of a voluntary petition in bankruptcy by Lessee under federal law, or the adjudication of Lessee as a bankrupt or insolvent, or the filing of any petition by Lessee in any proceeding for reorganization, arrangement, composition, adjustment, liquidation, dissolution or similar relief under any present or future federal statute, law or regulation, or the filing by Lessee of any answer admitting the material allegations of any petition filed against Lessee in any such proceeding, or Lessee seeking or consenting to or acquiescing in the appointment of any trustee, receiver or liquidator of Lessee, of all or a substantial part of the properties or assets of Lessee; or

h. Sufferance by Lessee of any lien on the Property or of any

attachment, execution or other judicial seizure of this lease or any estate or interest herein as a result of any act or omission of Lessee which is not released or discharged within ninety (90) days of notice thereof to Lessee; or

i. Lessee's discontinuance of the exercise of the lease granted hereunder for a period longer than six (6) calendar months; provided Lessor acknowledges that Lessee's operations hereunder may be seasonal; or

j. In the event that three (3) or more audits conducted by Lessor or its agents at any time during the term identify underpayments of rent by Lessee in amounts equal to or exceeding the greater of $5,000 or 5% of the rent paid for the periods covered by the audits; or

k. Any attempt by Lessee to avoid or reduce amounts payable to Lessor under this lease by any means, e.g. by using other companies to exercise any of the rights under this lease or by falsification of or refusal to deliver the records required to be delivered to Lessor hereunder; or

l. The occurrence of any event of default described elsewhere in this lease.

Section 10.02. Right to Reenter. Upon the occurrence of any event of default, Lessor in addition to any other right or remedy it may have, shall have the immediate right, with or without termination of this lease, of reentry and may remove all persons and property from the Property and all persons claiming by and through and under this lease and such property may be removed and stored at the cost of and for the account of Lessee, all without service of notice or resort to legal process and without being deemed guilty of trespass, or without liability for any loss or damage which may be occasioned thereby. Lessor may sell any perishable items in any reasonable manner.

Section 10.03. Right to Cure. Should an event of default occur, Lessor may at Lessor's option and without prejudice to any other right or remedy of Lessor provided herein, cure the same and Lessee shall reimburse Lessor for the cost thereof on demand, plus interest at the maximum rate permitted by applicable law, as such law may change from time to time.

Section 10.04. Non-Waiver. The failure of Lessor to insist upon the performance of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant or condition, or any subsequent breach of the same or any other term, covenant or condition herein contained, nor shall any custom or practice which may develop between the parties in the course of administering this lease be construed as a waiver of Lessor's right to insist upon the performance of any term, covenant or condition. The subsequent acceptance of rent by Lessor shall not be deemed to be a waiver of any preceding breach by Lessee of any term, covenant or condition of this lease, other than the failure of Lessee to pay the particular rental so accepted, regardless of Lessor's knowledge of such preceding breach at the time of acceptance of such rent.

Section 10.05. No Accord and Satisfaction. No payment by Lessee or receipt by Lessor of a lesser amount than the rent stipulated shall be deemed to be other than on account of an earlier stipulated rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction and Lessor may accept a check or payment without prejudice to Lessor's right to recover the balance of any amount owed by Lessee, or pursue any other remedy provided in this lease.

ARTICLE 11

SURRENDER AND HOLDING OVER

Section 11.01. Surrender Upon Termination. At the termination of the term of this lease or any extension thereof, Lessee shall surrender the Property in good order and condition, reasonable wear and tear and uninsured damage excepted. All improvements, alterations, additions and fixtures shall belong to Lessor, shall remain upon and be surrendered with the Property as a part thereof without credit to Lessee or anyone claiming under Lessee; provided, however, that Lessee may remove furniture, furnishings, appliances and movable equipment placed by Lessee on the Property so long as Lessee repairs all damage caused by such removal. Lessee's obligation to observe or perform the covenants contained in this Section shall survive the expiration or other termination of the term of this lease.

Section 11.02. Holding Over. Any holding over after the expiration or other termination of the term of this lease with the consent of Lessor shall be construed to be a tenancy from month to month at the rent specified in Section 2.01 and shall otherwise be on the same terms and conditions as this lease so far as applicable.

ARTICLE 12

EXTENSION OF TIME

Section 12.01. Extension of Time for Performance. In the event that either Lessor or Lessee shall be delayed or prevented from the performance of any act required by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war, or other cause beyond the reasonable control of the party delayed, then performance of such act shall be excused during the period of the delay and the period for the performance of such act shall be extended for a period equivalent to the period of such delay. It is understood, however, that this provision shall not operate to excuse Lessee from the prompt payment of rent.

ARTICLE 13

RIGHT OF FIRST REFUSAL; BROKER'S COMMISSION

Section 13.01. Right of First Refusal. During the term of this lease and subject to Lessee's option rights contained in this Article, Lessee shall have the right of first refusal to purchase the Property on terms offered by a third party to Lessor. Upon receipt of such offer, Lessor shall notify Lessee in writing of the terms of such offer. Lessee shall have forty-five (45) days in which to accept such offer in writing on the same terms or Lessor shall have the right to sell the Property free and clear of Lessee's right of first refusal. Should the terms of such offer from such offeror change in any way, Lessor shall re-offer the Property to Lessee in writing on such modified terms, and Lessee shall have another forty-five (45) day period to match the terms of such modified offer or Lessor shall have the right to sell the Property free and clear of Lessee's right of first refusal. All offers received by Lessor to purchase the Property during the term of this lease shall comply with the requirements of this Section.

Section 13.02. Broker's Commission. Savio Realty, Ltd. Better Homes and Gardens ("SRL") is the exclusive listing broker for the marketing and sale of the Property for the lease term. During such time, if the Property is sold by Lessor, Lessee or any other person or entity, Lessor shall pay to SRL a commission of four percent (4%) of the gross purchase price, which SRL may share in its discretion with any cooperating broker.

Section 13.03 Waiver of Conflict. Lessor acknowledges that Peter B. Savio is the sole member of Kingman Reef Atoll Development, LLC and is the sole shareholder of SRL, and Lessor hereby waives any conflict of interest with respect to such matter.

## ARTICLE 14

## MORTGAGES

Section 14.01. Consent to Mortgage. Lessee may from time to time without further consent of Lessor assign this lease by way of mortgage to any bank, insurance company, or other lender as mortgagee, to secure a loan to Lessee for the benefit of the Property; provided that Lessee shall, at least thirty (30) days prior to the execution of such mortgage, promptly deliver a true copy thereof to Lessor and provided that any such assignment shall be specifically subject to, and shall in no way modify the terms of this lease or diminish the rights of Lessor hereunder. The mortgagee or its assigns may enforce such mortgage and acquire title to the leasehold estate in any lawful way, and pending foreclosure of such mortgage may take possession of and rent the Property of which the same are a part, and upon foreclosure thereof may with the consent of Lessor sell and assign the leasehold estate by assignment in which the assignee shall expressly assume and agree to observe and perform all the covenants of Lessee herein contained, and such assignee may make a purchase money mortgage of this lease to the assignor; provided that upon execution of any such assignment or mortgage a true copy thereof shall be delivered promptly to Lessor and that no other or further assignment of this lease for which any provision hereof requires the written consent of Lessor shall be made without such consent. The mortgagee or the assigns of such mortgagee shall be liable to perform the obligations herein imposed on Lessee only during the period such person has possession or ownership of the leasehold estate. Nothing contained in such mortgage shall release or be deemed to relieve Lessee from the full and faithful observance and performance of his covenants herein contained or from any liability for the nonobservance or nonperformance thereof, nor be deemed to constitute a waiver of any rights of Lessor hereunder, and the terms, covenants and conditions of this lease shall control in case of any conflict with the provisions of such mortgage. Any provision in this lease contained to the contrary notwithstanding, so long as there shall be any mortgage on the Property, no amendment of this lease, no surrender of this lease by Lessee and no sale under threat of eminent domain shall be effective without the prior written consent of the mortgagee of such leasehold mortgage, which consent shall not be unreasonably withheld.

Section 14.02 Protection of Mortgage. During the continuance in effect of any authorized mortgage of this lease, Lessor will not terminate this lease because of any default on the part of the Lessee to observe or perform any of the covenants or conditions herein contained if the mortgagee or its assigns, within sixty (60) days after Lessor has mailed to the mortgagee or its assigns at the last known address thereof a written notice of intention to terminate this lease for such cause, shall cure such default, if the same can be cured by the payment of money, or, if such is not the case, shall undertake in writing to perform and shall thereafter perform all the covenants of this lease capable of performance by the mortgagee or its assigns until such time as this lease shall be sold upon foreclosure of such mortgage commenced promptly and completed with due diligence, and any default consisting of Lessee's failure promptly to discharge any lien,

charge or encumbrance against the Property junior in priority to such mortgage shall be deemed to be duly cured if such mortgage shall be foreclosed by appropriate action instituted within said sixty (60) day period and thereafter prosecuted in a diligent and timely manner.

Section 14.03. Right of Mortgagee to New Lease. If this lease shall terminate for any reason, Lessor agrees that the holder of any mortgage upon the leasehold estate of Lessee shall have the right, for a period of sixty (60) days subsequent to such termination, to elect to demand a new lease of the Property. Such new lease shall be for a term commencing on the date of the termination of this lease, and expiring on the same date stated in this lease as the fixed date for the expiration thereof. The rental and all the provisions, covenants and conditions of such new lease shall be the same as the rental, provisions, covenants and conditions of this lease, except that the liability of the holder of such mortgage or its designee under such new lease shall not extend beyond the period of its occupancy thereunder. If any such holder of any such mortgage shall elect to demand such new lease within such period, such holder shall give written notice to Lessor of such election; and thereupon, within forty-five (45) days thereafter, Lessor and such holder or its designee, shall execute and deliver such new lease upon said term, rental, provisions, covenants and conditions. Any such new lease may, at the option of the holder of any such mortgage, be issued to a financially responsible nominee of such holder without the holder assuming the obligations of Lessee thereunder beyond the period of its occupancy. If the holder of such mortgage shall elect to demand such new lease as in this paragraph provided, Lessor agrees, at the sole expense of said holder, to institute and pursue diligently to conclusion the appropriate remedy or remedies to oust or remove Lessee from the Property.

## ARTICLE 15

## NOTICES

Section 15.01. Notices to Lessee. All notices to be given to Lessee shall be given in writing and may be given personally to Lessee if Lessee is an individual or to each of them, if Lessee is more than one (1) individual or to an officer of Lessee if Lessee is a corporation or by depositing the same in the United States mail registered or certified and postage prepaid and addressed to Lessee at Lessee's address set forth on page 1 of this lease whether or not Lessee has departed from, abandoned or vacated the Property.

Section 15.02. Notices to Lessor. All notices to be given to Lessor shall be given in writing and may be given personally to Lessor if Lessor is an individual or to each of them, if Lessor is more than one (1) individual or to an officer of Lessor if Lessor is a corporation or by depositing the same in the United States mail registered or certified and postage prepaid and addressed to Lessor at Lessor's address set forth on page 1 of this lease.

Section 15.03. Time of Service. Any written notice sent by registered or certified mail shall have been deemed to have been delivered ninety-six (96) hours after it is mailed in accordance with the foregoing provisions.

## ARTICLE 16

## MISCELLANEOUS

Section 16.01. No Partnership Intended. It is expressly understood that by executing this lease or leasing the Property to Lessee, Lessor does not in any way or for any purpose become a

partner of Lessee in the conduct of its business or otherwise or joint venturer or a member of a joint enterprise with Lessee, notwithstanding the unique nature of the Property and the possibility that the Lessor may be more actively involved than a customary lessor of property.

Section 16.02. Broker's Commission. Except for brokerage commissions or finder's fees described in Section 13.03 or which are approved by Lessor in writing, Lessor and Lessee each represents and warrants to the other that there are no other claims for brokerage commissions or finder's fees in connection with the execution of this lease. Lessor and Lessee each agree to indemnify the other against and hold it harmless from all liabilities arising from any unauthorized claims by reason of the indemnifying parties' acts or omissions, including without limitation the cost of reasonable attorneys' fees in connection therewith.

Section 16.03. Time is of the Essence. Time is of the essence in the performance of every covenant in this lease.

Section 16.04. Partial Invalidity. If any covenant, condition, or other provision of this lease or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this lease or the application of such covenant, condition or provision to persons or circumstances other than those as to which it is invalid or unenforceable is not affected and each covenant, condition, or provision of this lease shall be valid and enforced to the fullest extent permitted by law.

Section 16.05. Captions and Numbers. The captions, article numbers, section numbers and index of this lease are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or intent of such articles or sections of this lease nor in any way affect this lease.

Section 16.06. Entire Agreement. This lease and the Exhibits annexed hereto constitute the entire agreement between the parties and any agreement hereafter made shall be ineffective to change, modify, discharge or effect an abandonment of this lease in whole or in part unless such agreement is in writing and signed by the party against whom enforcement of the change, modification, discharge or abandonment is sought.

Section 16.07. Successors. All of the covenants, agreements, terms and conditions contained in this lease shall apply to, accrue to and be binding upon the respective heirs, personal representatives, successors and assigns of Lessor and the successors and permitted assigns of Lessee.

Section 16.08. Governing Law. This lease shall be governed and construed in accordance with the laws of the United States of America.

Section 16.09. Recordation of Lease. Lessee may record a memorandum or short form of this lease, and Lessor agrees to cooperate with Lessee to effectuate this purpose.

Section 16.10. Copies of Documents. Lessee shall deliver to Lessor at no cost to Lessor copies of all plans, maps, legal decisions, photographs, video and audio tapes, written reports, surveys and similar documents obtained by Lessee for the Property.

Section 16.11. Tax-Deferred Exchange. Lessee acknowledges that Lessor may elect to qualify this transaction under Section 1031 of the United States Internal Revenue Code for tax deferred like-kind exchange treatment, and Lessee agrees to cooperate with Lessor, including the signing of any necessary documents, to qualify this transaction for tax-deferred, like-kind

exchange treatment; provided that Lessor shall not be required to take title to any property in connection with such exchange. Lessor agrees to indemnify Lessee for any and all liability and reasonable expenses incurred by Lessee as a result of Lessor's efforts to qualify this transaction for like-kind exchange treatment or for any tax liability that may be suffered by Lessee and caused by Lessor's failure to qualify this transaction for tax deferred treatment.

Section 16.12 Statehood. During the term of this lease Lessee shall not support the inclusion of the Property into any of the states of the United States of America, its commonwealths, other territories, possessions or federated states unless Lessor consents in writing. This Section 16.12 shall have no force and effect in the event that Lessee exercises its option to purchase the Property.

Section 16.13 Treasure. During the term of this lease, Lessor reserves 75% of any discrete pieces of treasure found from time to time on or about the Property, as opposed to an undivided 75% interest in any such pieces, which shall constitute a fair and representative sampling of such treasure and at the sole election of Lessor, Lessor shall reserve 75% of the value of any treasure found from time to time as that may be converted to United States currency. Lessee's share of such treasure shall be 25% during the term of this lease. In the event that Lessee purchases the Property, Lessor's percentage shall decrease to 25% and Lessee's percentage shall increase to 75%. Each party shall be responsible to pay taxes assessed against such party with respect to such treasure.

Section 16.14 No Party Deemed Drafter; Lessor Encouraged to Engage Counsel. Lessor and Lessee agree that no party shall be deemed to be the drafter of this lease and that in the event this lease is ever construed by a court of law, such court shall not construe this lease or any provision hereof against any party as the drafter of the lease. Lessee has been represented by counsel in the negotiations and drafting of this lease. Lessor acknowledges that Lessee and Lessee's attorney have encouraged Lessor to engage counsel to represent Lessor in the negotiations and drafting of this lease. Should Lessor not retain counsel, Lessor will not assert any claim against Lessee or its attorney that Lessee or its attorney used undue influence over Lessor.

Section 16.15 Media Releases. Savio Realty, Ltd. shall coordinate all media releases concerning the subject matter of this lease; provided, that all such media releases will mention Lessor's right to market the Property during the first two years of this lease.

Section 16.16. Nonrecourse. This lease shall be nonrecourse to Lessee and any claims by Lessor or any other parties against Lessee arising out of or in connection with this lease shall be limited to Lessee's interest in this lease.

Section 16.17. United States Dollars. All sums required to be paid under this lease shall be paid in United States dollars or the equivalent, upon mutual agreement by Lessor and Lessee.

[REMAINDER OF PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have executed this instrument as of the day and year first above mentioned.

KINGMAN REEF ATOLL INVESTMENTS, LLC, a Hawaii limited liability company

By Leslie Vincent Fullard-Leo
Leslie Vincent Fullard-Leo, Trustee under that certain unrecorded Living Trust of Leslie Vincent Fullard-Leo, dated February 12, 1986, as amended
Its Member Manager

Lessor

KINGMAN REEF ATOLL DEVELOPMENT, LLC, a Hawaii limited liability company

By Peter B. Savio
Peter B. Savio
Its Member Manager

Lessee

# EXHIBITS

A - legal description
B - master plan

EXHIBIT A

ALL of those certain parcels of land situate in the Pacific Ocean, described as follows:

The atoll commonly referred to as "Kingman Reef", located 162 degrees 18 minutes West Latitude and 6 degrees 23 minutes North Longitude, Central Pacific Ocean, Line Islands Group, described as TMK 391-38 in the Territorial Tax Office 1936, State of Hawaii, including the land, reef platforms, lagoons and territorial waters thereof.

Kingman Reef was annexed to the United States of America on May 10, 1922 and ownership of Kingman Reef was claimed on behalf of the Island of Palmyra Copra Company, by its agent Lorrin A. Thurston. The formal annexation document was sent by the Island of Palmyra Copra Company to the State Department in Washington D.C. and was duly acknowledged. A copy was also filed in the Territorial Archives in Honolulu, Hawaii, and was published in the local Honolulu newspapers, and is attached hereto.

Kingman Reef was subsequently ceded to Mr. and Mrs. Leslie Fullard-Leo on August 14, 1922, by the directors of the Island of Palmyra Copra Company. On December 29, 1934, Kingman Reef was placed under the jurisdiction of the Secretary of the Navy, by Executive Order No. 6935 signed by President Franklin D. Roosevelt, a copy of which is also attached hereto.

Case 1:06-cv-00626-MBH Document 11 Filed 02/22/2007 Page 23 of 82

64TH YEAR. NO. 12,789— PAGES. HONOLULU, TERRITORY OF

# U. S. FLAG OV

# Honolulu Party On Sampan Palmyra Takes Possessio Of Kingman's Reef May

## HISTORY IN MAKING; A PACIFIC DOCUMENT

"BE IT KNOWN TO ALL PEOPLE:

"That on the tenth day of May, A. D., 1922, the undersigned, agent of the Island of Palmyra Copra Co., Ltd. (an Hawaiian corporation), landed from the motor ship 'Palmyra' doth, on this tenth day of May, A. D., 1922, take formal possession of this island called Kingman's Reef, situate in longitude 162 18 west and in latitude 6 23 north; on behalf of the United States of America, and claim the same for said company.

"LORRIN A. THURSTON,

"Agent The Island of Palmyra Copra Co., Ltd.

"Witnesses:

"CAPTAIN HERMAN CHARLES LEMMEL,

"JOHN L. PADGETT,

"DIDLER D. THAANUM,

"THEODORE T. DRANGA,

"M. VASCONCELLOS.

"I hereby certify that the foregoing is a correct copy of certificate of possession of 'Kingman's Reef,' the original of which is deposited in a glass jar on the island at the easterly end of the reef, together with a copy of the Honolulu Star-Bulletin of May 3 and Honolulu Advertiser of May 4, and an American flag which had first been hoisted on a pole on the island at the time of making the proclamation of possession."

To the uninitiated it may be stated that the foregoing procedure is prescribed by American statute as that proper to follow in annexing territory to the United States—to be followed by the filing of a certificate of the facts, with the State Department at Washington.

The foregoing is the story of the "Annexation of Kingman's Reef." It now being demonstrated that there is a "really truly" island involved, I submit that it is entitled to a name of its own, and that "Leo Island" is an appropriate name.

In a later statement I will record reasons concerning the feasibility and advisability of attempting to create a workable landing and station at Kingman's Island.

LORRIN A. THURSTON.

## Here's to Him!

... man, Lorrin A. Thurston, who has car-

## Land Listed by U. S. Navy but Hith Definitely Known or Possessed nexed" and Found to Be Real Islanc Good Harbor and Ideal Natu Landing Facilities

## THURSTON SUGGESTS NAME "LEO ISI

### Valuable Possibilities as Naval or Commerci Revealed by Explorers' Visit to Spot in I Supposed to Be Only a Dangerous R

[Copyright Applied for]

"KINGMAN'S REEF," Wednesday, May 10, 19 cial Correspondence to The Advertiser by Thurston].

The above name awakens no memories in the 99.99 per cent of the people of Hawaii, and the da one picked at random from 365 on the year's calend the whole 100 per cent are concerned.

But the name "Kingman" will hereafter be know and it may be destined to bulk large in future history cific, while May 10, 1922, for weal or woe, importa portant, will hereafter mark a date in the history of of the United States of America!

What is this all about?

What is Kingman's?

Where is Kingman's?

Why is it Kingman's?

What is it to the United States?

Why is it of importance to anyone?

Is this a fairy story or a feature sensation for the S per?

I will answer all of these questions to the best of but "firstly in the first place," let me say that this fairy tale nor other form of "South Sea literature!" I record of facts, free of sensation—except as the fact may provide the elements of sensation!

The one outstanding, central fact around which a ers cluster, is that "Kingman's" this day became Am ritory. In other words, these United States have "ann other "island possession!"

The second outstanding fact is that "Kingman" is congeries of dangerous shoals, "bare at low water," a officially described, but is a real island ...

# Executive Order

## PLACING CERTAIN ISLANDS IN THE PACIFIC OCEAN UNDER THE CONTROL AND JURISDICTION OF THE SECRETARY OF THE NAVY

### WAKE ISLAND, KINGMAN REEF, AND JOHNSTON AND SAND ISLANDS

By virtue of and pursuant to the authority vested in me by the act of June 25, 1910, ch. 421, 36 Stat. 847, as amended by the act of August 24, 1912, ch. 369, 37 Stat. 497, and as President of the United States, it is ordered that Wake Island located in the Pacific Ocean approximately in latitude 19°17′28″ N. and longitude 166°34′42″ E. from Greenwich, Kingman Reef located in the Pacific Ocean approximately in latitude 6°24′37″ N. and longitude 162°22′ W. from Greenwich, and Johnston and Sand Islands located in the Pacific Ocean approximately in latitude 16°44′32″ N. and longitude 169°30′59″ W. from Greenwich, together with the reefs surrounding all the aforesaid islands, as indicated upon the diagram hereto attached and made a part of this order, be, and they are hereby, reserved, set aside, and placed under the control and jurisdiction of the Secretary of the Navy for administrative purposes, subject, however, to the use of the said Johnston and Sand Islands by the Department of Agriculture as a refuge and breeding ground for native birds as provided by Executive Order No. 4467 of June 29, 1926.

This order shall continue in full force and effect unless and until revoked by the President or by act of Congress.

FRANKLIN D ROOSEVELT

THE WHITE HOUSE,

*December 29, 1934.*

# EXHIBIT B

# LICENSE AGREEMENT
# (KINGMAN REEF)

THIS LICENSE AGREEMENT ("Agreement") is made and entered into this 17th day of November, 2000, by and between KINGMAN REEF ATOLL DEVELOPMENT, LLC, a Hawaii limited liability company, whose principal place of business and post office address is 931 University Avenue, Suite 202, Honolulu, Hawaii 96826 ("Licensor"), and KINGMAN REEF ENTERPRISES, LLC, a Washington limited liability company, whose business and post office address is 8113 S.E. 74th Place, Suite 312, Mercer Island, Washington 98040 ("Licensee"), with reference to the following:

## PREAMBLE

This Agreement covers portions of the atoll commonly referred to as "Kingman Reef" and the waters surrounding Kingman Reef, the same being more particularly described in Exhibit A hereto. Kingman Reef lies 33 miles northwest of Palmyra Island atoll and includes Kingman Reef's beaches and lagoons. Kingman Reef is a possession of the United States and subject to federal laws, but it is not subject to the laws of any state (including the State of Hawaii) or county (including the City and County of Honolulu). Licensee acknowledges that federal legislation was recently introduced that may include Kingman Reef as part of Palmyra Island within the jurisdiction of the State of Hawaii. Licensor makes no representations as to whether or not such legislation will be enacted, the terms of such legislation or what effect it may have on this Agreement, nor whether any similar legislation will be introduced and/or enacted in the future. Licensee agrees to accept this Agreement, subject to such legislation or any other legislation hereafter enacted which affects Kingman Reef or its waters, whether or not such legislation has an adverse effect on Licensee's rights or activities under this Agreement, but without affecting Licensee's rights under Section 1.08(3)(b) hereof.

Other than use by the United States military during World War II for military activities, to Licensor's knowledge, Kingman Reef has not been successfully used or developed for any commercial purpose. Licensor desires to develop Kingman Reef gradually and in a manner that will preserve its unique environment and ecosystems for future generations. In that regard, Licensor has, to date, limited access to and activity on Kingman Reef. Licensor has agreed to execute this Agreement with Licensee with the understanding by both parties that the rights granted to Licensee hereunder are restricted to specific activities in specific areas for a limited period of time.

It is the overriding intent of Licensor, and the understanding of Licensee, that this Agreement shall be interpreted and construed in accordance with the foregoing paragraphs.

EXHIBIT "32"

**WITNESSETH:**

## ARTICLE 1

## LICENSES AND TERM

**Section 1.01.** **Introduction; Definitions**. The intent of the parties is that Licensee shall have the exclusive right to use Kingman Reef for commercial fishing and related transport and support operations, as set forth in this Agreement, and that Licensor shall not allow Kingman Reef to be used for such operations by any others. The following words when used in this Agreement (unless the context shall otherwise provide) shall have the following meanings:

"Agents" are defined in Section 1.02(2)(a) of this Agreement.

"Arrival Date" is defined in Section 2.01 of this Agreement.

"Base Camp" is defined in Section 1.02 of this Agreement.

"Chart" is defined in Section 1.03(13) of this Agreement.

"Employees" are defined in Section 1.02(2)(a) of this Agreement.

"Events of Default" are defined in Section 10.01 of this Agreement.

"Gross Sales" are defined in Section 2.02 of this Agreement.

"Guests" are defined in Section 1.02(2)(a) of this Agreement.

"Hazardous Materials" are defined in Section 3.04 of this Agreement.

"Hazardous Materials Laws" are defined in Section 3.04 of this Agreement.

"Independent Contractors" are defined in Section 1.02(2)(a) of this Agreement.

"Kingman Reef" is defined in the first paragraph of the Preamble to this Agreement.

"Land" is defined in Section 1.05.2 of this Agreement.

"License Fees" are defined in Section 2.01 of this Agreement.

"Licensee" is defined in the first paragraph of this Agreement.

"Licensor" is defined in the first paragraph of this Agreement.

"Master Lease" is defined in Section 1.08 of this Agreement.

"Master Lessor" is defined in Section 1.08 of this Agreement.

"Period" is defined in Section 1.11 of this Agreement.

"Planning Period" is defined in Section 1.10(1) of this Agreement

"Security Deposit" is defined in Section 14.01 of this Agreement.

"System" is defined in Section 1.02(2)(b) of this Agreement.

"Term" is defined in Section 1.10 of this Agreement.

"Treasure" is defined in Section 16.10 of this Agreement.

**Section 1.02.** <u>**Base Camp License**</u>. Licensor, in consideration of the license fees reserved and of the covenants contained in this Agreement on the part of Licensee to be observed and performed, and upon and subject to the terms and conditions set forth in this Agreement, does grant to Licensee and Licensee does accept from Licensor, the exclusive right and license to occupy, use and enjoy during the Term (subject only to the rights of the Master Lessor and Licensor hereunder) that portion of Kingman Reef shown on Exhibit C annexed hereto and made a part hereof for the purpose of constructing and maintaining a floating base camp ("the Base Camp"), with a usable surface above mean sea level of not more than two (2) acres upon the following conditions and restrictions:

(1) The exact boundaries of the Base Camp shall be described by means of Global Positioning System (GPS) readings taken by Licensee on-site at the boundary corners and approved in writing by Licensor as soon as possible after the beginning of the Term. Such corners will be marked by Licensee on site by fixed buoys. Licensee shall have no right increase the area of or change the boundaries of the Base Camp without having first obtained the prior written approval of the Licensor, the Master Lessor and all governmental authorities and entities having jurisdiction over Kingman Reef and whose approval is required.

(2) The Base Camp shall be used and occupied by Licensee solely in support of Licensee's permitted operations under this Agreement, subject to the following conditions and restrictions:

(a) Licensee shall have the right to construct on the Base Camp such housing units, storage facilities, fish drying sheds, communication facilities and other facilities and improvements as Licensee shall deem desirable to support its permitted operations under this Agreement, subject to Licensor's prior written approval

of master plans provided by Licensee (which approval shall not be unreasonably withheld) and provided that no facility or improvement constructed by Licensee (other than radio towers) shall exceed forty (40) feet in height. The total number of persons permitted to live in housing located on the Base Camp shall be not more than one hundred (100), all of whom shall be "agents", "employees", "independent contractors" or "guests" (as defined below) of Licensee. The foregoing license does not include any other areas, buildings, structures or vessels located outside the Base Camp, which Licensee is prohibited from occupying or using in any manner, except as permitted under Sections 1.05, 1.06 and 1.07 of this Agreement.

For purposes of this Agreement, (i) the term "agent" shall mean and include any person authorized by Licensee to act on Licensee's behalf; (ii) the term "employee" shall mean and include any person who performs work for Licensee in exchange for salary or wages and is classified as an "employee" under federal law; (iii) the term "independent contractor" shall mean and include any person who provides equipment, facilities, goods or services to Licensee under contract in exchange for payment by Licensee, but is not classified as an "employee" under federal law; and (iv) the term "guest shall mean and include any person who is present at Licensee's invitation. All agents, employees, independent contracts and employees must be present for the purpose of supporting Licensee's operations under this Agreement. Any person who pays or otherwise compensates Licensee for the right to perform such work or is performing such work for recreation, shall not be considered an agent, employee, independent contractor or guest. The foregoing definitions shall apply solely to Licensee, and not to Licensor or Master Lessor.

(b) Licensee may install a water and waste management system to be used for Base Camp use and other permitted operations under this Agreement (the "System"). The System may include a water storage/catchment system, an R/O Water Maker and septic tanks, each with a capacity sufficient to meet the requirements of Licensee's permitted operations under this Agreement. In addition, Licensee shall comply with the following requirements: (i) all human waste from vessels and from the Base Camp shall be treated with a United States Coast Guard-approved septic system prior to being discharged into the ocean not less than three (3) miles from Kingman Reef, (ii) no outhouses or cesspools will be permitted and all human waste from Base Camp operations must be disposed of by septic tank or other treatment methods and disposed of not less than three (3) miles from Kingman Reef, (iii) fish waste must be disposed of at sea not less than three (3) miles from Kingman Reef or by other legal disposal methods approved by Licensor, (iv) no trash or waste shall be burned or buried at Kingman Reef; and (v) no discharges of any kind shall be made into the Kingman Reef lagoon; provided, however, that, Licensor hereby permits Licensee to (w) install septic tanks and/or incinerator-type or self-composting toilet systems for disposal of human waste, (x) grind fish waste to be frozen and held aboard vessels for use as palu (chum) for fishing operations permitted under this Agreement, and (y) compact and remove or burn trash and other waste by an incinerator system approved by Licensor, so long as all ashes and other remaining material are disposed of by legal methods. Notwithstanding anything to the contrary contained herein, if at any time Licensor

determines in its sole discretion that any act or omission by Licensee is causing ecological or environmental harm to Kingman Reef or the waters or ecosystems thereof, then Licensor shall have the right to require Licensee to implement changes to the System which are acceptable to Licensor in its sole discretion and which may be more restrictive than applicable laws, in order to reduce or eliminate such harm. Unless and until the installation of the waste management portion of the System is completed, all waste will be retained aboard one or more vessels and disposed of not less than three (3) miles from Kingman Reef. No waste material shall be disposed of less than three (3) miles from Kingman Reef.

(c) Licensee may install a communication system and associated structures within the Base Camp. Said communication system shall be available for use by Licensor and Master Lessor, and their agents, employees, independent contractors and guests, at reasonable times when such use does not unreasonably interfere with Licensee's permitted operations under this Agreement and Licensee shall charge said users solely for the actual airtime cost payable by Licensee for such use. The foregoing right shall not prevent Licensor from installing and using its own system or communication devices. Licensee and Licensor agree that each of their respective systems and devices shall not unreasonably interfere with the other party's systems and devices.

All of the foregoing uses of the Base Camp shall be subject to the general conditions contained elsewhere in this Agreement, including, without limitation, Sections 1.12, 3.01 and 4.04. The Base Camp shall not be used for any purpose except to support Licensee's permitted operations under this Agreement, and no other buildings or structures may be constructed on the Base Camp or elsewhere on Kingman Reef without Licensor's prior written consent, which will not be unreasonably withheld. The Base Camp shall not be occupied by any persons other than the one hundred (100) people described above.

**Section 1.03** **<u>Commercial Fishing License</u>**. Licensor hereby grants to Licensee the exclusive right and license during the Term to fish solely for commercial (resale) purposes in the waters not shallower than 100 fathoms off Kingman Reef and not closer than 12 miles to Kingman Reef, subject, however, to the terms of Section 1.03(14) below. No commercial fishing will be permitted in the lagoons at Kingman Reef. Licensor agrees that it will not grant to any other person or entity a right or license to use Kingman Reef for any activity in support of commercial fishing or fish processing or for the storage, transportation or transshipment of fish or fish products for commercial purposes. Licensee agrees that Licensor shall not be liable in the event that any person or entity fishes in such waters for commercial purposes or transits such waters in support of commercial fishing operations without Licensor's consent or approval. The license granted hereunder shall be subject to the following conditions and restrictions::

(1) Licensee may use motherships and/or vessels and barges or support vessels based in the Kingman Reef lagoon to receive, process and store

seafood and seafood products harvested under this commercial fishing license, for storage of fuel and supplies and for other operations and activities permitted under this Agreement. Licensee shall utilize not more than forty-five (45) harvesting vessels in its fishing operation, none of which shall exceed 500 feet in length. The vessels employed by Licensee under this Agreement may be owned or operated by Licensee or by other persons or entities conducting their operations under contract with Licensee; provided, however, that Licensee shall be responsible for ensuring that all commercial fishing operations and operations in support thereof are conducted in accordance with the requirements of this Agreement. Prior to the employment of any vessel in operations permitted under this Agreement, Licensee shall provide Licensor with documents evidencing the identity of the owner(s) of such vessels, insurance in amounts and with coverage customary in the State of Hawaii for such vessels and their operations, and any other documents requested by Licensor with respect to such vessels. Licensee shall have the right to substitute vessels from time to time, subject to the terms and conditions of this Agreement.

(2) Except as otherwise expressly provided in this subsection 1.03(2), Licensee may fish for all species of fish, shellfish and other marine species, including without limitation all species of tuna, marlin and swordfish. Licensee shall not fish for tropical fish captured live for the aquarium trade, sharks, porpoises, rays (manta, sting, etc.), turtles, clams or coral, except if caught as a by-product of fishing for permitted marine species, and provided that all such bycatch species shall be returned to the sea promptly and with a minimum of injury.

(3) Licensee may use any lawful fishing method or gear. Strict fishing records shall be maintained in accordance with Section 1.12(8).

(4) Prior to exercising such license, Licensee shall mark the main channel entrance to the Kingman Reef lagoon with reflective flexible buoys. Licensee shall verify and maintain the existing range at all times.

(5) Licensee may deploy fish aggregating buoys not shallower than 100 fathoms off Kingman Reef.

(6) Licensee shall not fish or conduct its operations in any manner which damages the coral reefs of Kingman Reef. Licensee shall not fish in the lagoons of Kingman Reef and shall not harvest or harm ocean clams.

(7) Licensee acknowledges and agrees that this Agreement shall not affect Licensor's or Master Lessor's legal and equitable title to the waters covered by this license and Licensee shall not claim any title or interest in said waters or any land adjacent thereto.

(8) Licensee agrees that it will exercise this license in a reasonable manner and shall cooperate with Licensor to minimize the impacts of its permitted operations under this Agreement on the waters and ecosystems of Kingman Reef.

(9) Except to the extent permitted under this Agreement, Licensee shall not use or authorize any other persons, entities or vessels to fish in the waters surrounding Kingman Reef. Further, Licensee shall not purchase or receive any fish or other marine species from other persons, entities or vessels, except as permitted by this Agreement.

(10) All harvesting vessels engaged in permitted fishing operations under this Agreement will be given access to the lagoon at Kingman Reef, as shown on Exhibit B, for the following purposes and subject to the following restrictions:

(a) Harvesting vessels must off-load one hundred percent (100%) of their catch to Licensee at Kingman Reef.

(b) Harvesting vessels will be allowed to purchase from Licensee bait, ice, fuel (subject to the terms of this Agreement), potable water, food, tackle and other goods and services required in connection with the permitted fishing operations.

(c) Harvesting vessels shall not discharge any waste or other matter into the lagoons or any other waters closer than three (3) miles offshore of Kingman Reef, including, but not limited to, gray water, sewage and fish remains. Notwithstanding the foregoing, discharges from R/O water systems and on-board vessel cooling systems are permitted.

(d) Harvesting vessels shall be permitted to moor to the Base Camp (but nowhere else in the lagoon) only as necessary for operations in support of Licensee's permitted operations under this Agreement and the time that harvesting vessels spend in such lagoon shall be minimized, consistent with the needs and requirements of Licensee's permitted operations. In case of inclement weather, inability to enter the channel, or if the mooring area is fully occupied, then vessels are to remain at sea.

(e) Licensee's agents, employees, independent contractors and guests must stay on their respective vessels, and no persons will be permitted to visit Kingman Reef, except when docking and unloading catch, when purchasing items from Licensee, when transiting Kingman Reef in connection with transportation by sea or air, or when using those areas specified in this Agreement for Licensee's use (with Licensee's permission).

(11) Licensee may use mothership vessels and barges or support vessels in its operations under this Agreement, subject to the following restrictions:

(a) The mothership vessels will be of a size suitable for the operations proposed and shall not exceed 500 feet in length without the prior written approval of Licensor (which approval shall not be unreasonably withheld).

(b) The operations of the mothership vessels and any barges or support vessels shall be subject to the terms and conditions of Section 1.02(2)(b) above concerning waste disposal.

(c) The operations of the motherships and/or vessels and any barge(s) or support vessel(s) shall be limited to receipt, processing and storage of seafood and seafood products harvested in commercial fishing operations permitted under this Agreement, and activities in support of such operations. Licensee may use the mothership vessel, barge(s) and support vessel(s) permitted hereunder for any operations or activities which may be conducted at the Base Camp under Section 1.02 of this Agreement.

(d) All motherships, vessels, barges and support vessels permitted to enter the lagoon shall moor only at the Base Camp and such other mooring points as are approved by Master Lessor and Licensor in their sole discretion, and shall not, except in the case of an emergency, drop anchor anywhere in the lagoon.

(12) No vessel maintenance or repairs shall be conducted in waters closer than three (3) miles offshore of Kingman Reef, except for emergency repairs and normal daily seagoing repairs and maintenance.

(13) Where any distance specified in this Section 1.03 or elsewhere in this Agreement is to be measured seaward of Kingman Reef, such distance shall be measured from the 100 fathom line offshore of Kingman Reef, as shown on Chart #83153 (1st ed. 8/13/77, rev. 5/31/86) published by the U.S. Department of Commerce, National Oceanic and Atmospheric Administration (the "Chart"). For example, if the distance specified is 3 miles from Kingman Reef, then the 3 miles must be measured beginning at the 100 fathom line outside of the perimeter of the Kingman Reef lagoon, shown on the Chart.

(14) Licensee acknowledges and agrees that an exclusive license to fish the waters within twelve (12) miles of Kingman Reef is currently held by Palmyra Pacific Enterprises, LLC ("PPE") under a separate license agreement dated July 1, 1999 (the "PPE License"). In the event of the termination or expiration of the PPE License, or in the event that Licensee acquires PPE and all of its assets, the commercial fishing license granted under this Section 1.03 will automatically be amended, without further action by Licensor or Licensee, to permit Licensee to fish the waters within twelve (12) miles of Kingman Reef under the same terms and conditions, and with the same restrictions, as currently apply to Licensee's fishing rights under this Agreement.

**Section 1.04** <u>**Transportation License**</u>. Licensor hereby grants to Licensee the exclusive right and license to transport seafood and seafood products harvested under this Agreement for commercial (resale) purposes, as well as individuals, equipment, supplies and materials in support of commercial fishing operations, to or from Kingman Reef; provided that Licensee may only transport

seafood and seafood products harvested pursuant to this Agreement. In addition, Licensor hereby grants to Licensee a non-exclusive right and license to transport Licensee's agents, employees, independent contractors, guests, equipment, materials and supplies to and from Kingman Reef solely for Licensee's permitted uses and operations under this Agreement. Licensor and its agents shall have the right and authority, at any and all times, and at any location either at or in transit from Kingman Reef, to conduct examinations and searches of (a) the contents of any container of any kind, and (b) any vessel, vehicle, aircraft or other conveyance used in connection with this license; provided, however, that Licensor shall not unreasonably interfere with the conduct of Licensee's permitted activities under this Agreement.

During the Term of this Agreement, Licensor agrees that it will not grant to any other person or entity a license to transport seafood or seafood products for commercial purposes to or from Kingman Reef.

**Section 1.05** **<u>Runway License</u>**.

**1.05.1** **<u>Lagoon Runway</u>**. Subject to the following conditions and restrictions, Licensor hereby grants to Licensee a non-exclusive right and license to use a portion of the Kingman Reef lagoon, to be located within the area designated on Exhibit "B", for take-off and landing of seaplane aircraft in support of Licensee's commercial fishing operations under this Agreement:

(1) Licensor makes no representations concerning the condition of the Kingman Reef lagoon or its suitability for Licensee's use as a seaplane runway.

(2) Licensee shall be permitted to taxi aircraft to and from designated areas of the Base Camp for purposes of loading and unloading fish and supplies in support of Licensee's commercial fishing operations under this Agreement, provided that Licensee shall at all times comply with applicable laws and regulations governing the operation of seaplane aircraft and shall use the designated runway and taxi areas at Licensee's sole risk.

(3) Licensee may not authorize any other aircraft, whether commercial or private, to use the lagoon runway for any purpose except in connection with Licensee's permitted operations under this Agreement, without Licensor's prior written consent, which may be withheld in Licensor's sole discretion or conditioned upon satisfaction of conditions determined by Licensor in its sole discretion.

(4) Licensee's use of the lagoon for runway purposes shall be limited solely to operations in support of Licensee's commercial fishing operations under this Agreement.

(5) Licensee's right to use the lagoon for aircraft runway purposes shall not preclude Master Lessor or Licensor from using the lagoon or authorizing others to use the lagoon for runway or other purposes; provided, however,

that during the Term of this Agreement, Licensor agrees that it will not grant to any other person or entity a right or license to access, occupy or use the lagoon for runway purposes for the transportation of seafood or seafood products for commercial purposes.

**1.05.2** __Land Runway__. Subject to the prior approval of the Master Lessor and Licensor, at any time during the term of this Agreement, Licensee shall have the right to petition and/or apply to the appropriate governmental authorities for permission to construct on the land area shown on Exhibit B (the "Land") an aircraft runway to be used in support of Licensee's commercial fishing operations, subject to the following conditions and restrictions:

(1) Prior to commencement of construction of such runway, Licensee shall provide Licensor with detailed plans and specifications showing the layout, location, dimensions and such other details of the proposed runway as requested by Licensor, and all such plans and specifications shall be subject to Licensor's prior written approval (which approval shall not be unreasonably withheld but shall be in addition to any approvals received from any governmental authority or agency having jurisdiction over the construction of runways at Kingman Reef).

(2) All costs and expenses of obtaining all necessary approvals and permits, planning, constructing, maintaining and repairing such runway shall be borne exclusively by Licensee.

(3) Licensee may not authorize any other aircraft, whether commercial or private, to use the runway for any purpose except in connection with Licensee's permitted operations under this Agreement, without Licensor's prior written consent, which may be withheld in Licensor's sole discretion or conditioned upon satisfaction of conditions determined by Licensor in its sole discretion.

(4) Licensee's use of the runway shall be limited solely to operations in support of Licensee's commercial fishing operations under this Agreement.

(5) Licensee's right to use the runway shall not preclude Master Lessor or Licensor from using the runway for purposes other than the transport of seafood or seafood products for commercial (resale) purposes.

During the Term of this Agreement, Licensor agrees that it will not grant to any other person or entity a right or license to access, occupy or use the lagoon for runway purposes or any land runway for the transportation of seafood or seafood products for commercial purposes.

**Section 1.06** __**Access Rights; Lagoon and Land**__.

(1) Licensor hereby grants to Licensee a non-exclusive right during the Term to enter the Kingman Reef lagoon for purposes in support of Licensee's commercial fishing operations, including access to the Base Camp and the right to moor permitted boats, ships and barges to the Base Camp for transhipping, processing and related purposes. Licensee's entry into the lagoon shall be at Licensee's sole risk, and Licensor makes no representations or warranties as to the navigability of any portion of the lagoon or the waters surrounding Kingman Reef. Licensee will indemnify, defend and hold harmless Licensor and the Master Lessor, and their respective officers, directors, employees, agents, heirs, personal representatives, successors and assigns from and against all claims, actions, suits, damages, costs and expenses, including attorneys' fees, by whomsoever brought or made, by reason of Licensee's entry into the Kingman Reef lagoon or the waters surrounding Kingman Reef, using counsel approved by Licensor and the Master Lessor, at Licensee's sole cost and expense.

(2) During the Term, Licensee's agents, employees, independent contractors and guests who visit Kingman Reef in support of Licensee's permitted operations and activities under this Agreement, including the crews of harvesting vessels, shall have a non-exclusive revocable right to enter upon and use the Land designated on Exhibit B for swimming, sunbathing and pedestrian exploration or sightseeing, subject to Licensee's supervision and control; provided, however, that (i) no part of Licensee's commercial operations shall be performed on the Land, (ii) no trash or waste of any kind shall be burned, buried or left upon the Land, (iii) no permanent structures shall be erected upon the land, (iv) no alterations of any kind shall be made to the geography or topography of the Land, and (v) nothing shall be taken to or from or done upon the Land which may cause ecological or environmental harm to Kingman Reef or the waters or ecosystems thereof. In particular, but not limiting the generality of the foregoing, nothing shall be done or permitted on the Land or in the surrounding waters which may damage or harm living coral or ocean clams or any other plant or animal life at Kingman Reef and its surrounding waters and lagoon. If at any time Licensor shall determine, in Licensor's sole judgment, that Licensee or any of Licensee's agents, employees, independent contractors or guests are entering upon or using the Land in violation of any of the conditions and restrictions contained herein, Licensor may suspend or revoke the rights granted under this Section 1.06(2) by notice to Licensee, and Licensee shall have no further right to enter upon or use the Land. Licensor makes no representations or warranties as to the condition, suitability or safety of the Land for any purpose. Each person entering upon the Land shall, prior to such entry, agree in writing that such access and entry shall be at such person's own risk, and each person shall agree to release, indemnify and hold Licensor and Master Lessor harmless from any loss, damage or liability arising in connection therewith.

(3) Except as expressly permitted in this Section 1.06, and except for Licensee's use of the Base Camp described in Section 1.02 and the lagoon runway described in Section 1.05; and except as permitted under Section 1.06(2), Licensee, its agents, employees, independent contractors and guests shall be deemed trespassers on all other areas of Kingman Reef (including, without limitation, land areas, reef areas, sand flats and lagoons), except if Licensee has requested occupancy or use of other

parts of Kingman Reef and Licensor has granted its approval (which may be withheld in Licensor's sole discretion or which may be conditioned upon restrictions such as location and time). Licensee will indemnify, defend and hold harmless Licensor and the Master Lessor, and their respective officers, directors, employees, agents, heirs, personal representatives, successors and assigns from and against all claims, actions, suits, damages, costs and expenses, including attorneys' fees, by whomsoever brought or made, by reason of any such trespass, using counsel approved by Licensor and the Master Lessor, at Licensee's sole cost and expense.

(4) Licensee shall not permit any vessel entering the lagoon or using the facilities of the Base Camp under this Agreement to be abandoned or to remain at Kingman Reef in an inoperable condition longer than necessary for emergency repairs.

**Section 1.07** <u>**Sales of Goods and Services**</u>. Licensor hereby grants to Licensee a non-exclusive right and license to sell goods and services from the Base Camp or the vessels described in Section 1.03 above, to its agents, employees, independent contractors and guests, to recreational vessels visiting Kingman Reef, and to the vessels described in Sections 1.03 (including, but not limited to, fish processing and shipping services); provided, however, that all goods and services sold to Licensee's agents, employees, independent contractors and guests shall be for their personal use and shall not be resold, and all sales of goods and services to others shall be at reasonable market prices; provided, further, that Licensee may not conduct a separate supply business from the Base Camp or such vessels, it being the intent of this Section that Kingman Reef shall not be used as a supply or refueling place for any vessels other than those described in Section 1.03; and further provided, that Licensee may store fuel at Kingman Reef for use by Licensee's vessels and for sale by Licensee to the vessels described in Section 1.03 and as permitted by this Section, provided that (1) Licensee, at its sole cost and expense, complies with all federal laws and regulations applicable to fuel storage and distribution, including without limitation, obtaining and maintaining all required permits and approvals, and (2) Licensee shall designate an area at the Base Camp for such fuel storage and distribution which shall not exceed 5,000 square feet, subject to Licensor's prior written approval (which approval shall not be unreasonably withheld).

**Section 1.08** <u>**Agreement Subject to Rights and Reservations of Others**</u>.

(1) Licensor hereby discloses, and Licensee acknowledges, that the federal government may have asserted or may assert claims regarding the ownership of Kingman Reef and its lagoons and territorial waters, which claims the Master Lessor disputes. Licensee acknowledges and agrees that Licensor has not made and does not hereby make any representations or warranties, express or implied, regarding the nature or extent of Licensor's or Master Lessor's interest in Kingman Reef or in the lagoons or territorial waters thereof. Without limiting the generality of the foregoing, Licensor hereby discloses and Licensee hereby acknowledges, that while the Master Lessor believes that the Master Lessor has rights to Kingman Reef, the nature of the

Master Lessor's interest in Kingman Reef has not been determined. All of Licensee's rights under this Agreement shall be solely as specified in this Agreement, and Licensee acknowledges and agrees that this Agreement is subject to the extent of Master Lessor's interest in Kingman Reef. Licensee further agrees that Licensor shall not be liable to Licensee or any other person, in the event that any person or entity enters Kingman Reef or its lagoons or territorial waters, for any purpose, absent a breach by Licensor of any covenant contained in this Agreement.

(2) Licensor and Licensee agree as follows:

(a) Master Lessor and Licensor may, in their sole discretion, but shall not be obligated to, defend their respective interests in and claims to Kingman Reef, Licensor's right to grant the license granted to Licensee under this Agreement and the validity and enforceability of this Agreement in accordance with its terms; provided that nothing herein shall require Master Lessor or Licensor to bring suit or join in any lawsuit. Master Lessor and Licensor may, in their sole discretion, but shall not be obligated to, cooperate with Licensee in the prosecution or defense by Licensee of any legal action or proceeding brought by or against Licensee (excluding any action brought by Licensor against Licensee or by Licensee against Licensor) in which Licensee's rights under this Agreement, or the validity or enforceability of those rights or this Agreement, may be adjudicated.

(b) If any person or governmental authority materially interferes with Licensee's permitted activities under this Agreement, then upon written notice to Licensor and payment of all accrued and unpaid amounts due to Licensor under this Agreement, Licensee may terminate this Agreement without further liability to Licensor. In the absence of a breach of this Agreement by Licensor, the foregoing shall constitute Licensee's sole and exclusive remedy as against Licensor and Master Lessor in the circumstances described. In the absence of a breach of this Agreement by Licensor, Licensee hereby waives and shall not have, claim or assert any other legal or equitable right or remedy, including, but not limited to, setoff, abatement, damages, specific performance or injunctive relief, against Licensor or Master Lessor, or any right or remedy in or against title to the Kingman Reef or the waters thereof, and hereby waives and shall not be entitled to file or record any notice of pendency of action or lis pendens against Kingman Reef or the waters thereof, and such rights or claims shall not exist.

**Section 1.09** <u>**Licensor's Rights**</u>. Licensee acknowledges and agrees that Licensor hereby reserves the right at any time to commence development activities, commercial operations, and/or take any other actions with respect to Kingman Reef, including, but not limited to, exercising Licensor's rights or granting rights to others which involve uses of the Land, waters or facilities (excluding, however, the Base Camp) as to which Licensee has been granted non-exclusive rights under this Agreement. Notwithstanding anything in this Agreement to the contrary, any act or omission of Licensor or any other person which does not violate Licensee's rights under this Agreement, shall not affect this Agreement or impose any liability on Licensor or be construed as a default by Licensor or constitute grounds for the reduction of the license

fees payable by Licensee. Without limiting the generality of the foregoing, Licensor shall not be liable to Licensee for any inconvenience, interference, annoyance, loss or damage resulting from the exercise of Licensor's rights; provided that the rights of Licensee under this Agreement shall not be abridged thereby.

**Section 1.10** Term. The term of this Agreement shall be as set forth below:

(1) For a period commencing on the date of this Agreement and expiring on the second (2nd) anniversary of that date, unless sooner terminated as provided herein, Licensee shall have all of the rights of the Licensee described herein as are necessary (but only such rights as are necessary) to perform planning operations and feasibility studies at Kingman Reef. This initial planning and study period is hereinafter called the "Planning Period". Licensee shall not engage in or perform any commercial or for-profit activities or operations at Kingman Reef during the Planning Period. In no event shall the Planning Period extend beyond two (2) years from the date of this Agreement.

(2) At any time during the Planning Period, Licensee may notify Licensor of Licensee's intent to commence commercial operations at Kingman Reef and shall specify a date prior to the end of the Planning Period upon which such operations shall commence (the "Commencement Date"). The Planning Period shall terminate and the first full term of this Agreement shall begin on the Commencement Date.

(3) If Licensee notifies Licensor within the Planning Period that Licensee does not intend to commence commercial operations at Kingman Reef, this Agreement shall terminate upon Licensor's receipt of such notice. In the event that Licensee neither notifies Licensor that it does not intend to commence commercial operations nor specifies a Commencement Date prior to termination of the Planning Period, this Agreement shall terminate automatically at the end of the Planning Period. Upon termination of this Agreement pursuant to this Section 1.10(3), neither party shall have any further rights or obligations hereunder, except that Licensor shall be obligated to remove, in a timely manner, all vessels, equipment, personnel, and any and all other materials which Licensee may have brought to Kingman Reef, and to vacate Kingman Reef, its lagoon and surrounding waters within sixty (60) days of termination of the Planning Period or be deemed liable for trespass.

(4) The first full term of this Agreement (the "Term") shall commence upon the Commencement Date (defined in Section 1.10(1) above) and shall expire on the tenth (10th) anniversary of the Commencement Date. Subject to the terms of this Section 1.10 and provided that this Agreement has not been earlier terminated in accordance with its terms, Licensee shall have the option to extend the Term of this Agreement, upon the same terms and conditions as contained herein, for two (2) additional consecutive ten (10) year periods. The first extension period shall commence on the tenth (10th) anniversary of the Commencement Date and shall expire on the twentieth (20th) anniversary of the Commencement Date, and the second extension period shall commence on the twentieth (20th) anniversary of the Commencement Date

and shall expire on the thirtieth (30th) anniversary of the Commencement Date, upon the following conditions: (i) Licensee shall deliver to Licensor written irrevocable notice of intent to extend the Term no earlier than one hundred eighty (180) days and no later than ninety (90) days prior to the expiration of the then current (original or extended) Term of this Agreement, (ii) no event of default has occurred during the current Term under Section 10.01(j), (iii) not more than three (3) events of default under Section 10.01 (excluding Section 10.01(j)) have occurred during the current Term, whether cured or not, (iv) no event of default has occurred which remains uncured at the end of the current Term, and (v) no event which would become an event of default upon the mere passage of time has occurred and shall remain uncured at the end of the current Term. Licensee shall not have any option to further extend the term of this Agreement beyond the second ten (10) year extension period.

Whether or not this Agreement is terminated under Section 10, Licensor may terminate the foregoing option to extend this Agreement upon the occurrence of (x) an event of default during the original or the first extended Term under Section 10.01(j) or (y) an aggregate of more than three (3) events of default during the original and/or first extended Term under Section 10.01 (excluding Section 10.01(j)), whether cured or not cured. Licensor may terminate Licensee's option to extend the Term without terminating this Agreement, but if Licensor terminates this Agreement, then Licensee's option to extend the Term shall also terminate.

Licensor shall have thirty (30) days after Licensor's receipt of Licensee's notice of intent to extend the Term to notify Licensee of Licensor's termination or acceptance of said extension; provided, however, that if at any time thereafter any of the events entitling Licensor to terminate Licensee's right to extend the Term occurs, then Licensor shall have ten (10) days to notify Licensee of such termination.

**Section 1.11** **Right of First Refusal**. If at any time prior to the expiration of the original or any extended Term or within ninety (90) days thereafter (the "Period"), Licensor receives an offer to conduct the commercial fishing and/or related transportation activities licensed by this Agreement after the expiration of the Term, which offer Licensor wishes to accept, then Licensor shall first notify Licensee in writing of Licensor's intention to accept said offer and shall send to Licensee the terms and conditions of such offer. Licensee shall have the right within ten (10) days after receipt of Licensor's written notification to accept the terms of said offer in its own name. If Licensee shall not so elect within said ten (10) day period, Licensor may then grant such license(s) to any other person, provided said license(s) shall be on the same terms and conditions as set forth in the proposed offer sent to Licensee. This right of first refusal shall terminate and be of no force or effect upon (a) expiration of the Period or (b) termination of this Agreement for any reason other than expiration of the Term, whichever occurs first.

**Section 1.12** **General Conditions**. The following conditions shall apply to Licensee's exercise of its rights under this Agreement:

(1) All costs incurred by Licensee in connection with the rights granted to Licensee under this Agreement shall be paid by Licensee.

(2) At all times, Licensee shall not exceed the specific number of Licensee's agents, employees, independent contractors and guests which are specified in this Agreement. Licensee acknowledges and agrees that the provisions of this Agreement are based on the foregoing maximum number of persons, and the permitted number of persons shall not be increased without Licensor's prior written consent (which may be withheld in Licensor's sole discretion).

(3) No agents, employees, independent contractors or guests of Licensee shall remove anything from Kingman Reef (including, but not limited to, dead or live plants or animals), except for the fish caught pursuant to the license granted to Licensee under this Agreement, rats, derelict or abandoned equipment, refuse or debris removed for disposal with Licensor's approval, and any buildings, fixtures or equipment (including the floating Base Camp) owned by Licensee, its agents, employees, independent contractors and guests, .

(4) Without the prior written consent of Licensor, which may be withheld in Licensor's sole discretion, no agents, employees, independent contractors or guests of Licensee shall bring any plants or animals to Kingman Reef.

(5) No motor vehicles shall be allowed on the Land. No motor vehicles shall be allowed at the Base Camp, except those required for Licensee's operations under this Agreement and approved in writing by Licensor (which approval shall not be unreasonably withheld). Limited numbers and types of recreational water vehicles or boats may be allowed in the waters of Kingman Reef with Licensor's prior written approval (both as to numbers and types), provided, however, that the presence and/or operation of such vehicles shall not cause any damage or harm to any reefs or lagoons or sealife in the Kingman Reef's lagoon or surrounding waters.

(6) Licensee and its agents, employees, independent contractors and guests will comply with all federal laws applicable to Licensee's activities under this Agreement, including, but not limited to, the Endangered Species Act.

(7) Licensee shall use a certified scale for weighing all fish handled by Licensee pursuant to this Agreement.

(8) Licensee shall maintain written records of all of Licensee's activities and operations under this Agreement, in such detail as may be required by Licensor in its sole discretion from time to time, including, but not limited to, the types and quantities of fish (including bycatch species) caught by Licensee and others under Section 1.03 hereof, the names and addresses of all agents, employees, independent contractors and guests of Licensee under this Agreement, their purpose for going to Kingman Reef, the length of their stay, what types and how much fish were caught (including weight and number of each type or species), and such other information as Licensor may

require from time to time in its sole discretion. Licensee shall prepare and deliver to Licensor copies of records summarizing its activities under this Agreement for each month of the Term on a quarterly basis within thirty (30) days after the end of each calendar quarter, or more frequently as Licensor may request from time to time in its sole discretion.

(9) Neither the Base Camp, the Land, the Kingman Reef lagoon nor any other part of the premises covered by this Agreement shall be used for the business of shipping or transporting persons or cargo, or as a re-fueling stop for aircraft or boats, except to the extent expressly permitted under this Agreement. All such shipping, transportation and re-fueling shall be strictly in accordance with the provisions of this Agreement.

(10) No employees, agents, contractors or guests of Licensee may enter Kingman Reef or its waters, except to the extent and for the purposes permitted under this Agreement. Licensee shall not permit or cause any of its employees, agents, independent contractors or guests to enter Kingman Reef or its surrounding waters and lagoon for any other purpose, without Licensor's prior written approval, which may be withheld in Licensor's sole discretion. Such approval, if granted, shall be subject to the following:

(a) All persons entering Kingman Reef, its lagoon or surrounding waters or the Land shall enter at their sole risk; shall comply with all rules and regulations imposed by Licensor and enforced by Licensor's resident manager; shall in no event remove any dead or live plants, animals, fish, shellfish or other marine species from Kingman Reef, except as permitted under this Agreement; and shall check in and out with Licensor's resident manager at Palmyra atoll; and

(b) All of Licensee's employees, agents, contractors and guests entering Kingman Reef, its lagoon or surrounding waters or the Land will indemnify, defend and hold harmless Licensor and the Master Lessor, and their respective officers, directors, employees, agents, heirs, personal representatives, successors and assigns from and against all claims, actions, suits, damages, costs and expenses, including attorneys' fees, by whomsoever brought or made, arising out of such entry, at Licensee's or such person's sole cost and expense.

(11) Licensor reserves the right in its sole discretion to adopt rules and regulations (similar to the United States customs and Hawaii agricultural inspection laws) prohibiting persons entering Kingman Reef from bringing harmful or dangerous substances or materials to Kingman Reef, including requiring Licensee and its agents, employees, independent contractors and guests to complete written declarations or other forms, and reserving to Licensor the right to inspect and to seize prohibited items.

(12) Licensee will keep the Base Camp and all buildings and other improvements located thereon and all vessels used in Licensee's fishing operations in a

manner which is safe for such activities and operations, and in good order and condition.

(13) Subject to the provisions of Section 16.16 of this Agreement, Licensee shall adopt, from time to time, rules and regulations to control and regulate the conduct and activities of its agents, employees, independent contractors and guests in connection with Licensee's operations under this Agreement, and for the health and safety of such persons; provided, however, that such rules and regulations shall not be inconsistent with this Agreement and shall not interfere with the use of Kingman Reef or the surrounding waters by Licensor, Master Lessor or any persons authorized by either of them. Licensee will indemnify, defend and hold harmless Licensor and the Master Lessor, and their respective officers, directors, employees, agents, heirs, personal representatives, successors and assigns from and against all claims, actions, suits, damages, costs and expenses, including attorneys' fees, by whomsoever brought or made, by reason of the nonobservance or nonperformance of said rules and regulations by Licensee or its agents, employees, independent contractors or guests, using counsel approved by Licensor and the Master Lessor, at Licensee's sole cost and expense.

(14) No land areas of Kingman Reef nor the waters shallower than 100 fathoms off Kingman Reef may be used or occupied by Licensee for any purpose except as specifically set forth in this Agreement.

(15) No uses or activities are allowed at Kingman Reef except those specified in this Agreement. All rights of Licensee under this Agreement shall be narrowly (not broadly) construed, and shall exclude any use or activity which is not specified herein.

(16) All of Licensee's rights under this Agreement shall be construed as a single license to be exercised together, and not as multiple licenses which may be exercised separately, notwithstanding any language to the contrary contained in this Agreement.

## ARTICLE 2

## LICENSE FEES

### **Section 2.01** <u>Time, Manner and Place of Payment</u>.

**2.01.1** **<u>Planning Period Fees</u>**. For the duration of the Planning Period described in Section 1.10(1), Licensee shall pay to Licensor as "Planning Period Fees" the sum of Five Hundred and No/100 Dollars ($500.00), payable each and every month, commencing upon the first day of the Planning Period and payable on the same day of each and every month thereafter during the Planning Period.

**2.01.2** **Regular and Extended Term Fees**. Following the Planning Period, Licensee shall pay to Licensor as "License Fees" the greater of (a) a Minimum License Fee of Ten Thousand and No/100 Dollars ($10,000.00) per month for each and every month throughout the Term (as the same may be extended), prorated for any partial month; or (b) "Percentage License Fees" equal to five percent (5%) of Licensee's Gross Sales (as hereinafter defined) for each year of the Term derived from the license granted to Licensee under this Agreement up to Fifteen Million and No/100 Dollars ($15,000,000.00), plus six and one-half percent (6.5%) of Licensee's annual Gross Sales for each year of the Term in excess of Fifteen Million and No/100 Dollars ($15,000,000.00) and up to Twenty-Five Million and No/100 Dollars ($25,000,000.00), plus eight percent (8%) of Licensee's annual Gross Sales for each year of the Term in excess of Twenty-Five Million and No/100 Dollars ($25,000,000.00), as follows:

Licensee shall pay Licensor the Minimum License Fee of $10,000 per month on the Commencement Date (as defined in Section 1.10(2)) and on the same day of each and every month thereafter during the Term; provided, however, that Licensee shall pay Licensor the amount of $30,000 on the Commencement Date, which amount constitutes a nonrefundable deposit to be applied by Licensor toward the Minimum License Fees due and payable (i) for the first six (6) months of the Term following the Commencement Date, if any employee, agent or independent contractor of Licensee arrives at Kingman Reef for the purpose of commencing any activity permitted or required under this Agreement (the "Arrival Date"), within the first three (3) months of the Term, or (ii) for the first three (3) months of the Term, if the Arrival Date does not occur within the first three (3) months of the Term. For example, if the Commencement Date is January 1, 2002, and the Arrival Date is March 20, 2002, then no Minimum License Fees would be due or payable for the period of January 1, 2002, through and including June 30, 2002. If the Arrival Date does not occur prior to April 1, 2002, then Licensee shall pay Licensor the Minimum License Fee commencing April 1, 2002, and on the first day of every month thereafter.

Licensee shall calculate its Gross Sales within thirty (30) days after the end of each calendar quarter during the Term and shall report its Gross Sales for the calendar quarter to Licensor within forty-five (45) days after the end of such calendar quarter with such supporting documentation as Licensor in its sole discretion may require. In the event that Licensee's total Gross Sales for the applicable year would result in the payment of Percentage License Fees at the end of any calendar quarter, then Licensee shall pay such Percentage License Fees to Licensor within forty-five (45) days after the end of such calendar quarter.

**Section 2.02** **Gross Sales**. Except as otherwise provided in this Section 2.02, the term "Gross Sales" as used herein shall mean the entire amount of the actual sales proceeds, whether received in cash, in kind, on credit or otherwise, resulting from the exercise of the rights granted under this Agreement, whether received directly or indirectly by Licensee, without deduction for packing, shipping and other expenses. Gross Sales of fish shall be based on sales by Licensee to unrelated parties from which Licensee or its affiliates receive no direct or indirect financial benefit apart from the

sales proceeds. Fish shall be sold by Licensee at the highest possible price for the volume sold in the applicable market; provided that Licensee shall market such fish in a manner which in its good faith judgment will maximize its Gross Sales for the entire Term of this Agreement. Sales of goods and services to Licensee's agents, employees, independent contractors or guests under Section 1.07 of this Agreement shall not be included in Gross Sales. All other sales under Section 1.07 shall be included in Gross Sales. If any deliberate error or falsification is discovered or determined by Licensor, then an event of default shall be deemed to have occurred. No reduction shall be allowed for dishonored checks or for uncollected or uncollectible credit accounts. The entire sales price, whether it is to be paid in cash or upon installment or credit, shall be included in Gross Sales in the full amount in the period in which the transaction takes place, irrespective of the time of payment.

**Section 2.03** **Records**. Within thirty (30) days after the end of each calendar quarter during the Term, Licensee shall submit a complete statement in detail satisfactory to Licensor in its sole discretion showing the Gross Sales of the immediately preceding calendar quarter. Contemporaneously with the filing of any federal tax return covering any part of such Gross Sales, Licensee shall furnish Licensor with a true copy of such return. Licensee shall keep complete and accurate books of account. At the time of each transaction by Licensee under this Agreement, whether for cash or credit, Licensee shall record or cause to be recorded all receipts from such transaction. For at least two (2) years after the end of every calendar year, Licensee shall keep in Honolulu, Hawaii or Mercer Island, Washington all books and records for the Licensee's operations under this Agreement.

Licensor agrees that Licensee's books and records contain confidential and proprietary information concerning the amounts and types of fish sold by Licensee, the amounts of Licensee's sales to individual customers and the names and addresses of its customers and suppliers. Licensor and its agents will use reasonable care to ensure that information concerning Licensee's business which is disclosed to Licensor or it agents pursuant to this Agreement is not disclosed to any other person. Neither Licensor nor its agents may use any information obtained from Licensee pursuant to this Agreement for any purpose other than to verify the amount of Licensee's Gross Sales.

**Section 2.04** **Audit**. Licensor and its agents shall be entitled to inspect and audit, upon reasonable notice and at any reasonable time during Licensee's ordinary business hours, the books of account, all bookkeeping, sales and inventory records, the records required by Section 2.03 above and any other records of Licensee pertaining to the License Fees and Gross Sales under this Agreement. Licensee shall cooperate and assist in any audit made by or for Licensor. If any inspection or audit by Licensor at Licensor's expense discloses any error in Licensee's statement of Gross Sales to Licensor's detriment, Licensee shall immediately pay to Licensor any deficiency in the License Fee(s) resulting from such error, plus interest on such deficiency at the rate of one percent (1%) per month from the date or dates when such License Fee(s) should have been paid to the date of payment of the deficiency. If such

deficiency equals or exceeds the greater of $5,000 or five percent (5%) of the License Fees paid for the period covered by such audit, Licensee shall pay the costs of Licensor's audit. The acceptance by Licensor of any payment hereunder shall in no event constitute a waiver of Licensee's default with respect to such deficiency, nor prevent Licensor from exercising any of the other rights and remedies under this Agreement.

**Section 2.05** **Interest on Past Due Amounts**. In addition to the late charges specified in this Agreement, all amounts which shall become due and payable under this Agreement from Licensee to Licensor shall bear interest payable to Licensor at the rate of one percent (1%) per month from the due date or dates until paid; PROVIDED that this section shall not be construed to authorize delay in payment of any amounts becoming due hereunder.

**Section 2.06** **Late Charges**. Licensee acknowledges that late payment by Licensee to Licensor of License Fees or other sums due will cause Licensor to incur costs not contemplated by this Agreement, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges incurred by Licensor. Accordingly, if any License Fee or portion thereof, or any other sum due from Licensee shall not be received by Licensor or Licensor's designee within five (5) days after such amount shall be due, then, without any requirement for notice to Licensee, Licensee shall pay to Licensor a late charge equal to five percent (5%) of such overdue amount. The parties agree that the late charge represents a fair and reasonable estimate of the costs Licensor will incur by reason of late payment by Licensee. Acceptance of such late charge by Licensor shall in no event constitute a waiver of Licensee's default with respect to such overdue amount, nor prevent Licensor from exercising any of the other rights and remedies granted under this Agreement.

**Section 2.07** **Late Charges for Chronic Underpayment**. In the event that three (3) or more audits conducted by Licensor or its agents at any time during the Term identify underpayments of License Fees by Licensee in amounts equal to or exceeding the greater of $5,000 or 5% of the License Fees paid for the periods covered by the audits, then in addition to the amount of the unpaid License Fees payable to Licensor, plus interest, and the cost of the audit as specified above, Licensee shall pay a late charge (in lieu of the late charge specified in Section 2.06), without notice, as follows: (a) On the occasion of the second such audit, the late charge shall equal one-half of the amount of the underpayment; (b) on the occasion of the third such audit, the late charge shall equal the amount of the underpayment; and (c) on the occasion of the fourth such audit (if any) and on each subsequent occasion (if any), the late charge shall equal twice the amount of the underpayment. The parties agree that such late charges represent a fair and reasonable estimate of the costs Licensor will incur by reason of Licensee's chronic underpayment of License Fees hereunder. Acceptance of such late charges by Licensor shall in no event constitute a waiver of Licensee's default with respect to any overdue amount, nor prevent Licensor from exercising any of the other rights and remedies granted under this Agreement.

**Section 2.08** **Tax on License Fees**. In addition to the License Fees, Licensee shall also pay over unto and reimburse Licensor on each payment date during the Term an amount equal to that portion of any general excise or Gross Sales tax assessed against Licensor by any governmental authority and measured by or attributable to the License Fees and any other payments made by or on behalf of Licensee under the terms of this Agreement, and Licensee shall also pay all and any increases in such taxes from time to time; provided, however, that Licensee shall not be liable for the payment of Licensor's federal or State of Hawaii income taxes.

**Section 2.09** **Additional Charges**. Licensee shall pay to Licensor any money required to be paid by Licensee to Licensor under any other provision of this Agreement , within ten (10) days after notice from Licensor specifying the amount due and the basis therefor. Nothing in this Agreement shall be deemed to suspend or delay the duty of payment of any such money at the time the same becomes due and payable, or limit any other right or remedy of Licensor.

## ARTICLE 3

## LICENSEE'S BUSINESS AND OPERATIONS

**Section 3.01** **Prohibited Activities**. In exercising any of its rights under this Agreement, (a) Licensee shall not store, dispose, process, transfer or repack garbage, nuclear and/or toxic materials or waste products, except that Licensee may, subject to compliance with applicable laws, use and store fuels, lubricants, solvents, and other petroleum or chemical products used in Licensee's permitted activities hereunder in accordance with this Agreement and may, subject to compliance with applicable laws, store, process, dispose or transfer waste products generated from such permitted activities as permitted by this Agreement; (b) Kingman Reef shall not be used for any noxious industry or other use that would be detrimental to the environment or ecosystems of Kingman Reef or any of their inhabitants; (c) Licensee, its agents, employees, independent contractors and guests shall not damage the reefs of Kingman Reef, including the reef platform and all surrounding deep water reefs located within its territorial waters; (d) no explosives shall be used, stored or discharged on Kingman Reef or in its lagoons or adjacent waters; (e) no firearms shall be discharged, used, stored or displayed on Kingman Reef except firearms in the possession of Licensee's resident manager(s) for the purpose of protecting life and property; and (f) no drugs or similar items which are illegal to possess or distribute under federal law (including without limitation, heroin, cocaine, marijuana, and crystal meth amphetamine) shall be grown, manufactured, processed, used or brought onto Kingman Reef or any of the vessels covered by this Agreement, or distributed or transported therefrom or thereto.

Without limiting the generality of the foregoing, Licensee shall not (1) engage in any excavation, filling or quarrying activities without Licensor's prior written permission, (2) discharge any materials into the ocean except as expressly permitted by law, by this Agreement or authorized in writing by Licensor in its sole discretion, or (3) remove any

coral or other reef material or inhabitants not specifically permitted to be removed by Licensee under this Agreement. Every effort will be made by Licensee to be sensitive to and preserve the flora, fauna, natural beauty and environment of Kingman Reef and its surrounding waters, consistent with the conduct of the operations and activities permitted hereunder.

**Section 3.02** **Compliance with Law and Insurance Requirements**.

(1) Licensee shall conduct its operations so as to keep Kingman Reef in a safe, clean and sanitary condition; provided, however, that Licensee shall have no obligation to repair unsafe conditions on Kingman Reef in existence prior to the beginning of the Term, except to the extent required for Licensee's operations under this Agreement. Licensee shall observe and perform all laws applicable to Kingman Reef and to the conduct of Licensee's business and operations under this Agreement.

(2) Licensee will observe, perform and comply with all insurance policies which are applicable to Kingman Reef or to the conduct of Licensee's business under this Agreement.

(3) Licensee shall obtain, at its sole cost and expense, all necessary governmental and other approvals and permits for its operations hereunder. No review or approval by Licensor of any item submitted to Licensor pursuant to this Agreement shall in any manner constitute Licensor's representation, warranty or agreement that such item (1) complies with any or all applicable laws or regulations, or (2) will result in any government entity's approval of the same. Neither Licensor nor Master Lessor shall be liable to Licensee or any other person for any damage, loss or prejudice suffered or claimed on account of (x) any approval or rejection of, or the failure to approve or reject, any item submitted by Licensee or any other request, or (y) the construction of any improvement or performance of any work, whether or not such construction or performance complies with this Agreement; provided that this provision shall not operate to release Licensor from any breach of this Agreement by Licensor.

(4) Licensee will indemnify, defend and hold harmless Licensor and the Master Lessor, and their respective officers, directors, employees, agents, heirs, personal representatives, successors and assigns from and against all claims, actions, suits, damages, costs and expenses, including attorneys' fees, by whomsoever brought or made, by reason of Licensee's nonobservance or nonperformance of said laws, ordinances, rules and regulations or other breach by Licensee of the foregoing covenants contained in this Section 3.02, using counsel approved by Licensor and the Master Lessor, at Licensee's sole cost and expense.

**Section 3.03**. **Hazardous Materials; Indemnity**. In exercising the licenses granted under this Agreement, Licensee will comply with, and shall not cause or permit the violation of, any Hazardous Materials Laws (hereinafter defined), and shall not use, generate, manufacture, treat, handle, refine, produce, process, store, discharge, release, dispose of or allow any Hazardous Materials (hereinafter defined) in,

on or under Kingman Reef in violation of any Hazardous Materials Laws. Licensee shall indemnify, defend and hold harmless Licensor and the Master Lessor, and their respective officers, directors, employees, agents, heirs, personal representatives, successors and assigns from and against any loss, damage, cost, expense or liability, direct or indirect, arising out of or attributable to the violation by Licensee or any of its agents, employees, independent contractors or guests, of any Hazardous Materials Laws or the unlawful use, generation, manufacture, treatment, handling, refining, production, processing, storage, release, threatened release, discharge, or disposal by Licensee or any of its agents, employees, independent contractors or guests, of Hazardous Materials in, on or under Kingman Reef, including, without limitation, all reasonably foreseeable consequential damages, the costs of any required or necessary repair, clean up or detoxification of the Land or any other areas of Kingman Reef which are affected by such violation, and the preparation and implementation of any closure, remedial or other required plans. In addition to the foregoing, Licensee shall immediately advise Licensor, in writing, if Licensee at any time becomes aware of any violation of any Hazardous Materials Laws or of any claim made pursuant to any Hazardous Materials Laws in respect of Kingman Reef or Licensee's operations under this Agreement.

For purposes of this Agreement, the term "Hazardous Materials Laws" means and includes all federal and Hawaii state laws or regulations, now or hereafter in effect, relating to environmental conditions or Hazardous Materials on, within, under or about Kingman Reef, including, without limitation, Chapters 342B, C, D, F, G, H, I, J, L, N and P, Hawaii Revised Statutes, as amended, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., the Hazardous Materials Transportation Act, 49 U.S.C. Section 1251, et seq., the Clean Air Act, 42 U.S.C. Section 7401, et seq., the Toxic Substances Control Act, 15 U.S.C. Sections 2601 through 2629, the Safe Drinking Water Act, 42 U.S.C. Section 300f through 300j, and any similar federal or Hawaii state laws and the regulations now or hereafter adopted, published and/or promulgated pursuant thereto.

As used in this Agreement, the term "Hazardous Materials" means and includes any and all radioactive materials, asbestos, organic compounds known as polychlorinated biphenyls, chemicals known to cause cancer or reproductive toxicity, pollutants, contaminants, hazardous wastes, toxic substances, and any and all other substances or materials defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials" or "toxic substances" under, or for the purposes of, the Hazardous Materials Laws.

## ARTICLE 4

## ACCEPTANCE OF PROPERTY; MAINTENANCE AND REPAIRS; CONSTRUCTION

**Section 4.01** **Acceptance of Property; Maintenance and Repairs by Licensee.** Licensee accepts Kingman Reef in "AS IS" condition "WITH ALL FAULTS", and Licensor makes no representations concerning the condition of Kingman Reef, including the Land. Without limiting the generality of the foregoing:

(1) Licensee acknowledges that Licensee, its agents, employees, independent contractors and guests were permitted to enter upon Kingman Reef to inspect and examine Kingman Reef at the Licensee's risk and expense, and to examine and evaluate all matters relating to Kingman Reef and other matters which in Licensee's judgment were necessary or advisable or might affect or influence Licensee's operations under this Agreement, or bear upon the value and suitability of Kingman Reef for Licensee's intended purposes, or Licensee's willingness to enter into this Agreement, including, without limitation, title matters, economic matters, physical condition of Kingman Reef, existence of Hazardous Materials on, from, or under Kingman Reef, necessity and scope of required improvements, income and expense data, permissible uses, archaeological or geological surveys, and Licensee's ability to obtain all necessary governmental approvals and permits for its operations under this Agreement. By executing this Agreement, Licensee shall be deemed to have accepted the condition of Kingman Reef and all matters relating to Licensee's operations under this Agreement. Notwithstanding the foregoing, nothing in this Section 4.01(1) shall impair or otherwise diminish or affect Licensee's right to perform planning and feasibility studies in accordance with the terms of Section 1.10 above.

(2) Licensor makes no representations concerning the presence or absence of Hazardous Materials on Kingman Reef, and Licensee acknowledges and accepts the risk that Hazardous Materials may be located on Kingman Reef. Licensee and Licensor acknowledge and agree that neither Licensor nor Licensee shall be liable for any expenses that may be incurred in the correction of any condition resulting from the presence of Hazardous Materials on Kingman Reef as of the commencement of the Term or incurred in the removal of any such hazardous materials from Kingman Reef, such expenses being the sole responsibility of the United States government. Nothing in this Agreement shall require Licensee to investigate, correct, clean up, remove or otherwise remediate any Hazardous Materials or toxic or hazardous substances present on, under or adjacent to Kingman Reef at the commencement of the Term or released or deposited on, under or adjacent to Kingman Reef by any person other than Licensee, its employees, agents, independent contractors or guests during the Term.

(3) Licensee acknowledges that the condition of Kingman Reef and the Land, plants, animals, fish, waters, lagoons and reefs, is unknown and could possibly be unsafe or dangerous. This includes, but is not limited to, the possible existence of

unexploded ordinances; animals, fish, shellfish, fruits and vegetables which may be poisonous; and the condition of the waters in and around Kingman Reef for drinking, swimming, fishing and other uses. In addition, Licensee acknowledges there is no assurance that any food or beverages (including drinking water) will be available at Kingman Reef.

(4) Licensee understands the risks and possible dangers to its proposed business and operations at Kingman Reef, and assumes all such risks and dangers. Licensee hereby releases, indemnifies and holds harmless Licensor and the Master Lessor, and their respective officers, directors, employees, agents, heirs, personal representatives, successors and assigns, from and against all liability, loss, damage, costs and expenses (including, but not limited to, attorneys' fees) and all claims and damages resulting therefrom, for injury to Licensee or any other persons or property, including death, from whatever cause, whether anticipated or not, whether known or unknown, resulting from, arising out of, or connected in any way, directly or indirectly, with Licensee's business and operations at Kingman Reef, and Licensee agrees to defend Licensor and the Master Lessor, and their respective officers, directors, employees, agents, heirs, personal representatives, successors and assigns, against such claims using counsel approved by Licensor and the Master Lessor, at Licensee's sole cost and expense. Licensee assumes all of the foregoing risks for itself and its property and its agents, employees, independent contractors and guests, and their property.

(5) It is specifically understood and agreed by Licensee that Licensor has made no promises to improve or repair Kingman Reef or any structure located thereon, or any part thereof.

**Section 4.02** **Waste and Nuisance**. Licensee will conduct its operations so as to keep Kingman Reef in a clean, safe, neat and sanitary condition and will not commit or suffer to be committed any waste upon or of Kingman Reef, or any nuisance or other act or omission which unreasonably disturbs the quiet enjoyment of any other occupant of Kingman Reef. Licensee will immediately abate any nuisance or said other act or omission upon demand of Licensor.

**Section 4.03** **Signs**. Licensee shall not erect, install, paint or inscribe on any portion of Kingman Reef, any signs, lettering or placards or other advertising media without the prior written approval of Licensor, which may be withheld in Licensor's sole discretion; provided that Licensee may, without further approval by Licensor, install the channel markers described in Section 1.03 and erect appropriate signs of reasonable size warning of known and unknown hazards, marking the boundaries of Kingman Reef or prohibiting access to areas of Kingman Reef not included in this Agreement. In the event that the written consent of Licensor is secured for advertising signs, Licensee shall pay all costs which may be required to be paid for the erection and maintenance of any and all such signs. Licensee shall indemnify and save Licensor and the Master Lessor, and their respective officers, directors, employees, agents, heirs, personal representatives, successors and assigns, harmless from and against any and all losses,

damages, claims, suits or actions for any damage or injury to persons or property caused by the presence or absence of such signs or parts thereof.

**Section 4.04** **Construction; Expenses**. All construction and other work to or on the Base Camp or any improvements thereon shall be subject to Licensor's prior written approval (which approval shall not be unreasonably withheld and shall be limited to the appearance of all buildings and improvements to be constructed on the Base Camp). Licensee acknowledges and agrees that Licensor shall not be responsible for the safety, soundness, adequacy or any other aspect of the Base Camp or any buildings or improvements on the Base Camp. Licensee agrees that all buildings or other structures used or occupied by Licensee, whether new or existing, shall be constructed, restored or altered to a reasonable and safe standard for the intended use of such building or structure, and shall not exceed twenty-five (25) feet in height. Licensee shall, before commencing any such construction, alteration, clearing or other work, show evidence satisfactory to Licensor that Licensee has sufficient current funds to pay for the entire cost of all construction and such other work.

**Section 4.05** **Inspection; Access**. Licensee will permit Licensor, the Master Lessor and their respective employees and agents, at all reasonable times, to enter the Base Camp and the Land and examine the state of repair and condition thereof, and Licensee will repair and make good (within ninety (90) days of receipt of written notice by Licensor) all defects which Licensee is obligated to correct under the terms of this Agreement and of which notice shall be given by Licensor. Without in any manner obligating Licensor or the Master Lessor to do so, Licensee will also permit Licensor, the Master Lessor and their respective agents to have access to Kingman Reef at all reasonable times for the purpose of posting such notices as it may deem necessary for Licensor's and/or the Master Lessor's protection or for the protection of Kingman Reef, for the purpose of repossessing Kingman Reef as herein provided and/or for the purpose of showing Kingman Reef to prospective tenants, purchasers, mortgagees and/or others, and neither Licensor nor the Master Lessor shall be liable for damages resulting to Licensee from such exercise of the right of entry and the License Fees stipulated hereunder shall not abate during the period of such entry (provided that such entry shall not unreasonably interfere with Licensee's permitted uses, activities or operations hereunder), nor shall Licensee be entitled to maintain a setoff or counterclaim for damages against Licensor or the Master Lessor by reason of loss or interruption of Licensee's business because of such entry (provided that such entry shall not unreasonably interfere with Licensee's permitted uses, activities or operations hereunder).

## ARTICLE 5

## INSURANCE; INDEMNITY

**Section 5.01** **Commercial General Liability Insurance**. Licensee shall at Licensee's expense procure and maintain during the entire Term commercial general liability insurance with respect to Kingman Reef and Licensee's business and

operations at Kingman Reef, for injuries and deaths with such coverage limits as shall be reasonably prescribed by Licensor based on coverage limits which are standard and customary for Licensee's business and operations, but initially with minimum limits not less than $5,000,000.00 per occurrence for combined bodily injury and property damage for the Base Camp and any lagoon or Land-based aircraft landing strip or area at Kingman Reef and $1,000,000.00 per occurrence for combined bodily injury and property damage for the rest of Kingman Reef. Licensee will pay all premiums on such insurance when due.

**Section 5.02** __**Fire and Extended Coverage Carried by Licensee**__. Licensee will procure at its own expense and will keep in force during the entire Term of this Agreement a policy or policies of fire and extended coverage insurance on all buildings and other improvements and on all personal property which are used or occupied in connection with Licensee's business and operations under this Agreement, by whomever owned, now or hereafter situated on Kingman Reef (including the Base Camp) in an amount as near as practicable to the full insurable value thereof, and will pay all premiums on such insurance when due.

**Section 5.03** __**Additional Insurance**__. Licensee shall at Licensee's expense procure and maintain during the entire Term a policy or policies of insurance with respect to Kingman Reef and Licensee's business and operations at Kingman Reef, insuring the performance of the covenants and conditions contained in Sections 1.02(2)(b), 1.03(10)(c), 1.07 (regarding fuel storage and distribution), 3.01 and 3.03 of this Agreement, including the payment of all damages, costs, expenses and other amounts provided therein. Such insurance shall have coverage limits as shall be reasonably prescribed by Licensor based on coverage limits which are standard and customary for Licensee's business and operations, but initially with minimum limits not less than $10,000,000.00 per occurrence. Licensee will pay all premiums on such insurance when due. In addition, Licensee shall cause all other owners/operators of vessels involved in Licensee's business and operations at Kingman Reef to procure and maintain such insurance for their activities at Kingman Reef.

**Section 5.04** __**Form and Copies of Policies**__. The insurance required under Sections 5.01, 5.02 and 5.03 above shall name Licensor, Master Lessor and such other persons as are within Licensor's and Master Lessor's scope of operation under this Agreement (such as the resident manager), as additional insureds and an executed copy of such policy or certificate thereof shall be delivered to and approved by Licensor and Master Lessor, together with a commitment from the insurance carrier endorsed thereon providing that the policy shall remain in full force and effect until Licensor and Master Lessor shall be given at least thirty (30) days prior written notice of any change or cancellation.

**Section 5.05** __**Lack of Availability**__. In the event that the insurance required under Sections 5.01, 5.02 or 5.03 cannot be obtained, Licensor may prohibit Licensee from engaging in such operations or using such buildings, improvements or property, and revoke any right granted by Licensor hereunder for such operations or

use until the required insurance has been obtained; provided, however, that Licensee may terminate this Agreement in accordance with Section 1.08(2)(b) in the event that such insurance cannot be obtained or such prohibition materially interferes with Licensee's permitted operations under this Agreement.

**Section 5.06** <u>**Waiver of Subrogation**</u>. The parties release each other, and their respective authorized representatives, from any claims for damage to any person or to Kingman Reef and to the buildings and other improvements, fixtures and personal property, of either Licensor or Licensee in or on Kingman Reef that are caused by or result from risks insured against under any insurance policies carried by the parties and in force at the time of any such damage.

Each party shall cause each insurance policy obtained by it to provide that the insurance company waives all right of recovery by way of subrogation against either party in connection with any damage covered by any such policy. Neither party shall be liable to the other for any damage caused by fire or any of the risks insured against under any insurance policy required by this Agreement. If any insurance policy cannot be obtained with a waiver of subrogation, or is obtainable only by the payment of an additional premium charge above that charged by insurance companies issuing policies without waivers of subrogation, the party undertaking to obtain the insurance shall notify the other party of this fact. The other party shall have a period of ten (10) days after receiving the notice either to place the insurance with a company that is reasonably satisfactory to the other party and that will carry the insurance with a waiver of subrogation, or to agree to pay the additional premium if such a policy is obtainable at additional cost. If the insurance cannot be obtained or the party in whose favor a waiver of subrogation is desired refuses to pay the additional premium charged, the other party shall be relieved of the obligation to obtain a waiver of subrogation with respect to the particular insurance involved.

**Section 5.07** <u>**Risk of Loss**</u>. The storage and/or presence of all equipment, goods, wares, merchandise or other property of Licensee or anyone claiming by, through or under Licensee on Kingman Reef shall be at Licensee's and such other owner's sole risk, and Licensor shall not be responsible for any loss or damage to such property from any cause whatsoever.

## ARTICLE 6

## DAMAGE OR DESTRUCTION

**Section 6.01** <u>**Damage or Destruction; Option to Terminate**</u>. In the event of any damage or destruction to Kingman Reef, any insurance proceeds derived from insurance policies described in Article 5 shall be immediately available to and used as soon as reasonably possible by Licensee for rebuilding, repairing or otherwise reinstating the Base Camp and all buildings and other improvements in a good and substantial manner according to the plan and elevation of any improvements so destroyed or damaged; provided, however, that if such damage is caused by a casualty

not covered by the insurance required under this Agreement, Licensee may at its option cancel this Agreement by giving written notice thereof to Licensor within thirty (30) days after such casualty on condition that before such cancellation becomes effective Licensee shall remove all remains of all damaged improvements placed on Kingman Reef by Licensee and all existing improvements which were altered by Licensee, and pay to Licensor a sum of money equal to all License Fees due and payable as of the termination of this Agreement. In case such improvements shall be destroyed by any casualty at any time during the Term, if restoration thereof shall be prevented by law, Licensee may at its option cancel this Agreement by giving written notice thereof to Licensor at any time thereafter on condition that Licensee shall, before such cancellation becomes effective, remove all remains of such damaged improvements placed on Kingman Reef or altered by Licensee and pay to Licensor all License Fees due and payable as of the termination of this Agreement. Upon cancellation of this Agreement, all insurance proceeds shall be payable to and be the property of Licensor or Licensee, as their interests may appear.

## ARTICLE 7

## CONDEMNATION

**Section 7.01** <u>Taking of Property</u>. In case at any time or times during the Term, any part of Kingman Reef which Licensee is permitted to use under this Agreement shall be required, taken or condemned by any authority having the power of eminent domain, then this Agreement shall at once cease and terminate.

All compensation and damages payable for or on account of all land and improvements shall be payable to and be the sole property of Licensor, except that Licensor agrees to pay to Licensee out of said compensation and damages an amount equal to:

(1) The "Average Annual License Fee" (as defined below), multiplied by three (3) , if such taking occurs during the first five (5) years of the Term;

(2) The Average Annual License Fee, multiplied by two (2), if such taking occurs during the second five (5) years of the Term; and

(3) The Average Annual License Fee, if such taking occurs during any remaining portion of the Term (if the Term is extended in accordance with Section 1.10); provided, however, that if such taking occurs during the last year of any extended Term, then the Average Annual License Fee shall be prorated.

For purposes hereof, the term "Average Annual License Fee" means the total License Fees paid by Licensee to Licensor under this Agreement, divided by the number of months elapsed from the beginning of the Term through the date of such taking, and multiplied by twelve.

In addition to the amount set forth above, Licensee shall also be entitled to claim and recover from the condemning authority, but not from Licensor, such compensation as may be separately awarded to or recovered by Licensee in its own right for any buildings, equipment and fixtures on Kingman Reef which are owned by Licensee, or for the cost of relocation or removal thereof or for any loss or damage thereto, but not for any damage or loss to Licensee's business or operations under this Agreement. In no event shall such recovery reduce or otherwise affect the amount of compensation payable by the condemning authority to Licensor.

Licensee acknowledges the possibility that the federal government may condemn all or a portion of Kingman Reef, and Licensor makes no representations as to whether or not such condemnation will be occur, the scope of such condemnation or what effect it may have on Kingman Reef or this Agreement. In the event of any condemnation, Licensee agrees that it will not bring, join in, or cause to be brought any lawsuit under against Licensor or the Master Lessor related thereto, and Licensee releases and gives up all claims which Licensee could bring directly or through another party, including any claim to damages for lost profits or business opportunities. The provisions of Section 9.01 are specifically incorporated herein by reference.

Licensor and Master Lessor agree that they will not cooperate with the condemning authority in any condemnation proceeding or consent to any judgment, order or decree resolving any condemnation proceeding which would result in termination of Licensee's rights under this Agreement.

## ARTICLE 8

## ASSIGNMENT

**Section 8.01** **No Assignment**. Licensee agrees not to sell, assign, transfer, license, mortgage or otherwise encumber all or any portion of its interest in this Agreement, without Licensor's prior written consent, which may be withheld by Licensor in its sole and absolute discretion. As used in the preceding sentence, the term "license" shall include, without limitation, any use of Kingman Reef by any party other than Licensee (except as permitted by this Agreement) and the term "sell" shall include, without limitation, any transfer of the license or any right granted hereunder, by agreement of sale or otherwise. Any attempted sale, assignment, transfer, license, mortgage or encumbrance of Licensee's rights under this Agreement without Licensor's consent is void and of no effect. Notwithstanding the foregoing, it is understood and agreed that nothing in this Article 8 shall prohibit Licensee from carrying on any or all of the activities permitted by this Agreement through one or more independent contractors.

An assignment shall be deemed to include any dissolution, merger, consolidation, or other reorganization of Licensee, or any sale or other transfer, by which either (i) fifty-one percent (51%) of the value of Licensee's assets become owned or controlled by any person other than Licensee and such occurrence is not in the ordinary course of Licensee's business, or (ii) a controlling percentage of the

membership interests of Licensee becomes owned or controlled by any person other than one or more of Licensee's original members. The phrase "controlling percentage" means the ownership of, and the right to vote, membership interests possessing at least 51% of the total combined voting power of all membership interests then entitled to vote on membership decisions.

Notwithstanding the foregoing, Licensee shall be permitted, without Licensor's prior consent, to admit new members at any time, provided, however, that (a) Frank Sorba shall at all times retain and exercise management power and authority over all of Licensee's business operations, and (b) Frank Sorba shall at all times retain not less than a fifty-one percent (51%) ownership interest in all of Licensee's assets.

It shall be a condition precedent to any consent of Licensor to any sale, assignment, transfer or license by Licensee that Licensee shall pay to Licensor fifty percent (50%) of the amount of all premiums, fees and other consideration payable to Licensee in connection with such sale, assignment, transfer or license.

**Section 8.02** <u>**No Release of Licensee**</u>. No permitted sale, assignment, transfer, license, mortgage or other encumbrance of Licensee's interest in this Agreement shall in any way release Licensee from any liability or responsibility of Licensee under this Agreement.

## ARTICLE 9

## INDEMNITY; WAIVER; AND ATTORNEYS' FEES

**Section 9.01** <u>**Licensee's Liability; Waiver; Indemnity**</u>. Licensee shall exercise the rights and privileges granted in this Agreement at Licensee's sole risk, and Licensee agrees that it shall never claim any damages against Licensor or the Master Lessor, or their respective officers, directors, employees, agents, heirs, personal representatives, successors or assigns, for any injuries or damages suffered on account of the exercise of such rights and privileges, regardless of the fault or negligence of such persons.

Licensee's rights and remedies under this Agreement shall be limited as provided in Section 10.07.

Licensee shall indemnify and hold Licensor and the Master Lessor, and their respective officers, directors, employees, agents, heirs, personal representatives, successors and assigns, harmless against and from any and all demands, claims, damages, fines, costs, expenses, attorneys' fees and liability for injury to property or persons, including wrongful death, arising from the exercise of Licensee's rights and privileges under this Agreement, arising out of or in connection with the use or occupancy of Kingman Reef by Licensee or any other person claiming by, through or under Licensee, or any accident or fire on Kingman Reef or any nuisance made or suffered thereon caused by Licensee's negligence, or any failure by Licensee to keep

Kingman Reef in a safe condition, or any failure by Licensee to comply and conform with all laws, statutes, ordinances and regulations of the United States and any other laws with which the Licensee is required to comply under this Agreement, now or hereafter in force, or arising from any default by Licensee in the performance of any of the covenants, conditions or provisions of this Agreement, or from any act or omission to act of Licensee, its agents, employees, independent contractors and guests, or those claiming by, through, or under Licensee in or about Kingman Reef in connection with this Agreement, will resist and defend at Licensee's expense any such claim by counsel approved by Licensor and the Master Lessor.

**Section 9.02** <u>**Attorneys' Fees and Expenses**</u>. In case Licensor shall, without fault on its part, be made a party to any litigation commenced by or against Licensee, its agents, employees, independent contractors or guests arising out of the acts, omissions, conduct, activities or operations of Licensee, its agents, employees, independent contractors, guests or anyone having a direct or indirect relationship to the foregoing, or in case suit shall be brought for recovery of License Fees or of any other amount due under the provisions of this Agreement, or because of the breach of any other covenant, condition or provision of this Agreement on the part of Licensee to be kept or performed, and a breach shall be established, Licensee shall pay to Licensor on demand all expenses incurred in connection therewith, including attorneys' fees, and any judgments or settlement of claims secured against Licensor by reason of such action or proceeding. Licensee will also pay to Licensor on demand all costs and expenses, including attorneys' fees, incurred by Licensor in enforcing any of the covenants herein contained and in remedying any breach thereof by Licensee, in the absence of litigation. Licensor shall pay all reasonable costs and expenses incurred by Licensee, including attorneys' fees, in the event that Licensee is the prevailing party in any litigation initiated against Licensee by Licensor or any litigation initiated by Licensee against Licensor to enforce this Agreement.

## ARTICLE 10

## DEFAULT

**Section 10.01** <u>**Events of Default**</u>. Licensee shall be in default under this Agreement upon the occurrence any of the following events, which shall constitute events of default:

(a) Any failure by Licensee to pay License Fees due under this Agreement within thirty (30) days after the same are due and payable; or

(b) Without limiting any other provisions of this section, any material failure by Licensee to perform or comply with any terms or provisions contained in this Agreement which failure shall continue for thirty (30) days after notice from Licensor particularly describing such failure; provided, however, that such 30-day grace period shall be extended by the time reasonably necessary to cure or correct the default if corrective measures are begun immediately and diligently prosecuted by Licensee

within the 30-day grace period; and provided, further, that such 30-day grace period shall not apply to any failure which cannot be corrected or remedied; or

(c) Any material representation or warranty by Licensee contained herein concerning the financial condition or credit standing of Licensee proves to be false or misleading; or

(d) Any final order or decree is obtained by any person in any court of competent jurisdiction enjoining Licensee or Licensor from performing this Agreement due to the action or inaction of Licensee and such proceedings are not discontinued, or such order or decree is not vacated or stayed within ninety (90) days after the granting thereof; or

(e) Any sale, assignment, transfer, license, mortgage or other encumbrance of this Agreement or any interest therein by Licensee, without Licensor's consent; or

(f) The making of an assignment by Licensee for the benefit of its creditors or admitting in writing its inability to pay its debts as they become due; or

(g) The filing of a voluntary petition in bankruptcy by Licensee under federal law, or the adjudication of Licensee as a bankrupt or insolvent, or the filing of any petition by Licensee in any proceeding for reorganization, arrangement, composition, adjustment, liquidation, dissolution or similar relief under any present or future federal statute, law or regulation, or the filing by Licensee of any answer admitting the material allegations of any petition filed against Licensee in any such proceeding, or Licensee seeking or consenting to or acquiescing in the appointment of any trustee, receiver or liquidator of Licensee, or of all or a substantial part of the properties or assets of Licensee; or

(h) Sufferance by Licensee of any lien on Kingman Reef or of any attachment, execution or other judicial seizure of this Agreement or any estate or interest herein as a result of any act or omission of Licensee which is not released or discharged within ninety (90) days of notice thereof to Licensee; or

(i) Licensee's discontinuance of the exercise of the license granted hereunder for a period longer than six (6) calendar months; provided Licensor acknowledges that Licensee's operations hereunder may be seasonal; or

(j) In the event that three (3) or more audits conducted by Licensor or its agents at any time during the Term identify underpayments of License Fees by Licensee in amounts equal to or exceeding the greater of $5,000 or 5% of the License Fees paid for the periods covered by the audits; or

(k) Any attempt by Licensee to avoid or reduce amounts payable to Licensor under this Agreement by any means, e.g. by using other companies to

exercise any of the rights under the licenses granted hereby or to sell goods or perform services in connection with such licenses without disclosure to Licensor, or by falsification of or refusal to deliver the records required to be delivered to Licensor hereunder; or

(l) The occurrence of any event of default described elsewhere in this Agreement.

**Section 10.02** <u>**Termination of License; Right to Reenter**</u>.

(a) Upon the occurrence of any event of default, Licensor may terminate this Agreement and the license granted to Licensee under this Agreement, by written notice to Licensee, and upon receipt of such notice, Licensee shall cease all activities and operations under this Agreement. In addition to any other right or remedy it may have, Licensor shall have the immediate right, upon giving such notice, of reentry and may remove all persons and property from Kingman Reef and all persons claiming by and through and under Licensee, and such property may be removed and stored at the cost of and for the account of Licensee, all without resort to legal process and without being deemed guilty of trespass, or without liability for any loss or damage which may be occasioned thereby. Licensor may sell any perishable items in any reasonable manner.

(b) To facilitate the exercise by Licensor of its rights under this Section 10.02, Licensee shall execute and deliver to Licensor on the date of this Agreement an undated Termination Agreement in the form attached hereto as Exhibit E. Upon the occurrence of an event of default under Section 10.01, Licensor, upon sixty (60) days' prior written notice to Licensee, may date, execute and record such Termination Agreement in the same court or office in which a short form of this Agreement shall have been recorded; provided, however, that neither the execution of such Termination Agreement by Licensee nor the execution or filing of such Termination Agreement by Licensor shall preclude Licensee from obtaining a judgment against Licensor for damages for wrongful termination or any otherwise available remedy or relief from a court of competent jurisdiction, except as prohibited by Section 10.07 of this Agreement. Licensee hereby waives and shall not have, claim or assert any right or remedy of specific performance against Licensor or Master Lessor, or any right or remedy in or against title to Kingman Reef or the waters thereof, and hereby waives and shall not be entitled to file or record any notice of pendency of action or lis pendens against Kingman Reef or the waters thereof, and such rights or claims shall not exist.

**Section 10.03** <u>**Right to Cure**</u>. Should an event of default occur, Licensor may at Licensor's option and without prejudice to any other right or remedy of Licensor provided herein, cure the same and Licensee shall reimburse Licensor on demand for the cost thereof (including attorneys' fees), plus interest at the rate of twelve percent (12%) per annum.

**Section 10.04** **Non-Waiver**. The failure of Licensor to insist upon the performance of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant or condition, or any subsequent breach of the same or any other term, covenant or condition herein contained, nor shall any custom or practice which may develop between the parties in the course of administering this Agreement be construed as a waiver of Licensor's right to insist upon the performance of any term, covenant or condition. The subsequent acceptance of License Fees by Licensor shall not be deemed to be a waiver of any preceding breach by Licensee of any term, covenant or condition of this Agreement, other than the failure of Licensee to pay the particular License Fee(s) so accepted, regardless of Licensor's knowledge of such preceding breach at the time of acceptance of such License Fee(s).

**Section 10.05** **No Accord and Satisfaction**. No payment by Licensee or receipt by Licensor of a lesser amount than the License Fees stipulated shall be deemed to be other than on account of earlier stipulated License Fees, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction and Licensor may accept a check or payment without prejudice to Licensor's right to recover the balance of any amount owed by Licensee, or pursue any other remedy provided in this Agreement.

**Section 10.06** **Additional Remedies**. Without limiting the remedies specified above, Licensor shall have all other remedies available at law or in equity (a) in the event of Licensee's default, (b) to enforce this Agreement against Licensee, (c) to enforce any of Licensor's rights hereunder, and (d) to enforce the intent and understanding of the parties as set forth on page 1 of this Agreement, including, but not limited to, injunctive relief.

**Section 10.07** **Licensee's Sole Remedy**. Notwithstanding anything to the contrary contained in this Agreement or the Covenants and Agreements of Master Lessor, Licensee's sole remedy against Licensor for any claim arising out of this Agreement and/or Master Lessor for any claim arising out of the Covenants and Agreements of Master Lessor, shall be damages, and in no event shall Licensor be liable for any claims against Master Lessor arising out of the Covenants and Agreements of Master Lessor, nor shall Master Lessor be liable for any claims against Licensor arising out of this Agreement. Licensee shall have no right to any other form of relief (including, but not limited to, temporary or permanent injunctive relief), and Licensee hereby waives and shall not have, claim or assert any other legal or equitable right or remedy, including, but not limited to, setoff, abatement, injunctive relief or specific performance, against Licensor, Master Lessor or their respective officers, directors, agents, personal representatives, beneficiaries or successor trustees, or any right or remedy in or against title to Kingman Reef or the waters thereof, and hereby waives and shall not be entitled to file or record any notice of pendency of action or lis pendens against Kingman Reef or the waters thereof, and such rights or claims shall not exist under any circumstance whatsoever. The provisions of this Section 10.07 shall terminate with respect to, and shall not run in favor of, any Licensor or Master

Lessor other than the Licensor and Master Lessor named herein and the beneficiaries and successor trustees of Master Lessor.

## ARTICLE 11

## SURRENDER AND HOLDING OVER

**Section 11.01** **Surrender Upon Termination**. At the expiration or earlier termination of the Term, Licensee shall surrender Kingman Reef in good order and condition, reasonable wear and tear and uninsured damage excepted. Licensee shall remove the Base Camp and all buildings, improvements, equipment, furniture and trade fixtures placed by Licensee on Kingman Reef and shall repair all damage caused by such removal. Licensee's obligation under this Section 11.01 shall survive the expiration or earlier termination of the Term.

If Licensee shall fail to remove all effects from Kingman Reef upon termination of this Agreement for any cause whatsoever, Licensor may, at its option, remove the same in any manner that Licensor shall choose, and store said effects without liability to Licensee for loss thereof, and Licensee agrees to pay Licensor any and all expenses incurred in such removal, including court costs and attorneys' fees and storage charges on such effects for any length of time the same shall be in Licensor's possession, or Licensor may, at its option, without notice, sell said effects, or any of the same, at private sale and without legal process, for such price as Licensor may obtain and apply the proceeds of such sale to payment of any amounts due under this Agreement from Licensee to Licensor and for the expenses incident to the removal, storage and sale of said effects.

**Section 11.02** **Holding Over**. Any holding over after the expiration or earlier termination of the Term with the consent of Licensor (which may be withheld in Licensor's sole discretion) shall be construed to be an extension of this Agreement from month to month at the license fees specified in Section 2.01.2, and shall otherwise be on the same terms and conditions as provided in this Agreement so far as applicable.

**Section 11.03** **Liquidated Damages**. Any holding over after the expiration or earlier termination of the Term without the consent of Licensor, which may be withheld in Licensor's sole discretion, shall be subject to the payment of liquidated damages for each day of such holdover period, in an amount equal to the average monthly rent paid by Licensee during the Term, divided by thirty (days) and then multiplied by two (2), per day.

## ARTICLE 12

## EXTENSION OF TIME

**Section 12.01** **Extension of Time for Performance**. In the event that either Licensor or Licensee shall be delayed or prevented from the performance of any

act required by this Agreement by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war, or other cause beyond the reasonable control of the party delayed or prevented, provided that such reason or cause directly affects Kingman Reef, then performance of such act shall be excused during the period of the delay or prevention and the period for the performance of such act shall be extended for a period equivalent to the period of such delay or prevention. It is understood, however, that this provision shall not operate to excuse Licensee from the prompt payment of License Fees.

## ARTICLE 13

## SALE OR MORTGAGE BY LICENSOR

**Section 13.01** __Sale By Licensor__. In the event of a sale or conveyance by Licensor of its interest in Kingman Reef, such sale shall operate to release Licensor from any liability arising thereafter under any of the covenants or conditions, express or implied, herein contained in favor of Licensee, provided that such sale or conveyance shall not release Licensor from liabilities arising prior to such sale or conveyance and Licensor's successor in interest shall affirm in writing its agreement to be bound as Licensor by the terms hereof, and in such event Licensee agrees to look thereafter solely to the successor in interest of Licensor in and to this Agreement. Except as is otherwise provided in this Section 13.01, this Agreement shall not be affected by any such sale or conveyance and shall be binding on Licensor's successor in interest, and Licensee agrees to attorn to such successor in interest.

**Section 13.02** __Subordination of License; Estoppel Certificates__. In the event that Licensor's or Master Lessor's mortgagee shall elect to have this Agreement prior to or subordinate to its mortgage, then and in such event, upon such mortgagee notifying Licensee to that effect, this Agreement shall have priority over or be subordinate to the lien of such mortgage. Licensee covenants and agrees, in the event any proceedings are brought for the foreclosure of, or in the event of exercise of the power of sale under, any mortgage heretofore or hereafter made by Licensor or Master Lessor covering Kingman Reef (and which may or may not also cover other premises), that Licensee will, upon request by the purchaser, attorn to the purchaser upon any foreclosure or sale and recognize such purchaser as the licensor under this Agreement, it being the intent hereof that this Agreement shall not be terminated or otherwise affected by such foreclosure or sale and that this Agreement shall become a license agreement between the purchaser and Licensee, it being nevertheless understood that such purchaser shall not be liable for any act or omission of a prior licensor nor be subject to any offsets or defenses which Licensee may have against any prior licensor. Licensee, upon request of any party in interest, shall execute such instrument or instruments as shall be requested to carry out the requirements of this paragraph within thirty (30) days after receipt by Licensee of written request therefor; provided, however, that Licensee shall not be required to effectuate such subordination, nor shall Licensor or Master Lessor be authorized to effect such subordination on behalf of Licensee, unless the mortgagee named in such mortgage shall first agree in writing, for the benefit

of Licensee that, so long as no event of default has occurred under the terms of this Agreement, neither this Agreement nor any of the rights of Licensee hereunder shall be terminated or modified or be subject to termination or modification, by an action or proceeding to foreclose or otherwise enforce said mortgage. In the event that Licensee fails to respond to such written request within thirty (30) days, Licensor or Master Lessor shall have the right to execute such instruments on behalf of Licensee. Licensee hereby constitutes Licensor and Master Lessor as Licensee's true and lawful attorneys-in-fact, coupled with an interest, for purposes of executing the foregoing instruments.

Within fifteen (15) days of presentation, Licensee shall execute, acknowledge and deliver to Licensor or Master Lessor (a) any subordination or non-disturbance agreement or other instrument that Licensor or Master Lessor may require to carry out the provisions of this paragraph, (b) any agreement for attornment to a purchaser upon foreclosure, and (c) any estoppel certificate requested by Licensor or Master Lessor from time to time certifying in writing that this Agreement is unmodified and in full force and effect or that if there have been modifications that the same is in full force and effect as modified and stating the modifications, and the dates to which the license fees and other charges shall have been paid, that there are no offsets or claims against license fees and certifying such matters as such mortgagee or purchaser may reasonably require.

## ARTICLE 14

## SECURITY DEPOSIT

**Section 14.01** **Security Deposit**.

(1) Licensee, contemporaneously with the execution of this Agreement, has deposited with Licensor the sum of ONE THOUSAND AND NO/100 DOLLARS ($1,000.00) (the "Security Deposit"), the receipt of which is hereby acknowledged by Licensor. The Security Deposit shall be held by Licensor, without liability for interest, as security for the faithful performance by Licensee of all of the terms, covenants and conditions of this Agreement by said Licensee to be kept and performed during the Term hereof. The Security Deposit may be commingled with other funds of Licensor.

(2) Upon the occurrence of an event of default hereunder, then at the option of Licensor, Licensor may appropriate and apply the Security Deposit, or so much thereof as may be necessary, to compensate Licensor for all loss or damage sustained or suffered by Licensor due to such default on the part of Licensee upon written notice to Licensee. Should the entire Security Deposit, or any portion thereof, be so appropriated or so applied by Licensor for the payment of overdue License Fees or other sums due and payable by Licensee hereunder, then Licensee shall, upon the written demand of Licensor, forthwith remit to Licensor a sufficient amount in cash to restore the Security Deposit to the original sum deposited, and Licensee's failure to do so within fifteen (15) days after receipt of such demand shall constitute an event of default under this Agreement. In the absence of an event of default and the application

of Licensee's deposit to compensate Licensor as provided herein, the Security Deposit shall be returned in full to Licensee at the end of the Term.

(3) Licensor may deliver the Security Deposit to the purchaser of Licensor's interest in Kingman Reef in the event that such interest is sold, and thereupon Licensor shall be discharged from any further liability with respect to the Security Deposit.

## ARTICLE 15

## NOTICES

**Section 15.01** **Notices to Licensee**. All notices to be given to Licensee shall be given in writing and by depositing the same in the United States mail registered or certified and postage prepaid and addressed to Licensee at Licensee's address set forth on page 1 of this Agreement or at such other United States address as Licensee may hereafter specify by notice to Licensor, whether or not Licensee has departed from, abandoned or vacated Kingman Reef.

**Section 15.02** **Notices to Licensor**. All notices to be given to Licensor shall be given in writing and by depositing the same in the United States mail registered or certified and postage prepaid and addressed to Licensor at Licensor's address set forth on page 1 of this Agreement or at such other United States address as Licensor may hereafter specify by notice to Licensee.

**Section 15.03** **Time of Service**. Any written notice sent by registered or certified mail shall have been deemed to have been delivered ninety-six (96) hours after it is mailed in accordance with the foregoing provisions.

## ARTICLE 16

## MISCELLANEOUS

**Section 16.01** **No Partnership Intended**. It is expressly understood that by executing this Agreement, Licensor does not in any way or for any purpose become a partner of Licensee in the conduct of its business or otherwise, or a joint venturer or a member of a joint enterprise with Licensee, notwithstanding the possibility that the Licensor may be more actively involved than a customary licensor of property in order to preserve the unique nature of Kingman Reef.

**Section 16.02** **Broker's Commission**. Licensor and Licensee each represent and warrant to the other that there are no claims for brokerage commissions or finder's fees in connection with the execution of this Agreement. Licensor and Licensee each agree to indemnify the other against and hold the other harmless from all claims and liabilities for such commissions or fees arising by reason of the indemnifying party's acts or omissions, including without limitation attorneys' fees and costs in connection therewith.

**Section 16.03** **Time is of the Essence**. Time is of the essence in the performance of every covenant in this Agreement.

**Section 16.04** **Partial Invalidity**. If any covenant, condition, or other provision of this Agreement or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Agreement or the application of such covenant, condition or provision to persons or circumstances other than those as to which it is invalid or unenforceable is not affected and each covenant, condition, or provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

**Section 16.05** **Captions and Numbers**. The captions, article numbers and section numbers of this Agreement are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or intent of such articles or sections of this Agreement nor in any way affect this Agreement.

**Section 16.06** **Entire Agreement; Amendments**. This Agreement and the Exhibits annexed hereto constitute the entire agreement between the parties and supersedes any and all prior or contemporaneous negotiations, correspondence, representations, understandings and agreements, written or oral, between the parties and/or their representatives. No terms, conditions, warranties, representations, promises or undertakings of any nature whatever, express or implied, exist between Licensor and Licensee except as herein expressly set forth. Any agreement hereafter made shall be ineffective to change, modify, discharge or effect an abandonment of this Agreement in whole or in part unless such agreement is in writing and signed by the party against whom enforcement of the change, modification, discharge or abandonment is sought.

**Section 16.07** **Successors**. All of the covenants, agreements, terms and conditions contained in this Agreement shall apply to, accrue to and be binding upon the successors and assigns of Licensor and the successors and permitted assigns of Licensee.

**Section 16.08** **Governing Law; Conflicts**. This Agreement shall be governed and construed in accordance with the laws and regulations of the United States of America. If any provision of this Agreement conflicts with such laws or regulations, then the more restrictive shall control. The parties hereby submit to the jurisdiction of the federal court in the State of Hawaii and agree that notice or service of process may be made on any party by certified or registered mail, postage prepaid, addressed to such party.

**Section 16.09** **Statehood**. During the Term, Licensee shall not support the inclusion of Kingman Reef into any of the states of the United States of America, its commonwealths, other territories, possessions or federated states unless Licensor consents in writing (which consent may be withheld in Licensor's sole discretion).

**Section 16.10** **Treasure**. Licensor and the Master Lessor have reserved to themselves all "Treasure" (as hereinafter defined) located in and around Kingman Reef. Any Treasure shall be delivered promptly to Licensor. Any violation of this Section 16.10 shall permit Licensor to immediately terminate this Agreement upon written notice to Licensee. For purposes of this Agreement, the term "Treasure" shall mean all artifacts, coins, jewels, and other valuable (whether for historic or other reasons) personal property which was not in the original possession of Licensee or any of its agents, employees, independent contractors or guests.

**Section 16.11** **No Party Deemed Drafter**. Licensor and Licensee agree that no party shall be deemed to be the drafter of this Agreement and that in the event this Agreement is ever construed by a court of law, such court shall not construe this Agreement or any provision hereof against any party as the drafter of the Agreement. Licensor and Licensee have been represented by counsel in the negotiations and drafting of this Agreement.

**Section 16.12** **Advertising and Media Releases**. All print, radio and television advertisement and releases shall be subject to Licensor's prior written approval, which may be withheld in Licensor's sole discretion.

**Section 16.13** **United States Dollars**. All sums required to be paid under this Agreement shall be paid in United States dollars.

**Section 16.14** **Waiver of Jury Trial and Counterclaims**. The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Agreement, the relationship of Licensor and Licensee, and/or any claim of injury or damage. In the event Licensor commences any proceedings for nonpayment of License Fees or other charges payable by Licensee hereunder, Licensee will not interpose any counterclaim of whatever nature or description in any such proceedings. This shall not, however, be construed as a waiver of Licensee's right to assert such claims in any separate action or actions brought by Licensee.

**Section 16.15** **Licensor's Approval**. Whenever consent or approval of Licensor is required by the terms of this Agreement, requests for consent or approval must be made in writing. Unless otherwise provided herein, such consent or approval may be withheld in Licensor's sole and absolute discretion. Licensee will reimburse Licensor for all reasonable architect's, engineer's and attorney's fees and other expenses reasonably incurred by Licensor in connection with the giving of each and every consent or approval required under this Agreement; provided, however, that Licensor may, without further reason withhold approval of any alterations, additions and improvements if the plans and specifications therefor are not acceptable to the architect or engineer (if any) retained by Licensor to review the same; and provided, further, that Licensor may, as a condition of giving any consent, require personal and complete

financial information, personal guaranties, or other information relevant to the transaction for which consent is being sought. With respect to any activity or other matter under this Agreement which requires Licensor's approval, Licensor shall in no event be liable to Licensee or any other person for any damage, loss or prejudice suffered or claimed on account of Licensor's approval or refusal to grant such approval, or on account of any act or omission of Licensee in connection with or without such approval; provided that this provision shall not operate to release Licensor from a breach of this Agreement by Licensor.

Licensor's consent or approval shall not warrant or imply the legality, safety, utility, reasonableness, or any other aspect of the activity or matter which requires such approval or consent, and Licensee shall be responsible for complying with all present or future applicable laws, statutes, rules, regulations, limitations, restrictions or requirements (including the requirements contained in this Agreement) concerning such activity or matter. Licensee shall also be solely responsible for obtaining all necessary governmental permits and any other required permits, and for the satisfaction or payment of any fees, charges, costs or assessments that may be imposed in connection with any such laws, statutes, rules, regulations, limitations, restrictions, requirements or permits.

Where required by the Master Lease, Licensor's consent may be conditioned on the receipt by Licensee of the Master Lessor's consent. Licensee shall be responsible for obtaining the Master Lessor's consent at Licensee's sole cost and expense, and Licensor shall have no liability to Licensee if the Master Lessor refuses, for any reason, to consent to the proposed action by Licensee; provided, however, that Licensor shall cooperate with Licensee in seeking the consent of Master Lessor where required.

**Section 16.16** **Rules and Regulations**. Licensee acknowledges that because there is no state, county or other local governing authority for Kingman Reef, Licensor and the Master Lessor have the right to adopt, from time to time, rules and regulations governing Kingman Reef and Licensee's activities under this Agreement. Licensee shall comply with all such rules and regulations as Licensor or Master Lessor may prescribe and which are required, in Licensor's or Master Lessor's sole judgment, for the preservation, safety, or care of Kingman Reef, of the ecosystems of Kingman Reef, of the Land of Kingman Reef and of any persons present thereon; provided, however, that such rules and regulations shall not be inconsistent with this Agreement; and provided, further, that, in addition to any remedy for damages to which Licensee may be entitled under Section 10.07, Licensee may terminate this Agreement upon not less than thirty (30) days prior written notice, without further liability of either party after the termination date, if such rules and regulations materially interfere with Licensee's permitted activities and operations under this Agreement. Licensor and Master Lessor shall give Licensee reasonable prior written notice before such rules or regulations shall take effect. Subject to such notice, upon delivery to Licensee of a copy of such rules and regulations and any amendments thereto, Licensee shall comply with the same, and a violation thereof shall constitute a default by Licensee under Section 10.01(b) of this Agreement. All such rules and regulations are of the essence hereof without which

this Agreement would not have been entered into by Licensor. Licensee will indemnify, defend and hold harmless Licensor and the Master Lessor, and their respective officers, directors, employees, agents, heirs, personal representatives, successors and assigns from and against all claims, actions, suits, damages, costs and expenses, including attorneys' fees, by whomsoever brought or made, by reason of Licensee's nonobservance or nonperformance of said rules and regulations or of this covenant, using counsel approved by Licensor and the Master Lessor, at Licensee's sole cost and expense. Licensee shall not establish any type of governing authority at Kingman Reef for the purpose of controlling or regulating the activities of any third party; provided, however, that nothing herein shall limit the power and authority of Licensee to control and regulate the conduct and activities of its agents, employees, independent contractors and guests in connection with Licensee's activities under this Agreement. Such power and authority of Licensee shall not in any event conflict with the power and authority of Licensor under this Agreement and over Kingman Reef, and in the event of such conflict, the power and authority of Licensor shall prevail. In the event that rules or regulations adopted by Licensor or Master Lessor shall conflict with the requirements of other applicable laws, then the more restrictive provision shall prevail. All of the provisions of this Section 16.16 shall also apply to the waters surrounding Kingman Reef which are covered by this Agreement.

**Section 16.17** **Recordation of Agreement**. It is agreed that a short form memorandum of this Agreement, approved by Licensor and Licensee, may be recorded or filed by Licensee, at Licensee's sole cost and expense, in such office or with such court or person as is authorized and empowered to accept the filing or recordation of written muniments of title to interests in Kingman Reef. Upon such recordation or filing, Licensee shall deliver to Licensor a filed or recorded original of such short form, bearing the official stamp or other recognition of acceptance of the recording office, court or entity, or a certified copy thereof bearing such information.

**Section 16.18** **Counterparts**. This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. All of such counterpart signature pages shall be read as though one, and they shall have the same force and effect as though all of the signers had signed a single signature page.

**THE PARTIES HERETO** hereby expressly acknowledge and agree that by signing this Agreement, all of the licenses, covenants, conditions and restrictions relating to Kingman Reef and set forth in that certain License Agreement dated July 1, 1999, made by and between PALMYRA DEVELOPMENT CO., INC., as "Licensor", and PALMYRA PACIFIC ENTERPRISES, LLC, as "Licensee" (the "PPE License"), are incorporated herein by this reference and are ratified and confirmed, and that all of the licenses, provisions and terms relating to Kingman Reef and in favor of Palmyra Pacific Enterprises, LLC, contained in the PPE License are hereby given the same force and effect as if the PPE License were originally entered into by and between the Licensor hereunder and Palmyra Pacific Enterprises, LLC.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above mentioned.

KINGMAN REEF ATOLL DEVELOPMENT, LLC

By [signature]
Peter B. Savio
Its Manager/Member

"Licensor"

KINGMAN REEF ENTERPRISES, LLC

By [signature]
Frank Sorba
Its Managing Member

"Licensee"

**PALMYRA DEVELOPMENT CO., INC.** and **PALMYRA PACIFIC ENTERPRISES, LLC,** by signing below hereby expressly acknowledge and agree that all of the licenses, covenants, conditions and restrictions relating to Kingman Reef and set forth in the PPE License (as defined above) are ratified and confirmed and that all of the licenses, provisions and terms relating to Kingman Reef and in favor of Palmyra Pacific Enterprises, LLC, contained in the PPE License are hereby given the same force and effect as if the PPE License were originally entered into by and between the Licensor hereunder and Palmyra Pacific Enterprises, LLC.

PALMYRA DEVELOPMENT CO., INC.

By [signature]
Peter B. Savio
Its President

PALMYRA PACIFIC ENTERPRISES, LLC

By [signature]
Frank Sorba
Its Managing Member

## COVENANTS AND AGREEMENTS OF MASTER LESSOR

KINGMAN REEF ATOLL INVESTMENTS, LLC, a Hawaii limited liability company ( "Master Lessor"), hereby represents, covenants and agrees as follows:

1. Master Lessor hereby consents to the provisions of this Agreement and to the activities and operations of Licensee permitted hereunder and agrees to the covenants of Licensor and Master Lessor contained in Sections 1.08(2)(a) and 16.16 of this Agreement.

2. Master Lessor hereby represents and warrants to and for the benefit of Licensee that (a) the Master Lease is in full force and effect; and that (b) the terms of this License Agreement, the consummation of the transactions contemplated herein and the exercise by Licensee of its rights hereunder are not in conflict with or in contravention of the terms of the Master Lease nor will cause a default thereunder.

3. Master Lessor hereby covenants and agrees that, in the event of termination or expiration of the Master Lease for any reason prior to the expiration of the Term of this License Agreement (including any extensions granted pursuant to Section 1.10 above which are exercised by Licensee), then this License Agreement shall not be extinguished or terminated by reason of the termination or expiration of the Master Lease, but rather this License Agreement shall remain in full force and effect and Master Lessor shall recognize and accept Licensee as Master Lessor's licensee under the License Agreement. In such event, Master Lessor shall be entitled to all or the rights and bound by all of the obligations of the Licensor hereunder and, provided that Licensee shall attorn to Master Lessor as Licensor hereunder, Licensee's possession, use or enjoyment of Kingman Reef under this License Agreement shall not be disturbed.

4. Master Lessor agrees that, where Licensor or Licensee is required by the Master Lease to obtain any additional or further consent or approval from Master Lessor for any operations or activities conducted or proposed by Licensee under this License Agreement which are not already permitted by this Agreement, Master Lessor shall cooperate with Licensee and Licensor to effectuate the purposes of this Agreement and shall not unreasonably withhold such consent or approval; provided, however, that Master Lessor may withhold its consent or approval when, in Master Lessor's sole and absolute determination, such action is necessary to protect the land, waters, facilities, inhabitants or natural ecosystems of Kingman Reef, and Master Lessor shall not in such event be liable to Licensee or any other person for any damage, loss or prejudice suffered or claimed on account of Master Lessor's refusal to grant such approval, or on account of any act or omission of Licensee in connection with or without such approval. The foregoing proviso (beginning with the words "provided, however" and continuing to the end of the sentence) shall terminate with respect to, and shall not run in favor of, any Master Lessor other than the Master Lessor named herein.

Licensee will reimburse Master Lessor for all reasonable architect's, engineer's and attorney's fees and other expenses reasonably incurred by Master Lessor in connection with the giving of such consent or approval.

Master Lessor's consent or approval shall not warrant or imply the legality, safety, utility, reasonableness, or any other aspect of the activity or matter which requires such approval or consent, and Licensee shall be responsible for complying with all present or future applicable laws, statutes, rules, regulations, limitations, restrictions or requirements (including the requirements contained in the License Agreement) concerning such activity or matter.

5. Master Lessor acknowledges and agrees that the rights and obligations of Licensee under this License Agreement and the covenants and agreements of Master Lessor hereunder shall be binding upon and inure to the benefit of the successors and assigns of Master Lessor.

6. Master Lessor agrees that Master Lessor will not consent to a sale or conveyance by Licensor of its interest in Kingman Reef in violation of Section 13.01 of this License Agreement.

In the event of a sale or conveyance by Master Lessor of its interest in Kingman Reef, such sale shall operate to release Master Lessor from any liability arising thereafter under any of the covenants or conditions, express or implied, herein contained in favor of Licensee, provided that such sale or conveyance shall not release Master Lessor from liabilities arising prior to such sale or conveyance. Such sale or conveyance shall be subject to the License Agreement.

7. Any liability of Master Lessor arising hereunder shall be enforceable solely against and recoverable solely from Master Lessor's interest in Kingman Reef, and shall not be enforceable against any other assets of Master Lessor nor the assets of any member of Master Lessor.

**[THE NEXT PAGE IS THE SIGNATURE PAGE]**

IN WITNESS WHEREOF, the undersigned have executed the Covenants and Agreements of Master Lessor as of the day and year first above mentioned.

KINGMAN REEF ATOLL INVESTMENTS, LLC, a Hawaii limited liability company

By ______________________
Leslie Vincent Fullard-Leo, Trustee under that certain unrecorded Living Trust of Leslie Vincent Fullard-Leo, dated February 12, 1986, as amended
Its Member Manager

By ______________________
Ainsley A.K. Fullard-Leo, Trustee of the Ainsley A.K. Fullard-Leo Revocable Living Trust, as amended in its entirety on April 30, 1992
Its Member Manager

By ______________________
Dudley Leinani Fullard-Leo, Trustee of The Dudley Leinani Fullard-Leo Palmyra Trust dated December 29, 1995
Its Member Manager

Master Lessor

EXHIBIT A

ALL of those certain parcels of land situate in the Pacific Ocean, described as follows:

The atoll commonly referred to as "Kingman Reef", located 162 degrees 18 minutes West Latitude and 6 degrees 23 minutes North Longitude, Central Pacific Ocean, Line Islands Group, described as TMK 391-38 in the Territorial Tax Office 1936, State of Hawaii, including the land, reef platforms, lagoons and territorial waters thereof.

Kingman Reef was annexed to the United States of America on May 10, 1922 and ownership of Kingman Reef was claimed on behalf of the Island of Palmyra Copra Company, by its agent Lorrin A. Thurston. The formal annexation document was sent by the Island of Palmyra Copra Company to the State Department in Washington D.C. and was duly acknowledged. A copy was also filed in the Territorial Archives in Honolulu, Hawaii, and was published in the local Honolulu newspapers, and is attached hereto.

Kingman Reef was subsequently ceded to Mr. and Mrs. Leslie Fullard-Leo on August 14, 1922, by the directors of the Island of Palmyra Copra Company. On December 29, 1934, Kingman Reef was placed under the jurisdiction of the Secretary of the Navy, by Executive Order No. 6935 signed by President Franklin D. Roosevelt, a copy of which is also attached hereto.

Case 1:06-cv-00828-MBH Document 11-5 Filed 02/22/2007 Page 75 of 82

64TH YEAR. NO. 12,789—— PAGES. HONOLULU, TERRITORY OF

# U. S. FLAG OV

## Honolulu Party On Sampan Palmyra Takes Possessio Of Kingman's Reef May

## HISTORY IN MAKING; A PACIFIC DOCUMENT

"BE IT KNOWN TO ALL PEOPLE:

"That on the tenth day of May, A. D., 1922, the undersigned, agent of the Island of Palmyra Copra Co., Ltd. (an Hawaiian corporation), landed from the motor ship 'Palmyra' doth, on this tenth day of May, A. D., 1922, take formal possession of this island called Kingman's Reef, situate in longitude 162 18 west and in latitude 6 23 north; on behalf of the United States of America, and claim the same for said company.

"LORRIN A. THURSTON,

"Agent The Island of Palmyra Copra Co., Ltd.

"Witnesses:

"CAPTAIN HERMAN CHARLES LEMMEL,
"JOHN L. PADGETT,
"DIDLER D. THAANUM,
"THEODORE T. DRANGA,
"M. VASCONCELLOS.

"I hereby certify that the foregoing is a correct copy of certificate of possession of 'Kingman's Reef,' the original of which is deposited in a glass jar on the island at the easterly end of the reef, together with a copy of the Honolulu Star-Bulletin of May 3 and Honolulu Advertiser of May 4, and an American flag which had first been hoisted on a pole on the island at the time of making the proclamation of possession."

To the uninitiated it may be stated that the foregoing procedure is prescribed by American statute as that proper to follow in annexing territory to the United States—to be followed by the filing of a certificate of the facts, with the State Department at Washington.

The foregoing is the story of the "Annexation of Kingman's Reef." It now being demonstrated that there is a "really truly" island involved, I submit that it is entitled to a name of its own, and that "Leo Island" is an appropriate name.

In a later statement I will record reasons concerning the feasibility and advisability of attempting to create a workable landing and station at Kingman's Island.

LORRIN A. THURSTON.

## Here's to Him!

Lorrin A. Thurston, who has car-

### Land Listed by U. S. Navy but Hith Definitely Known or Possessed nexed" and Found to Be Real Islanc Good Harbor and Ideal Natu Landing Facilities

## THURSTON SUGGESTS NAME "LEO ISI

### Valuable Possibilities as Naval or Commerci Revealed by Explorers' Visit to Spot in Supposed to Be Only a Dangerous R

[Copyright Applied for]

"KINGMAN'S REEF," Wednesday, May 10, 19 cial Correspondence to The Advertiser by Thurston].

The above name awakens no memories in the 99.99 per cent of the people of Hawaii, and the da one picked at random from 365 on the year's calend the whole 100 per cent are concerned.

But the name "Kingman" will hereafter be know and it may be destined to bulk large in future history cific, while May 10, 1922, for weal or woe, importa portant, will hereafter mark a date in the history of of the United States of America!

What is this all about?
What is Kingman's?
Where is Kingman's?
Why is it Kingman's?
What is it to the United States?
Why is it of importance to anyone?
Is this a fairy story or a feature sensation for the per?

I will answer all of these questions to the best of but "firstly in the first place," let me say that this fairy tale nor other form of "South Sea literature!" I record of facts, free of sensation—except as the fact may provide the elements of sensation!

The one outstanding, central fact around which a ers cluster, is that "Kingman's" this day became Am ritory. In other words, these United States have "ann other "island possession!"

The second outstanding fact is that "Kingman" is congeries of dangerous shoals, "bare at low water," a officially described

# Executive Order

## PLACING CERTAIN ISLANDS IN THE PACIFIC OCEAN UNDER THE CONTROL AND JURISDICTION OF THE SECRETARY OF THE NAVY

### WAKE ISLAND, KINGMAN REEF, AND JOHNSTON AND SAND ISLANDS

By virtue of and pursuant to the authority vested in me by the act of June 25, 1910, ch. 421, 36 Stat. 847, as amended by the act of August 24, 1912, ch. 369, 37 Stat. 497, and as President of the United States, it is ordered that Wake Island located in the Pacific Ocean approximately in latitude 19°17′28″ N. and longitude 166°34′42″ E. from Greenwich, Kingman Reef located in the Pacific Ocean approximately in latitude 6°24′37″ N. and longitude 162°22′ W. from Greenwich, and Johnston and Sand Islands located in the Pacific Ocean approximately in latitude 16°44′32″ N. and longitude 169°30′59″ W. from Greenwich, together with the reefs surrounding all the aforesaid islands, as indicated upon the diagram hereto attached and made a part of this order, be, and they are hereby, reserved, set aside, and placed under the control and jurisdiction of the Secretary of the Navy for administrative purposes, subject, however, to the use of the said Johnston and Sand Islands by the Department of Agriculture as a refuge and breeding ground for native birds as provided by Executive Order No. 4467 of June 29, 1926.

This order shall continue in full force and effect unless and until revoked by the President or by act of Congress.

FRANKLIN D ROOSEVELT

THE WHITE HOUSE,

*December 29, 1934.*

# EXHIBIT B




AREA A - Proposed non-exclusive right and license area for take-off and landing of seaplane pursuant to Section 1.05.1 of the License Agreement

AREA B - Proposed land area for aircraft runway pursuant to Section 1.05.2 of the License Agreement

AREAS B & C - Proposed areas for swimming, sunbathing and pedestrian exploration or sightseeing pursuant to Section 1.06(2) of the License Agreement

## EXHIBIT C




AREA 1 - Proposed floating base camp area pursuant to Section 1.02 of the License Agreement

EXHIBIT E

TERMINATION OF LICENSE AGREEMENT

THIS TERMINATION made this ______ day of _______________, 20____, but effective as of __________________, 20____, by and between KINGMAN REEF ATOLL DEVELOPMENT, LLC, a Hawaii limited liability company, whose principal place of business and post office address is 931 University Avenue, Suite 105, Honolulu, Hawaii 96826 ("Licensor"), and KINGMAN REEF ENTERPRISES, LLC, a Washington limited liability company, whose business and post office address is 8441 S.E. 68th Street, Suite 312, Mercer Island, Washington 98040 ("Licensee");

W I T N E S S E T H:

WHEREAS, Licensor and Licensee entered into a License Agreement dated November 17, 2000 (the "License"), a short form of which was recorded with the United States District Court for the District of Hawaii on November 17, 2000, covering portions of the atoll commonly referred to as "Kingman Reef" and the waters surrounding Kingman Reef (collectively, the "Property"); and

WHEREAS, Section 10.02(b) of the License provides that upon the occurrence of an event of default under the License, Licensor may date, execute and record this Termination; and

WHEREAS, Licensor has determined that an event of default has occurred under the License and Licensor desires to exercise its right to date, execute and record this Termination; and

WHEREAS, Licensor has given written notice to Licensee at least sixty (60) days prior to the effective date of this Termination in accordance with Section 10.02(b) of the License.

NOW, THEREFORE, this Termination witnesseth:

THAT Licensee, for good and valuable consideration, the receipt whereof is hereby acknowledged, does hereby sell, transfer, assign and convey to Licensor, and Licensor hereby accepts, all of Licensee's rights in and to the License, and Licensor and Licensee do hereby cancel and terminate the License; provided that the foregoing termination shall not operate to release or discharge Licensee from any and all obligations, claims and rights of whatever kind or character, including the payment of the License Fees (as defined in the License) arising out of the terms, covenants and conditions contained in the License.

AND Licensee, in consideration of the premises, does hereby for Licensee, Licensee's successors and assigns, covenant and agree to and with Licensor, Licensor's successors and assigns, that Licensee is the licensee under the License; that the License is free

and clear of and from all encumbrances; that Licensee has good right to enter into this Termination as aforesaid; and that Licensee will WARRANT AND DEFEND the same unto Licensor against the lawful claims and demands of all persons.

IN WITNESS WHEREOF, the parties hereto have executed these presents on the day and year first above written, effective as of the effective date first above written.

KINGMAN REEF ATOLL DEVELOPMENT, LLC, a Hawaii limited liability company

By____________________________
Its___________________________

Licensor

KINGMAN REEF ENTERPRISES, LLC, a Washington limited liability company

By____________________________
Its Member-Manager

Licensee

STATE OF HAWAII )<br>
) SS:<br>
CITY AND COUNTY OF HONOLULU )

On this _____ day of ________________, 20_____, before me appeared ____________, the __________________ of KINGMAN REEF ATOLL DEVELOPMENT, LLC, a Hawaii limited liability company, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that _____ executed the same as _____ free act and deed, as said __________________ of KINGMAN REEF ATOLL DEVELOPMENT, LLC, a Hawaii limited liability company.

____________________________________

____________________________________<br>
(Print/Type Name)

Notary Public, State of Hawaii<br>
My Commission Expires: ____________

STATE OF HAWAII )
) SS:
CITY AND COUNTY OF HONOLULU )

On this 17th day of November, 2000, before me appeared Frank Sorba, one of the Member-Managers of KINGMAN REEF ENTERPRISES, LLC, a Washington limited liability company, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed, as said Member-Manager of KINGMAN REEF ENTERPRISES, LLC, a Washington limited liability company.

LANCE Y. SHIROMA
(Print/Type Name)

Notary Public, State of Hawaii
My Commission Expires: 8/29/2003

LANCE Y. SHIROMA NOTARY PUBLIC STATE OF HAWAII