U.S. Fish & Wildlife Service

# Environmental Assessment

## *Proposed Kingman Reef National Wildlife Refuge*

*Line Islands, Central Pacific Ocean*



EXHIBIT
"33

Acknowledgments

Many people contributed to this proposal, and we would like to acknowledge the professional administrative and technical support we received from our colleagues in the U.S. Fish and Wildlife Service and others in the Department of the Interior.

The ongoing cooperation of the U.S. Coast Guard and the National Marine Fisheries Service in providing logistical support to the U.S. Fish and Wildlife Service for our Pacific Remote Island National Wildlife Refuge Complex management programs is very much appreciated. The National Marine Fisheries Service, in particular the crew of the Research Vessel *Townsend Cromwell* and other fisheries staff, provided substantial logistics and technical support during field site surveys of Kingman Reef, which we gratefully acknowledge.

Environmental Assessment:

Cover photographs (clockwise from top left): Underwater view of coral reef habitat at Kingman Reef showing lobe corals (*Porites* spp.), rose coral (*Pocillopora*), leather coral (order: Alcyonaria), and two butterflyfish (*Chaetodon quadrimaculatus*). [*Photograph by J. Maragos*]; Giant clam (*Tridacna maxima*), anemones, and coralline algae substrate in shallow waters of Kingman Reef. [*Photograph by D. Aycock*]; View from the emergent coral spit at Kingman Reef [*Photograph by D. Aycock*]; Aerial photograph of the eastern portion of Kingman Reef showing the shallow reefs and emergent land spits [*Photograph by R. J. Shallenberger*].

*Cover graphics by B. Maxfield.*

United States Department of the Interior

FISH AND WILDLIFE SERVICE

Hawaiian and Pacific Islands National Wildlife Refuge Complex
Box 50167
Honolulu, Hawaii 96850

December 11, 2000

Dear Interested Party:

As part of our efforts to ensure the protection of coral reef ecosystems under U.S. jurisdiction in the Pacific Ocean, the U.S. Department of the Interior, Fish and Wildlife Service (Service) is pleased to announce our proposal to establish a National Wildlife Refuge (Refuge) at Kingman Reef. This remote coral reef atoll is located in the Line Islands, 900 miles south of Hawaii and only 6 degrees north of the equator. The clear warm waters and extensive coral reefs support a spectacular diversity of marine life including reef fishes, corals, sharks, seaweeds, giant clams, crabs, lobsters, manta rays, and other wildlife including migratory seabirds and threatened green sea turtles. Small emergent coral spits provide a roosting habitat for migratory seabirds and shorebirds.

The Refuge would allow the Service to conserve this outstanding coral reef ecosystem and associated marine habitats and wildlife in perpetuity as part of the National Wildlife Refuge System. We have prepared an *Environmental Assessment for the Proposed Kingman Reef National Wildlife Refuge* that describes the proposed project and evaluates the environmental effects of two alternatives including the No-Action alternative, and a Refuge alternative. The *Conceptual Management Plan for the Proposed Kingman Reef National Wildlife Refuge*, included as an appendix, describes potential management programs at Kingman Reef.

We are inviting public review and comments through January 11, 2001. We are truly excited about the potential for the Service to protect and manage the resources of this coral reef ecosystem for the benefit of current and future generations.

Sincerely,

Jerry F. Leinecke
Project Leader

Enclosure

# Environmental Assessment

# for the Proposed

# Kingman Reef National Wildlife Refuge

# Line Islands, Central Pacific Ocean

*Prepared by:*

U.S. Fish and Wildlife Service
Pacific Islands Refuge Planning Office
Honolulu, Hawaii

December 2000

# Project Summary

| | |
|---|---|
| **Proposed action:** | Kingman Reef National Wildlife Refuge |
| **Stage of process:** | Environmental Assessment |
| **Lead agency:** | U.S. Department of the Interior, Fish and Wildlife Service |
| **Responsible official:** | Regional Director<br>U.S. Department of the Interior, Fish and Wildlife Service<br>Pacific Region, Portland, Oregon |
| **Send comments to:** | Phyllis Ha<br>Senior Staff Ecologist<br>Pacific Islands Refuge Planning Office<br>U.S. Fish and Wildlife Service<br>Box 50088<br>Honolulu, Hawaii 96850<br>Phone: (808) 541-2749<br><br>E-mail comments to: FW1PIE_Kingman_EA<br><br>Text Telephone (TTY) users may call us through the GTE Telecommunications Relay Service at: 643-8255. |
| **Publication Date:** | December 11, 2000 |
| **Comment Due Date:** | **Comments must be received by the Service on or before January 11, 2001 to be considered.** |

The U.S. Fish and Wildlife Service (Service) is proposing to establish a National Wildlife Refuge (Refuge) at Kingman Reef, the northernmost atoll in the Line Islands. Located in the central Pacific Ocean approximately 900 miles south of Hawaii, Kingman Reef is situated north of the equator at 6°23'N latitude and 162°25'W longitude. Kingman Reef is a United States unincorporated territory without an organic act, and the protection and management of its coral reef and other marine habitats for their outstanding ecological values are consistent with the national trust conservation responsibilities of the Service.

Kingman Reef is one of the most pristine coral reef atoll ecosystems in the Pacific. Crystal clear oceanic waters and vibrant coral reefs support a spectacular diversity of corals and other marine invertebrates, algae, fishes, marine mammals, sea turtles, and migratory seabirds. Submerged and partially exposed coral reefs form the shape of a triangle and surround a central lagoon. The outer reef is approximately 12.4 miles long on the southern face, 7.5 miles long on the northeastern face, and 8.7 miles long on the northwestern face. Lagoon depths range from approximately 50 to 250 feet. Three coral rubble land spits are found atop the eastern reefs providing resting sites for migratory shorebirds and seabirds.

We have prepared an *Environmental Assessment for the Proposed Kingman Reef National Wildlife Refuge* (EA) that describes the proposed Refuge and evaluates the environmental effects of two alternatives. Alternative A is the No-Action alternative, under which a National Wildlife Refuge would not be established at Kingman Reef, and the current administrator will keep the area in a custodial status, with no active natural resources management. Alternative B, the Service's preferred alternative, is an approved Refuge boundary that includes the lagoon, emergent lands, coral reefs, and other submerged lands and associated waters seaward to 12 nautical miles from reefs exposed at mean low tide. The Refuge would enable the Service to take an active role in implementing natural resource management programs to protect and conserve the coral atoll ecosystem and adjacent marine waters and the wildlife these areas support in perpetuity.

Potential interim Refuge management programs are described in the *Conceptual Management Plan for the Kingman Reef National Wildlife Refuge* that is appended to the EA. If a Refuge were to be established, natural resource management programs would include biological monitoring surveys, habitat enhancement projects, actions to promote the recovery of endangered and threatened species in the Refuge, and other long-term conservation actions. The Service is not proposing to develop public use programs during the interim period, the period of time between Refuge establishment and the completion of an approved Comprehensive Conservation Plan (CCP). Opportunities for public uses would be evaluated during the development of the Refuge CCP. Limited access would be considered on a case-by-case basis by the Refuge Manager during the interim period.

The Service welcomes public comments on the documents. All comments received from individuals during the public comment period will become part of the official public record. Requests for copies of the comments will be handled in accordance with the Freedom of Information Act, the Council on Environmental Quality's National Environmental Policy Act (NEPA) regulations [40 CFR 1506.6(f)], and other Service and Department of the Interior policies and procedures. When requested, the Service generally will provide copies of comment letters with the names and addresses of the individuals who wrote the comments. However, telephone numbers will not be released, to the extent permissible by law.

For further information, to request a copy of the documents, or to provide comments, please contact us at the address or phone number listed on page 1.

## Table of Contents

Page No.:


1 CHAPTER 1. NEED FOR AND PURPOSE OF THE ACTION . . . . . . . . . . . . . . . . . 1-1
1.1 The Proposed Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-1
1.2 Need for the Proposed Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-1
1.3 Purpose of the Proposed Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-1
1.4 Related Agency Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2
1.4.1 Service Refuge management activities in the equatorial Pacific area . . 1-2
1.4.2 Natural resources management in the northern Line Islands by other agencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-3
1.5 Decisions to be Made Based on the Analysis . . . . . . . . . . . . . . . . . . . . . . . 1-4
1.6 Public Involvement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-4
1.7 Land Acquisition Planning Policies, Authorities, and Regulatory Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-4
1.8 Document Organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-5
1.9 Scope of the Environmental Assessment . . . . . . . . . . . . . . . . . . . . . . . . . 1-5

2 CHAPTER 2. THE AFFECTED ENVIRONMENT . . . . . . . . . . . . . . . . . . . . . . . . 2-1
2.1 Overview of Kingman Reef . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-1
2.2 Affected Physical Environment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-1
2.2.1 Air and water quality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-2
2.3 Affected Social and Economic Environment . . . . . . . . . . . . . . . . . . . . . . . 2-2
2.3.1 Ownership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-2
2.3.2 Land use and the local economy . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-2
2.3.3 Current management of marine resources at Kingman Reef . . . . . . . . . 2-3
2.3.4 Public use and visitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-3
2.3.5 Historic resources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-3
2.4 Biological Environment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-4
2.4.1 Natural communities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-4
2.4.2 Wildlife of Kingman Reef . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-4

3 CHAPTER 3. ALTERNATIVES INCLUDING THE PROPOSED ACTION . . . . . . 3-1
3.1 Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-1
3.2 Boundary Selection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-1
3.3 Alternatives Considered in Detail . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-1
3.3.1 Alternative A. No Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-1
3.3.2 Alternative B. (the Service's preferred alternative) . . . . . . . . . . . . . . . 3-1
3.4 Alternatives Considered and Rejected . . . . . . . . . . . . . . . . . . . . . . . . . . 3-2
3.5 Comparison of the Alternatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-2

4 CHAPTER 4. ENVIRONMENTAL CONSEQUENCES OF THE ALTERNATIVES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-1
4.1 Effects of the Alternatives on the Physical Environment . . . . . . . . . . . . . . . 4-1
4.1.1 Effects of the alternatives on air and water quality . . . . . . . . . . . . . . . 4-1
4.2 Effects of the Alternatives on the Social and Economic Environment . . . . . . . 4-1
4.2.1 Effects of the alternatives on ownership . . . . . . . . . . . . . . . . . . . . . . 4-1
4.2.2 Effects of the alternatives on land use and the local economy . . . . . . . . 4-1

4.2.3 Effects of the alternatives on management of marine resources at Kingman Reef . . . . 4-1
4.2.4 Effects of the alternatives on public use and visitation . . 4-2
4.2.5 Effects of the alternatives on historic resources . . . . 4-2
4.3 Effects of the Alternatives on the Biological Environment . . 4-2
4.4 Other Considerations . . . . 4-3
4.4.1 Cumulative effects . . . . 4-3
4.4.2 Relationship between short-term uses of the environment and enhancement of long-term productivity . . . . 4-3
4.4.3 Environmental justice . . . . 4-3
4.4.4 Irreversible and irretrievable commitments of resources . . . . 4-3

5 CHAPTER 5. PREPARER, INTERDISCIPLINARY TEAM, AND CONSULTED PARTIES . . . . 5-1
5.1 Preparer . . . . 5-1
5.2 Interdisciplinary Team . . . . 5-1
5.3 Consulted Parties . . . . 5-2
5.3.1 Federal agencies . . . . 5-2
5.3.2 State agencies . . . . 5-2
5.3.3 Congressional Delegation . . . . 5-3
5.3.4 Other interested organizations . . . . 5-3
5.3.5 Public review . . . . 5-3

6 CHAPTER 6. REFERENCES CITED . . . . 6-1

## List of Figures

Figure 1-1. The location of Kingman Reef in the northern Line Islands, central Pacific Ocean. . . . . 1-6
Figure 1-2. Generalized physical features of Kingman Reef. . . . . 1-7
Figure 3-1. The boundary of the proposed Kingman Reef National Wildlife Refuge under Alternative B. . . . . 3-3

## List of Tables

Table 3-1. Comparison of the Alternatives. . . . . 3-4
Table 4-1. Summary of the Effects of the Alternatives on the Environment. . . . . 4-4

## List of Appendices

Appendix A. Protected Wildlife Species Recently Reported from Kingman Reef.
Appendix B. Conceptual Management Plan for the Proposed Kingman Reef National Wildlife Refuge.
Appendix C. Glossary.
Appendix D. Executive Orders for Coral Reef Protection and Marine Protected Areas.
Appendix E. Other Executive Orders.

# Environmental Assessment for the Proposed Kingman Reef National Wildlife Refuge

**Line Islands, Central Pacific Ocean**

## 1 CHAPTER 1. NEED FOR AND PURPOSE OF THE ACTION

### 1.1 The Proposed Action

The U.S. Fish and Wildlife Service (Service) is proposing to establish a National Wildlife Refuge at Kingman Reef, a remote United States' possession in the Line Islands (figure 1-1). Located in the central Pacific Ocean approximately 900 miles south of Hawaii, Kingman Reef lies just above the equator at 6°23'N latitude, 162°25'W longitude. The Service would acquire jurisdiction and authority for Kingman Reef through a Department of the Interior Secretarial Order.

Kingman Reef is a triangular-shaped atoll that features one of the most pristine coral reef ecosystems in the Pacific (Maragos 2000). Submerged and partially exposed coral reefs surround a central lagoon (figure 1-2). The outer reef measures approximately 12.4 miles long on the southern face, 7.5 miles long on the northeastern face, and 8.6 miles long on the northwestern face. The large central lagoon ranges from 50 to 250 feet deep. Emergent land consists of three coral rubble spits that have formed atop the eastern reef, providing resting and foraging sites for migratory birds and possible basking areas for threatened green sea turtles. The extensive coral reefs and other marine habitats at Kingman Reef support a diversity of marine invertebrates, algae, fishes, marine mammals, and sea turtles and are an important foraging ground for Pacific migratory seabirds.

### 1.2 Need for the Proposed Action

The proposed Refuge is needed to ensure the long-term conservation and management of the outstanding natural resources of the atoll. Kingman Reef's remote location and reservation as a U.S. Naval Defensive Sea Area have protected the atoll from the heavy exploitation pressures most Pacific atolls have experienced. The low-lying coral reef atoll is a navigational hazard that is vulnerable to shipwrecks and oil spills. Other threats to the fragile marine ecosystem that could be managed by the Service, include marine debris, over-exploitation of marine resources, and the effects of commercial fishing practices on seabirds and sea turtles.

### 1.3 Purpose of the Proposed Action

The purpose of the proposed action is to protect the lands, waters, coral reefs, and other fish and wildlife of the atoll ecosystem at Kingman Reef in perpetuity, through active conservation and management programs.

The mission of the National Wildlife Refuge System is

> ***"... to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans."*** [National Wildlife Refuge System Improvement Act of 1997]

Consistent with this mission, the purposes of the Kingman Reef National Wildlife Refuge are:

- To preserve, restore, and enhance in their natural ecosystems (when practicable) all species of animals and plants that occur at Kingman Reef, including those that are endangered or threatened with becoming endangered; and

- To conserve the migratory bird resources and coral reef ecosystem at Kingman Reef.

The establishment and management of the Kingman Reef National Wildlife Refuge would be consistent with recent Presidential Executive Orders directing government agencies with natural resources management responsibilities to provide for the protection and management of coral reefs (Executive Order 13089 "Coral Reef Protection," dated June 11, 1998), and to designate and manage a network of marine protected areas (Executive Order 13158 "Marine Protected Areas," dated May 26, 2000). Copies may be found in Appendix D at the end of this document.

## 1.4 Related Agency Actions

### 1.4.1 Service Refuge management activities in the equatorial Pacific area

The Service administers Howland Island, Baker Island, and Jarvis Island (three unincorporated U.S. possessions near the equator) as National Wildlife Refuges (NWRs). Jarvis Island NWR is located in the Line Islands approximately 400 nautical miles southeast of Kingman Reef (figure 1-1). The Service manages a total of 36,483 acres within the Jarvis NWR boundary which includes submerged lands and associated waters[1]. Jarvis NWR has approximately 1,086 acres of emergent land and 1,823 acres of coral reef. The remainder is submerged lands and associated waters. Howland Island NWR and Baker Island NWR are in the Phoenix Island group and are located close to the equator approximately 1,000 miles southwest of Kingman Reef. The Service manages 32,529 acres within the Howland Island NWR. This includes approximately 455 acres of emergent land and 2,083 acres of submerged coral reefs. At Baker Island NWR, the Service manages a total of 30,504 acres including approximately 405 acres of emergent land and an estimated 2,859 acres of coral reefs. The environment and natural resources of Howland, Baker, and Jarvis Islands are distinctly different from those of Kingman Reef due to climatic, geographic, oceanographic, and other differences. Management activities at these remote island National Wildlife Refuges include periodic monitoring surveys, habitat enhancement, and law

[1] Acreage figures for established Refuge areas are from published reports from the U.S. Fish and Wildlife Service (1999). Coral reef and emergent land acreage figures are derived from digitized navigation charts.

enforcement patrols. Visitor use is currently limited to authorized scientific research visits that are conducted under Special Use Permits issued by the Service.

In a separate action, the Service is developing a final proposal to establish a National Wildlife Refuge at Palmyra Atoll, located approximately 33 miles south of Kingman Reef. If a Refuge were to be established at Palmyra Atoll, it would contribute to the management of the proposed Kingman Reef National Wildlife Refuge. However, the proposal to establish a Refuge at Kingman Reef is independent of the proposal to establish the Palmyra Atoll National Wildlife Refuge.

### 1.4.2 Natural resources management in the northern Line Islands by other agencies

The National Marine Fisheries Service (NMFS) of the Department of Commerce and its advisory council, the Western Pacific Regional Fishery Management Council (WPRFMC), have marine resource management responsibilities in the 200-nautical mile Exclusive Economic Zones (EEZ) that surround United States' possessions. As authorized by the Magnuson Fisheries Management Act, the WPRFMC has the authority to manage commercial fisheries and other marine resources in the EEZ of Kingman Reef.

Current fishing regulations that are applicable to the EEZ around Kingman Reef include the exclusion of foreign fishing vessels except those that are part of a foreign fishing agreement; a ban on gillnets, trawls, explosives, and poisons; and a requirement for longliners and precious coral fishing vessels to have a Federal permit and maintain a Federal logbook (CFR Part 600).

In addition to its fisheries management responsibilities in the Pacific, the NMFS is also charged with administering the Endangered Species Act in waters of the United States with respect to endangered and threatened sea turtles at sea, the great whales of the Pacific, and the endangered Hawaiian monk seal. The NMFS is the primary Federal agency responsible for administering the provisions of the Marine Mammal Protection Act. The NMFS and WPRFMC are assisted in the enforcement of fishery and other laws by the U.S. Coast Guard and Service law enforcement officers.

Several atolls within the Republic of Kiribati lie south of Kingman Reef and Palmyra Atoll. The government of the Republic of Kiribati has designated wildlife sanctuaries on Kiritimati (a populated island also known as Christmas Island), Malden, Starbuck, and Vostok Islands (Perry 1980), and selected areas of the Republic have been designated as closed areas for the protection of wildlife. The government has promulgated a Wildlife Conservation Ordinance that protects all bird species that occur in the Republic. The ordinance also protects marine turtles on land, allows for the establishment of wildlife sanctuaries, and provides wildlife wardens with powers of search and arrest. The government division responsible for conservation management is the Wildlife Conservation Unit located at Kiritimati. The Wildlife Conservation Unit lacks

resources and does most of its work locally at Kiritimati, relying on the remoteness of the other sanctuary sites for their protection (International Union for the Conservation of Nature 1991).

## 1.5 Decisions to be Made Based on the Analysis

The Regional Director of the U.S. Fish and Wildlife Service's Region 1 will select an alternative for implementation, and determine whether or not the selected alternative would be a major Federal action significantly affecting the human environment. The Director of the U.S. Fish and Wildlife Service would approve the establishment of a National Wildlife Refuge.

## 1.6 Public Involvement

The Service is seeking public input on the proposed Refuge and Environmental Assessment. The public will have 30 days to review and comment on the documents. A news release on the availability of the documents will be issued to media representatives in Hawaii and a notice placed in the State of Hawaii's Office of Environmental Quality Control (OEQC) newsletter, *Environmental Notice*. The public comment period will run from December 11, 2000, through January 11, 2001.

## 1.7 Land Acquisition Planning Policies, Authorities, and Regulatory Compliance

This environmental assessment is part of the detailed land protection planning process for the proposed Kingman Reef National Wildlife Refuge. It describes the proposed Refuge and informs and involves the public.

The Service acquires land for National Wildlife Refuges in a manner that is consistent with legislation, other Congressional guidelines, and Executive Orders. The Service will acquire land and water interests including, but not limited to, fee title, easements, leases, and other interests. Donations of desired lands or interests are encouraged. At Kingman Reef, the interest necessary to ensure the ability to properly manage the resources is Service ownership of the reef and associated submerged lands and waters within the proposed Refuge boundary.

The authority for the Service to acquire and manage Kingman Reef as a National Wildlife Refuge is provided by the Fish and Wildlife Act of 1956, as amended (16 U.S.C. 742a-742j, not including 742 d-l; 70 Stat. 1119). If Kingman Reef is acquired by the Service, it would become part of the National Wildlife Refuge System to be administered and managed in accordance with the National Wildlife Refuge System Administration Act (16 U.S.C. Section 668dd-668jj), as amended by the National Wildlife Refuge System Improvement Act of 1997 (16 U.S.C. Section 668dd et seq.) and other applicable laws.

Planning for the establishment of the Kingman Reef National Wildlife Refuge will be completed in compliance with Service policies and the following laws and regulations: the National Environmental Policy Act (NEPA) of 1969, as amended; the National Wildlife Refuge Administration Act of 1966, as amended by the National Wildlife Refuge Improvement Act of 1997; Executive Order 12372 (Intergovernmental Review of Federal Programs); Executive

Orders 11988 (Floodplain Management) and 11990 (Protection of Wetlands); the Endangered Species Act of 1973, as amended; the National Historic Preservation Act of 1966, as amended; the Coastal Zone Management Act of 1972, as amended; Secretarial Order 3127 (Contaminants and Hazardous Waste); Executive Order 13089 (Coral Reef Protection); and Executive Order 13158 (Marine Protected Areas).

### 1.8 Document Organization

This document was developed in compliance with requirements of the National Environmental Policy Act (NEPA). Chapter 1 describes the proposed action, purpose of and need for the proposed action, applicable regulatory requirements and coordination, and the scope of the environmental assessment. Chapter 2 describes the affected environment. Chapter 3 describes and compares the alternatives. Chapter 4 assesses the environmental consequences of the alternatives. Chapter 5 lists preparers, reviewers, and agencies and persons contacted. Chapter 6 provides a list of references cited. Appendix A is a list of trust wildlife species recently observed at Kingman Reef. Appendix B is the Conceptual Management Plan. Appendix C is a glossary. Appendix D provides informational copies of Executive Orders relating to the protection and management of coral reefs and the establishment, protection, and management of Marine Protected Areas. Appendix E provides informational copies of other Executive Orders relevant to the proposed project.

### 1.9 Scope of the Environmental Assessment

This environmental assessment evaluates the environmental effects of establishing an approved boundary for the proposed Kingman Reef National Wildlife Refuge and initiating interim management activities during the initial stage of the Refuge. The *Conceptual Management Plan for Kingman Reef National Wildlife Refuge* complements this environmental assessment and provides a description of potential Refuge management programs. Changes to Refuge management programs and future Refuge Comprehensive Conservation Plans would be coordinated with the public as they are developed.




Figure 1-1. The location of Kingman Reef in the northern Line Islands, central Pacific Ocean.
*The U.S. Fish and Wildlife Service manages seven other remote islands and atolls in the Pacific as National Wildlife Refuges including Howland, Baker, and Jarvis Island NWRs in the central equatorial Pacific Ocean; the Hawaiian Islands NWR and Midway Atoll NWR in the northern Hawaiian Islands; Johnston Atoll NWR; and Rose Atoll NWR in the south Pacific Ocean. Palmyra Atoll, 33 miles south of Kingman Reef, is currently proposed as a National Wildlife Refuge.*




Figure 1-2. Generalized physical features of Kingman Reef.
(Base Map Source: National Oceanic and Atmospheric Administration Chart dated 4/13/85 rev. 1/26/91.)

# 2 CHAPTER 2. THE AFFECTED ENVIRONMENT

## 2.1 Overview of Kingman Reef

Kingman Reef is a low-lying coral reef atoll located in the Line Islands in the central Pacific Ocean. It features outstanding marine communities including the deep central lagoon, the extensive and diverse coral reef complex, emergent lands, and surrounding pelagic waters of the atoll, all of which support migratory birds, threatened green sea turtles, and other native fish and wildlife species.

The first recorded western contact at Kingman Reef was by an American seaman, Captain Fanning, in 1798 (Stanley 1991). The reef was named after Captain Kingman, who visited in 1853. The U.S. annexed the reef in 1922, and in 1934 delegated jurisdiction to the Navy. Pan American Airways "Clipper" planes bound from Honolulu to New Zealand landed in the lagoon several times during a trial period for a trans-Pacific airline route in 1937 and 1938. The route was unsuccessful and was subsequently abandoned (Davies 1987, Krupnick 1997).

The atoll is unsuitable for human habitation, due to the small size of emergent land spits and lack of fresh water. The airspace and waters at Kingman Reef have been reserved by the Department of the Navy for military purposes (see appendix E).

A scientific resource assessment was recently conducted by the Service and the National Marine Fisheries Service (NMFS) (Flint and Aycock 2000; Maragos 2000; Newbold 2000; Wass and DeMartini 2000). Working from the National Oceanographic and Atmospheric Administration's (NOAA) Research Vessel, *Townsend Cromwell*, three Service biologists conducted SCUBA dives at four sites and snorkeled at two other sites recording fishes, corals, and other invertebrates. Six NOAA divers participated in several miles of towed underwater SCUBA surveys. Two Service biologists were detailed to land spits to survey migratory birds. Reports and species lists from the site visit are on file with the Service and the NMFS. Divers reported that the coral reefs at Kingman Reef are among the most pristine in the Pacific (Maragos 2000).

## 2.2 Affected Physical Environment

Kingman Reef is located in the equatorial central Pacific Ocean in the Line Islands at 6°23'N latitude, 162°25'W longitude. (figure 1-1). Low-lying, partially exposed and submerged coral reefs surround a deep central lagoon (figure 1-2). The outer reef is approximately 12.4 miles long on the southern face, 7.5 miles long on the northeastern face, and 8.7 miles long on the northwestern face. The lagoon ranges in depth from 50 to 250 feet. Three barren coral rubble land spits are found on the eastern reefs and provide resting sites for migratory seabirds, foraging habitat for migratory shorebirds, and may serve as basking areas for threatened green sea turtles.

Climatic conditions are not well documented, however, the atoll's location just 33 nautical miles north of Palmyra Atoll means they are likely influenced by the same major climatic and oceanic systems. Kingman Reef lies within the northern hemisphere convergence zone (Sadler 1959). This zone, known as the "Intertropical Convergence Zone", or ITCZ, is an area of weak and variable winds between the northeast and southeast tradewind systems (Drake *et al.* 1978). As the two air masses meet, the air rises, becomes cooled, and drops its moisture in the form of rain. The ITCZ is responsible for the high rainfall and frequent cloud cover reported for Palmyra Atoll, and although rainfall data are not available for Kingman Reef, it is likely affected by the

high cloud cover associated with the ITCZ. Average temperatures at Palmyra are reported to range from 75° to 85°F and can be extrapolated to Kingman Reef, although Kingman Reef lacks the tropical rainforest of Palmyra Atoll that, together with a larger emergent land base, may contribute to localized warming. Kingman Reef is subject to tropical storms that occasionally batter the atoll with high winds and storm waves.

The project area is affected by the eastward-flowing North Equatorial Countercurrent, a relatively narrow current located between latitudes 5 degrees and 10 degrees North, that flows eastward, in the opposite direction from the major westward-flowing currents of the northern and southern hemispheres (Drake *et al.* 1978). The northern boundary of this current is an area of upwelling that brings nutrient rich waters to the surface, and is an important foraging ground for several marine species including seabirds.

### 2.2.1 Air and water quality

Air quality is excellent at Kingman Reef, as there are no sources of airborne pollutants. The waters of the atoll are remarkably clear, with more than 300-foot visibility reported from recent diving surveys (Maragos 2000). The water clarity is believed to be due to both a lack of land-based sediment inputs and the exposure of the reef and lagoon to oceanic waters.

## 2.3 Affected Social and Economic Environment

### 2.3.1 Ownership

Kingman Reef is not part of any state (U.S. GAO 1997). The atoll is a United States unincorporated territory without an organic act, which is currently subject to control by the U.S. Navy. For the past 59 years, the reefs and waters of the territorial sea[2] (within 12 nautical miles of the extreme high tide mark) have been reserved as a Naval Defensive Sea Area for the purpose of national defense (E.O. 8682 dated February 14, 1941).

At such time as Kingman Reef is longer needed for military purposes and the Navy terminates its military use, the Department of the Interior would regain full jurisdiction. The Service would subsequently establish the Refuge through a Secretarial Order transferring jurisdiction and control from the Office of Insular Affairs to the Service.

### 2.3.2 Land use and the local economy

Kingman Reef is a military defensive area. The reefs and waters of Kingman Reef are held in a custodial status by the Navy.

Fishing has not been authorized by the Navy within the Naval Defensive Sea Area. A relatively low-level of fishing is reported to occur within the 200-nautical mile Exclusive Economic Zone, according to a report by the Western Pacific Regional Fishery Management Council (1999).

---

[2] The territorial sea of the United States, as defined by Proclamation No. 5928 of the President of the United States of America (54 F.R. 777), extends to 12 nautical miles from the baselines of the United States determined in accordance with international law.

Shark fishing for the shark-fin trade, and fishing for big-eye and yellow-fin tuna characterize the known commercial fishery in the EEZ.

### 2.3.3 Current management of marine resources at Kingman Reef

The National Marine Fisheries Service (NMFS) of the Department of Commerce and the Western Pacific Fishery Management Council (WPRFMC) have fishery resource management responsibilities in the 200-NM EEZ that surrounds United States' possessions. Their fishery resource management responsibilities include regulating commercial fish harvests in the waters of the United States.

The WPRFMC is an advisory council and assists NMFS with developing policies regarding the management of fisheries in the EEZ around American Samoa, Guam, Hawaii, the Northern Mariana Islands, and other United States' possessions in the Pacific, an area of nearly 1.5 million square miles.

Current fishing regulations in the region address provisions for longline and other pelagic fisheries. The NMFS is in the process of developing other fishery management plans for the Western Pacific that will include provisions for the management of commercial harvest of coral reef resources, precious corals, and an extension of bottom fishery and lobster fishery management regulations to include the EEZ at Kingman Reef. The plans have not been finalized for public release at this time.

The NMFS also has a regulatory review role for those Federal activities that may affect endangered and threatened sea turtles at sea, and monk seals, and has Federal trust responsibilities for marine mammals under the Marine Mammal Protection Act.

At Kingman Reef, the Service has Federal trust responsibilities for migratory birds, endangered and threatened sea turtles on land (e.g., breeding and basking areas), and certain species of other aquatic wildlife (such as giant clams) that are protected by the Convention on International Trade in Endangered Species of Wild Fauna and Flora or CITES.

### 2.3.4 Public use and visitation

No permits have been recently issued by the Navy for members of the public to visit Kingman Reef.

### 2.3.5 Historic resources

There is no evidence of permanent human settlement on Kingman Reef, and there are no sites that are listed or that are known to be eligible for listing on the National Register of Historic Sites.

## 2.4 Biological Environment

### 2.4.1 Natural communities

Kingman Reef is classified as an oceanic atoll (Holthus and Maragos 1995). Emergent land at consists of three coral rubble spits that have formed atop the eastern portion of the reef. Both islets are approximately 50 feet by 300 feet long (Flint and Aycock 2000). These islets provide foraging and resting habitat for migratory shorebirds and seabirds including Brown Boobies and Wandering Tattlers.

The coral reefs at Kingman Reef are reported to be among the most pristine in the Pacific (Maragos 2000). A variety of reef formations are present at Kingman Reef including lagoon patch reefs, pinnacle reefs, ribbon reefs, intertidal reefs, reef slopes, reef terraces, and reef spur formations, each with distinctive natural communities and supporting an outstanding diversity of marine life forms.

The boundary areas between the North Equatorial Countercurrent and other ocean currents in the vicinity of Kingman Reef are areas of upwelling. The nutrient rich waters form important marine feeding grounds for seabirds and contribute to the biological diversity of the atoll.

### 2.4.2 Wildlife of Kingman Reef

The reefs and waters of Kingman Reef support a spectacularly diverse and healthy marine community. Coral reef ecologists reported 168 species of fishes including sharks, rays, eels, groupers, jacks, goatfishes, butterflyfishes, damselfishes, mullets, wrasses, parrotfishes, surgeonfishes, and tuna (Wass and DeMartini 2000). Also recorded were 102 species of corals, including an undescribed species of fingercoral (*Porites*) and spectacular assemblages of mushroom corals, fire coral, table coral, and plate coral, among other species (Maragos 2000). Other species noted were several giant clams (*Tridacna maxima*, *T. crocea*), and several species of other bivalves, anemones, octopus, crabs, sea urchins, sea cucumbers, and tunicates (Newbold 2000). Several species of giant clams (*Tridacna* spp.) are protected by CITES and can be found in relatively large numbers in waters of Kingman Reef.

Appendix A provides a list of national trust species of wildlife recently reported at Kingman Reef. Threatened green sea turtles (*Chelonia mydas*) were observed foraging at Kingman Reef and the coral islets may serve as basking sites for this species. The atoll may support endangered hawksbill sea turtles (*Eretmochelys imbricata*), although none were observed on recent dive surveys.

The waters of Kingman Reef are a rich foraging ground for Pacific migratory seabirds that feed on nearshore coral reef and other fish species. Seabirds observed during recent visits included Brown Boobies, Great Frigatebirds, Wandering Tattlers, and Sooty Terns. Brown Boobies were observed resting on the coral islets.

# 3 CHAPTER 3. ALTERNATIVES INCLUDING THE PROPOSED ACTION

## 3.1 Background

The U.S. Fish and Wildlife Service has been involved in protecting and managing remote Pacific islands and coral atolls since the Hawaiian Islands National Wildlife Refuge was established in 1909. Kingman Reef has long been noted by Service biologists for its importance to migratory birds and coral reef natural resources, and preliminary scoping of options for the Service to protect the area began in 1991. In October of 1997, the Director of the U.S. Fish and Wildlife Service gave her approval for the Service to proceed with detailed planning to study the establishment of a National Wildlife Refuge at Kingman Reef.

The Kingman Reef National Wildlife Refuge proposal was developed using an interdisciplinary approach that included input from people with special expertise in remote islands Refuge management and Pacific islands and atoll conservation, as well as ornithologists, botanists, and marine biologists.

## 3.2 Boundary Selection

The proposed Refuge boundary was designed to enable the Service to protect coral reefs, migratory birds, and other marine resources of Kingman Reef in perpetuity. The Refuge boundary would protect the coral reef ecosystem (which extends to at least the 100 fathom depth) and includes open waters that are important for marine mammals, pelagic fishes, deep water invertebrates, sea turtles, and migratory seabirds. The open waters would also serve as a management buffer around the coral reefs.

## 3.3 Alternatives Considered in Detail

### 3.3.1 Alternative A. No Action

Under the No-Action alternative, a National Wildlife Refuge would not be established at Kingman Reef. Public funds would not be expended annually for Refuge operations and maintenance. The No-Action alternative represents a continuation of the *status quo* in which the atoll would continue to be used for military purposes by the U.S. Navy. Except for otherwise authorized officers or employees of the United States, access to Kingman Reef and its surrounding waters out to12-NM would be restricted by the Navy. There would be no long-term comprehensive management actions implemented to conserve the marine wildlife and coral reef ecosystem at Kingman Reef under the No-Action alternative.

### 3.3.2 Alternative B. (the Service's preferred alternative). Establish the Kingman Reef National Wildlife Refuge with a boundary extending to 12 nautical miles from reefs exposed at mean low tide.

Under Alternative B (shown in figure 3-1), the Service would establish the Kingman Reef National Wildlife Refuge (Refuge). The approved Refuge boundary would include the lagoon, emergent land, coral reefs, and other submerged lands and associated waters extending seaward 12 NM from reefs exposed at mean low tide. Under Alternative B, the approved Refuge boundary would protect a total of 483,702 acres including approximately 3 acres of emergent

land and 25,874 acres of coral reef habitat. The Service would expend public funds for annual Refuge operations and management. The Service would implement long-term comprehensive management actions to conserve the coral reef ecosystem of Kingman Reef, implement endangered and threatened species recovery programs, and actively manage migratory birds and other native species.

### 3.4 Alternatives Considered and Rejected

The Service initially considered establishing a Refuge only to within 3 nautical miles from reefs exposed at low tide. This alternative was rejected because it did not protect all of the coral reef ecosystem, and excluded pelagic waters of the territorial seas that contain important fish and wildlife resources. The smaller Refuge boundary would have been too small to adequately prevent ships from accidentally grounding on shallow reefs. The Service desired a larger buffer area in which to manage maritime traffic and protect sea turtles and migratory birds from impacts related to commercial fishing.

### 3.5 Comparison of the Alternatives

Table 3-1 summarizes the attributes of the alternatives for the purpose of comparison. Effects of the alternatives on the environment are discussed in Chapter 4.

Alternative A, the No-Action alternative, would not result in an active natural resources conservation program at Kingman Reef. Protection of the fish and wildlife of Kingman Reef would be only through passive control of access. There would be no active programs to study and monitor the area, enforce wildlife laws, enhance fish and wildlife resources and habitats, and no public educational programs.

The Refuge (Alternative B) would allow the Service to provide long-term conservation and management of coral reef and other marine and terrestrial resources at Kingman Reef in perpetuity. This alternative would provide active habitat and fish and wildlife monitoring and enhancement programs, law enforcement, and public educational programs.




Figure 3-1. The boundary of the proposed Kingman Reef National Wildlife Refuge.
*The approved boundary would include those portions of the lagoon, the coral reef complex, and emergent land, and other submerged lands and associated waters within 12 nautical miles of reefs that are exposed at mean low tide.*

Table 3-1. Comparison of the Alternatives.

| | Alternative A: No Action. A Refuge would not be established at Kingman Reef. | Alternative B. Establish a Refuge at Kingman Reef to 12-NM from reefs exposed at mean low tide. |
|---|---|---|
| Description: | This alternative is the *status quo*. A National Wildlife Refuge (Refuge) would not be established at Kingman Reef. The Navy would retain jurisdiction and control of the area. | The Service's Preferred Alternative. The Service would establish a Refuge at Kingman Reef with a boundary of 12 NM from reefs awash at mean low tide. |
| Size of Refuge: | 0 acres | 483,702 acres |
| Area of coral reef habitat protected in an approved Refuge boundary: | 0 acres | 25,874 acres |
| Degree of conservation of atoll fish and wildlife resources: | Conservation would be through control of access and use. No active natural resources management would be implemented under this alternative. | Alternative B would result in active natural resources conservation and management through Refuge management programs that are described in the Conceptual Management Plan. These include control of access, monitoring, research, habitat and fish and wildlife enhancement actions, public education, and law enforcement. |
| Protection/recovery of endangered and threatened species | Currently limited to compliance with laws and positive benefits associated with controlled access. | Endangered and threatened species would be protected and actively managed on the Refuge. |
| Public Access to Kingman Reef. | The Navy would continue to regulate access to and uses in the waters of the atoll within the territorial seas. | The Service would regulate access to the Refuge. Future opportunities for compatible public visitation at the Refuge would be evaluated during the development of a Refuge Comprehensive Conservation Plan. |

# 4 CHAPTER 4. ENVIRONMENTAL CONSEQUENCES OF THE ALTERNATIVES

This chapter describes the potential environmental consequences of the alternatives. The No-Action alternative assumes a continuation of the current status and serves as the baseline for comparison of the effects of the action alternative. Table 4-1 summarizes the findings of this chapter.

## 4.1 Effects of the Alternatives on the Physical Environment

### 4.1.1 Effects of the alternatives on air and water quality

The present access restrictions help to protect water quality of the atoll by reducing the likelihood of accidental ship groundings.

Under Alternative B, the Service would regulate access and reduce the likelihood of accidental ship groundings. The protection of air and water quality is consistent with the Service's goals for protecting the pristine marine environment at Kingman Reef. Access to the Refuge by approved vessels, would be at relatively low levels, so there would not be a significant reduction in air or water quality. Refuge safety plans, navigation protocols, and the installation of mooring buoys would help to minimize the risk of accidental groundings by vessels used by the Service for Refuge natural resources management activities.

## 4.2 Effects of the Alternatives on the Social and Economic Environment

### 4.2.1 Effects of the alternatives on ownership

Both alternatives would continue the Federal ownership at Kingman Reef, and waters of the territorial seas.

If the Navy extinguishes its use reservation, under Alternative A, jurisdiction and control would revert to the Office of Insular Affairs.

If the Navy extinguishes its use reservation, under Alternative B, Kingman Reef and the waters of the territorial sea would be transferred to the Service for use as a National Wildlife Refuge.

### 4.2.2 Effects of the alternatives on land use and the local economy

Under the No-Action alternative, access to and use of Kingman Reef and its surrounding waters would continue to be regulated by the Navy and reserved for military use.

Alternative B would result in no change in the economic use of the lands and waters of Kingman Reef. The land use of the area would change from custodial natural resources management to active natural resource conservation and management in the National Wildlife Refuge System.

### 4.2.3 Effects of the alternatives on management of marine resources at Kingman Reef

Under the No-Action alternative, the NMFS and the WPRFMC would continue to have the authority for managing commercial fisheries in waters of the 200-NM Exclusive Economic Zone

that are open for commercial fishing. However, at present, there is no commercial fishing authorized by the Navy.

Under the No-Action Alternative, NMFS would continue its regulatory role in the protection and recovery of endangered and threatened sea turtles at sea and monk seals under the Endangered Species Act, and in the conservation of marine mammals under the Marine Mammal Protection Act. The Service would continue its regulatory role in the protection and recovery of endangered and threatened sea turtles on land, and in its wildlife law enforcement role.

Under Alternative B, there would be no change to NMFS's or the Service's regulatory roles related to endangered and threatened species, and other national trust wildlife. The establishment of the Refuge would not change the authority of NMFS to manage aquatic resources in the EEZ. Because the Service does not proposed to open the Refuge to commercial fishing or harvesting of other marine species, NMFS would not have an active fishery management role on the Refuge.

Under Alternative B, the Service would continue to coordinate management activities with NMFS to comply with section 7 of the Endangered Species Act. The Service would invite NMFS to cooperate with specific atoll management activities including baseline surveys, habitat enhancement such as the removal of marine debris, research on listed sea turtles or marine mammals, and research on other marine species.

### 4.2.4 Effects of the alternatives on public use and visitation

Under the No-Action alternative, access to Kingman Reef would continue to be restricted by the Navy within the territorial sea.

Alternative B would result in no change to public access. However, in the future, the Service may develop opportunities for low levels of compatible public visitation. Proposals for public use would be considered during future Comprehensive Conservation Planning efforts and coordinated with the public.

### 4.2.5 Effects of the alternatives on historic resources

Although there are no known historic resources or sites at Kingman Reef, under the No-Action alternative, the Federal administrator would continue to be responsible for complying with the National Historic Preservation Act.

If a Refuge were to be established under Alternative B, the Service would assume responsibility for compliance with the National Historic Preservation Act. There would be no change, therefore, in the degree of protection and management to historic resources that may be found in the future.

## 4.3 Effects of the Alternatives on the Biological Environment

Under the No-Action alternative, Navy controls over access to Kingman Reef would provide limited passive protection to the natural resources of the atoll. Natural reef processes would

continue. Endangered and threatened sea turtles and migratory sea birds would be protected from the effects of commercial fishing. There would be no active management programs to control marine debris, implement monitoring programs, provide public education about the area, and no law enforcement patrols under the No-Action alternative.

Refuge establishment would enable the Service to protect the coral reef ecosystem and associated waters of Kingman Reef in perpetuity. Refuge management programs (described in the Conceptual Management Plan, Appendix B) would help to conserve the native fish and wildlife resources, including marine and terrestrial habitats, migratory birds, marine mammals, endangered and threatened species, and the rich diversity of wildlife found in the land and waters of the atoll. The Service would implement active management programs to control marine debris, implement monitoring programs, provide public education about the area, and would also provide an active law enforcement presence.

## 4.4 Other Considerations

### 4.4.1 Cumulative effects

Under the No-Action alternative, over time, the lack of active natural resources management could result in a decline in the quality of the reef ecosystem.

The establishment of the Refuge would result in the long-term conservation of resources through proactive Refuge management programs.

### 4.4.2 Relationship between short-term uses of the environment and enhancement of long-term productivity

Both alternatives would maintain the lands, reefs and waters of Kingman Reef in a natural state. This would provide for the continued productivity of the natural ecosystem.

### 4.4.3 Environmental justice

Neither alternative would have a disproportionately high and adverse human health or environmental effect on minority populations and low-income populations.

### 4.4.4 Irreversible and irretrievable commitments of resources

Neither alternative would result in an irreversible or irretrievable commitment of resources.

Table 4-1. Summary of the Effects of the Alternatives on the Environment.

| Alternative: / Issue: | Alt. A. No Action. A National Wildlife Refuge would not be established at Kingman Reef. | Alt. B (The Service's Preferred Alternative): A National Wildlife Refuge would be established at Kingman Reef. |
|---|---|---|
| Effects on the Physical Environment | | |
| Effects on air and water quality | Navy control of access would protect water quality of the atoll by reducing the likelihood of accidental ship groundings. | The Service would work to protect air and water quality on the Refuge. The Refuge would reduce the potential for accidental vessel groundings. The limited use of vessels on the Refuge for Refuge management would not have a significant adverse effect on water or air quality. |
| Effects on the Social and Economic Environment | | |
| Effects on ownership | Kingman Reef would remain under the control of the U.S. Navy. If the Navy extinguished its use reservation, the Office of Insular Affairs would acquire jurisdiction. | Kingman Reef would remain under Federal jurisdiction. If the Navy extinguished its use reservation, the Service would acquire jurisdiction. |
| Effects on land use and local economy | The area would be used as a military reserve. No economic activity is currently authorized by the Navy within the territorial sea. | The area would be maintained in a natural state and actively managed to conserve natural resources. There would be no change to economic activity if a Refuge were established. |

| Alternative: / Issue: | Alt. A. No Action. A National Wildlife Refuge would not be established at Kingman Reef. | Alt. B (The Service's Preferred Alternative): A National Wildlife Refuge would be established at Kingman Reef. |
|---|---|---|
| Effects on management of marine resources | NMFS would continue to have a regulatory role, regarding the protection and recovery of threatened green sea turtles and endangered hawksbill sea turtles at sea, as well as for the protection of marine mammals.<br><br>The Service would continue to have a regulatory and enforcement role regarding the protection and recovery of threatened and endangered sea turtles on land, and the protection of migratory birds and other resources. | There would be no change to NMFS's or the Service's regulatory or enforcement roles and responsibilities. |
| Effects on public access | There is currently no public access. | No change. In the future, the Service would consider the potential for low levels of compatible public use during Comprehensive Conservation Planning for the Refuge. |
| Effects on historic resources | There are no sites listed on or known to be eligible for listing on the National Register of Historical Sites. Any cultural or historical resources that may be found at Kingman Reef in the future would be protected by the Navy as required by law. | No change to the level of protection that would be required. The only change would be that the Service would become the responsible agency for compliance with laws protecting historical resources that may be found in the future. |
| Effects on the Biological Environment | | |
| Effects on coral reefs, migratory birds, and other habitats and wildlife | Fish and wildlife and their habitats would be passively protected through the Navy's control of access and uses within the 12 NM territorial sea. | Coral reef ecosystems and other habitats and wildlife of the atoll would be protected and actively managed through Refuge programs that would include monitoring surveys, research, habitat and wildlife management and enhancement, public education, and law enforcement. |

| Alternative: / Issue: | Alt. A. No Action. A National Wildlife Refuge would not be established at Kingman Reef. | Alt. B (The Service's Preferred Alternative): A National Wildlife Refuge would be established at Kingman Reef. |
|---|---|---|
| Endangered and threatened species | Endangered and threatened species would be passively protected through the Navy's control of access and uses within the 12 NM territorial sea. | Endangered and threatened species and their habitats would be protected and actively managed on the Refuge in perpetuity. |
| OTHER CONSIDERATIONS | | |
| Cumulative effects | A lack of proactive management could lead to a decline in the quality of the reef ecosystem over time. | Long-term conservation of resources would occur through proactive Refuge management programs. |
| Short-term uses vs. long-term productivity | The natural environment and productivity would be conserved. | The natural environment and productivity would be conserved. |
| Environmental justice | No minority or low-income populations would be affected. | No minority or low-income populations would be affected. |
| Irreversible or irretrievable commitments of resources | None. | None. |

# 5 CHAPTER 5. PREPARER, INTERDISCIPLINARY TEAM, AND CONSULTED PARTIES

## 5.1 Preparer

Phyllis Y. Ha, Senior Staff Ecologist, Pacific Islands Refuge Planning Office, Honolulu, Hawaii

## 5.2 Interdisciplinary Team

Carolyn Bohan, Regional Chief, National Wildlife Refuge System, Region 1, Portland, Oregon
Forrest Cameron, Refuge Supervisor, National Wildlife Refuge System, Region 1, Portland, Oregon
Elizabeth N. Flint, Wildlife Biologist, Pacific Remote Islands National Wildlife Refuge Complex, Honolulu, Hawaii
Ben Harrison, Fish and Wildlife Biologist, Division of Habitat Protection and Management, Ecological Services, Region 1, Portland, Oregon
A. Eugene Hester, Senior Resident Agent, Division of Law Enforcement, Honolulu, Hawaii
Charles J. Houghten, Chief, Division of Refuge Planning, Region 1, Portland, Oregon
Kay Kier-Haggenjos, Writer/Editor, Division of Refuge Planning, Region 1, Portland, Oregon
David N. Johnson, Refuge Manager, Pacific Remote Islands National Wildlife Refuge Complex, Honolulu, Hawaii
Jerry F. Leinecke, Project Leader, Hawaiian and Pacific Islands National Wildlife Refuge Complex, Honolulu, Hawaii
James E. Maragos, Coral Reef Biologist, Pacific Islands Ecoregion, Honolulu, Hawaii
Barbara Maxfield, Public Information Officer, U.S. Fish and Wildlife Service, Pacific Islands Ecoregion, Honolulu, Hawaii
Stephen B. Moore, Chief, Division of Refuge Operations Support, Region 1, Portland Oregon
Cathy Osugi, Wildlife Biologist, Division of Refuge Planning, Region 1, Portland, Oregon
Catherine B. Sheppard, Chief, Division of Realty, Region 1, Portland, Oregon
Georgia Shirilla, Senior Realty Specialist, Division of Realty, Region 1, Portland, Oregon
Robert P. Smith, former Pacific Islands Manager, Honolulu Hawaii (assisted with project conception and preliminary drafts)

Cartography:

Rodman Low, Geographer, Pacific Islands Ecoregion, Honolulu, Hawaii
Susan Machida, Geographer, Pacific Islands Ecoregion, Honolulu, Hawaii

Other reviewers:

Kevin B. Foster, Fish and Wildlife Biologist, Division of Ecological Services, Honolulu, Hawaii
Joseph McDermott, Office of the Solicitor, Dept. of the Interior, Washington, DC
Don Palawski, Supervisory Fish and Wildlife Biologist, Division of Ecological Services, Honolulu, Hawaii
Karen Rosa, Fish and Wildlife Biologist, Division of Ecological Services, Honolulu, Hawaii
Francesca R. Ryan, Realty Specialist, Division of Realty, Washington, DC
Karen Sprecher-Keating, Office of the Solicitor, Dept. of the Interior, Washington, DC
Chris Swenson, Fish and Wildlife Biologist, Division of Ecological Services, Honolulu, Hawaii

Ronald Walker, Fish and Wildlife Biologist, U.S. Fish and Wildlife Service, Pacific Islands Ecoregion, Honolulu, Hawaii
David J. Wesley, former Geographic Assistant Regional Director, Pacific Islands Ecoregion, Portland, Oregon
David Woodside, Wildlife Biologist, Pacific Islands Ecoregion, Honolulu, Hawaii

## 5.3 Consulted Parties

The following agencies and interested individuals were provided with a copy of the Environmental Assessment and Conceptual Management Plan:

### 5.3.1 Federal agencies

U.S. Army Corps of Engineers, Army Engineer Division, Pacific Ocean, Ft. Shafter, Hawaii
U.S. Department of Agriculture, Natural Resources Conservation Service, Honolulu, Hawaii
U.S. Department of Commerce, National Oceanographic and Atmospheric Administration, National Marine Fisheries Service, Southwestern Regional Office, California
U.S. Department of Defense, Secretary of the Navy, Washington, DC
U.S. Department of Defense, Pacific Division, Naval Facilities Engineering Command, Honolulu, Hawaii
U.S. Department of the Interior, Secretary of the Interior, Washington, D.C.
U.S. Department of the Interior, Assistant Secretary for Fish and Wildlife and Parks, Washington, D.C.
U.S. Department of the Interior, Fish and Wildlife Service, Washington, D.C.
U.S. Department of the Interior, Office of Insular Affairs, Washington, D.C. (Director; Policy Division)
U.S. Department of the Interior, Fish and Wildlife Service, Region 1, Portland, Oregon
U.S. Department of the Interior, Fish and Wildlife Service, Pacific Islands Ecoregion, Honolulu, Hawaii
U.S. Department of Transportation, Coast Guard, Honolulu, Hawaii

### 5.3.2 State agencies

The State of Hawaii, while not having jurisdiction at Kingman Reef, has been interested in the Service's Refuge proposals in the Pacific. As a courtesy, the Service coordinated its proposal with the following State offices:

Governor, State of Hawaii, Honolulu, Hawaii
State of Hawaii, Department of Education, Main Library, Honolulu, Hawaii
State of Hawaii, Department of Land and Natural Resources, Honolulu, Hawaii
State of Hawaii, Historic Preservation Office, Honolulu, Hawaii
State of Hawaii, Office of Hawaiian Affairs, Honolulu, Hawaii
State of Hawaii, Office of Environmental Quality Control, Honolulu, Hawaii
State of Hawaii, University of Hawaii at Manoa Environmental Center, Hamilton Library, Marine Option Program, Honolulu, Hawaii
State of Hawaii, University of Hawaii at Hilo, Hawaii

### 5.3.3 Congressional Delegation

The Hawaii Congressional delegation was provided with a courtesy copy of the documents.

### 5.3.4 Other interested organizations

Bernice Pauahi Bishop Museum, Honolulu, Hawaii
Conservation Council for Hawaii, Honolulu, Hawaii
Earthjustice Legal Defense Fund, Honolulu, Hawaii
Hawaii Audubon Society, Honolulu, Hawaii
Marine Mammal Commission, Bethesda, Maryland and Washington, D.C.
National Fish and Wildlife Foundation, Washington, D.C.
National Tropical Botanical Garden, Lawai, Hawaii
Pacific Atoll Marine Preservation Society, Honolulu, Hawaii
The Nature Conservancy, San Francisco, California
The Nature Conservancy of Hawaii, Honolulu, Hawaii
Peregrine Fund, Boise, Idaho
Sierra Club of Hawaii, Honolulu, Hawaii
Western Pacific Regional Fishery Management Council, Honolulu, Hawaii
Wildlife Society, Hawaii Chapter, Honolulu, Hawaii

### 5.3.5 Public review

The environmental assessment and conceptual management plan are being distributed to the public for a 30-day comment period that will be open from December 11, 2000, through January 11, 2001. A press release and an abstract in the State of Hawaii's Office of Environmental Quality Control's newsletter, the *Environmental Notice*, will help inform the public of the project and of the availability of the documents.

Comments received from individuals on these documents will become part of the official public record. Requests for copies of the comments will be handled in accordance with the Freedom of Information Act, the Council on Environmental Quality's NEPA regulations [40 CFR 1506.6(f)], and other Service and Departmental policies and procedures. When requested, the Service generally will provide copies of letters with names and addresses of the individuals who wrote the comments. However, telephone numbers will not be provided, to the extent permissible by law.

# 6 CHAPTER 6. REFERENCES CITED


Davies, R.E.G. 1987. *Pan Am: an airline and its aircraft*. Orion Books, Crown Publishers, Inc. New York, NY. 90 pp.

Drake, C.L., J. Imbrie, J.A. Knauss, and K.K. Turekian. 1978. *Oceanography*. Holt, Rinehard and Winston. NY. 447 pp.

Flint, E. and D. Aycock. 2000. "Kingman Reef". Trip report. U.S. Fish and Wildlife Service.

Holthus, P.F. and J.E. Maragos. 1995. Marine Ecosystem Classification for the Tropical Island Pacific. Pp: 239-278. Chapter 13, In: *Marine and Coastal Biodiversity in the Tropical Island Pacific Region, Vol. 1: Species Systematics and Information Management Priorities,* Maragos, J.E., M.N.A. Peterson, L.G. Eldredge, J.E. Bardach, and H.F. Takeuchi (eds). East-West Center, Honolulu, 424 pp.

International Union for the Conservation of Nature. 1991. *IUCN Directory of Protected Areas in Oceania*. Prepared by the World Conservation Monitoring Centre. IUCN, Gland, Switzerland and Cambridge, UK. xxiii + 447 pp.

Krupnick, J.E. 1997. *Pan American's Pacific Pioneers: a pictoral history of Pan Am's Pacific first flights 1935-1946.* Pictoral Histories Publishing Co., Missoula, MT. 319 pp.

Maragos, J.E. 2000. "Status of Coral Reefs at Kingman Reef, U.S. Line Islands." Summary reporting on the expedition to Kingman Reef on file at U.S. Fish and Wildlife Service.

Newbold, R. 2000. Unpublished data listing invertebrates seen during dive surveys at the U.S. Line and Phoenix Islands, March-April, 2000. 3pp.

Perry, R. 1980. "Wildlife conservation in the Line Islands, Republic of Kiribati (formerly Gilbert Islands)." *Environmental Conservation*. 7: 311-318.

Sadler, J.C. 1959. "A Study of Some Recent Climatological Data of the Line Islands." *Proceedings of the Ninth Pacific Science Congress*, pp: 12-16.

Stanley, D. 1991. *Micronesia Handbook*. Moon Publications. Chico, CA. 238 pp.

U.S. Fish and Wildlife Service. 1999. *Report of Lands Under Control of the U.S. Fish and Wildlife Service: as of September 30, 1999.* 45 pp.

U.S. General Accounting Office. 1997. *U.S. Insular Areas: application of the U.S. Constitution.* Report to the Chairman, Committee on Resources, House of Representatives. November 1997. GAO/OGC-98-5.

Wass, R. and E. DeMartini. 2000. Unpublished data listing fishes seen during dive surveys at Kingman Reef, March-April, 2000. 10 pp.

Western Pacific Regional Fishery Management Council. 1999. *Draft Pelagic Fisheries of the Western Pacific Region 1998 Annual Report.* Draft report prepared by the Pelagics Plan Team and Council Staff, Honolulu, Hawaii.

# APPENDICES

# Appendix A.

# Protected Wildlife Species

# Recently Reported from Kingman Reef

**Appendix A. Protected Wildlife Species Recently Reported from Kingman Reef.**

| Common Name: | Scientific Name: | Federal Status: |
|---|---|---|
| **BIRDS:** | | |
| Brown Booby | *Sula leucogaster* | Migratory |
| Great Frigatebird | *Fregata minor* | Migratory |
| Wandering Tattler | *Heteroscelus incanus* | Migratory |
| Sooty Tern | *Sterna fuscata* | Migratory |
| **MARINE REPTILES:** | | |
| Green sea turtle | *Chelonia mydas* | Threatened |
| **MARINE INVERTEBRATES**[1]: | | |
| Giant clam | *Tridacna crocea* | CITES[2] |
| Giant clam | *Tridacna maxima* | CITES[2] |
| Giant clam | *Tridacna* spp. | CITES[2] |

[1] Lists of corals, other invertebrates, and fish species that were seen on recent field ascertainment surveys are on file at the U.S. Fish and Wildlife Service.

[2] CITES = Wildlife species protected by the Convention on International Trade in Endangered Species (CITES) of Wild Fauna and Flora. CITES species are regulated with respect to import, export, and re-export.

# Appendix B.

# Conceptual Management Plan

# for the

# Proposed Kingman Reef National Wildlife Refuge

Line Islands, Central Pacific Ocean

U.S. Fish & Wildlife Service

# Conceptual Management Plan

*Proposed Kingman Reef National Wildlife Refuge*

*Line Islands, Central Pacific Ocean*



## Acknowledgments

Many people contributed to this proposal, and we would like to acknowledge the professional administrative and technical support we received from our colleagues in the U.S. Fish and Wildlife Service and others in the Department of the Interior.

The ongoing cooperation of the U.S. Coast Guard and the National Marine Fisheries Service in providing logistical support to the U.S. Fish and Wildlife Service for our Pacific Remote Island National Wildlife Refuge Complex management programs is very much appreciated. The National Marine Fisheries Service, in particular the crew of the Research Vessel *Townsend Cromwell* and other fisheries staff, provided substantial logistics and technical support during field site surveys of Kingman Reef, which we gratefully acknowledge.

Conceptual Management Plan

Cover photographs (top to bottom): Mushroom coral (*Fungia* sp.) and green seaweed (*Halimeda* sp.); Pink lace coral (*Sylaster* sp.) and damselfish (*Chromis* sp.) beneath a coral ledge; Underwater view of coral reef habitat in the lagoon of Kingman Reef featuring a variety of corals including table corals (*Acropora* spp.), finger corals (*Pocillopora* spp.), and fusilier fish (*Caesio* sp.). [Photographs by *J. Maragos*].

*Cover graphics by B. Maxfield.*

# Conceptual Management Plan

## for the Proposed

## Kingman Reef National Wildlife Refuge

## Line Islands, Central Pacific Ocean

*Prepared by:*

U.S. Fish and Wildlife Service
Pacific Islands Refuge Planning Office
Honolulu, Hawaii

December 2000

## Table of Contents

Page No.:


I. INTRODUCTION . . . 1
- A. Overview . . . 1
- B. The National Wildlife Refuge System . . . 1
  1. Background and overview . . . 1
  2. Mission, principles, and guidelines for natural resources management of the National Wildlife Refuge System . . . 2
  3. Visitor uses on National Wildlife Refuges . . . 3
- C. Refuge Purposes . . . 3

II. OVERVIEW OF THE ENVIRONMENT OF KINGMAN REEF . . . 3
- A. General . . . 3
- B. Approved Refuge Boundary . . . 4

III. INTERIM REFUGE MANAGEMENT AT THE PROPOSED KINGMAN REEF NWR . . . 8
- A. Overview . . . 8
- B. Administration and Staffing . . . 8
- C. Facilities . . . 8
- D. Transportation . . . 9
- E. Management Planning and Implementation . . . 9

IV. NATURAL RESOURCES MANAGEMENT . . . 9
- A. Summary of the Natural Resources of Kingman Reef . . . 9
- B. Principal Threats to Natural Resources . . . 10
- C. Interim Refuge Management Goals . . . 10
- D. Natural Resources Management Activities . . . 11
  1. Overview . . . 11
  2. Monitoring surveys . . . 11
  3. Endangered and threatened species recovery . . . 11
  4. Other species of management emphasis . . . 12
  5. Habitat and wildlife population monitoring . . . 12
  6. Habitat management and enhancement . . . 12
  7. Law enforcement . . . 12
  8. Research . . . 13
- E. Cultural Resources . . . 13
- F. Other Refuge Issues . . . 14
  1. Access . . . 14
  2. Navigation and safety . . . 14
  3. Inspection and quarantine programs . . . 14
- G. Public Use . . . 14

V. POTENTIAL REFUGE OPERATION AND MAINTENANCE BUDGET . . . . . . . . . . 16
A. Refuge Start-up Costs . . . . . . . . . . 16
B. Estimated Refuge Annual Operations and Maintenance Costs . . . . . . . . . . 16
C. Estimated Facilities Costs . . . . . . . . . . 16

VI. PREPARER AND INTERDISCIPLINARY TEAM . . . . . . . . . . 16
A. Preparer . . . . . . . . . . 16
B. Interdisciplinary Team . . . . . . . . . . 16

VII. REFERENCES . . . . . . . . . . 18

## List of Figures

Figure 1. The location of Kingman Reef in the northern Line Islands, central Pacific Ocean. . . 5
Figure 2. Generalized physical features of Kingman Reef. . . . . . . . . . 6
Figure 3. The boundary of the proposed Kingman Reef National Wildlife Refuge. . . . . . . . . . 7

# Conceptual Management Plan for the Proposed Kingman Reef National Wildlife Refuge

## Line Islands, Central Pacific Ocean

## II. INTRODUCTION

### A. Overview

Kingman Reef is a partially submerged coral reef atoll that lies approximately 6 degrees north of the equator in the Line Islands in the central Pacific Ocean (figure 1). A variety of different habitat types are present, including intertidal reefs, submerged coral terraces, lagoon patch reefs and pinnacle reefs, spur reefs, and emergent coral islets. Marine species include coral reef and pelagic fishes, corals, algae, and other marine invertebrates. The reefs and surrounding waters also support Pacific migratory seabirds, threatened green sea turtles, endangered hawksbill sea turtles, and marine mammals.

The U.S. Fish and Wildlife Service (Service) is proposing to establish the Kingman Reef National Wildlife Refuge (Refuge) to conserve and manage the coral reef ecosystem, including national trust species, in perpetuity.

This Conceptual Management Plan (CMP) was developed using an interdisciplinary planning approach. It presents a general description of future Refuge management. As a conceptual document it does not provide extensive detail – such details would be included in a Refuge Comprehensive Conservation Plan (CCP) that would be developed in the future with additional opportunities for public input and agency review. Following Refuge establishment at Kingman Reef, the CMP would serve as an interim management guide until a CCP is developed. The CMP answers questions commonly posed by the general public and government agencies during the planning and public involvement phase of Refuge establishment.

### B. The National Wildlife Refuge System

#### 1. Background and overview

The Service is the primary Federal agency responsible for the protection and management of migratory birds, endangered and threatened plants and animals, certain marine mammals, and anadromous fishes. As part of its responsibilities, the Service establishes and administers National Wildlife Refuges in accordance with the National Wildlife Refuge System Administration Act of 1966, as amended by the National Wildlife Refuge System Improvement Act of 1997; the National Environmental Policy Act (NEPA); and other pertinent legislation, Executive Orders, regulations, and policies.

The National Wildlife Refuge System (Refuge System) is a national system of lands and waters dedicated to wildlife conservation and management. The first National Wildlife Refuge was established in 1903, and the Refuge System now consists of more than 520 Refuges nationwide including 16 Refuges in Hawaii and the Pacific Islands[1]. Recently, Congress enacted the National Wildlife Refuge System Improvement Act of 1997, Public Law 105-57 (16 U.S.C. 668dd et seq.), which is an organic act[2] for the Refuge System that codifies the System's mission, administration, conservation management, public use, conservation planning, interagency coordination, and public involvement.

2. Mission, principles, and guidelines for natural resources management of the National Wildlife Refuge System

The mission of the National Wildlife Refuge System is

> ***"... to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans."*** [National Wildlife Refuge System Improvement Act of 1997]

Through its natural resources management programs on National Wildlife Refuges, the Service is required to maintain the Refuge System's biological integrity, diversity, and environmental health; and monitor the status and trends of Refuge fish, wildlife, and plants. Partnerships with conservation organizations, other government agencies, landowners, and other interested parties are encouraged as a means of increasing the effectiveness of Refuge management programs. The Service is directed to inform and involve the public in major decisions affecting National Wildlife Refuges.

Two recent Executive Orders provide enhanced protection for the nation's coral reef and other marine areas that fall under Federal jurisdiction. Presidential Executive Order Number 13089, entitled "Coral Reef Protection," dated June 11, 1998, calls for Federal agencies to provide for the protection of coral reefs that may be affected by their actions, and to utilize their authorities to protect and enhance coral reef ecosystems.

Presidential Executive Order Number 13158, entitled "Marine Protected Areas," dated May 26, 2000, calls for Federal agencies with jurisdiction over lands and waters with marine resources to

---

[1] National Wildlife Refuges (NWR) in the U.S. Pacific include Kilauea Point, Huleia, and Hanalei NWRs on Kauai; Pearl Harbor and James Campbell NWRs on Oahu; Kealia Pond NWR, Maui; Kakahaia NWR, Molokai; and Hakalau Forest NWR, on Hawaii Island. In the northwestern Hawaiian Islands, the Service manages the Hawaiian Islands NWR that includes Laysan Island, French Frigate Shoals, Gardner Pinnacles, Maro Reef, Nihoa Island, Necker Island, Lisianski Island, and Pearl and Hermes Reef. Midway Atoll NWR is also located in the northwestern Hawaiian Islands. The Service manages National Wildlife Refuges on other U.S. islands in the Pacific including Howland Island, Baker Island, Jarvis Island, Johnston Atoll, and Rose Atoll NWRs. The Guam NWR includes the Ritidian unit, and overlay units on Navy and Air Force installations.

[2] Essential organizing legislation.

ensure protection of natural and cultural resources in those areas. Federal agencies are also called upon to take appropriate actions to enhance or expand protection of existing Marine Protected Areas or establish new Marine Protected Areas.[3]

3. Visitor uses on National Wildlife Refuges

Certain wildlife-dependent visitor uses are considered legitimate and appropriate uses on some National Wildlife Refuges. However, all visitor uses must be compatible with (*i.e.*, not materially detract from or interfere with) the primary purpose of the Refuge. Adequate staffing and funding must be available to properly administer a proposed visitor use program. Six priority wildlife dependent visitor uses on Refuges are denoted by the National Wildlife Refuge Administration Act of 1966, as amended by the National Wildlife Refuge Improvement Act of 1997, and include: hunting, fishing, wildlife observation and photography, environmental education, and interpretation. During the development of the Refuge Comprehensive Conservation Plan, the Service would evaluate opportunities for compatible visitor uses for the proposed Refuge.

C. Refuge Purposes

The purposes of the Kingman Reef National Wildlife Refuge would be:

- To preserve, restore, and enhance in their natural ecosystems (when practicable) all species of animals and plants that occur at Kingman Reef, including those that are endangered or threatened with becoming endangered; and
- To conserve the migratory bird resources and coral reef ecosystem at Kingman Reef.

## III. OVERVIEW OF THE ENVIRONMENT OF KINGMAN REEF

A. General

Kingman Reef is the northernmost atoll in the Line Islands. Located in the central Pacific Ocean approximately 900 miles south of Hawaii, Kingman Reef lies north of the equator at 6°23'N latitude, 162°25'W longitude (figure 1). The reef is approximately 33 miles northwest of Palmyra Atoll, another United States' possession in the Line Islands. Geologically, Kingman Reef is a partially submerged table reef atoll. The reef is triangular in shape with its apex to the north, surrounding a large central lagoon (figure 2). Much of the eastern and southern portions of the reef are exposed at low tide, while the western portions are submerged. The outer reef measures approximately 12.4 miles long on the southern face, 7.5 miles long on the northeastern face, and 8.6 miles long on the northwestern face. The large central lagoon ranges in depth from 50 to 250 feet. Emergent land consists of three unvegetated coral spits that total approximately 3.2 acres (Flint and Aycock 2000).

---

[3] Appendix E of the Environmental Assessment for the Proposed Kingman Reef National Wildlife Refuge provides the full text of both Executive Orders.

Kingman Reef is within an area of high rainfall near the equator known as the "Intertropical Convergence Zone" (also called "the Doldrums"). The project area is affected by the eastward-flowing North Equatorial Countercurrent, a relatively narrow current located between latitudes 5 degrees and 10 degrees North, that flows eastward, in the opposite direction from the major westward-flowing currents of the northern and southern hemispheres (Drake *et al.* 1978). The northern boundary of this current is an area of upwelling that brings nutrient rich waters to the surface, and is an important foraging ground for several marine species including seabirds. The lagoon and offshore waters are habitats for coral reef and other marine fishes, marine mammals, sea turtles, and a variety of other species, and serve as important foraging areas for migratory seabirds. Emergent lands are important resting habitats for seabirds and may provide basking sites for threatened green sea turtles.

### B. Proposed Refuge Boundary

The proposed Refuge boundary would include the lagoon, emergent lands, coral reefs, and other submerged lands and associated waters seaward to 12 nautical miles from reefs exposed at mean low tide. If the Refuge is established, it would include a total of approximately 483,702 acres including approximately 3.2 acres of emergent land and approximately 25,874 acres of coral reef habitat[4].

## IV. INTERIM REFUGE MANAGEMENT AT THE PROPOSED KINGMAN REEF NWR

### A. Overview

The operation and management of remote island National Wildlife Refuges pose unique challenges to Refuge Managers. Management strategies for remote island Refuges in Hawaii and the Pacific range from intermittent management visits, to temporary staffing of primitive field camps, permanent staffing at field stations with established support facilities, to year-round field stations such as are found at Midway Atoll National Wildlife Refuge and Johnston Atoll National Wildlife Refuge. Compared with most Refuges in the National Wildlife Refuge System, remote island management and operational costs are high because of the high cost of logistics support including transporting equipment, supplies, and personnel to remote stations, and maintaining operations in harsh marine climates.

---

[4] Coral reef habitat acreage estimates were derived by digitally measuring areas on the U.S. National Oceanographic and Atmospheric Administration's navigation chart that are shallower than 100 fathoms (600 feet). This depth is based on the biological characteristics of coral reef organisms.




Figure 1. The location of Kingman Reef in the northern Line Islands, central Pacific Ocean.
*The U.S. Fish and Wildlife Service manages seven other remote islands and atolls in the Pacific as National Wildlife Refuges including Howland, Baker, and Jarvis Island NWRs in the central equatorial Pacific Ocean; the Hawaiian Islands NWR and Midway Atoll NWR in the northern Hawaiian Islands; Johnston Atoll NWR; and Rose Atoll NWR in the south Pacific Ocean. Palmyra Atoll, 33 miles south of Kingman Reef, is currently proposed as a National Wildlife Refuge.*




Figure 2. Generalized physical features of Kingman Reef.
(Base Map Source: National Oceanic and Atmospheric Administration Chart dated 4/13/85 rev. 1/26/91.)




Figure 3. The boundary of the proposed Kingman Reef National Wildlife Refuge.
*The approved boundary would include those portions of the lagoon, the coral reef complex, and emergent land, and other submerged lands and associated waters within 12 nautical miles of reefs that are exposed at mean low tide.*

The Service is proposing to manage natural resources at Kingman Reef through regular ship-based visits. In a separate action, the Service is working with The Nature Conservancy (TNC), a private conservation organization, to protect and manage natural resources at Palmyra Atoll located 33 miles to the south of Kingman Reef. If a National Wildlife Refuge were to be established at Palmyra Atoll in the future, the Service would make use of natural resources management staff and equipment that would be based there. If the Service does not have access to nearby logistics support facilities, the Refuge would be managed from the Honolulu Office of the Pacific Remote Islands National Wildlife Refuge Complex. This plan assumes that management staff would be based in Honolulu.

B. Administration and Staffing

Kingman Reef would be administered as part of the Pacific Remote Islands National Wildlife Refuge Complex headquartered in Honolulu, Hawaii. Staffing levels and management visitation to Kingman Reef would be based on Refuge management needs and availability of funding. A Refuge at Palmyra Atoll would facilitate more visits to Kingman Reef by the Service for Refuge management than if a Refuge were not established at that nearby atoll. Other Refuge management trips could be undertaken in conjunction with other scientific or Coast Guard expeditions. Existing Remote Island NWR Complex staff would be assigned to work at Kingman Reef, as required.

C. Facilities

The only facilities that may be installed at Kingman Reef in the future are permanent mooring buoys to prevent boat anchors from damaging corals. Details of the mooring stations would be developed at a later date, but the concept is to install buoys that are tethered by chains and fastened to a bolt in the substrate. We envision using the type of buoy that has been used by the State of Hawaii at Molokini Islet in Hawaii. Mooring buoys would need to withstand rough seas and should not present an entanglement hazard to wildlife. Before deciding on a final design the Service would consider a range of engineering options, evaluate the short-term, long-term, and cumulative effects of establishing permanent mooring sites, and coordinate its proposal with other agencies and the public.

D. Transportation

Transportation to and from the proposed Refuge would be by boat.

E. Management Planning and Implementation

During the start-up period, this CMP would serve as an interim Refuge management plan until a Refuge Comprehensive Conservation Plan is developed. More detailed operational plans (for habitat and wildlife management, and Refuge safety) would be developed after the Refuge is established to provide detailed guidance for staff and allow for coordination with regulatory agencies.

# V. NATURAL RESOURCES MANAGEMENT

## A. Summary of the Natural Resources of Kingman Reef

Kingman Reef is classified as an oceanic atoll (Holthus and Maragos 1995). Emergent land spits provide foraging and resting habitat for migratory shorebirds and seabirds that include Brown Boobies, Sooty Terns, Frigatebirds, and Wandering Tattlers, and may provide basking sites for threatened green sea turtles.

The coral reefs at Kingman Reef are reported to be among the most pristine in the Pacific (Maragos 2000). Coral reef ecologists reported a variety of reef formations at Kingman Reef including lagoon patch reefs, pinnacle reefs, ribbon reefs, intertidal reefs, reef slopes, reef terraces, and reef spur-and-groove formations, each with distinctive assemblages of corals and other reef building organisms. The waters and reefs of Kingman Reef support a spectacularly diverse and healthy marine community. Divers reported 168 species of fish, including sharks, rays, eels, groupers, jacks, goatfishes, butterflyfishes, damselfishes, mullets, wrasses, parrotfishes, surgeonfishes, and tuna (Wass and DeMartini 2000). Preliminary surveys also documented 102 species of corals, including an undescribed species of fingercoral (*Porites*), and spectacular assemblages of mushroom corals, fire coral, table coral, and plate corals (Maragos 2000). Other species noted were several giant clams (*Tridacna maxima*, *T. crocea*), and several species of other bivalves, anemones, octopus, crabs, sea urchins, sea cucumbers, tunicates, and a variety of marine algae (Newbold 2000).

Kingman Reef provides essential habitat for threatened green sea turtles (*Chelonia mydas*) and endangered hawksbill sea turtles (*Eretmochelys imbricata*). The emergent coral islets may serve as basking sites for green sea turtles, but are not believed to be suitable for large-scale breeding by either species at the atoll (NMFS/FWS 1998a,b).

Several species of giant clams (*Tridacna* spp.) are protected by the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) and are found in relatively large numbers in waters of Kingman Reef. This commercially important clam genus has been decimated from waters of other inhabited islands in the Pacific (Munro 1986, Hirschberger 1980).

Pacific migratory seabirds, including Brown Boobies, Great Frigatebirds, Sooty Terns, and Wandering Tattlers, forage in the waters of the atoll.

## B. Principal Threats to Natural Resources

Principal threats to habitats and species at Kingman Reef include shipwrecks, oil spills, marine debris, overfishing, and poaching of protected species. Sea turtles and seabirds are threatened by fishing activities because they are often accidentally caught on hooks, lines, or other gear. Sources of hard corals, precious corals, giant clams, ornamental fishes and shells, sharks, and other marine species are being overharvested in other areas of the Pacific, and fishing expeditions are likely to increase in the remote areas.

C. Interim Refuge Management Goals

Interim goals of the proposed Kingman Reef NWR reflect the primary mission of the Service, to protect and manage wildlife resources of national importance. Refuge goals would be refined during future comprehensive management planning.

Interim goals to accomplish this mission would be to:

- Maintain, restore, and enhance the structure, species composition, and processes of the atoll including coral reefs, lagoon, and pelagic marine environments.
- Aid in the recovery of federally listed endangered and threatened species and migratory birds by protecting and managing their habitats on the proposed Refuge.

Interim Refuge objectives:

- Upon Refuge establishment, conduct routine monitoring of marine ecosystems and resources to guide management decisions on the Refuge.
- Upon Refuge establishment, develop and publish rulemaking for use of vessels in the waters of the Refuge.
- Upon Refuge establishment, develop a Refuge safety plan to ensure safe boating operations, and other personnel safety.
- Upon Refuge establishment, coordinate routine law enforcement initiatives with the U.S. Coast Guard and establish appropriate navigational aids to protect shallow reefs.
- Within the first ten years of Refuge establishment, develop a Comprehensive Conservation Plan for Kingman Reef.

D. Natural Resources Management Activities

1. Overview

Wildlife and habitat protection and enhancement, endangered and threatened species recovery, monitoring, outreach, and research are key focus areas for the proposed Refuge. In general, the Service would allow natural processes that support native fish and wildlife to continue. The Service would use the best available information to make its management decisions and seek advice and review from scientists, managers, private conservation partners, and other government agencies.

2. Monitoring surveys

Preliminary surveys have been completed and would help to design future monitoring surveys. Ongoing marine surveys would help document the distribution and status of coral reef communities and species of management concern and would be used to design management programs. The Service would work with the National Marine Fisheries Service to study marine mammals and sea turtles that occur in the waters of the proposed Refuge and to ensure that Refuge activities are consistent with the conservation and recovery of these species. These surveys would be used by Refuge managers and biologists to identify key areas of the Refuge that would be focal points for specific protection or enhancement actions, serve as long-term monitoring sites, and to evaluate opportunities for future visitor use.

3. Endangered and threatened species recovery

Threatened green sea turtles (*Chelonia mydas*) are numerous at Kingman Reef. Hawksbill sea turtles (*Eretmochelys imbricata*) also likely occur there, but were not observed during recent surveys. The Refuge would benefit endangered and threatened species and would help foster their recovery. The low levels of management activities proposed for the Refuge during the interim time period would not likely adversely affect listed species.

Interim management activities that would benefit listed species include periodic management visits, population and habitat monitoring, closure of the Refuge to fishing and regulation of vessels within the waters of the Refuge, long term protection of habitat, removal of marine debris, implementation of law enforcement patrols, and conducting scientific studies. The Service would coordinate its interim Refuge management activities with the National Marine Fisheries Service (NMFS).

Future Refuge activities that may affect listed species require review by the Service and NMFS in accordance with section 7 of the Endangered Species Act. Refuge activities would be explained in detail in the Comprehensive Conservation Plan that would be reviewed by both agencies. Recovery tasks for listed species would be guided by approved recovery plans (National Marine Fisheries Service and U.S. Fish and Wildlife Service 1998a,b).

4. Other species of management concern

Giant clams (*Tridacna* spp.) are protected under CITES[5] and are rare throughout most of their range where they are harvested for food, the aquarium trade, and for decoration. A number of species of migratory seabirds occur at Kingman Reef, foraging on marine life in the waters of the atoll, and roosting on the emergent spits. Marine mammals are also protected and occur in the waters of the atoll. Management actions on the Refuge that would benefit listed species would also protect other wildlife.

---

5 CITES = Convention on International Trade in Endangered Species of Wild Fauna and Flora. Species listed in Appendices I, II, or III (and all parts and derivatives thereof, with limited exceptions) are regulated with respect to international transport.

5. Habitat and wildlife population monitoring

Habitat and population monitoring would help the Service to track trends, detect environmental problems, and guide management decisions. Standard techniques for monitoring seabirds, fish, coral, algae, other invertebrates, sea turtles, and marine mammals would be used on the Refuge.

6. Habitat management and enhancement

Marine debris would periodically be collected and destroyed off site. Other habitat management may include the installation of mooring buoys to prevent anchor damage to coral reefs; enhancement of navigation maps and installation of navigation aids to prevent accidental groundings; regulation of activities to ensure protection of marine wildlife and migratory birds on the Refuge; and other initiatives as needed.

7. Law enforcement

The Service's Division of Law Enforcement protects fish, wildlife, and plants through a range of law enforcement techniques. These include: surveillance of areas where priority wildlife and fishery resources are concentrated; inspection of shipments entering or leaving the United States at designated ports, border ports, and special ports; investigation of known and suspected violations; distribution of information about Federal wildlife regulations and their enforcement; and submission of evidence of violations to the Department of the Interior and/or the Department of Justice for consideration of civil penalties or criminal prosecution.

Title 50 of the Code of Federal Regulations provides the administrative regulations concerning Service enforcement of wildlife laws. By law, employees of the Service who are trained in law enforcement and approved as law enforcement officials carry out wildlife law enforcement activities on National Wildlife Refuges. Enforcement of Federal laws and Refuge regulations on the proposed Refuge would be important to protect public and private property, and for the conservation of natural resources.

In general, the Service would seek to maintain law and order and enforce wildlife laws of the United States at Kingman Reef National Wildlife Refuge, work to prevent illegal activities from occurring on the Refuge, particularly any unauthorized harvest of marine organisms or wildlife products, and to inform citizens of various Federal laws and regulations relating to the protection of fish, wildlife, and plants at Kingman Reef. Should it become necessary, the Service would prosecute violators of Federal laws and Refuge regulations.

8. Research

Scientific information is vital to Refuge management as it forms the basis for management decisions. The Service would support research and resource management studies, provided they were found to be compatible with the purpose of the Refuge and could be accommodated while benefitting other priority Refuge management programs. In general, work that would contribute to the Service's ability to protect and manage the natural resources of Kingman Reef would

receive priority consideration. Research activities would require a Special Use Permit unless the research were already included as part of an approved management plan.

E. Historic Resources

There is no evidence of permanent human settlement on Kingman Reef, and there are no sites that are listed or that is known to be eligible for listing on the National Register of Historic Sites. Once a Refuge is established, activities that have the potential to affect historic properties that may be found in the future, would require review under section 106 of the National Historic Preservation Act. The Section 106 process includes steps to identify and evaluate resources and to ensure that historic properties are treated appropriately, if they are present with the project's area of potential effect.

F. Other Refuge Issues

1. Access

Upon establishment of the Refuge, the Refuge would be closed to public access, until the Service provided for access through additional planning or rulemaking. Although the Service is not proposing to open the Refuge for public use during the interim period (following Refuge establishment and prior to the development of a Comprehensive Conservation Plan), the Refuge Manager may permit low levels of access under Special Use Permits, that would be evaluated on a case-by-case basis for compatibility and appropriateness. Special Use Permits and associated Compatibility Determinations would be coordinated with the National Marine Fisheries Service and with the public, as appropriate.

2. Navigation and safety

Boating and diving operations in this remote area would be guided by safety plans. The Service envisions the need to develop navigation aids to prevent accidental groundings on the shallow reefs of the Refuge.

The Service would work with the U.S. Coast Guard to publish rules for mariners. The rules would define those areas wherein which general maritime transit is not restricted and would also define areas within which vessels without permission from the Service are not permitted.

3. Inspection and quarantine programs

The Service would implement an inspection and quarantine program for the Refuge to prevent the accidental introduction of marine and terrestrial alien species. Refuge-specific procedures would outline measures for inspecting vessels and personal belongings prior to visiting the atoll to prevent accidental introductions of pest species.

G. Public Use

The National Wildlife Refuge System Administration Act of 1966, as amended by the National Wildlife Refuge System Improvement Act of 1997, requires the Service to consider the potential for six priority public uses on all Refuges during the development of a Refuge Comprehensive Conservation Plan (CCP) or before, if priority uses exist at the time of Refuge establishment. The six wildlife-dependent priority public uses include recreational hunting, recreational fishing, wildlife observation and photography, environmental education, and interpretation. The current landowner does not permit public use at Kingman Reef, so none of these uses is being evaluated for compatibility at this time.

Due to the remote location of the Refuge, the lack of a land base and support facilities to operate a visitor program, and the nearly pristine condition of the coral reef ecosystem, the Service has determined that Kingman Reef would not be open to public use during the interim phase. More information would be needed to evaluate the potential for public use at Kingman Reef. The Service would monitor the reef ecosystem prior to developing a Comprehensive Conservation Plan for the Refuge.

## VI. POTENTIAL REFUGE OPERATIONS AND MAINTENANCE BUDGET

The Refuge operations and maintenance budget for the Kingman Reef NWR would cover salaries, facilities, equipment, and maintenance, biological surveys, management planning, habitat restoration, interpretive materials (for off-site educational programs), and supplies.

A. Refuge Start-up Costs

First year start-up costs are estimated to be up to $50,000. This level of funding would permit Pacific Remote Islands National Wildlife Refuge Complex biologists to undertake migratory bird and coral reef monitoring surveys, and contribute to the evaluation of environmental effects of installing mooring buoys at Kingman Reef.

B. Estimated Refuge Annual Operations and Maintenance Costs

At a conservative staffing level, the annual Refuge operations and maintenance costs are estimated to be up to $100,000, which includes salaries (a proportioned share), logistics, and resource management project costs.

C. Estimated Facilities Costs

Mooring buoys are the only projected facilities needed at Kingman Reef. Although detailed prices are not available, the cost of planning, purchasing components, and installing mooring buoys is estimated to be around $300 apiece for each small buoy based on the costs for mooring buoys currently in use at Molokini Islet, in Hawaii. Large buoys might each cost up to $4,000.

## VII. PREPARER AND INTERDISCIPLINARY TEAM

### A. Preparer

Phyllis Y. Ha, Ecologist, Pacific Islands Refuge Planning Office, Honolulu, Hawaii

### B. Interdisciplinary Team

Carolyn Bohan, Regional Chief, National Wildlife Refuge System, Region 1, Portland, Oregon
Forrest Cameron, Refuge Supervisor, National Wildlife Refuge System, Region 1, Portland, Oregon
Elizabeth N. Flint, Wildlife Biologist, Pacific Remote Islands National Wildlife Refuge Complex, Honolulu, Hawaii
Ben Harrison, Fish and Wildlife Biologist, Division of Habitat Protection and Management, Ecological Services, Region 1, Portland, Oregon
A. Eugene Hester, Senior Resident Agent, Division of Law Enforcement, Honolulu, Hawaii
Charles J. Houghten, Chief, Division of Refuge Planning, Region 1, Portland, Oregon
David N. Johnson, Refuge Manager, Pacific Remote Islands National Wildlife Refuge Complex, Honolulu, Hawaii
Kay Kier-Haggenjos, Writer/Editor, Division of Refuge Planning, Region 1, Portland, Oregon
Jerry F. Leinecke, Project Leader, Hawaiian and Pacific Islands National Wildlife Refuge Complex, Honolulu, Hawaii
James E. Maragos, Coral Reef Biologist, Pacific Islands Ecoregion, Honolulu, Hawaii
Barbara Maxfield, Public Information Officer, U.S. Fish and Wildlife Service, Pacific Islands Ecoregion, Honolulu, Hawaii
Stephen B. Moore, Chief, Division of Refuge Operations Support, Region 1, Portland Oregon
Cathy Osugi, Wildlife Biologist, Division of Refuge Planning, Region 1, Portland, Oregon
Karen Rosa, Fish and Wildlife Biologist, Division of Ecological Services, Honolulu, Hawaii
Catherine B. Sheppard, Chief, Division of Realty, Region 1, Portland, Oregon
Georgia Shirilla, Senior Realty Specialist, Division of Realty, Region 1, Portland, Oregon
Robert P. Smith, former Pacific Islands Manager, Honolulu, Hawaii (participated in project conceptualization and the development of preliminary drafts)

Cartography:

Rodman Low, Geographer, Pacific Islands Ecoregion, Honolulu, Hawaii
Susan Machida, Geographer, Pacific Islands Ecoregion, Honolulu, Hawaii

Other technical assistance:

Kevin B. Foster, Fish and Wildlife Biologist, Division of Ecological Services, Honolulu, Hawaii
Joseph McDermott, Office of the Solicitor, Department of the Interior, Washington, D.C.
Don Palawski, Supervisory Fish and Wildlife Biologist, Division of Ecological Services, Honolulu, Hawaii
Francesca R. Ryan, Realty Specialist, Division of Realty, Washington, D.C.

Karen Sprecher-Keating, Office of the Solicitor, Dept. of the Interior, Washington, D.C.
Chris Swenson, Fish and Wildlife Biologist, Division of Ecological Services, Honolulu, Hawaii
Ronald Walker, Fish and Wildlife Biologist, U.S. Fish and Wildlife Service, Pacific Islands Ecoregion, Honolulu, Hawaii
David J. Wesley, former Geographic Assistant Regional Director, Pacific Islands Ecoregion, Portland, Oregon
David Woodside, Wildlife Biologist, Pacific Islands Ecoregion, Honolulu, Hawaii
Marilet Zablan, Division of Ecological Services, Honolulu, Hawaii

## VIII. REFERENCES

Drake, C.L., J. Imbrie, J.A. Knauss, and K.K. Turekian. 1978. *Oceanography*. Holt, Rinehard and Winston. NY. 447 pp.

Flint, E. and D. Aycock. 2000. "Kingman Reef." Trip report. U.S. Fish and Wildlife Service.

Hirschberger, W. 1980. "Tridacnid clam stocks on Helen Reef, Palau, Western Caroline Islands." *Mar. Fish. Rev.* 42:8-15.

Holthus, P.F. and J.E. Maragos. 1995. Marine Ecosystem Classification for the Tropical Island Pacific. Pp: 239-278. Chapter 13, In: *Marine and Coastal Biodiversity in the Tropical Island Pacific Region, Vol. 1: Species Systematics and Information Management Priorities,* Maragos, J.E., M.N.A. Peterson, L.G. Eldredge, J.E. Bardach, and H.F. Takeuchi (eds). East-West Center, Honolulu, 424 pp.

Maragos, J.E. 2000. "Status of Coral Reefs at Kingman Reef, U.S. Line Islands." Summary reporting on the expedition to Kingman Reef on file at U.S. Fish and Wildlife Service.

Munro, J.L. 1986. "Fisheries for giant clams (Tridacnidae: Bivalvia) and prospects for stock enhancement." *In:* Caddy, J.F. (Ed.) *Scientific approaches to management of shellfish resources*. John Wiley & Sons, New York.

National Marine Fisheries Service and U.S. Fish and Wildlife Service. 1998a. *Recovery Plan for U.S. Pacific Populations of the Green Turtle (Chelonia mydas)* National Marine Fisheries Service, Silver Spring, MD. 84pp.

National Marine Fisheries Service and U.S. Fish and Wildlife Service. 1998b. *Recovery Plan for U.S. Pacific Populations of the Hawksbill Turtle (Eretmochelys imbricata)*. National Marine Fisheries Service, Silver Spring, MD. 82pp.

Newbold, R. 2000. Unpublished data listing invertebrates seen during dive surveys at the U.S. Line and Phoenix Islands, March-April, 2000.

Wass, R. and E. DeMartini. 2000. Unpublished data listing fishes seen during dive surveys at Kingman Reef, March-April, 2000.

# Appendix C.

## Glossary

## Appendix C. Glossary

**Alien:** a species not naturally occurring in an area; also called an "introduced", "nonnative", or "exotic" species.

**Approved Refuge Boundary.** A project boundary that the Regional Director and Director of the U.S. Fish and Wildlife Service approve upon completion of the planning and environmental compliance process. An approved Refuge boundary only designates those lands that the Fish and Wildlife Service (Service) has authority to acquire and/or manage through various agreements. Approval of a Refuge boundary does not grant the Fish and Wildlife Service jurisdiction or control over lands within the boundary, and does not by itself make the lands part of the National Wildlife Refuge System. Lands are not included in the National Wildlife Refuge System until they are purchased or are placed under an agreement that provides for management as part of the National Wildlife Refuge System.

**Biological Diversity or Biodiversity.** The variety of life, including the variety of living organisms, the genetic differences among them, and the communities in which they occur.

**CITES.** Acronym standing for the Convention on International Trade in Endangered Species of Wild Fauna and Flora. Species listed in Appendices I, II or III (and all parts and derivatives thereof, with limited exceptions) are regulated with respect to import, export and re-export. CITES is implemented statutorily in the United States by the Endangered Species Act of 1973, as amended.

**Compatible Use.** A use that, in the sound professional judgement of the Director of the U.S. Fish and Wildlife Service, will not materially interfere with or detract from the fulfillment of the mission of the National Wildlife Refuge System or the purposes of a National Wildlife Refuge.

**Comprehensive Conservation Plan (CCP).** A document that describes the desired future conditions of a refuge or planning unit and provides long-range guidance and management direction to achieve the purposes of the refuge; helps fulfill the mission of the Refuge System; maintains and, where appropriate, restores the ecological integrity of each refuge and the Refuge System; helps achieve the goals of the National Wilderness Preservation System; and meets other mandates.

**Conceptual Management Plan (CMP).** A document that presents a broad overview of the Service's proposed management approach to lands included within the National Wildlife Refuge System. Management actions are finalized only after additional planning and public input, generally in the form of a CCP.

**Ecosystem.** A biological community together with its environment, functioning as a unit. For the Service's administrative purposes, 53 ecosystems have been designated covering the United States and its possessions. These ecosystems generally correspond with watershed boundaries and their sizes and respective ecological complexity vary.

Appendix C. (Continued)

**Endangered Species.** A species that is officially recognized by Federal or State agencies to be in immediate danger of extinction throughout all or a significant portion of its range.

**Environmental Assessment (EA).** A concise public document prepared in compliance with the National Environmental Policy Act of 1973, that discusses the purpose and need for an action, considers alternatives to such action, and provides sufficient evidence and analysis of impacts to determine whether to prepare an environmental impact statement.

**Habitat.** The specific environmental setting (*e.g.*, soil, water, shelter, food, etc.) required by the individuals of a population, variety, subspecies, or species to survive and reproduce.

**Marine Protected Area.** As defined in Executive Order Number 13158, entitled, Marine Protected Areas, and dated May 26, 2000, the term "Marine Protected Area" (MPA) refers to any area of the marine environment that has been reserved by Federal, State, territorial, tribal, or local laws or regulations to provide lasting protection for part or all of the natural and cultural resources therein. Submerged lands and waters within an approved Refuge boundary would fall within this classification. The Executive Order directs certain agencies to work to help protect the significant natural and cultural resources of the marine environment by working to expand and strengthen a network of marine protected areas, and among other activities, to work together to establish and protect the resources of MPAs.

**Migratory Bird.** An official designation by the U.S. Fish and Wildlife Service for birds that are covered by the Migratory Bird Conservation Act, the Migratory Bird Conservation Treaty, and included on official lists. Migratory birds are protected by certain laws in the United States and are a specific category of natural resources that is managed on National Wildlife Refuges.

**National Wildlife Refuge (Refuge).** A designated area of land, water, or an interest in land or water within the Refuge System. Does not include Coordination Areas.

**Native Species.** An organism that is indigenous or endemic to a particular area and whose presence in the area is not due to past or present human activities or actions.

**Natural Community.** Individuals of several native species that occur in the same habitat or region and interact directly or indirectly with one another.

**Refuge purposes.** The purposes specified in or derived from the law, proclamation, executive order, agreement, public land order, donation document, or administrative memorandum establishing, authorizing, or expanding a Refuge, Refuge Unit, or Refuge subunit.

**Species.** A group of organisms all of which have a high degree of physical and genetic similarity, generally interbreed only among themselves, and show persistent differences from members of allied groups of organisms.

Appendix C. (Continued)

**Threatened Species.** A species that is officially recognized by Federal or State agencies as likely to become endangered or extinct within the foreseeable future throughout all or a significant portion of its range.

**Wildlife-Dependent Visitor Recreational or Educational Use.** A use of a Refuge involving hunting, fishing, wildlife observation and photography, or environmental education and interpretation. These are the six priority public uses of the System as established in the National Wildlife Refuge System Administration Act, as amended. Wildlife-dependent recreational uses, other than the six priority public uses, are those that depend on the presence of wildlife. We also will consider these other uses in the preparation of Refuge CCPs, however, the six priority public uses always will take precedence.

# Appendix D.

# Executive Orders for

# Coral Reef Protection

# and

# Marine Protected Areas

Federal Register
Vol. 63, No. 115
Tuesday, June 16, 1998

# Presidential Documents

Title 3—

The President

Executive Order 13089 of June 11, 1998

## Coral Reef Protection

By the authority vested in me as President by the Constitution and the laws of the United States of America and in furtherance of the purposes of the Clean Water Act of 1977, as amended (33 U.S.C. 1251, *et seq.*), Coastal Zone Management Act (16 U.S.C. 1451, *et seq.*), Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. 1801, *et seq.*), National Environmental Policy Act of 1969, as amended (42 U.S.C. 4321, *et seq.*), National Marine Sanctuaries Act, (16 U.S.C. 1431, *et seq.*), National Park Service Organic Act (16 U.S.C. 1, *et seq.*), National Wildlife Refuge System Administration Act (16 U.S.C. 668dd-ee), and other pertinent statutes, to preserve and protect the biodiversity, health, heritage, and social and economic value of U.S. coral reef ecosystems and the marine environment, it is hereby ordered as follows:

Section 1. *Definitions.* (a) "U.S. coral reef ecosystems" means those species, habitats, and other natural resources associated with coral reefs in all maritime areas and zones subject to the jurisdiction or control of the United States (e.g., Federal, State, territorial, or commonwealth waters), including reef systems in the south Atlantic, Caribbean, Gulf of Mexico, and Pacific Ocean. (b) "U.S. Coral Reef Initiative" is an existing partnership between Federal agencies and State, territorial, commonwealth, and local governments, nongovernmental organizations, and commercial interests to design and implement additional management, education, monitoring, research, and restoration efforts to conserve coral reef ecosystems for the use and enjoyment of future generations. The existing U.S. Islands Coral Reef Initiative strategy covers approximately 95 percent of U.S. coral reef ecosystems and is a key element of the overall U.S. Coral Reef Initiative. (c) "International Coral Reef Initiative" is an existing partnership, founded by the United States in 1994, of governments, intergovernmental organizations, multilateral development banks, nongovernmental organizations, scientists, and the private sector whose purpose is to mobilize governments and other interested parties whose coordinated, vigorous, and effective actions are required to address the threats to the world's coral reefs.

Sec. 2. *Policy.* (a) All Federal agencies whose actions may affect U.S. coral reef ecosystems shall: (a) identify their actions that may affect U.S. coral reef ecosystems; (b) utilize their programs and authorities to protect and enhance the conditions of such ecosystems; and (c) to the extent permitted by law, ensure that any actions they authorize, fund, or carry out will not degrade the conditions of such ecosystems.

(b) Exceptions to this section may be allowed under terms prescribed by the heads of Federal agencies:

(1) during time of war or national emergency;

(2) when necessary for reasons of national security, as determined by the President;

(3) during emergencies posing an unacceptable threat to human health or safety or to the marine environment and admitting of no other feasible solution; or

(4) in any case that constitutes a danger to human life or a real threat to vessels, aircraft, platforms, or other man-made structures at sea, such as cases of *force majeure* caused by stress of weather or other act of God.

Sec. 3. *Federal Agency Responsibilities.* In furtherance of section 2 of this order, Federal agencies whose actions affect U.S. coral reef ecosystems, shall, subject to the availability of appropriations, provide for implementation of measures needed to research, monitor, manage, and restore affected ecosystems, including, but not limited to, measures reducing impacts from pollution, sedimentation, and fishing. To the extent not inconsistent with statutory responsibilities and procedures, these measures shall be developed in cooperation with the U.S. Coral Reef Task Force and fishery management councils and in consultation with affected States, territorial, commonwealth, tribal, and local government agencies, nongovernmental organizations, the scientific community, and commercial interests.

Sec. 4. *U.S. Coral Reef Task Force.* The Secretary of the Interior and the Secretary of Commerce, through the Administrator of the National Oceanic and Atmospheric Administration, shall co-chair a U.S. Coral Reef Task Force ("Task Force"), whose members shall include, but not be limited to, the Administrator of the Environmental Protection Agency, the Attorney General, the Secretary of the Interior, the Secretary of Agriculture, the Secretary of Commerce, the Secretary of Defense, the Secretary of State, the Secretary of Transportation, the Director of the National Science Foundation, the Administrator of the Agency for International Development, and the Administrator of the National Aeronautics and Space Administration. The Task Force shall oversee implementation of the policy and Federal agency responsibilities set forth in this order, and shall guide and support activities under the U.S. Coral Reef Initiative ("CRI"). All Federal agencies whose actions may affect U.S. coral reef ecosystems shall review their participation in the CRI and the strategies developed under it, including strategies and plans of State, territorial, commonwealth, and local governments, and, to the extent feasible, shall enhance Federal participation and support of such strategies and plans. The Task Force shall work in cooperation with State, territorial, commonwealth, and local government agencies, nongovernmental organizations, the scientific community, and commercial interests.

Sec. 5. *Duties of the U.S. Coral Reef Task Force.* (a) *Coral Reef Mapping and Monitoring.* The Task Force, in cooperation with State, territory, commonwealth, and local government partners, shall coordinate a comprehensive program to map and monitor U.S. coral reefs. Such programs shall include, but not be limited to, territories and commonwealths, special marine protected areas such as National Marine Sanctuaries, National Estuarine Research Reserves, National Parks, National Wildlife Refuges, and other entities having significant coral reef resources. To the extent feasible, remote sensing capabilities shall be developed and applied to this program and local communities should be engaged in the design and conduct of programs.

(b) *Research.* The Task Force shall develop and implement, with the scientific community, research aimed at identifying the major causes and consequences of degradation of coral reef ecosystems. This research shall include fundamental scientific research to provide a sound framework for the restoration and conservation of coral reef ecosystems worldwide. To the extent feasible, existing and planned environmental monitoring and mapping programs should be linked with scientific research activities. This Executive order shall not interfere with the normal conduct of scientific studies on coral reef ecosystems.

(c) *Conservation, Mitigation, and Restoration.* The Task Force, in cooperation with State, territorial, commonwealth, and local government agencies, nongovernmental organizations, the scientific community and commercial interests, shall develop, recommend, and seek or secure implementation of measures necessary to reduce and mitigate coral reef ecosystem degradation and to restore damaged coral reefs. These measures shall include solutions to problems such as land-based sources of water pollution, sedimentation, detrimental alteration of salinity or temperature, over-fishing, over-use, collection of coral reef species, and direct destruction caused by activities such as recreational and commercial vessel traffic and treasure salvage. In developing these measures, the Task Force shall review existing legislation

to determine whether additional legislation is necessary to complement the policy objectives of this order and shall recommend such legislation if appropriate. The Task Force shall further evaluate existing navigational aids, including charts, maps, day markers, and beacons to determine if the designation of the location of specific coral reefs should be enhanced through the use, revision, or improvement of such aids.

(d) *International Cooperation.* The Secretary of State and the Administrator of the Agency for International Development, in cooperation with other members of the Coral Reef Task Force and drawing upon their expertise, shall assess the U.S. role in international trade and protection of coral reef species and implement appropriate strategies and actions to promote conservation and sustainable use of coral reef resources worldwide. Such actions shall include expanded collaboration with other International Coral Reef Initiative ("ICRI") partners, especially governments, to implement the ICRI through its Framework for Action and the Global Coral Reef Monitoring Network at regional, national, and local levels.

Sec. 6. This order does not create any right or benefit, substantive or procedural, enforceable in law or equity by a party against the United States, its agencies, its officers, or any person.

William J. Clinton

THE WHITE HOUSE,
*June 11, 1998.*

[FR Doc. 98-16161
Filed 6-15-98; 8:45 am]
Billing code 3195-01-P

Federal Register / Vol. 65, No. 105 / Wednesday, May 31, 2000 / Presidential Documents 34909

# Presidential Documents

Executive Order 13158 of May 26, 2000

## Marine Protected Areas

By the authority vested in me as President by the Constitution and the laws of the United States of America and in furtherance of the purposes of the National Marine Sanctuaries Act (16 U.S.C. 1431 *et seq.*), National Wildlife Refuge System Administration Act of 1966 (16 U.S.C. 668dd-ee), National Park Service Organic Act (16 U.S.C. 1 *et seq.*), National Historic Preservation Act (16 U.S.C. 470 *et seq.*), Wilderness Act (16 U.S.C. 1131 *et seq.*), Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. 1801 *et seq.*), Coastal Zone Management Act (16 U.S.C. 1451 *et seq.*), Endangered Species Act of 1973 (16 U.S.C. 1531 *et seq.*), Marine Mammal Protection Act (16 U.S.C. 1362 *et seq.*), Clean Water Act of 1977 (33 U.S.C. 1251 *et seq.*), National Environmental Policy Act, as amended (42 U.S.C. 4321 *et seq.*), Outer Continental Shelf Lands Act (42 U.S.C. 1331 *et seq.*), and other pertinent statutes, it is ordered as follows:

Section 1. *Purpose.* This Executive Order will help protect the significant natural and cultural resources within the marine environment for the benefit of present and future generations by strengthening and expanding the Nation's system of marine protected areas (MPAs). An expanded and strengthened comprehensive system of marine protected areas throughout the marine environment would enhance the conservation of our Nation's natural and cultural marine heritage and the ecologically and economically sustainable use of the marine environment for future generations. To this end, the purpose of this order is to, consistent with domestic and international law: (a) strengthen the management, protection, and conservation of existing marine protected areas and establish new or expanded MPAs; (b) develop a scientifically based, comprehensive national system of MPAs representing diverse U.S. marine ecosystems, and the Nation's natural and cultural resources; and (c) avoid causing harm to MPAs through federally conducted, approved, or funded activities.

Sec. 2. *Definitions.* For the purposes of this order: (a) "Marine protected area" means any area of the marine environment that has been reserved by Federal, State, territorial, tribal, or local laws or regulations to provide lasting protection for part or all of the natural and cultural resources therein.

(b) "Marine environment" means those areas of coastal and ocean waters, the Great Lakes and their connecting waters, and submerged lands thereunder, over which the United States exercises jurisdiction, consistent with international law.

(c) The term "United States" includes the several States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands of the United States, American Samoa, Guam, and the Commonwealth of the Northern Mariana Islands.

Sec. 3. *MPA Establishment, Protection, and Management.* Each Federal agency whose authorities provide for the establishment or management of MPAs shall take appropriate actions to enhance or expand protection of existing MPAs and establish or recommend, as appropriate, new MPAs. Agencies implementing this section shall consult with the agencies identified in subsection 4(a) of this order, consistent with existing requirements.

Sec. 4. *National System of MPAs.* (a) To the extent permitted by law and subject to the availability of appropriations, the Department of Commerce and the Department of the Interior, in consultation with the Department

of Defense, the Department of State, the United States Agency for International Development, the Department of Transportation, the Environmental Protection Agency, the National Science Foundation, and other pertinent Federal agencies shall develop a national system of MPAs. They shall coordinate and share information, tools, and strategies, and provide guidance to enable and encourage the use of the following in the exercise of each agency's respective authorities to further enhance and expand protection of existing MPAs and to establish or recommend new MPAs, as appropriate:

(1) science-based identification and prioritization of natural and cultural resources for additional protection;

(2) integrated assessments of ecological linkages among MPAs, including ecological reserves in which consumptive uses of resources are prohibited, to provide synergistic benefits;

(3) a biological assessment of the minimum area where consumptive uses would be prohibited that is necessary to preserve representative habitats in different geographic areas of the marine environment;

(4) an assessment of threats and gaps in levels of protection currently afforded to natural and cultural resources, as appropriate;

(5) practical, science-based criteria and protocols for monitoring and evaluating the effectiveness of MPAs;

(6) identification of emerging threats and user conflicts affecting MPAs and appropriate, practical, and equitable management solutions, including effective enforcement strategies, to eliminate or reduce such threats and conflicts;

(7) assessment of the economic effects of the preferred management solutions; and

(8) identification of opportunities to improve linkages with, and technical assistance to, international marine protected area programs.

(b) In carrying out the requirements of section 4 of this order, the Department of Commerce and the Department of the Interior shall consult with those States that contain portions of the marine environment, the Commonwealth of Puerto Rico, the Virgin Islands of the United States, American Samoa, Guam, and the Commonwealth of the Northern Mariana Islands, tribes, Regional Fishery Management Councils, and other entities, as appropriate, to promote coordination of Federal, State, territorial, and tribal actions to establish and manage MPAs.

(c) In carrying out the requirements of this section, the Department of Commerce and the Department of the Interior shall seek the expert advice and recommendations of non-Federal scientists, resource managers, and other interested persons and organizations through a Marine Protected Area Federal Advisory Committee. The Committee shall be established by the Department of Commerce.

(d) The Secretary of Commerce and the Secretary of the Interior shall establish and jointly manage a website for information on MPAs and Federal agency reports required by this order. They shall also publish and maintain a list of MPAs that meet the definition of MPA for the purposes of this order.

(e) The Department of Commerce's National Oceanic and Atmospheric Administration shall establish a Marine Protected Area Center to carry out, in cooperation with the Department of the Interior, the requirements of subsection 4(a) of this order, coordinate the website established pursuant to subsection 4(d) of this order, and partner with governmental and nongovernmental entities to conduct necessary research, analysis, and exploration. The goal of the MPA Center shall be, in cooperation with the Department of the Interior, to develop a framework for a national system of MPAs, and to provide Federal, State, territorial, tribal, and local governments with the information, technologies, and strategies to support the system. This

national system framework and the work of the MPA Center is intended to support, not interfere with, agencies' independent exercise of their own existing authorities.

(f) To better protect beaches, coasts, and the marine environment from pollution, the Environmental Protection Agency (EPA), relying upon existing Clean Water Act authorities, shall expeditiously propose new science-based regulations, as necessary, to ensure appropriate levels of protection for the marine environment. Such regulations may include the identification of areas that warrant additional pollution protections and the enhancement of marine water quality standards. The EPA shall consult with the Federal agencies identified in subsection 4(a) of this order, States, territories, tribes, and the public in the development of such new regulations.

**Sec. 5.** *Agency Responsibilities.* Each Federal agency whose actions affect the natural or cultural resources that are protected by an MPA shall identify such actions. To the extent permitted by law and to the maximum extent practicable, each Federal agency, in taking such actions, shall avoid harm to the natural and cultural resources that are protected by an MPA. In implementing this section, each Federal agency shall refer to the MPAs identified under subsection 4(d) of this order.

**Sec. 6.** *Accountability.* Each Federal agency that is required to take actions under this order shall prepare and make public annually a concise description of actions taken by it in the previous year to implement the order, including a description of written comments by any person or organization stating that the agency has not complied with this order and a response to such comments by the agency.

**Sec. 7.** *International Law.* Federal agencies taking actions pursuant to this Executive Order must act in accordance with international law and with Presidential Proclamation 5928 of December 27, 1988, on the Territorial Sea of the United States of America, Presidential Proclamation 5030 of March 10, 1983, on the Exclusive Economic Zone of the United States of America, and Presidential Proclamation 7219 of September 2, 1999, on the Contiguous Zone of the United States.

**Sec. 8.** *General.* (a) Nothing in this order shall be construed as altering existing authorities regarding the establishment of Federal MPAs in areas of the marine environment subject to the jurisdiction and control of States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands of the United States, American Samoa, Guam, the Commonwealth of the Northern Mariana Islands, and Indian tribes.

(b) This order does not diminish, affect, or abrogate Indian treaty rights or United States trust responsibilities to Indian tribes.

(c) This order does not create any right or benefit, substantive or procedural, enforceable in law or equity by a party against the United States, its agencies, its officers, or any person.

William J. Clinton

THE WHITE HOUSE,
*May 26, 2000.*

[FR Doc. 00–13830
Filed 5–30–00; 12:14 pm]
Billing code 3195–01–P

# Appendix E.

## Other Executive Orders

# Executive Order

## Placing Certain Islands in the Pacific Ocean Under the Control and Jurisdiction of the Secretary of the Navy

### WAKE ISLAND, KINGMAN REEF, AND JOHNSTON AND SAND ISLANDS

By virtue of and pursuant to the authority vested in me by the act of June 25, 1910, ch. 421, 36 Stat. 847, as amended by the act of August 24, 1912, ch. 369, 37 Stat. 497, and as President of the United States, it is ordered that Wake Island located in the Pacific Ocean approximately in latitude 19°17′28″ N. and longitude 166°34′42″ E. from Greenwich, Kingman Reef located in the Pacific Ocean approximately in latitude 6°24′37″ N. and longitude 162°22′ W. from Greenwich, and Johnston and Sand Islands located in the Pacific Ocean approximately in latitude 16°44′32″ N. and longitude 169°30′59″ W. from Greenwich, together with the reefs surrounding all the aforesaid islands, as indicated upon the diagram hereto attached and made a part of this order, be, and they are hereby, reserved, set aside, and placed under the control and jurisdiction of the Secretary of the Navy for administrative purposes, subject, however, to the use of the said Johnston and Sand Islands by the Department of Agriculture as a refuge and breeding ground for native birds as provided by Executive Order No. 4467 of June 29, 1926.

This order shall continue in full force and effect unless and until revoked by the President or by act of Congress.

FRANKLIN D ROOSEVELT

The White House,

*December 29, 1934.*

[No. 6935]


Nautical Miles
Toki Pt
Heel Pt
Kuku Pt
Lagoon
Peacock Pt


KINGMAN REEF
Nautical Miles
3 ft high
162°22'


Sand I
Johnston I
JOHNSTON ISLAND
AND
SAND ISLAND

# Executive Order 8682--Establishing naval defensive sea areas around and naval airspace reservations over the islands of Palmyra, Johnston, Midway, Wake, and Kingman Reef

**Source:** The provisions of Executive Order 8682 of Feb. 14, 1941, appear at 6 FR 1015, 3 CFR, 1938-1943 Comp., p. 894, unless otherwise noted.

**Pacific Ocean**

By virtue of the authority vested in me by the provisions of section 44 of the Criminal Code, as amended (U.S.C., title 18, sec. 96), and section 4 of the Air Commerce Act approved May 20, 1926 (44 Stat. 570, U.S.C., title 49, sec. 174), the territorial waters between the extreme high-water marks and the three-mile marine boundaries surrounding the islands of Palmyra, Johnston, Midway, Wake, and Kingman Reef, in the Pacific Ocean, are hereby established and reserved as naval defensive sea areas for purposes of national defense, such as areas to be known, respectively, as "Palmyra Island Naval Defensive Sea Area", "Johnston Island Naval Defensive Sea Area", "Midway Island Naval Defensive Sea Area", "Wake Island Naval Defensive Sea Area", and "Kingman Reef Naval Defensive Sea Area" and the airspaces over the said territorial waters and islands are hereby set apart and reserved as naval airspace reservations for purposes of national defense, such reservations to be known, respective, as "Palmyra Island Naval Airspace Reservation", "Johnston Island Naval Airspace Reservation", "Midway Island Naval Airspace Reservation", "Wake Island Naval Airspace Reservation", and "Kingman Reef Naval Airspace Reservation".

At no time shall any person, other than persons on public vessels of the United States, enter any of the naval defensive sea areas herein set apart and reserved, nor shall any vessel or other craft, other than public vessels of the United States, be navigated into any of said areas, unless authorized by the Secretary of the Navy.

At no time shall any aircraft, other than public aircraft of the United States, be navigated into any of the naval airspace reservations herein set apart and reserved, unless authorized by the Secretary of the Navy.

The provisions of the preceding paragraphs shall be enforced by the Secretary of the Navy, with the cooperation of the local law enforcement officers of the United States and of the Territory of Hawaii; and the Secretary of the Navy is hereby authorized to prescribe such regulations as may be necessary to carry out such provisions.

Any person violating any of the provisions of this order relating to the above-named naval defensive sea areas shall be subject to the penalties provided by section 44 of the Criminal Code as amended (U.S.C., title 18, sec. 96), and any person violating any of the provisions of this order relating to the above-named naval airspace reservations shall be subject to the penalties prescribed by the Civil Aeronautics Act of 1938 (52 Stat. 973).

This order shall take effect ninety days after date hereof.

[EO 8682 amended by EO 8729 of Apr. 2, 1941, 6 FR 1791, 3 CFR, 1938-1941 Comp., p. 919]

---

**Editorial note:** Executive Order 9881 of Aug. 4, 1947, 12 FR 5325, 3 CFR, 1943-1948 Comp., p. 662, discontinued the Palmyra Island Naval Airspace Reservation and the Palmyra Island Naval Defensive Sea Area.

Proclamation 5928 of December 27, 1988

# Territorial Sea of the United States of America

54 F.R. 777

By the President of the United States of America

A Proclamation

International law recognizes that coastal nations may exercise sovereignty and jurisdiction over their territorial seas.

The territorial sea of the United States is a maritime zone extending beyond the land territory and internal waters of the United States over which the United States exercises sovereignty and jurisdiction, a sovereignty and jurisdiction that extend to the airspace over the territorial sea, as well as to its bed and subsoil.

Extension of the territorial sea by the United States to the limits permitted by international law will advance the national security and other significant interests of the United States.

NOW, THEREFORE, I, RONALD REAGAN, by the authority vested in me as President by the Constitution of the United States of America, and in accordance with international law, do hereby proclaim the extension of the territorial sea of the United States of America, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, the Commonwealth of the Northern Mariana Islands, and any other territory or possession over which the United States exercises sovereignty.

The territorial sea of the United States henceforth extends to 12 nautical miles from the baselines of the United States determined in accordance with international law.

In accordance with international law, as reflected in the applicable provisions of the 1982 United Nations Convention on the Law of the Sea, within the territorial sea of the United States, the ships of all countries enjoy the right of innocent passage and the ships and aircraft of all countries enjoy the right of transit passage through international straits.

Nothing in this Proclamation:

(a) extends or otherwise alters existing Federal or State law or any jurisdiction, rights, legal interests, or obligations derived therefrom; or

(b) impairs the determination, in accordance with international law, of any maritime boundary of the United States with a foreign jurisdiction.

IN WITNESS WHEREOF, I have hereunto set my hand this 27th day of December, in the year of our Lord nineteen hundred and eighty-eight, and of the Independence of the United States of America the two hundred and thirteenth.

Ronald Reagan

**U.S. Department of the Interior**
**Fish and Wildlife Service**
**Pacific Region**

**December 2000**

U.S. Fish & Wildlife Service

# Conceptual Management Plan

## *Proposed Kingman Reef National Wildlife Refuge*

*Line Islands, Central Pacific Ocean*



EXHIBIT
"34"

**Acknowledgments**

Many people contributed to this proposal, and we would like to acknowledge the professional administrative and technical support we received from our colleagues in the U.S. Fish and Wildlife Service and others in the Department of the Interior.

The ongoing cooperation of the U.S. Coast Guard and the National Marine Fisheries Service in providing logistical support to the U.S. Fish and Wildlife Service for our Pacific Remote Island National Wildlife Refuge Complex management programs is very much appreciated. The National Marine Fisheries Service, in particular the crew of the Research Vessel *Townsend Cromwell* and other fisheries staff, provided substantial logistics and technical support during field site surveys of Kingman Reef, which we gratefully acknowledge.

Conceptual Management Plan

Cover photographs (top to bottom): Mushroom coral (*Fungia* sp.) and green seaweed (*Halimeda* sp.); Pink lace coral (*Sylaster* sp.) and damselfish (*Chromis* sp.) beneath a coral ledge; Underwater view of coral reef habitat in the lagoon of Kingman Reef featuring a variety of corals including table corals (*Acropora* spp.), finger corals (*Pocillopora* spp.), and fusilier fish (*Caesio* sp.). [Photographs by *J. Maragos*].

*Cover graphics by B. Maxfield.*

# Conceptual Management Plan

## for the Proposed

## Kingman Reef National Wildlife Refuge

## Line Islands, Central Pacific Ocean

*Prepared by:*

U.S. Fish and Wildlife Service
Pacific Islands Refuge Planning Office
Honolulu, Hawaii

December 2000

## Table of Contents

Page No.:

I. INTRODUCTION . . . . . 1
A. Overview . . . . . 1
B. The National Wildlife Refuge System . . . . . 1
1. Background and overview . . . . . 1
2. Mission, principles, and guidelines for natural resources management of the National Wildlife Refuge System . . . . . 2
3. Visitor uses on National Wildlife Refuges . . . . . 3
C. Refuge Purposes . . . . . 3

II. OVERVIEW OF THE ENVIRONMENT OF KINGMAN REEF . . . . . 3
A. General . . . . . 3
B. Approved Refuge Boundary . . . . . 4

III. INTERIM REFUGE MANAGEMENT AT THE PROPOSED KINGMAN REEF NWR . . . . . 8
A. Overview . . . . . 8
B. Administration and Staffing . . . . . 8
C. Facilities . . . . . 8
D. Transportation . . . . . 9
E. Management Planning and Implementation . . . . . 9

IV. NATURAL RESOURCES MANAGEMENT . . . . . 9
A. Summary of the Natural Resources of Kingman Reef . . . . . 9
B. Principal Threats to Natural Resources . . . . . 10
C. Interim Refuge Management Goals . . . . . 10
D. Natural Resources Management Activities . . . . . 11
1. Overview . . . . . 11
2. Monitoring surveys . . . . . 11
3. Endangered and threatened species recovery . . . . . 11
4. Other species of management emphasis . . . . . 12
5. Habitat and wildlife population monitoring . . . . . 12
6. Habitat management and enhancement . . . . . 12
7. Law enforcement . . . . . 12
8. Research . . . . . 13
E. Cultural Resources . . . . . 13
F. Other Refuge Issues . . . . . 14
1. Access . . . . . 14
2. Navigation and safety . . . . . 14
3. Inspection and quarantine programs . . . . . 14
G. Public Use . . . . . 14

V. POTENTIAL REFUGE OPERATION AND MAINTENANCE BUDGET . . . . . . . . . . 16
A. Refuge Start-up Costs . . . . . . . . . . 16
B. Estimated Refuge Annual Operations and Maintenance Costs . . . . . . . . . . 16
C. Estimated Facilities Costs . . . . . . . . . . 16

VI. PREPARER AND INTERDISCIPLINARY TEAM . . . . . . . . . . 16
A. Preparer . . . . . . . . . . 16
B. Interdisciplinary Team . . . . . . . . . . 16

VII. REFERENCES . . . . . . . . . . 18

## List of Figures

Figure 1. The location of Kingman Reef in the northern Line Islands, central Pacific Ocean. . . 5
Figure 2. Generalized physical features of Kingman Reef. . . . . . . . . . . 6
Figure 3. The boundary of the proposed Kingman Reef National Wildlife Refuge. . . . . . . . . . 7

# Conceptual Management Plan for the Proposed Kingman Reef National Wildlife Refuge

Line Islands, Central Pacific Ocean

## II. INTRODUCTION

### A. Overview

Kingman Reef is a partially submerged coral reef atoll that lies approximately 6 degrees north of the equator in the Line Islands in the central Pacific Ocean (figure 1). A variety of different habitat types are present, including intertidal reefs, submerged coral terraces, lagoon patch reefs and pinnacle reefs, spur reefs, and emergent coral islets. Marine species include coral reef and pelagic fishes, corals, algae, and other marine invertebrates. The reefs and surrounding waters also support Pacific migratory seabirds, threatened green sea turtles, endangered hawksbill sea turtles, and marine mammals.

The U.S. Fish and Wildlife Service (Service) is proposing to establish the Kingman Reef National Wildlife Refuge (Refuge) to conserve and manage the coral reef ecosystem, including national trust species, in perpetuity.

This Conceptual Management Plan (CMP) was developed using an interdisciplinary planning approach. It presents a general description of future Refuge management. As a conceptual document it does not provide extensive detail – such details would be included in a Refuge Comprehensive Conservation Plan (CCP) that would be developed in the future with additional opportunities for public input and agency review. Following Refuge establishment at Kingman Reef, the CMP would serve as an interim management guide until a CCP is developed. The CMP answers questions commonly posed by the general public and government agencies during the planning and public involvement phase of Refuge establishment.

### B. The National Wildlife Refuge System

#### 1. Background and overview

The Service is the primary Federal agency responsible for the protection and management of migratory birds, endangered and threatened plants and animals, certain marine mammals, and anadromous fishes. As part of its responsibilities, the Service establishes and administers National Wildlife Refuges in accordance with the National Wildlife Refuge System Administration Act of 1966, as amended by the National Wildlife Refuge System Improvement Act of 1997; the National Environmental Policy Act (NEPA); and other pertinent legislation, Executive Orders, regulations, and policies.

The National Wildlife Refuge System (Refuge System) is a national system of lands and waters dedicated to wildlife conservation and management. The first National Wildlife Refuge was established in 1903, and the Refuge System now consists of more than 520 Refuges nationwide including 16 Refuges in Hawaii and the Pacific Islands[1]. Recently, Congress enacted the National Wildlife Refuge System Improvement Act of 1997, Public Law 105-57 (16 U.S.C. 668dd et seq.), which is an organic act[2] for the Refuge System that codifies the System's mission, administration, conservation management, public use, conservation planning, interagency coordination, and public involvement.

2. Mission, principles, and guidelines for natural resources management of the National Wildlife Refuge System

The mission of the National Wildlife Refuge System is

> ***"... to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans."*** [National Wildlife Refuge System Improvement Act of 1997]

Through its natural resources management programs on National Wildlife Refuges, the Service is required to maintain the Refuge System's biological integrity, diversity, and environmental health; and monitor the status and trends of Refuge fish, wildlife, and plants. Partnerships with conservation organizations, other government agencies, landowners, and other interested parties are encouraged as a means of increasing the effectiveness of Refuge management programs. The Service is directed to inform and involve the public in major decisions affecting National Wildlife Refuges.

Two recent Executive Orders provide enhanced protection for the nation's coral reef and other marine areas that fall under Federal jurisdiction. Presidential Executive Order Number 13089, entitled "Coral Reef Protection," dated June 11, 1998, calls for Federal agencies to provide for the protection of coral reefs that may be affected by their actions, and to utilize their authorities to protect and enhance coral reef ecosystems.

Presidential Executive Order Number 13158, entitled "Marine Protected Areas," dated May 26, 2000, calls for Federal agencies with jurisdiction over lands and waters with marine resources to

---

[1] National Wildlife Refuges (NWR) in the U.S. Pacific include Kilauea Point, Huleia, and Hanalei NWRs on Kauai; Pearl Harbor and James Campbell NWRs on Oahu; Kealia Pond NWR, Maui; Kakahaia NWR, Molokai; and Hakalau Forest NWR, on Hawaii Island. In the northwestern Hawaiian Islands, the Service manages the Hawaiian Islands NWR that includes Laysan Island, French Frigate Shoals, Gardner Pinnacles, Maro Reef, Nihoa Island, Necker Island, Lisianski Island, and Pearl and Hermes Reef. Midway Atoll NWR is also located in the northwestern Hawaiian Islands. The Service manages National Wildlife Refuges on other U.S. islands in the Pacific including Howland Island, Baker Island, Jarvis Island, Johnston Atoll, and Rose Atoll NWRs. The Guam NWR includes the Ritidian unit, and overlay units on Navy and Air Force installations.

[2] Essential organizing legislation.

ensure protection of natural and cultural resources in those areas. Federal agencies are also called upon to take appropriate actions to enhance or expand protection of existing Marine Protected Areas or establish new Marine Protected Areas.[3]

3. Visitor uses on National Wildlife Refuges

Certain wildlife-dependent visitor uses are considered legitimate and appropriate uses on some National Wildlife Refuges. However, all visitor uses must be compatible with (*i.e.*, not materially detract from or interfere with) the primary purpose of the Refuge. Adequate staffing and funding must be available to properly administer a proposed visitor use program. Six priority wildlife dependent visitor uses on Refuges are denoted by the National Wildlife Refuge Administration Act of 1966, as amended by the National Wildlife Refuge Improvement Act of 1997, and include: hunting, fishing, wildlife observation and photography, environmental education, and interpretation. During the development of the Refuge Comprehensive Conservation Plan, the Service would evaluate opportunities for compatible visitor uses for the proposed Refuge.

C. Refuge Purposes

The purposes of the Kingman Reef National Wildlife Refuge would be:

- To preserve, restore, and enhance in their natural ecosystems (when practicable) all species of animals and plants that occur at Kingman Reef, including those that are endangered or threatened with becoming endangered; and

- To conserve the migratory bird resources and coral reef ecosystem at Kingman Reef.

## III. OVERVIEW OF THE ENVIRONMENT OF KINGMAN REEF

A. General

Kingman Reef is the northernmost atoll in the Line Islands. Located in the central Pacific Ocean approximately 900 miles south of Hawaii, Kingman Reef lies north of the equator at 6°23'N latitude, 162°25'W longitude (figure 1). The reef is approximately 33 miles northwest of Palmyra Atoll, another United States' possession in the Line Islands. Geologically, Kingman Reef is a partially submerged table reef atoll. The reef is triangular in shape with its apex to the north, surrounding a large central lagoon (figure 2). Much of the eastern and southern portions of the reef are exposed at low tide, while the western portions are submerged. The outer reef measures approximately 12.4 miles long on the southern face, 7.5 miles long on the northeastern face, and 8.6 miles long on the northwestern face. The large central lagoon ranges in depth from 50 to 250 feet. Emergent land consists of three unvegetated coral spits that total approximately 3.2 acres (Flint and Aycock 2000).

---

[3] Appendix E of the Environmental Assessment for the Proposed Kingman Reef National Wildlife Refuge provides the full text of both Executive Orders.

Kingman Reef is within an area of high rainfall near the equator known as the "Intertropical Convergence Zone" (also called "the Doldrums"). The project area is affected by the eastward-flowing North Equatorial Countercurrent, a relatively narrow current located between latitudes 5 degrees and 10 degrees North, that flows eastward, in the opposite direction from the major westward-flowing currents of the northern and southern hemispheres (Drake *et al.* 1978). The northern boundary of this current is an area of upwelling that brings nutrient rich waters to the surface, and is an important foraging ground for several marine species including seabirds. The lagoon and offshore waters are habitats for coral reef and other marine fishes, marine mammals, sea turtles, and a variety of other species, and serve as important foraging areas for migratory seabirds. Emergent lands are important resting habitats for seabirds and may provide basking sites for threatened green sea turtles.

### B. Proposed Refuge Boundary

The proposed Refuge boundary would include the lagoon, emergent lands, coral reefs, and other submerged lands and associated waters seaward to 12 nautical miles from reefs exposed at mean low tide. If the Refuge is established, it would include a total of approximately 483,702 acres including approximately 3.2 acres of emergent land and approximately 25,874 acres of coral reef habitat[4].

## IV. INTERIM REFUGE MANAGEMENT AT THE PROPOSED KINGMAN REEF NWR

### A. Overview

The operation and management of remote island National Wildlife Refuges pose unique challenges to Refuge Managers. Management strategies for remote island Refuges in Hawaii and the Pacific range from intermittent management visits, to temporary staffing of primitive field camps, permanent staffing at field stations with established support facilities, to year-round field stations such as are found at Midway Atoll National Wildlife Refuge and Johnston Atoll National Wildlife Refuge. Compared with most Refuges in the National Wildlife Refuge System, remote island management and operational costs are high because of the high cost of logistics support including transporting equipment, supplies, and personnel to remote stations, and maintaining operations in harsh marine climates.

---

[4] Coral reef habitat acreage estimates were derived by digitally measuring areas on the U.S. National Oceanographic and Atmospheric Administration's navigation chart that are shallower than 100 fathoms (600 feet). This depth is based on the biological characteristics of coral reef organisms.




Figure 1. The location of Kingman Reef in the northern Line Islands, central Pacific Ocean.
*The U.S. Fish and Wildlife Service manages seven other remote islands and atolls in the Pacific as National Wildlife Refuges including Howland, Baker, and Jarvis Island NWRs in the central equatorial Pacific Ocean; the Hawaiian Islands NWR and Midway Atoll NWR in the northern Hawaiian Islands; Johnston Atoll NWR; and Rose Atoll NWR in the south Pacific Ocean. Palmyra Atoll, 33 miles south of Kingman Reef, is currently proposed as a National Wildlife Refuge.*




Figure 2. Generalized physical features of Kingman Reef.
(Base Map Source: National Oceanic and Atmospheric Administration Chart dated 4/13/85 rev. 1/26/91.)




Figure 3. The boundary of the proposed Kingman Reef National Wildlife Refuge.
*The approved boundary would include those portions of the lagoon, the coral reef complex, and emergent land, and other submerged lands and associated waters within 12 nautical miles of reefs that are exposed at mean low tide.*

The Service is proposing to manage natural resources at Kingman Reef through regular ship-based visits. In a separate action, the Service is working with The Nature Conservancy (TNC), a private conservation organization, to protect and manage natural resources at Palmyra Atoll located 33 miles to the south of Kingman Reef. If a National Wildlife Refuge were to be established at Palmyra Atoll in the future, the Service would make use of natural resources management staff and equipment that would be based there. If the Service does not have access to nearby logistics support facilities, the Refuge would be managed from the Honolulu Office of the Pacific Remote Islands National Wildlife Refuge Complex. This plan assumes that management staff would be based in Honolulu.

B. Administration and Staffing

Kingman Reef would be administered as part of the Pacific Remote Islands National Wildlife Refuge Complex headquartered in Honolulu, Hawaii. Staffing levels and management visitation to Kingman Reef would be based on Refuge management needs and availability of funding. A Refuge at Palmyra Atoll would facilitate more visits to Kingman Reef by the Service for Refuge management than if a Refuge were not established at that nearby atoll. Other Refuge management trips could be undertaken in conjunction with other scientific or Coast Guard expeditions. Existing Remote Island NWR Complex staff would be assigned to work at Kingman Reef, as required.

C. Facilities

The only facilities that may be installed at Kingman Reef in the future are permanent mooring buoys to prevent boat anchors from damaging corals. Details of the mooring stations would be developed at a later date, but the concept is to install buoys that are tethered by chains and fastened to a bolt in the substrate. We envision using the type of buoy that has been used by the State of Hawaii at Molokini Islet in Hawaii. Mooring buoys would need to withstand rough seas and should not present an entanglement hazard to wildlife. Before deciding on a final design the Service would consider a range of engineering options, evaluate the short-term, long-term, and cumulative effects of establishing permanent mooring sites, and coordinate its proposal with other agencies and the public.

D. Transportation

Transportation to and from the proposed Refuge would be by boat.

E. Management Planning and Implementation

During the start-up period, this CMP would serve as an interim Refuge management plan until a Refuge Comprehensive Conservation Plan is developed. More detailed operational plans (for habitat and wildlife management, and Refuge safety) would be developed after the Refuge is established to provide detailed guidance for staff and allow for coordination with regulatory agencies.

## V. NATURAL RESOURCES MANAGEMENT

### A. Summary of the Natural Resources of Kingman Reef

Kingman Reef is classified as an oceanic atoll (Holthus and Maragos 1995). Emergent land spits provide foraging and resting habitat for migratory shorebirds and seabirds that include Brown Boobies, Sooty Terns, Frigatebirds, and Wandering Tattlers, and may provide basking sites for threatened green sea turtles.

The coral reefs at Kingman Reef are reported to be among the most pristine in the Pacific (Maragos 2000). Coral reef ecologists reported a variety of reef formations at Kingman Reef including lagoon patch reefs, pinnacle reefs, ribbon reefs, intertidal reefs, reef slopes, reef terraces, and reef spur-and-groove formations, each with distinctive assemblages of corals and other reef building organisms. The waters and reefs of Kingman Reef support a spectacularly diverse and healthy marine community. Divers reported 168 species of fish, including sharks, rays, eels, groupers, jacks, goatfishes, butterflyfishes, damselfishes, mullets, wrasses, parrotfishes, surgeonfishes, and tuna (Wass and DeMartini 2000). Preliminary surveys also documented 102 species of corals, including an undescribed species of fingercoral (*Porites*), and spectacular assemblages of mushroom corals, fire coral, table coral, and plate corals (Maragos 2000). Other species noted were several giant clams (*Tridacna maxima*, *T. crocea*), and several species of other bivalves, anemones, octopus, crabs, sea urchins, sea cucumbers, tunicates, and a variety of marine algae (Newbold 2000).

Kingman Reef provides essential habitat for threatened green sea turtles (*Chelonia mydas*) and endangered hawksbill sea turtles (*Eretmochelys imbricata*). The emergent coral islets may serve as basking sites for green sea turtles, but are not believed to be suitable for large-scale breeding by either species at the atoll (NMFS/FWS 1998a,b).

Several species of giant clams (*Tridacna* spp.) are protected by the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) and are found in relatively large numbers in waters of Kingman Reef. This commercially important clam genus has been decimated from waters of other inhabited islands in the Pacific (Munro 1986, Hirschberger 1980).

Pacific migratory seabirds, including Brown Boobies, Great Frigatebirds, Sooty Terns, and Wandering Tattlers, forage in the waters of the atoll.

### B. Principal Threats to Natural Resources

Principal threats to habitats and species at Kingman Reef include shipwrecks, oil spills, marine debris, overfishing, and poaching of protected species. Sea turtles and seabirds are threatened by fishing activities because they are often accidentally caught on hooks, lines, or other gear. Sources of hard corals, precious corals, giant clams, ornamental fishes and shells, sharks, and other marine species are being overharvested in other areas of the Pacific, and fishing expeditions are likely to increase in the remote areas.

C. Interim Refuge Management Goals

Interim goals of the proposed Kingman Reef NWR reflect the primary mission of the Service, to protect and manage wildlife resources of national importance. Refuge goals would be refined during future comprehensive management planning.

Interim goals to accomplish this mission would be to:

- o Maintain, restore, and enhance the structure, species composition, and processes of the atoll including coral reefs, lagoon, and pelagic marine environments.

- o Aid in the recovery of federally listed endangered and threatened species and migratory birds by protecting and managing their habitats on the proposed Refuge.

Interim Refuge objectives:

- o Upon Refuge establishment, conduct routine monitoring of marine ecosystems and resources to guide management decisions on the Refuge.

- o Upon Refuge establishment, develop and publish rulemaking for use of vessels in the waters of the Refuge.

- o Upon Refuge establishment, develop a Refuge safety plan to ensure safe boating operations, and other personnel safety.

- o Upon Refuge establishment, coordinate routine law enforcement initiatives with the U.S. Coast Guard and establish appropriate navigational aids to protect shallow reefs.

- o Within the first ten years of Refuge establishment, develop a Comprehensive Conservation Plan for Kingman Reef.

D. Natural Resources Management Activities

1. Overview

Wildlife and habitat protection and enhancement, endangered and threatened species recovery, monitoring, outreach, and research are key focus areas for the proposed Refuge. In general, the Service would allow natural processes that support native fish and wildlife to continue. The Service would use the best available information to make its management decisions and seek advice and review from scientists, managers, private conservation partners, and other government agencies.

2. Monitoring surveys

Preliminary surveys have been completed and would help to design future monitoring surveys. Ongoing marine surveys would help document the distribution and status of coral reef communities and species of management concern and would be used to design management programs. The Service would work with the National Marine Fisheries Service to study marine mammals and sea turtles that occur in the waters of the proposed Refuge and to ensure that Refuge activities are consistent with the conservation and recovery of these species. These surveys would be used by Refuge managers and biologists to identify key areas of the Refuge that would be focal points for specific protection or enhancement actions, serve as long-term monitoring sites, and to evaluate opportunities for future visitor use.

3. Endangered and threatened species recovery

Threatened green sea turtles (*Chelonia mydas*) are numerous at Kingman Reef. Hawksbill sea turtles (*Eretmochelys imbricata*) also likely occur there, but were not observed during recent surveys. The Refuge would benefit endangered and threatened species and would help foster their recovery. The low levels of management activities proposed for the Refuge during the interim time period would not likely adversely affect listed species.

Interim management activities that would benefit listed species include periodic management visits, population and habitat monitoring, closure of the Refuge to fishing and regulation of vessels within the waters of the Refuge, long term protection of habitat, removal of marine debris, implementation of law enforcement patrols, and conducting scientific studies. The Service would coordinate its interim Refuge management activities with the National Marine Fisheries Service (NMFS).

Future Refuge activities that may affect listed species require review by the Service and NMFS in accordance with section 7 of the Endangered Species Act. Refuge activities would be explained in detail in the Comprehensive Conservation Plan that would be reviewed by both agencies. Recovery tasks for listed species would be guided by approved recovery plans (National Marine Fisheries Service and U.S. Fish and Wildlife Service 1998a,b).

4. Other species of management concern

Giant clams (*Tridacna* spp.) are protected under CITES[5] and are rare throughout most of their range where they are harvested for food, the aquarium trade, and for decoration. A number of species of migratory seabirds occur at Kingman Reef, foraging on marine life in the waters of the atoll, and roosting on the emergent spits. Marine mammals are also protected and occur in the waters of the atoll. Management actions on the Refuge that would benefit listed species would also protect other wildlife.

5 CITES = Convention on International Trade in Endangered Species of Wild Fauna and Flora. Species listed in Appendices I, II, or III (and all parts and derivatives thereof, with limited exceptions) are regulated with respect to international transport.

5. Habitat and wildlife population monitoring

Habitat and population monitoring would help the Service to track trends, detect environmental problems, and guide management decisions. Standard techniques for monitoring seabirds, fish, coral, algae, other invertebrates, sea turtles, and marine mammals would be used on the Refuge.

6. Habitat management and enhancement

Marine debris would periodically be collected and destroyed off site. Other habitat management may include the installation of mooring buoys to prevent anchor damage to coral reefs; enhancement of navigation maps and installation of navigation aids to prevent accidental groundings; regulation of activities to ensure protection of marine wildlife and migratory birds on the Refuge; and other initiatives as needed.

7. Law enforcement

The Service's Division of Law Enforcement protects fish, wildlife, and plants through a range of law enforcement techniques. These include: surveillance of areas where priority wildlife and fishery resources are concentrated; inspection of shipments entering or leaving the United States at designated ports, border ports, and special ports; investigation of known and suspected violations; distribution of information about Federal wildlife regulations and their enforcement; and submission of evidence of violations to the Department of the Interior and/or the Department of Justice for consideration of civil penalties or criminal prosecution.

Title 50 of the Code of Federal Regulations provides the administrative regulations concerning Service enforcement of wildlife laws. By law, employees of the Service who are trained in law enforcement and approved as law enforcement officials carry out wildlife law enforcement activities on National Wildlife Refuges. Enforcement of Federal laws and Refuge regulations on the proposed Refuge would be important to protect public and private property, and for the conservation of natural resources.

In general, the Service would seek to maintain law and order and enforce wildlife laws of the United States at Kingman Reef National Wildlife Refuge, work to prevent illegal activities from occurring on the Refuge, particularly any unauthorized harvest of marine organisms or wildlife products, and to inform citizens of various Federal laws and regulations relating to the protection of fish, wildlife, and plants at Kingman Reef. Should it become necessary, the Service would prosecute violators of Federal laws and Refuge regulations.

8. Research

Scientific information is vital to Refuge management as it forms the basis for management decisions. The Service would support research and resource management studies, provided they were found to be compatible with the purpose of the Refuge and could be accommodated while benefitting other priority Refuge management programs. In general, work that would contribute to the Service's ability to protect and manage the natural resources of Kingman Reef would

receive priority consideration. Research activities would require a Special Use Permit unless the research were already included as part of an approved management plan.

E. Historic Resources

There is no evidence of permanent human settlement on Kingman Reef, and there are no sites that are listed or that is known to be eligible for listing on the National Register of Historic Sites. Once a Refuge is established, activities that have the potential to affect historic properties that may be found in the future, would require review under section 106 of the National Historic Preservation Act. The Section 106 process includes steps to identify and evaluate resources and to ensure that historic properties are treated appropriately, if they are present with the project's area of potential effect.

F. Other Refuge Issues

1. Access

Upon establishment of the Refuge, the Refuge would be closed to public access, until the Service provided for access through additional planning or rulemaking. Although the Service is not proposing to open the Refuge for public use during the interim period (following Refuge establishment and prior to the development of a Comprehensive Conservation Plan), the Refuge Manager may permit low levels of access under Special Use Permits, that would be evaluated on a case-by-case basis for compatibility and appropriateness. Special Use Permits and associated Compatibility Determinations would be coordinated with the National Marine Fisheries Service and with the public, as appropriate.

2. Navigation and safety

Boating and diving operations in this remote area would be guided by safety plans. The Service envisions the need to develop navigation aids to prevent accidental groundings on the shallow reefs of the Refuge.

The Service would work with the U.S. Coast Guard to publish rules for mariners. The rules would define those areas wherein which general maritime transit is not restricted and would also define areas within which vessels without permission from the Service are not permitted.

3. Inspection and quarantine programs

The Service would implement an inspection and quarantine program for the Refuge to prevent the accidental introduction of marine and terrestrial alien species. Refuge-specific procedures would outline measures for inspecting vessels and personal belongings prior to visiting the atoll to prevent accidental introductions of pest species.

G. Public Use

The National Wildlife Refuge System Administration Act of 1966, as amended by the National Wildlife Refuge System Improvement Act of 1997, requires the Service to consider the potential for six priority public uses on all Refuges during the development of a Refuge Comprehensive Conservation Plan (CCP) or before, if priority uses exist at the time of Refuge establishment. The six wildlife-dependent priority public uses include recreational hunting, recreational fishing, wildlife observation and photography, environmental education, and interpretation. The current landowner does not permit public use at Kingman Reef, so none of these uses is being evaluated for compatibility at this time.

Due to the remote location of the Refuge, the lack of a land base and support facilities to operate a visitor program, and the nearly pristine condition of the coral reef ecosystem, the Service has determined that Kingman Reef would not be open to public use during the interim phase. More information would be needed to evaluate the potential for public use at Kingman Reef. The Service would monitor the reef ecosystem prior to developing a Comprehensive Conservation Plan for the Refuge.

## VI. POTENTIAL REFUGE OPERATIONS AND MAINTENANCE BUDGET

The Refuge operations and maintenance budget for the Kingman Reef NWR would cover salaries, facilities, equipment, and maintenance, biological surveys, management planning, habitat restoration, interpretive materials (for off-site educational programs), and supplies.

A. Refuge Start-up Costs

First year start-up costs are estimated to be up to $50,000. This level of funding would permit Pacific Remote Islands National Wildlife Refuge Complex biologists to undertake migratory bird and coral reef monitoring surveys, and contribute to the evaluation of environmental effects of installing mooring buoys at Kingman Reef.

B. Estimated Refuge Annual Operations and Maintenance Costs

At a conservative staffing level, the annual Refuge operations and maintenance costs are estimated to be up to $100,000, which includes salaries (a proportioned share), logistics, and resource management project costs.

C. Estimated Facilities Costs

Mooring buoys are the only projected facilities needed at Kingman Reef. Although detailed prices are not available, the cost of planning, purchasing components, and installing mooring buoys is estimated to be around $300 apiece for each small buoy based on the costs for mooring buoys currently in use at Molokini Islet, in Hawaii. Large buoys might each cost up to $4,000.

## VII. PREPARER AND INTERDISCIPLINARY TEAM

### A. Preparer

Phyllis Y. Ha, Ecologist, Pacific Islands Refuge Planning Office, Honolulu, Hawaii

### B. Interdisciplinary Team

Carolyn Bohan, Regional Chief, National Wildlife Refuge System, Region 1, Portland, Oregon
Forrest Cameron, Refuge Supervisor, National Wildlife Refuge System, Region 1, Portland, Oregon
Elizabeth N. Flint, Wildlife Biologist, Pacific Remote Islands National Wildlife Refuge Complex, Honolulu, Hawaii
Ben Harrison, Fish and Wildlife Biologist, Division of Habitat Protection and Management, Ecological Services, Region 1, Portland, Oregon
A. Eugene Hester, Senior Resident Agent, Division of Law Enforcement, Honolulu, Hawaii
Charles J. Houghten, Chief, Division of Refuge Planning, Region 1, Portland, Oregon
David N. Johnson, Refuge Manager, Pacific Remote Islands National Wildlife Refuge Complex, Honolulu, Hawaii
Kay Kier-Haggenjos, Writer/Editor, Division of Refuge Planning, Region 1, Portland, Oregon
Jerry F. Leinecke, Project Leader, Hawaiian and Pacific Islands National Wildlife Refuge Complex, Honolulu, Hawaii
James E. Maragos, Coral Reef Biologist, Pacific Islands Ecoregion, Honolulu, Hawaii
Barbara Maxfield, Public Information Officer, U.S. Fish and Wildlife Service, Pacific Islands Ecoregion, Honolulu, Hawaii
Stephen B. Moore, Chief, Division of Refuge Operations Support, Region 1, Portland Oregon
Cathy Osugi, Wildlife Biologist, Division of Refuge Planning, Region 1, Portland, Oregon
Karen Rosa, Fish and Wildlife Biologist, Division of Ecological Services, Honolulu, Hawaii
Catherine B. Sheppard, Chief, Division of Realty, Region 1, Portland, Oregon
Georgia Shirilla, Senior Realty Specialist, Division of Realty, Region 1, Portland, Oregon
Robert P. Smith, former Pacific Islands Manager, Honolulu, Hawaii (participated in project conceptualization and the development of preliminary drafts)

Cartography:

Rodman Low, Geographer, Pacific Islands Ecoregion, Honolulu, Hawaii
Susan Machida, Geographer, Pacific Islands Ecoregion, Honolulu, Hawaii

Other technical assistance:

Kevin B. Foster, Fish and Wildlife Biologist, Division of Ecological Services, Honolulu, Hawaii
Joseph McDermott, Office of the Solicitor, Department of the Interior, Washington, D.C.
Don Palawski, Supervisory Fish and Wildlife Biologist, Division of Ecological Services, Honolulu, Hawaii
Francesca R. Ryan, Realty Specialist, Division of Realty, Washington, D.C.

Karen Sprecher-Keating, Office of the Solicitor, Dept. of the Interior, Washington, D.C.
Chris Swenson, Fish and Wildlife Biologist, Division of Ecological Services, Honolulu, Hawaii
Ronald Walker, Fish and Wildlife Biologist, U.S. Fish and Wildlife Service, Pacific Islands Ecoregion, Honolulu, Hawaii
David J. Wesley, former Geographic Assistant Regional Director, Pacific Islands Ecoregion, Portland, Oregon
David Woodside, Wildlife Biologist, Pacific Islands Ecoregion, Honolulu, Hawaii
Marilet Zablan, Division of Ecological Services, Honolulu, Hawaii

## VIII. REFERENCES


Drake, C.L., J. Imbrie, J.A. Knauss, and K.K. Turekian. 1978. *Oceanography*. Holt, Rinehard and Winston. NY. 447 pp.

Flint, E. and D. Aycock. 2000. "Kingman Reef." Trip report. U.S. Fish and Wildlife Service.

Hirschberger, W. 1980. "Tridacnid clam stocks on Helen Reef, Palau, Western Caroline Islands." *Mar. Fish. Rev.* 42:8-15.

Holthus, P.F. and J.E. Maragos. 1995. Marine Ecosystem Classification for the Tropical Island Pacific. Pp: 239-278. Chapter 13, In: *Marine and Coastal Biodiversity in the Tropical Island Pacific Region, Vol. 1: Species Systematics and Information Management Priorities,* Maragos, J.E., M.N.A. Peterson, L.G. Eldredge, J.E. Bardach, and H.F. Takeuchi (eds). East-West Center, Honolulu, 424 pp.

Maragos, J.E. 2000. "Status of Coral Reefs at Kingman Reef, U.S. Line Islands." Summary reporting on the expedition to Kingman Reef on file at U.S. Fish and Wildlife Service.

Munro, J.L. 1986. "Fisheries for giant clams (Tridacnidae: Bivalvia) and prospects for stock enhancement." *In:* Caddy, J.F. (Ed.) *Scientific approaches to management of shellfish resources*. John Wiley & Sons, New York.

National Marine Fisheries Service and U.S. Fish and Wildlife Service. 1998a. *Recovery Plan for U.S. Pacific Populations of the Green Turtle (Chelonia mydas)* National Marine Fisheries Service, Silver Spring, MD. 84pp.

National Marine Fisheries Service and U.S. Fish and Wildlife Service. 1998b. *Recovery Plan for U.S. Pacific Populations of the Hawksbill Turtle (Eretmochelys imbricata)*. National Marine Fisheries Service, Silver Spring, MD. 82pp.

Newbold, R. 2000. Unpublished data listing invertebrates seen during dive surveys at the U.S. Line and Phoenix Islands, March-April, 2000.

Wass, R. and E. DeMartini. 2000. Unpublished data listing fishes seen during dive surveys at Kingman Reef, March-April, 2000.

# Appendix C.

## Glossary

## Appendix C. Glossary

**Alien:** a species not naturally occurring in an area; also called an "introduced", "nonnative", or "exotic" species.

**Approved Refuge Boundary.** A project boundary that the Regional Director and Director of the U.S. Fish and Wildlife Service approve upon completion of the planning and environmental compliance process. An approved Refuge boundary only designates those lands that the Fish and Wildlife Service (Service) has authority to acquire and/or manage through various agreements. Approval of a Refuge boundary does not grant the Fish and Wildlife Service jurisdiction or control over lands within the boundary, and does not by itself make the lands part of the National Wildlife Refuge System. Lands are not included in the National Wildlife Refuge System until they are purchased or are placed under an agreement that provides for management as part of the National Wildlife Refuge System.

**Biological Diversity or Biodiversity.** The variety of life, including the variety of living organisms, the genetic differences among them, and the communities in which they occur.

**CITES.** Acronym standing for the Convention on International Trade in Endangered Species of Wild Fauna and Flora. Species listed in Appendices I, II or III (and all parts and derivatives thereof, with limited exceptions) are regulated with respect to import, export and re-export. CITES is implemented statutorily in the United States by the Endangered Species Act of 1973, as amended.

**Compatible Use.** A use that, in the sound professional judgement of the Director of the U.S. Fish and Wildlife Service, will not materially interfere with or detract from the fulfillment of the mission of the National Wildlife Refuge System or the purposes of a National Wildlife Refuge.

**Comprehensive Conservation Plan (CCP).** A document that describes the desired future conditions of a refuge or planning unit and provides long-range guidance and management direction to achieve the purposes of the refuge; helps fulfill the mission of the Refuge System; maintains and, where appropriate, restores the ecological integrity of each refuge and the Refuge System; helps achieve the goals of the National Wilderness Preservation System; and meets other mandates.

**Conceptual Management Plan (CMP).** A document that presents a broad overview of the Service's proposed management approach to lands included within the National Wildlife Refuge System. Management actions are finalized only after additional planning and public input, generally in the form of a CCP.

**Ecosystem.** A biological community together with its environment, functioning as a unit. For the Service's administrative purposes, 53 ecosystems have been designated covering the United States and its possessions. These ecosystems generally correspond with watershed boundaries and their sizes and respective ecological complexity vary.

Appendix C. (Continued)

**Endangered Species.** A species that is officially recognized by Federal or State agencies to be in immediate danger of extinction throughout all or a significant portion of its range.

**Environmental Assessment (EA).** A concise public document prepared in compliance with the National Environmental Policy Act of 1973, that discusses the purpose and need for an action, considers alternatives to such action, and provides sufficient evidence and analysis of impacts to determine whether to prepare an environmental impact statement.

**Habitat.** The specific environmental setting (*e.g.*, soil, water, shelter, food, etc.) required by the individuals of a population, variety, subspecies, or species to survive and reproduce.

**Marine Protected Area.** As defined in Executive Order Number 13158, entitled, Marine Protected Areas, and dated May 26, 2000, the term "Marine Protected Area" (MPA) refers to any area of the marine environment that has been reserved by Federal, State, territorial, tribal, or local laws or regulations to provide lasting protection for part or all of the natural and cultural resources therein. Submerged lands and waters within an approved Refuge boundary would fall within this classification. The Executive Order directs certain agencies to work to help protect the significant natural and cultural resources of the marine environment by working to expand and strengthen a network of marine protected areas, and among other activities, to work together to establish and protect the resources of MPAs.

**Migratory Bird.** An official designation by the U.S. Fish and Wildlife Service for birds that are covered by the Migratory Bird Conservation Act, the Migratory Bird Conservation Treaty, and included on official lists. Migratory birds are protected by certain laws in the United States and are a specific category of natural resources that is managed on National Wildlife Refuges.

**National Wildlife Refuge (Refuge).** A designated area of land, water, or an interest in land or water within the Refuge System. Does not include Coordination Areas.

**Native Species.** An organism that is indigenous or endemic to a particular area and whose presence in the area is not due to past or present human activities or actions.

**Natural Community.** Individuals of several native species that occur in the same habitat or region and interact directly or indirectly with one another.

**Refuge purposes.** The purposes specified in or derived from the law, proclamation, executive order, agreement, public land order, donation document, or administrative memorandum establishing, authorizing, or expanding a Refuge, Refuge Unit, or Refuge subunit.

**Species.** A group of organisms all of which have a high degree of physical and genetic similarity, generally interbreed only among themselves, and show persistent differences from members of allied groups of organisms.

Appendix C. (Continued)

**Threatened Species.** A species that is officially recognized by Federal or State agencies as likely to become endangered or extinct within the foreseeable future throughout all or a significant portion of its range.

**Wildlife-Dependent Visitor Recreational or Educational Use.** A use of a Refuge involving hunting, fishing, wildlife observation and photography, or environmental education and interpretation. These are the six priority public uses of the System as established in the National Wildlife Refuge System Administration Act, as amended. Wildlife-dependent recreational uses, other than the six priority public uses, are those that depend on the presence of wildlife. We also will consider these other uses in the preparation of Refuge CCPs, however, the six priority public uses always will take precedence.

# Appendix D.

# Executive Orders for

# Coral Reef Protection

# and

# Marine Protected Areas

Federal Register
Vol. 63, No. 115
Tuesday, June 16, 1998

# Presidential Documents

Title 3—

The President

Executive Order 13089 of June 11, 1998

## Coral Reef Protection

By the authority vested in me as President by the Constitution and the laws of the United States of America and in furtherance of the purposes of the Clean Water Act of 1977, as amended (33 U.S.C. 1251, *et seq.*), Coastal Zone Management Act (16 U.S.C. 1451, *et seq.*), Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. 1801, *et seq.*), National Environmental Policy Act of 1969, as amended (42 U.S.C. 4321, *et seq.*), National Marine Sanctuaries Act, (16 U.S.C. 1431, *et seq.*), National Park Service Organic Act (16 U.S.C. 1, *et seq.*), National Wildlife Refuge System Administration Act (16 U.S.C. 668dd-ee), and other pertinent statutes, to preserve and protect the biodiversity, health, heritage, and social and economic value of U.S. coral reef ecosystems and the marine environment, it is hereby ordered as follows:

Section 1. *Definitions*. (a) "U.S. coral reef ecosystems" means those species, habitats, and other natural resources associated with coral reefs in all maritime areas and zones subject to the jurisdiction or control of the United States (e.g., Federal, State, territorial, or commonwealth waters), including reef systems in the south Atlantic, Caribbean, Gulf of Mexico, and Pacific Ocean. (b) "U.S. Coral Reef Initiative" is an existing partnership between Federal agencies and State, territorial, commonwealth, and local governments, nongovernmental organizations, and commercial interests to design and implement additional management, education, monitoring, research, and restoration efforts to conserve coral reef ecosystems for the use and enjoyment of future generations. The existing U.S. Islands Coral Reef Initiative strategy covers approximately 95 percent of U.S. coral reef ecosystems and is a key element of the overall U.S. Coral Reef Initiative. (c) "International Coral Reef Initiative" is an existing partnership, founded by the United States in 1994, of governments, intergovernmental organizations, multilateral development banks, nongovernmental organizations, scientists, and the private sector whose purpose is to mobilize governments and other interested parties whose coordinated, vigorous, and effective actions are required to address the threats to the world's coral reefs.

Sec. 2. *Policy*. (a) All Federal agencies whose actions may affect U.S. coral reef ecosystems shall: (a) identify their actions that may affect U.S. coral reef ecosystems; (b) utilize their programs and authorities to protect and enhance the conditions of such ecosystems; and (c) to the extent permitted by law, ensure that any actions they authorize, fund, or carry out will not degrade the conditions of such ecosystems.

(b) Exceptions to this section may be allowed under terms prescribed by the heads of Federal agencies:

(1) during time of war or national emergency;

(2) when necessary for reasons of national security, as determined by the President;

(3) during emergencies posing an unacceptable threat to human health or safety or to the marine environment and admitting of no other feasible solution; or

(4) in any case that constitutes a danger to human life or a real threat to vessels, aircraft, platforms, or other man-made structures at sea, such as cases of *force majeure* caused by stress of weather or other act of God.

Sec. 3. *Federal Agency Responsibilities.* In furtherance of section 2 of this order, Federal agencies whose actions affect U.S. coral reef ecosystems, shall, subject to the availability of appropriations, provide for implementation of measures needed to research, monitor, manage, and restore affected ecosystems, including, but not limited to, measures reducing impacts from pollution, sedimentation, and fishing. To the extent not inconsistent with statutory responsibilities and procedures, these measures shall be developed in cooperation with the U.S. Coral Reef Task Force and fishery management councils and in consultation with affected States, territorial, commonwealth, tribal, and local government agencies, nongovernmental organizations, the scientific community, and commercial interests.

Sec. 4. *U.S. Coral Reef Task Force.* The Secretary of the Interior and the Secretary of Commerce, through the Administrator of the National Oceanic and Atmospheric Administration, shall co-chair a U.S. Coral Reef Task Force ("Task Force"), whose members shall include, but not be limited to, the Administrator of the Environmental Protection Agency, the Attorney General, the Secretary of the Interior, the Secretary of Agriculture, the Secretary of Commerce, the Secretary of Defense, the Secretary of State, the Secretary of Transportation, the Director of the National Science Foundation, the Administrator of the Agency for International Development, and the Administrator of the National Aeronautics and Space Administration. The Task Force shall oversee implementation of the policy and Federal agency responsibilities set forth in this order, and shall guide and support activities under the U.S. Coral Reef Initiative ("CRI"). All Federal agencies whose actions may affect U.S. coral reef ecosystems shall review their participation in the CRI and the strategies developed under it, including strategies and plans of State, territorial, commonwealth, and local governments, and, to the extent feasible, shall enhance Federal participation and support of such strategies and plans. The Task Force shall work in cooperation with State, territorial, commonwealth, and local government agencies, nongovernmental organizations, the scientific community, and commercial interests.

Sec. 5. *Duties of the U.S. Coral Reef Task Force.* (a) *Coral Reef Mapping and Monitoring.* The Task Force, in cooperation with State, territory, commonwealth, and local government partners, shall coordinate a comprehensive program to map and monitor U.S. coral reefs. Such programs shall include, but not be limited to, territories and commonwealths, special marine protected areas such as National Marine Sanctuaries, National Estuarine Research Reserves, National Parks, National Wildlife Refuges, and other entities having significant coral reef resources. To the extent feasible, remote sensing capabilities shall be developed and applied to this program and local communities should be engaged in the design and conduct of programs.

(b) *Research.* The Task Force shall develop and implement, with the scientific community, research aimed at identifying the major causes and consequences of degradation of coral reef ecosystems. This research shall include fundamental scientific research to provide a sound framework for the restoration and conservation of coral reef ecosystems worldwide. To the extent feasible, existing and planned environmental monitoring and mapping programs should be linked with scientific research activities. This Executive order shall not interfere with the normal conduct of scientific studies on coral reef ecosystems.

(c) *Conservation, Mitigation, and Restoration.* The Task Force, in cooperation with State, territorial, commonwealth, and local government agencies, nongovernmental organizations, the scientific community and commercial interests, shall develop, recommend, and seek or secure implementation of measures necessary to reduce and mitigate coral reef ecosystem degradation and to restore damaged coral reefs. These measures shall include solutions to problems such as land-based sources of water pollution, sedimentation, detrimental alteration of salinity or temperature, over-fishing, over-use, collection of coral reef species, and direct destruction caused by activities such as recreational and commercial vessel traffic and treasure salvage. In developing these measures, the Task Force shall review existing legislation

to determine whether additional legislation is necessary to complement the policy objectives of this order and shall recommend such legislation if appropriate. The Task Force shall further evaluate existing navigational aids, including charts, maps, day markers, and beacons to determine if the designation of the location of specific coral reefs should be enhanced through the use, revision, or improvement of such aids.

(c) *International Cooperation.* The Secretary of State and the Administrator of the Agency for International Development, in cooperation with other members of the Coral Reef Task Force and drawing upon their expertise, shall assess the U.S. role in international trade and protection of coral reef species and implement appropriate strategies and actions to promote conservation and sustainable use of coral reef resources worldwide. Such actions shall include expanded collaboration with other International Coral Reef Initiative ("ICRI") partners, especially governments, to implement the ICRI through its Framework for Action and the Global Coral Reef Monitoring Network at regional, national, and local levels.

Sec. 6. This order does not create any right or benefit, substantive or procedural, enforceable in law or equity by a party against the United States, its agencies, its officers, or any person.

William J. Clinton

THE WHITE HOUSE,
*June 11, 1998.*

[FR Doc. 98-16161
Filed 6-15-98; 8:45 am]
Billing code 3195-01-P

Federal Register / Vol. 65, No. 105 / Wednesday, May 31, 2000 / Presidential Documents 34909

# Presidential Documents

Executive Order 13158 of May 26, 2000

## Marine Protected Areas

By the authority vested in me as President by the Constitution and the laws of the United States of America and in furtherance of the purposes of the National Marine Sanctuaries Act (16 U.S.C. 1431 *et seq.*), National Wildlife Refuge System Administration Act of 1966 (16 U.S.C. 668dd-ee), National Park Service Organic Act (16 U.S.C. 1 *et seq.*), National Historic Preservation Act (16 U.S.C. 470 *et seq.*), Wilderness Act (16 U.S.C. 1131 *et seq.*), Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. 1801 *et seq.*), Coastal Zone Management Act (16 U.S.C. 1451 *et seq.*), Endangered Species Act of 1973 (16 U.S.C. 1531 *et seq.*), Marine Mammal Protection Act (16 U.S.C. 1362 *et seq.*), Clean Water Act of 1977 (33 U.S.C. 1251 *et seq.*), National Environmental Policy Act, as amended (42 U.S.C. 4321 *et seq.*), Outer Continental Shelf Lands Act (42 U.S.C. 1331 *et seq.*), and other pertinent statutes, it is ordered as follows:

Section 1. *Purpose*. This Executive Order will help protect the significant natural and cultural resources within the marine environment for the benefit of present and future generations by strengthening and expanding the Nation's system of marine protected areas (MPAs). An expanded and strengthened comprehensive system of marine protected areas throughout the marine environment would enhance the conservation of our Nation's natural and cultural marine heritage and the ecologically and economically sustainable use of the marine environment for future generations. To this end, the purpose of this order is to, consistent with domestic and international law: (a) strengthen the management, protection, and conservation of existing marine protected areas and establish new or expanded MPAs; (b) develop a scientifically based, comprehensive national system of MPAs representing diverse U.S. marine ecosystems, and the Nation's natural and cultural resources; and (c) avoid causing harm to MPAs through federally conducted, approved, or funded activities.

Sec. 2. *Definitions*. For the purposes of this order: (a) "Marine protected area" means any area of the marine environment that has been reserved by Federal, State, territorial, tribal, or local laws or regulations to provide lasting protection for part or all of the natural and cultural resources therein.

(b) "Marine environment" means those areas of coastal and ocean waters, the Great Lakes and their connecting waters, and submerged lands thereunder, over which the United States exercises jurisdiction, consistent with international law.

(c) The term "United States" includes the several States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands of the United States, American Samoa, Guam, and the Commonwealth of the Northern Mariana Islands.

Sec. 3. *MPA Establishment, Protection, and Management*. Each Federal agency whose authorities provide for the establishment or management of MPAs shall take appropriate actions to enhance or expand protection of existing MPAs and establish or recommend, as appropriate, new MPAs. Agencies implementing this section shall consult with the agencies identified in subsection 4(a) of this order, consistent with existing requirements.

Sec. 4. *National System of MPAs*. (a) To the extent permitted by law and subject to the availability of appropriations, the Department of Commerce and the Department of the Interior, in consultation with the Department

of Defense, the Department of State, the United States Agency for International Development, the Department of Transportation, the Environmental Protection Agency, the National Science Foundation, and other pertinent Federal agencies shall develop a national system of MPAs. They shall coordinate and share information, tools, and strategies, and provide guidance to enable and encourage the use of the following in the exercise of each agency's respective authorities to further enhance and expand protection of existing MPAs and to establish or recommend new MPAs, as appropriate:

(1) science-based identification and prioritization of natural and cultural resources for additional protection;

(2) integrated assessments of ecological linkages among MPAs, including ecological reserves in which consumptive uses of resources are prohibited, to provide synergistic benefits;

(3) a biological assessment of the minimum area where consumptive uses would be prohibited that is necessary to preserve representative habitats in different geographic areas of the marine environment;

(4) an assessment of threats and gaps in levels of protection currently afforded to natural and cultural resources, as appropriate;

(5) practical, science-based criteria and protocols for monitoring and evaluating the effectiveness of MPAs;

(6) identification of emerging threats and user conflicts affecting MPAs and appropriate, practical, and equitable management solutions, including effective enforcement strategies, to eliminate or reduce such threats and conflicts;

(7) assessment of the economic effects of the preferred management solutions; and

(8) identification of opportunities to improve linkages with, and technical assistance to, international marine protected area programs.

(b) In carrying out the requirements of section 4 of this order, the Department of Commerce and the Department of the Interior shall consult with those States that contain portions of the marine environment, the Commonwealth of Puerto Rico, the Virgin Islands of the United States, American Samoa, Guam, and the Commonwealth of the Northern Mariana Islands, tribes, Regional Fishery Management Councils, and other entities, as appropriate, to promote coordination of Federal, State, territorial, and tribal actions to establish and manage MPAs.

(c) In carrying out the requirements of this section, the Department of Commerce and the Department of the Interior shall seek the expert advice and recommendations of non-Federal scientists, resource managers, and other interested persons and organizations through a Marine Protected Area Federal Advisory Committee. The Committee shall be established by the Department of Commerce.

(d) The Secretary of Commerce and the Secretary of the Interior shall establish and jointly manage a website for information on MPAs and Federal agency reports required by this order. They shall also publish and maintain a list of MPAs that meet the definition of MPA for the purposes of this order.

(e) The Department of Commerce's National Oceanic and Atmospheric Administration shall establish a Marine Protected Area Center to carry out, in cooperation with the Department of the Interior, the requirements of subsection 4(a) of this order, coordinate the website established pursuant to subsection 4(d) of this order, and partner with governmental and nongovernmental entities to conduct necessary research, analysis, and exploration. The goal of the MPA Center shall be, in cooperation with the Department of the Interior, to develop a framework for a national system of MPAs, and to provide Federal, State, territorial, tribal, and local governments with the information, technologies, and strategies to support the system. This

national system framework and the work of the MPA Center is intended to support, not interfere with, agencies' independent exercise of their own existing authorities.

(f) To better protect beaches, coasts, and the marine environment from pollution, the Environmental Protection Agency (EPA), relying upon existing Clean Water Act authorities, shall expeditiously propose new science-based regulations, as necessary, to ensure appropriate levels of protection for the marine environment. Such regulations may include the identification of areas that warrant additional pollution protections and the enhancement of marine water quality standards. The EPA shall consult with the Federal agencies identified in subsection 4(a) of this order, States, territories, tribes, and the public in the development of such new regulations.

**Sec. 5.** *Agency Responsibilities.* Each Federal agency whose actions affect the natural or cultural resources that are protected by an MPA shall identify such actions. To the extent permitted by law and to the maximum extent practicable, each Federal agency, in taking such actions, shall avoid harm to the natural and cultural resources that are protected by an MPA. In implementing this section, each Federal agency shall refer to the MPAs identified under subsection 4(d) of this order.

**Sec. 6.** *Accountability.* Each Federal agency that is required to take actions under this order shall prepare and make public annually a concise description of actions taken by it in the previous year to implement the order, including a description of written comments by any person or organization stating that the agency has not complied with this order and a response to such comments by the agency.

**Sec. 7.** *International Law.* Federal agencies taking actions pursuant to this Executive Order must act in accordance with international law and with Presidential Proclamation 5928 of December 27, 1988, on the Territorial Sea of the United States of America, Presidential Proclamation 5030 of March 10, 1983, on the Exclusive Economic Zone of the United States of America, and Presidential Proclamation 7219 of September 2, 1999, on the Contiguous Zone of the United States.

**Sec. 8.** *General.* (a) Nothing in this order shall be construed as altering existing authorities regarding the establishment of Federal MPAs in areas of the marine environment subject to the jurisdiction and control of States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands of the United States, American Samoa, Guam, the Commonwealth of the Northern Mariana Islands, and Indian tribes.

(b) This order does not diminish, affect, or abrogate Indian treaty rights or United States trust responsibilities to Indian tribes.

(c) This order does not create any right or benefit, substantive or procedural, enforceable in law or equity by a party against the United States, its agencies, its officers, or any person.



THE WHITE HOUSE,
*May 26, 2000.*

[FR Doc. 00–13830
Filed 5–30–00; 12:14 pm]
Billing code 3195–01–P

# Appendix E.

## Other Executive Orders

# Executive Order

## PLACING CERTAIN ISLANDS IN THE PACIFIC OCEAN UNDER THE CONTROL AND JURISDICTION OF THE SECRETARY OF THE NAVY

### WAKE ISLAND, KINGMAN REEF, AND JOHNSTON AND SAND ISLANDS

By virtue of and pursuant to the authority vested in me by the act of June 25, 1910, ch. 421, 36 Stat. 847, as amended by the act of August 24, 1912, ch. 369, 37 Stat. 497, and as President of the United States, it is ordered that Wake Island located in the Pacific Ocean approximately in latitude 19°17'28" N. and longitude 166°34'42" E. from Greenwich, Kingman Reef located in the Pacific Ocean approximately in latitude 6°24'37" N. and longitude 162°22' W. from Greenwich, and Johnston and Sand Islands located in the Pacific Ocean approximately in latitude 16°44'32" N. and longitude 169°30'59" W. from Greenwich, together with the reefs surrounding all the aforesaid islands, as indicated upon the diagram hereto attached and made a part of this order, be, and they are hereby, reserved, set aside, and placed under the control and jurisdiction of the Secretary of the Navy for administrative purposes, subject, however, to the use of the said Johnston and Sand Islands by the Department of Agriculture as a refuge and breeding ground for native birds as provided by Executive Order No. 4467 of June 29, 1926.

This order shall continue in full force and effect unless and until revoked by the President or by act of Congress.

FRANKLIN D ROOSEVELT

THE WHITE HOUSE,

*December 29, 1934.*

[No. 6935]


Nautical Miles
Toki Pt
Heel Pt
Lagoon
Peacock Pt


KINGMAN REEF
Nautical Miles
3 ft. high
162° 22'


Sand I
Johnston I
JOHNSTON ISLAND
AND
SAND ISLAND

# Executive Order 8682--Establishing naval defensive sea areas around and naval airspace reservations over the islands of Palmyra, Johnston, Midway, Wake, and Kingman Reef

**Source:** The provisions of Executive Order 8682 of Feb. 14, 1941, appear at 6 FR 1015, 3 CFR, 1938-1943 Comp., p. 894, unless otherwise noted.

## Pacific Ocean

By virtue of the authority vested in me by the provisions of section 44 of the Criminal Code, as amended (U.S.C., title 18, sec. 96), and section 4 of the Air Commerce Act approved May 20, 1926 (44 Stat. 570, U.S.C., title 49, sec. 174), the territorial waters between the extreme high-water marks and the three-mile marine boundaries surrounding the islands of Palmyra, Johnston, Midway, Wake, and Kingman Reef, in the Pacific Ocean, are hereby established and reserved as naval defensive sea areas for purposes of national defense, such as areas to be known, respectively, as "Palmyra Island Naval Defensive Sea Area", "Johnston Island Naval Defensive Sea Area", "Midway Island Naval Defensive Sea Area", "Wake Island Naval Defensive Sea Area", and "Kingman Reef Naval Defensive Sea Area" and the airspaces over the said territorial waters and islands are hereby set apart and reserved as naval airspace reservations for purposes of national defense, such reservations to be known, respective, as "Palmyra Island Naval Airspace Reservation", "Johnston Island Naval Airspace Reservation", "Midway Island Naval Airspace Reservation", "Wake Island Naval Airspace Reservation", and "Kingman Reef Naval Airspace Reservation".

At no time shall any person, other than persons on public vessels of the United States, enter any of the naval defensive sea areas herein set apart and reserved, nor shall any vessel or other craft, other than public vessels of the United States, be navigated into any of said areas, unless authorized by the Secretary of the Navy.

At no time shall any aircraft, other than public aircraft of the United States, be navigated into any of the naval airspace reservations herein set apart and reserved, unless authorized by the Secretary of the Navy.

The provisions of the preceding paragraphs shall be enforced by the Secretary of the Navy, with the cooperation of the local law enforcement officers of the United States and of the Territory of Hawaii; and the Secretary of the Navy is hereby authorized to prescribe such regulations as may be necessary to carry out such provisions.

Any person violating any of the provisions of this order relating to the above-named naval defensive sea areas shall be subject to the penalties provided by section 44 of the Criminal Code as amended (U.S.C., title 18, sec. 96), and any person violating any of the provisions of this order relating to the above-named naval airspace reservations shall be subject to the penalties prescribed by the Civil Aeronautics Act of 1938 (52 Stat. 973).

This order shall take effect ninety days after date hereof.

[EO 8682 amended by EO 8729 of Apr. 2, 1941, 6 FR 1791, 3 CFR, 1938-1941 Comp., p. 919]

---

**Editorial note:** Executive Order 9881 of Aug. 4, 1947, 12 FR 5325, 3 CFR, 1943-1948 Comp., p. 662, discontinued the Palmyra Island Naval Airspace Reservation and the Palmyra Island Naval Defensive Sea Area.

FR-158.0/504.0/507.0
518.0/519.0

EXECUTIVE ORDER

8729

CORRECTING EXECUTIVE ORDERS NOS. 8680, 8682, AND 8683 OF FEBRUARY 14, 1941, ESTABLISHING CERTAIN NAVAL DEFENSIVE SEA AREAS AND NAVAL AIRSPACE RESERVATIONS

The phrase "the territorial waters between the extreme high-water marks in the three-mile marine boundaries" occurring in the first paragraph of Executive Orders Nos. 8680, 8682, and 8683 of February 14, 1941, establishing certain naval defensive sea areas and naval airspace reservations, is hereby corrected to read "the territorial waters between the extreme high-water marks and the three-mile marine boundaries."

/s/ Franklin D. Roosevelt

THE WHITE HOUSE

April 2, 1941.

THE NATIONAL ARCHIVES
FILED AND MADE AVAILABLE
FOR PUBLIC INSPECTION
APR 4 9:42 AM '41
IN THE DIVISION OF THE
FEDERAL REGISTER

DOC. NO. 114

C
O
P
Y

Encl (9)

Proclamation 5928 of December 27, 1988

# Territorial Sea of the United States of America

54 F.R. 777

By the President of the United States of America

A Proclamation

International law recognizes that coastal nations may exercise sovereignty and jurisdiction over their territorial seas.

The territorial sea of the United States is a maritime zone extending beyond the land territory and internal waters of the United States over which the United States exercises sovereignty and jurisdiction, a sovereignty and jurisdiction that extend to the airspace over the territorial sea, as well as to its bed and subsoil.

Extension of the territorial sea by the United States to the limits permitted by international law will advance the national security and other significant interests of the United States.

NOW, THEREFORE, I, RONALD REAGAN, by the authority vested in me as President by the Constitution of the United States of America, and in accordance with international law, do hereby proclaim the extension of the territorial sea of the United States of America, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, the Commonwealth of the Northern Mariana Islands, and any other territory or possession over which the United States exercises sovereignty.

The territorial sea of the United States henceforth extends to 12 nautical miles from the baselines of the United States determined in accordance with international law.

In accordance with international law, as reflected in the applicable provisions of the 1982 United Nations Convention on the Law of the Sea, within the territorial sea of the United States, the ships of all countries enjoy the right of innocent passage and the ships and aircraft of all countries enjoy the right of transit passage through international straits.

Nothing in this Proclamation:

(a) extends or otherwise alters existing Federal or State law or any jurisdiction, rights, legal interests, or obligations derived therefrom; or

(b) impairs the determination, in accordance with international law, of any maritime boundary of the United States with a foreign jurisdiction.

IN WITNESS WHEREOF, I have hereunto set my hand this 27th day of December, in the year of our Lord nineteen hundred and eighty-eight, and of the Independence of the United States of America the two hundred and thirteenth.

Ronald Reagan

U.S. Department of the Interior
Fish and Wildlife Service
Pacific Region

December 2000