U.S. Fish & Wildlife Service

# News Release

*Pacific Islands Ecoregion*
*External Affairs Office*

300 Ala Moana Blvd., Room 3-122, Box 50088, Honolulu, Hawaii 96850
Phone: 808 541 2749 Fax: 808 541 2756

For Release: December 12, 2000 PIE-01-04
Contact: Barbara Maxfield — 808 541 2749 or 342 5600

## Public Comments Sought on Kingman Reef National Wildlife Refuge Proposal

The U.S. Fish and Wildlife Service is seeking public comments on its proposal to establish a National Wildlife Refuge at Kingman Reef, located about 900 miles south of Hawaii in the Line Islands. An environmental assessment and conceptual management plan outlining the proposal were released yesterday for public review.

Located in the central Pacific Ocean about 6 degrees north of the equator, Kingman Reef is one of the most pristine coral reef atoll ecosystems in the Pacific, according to Fish and Wildlife Service biologists. Crystal clear oceanic waters and vibrant coral reefs support a spectacular diversity of corals and other marine invertebrates, algae, fishes, marine mammals, sea turtles, and migratory seabirds.

Three coral rubble spits provide resting and foraging sites for migratory birds and possible basking areas for threatened green sea turtles. Submerged and partially exposed coral reefs surround a central lagoon that ranges from 50 to 250 feet deep.

Kingman Reef is an unincorporated United States territory currently administered by the U.S. Navy. For the past 59 years, its reefs and waters have been reserved as a Naval Defensive Sea Area. The Navy is considering relinquishing its administration and returning it to the U.S. Department of the Interior.

The environmental assessment evaluates two alternatives. Under Alternative A, the No-Action alternative, a Refuge would not be established at Kingman Reef and controls on access would continue. No active long-term conservation would be implemented. Under Alternative B, the Service's preferred alternative, a Refuge boundary would be approved that would include the lagoon, emergent lands, coral reefs, and other submerged lands and associated waters seaward to 12 nautical miles from the reefs that are exposed at low tide.

A conceptual management plan for the project calls for enhanced natural resource management programs including monitoring, habitat enhancement projects, recovery of endangered and threatened species, and other activities designed to conserve the habitats and fish and wildlife resources of the Refuge in perpetuity.

– more –

EXHIBIT 42

EXHIBIT "35"

*the U.S. Fish and Wildlife Service conserves, protects, and enhances fish, ts and their habitats for the continuing benefit of the American people.*

Public use is not proposed at this time, although limited requests for access could be considered on a case-by-case basis by the Refuge Manager. The Navy has not authorized fishing within its naval defensive seas, though a low level of commercial fishing for sharks and big-eye and yellow-fin tuna occurs within the 200-nautical mile Exclusive Economic Zone outside the Navy's jurisdiction.

The first recorded western contact at Kingman Reef was by an American seaman, Captain Fanning, in 1798. The reef was named after Captain Kingman, who visited in 1853. The United States annexed the reef in 1922 and in 1934 delegated jurisdiction to the Navy. Pan American Airways Flying Clippers bound from Honolulu to New Zealand landed in Kingman Reef's lagoon several times during a trial period for a trans-Pacific airline route in 1937 and 1938. The route was unsuccessful and was subsequently abandoned.

Copies of the environmental assessment are available from the U.S. Fish and Wildlife Service's Pacific Islands office at 300 Ala Moana Boulevard, Room 3-122, in Honolulu or by calling 541-2749. Comments must be received by January 11, 2001.

*– FWS –*

FILE COPY

LAW OFFICES
SHORT CRESSMAN & BURGESS PLLC

999 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98104-4088
FAX: (206) 340-8856
(206) 682-3333

Houlihan
—KRE

DAVID E. BRESKIN
KERRY S. BUCKLIN *
JOHN O. BURGESS
SAMUEL S. CHUNG
MICHELLE Y. CLARK
BRYAN P. COLUCCIO
BRIAN L. COMSTOCK
STEPHEN P. CONNOR
JEFFREY A. COOP ¤
CLAUDIA CRAWFORD
PAUL R. CRESSMAN, JR.
PAUL R. CRESSMAN, SR. P.S.
DEREK D. CRICK
MICHAEL J. CRISERA
PAUL J. DAYTON
WILLIAM L. DIXON V
RICHARD A. DU BEY ∞
BRADLEY A. EVENS
MICHAEL R. GARNER ◊
DAVID A. HERRMAN
ROBERT E. HIBBS †††
DANIEL F. JOHNSON
KAREN L. KENDRICK ††
JANE R. KOLER
DAVID R. KOOPMANS
MICHAEL J. LAYTON
ANDREW W. MARON ***
CONNIE SUE MANOS MARTIN
ROBIN G. McPHERSON
SCOTT M. MISSALL
MAUREEN L. MITCHELL
KENNETH L. MYER
JAMES A. OLIVER
CHRISTOPHER R. OSBORN
CHRISTOPHER L. OTTELE
ALEX J. ROSE
ANNE-MARIE E. SARGENT
SCOTT A. SMITH
CHRISTOPHER J. SOELLING

JOHN H. STRASBURGER ††
JOHN D. SULLIVAN
SUSAN THORBROGGER
BRADLEY P. THORESON
GRAEHM C. WALLACE
R. BRENT WALTON
LISA A. WOLFARD
ZACHARY A. WRIGHT

JOSEF E. DIAMOND
COUNSEL TO THE FIRM

PAUL E. BRAIN
CARINA Y. ENHADA ◊
CHARLES R. GOSSAGE *
DOUGLAS R. HARTWICH
ROBERT E. HEATON
JOHN J. HOULIHAN, JR. ‡
MARK S. NADLER
KENNETH P. SHORT
ROBERT A. STEWART
OF COUNSEL

* MEMBER OF PATENT BAR, USPTO
¤ ADMITTED IN MONTANA ONLY
‡ ALSO ADMITTED IN CALIFORNIA AND ILLINOIS
• ALSO ADMITTED IN CALIFORNIA
*** ALSO ADMITTED IN S. CAROLINA
†† ALSO ADMITTED IN TEXAS
††† ALSO ADMITTED IN MONTANA
◊ ALSO ADMITTED IN HAWAII
∞ ALSO ADMITTED IN MASSACHUSETTS

ROBERT J. SHAW (1942-2000)

December 19, 2000

**VIA FACSIMILE**
**& CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Carolyn Bohan
Regional Chief
National Wildlife Refuge System
911 N.E. 11th Avenue
Portland, OR 97232

Re: Notice for Public Comments Regarding Kingman Reef National Wildlife Refuge Proposal (December 11, 2000)

Dear Ms. Bohan:

On behalf of Kingman Reef Enterprises, LLC (KRE), we are responding to the U.S. Fish and Wildlife Services' (FWS) December 11, 2000 request for public comments on the proposed establishment of a national wildlife refuge at Kingman Reef. By his December 14, 2000 letter, Frank Sorba, managing member of KRE, previously notified the FWS of KRE's commercial fishing license with Kingman Reef Atoll Development, LLC. Mr. Sorba's

308861.1/6MB1-I011/014189.00001

EXHIBIT
"36"

December 14, 2000 correspondence provides the FWS with record notice of KRE's business interests and proprietary rights associated with commercial fishing in and around Kingman Reef. Establishment of a national wildlife refuge would result in a direct and regulatory taking of KRE's property and business opportunity in violation of law.

For example, the December 11, 2000 notice for comments indicates that the proposed refuge will extend 12 miles from the low water mark at Kingman Reef. The practical impact of this 12 mile boundary extending in every direction from the outer boundary of Kingman Reef includes hundreds of miles of ocean area in which KRE holds inchoate contractual fishing rights. Establishment of the refuge would also eliminate KRE's contractual rights to establish a base camp operation at the atoll. These issues of constitutional dimension are central to any such proposed action by the FWS and may not simply be swept aside.

In addition to the potential taking of private property, the establishment of a national wildlife refuge in and around Kingman Reef poses a significant public issue which requires appropriate consideration by interested parties and the public at large. The December 11th request for public comment on the environmental assessment and conceptual management plan does not provide adequate due process notice to the interested parties or the public. The 30 day public comment period in the midst of the holiday season prohibits adequate time for review and substantive comment on the proposed wildlife refuge and calls into question whether this was simply facial compliance without substantive intent to give interested parties a chance to participate in the decision making process.

Accordingly, at a minimum, we respectfully request that FWS extend the public comment period an additional 60 days through and including March 12, 2001. Absent this extension of time, neither the public nor interested parties will likely have an opportunity to review and comment on the proposed refuge and obtain the supporting documents. Any further action without this minimum extension of time flies in the face of reason, would violate applicable due process and subject the FWS to administrative and judicial challenges.

In addition to this request for extension of the public comment period, was hereby request a copy of the Environmental Impact Statement supporting establishment of the refuge as well the table of contents for the administrative record. Please treat this request as a formal request for documents under the Freedom of Information Act.

We look forward to your prompt response to this request. Please include this request and notice of potential regulatory taking in the official administrative record. If you have any questions or comments, please do not hesitate to call me at 1-206-389-8255.

Very truly yours,

SHORT CRESSMAN & BURGESS PLLC

John J. Houlihan, Jr.

JJH:jmb
cc: Daniel Ashe (via facsimile)
Jerry Leinecke (via facsimile)
Frank Sorba (via facsimile)
Peter Savio (via facsimile)
Richard Du Bey

FILE COPY

LAW OFFICES
SHORT CRESSMAN & BURGESS PLLC
999 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98104-4088
FAX: (206) 340-8856
(206) 682-3333

Houlihan
PPS

DAVID E. BRESKIN
KERRY S. BUCKLIN *
JOHN Q. BURGESS
SAMUEL S. CHUNG
MICHELLE Y. CLARK
BRYAN P. COLUCCIO
BRIAN L. COMSTOCK
STEPHEN P. CONNOR
JEFFREY A. COOP *
CLAUDIA CRAWFORD
PAUL R. CRESSMAN, JR.
PAUL R. CRESSMAN, SR., P.S.
DEREK D. CRICK
MICHAEL J. CRISERA
PAUL J. DAYTON
WILLIAM L. DIXON V
RICHARD A. DU BEY oo
BRADLEY A. EVENS
MICHAEL R. GARNER o
DAVID A. HERRMAN
ROBERT E. HIBBS †††
DANIEL F. JOHNSON
KAREN L. KENDRICK ††
JANE R. KOLER
DAVID R. KOOPMANS
MICHAEL J. LAYTON
ANDREW W. MARON ***
CONNIE SUE MANOS MARTIN
ROBIN C. McPHERSON
SCOTT M. MISSALL
MAUREEN L. MITCHELL
KENNETH L. MYER
JAMES A. OLIVER
CHRISTOPHER R. OSBORN
CHRISTOPHER L. OTTELE
ALEX J. ROSE
ANNE-MARIE E. SARGENT
SCOTT A. SMITH
CHRISTOPHER J. SOELLING

JOHN H. STRASBURGER ††
JOHN D. SULLIVAN
SUSAN THORBROGGER
BRADLEY P. THORESON
GRAEHM C. WALLACE
R. BRENT WALTON
LISA A. WOLPARD
ZACHARY A. WRIGHT

JOSEF E. DIAMOND
COUNSEL TO THE FIRM

PAUL E. BRAIN
CARINA Y. ENHADA o
CHARLES R. COSSAGE *
DOUGLAS R. HARTWICH
ROBERT E. HEATON
JOHN J. HOULIHAN, JR. ‡
MARK S. NADLER
KENNETH P. SHORT
ROBERT A. STEWART
OF COUNSEL

* MEMBER OF PATENT BAR USPTO
☆ ADMITTED IN MONTANA ONLY
‡ ALSO ADMITTED IN CALIFORNIA AND ILLINOIS
* ALSO ADMITTED IN CALIFORNIA
*** ALSO ADMITTED IN S. CAROLINA
†† ALSO ADMITTED IN TEXAS
††† ALSO ADMITTED IN MONTANA
o ALSO ADMITTED IN HAWAII
oo ALSO ADMITTED IN MASSACHUSETTS

ROBERT J. SHAW (1942-2000)

December 19, 2000

**VIA FACSIMILE &
REGISTERED MAIL, RETURN
RECEIPT REQUESTED**

Carolyn Bohan
Regional Chief
National Wildlife Refuge System
911 N.E. 11th Avenue
Portland, OR 97232

Re: Notice for Public Comments Regarding Kingman Reef National Wildlife Refuge Proposal (December 11, 2000)

Dear Ms. Bohan:

We represent Palmyra Pacific Seafoods, LLC (PPS) and on behalf of PPS, we are responding to the U.S. Fish and Wildlife Service (FWS) December 11, 2000 notice and request for public comments on the proposed establishment of a national wildlife refuge at Kingman Reef. For the reasons set forth below, PPS respectfully requests that the FWS extend the public comment period by sixty (60) days.

Carolyn Bohan
December 19, 2000
Page 2

The proposed FWS action may adversely impact the economic interests of PPS. PPS has established and is currently operating a commercial fishing operation with facilities located on the Palmyra Atoll pursuant to a license agreement with Palmyra Development Company, LLC. PPS' existing fishing areas and business interests include the resources in the vicinity of Kingman Reef. This letter provides record notice to the FWS of PPS' business interests and property rights associated with commercial fishing in and around Kingman Reef. As currently proposed, the establishment of a national wildlife refuge would result in a direct and regulatory taking of PPS' property and economic interests in violation of law.

PPS has made a significant investment in obtaining, developing and operating its commercial fishing operation from the Palmyra Atoll and within the ocean waters around Kingman Reef. It is PPS' understanding that both Palmyra and Kingman are privately owned by the Fullard-Leo family of Hawaii. PPS is operating under rights granted to it by the Fullard-Leo family.

FWS' December 12, 2000 news release concerning the proposed Kingman Reef refuge specifically acknowledges and mentions the commercial fishing activities in the exclusive economic zone around Kingman Reef. PPS's contractual rights with the Fullard-Leo family secure its ability to access these waters. The proposed refuge will cause significant damage to PPS' current private property rights and future business opportunity by potentially excluding PPS from conducting its fishing operations within hundreds of miles of ocean area currently accessed by its operations.

Further, such a direct or regulatory taking would have occurred without due process of law. As proposed, the FWS notice is based upon documents that need to be properly evaluated and that simply takes time. On its face, the proposed FWS rush to judgment raises significant questions about the timing of the action.

In addition to the potential taking of private property, the establishment of a national wildlife refuge in and around Kingman Reef poses a significant public issue which requires appropriate consideration by all interested parties and the public at large. The December 11th request for public comment on the environmental assessment and conceptual management plan does not provide adequate due process notice to the interested parties or the public. For

example, we have not yet had the opportunity to review these documents and by this letter are requesting copies from FWS. Moreover, the 30 day public comment period in the midst of the holiday season raises additional questions about the intent of the FWS and the current "lame duck" administration to intentionally shorten time and prohibit adequate review and substantive comment on the proposed wildlife refuge.

Accordingly, as noted above, we respectfully request that the FWS extend the public comment period 60 days through and including March 12, 2001. Absent this extension of time for the public and interested parties to review and comment on the proposed refuge, we believe that any further action by the FWS will on its face violate due process protections and subject FWS to administrative and judicial challenges.

We look forward to your prompt response to this request. Please include this letter in the official administrative record. If you have any questions or comments, please do not hesitate to call me.

Very truly yours,

SHORT CRESSMAN & BURGESS PLLC

John J. Houlihan, Jr.

JJH:jmb
cc: Daniel Ashe (via facsimile)
Jerry Leinecke (via facsimile)
Frank Sorba (via facsimile)
Peter Savio (via facsimile)
Richard Du Bey

Simonds K

Western
Pacific
Regional
Fishery
Management
Council

FILE COPY

Kingman Comments

JAN 2001
RECEIVED
Fish & Wildlife
Enhancement
Honolulu, HI

Simond

29 December 2000

Phyllis Ha
Pacific Islands Refuge Office
US Fish & Wildlife Service
Box 50088
Honolulu
HI 96850

Dear Ms Ha:

The Council has recently received the Environmental Assessment proposing a wildlife refuge at Kingman Reef. The Council requests that the comment period be extended from one month to two months with a cut-off date of February 11th 2000.

We are very concerned that insufficient time has been allotted for public comment. This release of this document over the Christmas period is ill-timed to bring the document to the attention of concerned individuals. This is particularly true for the fishermen in Hawaii who are especially busy during the festive season and many of whom may who also may be at sea during the comment period.

We also understand that ownership of the island may be vigorously contested in court, and in connection with this there are other legal issues concerning rights to commercial fishing around the island. Further, there is no urgency about the need to protect Kingman and its environs, based on the recent NMFS/USFWS survey of the marine and terrestrial ecosystems earlier this year, which were found to be in "pristine condition". We look forward to hearing from you. Mahalo!

Sincerely,

Kitty M. Simonds

Kitty M. Simonds
Executive Director

O-copy
O-log

C.P.
Porter, KI

BROOKS TOM PORTER & QUITIQUIT

ATTORNEYS AT LAW
2125 DAVIES PACIFIC CENTER
841 BISHOP STREET,
HONOLULU, HAWAII 96813
E-MAIL: cporter@btpqlaw.com

TELEPHONE:
(808) 526-3011

FAX: (808) 523-1171
(808) 526-0121

JAN 2001
RECEIVED
Fish & Wildlife
Enforcement
Honolulu, HI

January 4, 2001

REGULAR MAIL AND CERTIFIED MAIL

Carolyn Bohan
Regional Chief
National Wildlife Refuge System
911 N.E. 11th Avenue
Portland, OR 97232

VIA FACSIMILE 541-2756
REGULAR MAIL AND CERTIFIED MAIL

Phyllis Ha
Senior Staff Ecologist
Pacific Islands Refuge
Planning Office
U.S. Fish & Wildlife Service
Box 50088
Honolulu, HI 96850

**Re: Notice for Public Comments regarding Kingman Reef National Wildlife Refuge Proposal (December 11, 2000)**

Dear Ms. Bohan and Ms. Ha:

As a follow-up to our December 22, 2000 letter regarding the Fullard-Leo family/Kingman Reef Atoll Investments, LLC's ("Kingman Investments") undisputed ownership of Kingman Reef, and the U.S. Fish & Wildlife Services' ("FWS") December 11, 2000 Notice and request for public comments on the proposed establishment of a National Wildlife Refuge at Kingman Reef (the "Refuge"), we are distressed that FWS has ignored our December 22 letter. FWS must confront this ownership issue prior to moving any further with respect to the proposed Refuge, or accepting any more public comments regarding the same. The public should not be deceived by FWS' failure to mention that -- (a) the Fullard-Leo family/Kingman Investments holds legal title to Kingman Reef; (b) their consent has not been obtained by FWS; and (c) FWS' actions are impacting the Fullard-Leo family/Kingman Investments' economic/financial interest in the property.

FWS' non-responsiveness can only be viewed as a continuing effort to ignore the constitutional rights (i.e., attempted taking of private property) of the legal owner of Kingman Reef, and a bad faith attempt to push this matter through on an accelerated track prior to the new administration taking office. FWS' conduct will only result in administrative and judicial challenges.

Under the Freedom of Information Act, please provide our office with copies of the Environmental Assessment for the Proposed Kingman Reef Wildlife Refuge and the Conceptual Management Plan. In addition, please provide us with all documents contained in your "Honolulu Office files that [support your] analysis", and any other documents that allegedly support your analysis. Furthermore, we assume that our December 22, 2000 letter (another copy of which is enclosed herein) and this letter will be included in the administrative record for public comments on the proposed Refuge.

We would appreciate the courtesy of FWS' prompt response to the aforementioned.

Very truly yours,

Christian P. Porter

CPP:wr

Enclosure

cc: Kingman Reef Atoll Investments, LLC
Bruce Babbitt, Secretary of Interior
Honorable Daniel K. Inouye, U.S. Senator
Honorable Daniel K. Akaka, U.S. Senator
Honorable Neil Abercrombie, U.S. Congressman
Honorable Patsy T. Mink, U.S. Congresswoman

Porter.c.p.

B[illegible]KS TOM PORTER & QUITIQ[illegible]

ATTORNEYS AT LAW
2125 DAVIES PACIFIC CENTER
841 BISHOP STREET,
HONOLULU, HAWAII 96813
E-MAIL: cporter@btpqlaw.com

TELEPHONE:
(808) 526-3011

FAX: (808) 523-1171
(808) 526-0121

December 22, 2000

<u>REGULAR MAIL AND CERTIFIED MAIL</u>

Carolyn Bohan
Regional Chief
National Wildlife Refuge System
911 N.E. 11th Avenue
Portland, OR 97232

VIA FACSIMILE 541-2756
<u>REGULAR MAIL AND CERTIFIED MAIL</u>

Phyllis Ha
Senior Staff Ecologist
Pacific Islands Refuge
Planning Office
U.S. Fish & Wildlife Service
Box 50088
Honolulu, HI 96850

**Re: Notice for Public Comments regarding Kingman Reef National Wildlife Refuge Proposal <u>(December 11, 2000)</u>**

Dear Ms. Bohan and Ms. Ha:

This law firm represents the Fullard-Leo family, the undisputed owners of Kingman Reef. The Fullard-Leo family has recently established a company called Kingman Reef Atoll Investments, LLC ("Kingman Investments"), and title to Kingman Reef is now held by Kingman Investments. We are responding to the U.S. Fish & Wildlife Service's ("FWS") December 11, 2000 Notice and request for public comments on the proposed establishment of a National Wildlife Refuge at Kingman Reef. For the reasons set forth below, the Fullard-Leo family/Kingman Investments respectfully requests that FWS cease and desist with all current efforts to establish a National Wildlife Refuge (the "Refuge") at Kingman Reef since the legal owners of the property have not consented, nor have they been consulted by FWS or any other party, to the Refuge, or, <u>alternatively</u>, the Fullard-Leo Family/Kingman Investments respectfully requests that FWS extend the public

comment period by at least 60 days, i.e., through and including March 12, 2001.

Since 1922 the undisputed owners of Kingman Reef have been the Fullard-Leo family. Effective November 17, 2000, Kingman Reef was transferred to the Fullard-Leo family's wholly-owned company, Kingman Investments. No local or federal government agency, including any department or division, has ever disputed the Fullard-Leo family's ownership of Kingman Reef. As a matter of fact, the U.S. Dept. of Navy and the U.S. Dept. of Interior have administered Kingman Reef in a manner that is consistent with the ownership residing with the Fullard-Leo family. Furthermore, all conduct, communications and information that has been represented regarding Kingman Reef to date has consistently reflected the Fullard-Leo family as the owners of Kingman Reef.

The recent "News Release" and any other communications from FWS or any other government agency regarding the proposed establishment of a Refuge at Kingman Reef, without the express written consent of the Fullard-Leo family, and the failure by FWS to mention the Fullard-Leo family in any of the published documentation, can only lead the family to believe that FWS is acting in bad faith and without regard to the Fullard-Leo family's undisputed ownership of Kingman Reef. These actions, i.e., the misrepresentation of known facts regarding the ownership of Kingman Reef, adversely affects the Fullard-Leo family's economic/financial interest in the property.

As of this date, you have received correspondence from other interested parties that have rightfully relied on the Fullard-Leo family/Kingman Investments' legal title to the property. FWS is now on notice of this interference with the Fullard-Leo family's contractual relations with third-parties; that these public statements may have caused economic/financial hardship with these third-parties; and that this was done with full knowledge of the Fullard-Leo family having the undisputed title to this property.

On the basis of the above, the Fullard-Leo family/Kingman Investments hereby demands that FWS CEASE AND DESIST from proceeding with the establishment of the Refuge at Kingman Reef. If FWS desires to pursue this Refuge, FWS must submit a proposal to the Fullard-Leo family/Kingman Investments seeking consent to proceed in any manner that affects Kingman Reef including the establishment of a refuge. Of course, this suggestion does not in any way mean that the Fullard-Leo family/Kingman Investments

will consent to the establishment of the Refuge. However, we are simply pointing out the proper procedure to be followed by FWS or any other party.

Alternatively, the Fullard-Leo family/Kingman Investments hereby requests that the public comments be extended for a period of 60 days, through and including March 12, 2001.

Please be further advised that the Fullard-Leo family/Kingman Investments reserves all rights against FWS with respect to the actions taken to date. Furthermore, if the Fullard-Leo family/Kingman Investments does not receive a favorable response from FWS to the above that is in accordance with the family's demands, the Fullard-Leo family/Kingman Investments has instructed this law firm to pursue administrative and/or judicial action, including a temporary restraining order, with respect to the current actions affecting ownership of Kingman Reef.

Please respond by no later than **Friday, December 29, 2000** as to FWS's position with respect to the above, including whether FWS will cease and desist its current activity (including giving the public notice that FWS is currently ceasing and desisting all efforts with respect to the Refuge) or, alternatively, that FWS will extend the public comment to March 12, 2001, and the public is so informed of the same.

Please do not hesitate to contact me if you have any questions.

Very truly yours,

Christian P. Porter

CPP:wr
cc: Kingman Reef Atoll Investments, LLC

FILE COPY

rcd 1/3/00 Kingman comments

Fullard-Leo, N.A.
Indiv

December 23, 2000

Regular and Certified Mail

Ms. Phyllis Ha
Senior Staff Ecologist
Pacific Islands Refuge Planning Office
U. S. Fish & Wildlife Service
Box 50088
Honolulu, Hawaii 96850

Regular and Certified Mail

Ms. Carolyn Bohan.
Regional Chief
National Wildlife Refuge System
911 NE 11th Avenue
Portland, Oregon 97232

Subject: Response to Kingman Reef Proposed National Wildlife Proposal dated December 11, 2000

Dear Ms. Ha and Ms. Bohan,

I am in receipt of the Environmental Assessment on Kingman Reef dated December 11, 2000. Upon reviewing this document I find it lacking in its documentation with regard to the ownership of the atoll as well as the supporting documents found in the appendixes.

As you know, Kingman Reef is a privately owned atoll. It is owned by the Fullard-Leo family of Honolulu, Hawaii, and more specifically by brothers Leslie, Dudley and Ainsley Fullard-Leo heirs of Ellen and Leslie Fullard-Leo. Ellen and Leslie Fullard-Leo had the atoll annexed to the United States and the "Island of Palmyra Copra Company" by their agent Lorrin Thurston on May 10, 1922. (Please see the attached print out from the Department of Interiors web page, that shows that even they are aware of this history OR review the reference material sited in the Environmental Assessment prepared by your office.)

Ellen and Leslie Fullard-Leo paid off the debts of the "Island of Palmyra Copra Company" and in August 1922 were ceded the assets of the company including all rights to Kingman Reef and Palmyra Island in return for certain unsecured loans.

Also in August 1922, the Fullard-Leos purchased Palmyra island and paid taxes on both properties while they were under jurisdiction of the Territory of Hawaii and the City and County of Honolulu. When Hawaii obtained statehood Palmyra Island and Kingman Reef where left out of the new state's boundaries. President Kennedy's Executive Order No. 10967 placed Palmyra under the jurisdiction of the Department of the Interior on October 10, 1961.

D-copy
C-log

President Roosevelt's Executive Order No. 6935 placed Kingman Reef under the jurisdiction of the Secretary of the Navy on December 12, 1934. Although Kingman Reef remains under this jurisdiction, it has never been purchased from or taken by the power of eminent domain from the Fullard-Leo family.

I find it deplorable and dishonorable, that during Fish and Wildlife's Environmental Assessment Process, that the Fullard-Leo brothers have never been contacted with regard to the government's plans for their real property. This seems a repeat of the injustice that the Fullard-Leos suffered with regard to their previous ownership of Palmyra Island. It is a disgrace that once again they must initially find out via the newspaper that their property rights are to be violated. In 1938 the Navy and the Fullard-Leos structured a lease for a portion of Palmyra Island. In 1939 they found out via the newspaper that the Navy (who claimed that the Fullard-Leos did not have a valid title to Palmyra) was suing them. As is well known, several court cases were held eventually ending up with the U. S. Supreme Courts decision of May 12, 1947 in favor of the Fullard-Leos.

I hope that Fish and Wildlife's assertions and failure to discuss this matter with the Fullard-Leos with regard to this Environmental Assessment and proposed use have been merely oversights and not attempts at subverting the Fullard-Leo's ownership of the atoll through the bureaucratic process of changing the jurisdiction under which the atoll falls.

It is imperative and proper that Leslie, Dudley and Ainsley Fullard-Leo be both consulted in regard to any matter involving Kingman Reef and that they, as well as others, who hold an interest in the atoll, be compensated should any legislation diminish their rights of ownership.

I believe, that due to the holiday season and the mis-information found in the Environmental Assessment, that the time restraints placed by The Fish and Wildlife Service for a response is inadequate and should be extend for a minimum of an additional 60 days. To not do so would be patently unfair and unjust.

I request that this response be place in the official record. Any response you would like to make to the undersigned would be appreciated.

Sincerely,

Marcus A. Fullard-Leo
2009 SE 159th Place
Vancouver, WA 98683

cc: mafl
Encl:

http://www.doi.gov/oia/facts2000.html

# KINGMAN REEF

Click here to view a larger image of this map

---

**History**
Kingman Reef was named for Captain W. E. Kingman, who discovered it in the American ship Shooting Star, of Boston, on November 29, 1853. He said that it was near the spot assigned to"Danger rock" on some charts. Under the name of "Danger", it was among the islands listed asclaimed by Americans under the Guano Act of 1856.
The American flag was hoisted over Kingman Reef, May 10, 1922, by the late Lorrin A. Thurston, at the request of Leslie and Ellen Fullard-Leo. He took formal possession by readinga proclamation of annexation and leaving a record of the proceedings, a certificate of possession, the flag, and copies of the Honolulu Advertiser and Star-Bulletin of May 3, 1992, in a glass jar, deposited at the base of a cairn of coral slabs about four feet high.
A December 29, 1934, Executive Order of President Franklin D. Roosevelt placed Kingman Reef under the control and jurisdiction of the U.S. Navy, in immediate charge of the 14th Naval District and, on February 14, 1941, he issued another Executive Order making Kingman Reefa U.S. national defense area and prohibiting foreign planes and surface craft.
**Status**
Kingman Reef is a single triangular shaped reef currently under the jurisdiction of the Department of the Navy. For more information, contact the Department of the Navy, Office of Public Information, Washington, DC 20350. Telephone number is (703) 695-0965
**Location, Geography, Climate, and Population**
Kingman Reef lies 382 nautical miles north of the equator. It is about 33 miles northwest of Palmyra Island and 925 miles south by west of Honolulu.
It is a triangular, atoll-like reef and shoal about 9 1/2 miles east and west by 5 miles north andsouth, of which all but the eastern end is now submerged.
The area supports a rich marine fauna, including large numbers of fishes. There is no land flora.Various seabirds roost on exposed coral rubble.
**Transportation Facilities** - None

Guthertz, J.P.

Western
Pacific
Regional
Fishery
Management
Council

rcd TA
JAN 2001
RECEIVED
Fish & Wildlife
Enforcement
Honolulu, HI

January 11, 2001

Phyllis Ha
Senior Staff Ecologist
Pacific Islands Refuge Planning Office
U.S. Fish and Wildlife Service
Box 50088
Honolulu, Hawaii 96850

Dear Ms. Ha:

Thank you for the opportunity for the Western Pacific Regional Fishery Management Council (Council) to provide comments on the Environmental Assessment (EA) and Conceptual Management Plan for the Proposed Kingman Reef National Wildlife Refuge (NWR) which was received on December 12, 2000.

The Council has reviewed the U.S. Fish and Wildlife Service (Service) EA for the Proposed Kingman Reef National Wildlife Refuge (NWR) and would like to express our concerns regarding the establishment of the refuge boundary out to 12 nautical miles.

The purpose of the Environmental Assessment is to provide comprehensive disclosure of information necessary to evaluate the feasability of establishing the Kingman Reef NWR, and also to identify potential significant impacts of the alternatives considered relative to the physical-chemical, biological, cultural and socioeconomic components of the total environment. Under the preferred alternative of the Proposed Kingman Reef NWR, the Refuge would encompass the U.S. unincorporated territory of Kingman Reef and U.S. territorial waters surrounding the reef out to a distance of 12 nautical miles. As written, the EA does not adequately address specific issues that are imperative for full disclosure of the purpose, need and justification of establishment of the Kingman Reef NWR as required by the National Environmental Policy Act (NEPA). Specifically, the EA does not provide sufficient descriptions of the long-term comprehensive management actions proposed under the preferred alternative. Additionally, the Council is concerned that the EA does not include an accurate account of fishing activities conducted by recreational and federally permitted Hawaii longline fishing vessels currently operating within the proposed 12 nautical mile refuge boundary. As a result, the EA does not include an assessment of the social and economic impacts to fishermen currently operating within the proposed 12 nautical mile refuge boundary.

As detailed to you in correspondence dated December 29, 2000, the Council is also very concerned that insufficient time has been provided for public comment. The Council requests that the comment period be extended from one month to two months with a cut-off date of February 11, 2001 to allow adequate time for all interested parties to respond. The Council further recommends that public hearings be held in Honolulu and Kona to provide additional opportunities for the Service to receive accurate information regarding fishing activities currently occurring within the proposed 12 nautical mile refuge boundary.

The Council appreciates the opportunity to provide comments on the proposed Kingman Reef National Wildlife Refuge Environmental Assessment and looks forward to receiving response on these important issues.

The Council would like to work cooperatively with the USFWS to provide comprehensive management and continued coordination of interagency actions to ensure both protection and sustainable use of valuable marine resources.

Attached is the Council comments on the Proposed Kingman Reef National Wildlife Refuge Environmental Assessment and Conceptual Management Plan.

Sincerely,

Dr. Judith P. Guthertz
Chair

cc: NOAA- P. Dalton
SWR- R. Lent
SWR/GC- J. Feder
NMFS/PIAO- C. Karnella
Council Members
Congressional Delegation

**Proposed Kingman Reef NWR- Environmental Assessment**

Page 1-1: Need for the Proposed Action

The proposed Refuge is needed to ensure the long-term conservation and management of the outstanding natural resources of the atoll. Kingman Reef's remote location and reservation as a U.S. Naval Defensive Sea Area have protected the atoll from heavy exploitation pressures most Pacific atolls have experienced. The low-lying coral reef atoll is a navigational hazzard that is vulnerable to shipwrecks and oil spills. Other threats to the fragile marine ecosystem that could be managed by the Service, including marine debris, over-exploitation of marine resources and the effects of commercial fishing practices on seabirds and sea turtles.

*Response:* *The EA states that threats to Kingman Reef include shipwrecks, oil spills, over-exploitation of marine resources, marine debris and effects of commercial fishing on seabirds and turtles. The Council agrees that these are potential threats that could impact Kingman Reef, or any other marine ecosystem in the Western Pacific Region. However, in order to fully understand the need and purpose of protection provided via establishment of the Kingman Reef NWR, the EA should provide further detail as to the degree to which these threats are presently affecting Kingman Reef. For example, the EA should list the number of shipwrecks and oil spills that have occurred on Kingman Reef in the past century. The EA should also provide the volume of marine debris that was observed during the latest multi-agency study conducted by the NMFS and USFWS from March to April 2000 and how this debris has impacted marine resources in the area. If the marine resources of Kingman Reef are in pristine condition as evinced by the last multi-agency study, indicate the nature of the threat from over-exploitation of marine resources and indicate how commercial fishing has threatened seabirds and turtles around Kingman Reef. Please provide figures of the hooking rate of marine turtles and seabirds and estimated mortalities therefrom by diving, trolling, longline fishing, and handline fishing in the area.*

Page 1-1: Purpose of the Proposed Action

The purpose of the proposed action is to protect the lands, waters, coral reefs, and other fish and wildlife of the atoll at Kingman Reef in perpetuity, through active conservation and management programs.

*Response:* *Please describe in detail active conservation and management programs that are planned for Kingman Reef NWR and why are these programs are needed. Providing descriptions of these programs will aid in determining their potential effects to the existing pristine condition of the ecosystem. Specifically the EA should describe in detail, the proposed monitoring activities, the tangible net benefits that the Refuge will provide and a description of how these benefits will be measured.*

Page 1-2: Purpose of the Proposed Action

The establishment and management of the Kingman Reef National Wildlife Refuge would be consistent with recent Presidential Executive Order directing government agencies with natural resource management responsibilities to provide for the protection and management of coral reefs (Executive Order 13089 "Coral Reef Protection," dated June 11, 1998), and to designate and manage a network of marine protected areas (Executive Order 13158 "Marine Protected Areas," dated May 26, 2000).

*Response:* *Executive Orders 13089 "Coral Reef Protection and Executive Order 131158 "Marine Protected Areas" provide to agencies with natural resource management responsibilities, guidelines to aid in the conservation and management of coral reefs and other marine resources under their jurisdiction. However, neither of these orders provide the authority for any such agency to withdraw public lands to achieve these directives. As written, the National Wildlife Refuge and Administration Act of 1966 as amended by the National Wildlife Refuge Systems Improvement Act of 1997, does not contain a provision authorizing the President, nor the Secretary of the Interior to make any divestiture of public lands for establishment for a wildlife refuge. Moreover, the Federal Land Policy and Management Act (FLMPA) of 1976 repealed the implied authority of the President to make such withdrawals and reservations resulting from acquiescence of Congress (**U.S. v. Midwest Oil Co. 236 U.S. 459**) including lands located on the outer continental shelf and submerged lands under the jurisdiction of the United States. From this interpretation, the US Department of Justice released their legal opinion dated September 15, 2000 to John Leshy, Solicitor, Department of the Interior. The letter states that **"the FLMPA prohibits the President from relying on the implied Midwest Oil authority to withdraw lands, regardless of where those lands are located."** Does the Department of Interior rely on some other federal law authorizing establishment of a National Wildlife Refuge? If so, then inclusion of a section which describes the authority of the Department of the Interior to make such reservations would clarify any misinterpretations. The Council recommends that the Service include a separate section in the EA which describes how the proposed refuge designation will comply and be consistent with other applicable federal laws such as the Endangered Species Act, the Migratory Bird Treaty Act, the Federal Land Policy and Management Act and the Regulatory Flexibility Act.*

Page 1-3: Natural Resource Management in the northern Line Islands by other agencies

The National Marine Fisheries Service (NMFS) of the Department of Commerce and its advisory council, the Western Pacific Regional Fishery Management Council (WPRFMC), have marine resource management responsibilities in the 200 nautical mile Exclusive Economic Zones (EEZ) that surround United States Possessions.

*Response:* *The EA should also acknowledge the Council's authority for marine resource*

*management to the shoreline at Kingman Reef, and other unincorporated U.S. possessions, including those designated as National Wildlife Refuges. At present, the Council has management responsibility for the commercial harvest of Pelagic management unit species to the shoreline within the US EEZ surrounding Kingman Reef under the Pelagic Fisheries Fishery Management Plan.*

Page 1-4: Public Involvement

The Service is seeking public input on the proposed Refuge and Environmental Assessment. The public will have 30 days to review and comment on the documents.

*Response:* *The release of this document by the Service was ill-timed as it was only made available shortly before one of the nations busiest holiday season. Given the 30 day public comment period, the Service may not be able to receive adequate public input necessary for undertaking such an important endeavor. The Council requests that the public comment period be extended to February 11, 2001 and that public hearing be conducted so that the Service can receive thorough and complete information regarding Kingman Reef from all interested parties and stakeholders. In addition, public hearings should be held in Honolulu, the base port of the Hawaii longline fleet, and Kona, the major port of pelagic handline fishermen that currently fish the area of Kingman Reef.*

Page 2-2: Ownership

Kingman Reef is not part of any state. The atoll is a United States unincorporated territory without an organic act, which is currently subject to control by the U.S. Navy.

*Response:* *The statement presented above provides information regarding the administrative authority over Kingman Reef. However, it does not disclose the actual ownership of the property. Presently, the Fullard-Leo family claims ownership of the area along with Palmyra Atoll and has claimed possession of undisputed fee title since the turn of the century. The Service should thoroughly investigate this claim (i.e. fee title, Kingdom/Territory of Hawaii documents, adverse possession etc) and resolve the issue prior to any further action regarding the establishment of the Kingman Reef NWR. Should the Fullard-Leo family prove ownership of Kingman Reef, the Service should attempt to acquire the land and waters of Kingman Reef in a manner consistent with legislation, Congressional guidelines and other federal land acquisition policies.*

Page 2-2: Ownership

For the past 59 years, the reefs and waters of the territorial seas[2] (within 12 nautical miles of the extreme high tide mark) have been reserved as a Naval Defensive Sea Area for the purpose of national defense.

*The preferred alternative of this EA proposes to establish the Kingman Reef NWR*

*in the United States Territorial Sea (12 nautical miles). USFWS asserts that Executive Order 8682 of 1941, granted the U.S. Navy control over the territorial seas surrounding Kingman Reef through reservation and establishment of the Kingman Reef Naval Defensive Sea Area (NDSA). However, language included in Executive Order 8682* as amended by *Executive Order 8729, specifically delineate the boundary of the Kingman Reef NDSA as the* ***"territorial waters between the extreme high water marks and the three-mile marine boundaries surrounding the islands of..... Kingman Reef...."*** *(Appendix E).*

*The proposal also cites Reagan's proclamation which extended U.S. Territorial Seas as the basis for a 12 nautical mile refuge boundary. In 1988, Presidential Proclamation 5928 extended U.S. Territorial Seas from 3 to 12 nautical miles from the baseline of the United States (Kingman Reef). The intent of the proclamation was primarily for international purposes such as national security and the regulation of foreign fishing. Further provisions state that,* ***"Nothing in this Proclamation extends, or otherwise alters existing Federal or State law, or any jurisdiction, rights, legal interests, or obligations derived therefrom."*** *From this interpretation, the Kingman Reef NDSA is limited to three nautical miles from the extreme high water mark of Kingman Reef, and the establishment of the Refuge out to 12 nautical miles cannot be based on a claim of usurpation from the Navy, as its jurisdiction does not extend beyond three nautical miles. If the Service asserts that Presidential Proclamation 5928 extended jurisdiction of the Navy from 3 to 12 nautical miles, did the proclamation also extend jurisdiction of the Department of the Interior and Refuge boundaries around Howland, Baker, and Jarvis NWR out to 12 nautical miles in the same manner?*

Page 2-3: Current management of marine resources at Kingman Reef

Current fishing regulations in the region address provisions for longline and other pelagic fisheries. The NMFS is in the process of developing other fishery management plans for the Western Pacific that will include provisions for the management of commercial harvest of coral reef resources, precious corals, and an extension of bottomfish and lobster fishery management regulations to include the EEZ at Kingman Reef.

*Response:* *The EA should at a minimum, acknowledge and preferably adopt the measures proposed in the Council's Draft Coral Reef Ecosystem Fishery Management Plan (CRE FMP), as the Service has active representation and participated in formation of the CRE-FMP. Under the CRE FMP, all benthic substrates between 0-50 fathoms at Kingman Reef would be designated as a no-take Marine Protected Area. Under this designation, the commercial, recreational, subsistence or cultural take of any marine species within this area is prohibited. The CRE FMP would be consistent with the mission and purpose of the proposed Kingman Reef NWR to ensure the long tern conservation and management of the outstanding natural resources of the atoll.*

Page 2-3: Historic Resources

There is no evidence of permanent human settlement on Kingman Reef, and there are no sites that are listed or that are known to be eligible for listing on the National Register of Historic Sites.

*Response:* *Prior to annexation to the United States, Kingman Reef was claimed as part of the Kingdom of Hawaii. Upon Hawaii's annexation as a territory of the United States (Hawaii's Organic Act of 1900), Kingman Reef was specifically excluded from this affiliation and instead, became an unincorporated territory of the United States. Since this designation, has the Service thoroughly investigated the use of Kingman Reef by Native Hawaiians or other Pacific Islanders? If so, it is necessary to list the anthropological assessment/survey which determined that no such evidence exists.*

Page 3-1: Background

The U.S. Fish and Wildlife Service has been involved in protecting and managing remote Pacific islands and coral atolls since the Hawaiian Island National Wildlife Refuge was established in 1909.

*Response:* *Although there is no doubt that the Service has been involved in managing natural resources for several decades, the Hawaiian Island National Wildlife Refuge was not under the authority of the Department of the Interior (USFWS) until Reorganization Plan No. 2 of 1939. Further, between 1909 and 1939, the area now known as the Hawaiian Island National Wildlife Refuge was originally named the Hawaiian Islands Reservation under the authority of the Department of Agriculture. The name was subsequently changed to the Hawaiian Islands National Wildlife Refuge by Presidential Proclamation 2416 in 1940. A more accurate statement illustrating the Service's management of remote Pacific islands could include amending this oversight or to cite the Howland, Baker and Jarvis National Wildlife Refuges which has been administered by the Department of the Interior since 1936.*

Page 3-2: Alternatives Considered in Detail

Under Alternative B (shown in figure 3-1), the Service would establish the Kingman Reef National Wildlife Refuge (Refuge). The approved Refuge boundary would include the lagoon, emergent land, coral reefs, and other submerged lands and associated waters extending seaward 12 NM from the reefs exposed at mean low tide. Under Alternative B, the approved Refuge boundary would protect a total of 483,702 acres, approximately 3 acres of emergent land and 25,874 acres of coral reef habitat. The Service would expend public funds for annual Refuge operations and management. The Service would implement long-term comprehensive management actions to conserve the coral reef ecosystem of Kingman Reef, implement endangered and threatened species recovery programs, and actively manage migratory birds and

other native species.

Response: *While Alternative B provides justification for establishing a NWR at Kingman Reef to protect the coral reef ecosystem, no further justification is provided as to why the Service seeks to include submerged lands and associated waters extending seaward to 12 nautical miles. Assuming there is statutory authority to withdraw lands in the US Territorial Seas for a Refuge, the Service should analyze the alternative refuge sizes and their environmental effects. Such an analysis should include a detailed list all fish and wildlife resources including the life histories and habitat requirements of these resources associated with the areas designated to become part of the Kingman Reef NWR, thus providing justification of a 12 nautical mile Refuge boundary. The Council recommends that the Service incorporate the findings of the Kingman Reef rapid ecological assessment conducted by the National Marine Fisheries Service (NMFS) and the U.S. Fish and Wildlife Service from March to April 2000. The inclusion of those findings would provide:*

1) *A detailed biological inventory of taxa/species inhabiting waters within the proposed Kingman Reef NWR boundary.*

2) *Habitat composites found within the Refuge boundary. Habitat composites may be useful for identifying the types of organisms that may inhabit the waters surrounding Kingman Reef.*

3) *Evidence to support that anthropological threats are presently affecting Kingman Reef to a certain degree.*

Page 3-2: Alternatives Considered and Rejected

The Service initially considered establishing a Refuge only to within 3 nautical miles from the reefs exposed at low tide. This alternative was rejected because it did not protect all of the coral reef ecosystem, and excluded pelagic waters of the territorial seas that contain important fish and wildlife resources. The smaller Refuge boundary would have been too small to adequately prevent ships from accidental grounding on shallow reef.

Response: *In order to provide a comprehensive assessment of the possible alternatives of this proposal, this alternative should be further developed to provide an example of the median between No-Action and maximum protection (12 nautical miles). Although this alternative can ultimately remain "rejected' its inclusion would give the reviewer further insight as to why it was rejected, thus reinforcing the selection of the preferred alternative. Furthermore, in the event that the Refuge cannot be established out to 12 nautical miles, the maximum protection may be limited to three nautical miles. Therefore, further development of this alternative would preclude the Service from developing a new proposal with the rejected alternative (three mile boundary) becoming the preferred alternative.*

Page 3-2: Comparison of the Alternatives

The Refuge (Alternative B) would allow the Service to provide long-term conservation and management of coral reefs and other marine and terrestrial resources at Kingman Reef in perpetuity. This alternative would provide active habitat and fish and wildlife monitoring and enhancement programs, law enforcement, and public education.

*Response:* *Again, the EA should clarify vague language. What is meant by active habitat and fish and wildlife monitoring and enhancement programs and why are these needed. The current adverse impacts to the ecology of Kingman Reef are mainly generated by environmental factors, therefore any wildlife monitoring and enhancement programs need to be specifically outlined so as to assess the benefits they afford to that ecosystem. Further, what impacts will be incurred to the environment by implementation of these "active habitat and fish and wildlife monitoring and enhancement programs?" The Council recommends that the EA provide descriptions on the types of educational programs that the Service intends to conduct for Kingman Reef. As one of the six priority uses of a NWR, the Service needs to identify what educational programs are required for a reef system so remote from the public.*

Page 4-1: Effects of the alternatives on management of marine resources at Kingman Reef

Under the No-Action alternative, the NMFS and the Council would continue to have the authority for managing commercial fisheries in waters of the 200 NM Exclusive Economic Zone that are open to commercial fishing. However, at the present, there is no commercial fishing authorized by the Navy.

*Response:* *This section needs further clarification as to what area you are referring. The Navy has no authority to authorize or restrict commercial fishing activities within the 200 NM EEZ of Kingman Reef, except within the three mile territorial seas listed as Naval Defensive Seas Areas pursuant to Executive Order 8682. As for commercial fishing occurring within the proposed 12 nautical mile Refuge boundary, NMFS has documented nearly 200 longline sets made within 3-12 nautical miles between 1998 and 1999. Additionally, between 1998-2000, NMFS data indicate that the U.S. EEZ around Kingman and Palmyra has become increasingly important for the Hawaii pelagic longline fishery. There has also been occasional recreational and commercial bottomfishing, and troll and handline fishing for pelagic species conducted within the proposed 12 nautical mile boundary by residents from the State of Hawaii. The Council recommends that the EA be revised to include the level of fishing presently occurring within the proposed 12 nautical mile boundary. The revision should also include an assessment of the social and economic impact that this action will accrue to the fishermen presently operating within the proposed 12 nautical mile Refuge boundary.*

**Proposed Kingman Reef NWR-Conceptual Management Plan**

Page 8- Facilities

The only facilities that may be installed at Kingman Reef in the future are permanent mooring buoys to prevent boat anchors from damaging corals. Details of the mooring stations would be developed at a later date, but the concept is to install buoys that are tethered by chains and fastened to a bolt in the substrate. We envision using the type of buoy that has been used by the State of Hawaii at Molokini Islet in Hawaii.

*Response:* *It should be made clear as to why the Service may propose to install mooring buoys in the waters of Kingman Reef. Does the Service intend to increase visitation to Kingman Reef in the future? Do the active conservation and management programs proposed by the Service require mooring buoys similar to those at Molokini? Presently, the only vessels known to anchor near Kingman Reef are the Townsend Cromwell and few military ships. However, mooring buoys similar to those at Molokini are not designed to accommodate ships of those sizes.*

Page13- Other Refuge Issues (G. Public Use)

The National Wildlife Refuge Systems Administration Act of 1966, as amended, requires the Service to consider the potential for six priority public uses on all Refuges during the development of a Refuge Comprehensive Conservation Plan (CCP) or before, if priority exist at the time of Refuge establishment. The six wildlife-dependent priority public uses include recreational hunting, recreational fishing, wildlife observation and photography, environmental education, and interpretation. The current landowner does not permit public use at Kingman Reef, so none of these uses is being evaluated for compatibility at this time.

*Response:* *The Council recommends that the Service exercise its full authority to obtain available resources that is necessary in preparation of this document. At the present time, fishermen from the State of Hawaii have fished within the proposed 12 nautical mile boundary of the Kingman Reef NWR for recreational purposes. Therefore, consistent with Section 668dd (d)(2)(ii) of the National Wildlife Refuge Administration Act, prior to acquisition of Kingman Reef, the Secretary of the Interior should identify any existing compatible wildlife-dependent recreational uses permitted to continue on an interim basis pending completion of the comprehensive conservation plan for the refuge. Furthermore, prior to any further development of this plan, the Service must initiate dialogue with the Fullard-Leo family and also residents of the State of Hawaii who have conducted recreational fishing activities in the waters surrounding Kingman Reef in order to comply with existing federal policies and to prevent any further inaccuracies regarding pertinent issues detailed in this plan.*

LAW OFFICES

SHORT CRESSMAN & BURGESS PLLC

999 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98104-4088
FAX: (206) 340-8856
(206) 682-3333

DAVID E. BRESKIN
KERRY S. BUCKLIN ★
JOHN Q. BURGESS
SAMUEL S. CHUNG
MICHELLE Y. CLARK
BRYAN P. COLUCCIO
BRIAN L. COMSTOCK
STEPHEN P. CONNOR
JEFFREY A. COOP ††† 
PAUL R. CRESSMAN, JR.
PAUL R. CRESSMAN, SR., P.S.
DEREK D. CRICK
MICHAEL J. CRISERA
PAUL J. DAYTON
WILLIAM L. DIXON V
RICHARD A. DU BEY ◊◊
BRADLEY A. EVENS
MICHAEL R. GARNER ◊
DAVID A. HERRMAN
ROBERT E. HIBBS †††

DANIEL F. JOHNSON
KAREN L. KENDRICK ††
CLAUDIA KILBREATH
DAVID R. KOOPMANS
MICHAEL J. LAYTON
ANDREW W. MARON ↔
CONNIE SUE MANOS MARTIN
ROBIN G. McPHERSON
SCOTT M. MISSALL
MAUREEN L. MITCHELL
KENNETH L. MYER
JAMES A. OLIVER
CHRISTOPHER R. OSBORN
CHRISTOPHER L. OTTELE
ALEX J. ROSE
ANNE-MARIE E. SARGENT
SCOTT A. SMITH
CHRISTOPHER J. SOELLING
JOHN H. STRASBURGER ††

JOHN D. SULLIVAN
SUSAN THORBROGGER
BRADLEY P. THOREEN
JAMIE A. WALKER ↔
R. BRENT WALTON
LISA A. WOLFARD
ZACHARY A. WRIGHT

JOSEF E. DIAMOND
COUNSEL TO THE FIRM

PAUL E. BRAIN
CARINA Y. ENHADA ◊
CHARLES R. GOSSAGE *
DOUGLAS R. HARTWICH
ROBERT E. HEATON
JOHN J. HOULIHAN, JR. ‡
JANE R. KOLER
MARK S. NADLER

KENNETH P. SHORT
ROBERT A. STEWART
OF COUNSEL

★ MEMBER OF PATENT BAR USPTO
‡ ALSO ADMITTED IN CALIFORNIA AND ILLINOIS
* ALSO ADMITTED IN CALIFORNIA
↔ ADMITTED IN CALIFORNIA ONLY
*** ALSO ADMITTED IN S. CAROLINA
†† ALSO ADMITTED IN TEXAS
††† ALSO ADMITTED IN MONTANA
◊ ALSO ADMITTED IN HAWAII
◊◊ ALSO ADMITTED IN MASSACHUSETTS

ROBERT J. SHAW (1942-2000)

January 11, 2001

**VIA ELECTRONIC MAIL,**
**FACSIMILE & HAND DELIVERY**

Phyllis Ha
Senior Staff Ecologist
Pacific Islands Refuge Planning Office
U.S. Fish & Wildlife Service
Box 50088
Honolulu, Hawaii 96850

Re: **PROPOSED KINGMAN REEF NATIONAL WILDLIFE REFUGE: REQUEST FOR PUBLIC COMMENT**

Dear Ms. Ha:

In accordance with the United States Fish & Wildlife Service's ("FWS") December 11, 2000 request for public comments on the Environmental Assessment ("EA") and Conceptual Management Plan ("CMP") for the Proposed Kingman Reef National Wildlife Refuge ("NWR"), we are submitting these comments on behalf of the entities set forth in Section 2 below. Our specific comments are set forth in Section 3. below.

## 1. SUMMARY

In sum, as set out in detail below, the proposed designation of Kingman Reef as a NWR is an illegal act by FWS under the United States Constitution, the Federal Administrative Procedure Act ("APA"), the National Environmental Policy Act ("NEPA") and other applicable Federal statutes and regulations. If FWS takes final agency action to

designate Kingman Reef as a NWR based upon the EA and the current administrative record, we reserve the right assert all available remedies including administrative and by way of judicial review. The EA is fatally flawed and cannot support designation of Kingman Reef as a NWR.

Creation of the NWR will result in a direct taking and confiscation of private property in violation of the Fifth Amendment to the United States Constitution. In addition, the EA and administrative record are inadequate under NEPA and regulations promulgated by the Council on Environmental Quality ("CEQ") to implement NEPA. Any final agency action taken based upon the EA, current administrative record and any subsequently issued finding of no significant impact ("FONSI") will be arbitrary and capricious and in violation of Federal law.

The EA, allegedly supporting the creation of the NWR, contains numerous errors, inconsistencies, omissions and misrepresentations. The EA is fatally flawed and cannot form the foundation for any final agency action. In particular, the EA conceals from the public the fact that Kingman Reef is privately owned by Fullard-Leo Family and that the Fullard-Leo Family is the undisputed owner of Kingman Reef. The omission of this key fact, on its face, appears to be a bad faith effort by FWS to confiscate extremely valuable private property and push this proposed matter through on an accelerated track prior to the new Bush administration taking office.

The FWS must either address the Constitutional and statutory inadequacies of the proposed designation or abandon the proposed designation.

## 2.
## COMMENTORS

These comments are submitted by the undersigned on behalf of the following persons and entities.

### 2.1 The Fullard-Leo Family of Hawaii.

The Fullard-Leo Family ("Family") is the undisputed owner of Kingman Reef. The Family has owned Kingman Reef since 1922 when it was annexed to the United States by

Leslie and Ellen Fullard-Leo. The Family is comprised of Messrs. Leslie Vincent Fullard-Leo, Dudley Leinani Fullard-Leo and Ainsely Kahealani Fullard-Leo and their respective families.

## 2.2 Kingman Reef Atoll Investments, L.L.C.

Kingman Reef Atoll Investments, LLC ("KRAI") was established by the Family to develop the economic potential of Kingman Reef. KRAI currently holds title to Kingman Reef. On November 17, 2000, the Family deeded Kingman Reef to KRAI. The deed was duly filed and recorded in the United States District Court for the District of Hawaii on November 17, 2000.

## 2.3 Kingman Reef Atoll Development, L.L.C.

Kingman Reef Atoll Development, LLC ("KRD") owns a leasehold property interest in Kingman Reef pursuant to a master lease and development agreement with KRAI. KRD has also entered into a property license agreement with Kingman Reef Enterprises, LLC granting access to Kingman Reef for certain commercial fishing operations.

## 2.4 Kingman Reef Enterprises, L.L.C.

Kingman Reef Enterprises, LLC (KRE) holds a license property right to access and develop Kingman Reef as a base camp for commercial long-line fishing in the Exclusive Economic Zone around Kingman Reef. KRE entered into its license agreement with KRD based upon KRD's master lease and development agreement with KRAI.

## 2.5 Palmyra Pacific Seafoods, L.L.C.

Palmyra Pacific Seafoods, LLC ("PPS") has established and is currently operating a commercial fishing operation with facilities located on the Palmyra Atoll pursuant to a license agreement with The Nature Conservancy ("TNC"). PPS' existing fishing areas and business interests include the resources in the vicinity of Kingman Reef. PPS has made a significant investment in obtaining, developing and operating its commercial fishing operation from the Palmyra Atoll and within the ocean waters around Kingman Reef. It is

PPS' understanding that both Palmyra and Kingman are privately owned by TNC and the Fullard-Leo family of Hawaii, respectively. PPS is operating under rights granted to it by the Fullard-Leo family.

## 3. COMMENTS ON PROPOSED KINGMAN REEF NWR

### 3.1 THE EA VIOLATES FEDERAL STATUTES -- IT DOES NOT COMPLY WITH NEPA OR THE APA

The EA prepared by the FWS for the proposed Kingman Reef is fatally flawed both in terms of the facts presented, the limited alternatives identified, and the forced result. The conclusion is without question -- the EA does not comply with either NEPA or the implementing regulations thereunder. 40 CFR §1508.9. Accordingly, for the reasons set forth below, the EA cannot serve as an adequate decision-making document for the purposes of FWS's determination with regard to the proposed Kingman Reef NWR.

The FWS has a duty under NEPA, and a responsibility to the interested public, to fully investigate and analyze potential impacts to human health and the environment and in the course of that investigation evaluate the socioeconomic impacts associated with the proposed designation action. 40 CFR §1508.8 and §1508.14. Considering its broad mandate and lofty goals, it is tragic that the FWS has ignored those facts with which it may not agree and has likewise failed to perform an appropriate factual investigation to support its proposed determination.

The unique nature of the proposed action, one clearly of national significance, merits an investigation much broader than that provided for in the limited EA prepared to date. This is clearly a significant federal action with sweeping potential impacts upon both the natural environment, commercial interests and private land ownership mandating the preparation of an Environmental Impact Statement (EIS) under NEPA. 40 CFR §1508.27(a) and (b). It is plain error on the part of the FWS not to have prepared an EIS and it is likewise clear that the FWS is prohibited under law from implementing any proposed action, such as the proposed action for which preparation of an EIS is mandatory, pursuant to 40 CFR 1506.1, unless and until an EIS has been completed.

A primary purpose of these comments is to emphasize to the FWS that under NEPA no further action may be undertaken to implement the proposed Kingman NWR unless and until the impacts of such action, both environmental and socioeconomic, have been analyzed in an EIS and appropriate mitigation has been provided for. 40 CFR 1501.6. To date, there has been no indication that the FWS understands the scope of the issues that it needs to consider and the urgent need for study and further investigation with regard to the proposed action.

Even a cursory review of the available information reveals the following:

- *That the Fullard-Leo family owns Kingman Reef.* It should be noted that the preliminary project proposal prepared by FWS in August 1997 at page 5 stated that: "[e]xplorers wishing to visit Kingman Reef must secure permission from the Fullard-Leo family and the U.S. Coast Guard." Moreover, at page 6 of the FWS Preliminary Project Proposal it states that "The [Fullard-Leo] family claims ownership (Kingman Reef) is . . . . administered by the U.S. Department of the Navy."

- *That a commercial long-line tuna fishery is operating in and about Kingman Reef within the proposed area to be designated as the 12-mile territorial sea surrounding Kingman Reef.* PPS is currently operating pursuant to a License Agreement originally issued by the Fullard-Leo family and currently administered by The Nature Conservancy. Moreover, KRE under its License Agreement with KRD and the Family is currently studying a variety of economic uses of Kingman Reef.

- *That the proposed action would constitute an unconstitutional taking of private property for a public purpose without providing for adequate compensation.* This constitutional impairment to the proposed action in and of itself invalidates the EA which is based on the assumption that the U.S. Navy can transfer its alleged ownership interest to the FWS. The FWS conveniently ignored its own prior investigation as set forth in the Preliminary Project Proposal that "[t]he Service is proposing to study fee title acquisition of Kingman Reef from the center of the atoll to a three mile nautical limit . . . . the price for fee title to Kingman Reef is unknown." Preliminary Project Proposal at page 6. It should be noted that the EA totally ignores the issue of ownership. The FWS Preliminary Project Proposal at page 7 states that: "[t]he land owners (the Fullard-Leo family) are willing to consider

an offer from the Service . . . . Here again, title ownership to Kingman Reef in the current EA is either ignored or incorrectly transferred to another federal agency without further support or consideration.

- *The FWS has failed to conduct any former pre-acquisition contamination survey at Kingman Reef.* The FWS had previously committed to do so and so informed the public in the Preliminary Project Proposal at page 7. No information is provided to the public one way or the other in the EA as to whether or not this activity was undertaken.

The rush to judgment aspect of the proposed action, the denial of an extension to the public comment period for the EA and associated activities underscore the FWS's efforts to undertake the proposed designation notwithstanding compliance with applicable law or constitutional due process of law, in a blatant effort to quash the individual rights and liberties of those impacted members of the public.

As noted above, the proposed action by FWS is subject to the CEQ administrative injunction provision of 40 CFR 1506.1(a). NEPA requires that an EIS be prepared for governmental proposals which are "major" federal actions which significantly affect the quality of the human environment. As set forth herein, the FWS plans to act contrary to federal law and policy to the significant disadvantage of the Family, KRAI, KRD, KRE, PPS and other impacted persons and entities, by undertaking the proposed action without the benefit of an EIS. Consequently, the FWS should be placed on notice that unless and until there is compliance with NEPA, "no action concerning the proposal shall be taken which would: have an adverse environmental impact; or limit the choice of reasonable alternatives." 40 CFR 1506.1(a)(1)-(2). In effect, this provision of the CEQ Regulations which is binding on FWS, imposes an absolute and immediate administrative stay on the proposed designation action by FWS.

An EIS is required to fully inform the public as well as the FWS and to support a well considered decision with regard to the proposed action. The primary function of an EIS is to ensure that the proponent of a major federal action such as the FWS in this instance, make a fully informed and well considered decision. *Friends of Clearwater v. Dombeck*, 2000 W.L. 1154279 (9th Cir. Idaho). The EIS requirement serves a dual role: first it insures adequate consideration of the relevant information; and second, it guarantees that the

relevant information will be made available to other public agencies and the public so that they may share their comments and concerns as invited participants in both decision-making process and a manner in which that decision is implemented. *Friends of the Clearwater* Id. at 3. Compliance with NEPA is intended to insure that the agency will not act on incomplete information "only to regret its decision after it is too late to correct." *Id.*

The judicial standard of review that is applicable to the NEPA decision-making process is the "rule of reason." The "rule of reason" is not an exhaustive standard requiring discussion of all possible details bearing on the proposed action. See, *Sierra Club*, 701 F.2d at 1030 n. 18, and *County of Suffolk v. Sec. Of Interior*, 562 F.2d 1368, 1383 (2nd Cir. 1977). Rather, the rule of reason demands that the FWS make a good faith effort to compile and present all significant environmental factors and alternatives to the decision-maker so that he or she may fully consider them in order to make an informed decision. This informed decision is the product of having balanced the risks of harm to the environment against the benefits to be derived from the proposed action and includes making a reasoned choice between alternatives. *Id.*

If the FWS continues to rely upon the existing EA and the current record to support the proposed action, the FWS will violate the express provisions of NEPA as well as the other applicable laws discussed herein. Furthermore, should the bold arrogance of the FWS outweigh its mandate to lawfully serve the public, it will be casting aside underlying purposes and goals established by Congress in enacting NEPA because:

- The environmental information underlying the existing EA is incomplete and fatally flawed;

- Substantial new information has been developed since compilation of the current EA which requires preparation and consideration of an EIS; and,

- The proposed actions conflict with and may violate Federal and State environmental laws and regulations some of which had not been determined to be applicable when the existing EA was compiled and issued.

Finally, if the FWS proceeds without an EIS, it will not only make an uninformed, ill-reasoned decision subject to judicial nullification but also deny the interested and affected

public their lawful right to fully participate in the decision-making process on an informed basis.

Applicable regulations require that the FWS take steps to acquire additional information if it is relevant to the decision making process and the costs of obtaining it are not exorbitant. 40 CFR § 1502.22. The FWS may not simply ignore the ownership issue or the impacted commercial fishing interests.

The FWS not only acknowledged that information concerning ownership was omitted but also refused to obtain the readily available information from its sister agency, the NMFS. The costs were not exorbitant and the reports were readily available in an Open File. Nonetheless, the FWS decided to willfully ignore this significant, relevant information.

It is apparent that the FWS's refusal to acknowledge the relevance of the ownership matters and existing commercial interests was not well reasoned or adequately considered. This alone is sufficient to show that the EA does not even come close to complying with NEPA. *County of Suffolk, supra* (Where the information presented to the reviewing agency is ignored or inadequately dealt with, serious questions arise concerning compliance with NEPA and good faith compilation of the necessary environmental information).

The intentional omission of readily available, pertinent and valuable information concerning the socio-economic and constitutional consequences of the proposed action renders the existing EA inadequate. The FWS must prepare an EIS so that the decision-maker and the public have the benefit of an administrative record that includes a good faith compilation of significant information. If the record is flawed, it is simply not possible for the decision-maker to have a full understanding of the environmental and economic issues that would result in an informed, reasoned decision on the proposed action.

### 3.1.1 <u>An EIS Must be Prepared</u>

Significant new information requires preparation of an EIS. The CEQ Guidelines, applicable to all executive agencies such as the FWS, mandate the preparation of an EIS if there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." CFR §1502.9(c)(1)(ii). There is no

discretion. There is no alternative. If there is significant new information, the FWS must prepare an EIS.

The FWS has no discretion in this instance-- the applicable standards mandate preparation of an EIS. The Rule of Reason also governs the preparation of an EIS. See, *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 373 (1989). The rule of reason states that an agency need not supplement an EIS (or in this case an EA) every time new information becomes available. *Id* at 374. Rather the application of the rule of reason turns on the value of the new information in the decision making process. *Id.* While the mere passage of time is not sufficient in and of itself to require supplementation:

> The agency must be alert to new information which may alter the results of its original environmental analysis, and continue to take a "hard look at the environmental effects of [its] planned action, even after a proposal has received initial approval."
>
> * * *
>
> "If there remains a major Federal action to occur and the new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared."

*Friends of the Clearwater*, 2000 WL 1154279 at *3 (9th Cir. 2000); quoting with approval *Marsh; supra* at 374 (citation omitted) (emphasis added).

Here there is no question that the new information concerning ownership and socio-economic interests is significant to the decision-making process. This is not an instance of needing to be alert to new information. Rather, the FWS had been informed of the need and central importance of the information.

The FWS have now proposed the designation of Kingman Reef as a NWR. The FWS cannot, in good faith, now take the position that the ownership and socio-economic issues are irrelevant. Without preparation of an EIS to encompass this significant, new

information, the FWS cannot satisfy the rule of reason requirement for a "good faith compilation" of all relevant issues. Absent an EIS, any decision will be fatally flawed, without substantial basis and subject to judicial review and nullification. An EIS must be prepared.

Any decision made in the midst of these conflicting positions without an EIS will engender heighten judicial scrutiny and skepticism that the decision fulfilled NEPA requirements. *Sierra Club*, 701 F.2d at 1030 (Where the responsible agency ignores the conflicting views of a sister agency having pertinent expertise, substantial skepticism arises concerning whether the decision had substantial basis in fact.)

There is no valid basis upon which the FWS may ignore the need for an EIS. The new information is significant and necessary to a good faith compilation of the environmental and socio-economic issues so that the decision-maker and interested public can fully consider all relevant issues.

Section 1502.16 of the CEQ regulations at 40 CFR requires that the FWS consider the environmental and socio-economic consequences of the proposed action, as well as the cumulative consequence of agency action. In particular, possible conflicts of the proposed action with the objectives of local land use plans, policies and controls for the areas of concern should also be considered. 40 CFR § 1502.16(c). Accordingly, the FWS must consider the local property ownership and control program currently in place.

**3.1.2 <u>The EA is Fatally Flawed Because An Inadequate Number of Alternatives were Considered</u>**

The alternative analysis is the lynch pin of the EA or EIS. *Monroe County Conservation Council, Inc. v. Volpe*, 472 F.2d 693, 697-98 (2d Cir. 1972). No viable alternative should be excluded from consideration. The scope of alternatives identified is limited by the rule of reason. *Life of the Land v. Briaegar*, 485 F.2d 460 (9th Cir. 1973).

Just as the alternatives considered must be reasonable, so must the number of alternatives considered. *Laguna Greenbelt, Inc. v. U.S. Dept. of Transp.*, 42 F.3d 517, 524-25 (9th Cir. 1994). In this instance, by any standard, two (2) alternatives are simply not enough and fly in the face of what is reasonable.

It is also important to note that NEPA requires an agency to develop and describe alternatives to recommend actions in any proposal that involves unresolved conflict, concerning alternative uses of available resources, even when an EIS is not required. 42 U.S.C. §4332(2)(E) (1994). With regard to Kingman Reef, the FWS is relying on an alternative analysis, the factual basis for which is under challenge by our clients and this challenge goes to the most basic attribute of the proposed action . . . . who owns the Kingman Reef. This is a credible challenge, one that must be fully investigated by the FWS pursuant to Section 102(2)(E) of NEPA. *Van Abbema v. Fornell*, 807 F.2d 633 (7th Cir. 1987).

Here, not only were the number of alternatives inadequate, but the public was excluded from any meaningful review of those proposed. The FWS denied the public an opportunity to participate in this process under the APA. The failure of an agency to offer adequate public participation in the NEPA process may lead a Court to conclude that the action was taken "without observance of procedures required by law." 5 U.S.C. §706(2)(D) (1994). The burden to involve the public is no less appropriate in the case of an EA than an EIS. Whatever the fact findings tool employed by the agency, there is a need to allow the light of public scrutiny to shine on the administrative process. The FWS failed to meet its obligation in this instance.

The EA proposed in this matter is not adequate. An inadequate EA may not serve as the basis for the issuance of a FONSI. 40 CFR §1501.3, and §1508.9 (1997). There again, *inter alia* glaring lack of adequate alternatives renders the proposed EA invalid and of no effect. *See*, 40 CFR §1502.14.

In summary, the FWS must start the NEPA process anew. Hopefully, the lessons learned to date will enable the agency to fully comply with applicable law and allow it to carry out its mission in a manner consistent with the U.S. Constitution and all property interests of the impacted public.

The refusal of the FWS to undertake an adequate EA or an EIS in the face of the substantial information evidencing a potentially significant adverse, disparate impact on the Family, KRAI, KRD, KRE and PPS and other members of the impacted public is clear evidence that the protections afforded all Americans under the U.S. Constitution, statutory and common law have been violated. An adequate EA or more likely an EIS is mandated

to ensure adequate protection and consideration of the constitutionally guaranteed property rights and administrative law process under the APA.

## 3.2 DESIGNATION OF the KINGMAN REEF NWR WILL RESULT IN AN UNCONSTITUTIONAL TAKING OF PRIVATE PROPERTY

The FWS' proposed designation of Kingman Reef as a NWR will result in a taking of private property in violation of the Fifth Amendment of the United States Constitution. The Fifth Amendment prohibits the federal government from taking private property without just compensation. As set forth below, Kingman Reef is the undisputed private property of the Family. The EA does not acknowledge the Family's ownership nor does it even discuss the potential for an ownership dispute. Designation as a NWR will vest ownership and control of Kingman Reef in FWS -- a direct invasion and confiscation of the Family's private property. The FWS confiscation will also take and completely destroy the private property of KRAI, KRD, KRE and PPS relating to Kingman Reef.

The EA does not provide for just compensation for this categorical taking of private property. As such, if FWS takes final action to establish the NWR, it will violate the United States Constitution.

### 3.2.1 The Fifth Amendment Prohibits the Federal Government's Taking of Private Property Without Just Compensation

The Fifth Amendment to the United States Constitution provides in relevant part that ". . . private property [shall not] be taken for public use without just compensation." It is well established that a taking can be accomplished by governmental regulation. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922)(while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.) The proposed designation of Kingman Reef as a NWR satisfies all of the elements of a Fifth Amendment categorical "taking" for which the Family, KRAI, KRD, KRE and PPS must be justly compensated.

### 3.2.2 Each of the Commentors have Private Property Subject to Fifth Amendment Protection

The Fifth Amendment covers all "property" including real property, personal property and intellectual property. With respect to real property, the Fifth Amendment protection against takings without just compensation extends not only to fee ownership of real property but also to less-than-fee interests such as leases, licenses and options. See, *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992)(beach-front real property taken by coastal zone management); *Forest Properties v. United States*, 39 Fed.Cl. 56 (1997)(option to acquire real estate). Each of the Commentors have private property that will be taken by establishment of a NWR.

**a. The Family is the Undisputed Fee Owner of Kingman Reef**[1]

The Family owns Kingman Reef. The Family ownership is readily ascertainable from the public record and has been admitted and acknowledged by the Federal Government including the U.S. Senate, U.S. Navy and FWS.

**i. <u>The Family Takes Ownership in 1922 Annexation</u>**

In 1922, Leslie and Ellen Fullard-Leo annexed Kingman Reef to the United States for the Island of Palmyra Copra Company, Ltd. ("Copra Company"). On April 28, 1922, Copra Company noted in one of its Board meeting minutes that "Kingman's Reef" would be of "inestimable value" to the company and should be claimed "either on the out or homeward voyage of the Palmyra during her next trip." [Exhibit "1"]. On May 3, 1922, Copra Company instructed and commissioned its agent, Lorrin A. Thurston, to proceed to the atoll known as "Kingman's Reef", and to take formal possession of said atoll for the United States of America and to claim the same for the "Island of Palmyra Copra Company". [Exhibit "2"]

On May 10, 1922, Mr. Thurston landed on Kingman Reef [longitude 162 degrees 18 minutes West and Latitude 6 degrees 23 minutes North] from the company's ship "Palmyra" and did annex the atoll, its reefs and lagoon as instructed. The annexation documents were

---

[1]Attached hereto and incorporated herein by reference are (1) the Declaration of Ainsley Fullard-Leo, (2) a chronology of events, (3) Exhibits 1-16 and (4) the Declaration of Peter Savio. These documents and Declarations offer support for the factual representations herein regarding the ownership of Kingman Reef.

signed by Mr. Thurston and five companions and was sent by the Copra Company to the State Department in Washington D.C. and duly acknowledged. [Exhibit "3"]

On July 15, 1922, Copra Company sent a letter to the Honorable Charles E. Hughes, Secretary of State, Washington, D.C., noting, among other things, that the company annexed, on May 10, 1922,

> "in the name of the United States of America, and for [Palmyra Copra Company's] own use, an atoll chartered as 'Kingman's Reef' but never before claimed".
>
> * * *
>
> According to the United States Attorney here, this notification is all that is necessary in addition to listing the same in our local tax returns, as the Palmyra Islands are a part of the County of Honolulu.
>
> Hoping that this is sufficient evidence that the same will be recorded and due credit given this Company and Territory..." [Exhibit "4"]

On September 28, 1922, the Department of State, Washington, D.C., acknowledged receipt of the July 15, 1922 annexation letter from the Copra Company, together with its enclosures, and another letter of August 24, 1922, regarding "Kingman's Reef". [Exhibit "5"]

On August 14, 1922, the Family acquired direct ownership of Kingman Reef from Copra Company. A resolution was introduced and unanimously adopted by Copra Company to cede to L. Fullard-Leo all of the company's rights of whatsoever nature in the newly annexed territory of Kingman Reef in return for "sundry unsecured loans".

Additional evidence of the annexation and the Family's long-time ownership of Kingman Reef is found in a letter dated July 9, 1926, from Lorrin A. Thurston, on "The Honolulu Advertiser" letterhead, to "The Archives Committee" for the Territory of Hawaii. In that letter, he recounts the events of annexing Kingman Reef for the Copra Company and the evidence of the annexation that was placed at Kingman Reef. The letter also notes the evidence that was transmitted with this letter so that it may be "kept

on file in your office in Honolulu, subject to the order of the owner of said Kingman Island, or of the United States Government." His letter goes on to state that

> **"I understand the present owner of said Kingman Island to be the Mrs. E. Fullard Leo of Honolulu, the successor of said Palmyra Company, Ltd."** [Exhibit "7"]

**ii. The Family Paid Real Estate Property Taxes on Kingman Reef**

Further record notice of the Family's ownership is also available from the Hawaii Territorial tax files. From 1922 through 1959, the Family paid real property taxes to the Territory of Hawaii for both Palmyra Atoll and Kingman Reef. See, Declaration of Ainsley Fullard-Leo attached hereto. The tax status as private property of Kingman Reef was also published in Honolulu Advertiser noting that Palmyra Island and "Kingman's Reef" had been given the same tax map key number. In addition, the article recounted the acquisition of Kingman's Reef for the Copra Company and that "Kingman's Reef" was ceded to Mr. and Mrs. Leslie Fullard-Leo on August 14, 1922 by the directors of the Company. [Exhibit "8"] After 1959, Hawaiian real property taxes were not assessed against Palmyra Atoll and Kingman reef because they were excluded from the property included in the State of Hawaii upon its admittance to the Union in 1959.

**iii. The Family Deeds Title to KRAI**

Kingman Reef remains the private property of the Family. Title to Kingman Reef was recently transferred to KRAI in November, 1999 to facilitate the development of the economic opportunities associated with Kingman Reef. A copy of the deed effecting title transfer is attached at Exhibit "16". The Deed was properly filed and recorded in the United States District Court for the District of Hawaii on November 17, 2000 as Document No. 27.

Subsequent to the transfer of Kingman Reef to KRAI, it entered into a lease with KRD. Thereafter, KRD entered into the property license agreement with KRE for the

operation of a commercial fishing base camp at Kingman Reef. The KRD lease and KRE license acknowledge the Family as the owner of Kingman Reef.

**iv. The Federal Government Admits the Family's Ownership of Kingman Reef**

In addition to record notice of the Family's ownership, numerous Federal Agencies and the United States Senate have admitted and acknowledged the Family's ownership of Kingman Reef including the FWS, the U.S. Navy and the United States General Accounting Office. The EA's failure to reference the government's prior acknowledgment of the Family's ownership interest evidences FWS' bad faith intent to confiscate valuable private property in violation of the U.S. Constitution.

The FWS itself has admitted and acknowledged that the Family owns Kingman Reef. In the October 2, 1997 Project Proposal authorizing the evaluation of Kingman Reef for NWR status, Jane Rappaport Clark, the Director of FWS, specifically admits the Family's ownership:

> . . .Explorers wishing to visit Kingman Reef ***must secure permission from the Fullard-Leo Family.***
>
> * * *
>
> Kingman Reef was annexed on behalf of the United States in 1922, by the Palmyra Copra Company (Fullard-Leo family), and ***the family claims ownership***. . . .
>
> The Service is proposing to study ***fee title acquisition*** of the Reef . . .
>
> ***The landowners [Fullard-Leo] are reportedly willing to sell their lands . . .***
>
> ***. . .the price for fee title to Kingman Reef is unknown.***

See, Preliminary Project Proposal at pp. 5 - 6 [Exhibit "11". It is clear that the FWS acknowledged from the outset that the Family owned the Reef and it would have to be acquired from them. In fact, the Department of Interior, FWS and the City and County of

Honolulu have repeated approached the Family over the years to see if Kingman Reef could be purchased. See, Savio Declaration attached hereto. For example as far back as 1991, TNC and the FWS have been negotiating with the Family to purchase Kingman Reef. Jim Maragos of The Nature Conservancy prepared a Memorandum to "Palmyra Atoll file" dated August 19, 1991, regarding a meeting held on July 26, 1991, that included, among others, representatives of the Fullard-Leo family, The Nature Conservancy and U.S. Fish & Wildlife Service. One of the issues discussed was the Family's possible interest in dedicating Kingman Reef for conservation and/or selling it for that purpose. The Memorandum also goes on to state in relevant part that:

> 9. Savio mentioned that the owners believe they control all reefs and the territorial seas off Palmyra Atoll and they also claim Kingman Reef, the next atoll to the northwest.
>
> * * *
>
> 27. ... The buy-out option proposed by Savio should be seriously considered. Transfer of Kingman Reef by the owners to the USFWS could also serve as compensation or mitigation for other impacts, and the USFWS is keenly interested in Kingman. [Exhibit "10"]

Now, however, the FWS has decided to conveniently ignore these critical ownership interests in a flawed effort to expedite the confiscation of Kingman Reef.

The EA's reliance on the alleged ownership interest of the U.S. Navy is also misplaced. The U.S. Navy has repeatedly acknowledged the Family's ownership of Kingman Reef. Contrary to FWS' conclusion in the EA, the U.S. Navy has asked the Family for permission to access Kingman Reef. On numerous occasions since impression of the Naval defensive zone in and around Kingman Reef, the Navy has directed requests for authorization to visit or access to Kingman Reef to the Family for review and approval. See, Declaration of Peter Savio attached hereto. It is clear that the Navy acknowledges and respects the Family's private property ownership interest in Kingman Reef. The Navy's assessment of the Family's ownership also comports with the FWS Preliminary Project Proposal which specifically referenced the need for explorers to

secure permission from the Family prior to visiting Kingman Reef. See, Preliminary Project Proposal at p. 5. [Exhibit "11"]

In addition to the U.S. Navy, the National Marine Fisheries Service has also referred fishermen to the Family to secure permission to access Kingman Reef. See, Savio Declaration, attached hereto.

The United States General Accounting Office ("GAO") has also recently referenced and acknowledged the Family's claim of ownership of Kingman Reef. See, GAO Report to the Chairman, Committee on Resources, House of Representatives, U.S. Insular Areas, Application of the United States Constitution, (November, 1997). In evaluating the application of the Constitution to U.S. Insular Areas, the GAO specifically noted that: ***Kingman Reef has been claimed by the Fullard-Leo Family. Id.*** at n. 12. [Exhibit "13"]

The United States Senate, Committee on Appropriations, also clearly admits that Kingman Reef is privately owned. On October 26, 2000, Committee on Appropriations sent letters to the Honorable Bruce Babbitt, Secretary of the Interior, U.S. Dept. of the Interior, and the Honorable Dan Glickman, Secretary of the Department of Agriculture, U.S. Department of Agriculture, noting that Congress provided additional funding for "high priority land acquisitions." The letters attached a list of projects for such land acquisitions, including, but not limited to, "Palmyra Atoll/Kingman Reef". [Exhibit "15"] If Kingman Reef was a federally owned property, the Senate Appropriations Committee would not need to allocate funds for its acquisition.

The public record is absolutely clear -- the Family owns Kingman Reef. The FWS own Project Proposal admits the Family's ownership. Nonetheless, in preparing the EA, FWS has willfully disregarded the Family's ownership interest in an effort to avoid fairly compensating the Family for its brazen land grab. FWS incorrectly concludes that Kingman Reef is a Federal property under Naval administration. As set forth above, the U.S. Navy also recognizes the Family's ownership of Kingman Reef.

In sum, the Family has a cognizable and compensable property interest which will be taken by designation of Kingman Reef as a NWR. FWS will effect a permanent

physical occupation of the Reef and oust the Family from possession, use and disposition of Kingman Reef and extinguish the property rights of the Family, KRAI, KRD, KRE and PPS.

**b. KRAI, KRD and KRE Have Lease-Hold and Contractual Real Property Interests which Derive From the Fullard Leo Family's Fee Title to Kingman Reef**

KRAI, KRD and KRE have leasehold and license property interests in Kingman Reef which flow from the Family's fee ownership. Each of these property interests are cognizable under the Fifth Amendment and entitled the benefits and protections of its prohibition of governmental takings without just compensation.

**c. PPS has Contractual Property Rights to Fish the EEZ around Kingman Reef**

PPS operates a commercial fishing operation based on the Palmyra Atoll pursuant to a license agreement with The Nature Conservancy as the successor in interest to the Fullard - Leo Family. PPS' license agreement provides it with the exclusive right to establish a commercial fishing operation on Palmyra to access the commercial fisheries in and around Palmyra and Kingman Reef. The license agreement allows commercial fishing outside of the 100 fathom mark of Palmyra and Kingman Reef based upon the Fullard Leo Family's ownership.

Establishment of the proposed NWR will take a significant portion of the available fishing grounds from PPS. PPS' contractual right is also cognizable under the Fifth Amendment and entitled to the benefits and protections of its prohibition of governmental takings without just compensation.

**3.2.3 Designation of Kingman Reef as a NWR is a Categorical Taking of Private Property**

The proposed FWS action to confiscate Kingman Reef will effect a "categorical taking" of private property. A categorical taking under the Fifth Amendment of the United States Constitution occurs when:

(i) A property owner suffers a "physical invasion" of property; or

(ii) government regulation denies a property owner of all economically beneficial or productive use of their lands.

*See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992). Categorical takings do not require any balancing of the relative interest of the property owner versus the public purpose underlying the governmental action resulting in the taking. When the property owner suffers a permanent invasion, no matter how minute, there is a *per se* taking requiring compensation no matter now weighty the public purpose behind the governmental action. *Id.* Absent just compensation for categorical taking, the constitutional protections afforded by the Fifth Amendment are violated.

The most direct and obvious categorical taking is a physical taking of property by the government. If the government has committed or authorized a permanent physical occupation of property, the takings clause ***requires*** compensation. *See, Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), *Yee v. City of Escondido*, 503 U.S. 519 (1992), and *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982). A permanent physical occupation occurs when government action permanently destroys the three rights associated with the ownership of property: (i) the power to possess; (ii) the power to use; and (iii) the power to dispose. See, *Loretto, supra*. The *Loretto* court added that the absolute exclusivity of the occupation and absolute deprivation of the owner's right to use and exclude others from the property were the hallmarks of a physical taking.

**a. The Designation Will Effect an Exclusive Physical Occupation of The Family's Private Property**

The proposed designation of Kingman Reef as a NWR bears all the hallmarks of a physical taking. First, the FWS action will deprive the Family of both its right to possess

Kingman Reef and the Family's right to exclude FWS from possession and use of Kingman Reef. Second, the designation will forever deny the Family any power to control the use of the Reef such that the Family will be unable to make any non-possessory use of the property. Finally, the EA and CMP specifically provide for the exclusion of all unauthorized persons from the Refuge – including the Family, KRAI, KRD, KRE and PPS. The CMP further reserves solely and exclusively to FWS the right to control access to Kingman Reef.

Designation will completely destroy the Family's power to possess Kingman Reef, the Family's power to use the reef as well as the power of the Family to dispose of the reef as it sees economically fit. The designation will effect a complete confiscation the Family's private property. In particular, establishment of the NWR will vitiate the economically valuable development, leasehold, and license agreements held by the Family, KRAI, KRD, KRE and PPS.

**b. The Designation Will Also Destroy All Beneficial Uses of Family's Private Property**

The FWS designation will also result in a categorical taking because it eliminates all beneficial economic use of Kingman Reef. The EA and CMP prohibit all economic use of Kingman Reef. In addition to acting as a direct physical taking and confiscation of private property, this elimination of all economic beneficial use associated with the Family's ownership of Kingman Reef is also a categorical taking requiring just compensation.

As set forth above, the Family has entered into development, leasehold and license agreements for the development of commercial fishing and other economically viable ventures linked to its ownership interest in Kingman Reef. These valuable property rights are equally protected under the Fifth Amendment from governmental takings without just compensation. In that the private property of KRAI, KRD, KRE and PPS flow from and are subservient to the fee interest of the Family, the confiscation of Kingman Reef will extinguish these property interests as well. As such, KRAI, KRD and KRE are similarly entitled to just compensation pursuant to the Fifth Amendment. Creation of the NWR will render these valuable, contractual and leasehold interests completely worthless.

KRAI, KRD, KRE and PPS will be physically ousted and excluded from not only Kingman Reef but also the waters extending 12 miles from the low tide mark. This exclusion destroys all beneficial uses of their private property.

The categorical taking of Kingman Reef by physical possession, confiscation and destruction of all beneficial or productive use of the property is a *per se* taking. As such, the public purposes underlying Fish & Wildlife Services' action is irrelevant in the determination of whether a Fifth Amendment takings has occurred. The Supreme Court has made it clear that in the case of the categorical taking, the underlying public purpose of the governmental action is irrelevant. If the categorical taking has occurred, just compensation is required. As set forth below in Section 3.2.5, the EA fails to make any provision to compensate the Family, KRAI, KRD, KRE or PPS for these takings and will thereby violate the U.S. Constitution.

**3.2.4. Designation will also Effect a "Regulatory" Taking of Private Property**

In comparison to a categorical taking, a regulatory or "partial" taking pursuant to government regulation occurs when the imposition on the owner's property is "one step short of complete." *See Lucas, supra.* The designation will also effects a "regulatory" or "partial" taking of PPS' private property.

The NWR will extend out 12 nautical miles from the low-tide mark at Kingman Reef. The designation will create a 450,000 acre area of ocean in which PPS will be excluded from conducting its existing commercial fishing operations. This taking of PPS' private property satisfies the three-part test to determine the existence of partial takings enunciated in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978). The *Penn Central* test examines: 1) the character of the governmental action, 2) the extent to which the regulation interferes with the claimant's investment back expectations and 3) the economic impact of the regulation on the landowner.

First, the character of Fish & Wildlife Services' action will be to completely exclude all commercial fishing operations within the 12-mile NWR boundary. A significant of this proposed 12-mile area is currently being harvested by PPS. The

governmental action completely divests PPS of its contractual right to access these waters from the Palmyra Atoll.

Secondly, the establishment of the NWR will significantly interfere with PPS' reasonably based investment-backed expectations concerning harvesting commercial fish in and around the Kingman Reef. PPS entered into the license agreement for Palmyra-based fishing operations with the reasonable expectation of accessing the waters in and around Kingman Reef. PPS has expended over $1,000,000 to establish its base camp on Palmyra and has undertaken commercial long-line fishing in and around Palmyra and Kingman Reef. In fact, PPS has harvested and sold over 250,000 lbs. of commercial fish since initiating its operations in September 2000. As such, PPS' investment-backed expectation is more than a "unilateral expectation or an abstract need." *See Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980). Rather, PPS' investment-backed expectation is reasonable and has been supported by actual harvesting and sales. Moreover, PPS entered into its license agreement for the Palmyra Atoll fishing operations prior to any proposed designation of Kingman Reef or the surrounding waters as a NWR. As such, PPS' investment-backed expectations were not discounted by the exclusion of 450,000 acres of prime harvesting grounds.

Finally, the economic impact of the NWR designation will significantly and adversely affect PPS. The significant economic impact results from the total exclusion of PPS and its commercial fishing operations from over 450,000 acres of ocean area. These 450,000 acres encompass some of the most valuable commercial fishing areas for high-value species such as Big Eye tuna, Bluefin and Yellow Fin tuna. This exclusion will result in million dollars of lost revenue over the ten-year life of PPS' license agreement.

The FWS designation of Kingman Reef as a NWR will result in an uncompensated regulatory taking of PPS' private property in violation of the U.S. Constitution.

### 3.2.5 The NWR Proposal Does Not Provide for Just Compensation in Violation of the Fifth Amendment to the United States Constitution

FWS has intentionally ignored the Constitutional impact of its proposed action. The EA does not even discuss, let alone provide for, just compensation for the

governmental occupation and appropriation of private property. Establishment of the NWR will violate the U.S. Constitution's Fifth Amendment prohibition of the governmental taking of private property without just compensation. The FWS has decided to ignore not only its own acknowledgment of the Family's ownership but also over 80 years of public record notice and the Senate's, Navy's and GAO's recognition that the Family is the undisputed owner of Kingman Reef.

As set forth above, FWS' intentional concealment of this Constitutional violation renders the EA wholly insufficient under NEPA as a decision making document. Absent full and complete disclosure of the taking, the EA is fatally flawed. Any decision based upon the EA will be arbitrary and capricious. The FWS intentional concealment of the takings issue renders its financial assessment of the proposed NWR incomplete and inaccurate. Neither the EA nor the CMP accounts for or considers the cost of justly compensating the Family, KRAI, KRD, KRE or PPS for the taking of extremely valuable private property.

The financial magnitude of this intentional omission is significant. The Family, KRAI, KRD, KRE and PPS are not compensated for the taking of their valuable property rights. The fishing and development property rights of KRAI, KRD, KRE and PPS will be rendered completely worthless by the taking. The value of these long term property rights could exceed the economic value of the Reef itself.

The proposed designation will effect a direct, categorical and regulatory taking of private property. Well settled Constitutional law ***requires*** that FWS provide just compensation for the takings. FWS has made no provision for justly compensating the Family, KRAI, KRD, KRE or PPS for its confiscation of Kingman Reef. If the FWS takes final action based upon the fatally flawed EA, the direct, inexorable result will be the violation of the United States Constitution.

## 4.
## CONCLUSION

As set forth above, the proposed designation of Kingman Reef as a NWR is fatally flawed. If FWS takes final action based upon the EA, CMP and current administrative

record or subsequent FONSI finding, the designation of Kingman Reef as a NWR will be arbitrary and capricious and violate the U.S. Constitution, the APA, NEPA and other applicable Federal laws and regulations. FWS must either correct the Constitutional, statutory and regulatory deficiencies or abandon the proposed designation of Kingman Reef as a NWR

We specifically request that these comments be made part of the official administrative record. The Commentors reserve all of their rights to seek further administrative or judicial relief concerning the proposed FWS action.

Respectfully submitted,

SHORT CRESSMAN & BURGESS, PLLC

By:____________________________
Richard A. DuBey

cc: Commentors

United States Department of the Interior

FISH AND WILDLIFE SERVICE
911 NE. 11th Avenue
Portland, Oregon 97232-4181

IN REPLY REFER TO:

FWS/NWRS-RE

January 11, 2001

LA-Pacific Islands
Kingman Reef
Environmental Assessment

Christian P. Porter, Esquire
Brooks Tom Porter & Quitquit
2125 Davies Pacific Center
841 Bishop Street
Honolulu, Hawaii 96813

Dear Mr. Porter:

This letter is in response to your letters to the U.S. Fish and Wildlife Service dated December 22, 2000, and January 4, 2001.

The letters address the environmental assessment for the establishment of the proposed Kingman Reef National Wildlife Refuge. We will include the two letters in the administrative record.

The public comment period closes today. We made the decision not to extend the comment period because it is not the means to resolve a title issue. The end result of our planning process, if the decision is made to proceed with a refuge, is an approved refuge boundary within which we will have authority to acquire lands and waters. After a boundary is approved, title to lands can and often does change. Title issues can continue to be raised and resolved.

Through the proposed Secretarial Order, we will acquire what the Department of the Interior has to transfer to us. If your clients establish title to some or all of Kingman Reef, those rights would be recognized and respected.

Your letters assert that the Fullard-Leo family are the owner of Kingman Reef. After reviewing the matter, we have found no substantiation to this claim. In 1934 and again in 1941, Kingman Reef was reserved, set aside, and placed under the control and jurisdiction of the Department of the Navy by Executive Orders (enclosed). We are aware of no evidence that the claim the Fullard-Leo family is asserting was ever recognized by the United States. In addition, we are aware of no evidence that the Fullard-Leos have, subsequent to the 1934 Executive Order, challenged the claim of the United States to Kingman Reef.

EXHIBIT "37"

RECEIVED 1/16/01

We need adequate, documented proof of ownership. Any information you can provide to us about the history, extent, and conveyance or establishment of your client's claim to title would be most helpful in trying to resolve this issue. We will acknowledge your client's claim in the final revisions to our environmental assessment; but unless we receive acceptable, written proof of ownership, our position will continue to be that Kingman Reef is Federally owned.

We are available on short notice to meet with you or your clients to discuss their claim, the refuge proposal, or any other matters. Please feel free to contact me at the address above or by calling me at (503) 231-6214.

Sincerely,

Carolyn A. Bohan

Carolyn Bohan, Regional Chief
National Wildlife Refuge System

Enclosures

# Executive Order

## Placing Certain Islands in the Pacific Ocean Under the Control and Jurisdiction of the Secretary of the Navy

### WAKE ISLAND, KINGMAN REEF, AND JOHNSTON AND SAND ISLANDS

By virtue of and pursuant to the authority vested in me by the act of June 25, 1910, ch. 421, 36 Stat. 847, as amended by the act of August 24, 1912, ch. 369, 37 Stat. 497, and as President of the United States, it is ordered that Wake Island located in the Pacific Ocean approximately in latitude 19°17′28″ N. and longitude 166°34′42″ E. from Greenwich, Kingman Reef located in the Pacific Ocean approximately in latitude 6°24′37″ N. and longitude 162°22′ W. from Greenwich, and Johnston and Sand Islands located in the Pacific Ocean approximately in latitude 16°44′32″ N. and longitude 169°30′59″ W. from Greenwich, together with the reefs surrounding all the aforesaid islands, as indicated upon the diagram hereto attached and made a part of this order, be, and they are hereby, reserved, set aside, and placed under the control and jurisdiction of the Secretary of the Navy for administrative purposes, subject, however, to the use of the said Johnston and Sand Islands by the Department of Agriculture as a refuge and breeding ground for native birds as provided by Executive Order No. 4467 of June 29, 1926.

This order shall continue in full force and effect unless and until revoked by the President or by act of Congress.

FRANKLIN D ROOSEVELT

The White House,

*December 29, 1934.*

[No. 6935]


Nautical Miles
Toki Pt
Heel Pt
Kuku Pt
Lagoon
Peacock Pt


KINGMAN REEF
Nautical Miles
3 ft. high


Sand I
Johnston I
JOHNSTON ISLAND
AND
SAND ISLAND

# Executive Order 8682--Establishing naval defensive sea areas around and naval airspace reservations over the islands of Palmyra, Johnston, Midway, Wake, and Kingman Reef

**Source:** The provisions of Executive Order 8682 of Feb. 14, 1941, appear at 6 FR 1015, 3 CFR, 1938-1943 Comp., p. 894, unless otherwise noted.

**Pacific Ocean**

By virtue of the authority vested in me by the provisions of section 44 of the Criminal Code, as amended (U.S.C., title 18, sec. 96), and section 4 of the Air Commerce Act approved May 20, 1926 (44 Stat. 570, U.S.C., title 49, sec. 174), the territorial waters between the extreme high-water marks and the three-mile marine boundaries surrounding the islands of Palmyra, Johnston, Midway, Wake, and Kingman Reef, in the Pacific Ocean, are hereby established and reserved as naval defensive sea areas for purposes of national defense, such as areas to be known, respectively, as "Palmyra Island Naval Defensive Sea Area", "Johnston Island Naval Defensive Sea Area", "Midway Island Naval Defensive Sea Area", "Wake Island Naval Defensive Sea Area", and "Kingman Reef Naval Defensive Sea Area" and the airspaces over the said territorial waters and islands are hereby set apart and reserved as naval airspace reservations for purposes of national defense, such reservations to be known, respective, as "Palmyra Island Naval Airspace Reservation", "Johnston Island Naval Airspace Reservation", "Midway Island Naval Airspace Reservation", "Wake Island Naval Airspace Reservation", and "Kingman Reef Naval Airspace Reservation".

At no time shall any person, other than persons on public vessels of the United States, enter any of the naval defensive sea areas herein set apart and reserved, nor shall any vessel or other craft, other than public vessels of the United States, be navigated into any of said areas, unless authorized by the Secretary of the Navy.

At no time shall any aircraft, other than public aircraft of the United States, be navigated into any of the naval airspace reservations herein set apart and reserved, unless authorized by the Secretary of the Navy.

The provisions of the preceding paragraphs shall be enforced by the Secretary of the Navy, with the cooperation of the local law enforcement officers of the United States and of the Territory of Hawaii; and the Secretary of the Navy is hereby authorized to prescribe such regulations as may be necessary to carry out such provisions.

Any person violating any of the provisions of this order relating to the above-named naval defensive sea areas shall be subject to the penalties provided by section 44 of the Criminal Code as amended (U.S.C., title 18, sec. 96), and any person violating any of the provisions of this order relating to the above-named naval airspace reservations shall be subject to the penalties prescribed by the Civil Aeronautics Act of 1938 (52 Stat. 973).

This order shall take effect ninety days after date hereof.

[EO 8682 amended by EO 8729 of Apr. 2, 1941, 6 FR 1791, 3 CFR, 1938-1941 Comp., p. 919]

---

**Editorial note:** Executive Order 9881 of Aug. 4, 1947, 12 FR 5325, 3 CFR, 1943-1948 Comp., p. 662, discontinued the Palmyra Island Naval Airspace Reservation and the Palmyra Island Naval Defensive Sea Area.

LAW OFFICES
SHORT CRESSMAN & BURGESS PLLC

999 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98104-4088
FAX: (206) 340-8856
(206) 682-3333

## TELECOPIER TRANSMITTAL LETTER

Client/Matter Number: 20576.1 Date: January 11, 2001

Sender: Time: 4:07 p.m.

**PLEASE DELIVER THE FOLLOWING PAGES TO:**

**Name:** Phyllis Ha **Fax No.:** (808) 541-2756

**'Name:** Chris Porter **Fax No.:** (808) 523-1171

**From:** Richard Du Bey

**Re:** *Kingman Reef*

TOTAL NUMBER OF PAGES, INCLUDING THIS PAGE: 26

**Message:** Attached is a formal comment regarding the Proposed Designation of Kingman Reef as a National Wildlife Refuge. A hard copy, together with the Declarations and exhibits, will be hand delivered to the Fish and Wildlife Service, Honolulu, Hawaii office.

**Original Mailed:** Yes

**PLEASE CALL IMMEDIATELY IF YOU DO NOT RECEIVE ALL PAGES**

NOTE: THE INFORMATION CONTAINED IN THIS FACSIMILE IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED FOR THE USE OF THE INDIVIDUAL(S) NAMED ABOVE. ANY DISSEMINATION, DISTRIBUTION OR COPYING, EXCEPT BY THE PERSON ABOVE NAMED, IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS FAX IN ERROR, PLEASE NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL VIA THE U.S. POSTAL SERVICE. THANK YOU.

U.S. Department of the Interior
FISH AND WILDLIFE SERVICE
Region 1, Portland, Oregon

# FINDING OF NO SIGNIFICANT IMPACT

## Proposed Kingman Reef National Wildlife Refuge

Line Islands, Central Pacific Ocean

The U.S. Fish and Wildlife Service (Service) has completed an Environmental Assessment (EA) for the proposed Kingman Reef National Wildlife Refuge (Refuge). The EA describes the Service's proposal and the affected environment and evaluates the effects of two alternatives (including the No-Action alternative) on the environment. A Conceptual Management Plan (CMP) complements the EA and provides information on management programs that may be implemented on the Refuge during the interim period, between Refuge establishment and completion of a Refuge Comprehensive Conservation Plan. The analysis in the EA documents the Service's evaluation of the environmental consequences of establishing an approved Refuge boundary and implementing Refuge management according to guidelines in the CMP, and is the basis for this Finding of No Significant Impact.

The proposed Refuge will allow the Service to protect and manage outstanding coral reef resources of Kingman Reef in perpetuity as part of the National Wildlife Refuge System. The affected environment at Kingman Reef is a remote oceanic coral reef atoll ecosystem that supports migratory seabirds and shorebirds, and a rich diversity of coral reef and other marine species including giant clams, more than 100 species of corals, a variety of other marine invertebrates, algae, hundreds of species of fish, endangered and threatened sea turtles, and marine mammals.

The long term, short term direct, indirect, and cumulative environmental effects of the alternatives were evaluated in the EA.

Under Alternative A, the No-Action alternative, the Service would not establish a Refuge at Kingman Reef, and the lagoon, reef, and associated waters would not have a protected boundary or receive active management by the Service under the auspices of the National Wildlife Refuge System.

Under Alternative B, the Service's selected alternative, a Refuge boundary will be approved that would include emergent lands, submerged lands and associated waters extending seaward 12-nautical miles from reefs exposed at low water, the extent of the territorial sea. This will protect the entire lagoon and reef complex and provide for conservation and management of the coral reef atoll ecosystem and other natural resources by the Service under the auspices of the National Wildlife Refuge System, in perpetuity. Alternative B will protect a total of approximately 483,702 acres including approximately 3.2 acres of emergent land and approximately 25,874 acres of coral reef habitat. This alternative was selected for implementation because it provides the highest level of protection and management for the outstanding marine resources of Kingman Reef.



EXHIBIT "38"

The Service is not proposing to open the Refuge to public visitation during the interim period. Opportunities for a Refuge public visitation program will be considered during the future development of a Comprehensive Conservation Plan.

With the exception of mooring buoys, the Service does not envision any facilities development at Kingman Reef. The design, construction, and operation of the buoys will undergo additional planning and environmental review prior to installation.

The Service would not open the waters of the Refuge to commercial fishing, and plans to establish guidelines for mariners that would include voluntary routing measures, such as areas-to-be-avoided. The guidelines would not be intended to infringe on international rights of innocent passage through the waters of the Refuge.

**Public Review**

As part of the public notice and review process, the EA and associated documents were made available for a 30-day public review and comment period that was open from December 11, 2000, through January 11, 2001. Newspaper articles, and an abstract in the State of Hawaii's Office of Environmental Quality Control newsletter, the *Environmental Notice*, informed the public of the project and the availability of the draft EA. During the public comment period, we received 18 letters from individuals, government agencies, and conservation and fishing groups. Conservation organizations strongly supported the proposed Refuge, while fishing interests opposed the proposed Refuge. The comments were considered in finalizing our decision document and environmental assessment.

**Effects of the Selected Alternative on the Social and Economic Environment**

A private entity claimed to own title at Kingman Reef. The Service requested that the Office of Solicitor, Department of the Interior, review the documents provided by the legal firm representing the claimants. The Solicitor believes the claim is not legally valid. Therefore, the proposed Refuge would not result in a significant adverse economic or regulatory taking on the private entity.

Because of its remote location and reservation as a Naval Defensive Sea Area (NDSA), access to and use of Kingman Reef for economic purposes has been restricted by proclamation, although Naval regulations do not preclude the right of foreign flag vessels exercising their right of innocent passage under international law.

Some comment letters stated a certain level of commercial fishing occurs nearby Kingman Reef. When considering the remote location of the atoll, the relatively low reported commercial harvests from within the Kingman Reef Exclusive Economic Zone (EEZ), current access and use restrictions by the Navy, and the opportunity for commercial fishing ventures to fish in the waters of the EEZ outside the 12-NM Refuge boundary, the Service concluded that there would be no significant adverse economic effects associated with Refuge establishment.

# 2 CHAPTER 2. THE AFFECTED ENVIRONMENT

## 2.1 Overview of Kingman Reef

Kingman Reef is a low-lying coral reef atoll located in the Line Islands in the central Pacific Ocean. It features outstanding marine communities including the deep central lagoon, an extensive and diverse coral reef complex, emergent lands, and surrounding pelagic waters of the atoll, all of which support migratory birds, threatened green sea turtles, and other native fish and wildlife species.

The first recorded western contact at Kingman Reef was by an American seaman, Captain Fanning, in 1798 (Stanley 1991). The reef was named after Captain Kingman, who visited in 1853. The U.S. annexed the reef in 1922, and in 1934 delegated jurisdiction to the Navy. Pan American Airways "Clipper" planes bound from Honolulu to New Zealand landed in the lagoon several times during a trial period for a trans-Pacific airline route in 1937 and 1938. The route was unsuccessful and was subsequently abandoned (Davies 1987, Krupnick 1997).

The atoll is unsuitable for human habitation, due to the small size of emergent land spits and lack of fresh water. The airspace and waters at Kingman Reef have been reserved by the Department of the Navy for military purposes (see appendix E).

A scientific resource assessment was recently conducted by the Service and the National Marine Fisheries Service (NMFS) (Flint and Aycock 2000; Maragos 2000; Newbold 2000; Wass and DeMartini 2000). Working from the National Oceanographic and Atmospheric Administration's (NOAA) Research Vessel, *Townsend Cromwell*, three Service biologists conducted SCUBA dives at four sites and snorkeled at two other sites recording fishes, corals, and other invertebrates. Six NOAA divers participated in several miles of towed underwater SCUBA surveys. Two Service biologists were detailed to land spits to survey migratory birds. Reports and species lists from the site visit are on file with the Service and the NMFS. Divers reported that the coral reefs at Kingman Reef are among the most pristine in the Pacific (Maragos 2000).

## 2.2 Affected Physical Environment

Kingman Reef is located in the equatorial central Pacific Ocean in the Line Islands at 6°23'N latitude, 162°25'W longitude. (figure 1-1). Low-lying, partially exposed and submerged coral reefs surround a deep central lagoon (figure 1-2). The outer reef is approximately 12.4 miles long on the southern face, 7.5 miles long on the northeastern face, and 8.7 miles long on the northwestern face. The lagoon ranges in depth from 50 to 250 feet. Three barren coral rubble land spits are found on the eastern reefs and provide resting sites for migratory seabirds, foraging habitat for migratory shorebirds, and may serve as basking areas for threatened green sea turtles.

Climatic conditions are not well documented, however, the atoll's location just 33 nautical miles north of Palmyra Atoll means they are likely influenced by the same major climatic and oceanic systems. Kingman Reef lies within the northern hemisphere convergence zone (Sadler 1959). This zone, known as the "Intertropical Convergence Zone", or ITCZ, is an area of weak and variable winds between the northeast and southeast tradewind systems (Drake *et al.* 1978). As the two air masses meet, the air rises, becomes cooled, and drops its moisture in the form of rain. The ITCZ is responsible for the high rainfall and frequent cloud cover reported for Palmyra Atoll, and although rainfall data are not available for Kingman Reef, it is likely affected by the

high cloud cover associated with the ITCZ. Average temperatures at Palmyra are reported to range from 75° to 85°F and can be extrapolated to Kingman Reef, although Kingman Reef lacks the tropical rainforest of Palmyra Atoll that, together with a larger emergent land base, may contribute to localized warming. Kingman Reef is subject to tropical storms that occasionally batter the atoll with high winds and storm waves.

The project area is affected by the eastward-flowing North Equatorial Countercurrent, a relatively narrow current located between latitudes 5 degrees and 10 degrees North, that flows eastward, in the opposite direction from the major westward-flowing currents of the northern and southern hemispheres (Drake *et al.* 1978). The northern boundary of this current is an area of upwelling that brings nutrient rich waters to the surface, and is an important foraging ground for several marine species including seabirds.

### 2.2.1 Air and water quality

Air quality is excellent at Kingman Reef, as there are no sources of airborne pollutants. The waters of the atoll are remarkably clear, with more than 300-foot visibility reported from recent diving surveys (Maragos 2000). The water clarity is believed to be due to both a lack of land-based sediment inputs and the exposure of the reef and lagoon to oceanic waters.

## 2.3 Affected Social and Economic Environment

### 2.3.1 Ownership

Kingman Reef is not part of any state (U.S. GAO 1997). The atoll is a United States unincorporated territory without an organic act, which is currently subject to control by the U.S. Navy. For the past 59 years, the reefs and waters of the territorial sea[2] (within 12 nautical miles of the extreme high tide mark) have been reserved as a Naval Defensive Sea Area for the purpose of national defense (E.O. 8682 dated February 14, 1941).

At such time as Kingman Reef is no longer needed for military purposes and the Navy terminates its military use, the Department of the Interior would regain full jurisdiction. The Service would subsequently establish the Refuge through a Secretarial Order transferring jurisdiction and control from the Office of Insular Affairs to the Service.

A private entity challenged the government's claim to title at Kingman Reef. Although the Service is aware of previous claims of ownership by a private party, the Navy's title research in the past (reported in GAO 1997) and our own title research did not find evidence to substantiate the claim. During the public comment period, the private party provided documentation regarding their ownership claim. The documents were reviewed by the Department of the Interior's Office of the Solicitor. The Solicitor believes that the legal title holder of record is the Department of the Interior, with a reservation in favor of the U.S. Navy.

[2] The territorial sea of the United States, as defined by Proclamation No. 5928 of the President of the United States of America (54 F.R. 777), extends to 12 nautical miles from the baselines of the United States determined in accordance with international law.

**Effects of the Selected Alternative on the Physical and Biological Environment**

The Refuge will enable the Service to protect and manage the atoll ecosystem at Kingman Reef in perpetuity. Refuge management will help to protect the coral reef ecosystem by controlling maritime access and uses within the 12-nautical mile Refuge boundary. Natural resources management programs such as marine debris removal, monitoring, research, and other actions will promote the long-term conservation of the coral reefs and other habitats for the benefit of the wildlife that live on the lands and in the waters of the Refuge. These actions are an enhancement over existing management of the area, and are expected to protect the high quality of existing resources and slightly enhance the atoll natural resources over time. Thus, establishment and management of the Refuge will not result in significant impact to the physical and biological environment.

**Effects on Endangered or Threatened Species, Migratory Birds, and other Federal Trust Species**

The Refuge will protect listed species and other Federal trust species and their essential habitats at Kingman Reef in perpetuity. Therefore, there is no significant impact to Federal trust species.

**Effects on Historic and Cultural Resources**

There is no evidence of permanent prehistoric human settlement on Kingman Reef, and there are no sites listed on or eligible for listing on the National Register of Historic Sites at Kingman Reef. If significant historic and cultural resources are found on the Refuge in the future, the Service will protect and manage them as required by the National Historic Preservation Act. Therefore, establishment and management of the Refuge will not have a significant effect on any historic and cultural resources that may be found on the Refuge.

**Other Effects**

The establishment and management of the Refuge will not significantly affect ambient noise, air quality, water quality, or public health and safety. Establishment and management of the Refuge will not change the unique characteristics of the geographic area, will not result in scientific controversy over effects, will not result in uncertain or unknown risks, and will not result in disproportionately high adverse environmental effects to a low-income population, minority population, or tribal group. The action will not be a precedent for establishment of a National Wildlife Refuge in a remote atoll area; or for the inclusion of submerged lands, coral reef resources, and pelagic marine species within the boundaries of a National Wildlife Refuge or under the management responsibilities of the Service. Because the Refuge is designed to conserve the natural environment of the atoll, and because of the current low level of use of the atoll and opportunities for commercial enterprises in nearby areas, there will be no significant long term, short term, or cumulative effects due to establishment and management of the Refuge.

**Supporting References**

U.S. Fish and Wildlife Service. 2001. Environmental Assessment for the Proposed Kingman Reef National Wildlife Refuge. Honolulu, HI.

**Public Availability of this Finding of No Significant Impact**

This Finding of No Significant Impact and supporting reference will be on file at the following office and will be available for public inspection. Interested and affected parties are being notified of this decision.

U.S. Fish and Wildlife Service
Pacific Islands Refuge Planning Office
Box 50088
Honolulu, Hawaii 96850
Phone: (808) 541-2749 / Fax: (808) 541-2756

**Determination**

Based upon my review and evaluation of the information contained in the supporting reference, I have determined that the action of approving a Refuge boundary that includes emergent lands, coral reefs, other submerged lands, and associated waters to the limit of the territorial sea (12 nautical miles from reefs awash at low water), and establishing a National Wildlife Refuge at Kingman Reef to be managed in accordance with a Conceptual Management Plan, is not a major Federal action that will significantly affect the quality of the human environment within the meaning of section 102(2)(C) of the National Environmental Policy Act of 1969, as amended. Accordingly, the Service is not required to prepare an environmental impact statement.

Issued in Portland, Oregon, January 17, 2001.

Anne Badgley 1/17/01

Regional Director, Region 1 Date

### 2.3.2 Land use and the local economy

Kingman Reef is a military defensive area. The reefs and waters of Kingman Reef are held in a custodial status by the Navy.

Fishing has not been authorized by the Navy within the Naval Defensive Sea Area. However, a relatively low-level of fishing is reported to occur within the 200-nautical mile Exclusive Economic Zone, according to a report by the Western Pacific Regional Fishery Management Council (1999) and comments received during the public comment period. Shark fishing for the shark-fin trade, and fishing for big-eye and yellow-fin tuna characterize the known commercial fishery in the EEZ.

During the public comment period, the Service was informed by a commercial fishing operator that a few fishermen fish for bottomfish near or on Kingman Reef and troll near the reef for ono, mahimahi and other pelagic fishes. According to the respondent, the waters outside of the 500 fathom depth (2,000 feet), support an active tuna longline fleet based in Honolulu. Another respondent notified us that a commercial operation based out of Palmyra Atoll on a temporary license agreement, fishes in the EEZ of Kingman Reef, including nearshore waters that are proposed for inclusion in the Refuge boundary.

### 2.3.3 Current management of marine resources at Kingman Reef

The National Marine Fisheries Service (NMFS) of the Department of Commerce and the Western Pacific Fishery Management Council (WPRFMC) have fishery resource management responsibilities in the 200-NM EEZ that surrounds United States' possessions. Their fishery resource management responsibilities include regulating commercial fish harvests in the waters of the United States.

The WPRFMC is an advisory council and assists NMFS with developing policies regarding the management of fisheries in the EEZ around American Samoa, Guam, Hawaii, the Northern Mariana Islands, and other United States' possessions in the Pacific, an area of nearly 1.5 million square miles.

Current fishing regulations in the region address provisions for longline and other pelagic fisheries. The NMFS is in the process of developing other fishery management plans for the Western Pacific that will include provisions for the management of commercial harvest of coral reef resources, precious corals, and an extension of bottom fishery and lobster fishery management regulations to include the EEZ at Kingman Reef. The plans have not been finalized for public release at this time.

The NMFS also has a regulatory review role for those Federal activities that may affect endangered and threatened sea turtles at sea, and monk seals, and has Federal trust responsibilities for marine mammals under the Marine Mammal Protection Act.

At Kingman Reef, the Service has Federal trust responsibilities for migratory birds, endangered and threatened sea turtles on land (e.g., breeding and basking areas), and certain species of other

aquatic wildlife (such as giant clams) that are protected by the Convention on International Trade in Endangered Species of Wild Fauna and Flora or CITES.

### 2.3.4 Public use and visitation

No permits have been recently issued by the Navy for members of the public to visit or fish within the Naval Defensive Sea Area at Kingman Reef.

### 2.3.5 Historic resources

There is no evidence of permanent human settlement on Kingman Reef, and there are no sites that are listed or that are known to be eligible for listing on the National Register of Historic Sites.

## 2.4 Biological Environment

### 2.4.1 Natural communities

Kingman Reef is classified as an oceanic atoll (Holthus and Maragos 1995). At the present time, emergent land at consists of three coral rubble spits that have formed atop the eastern portion of the reef. These islets are approximately 50 feet by 300 feet long (Flint and Aycock 2000). These islets provide foraging and resting habitat for migratory shorebirds and seabirds including Brown Boobies and Wandering Tattlers.

The coral reefs at Kingman Reef are reported to be among the most pristine in the Pacific (Maragos 2000). A variety of reef formations are present at Kingman Reef including lagoon patch reefs, pinnacle reefs, ribbon reefs, intertidal reefs, reef slopes, reef terraces, and reef spur formations, each with distinctive natural communities and supporting an outstanding diversity of marine life forms.

The boundary areas between the North Equatorial Countercurrent and other ocean currents in the vicinity of Kingman Reef are areas of upwelling. The nutrient rich waters form important marine feeding grounds for seabirds and contribute to the biological diversity of the atoll.

### 2.4.2 Wildlife of Kingman Reef

The reefs and waters of Kingman Reef support a spectacularly diverse and healthy marine community. Coral reef ecologists reported 168 species of fishes including sharks, rays, eels, groupers, jacks, goatfishes, butterflyfishes, damselfishes, mullets, wrasses, parrotfishes, surgeonfishes, and tuna (Wass and DeMartini 2000). Also recorded were 102 species of corals, including an undescribed species of fingercoral (*Porites*) and spectacular assemblages of mushroom corals, fire coral, table coral, and plate coral, among other species (Maragos 2000). Other species noted were several giant clams (*Tridacna maxima*, *T. crocea*), and several species of other bivalves, anemones, octopus, crabs, sea urchins, sea cucumbers, and tunicates (Newbold 2000). Several species of giant clams (*Tridacna* spp.) are protected by CITES and can be found in relatively large numbers in waters of Kingman Reef.

Appendix A provides a list of national trust species of wildlife recently reported at Kingman Reef. Threatened green sea turtles (*Chelonia mydas*) were observed foraging at Kingman Reef and the coral islets may serve as basking sites for this species. The atoll may support endangered hawksbill sea turtles (*Eretmochelys imbricata*), although none were observed on recent dive surveys.

The waters of Kingman Reef are a rich foraging ground for Pacific migratory seabirds that feed on nearshore coral reef and other fish species. Seabirds observed during recent visits included Brown Boobies, Great Frigatebirds, Wandering Tattlers, and Sooty Terns. Brown Boobies were observed resting on the coral islets.

# 3 CHAPTER 3. ALTERNATIVES INCLUDING THE PROPOSED ACTION

## 3.1 Background

The U.S. Fish and Wildlife Service has been involved in protecting and managing remote Pacific islands and coral atolls since the Hawaiian Islands National Wildlife Refuge was established in 1909. Kingman Reef has long been noted by Service biologists for its importance to migratory birds and coral reef natural resources, and preliminary scoping of options for the Service to protect the area began in 1991. In October of 1997, the Director of the U.S. Fish and Wildlife Service gave her approval for the Service to proceed with detailed planning to study the establishment of a National Wildlife Refuge at Kingman Reef.

The Kingman Reef National Wildlife Refuge proposal was developed using an interdisciplinary approach that included input from people with special expertise in remote islands Refuge management and Pacific islands and atoll conservation, as well as ornithologists, botanists, and marine biologists.

## 3.2 Boundary Selection

The proposed Refuge boundary was designed to enable the Service to protect coral reefs, migratory birds, and other marine resources of Kingman Reef in perpetuity. The Refuge boundary would protect the coral reef ecosystem (which extends to at least the 100 fathom depth) and includes open waters that are important for marine mammals, pelagic fishes, deep water invertebrates, sea turtles, and migratory seabirds. The open waters would also serve as a management buffer around the coral reefs.

## 3.3 Alternatives Considered in Detail

### 3.3.1 Alternative A. No Action

Under the No-Action alternative, a National Wildlife Refuge would not be established at Kingman Reef. Public funds would not be expended annually for Refuge operations and maintenance. The No-Action alternative represents a continuation of the *status quo* in which the atoll would continue to be used for military purposes by the U.S. Navy. Except for otherwise authorized officers or employees of the United States, access to Kingman Reef and its surrounding waters would continue to be restricted to access by the Navy. There would be no long-term comprehensive management actions implemented by the Service to conserve the marine wildlife and coral reef ecosystem at Kingman Reef under the No-Action alternative.

Under proposed regulations, the National Marine Fisheries Service would potentially designate a no-take marine protected area in waters shallower than 50-fathoms around Kingman Reef (see WPRFMC 2001). There would be no commercial fishing allowed for coral reef species, bottom fishes, precious corals, crustaceans, or pelagic fish managed by NMFS within this area.

3.3.2 Alternative B. (the Service's preferred alternative). Establish the Kingman Reef National Wildlife Refuge with a boundary extending to 12 nautical miles from reefs exposed at mean low tide.

Under Alternative B (shown in figure 3-1), the Service would establish the Kingman Reef National Wildlife Refuge (Refuge). The approved Refuge boundary would include the lagoon, emergent land, coral reefs, and other submerged lands and associated waters extending seaward 12 NM from reefs exposed at mean low tide. Under Alternative B, the approved Refuge boundary would protect a total of 483,702 acres including approximately 3 acres of emergent land and 25,874 acres of coral reef habitat. The Service would expend public funds for Refuge operations and management. The Service would implement long-term comprehensive management actions to conserve the coral reef ecosystem of Kingman Reef, implement endangered and threatened species recovery programs, and actively manage migratory birds and other native species.

## 3.4 Alternatives Considered and Rejected

The Service initially considered establishing a Refuge only to within 3 nautical miles from reefs exposed at low tide. This alternative was not included in the environmental assessment because the Service believed in would not meet the project purposes because it would not protect all of the coral reef ecosystem that contains important fish and wildlife resources. We were concerned that such a boundary would have been too small to adequately prevent ships from accidentally grounding on shallow reefs. The Service desired a larger buffer area in which to manage maritime traffic, and in which to protect sea turtles, migratory birds, and marine mammals from interactions with commercial fishing operations.

## 3.5 Comparison of the Alternatives

Table 3-1 summarizes the attributes of the alternatives for the purpose of comparison. Effects of the alternatives on the environment are discussed in Chapter 4.

Alternative A, the No-Action alternative, would not result in an active natural resources conservation program at Kingman Reef under the auspices of the National Wildlife Refuge System. Protection of the fish and wildlife of Kingman Reef would be only through passive control of access and proposed NMFS provisions for a marine no-take area in waters shallower than 50-fathoms (300 feet). There would be no active programs to study and monitor the area, enforce Refuge system laws, enhance fish and wildlife resources and habitats, and no public educational programs implemented by the Service. Commercial fishing would likely be permitted in waters deeper than 50-fathoms, and managed by NMFS under various new and revised fisheries plans.

A Refuge (Alternative B) would allow the Service to provide long-term conservation and management of coral reef and other marine and terrestrial resources at Kingman Reef in perpetuity. This alternative would provide active habitat and fish and wildlife monitoring and enhancement programs, Refuge law enforcement, and public educational programs. The Refuge would not be open to commercial fishing.




Figure 3-1. The boundary of the proposed Kingman Reef National Wildlife Refuge. *The approved boundary would include emergent land, and submerged lands and associated waters seaward from reefs exposed at low water to the 12-nautical mile extent of the territorial sea.*

Table 3-1. Comparison of the Alternatives.

| | [illegible] No Action. A Refuge would not be [illegible] Kingman Reef. | Alternative B: Establish a Refuge at Kingman Reef to 12 NM from reefs exposed at mean low tide. |
|---|---|---|
| Description: | This alternative is the *status quo*. A National Wildlife Refuge (Refuge) would not be established at Kingman Reef. The Navy would retain jurisdiction and control of the area. | The Service's Preferred Alternative. The Service would establish a Refuge at Kingman Reef with a boundary of 12 NM from reefs awash at mean low tide. |
| Size of Refuge: | 0 acres | 483,702 acres |
| Area of coral reef habitat protected in an approved Refuge boundary: | 0 acres | 25,874 acres |
| Conservation of atoll fish and wildlife resources: | Conservation would be primarily through control of access and provisions to regulate commercial fishing including a no-take marine area in waters shallower than 50-fathoms (300 feet). Commercial fishing would potentially result in interactions with listed species, marine mammals, and seabirds. | Alternative B would result in active natural resources conservation and management by the Service through Refuge management programs that are described in the Conceptual Management Plan. These include control of access and uses of the Refuge, monitoring, research, habitat and fish and wildlife enhancement actions, public education, and law enforcement. |
| Protection/recovery of endangered and threatened species | Commercial fishing would likely impact listed species to some degree under the no-action alternative. | Endangered and threatened species would be actively protected and managed to promote recovery in waters of the Refuge. |
| Public Access to Kingman Reef. | The Navy would continue to regulate the waters of the atoll. Commercial fishing would be regulated by NMFS and with approval by the Navy. | The Service would regulate access to the Refuge. Future opportunities for compatible public visitation at the Refuge would be evaluated during the development of a Refuge Comprehensive Conservation Plan |

# 4 CHAPTER 4. ENVIRONMENTAL CONSEQUENCES OF THE ALTERNATIVES

This chapter describes the potential environmental consequences of the alternatives. The No-Action alternative assumes a continuation of the current status and serves as the baseline for comparison of the effects of the action alternative. Table 4-1 summarizes the findings of this chapter.

## 4.1 Effects of the Alternatives on the Physical Environment

### 4.1.1 Effects of the alternatives on air and water quality

The present access restrictions help to protect water quality of the atoll by reducing the likelihood of accidental ship groundings.

Under Alternative B, the Service would provide mariners with guidelines for access which would help prevent accidental ship groundings. The protection of air and water quality is consistent with the Service's goals for protecting the pristine marine environment at Kingman Reef. Access to the Refuge by approved vessels would be at relatively low levels, so there would not be a significant reduction in air or water quality. Refuge safety plans, navigation protocols, and the installation of mooring buoys would help to minimize the risk of accidental groundings by vessels used by the Service for Refuge natural resources management activities.

## 4.2 Effects of the Alternatives on the Social and Economic Environment

### 4.2.1 Effects of the alternatives on ownership

Both alternatives would continue the Federal ownership at Kingman Reef, and waters of the territorial seas.

If the Navy extinguishes its use reservation, under Alternative A, jurisdiction and control would revert to the Office of Insular Affairs. This alternative assumes that OIA would maintain the area in custodial status (would not implement active natural resources management).

If the Navy extinguishes its use reservation, under Alternative B, Kingman Reef and the waters of the territorial sea would be transferred to the Service for inclusion in the National Wildlife Refuge System.

### 4.2.2 Effects of the alternatives on land use and the local economy

Under the No-Action alternative, access to and use of Kingman Reef and its surrounding waters would continue to be regulated by the Navy and reserved for military use.

Under Alternative B, the use of the area would change from custodial military reserve to active natural resource conservation and management in the National Wildlife Refuge System. While we received reports that limited fishing occurs in the waters surrounding Kingman Reef, the reported levels are comparatively low. Commercial fishing operations would continue to be able to fish in the EEZ beyond the 12 NM Refuge boundary. Therefore, the proposed Refuge fishing would not have a significant adverse economic effect on commercial fishing operations.

#### 4.2.3 Effects of the alternatives on management of marine resources at Kingman Reef

Under the No-Action alternative, NMFS would continue to have the authority for managing commercial fisheries in waters of the 200-NM Exclusive Economic Zone that are open for commercial fishing. At present, there is no commercial fishing authorized by the Navy at Kingman Reef, although it has been reported to the Service that a low level of fishing does occur.

Under the No-Action Alternative, NMFS would continue its regulatory role in the protection and recovery of endangered and threatened sea turtles at sea and monk seals under the Endangered Species Act, and in the conservation of marine mammals under the Marine Mammal Protection Act. The Service would continue its regulatory role in the protection and recovery of endangered and threatened sea turtles on land, and in its wildlife law enforcement role.

Under Alternative B, NMFS would no long have the authority to manage commercial fishing in the Refuge boundary, because the Refuge would not be opened to commercial fishing. This is a relatively small area compared to the large areas of ocean that NMFS manages, so it would not be a significant change in their management authority. Alternative B would not affect NMFS's or the Service's respective regulatory roles related to endangered and threatened species, and other national trust wildlife.

Under Alternative B, the Service would continue to coordinate management activities with NMFS to comply with section 7 of the Endangered Species Act. The Service would invite NMFS to cooperate with specific atoll management activities including baseline surveys, habitat enhancement such as the removal of marine debris, research on listed sea turtles or marine mammals, and research on other marine species.

#### 4.2.4 Effects of the alternatives on public use and visitation

Under the No-Action alternative, access to Kingman Reef would continue to be restricted by the Navy within the territorial sea. The Navy does not currently have the ability to prevent innocent passage within the territorial sea according to international regulations, so far as those are incidental to ordinary navigation, or rendered necessary by major forces including distress, or to render assistance.

Alternative B would result in no change to public access. However, in the future, the Service may develop opportunities for low levels of compatible public visitation. Proposals for public use would be considered during future Comprehensive Conservation Planning efforts and coordinated with the public. As is currently true, Service Refuge regulations would not be intended to limit innocent passage according to international laws.

#### 4.2.5 Effects of the alternatives on historic resources

Although there are no known historic resources or sites at Kingman Reef, under the No-Action alternative, the Federal administrator would continue to be responsible for complying with the National Historic Preservation Act.

If a Refuge were to be established under Alternative B, the Service would assume responsibility for compliance with the National Historic Preservation Act. There would be no change, therefore, in the degree of protection and management to historic resources that may be found in the future.

## 4.3 Effects of the Alternatives on the Biological Environment

Under the No-Action alternative, Navy controls over access to Kingman Reef would provide limited passive protection to the natural resources of the atoll. Natural reef processes would continue. Endangered and threatened sea turtles and migratory sea birds would be protected from the effects of commercial fishing. There would be no active management programs to control marine debris, implement monitoring programs, provide public education about the area, and no law enforcement patrols under the No-Action alternative.

Refuge establishment would enable the Service to protect the coral reef ecosystem and associated waters of Kingman Reef in perpetuity. Refuge management programs (described in the Conceptual Management Plan, Appendix B) would help to conserve the native fish and wildlife resources, including marine and terrestrial habitats, migratory birds, marine mammals, endangered and threatened species, and the rich diversity of wildlife found in the land and waters of the atoll. The Service would implement active management programs to control marine debris, implement monitoring programs, provide public education about the area, and would also provide an active law enforcement presence.

## 4.4 Other Considerations

### 4.4.1 Cumulative effects

Under the No-Action alternative, over time, the lack of active natural resources management could result in a decline in the quality of the reef ecosystem. Establishment and management of the Refuge would maintain the high quality marine resources which presently exist and result in the long-term conservation of resources through proactive Refuge management programs.

### 4.4.2 Relationship between short-term uses of the environment and enhancement of long-term productivity

Both alternatives would maintain the lands, reefs and waters of Kingman Reef in a natural state. This would provide for the continued productivity of the natural ecosystem.

### 4.4.3 Environmental justice

Neither alternative would have a disproportionately high and adverse human health or environmental effect on minority populations and low-income populations.

### 4.4.4 Irreversible and irretrievable commitments of resources

Neither alternative would result in an irreversible or irretrievable commitment of resources.

Table 4-1. Summary of the Effects of the Alternatives on the Environment.

| Alternative: / Issue: | Alt. A (No Action): A National Wildlife Refuge would not [illegible] at Kingman Reef. | Alt. B (The Service's Preferred Alternative): A National Wildlife Refuge would be established at Kingman Reef. |
|---|---|---|
| **Effects on the Physical Environment** | | |
| Effects on air and water quality | Navy control of access helps to protect water quality of the atoll by reducing the likelihood of accidental ship groundings. | The Service would work to protect air and water quality on the Refuge. The Refuge boundary and navigation guidelines would help reduce the potential for accidental vessel groundings. The limited, controlled use of vessels on the Refuge for Refuge management would not have a significant adverse effect on water or air quality. |
| **Effects on the Social and Economic Environment** | | |
| Effects on ownership | Kingman Reef would remain under the control of the U.S. Navy. If the Navy extinguished its use reservation, the Office of Insular Affairs would acquire jurisdiction. | Kingman Reef would remain under Federal jurisdiction. If the Navy extinguished its use reservation, the Service would acquire jurisdiction. |
| Effects on land use and local economy | The area would continue in the status quo as a military reserve area. No economic activity is currently authorized by the Navy in the Naval Defensive Sea Area. A low level of commercial fishing was reported to the Service from waters surrounding Kingman Reef. | The area would be maintained in a natural state and actively managed to conserve natural resources. The Refuge would be closed to commercial fishing, although commercial fishing vessels could fish within the EEZ outside of the proposed Refuge boundary. Given the low levels of current fishing, and ongoing military access restrictions, the economic effects of the proposed Refuge would not be significant. |

| Alternative: / Issue: | Alt. A (No Action): A National Wildlife Refuge would not be established at Kingman Reef. | Alt. B (The Service's Preferred Alternative): A National Wildlife Refuge would be established at Kingman Reef. |
|---|---|---|
| Effects on management of marine resources | NMFS would continue to have a regulatory role regarding the protection and recovery of threatened green sea turtles and endangered hawksbill sea turtles at sea, as well as for the protection of marine mammals.<br><br>NMFS would manage and regulate commercial fishing in the waters of the EEZ with the Navy's permission.<br><br>The Service would continue to have a regulatory and enforcement role in the protection and recovery of threatened and endangered sea turtles on land, and the protection of migratory birds and other resources. | NMFS would no longer have fisheries management jurisdiction in the waters of the Refuge. The change in the area over which they have the authority and right to manage fisheries would not be significant.<br><br>There would be no change to NMFS's or the Service's regulatory or enforcement roles and responsibilities. |
| Effects on public access | The waters of the NDSA are closed to general public access. | The Service would not open the Refuge to public access during the interim period–except by Special Use Permit considered on a case by case basis. In the future, the Service would consider the potential for low levels of compatible public use during Comprehensive Conservation Planning for the Refuge. |
| Effects on historic resources | There are no sites listed on or known to be eligible for listing on the National Register of Historical Sites. Any cultural or historical resources that may be found at Kingman Reef in the future would be protected by the Navy as required by law. | No change to the level of protection that would be required. The only change would be that the Service would become the responsible agency for compliance with laws protecting historical resources that may be found in the future. |

| Alternative: <br> Issue: | Alt. A. No Action: A National Wildlife Refuge would not be established at Kingman Reef. | Alt. B (The Service's Preferred Alternative): A National Wildlife Refuge would be established at Kingman Reef. |
|---|---|---|
| Effects on the Biological Environment | | |
| Effects on coral reefs, migratory birds, and other habitats and wildlife | Fish and wildlife and their habitats would be passively protected through the Navy's control of access and uses within the Naval Defensive Sea Area. A no-take marine preserve may be established to the 50-fathom depth around the atoll by NMFS. | Coral reef ecosystems, other habitats, and wildlife of the atoll would be protected and actively managed by the Refuge through programs including monitoring surveys, research, habitat and wildlife management and enhancement, public education, and law enforcement. A no-take marine preserve would be established to the 12-NM Refuge boundary. |
| Endangered and threatened species | Endangered and threatened species would be passively protected through the Navy's control of access and uses within the Naval Defensive Sea Area. Future commercial fishing operations would likely have interactions with listed species. | Endangered and threatened species and their habitats would be protected and actively managed on the Refuge in perpetuity. Protection of nearshore and surrounding waters from commercial fishing activities would benefit listed species. |
| Other Considerations | | |
| Cumulative effects | A lack of proactive management could lead to a decline in the quality of the reef ecosystem over time. | Long-term conservation of resources would occur through proactive Refuge management programs. |
| Short-term uses vs. long-term productivity | At present, the low levels of commercial fishing that are reported are not believed to be affecting long-term productivity. | The natural environment and productivity would be conserved. |
| Environmental justice | No minority or low-income populations would be affected. | No minority or low-income populations would be affected. |
| Irreversible or irretrievable commitments of resources | None. | None. |

# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, D.C. 20240

ORDER NO. 3223

Subject: Kingman Reef National Wildlife Refuge

Sec. 1 **Purpose.** On September 1, 2000, the Department of the Interior accepted restoration of its administrative jurisdiction over Kingman Reef from the Department of the Navy. The purpose of this Order is to establish the Kingman Reef National Wildlife Refuge (Refuge) to be administered by the Director, United States Fish and Wildlife Service (Director). This action is taken to protect the natural character, including the fish, wildlife, plants, coral reef communities, and other resources of Kingman Reef and all reefs surrounding Kingman Reef.

Sec. 2 **Authority.** The authority for this Order is derived from: 1) 43 U.S.C. §1458; 2) the National Wildlife Refuge System Administration Act of 1966, as amended, 16 U.S.C. §§ 668dd; 3) Reorganization Plan No. 3 of 1950; 4) the Fish and Wildlife Act of 1956, 16 U.S.C. §742f; 5) Executive Order 13089 dated June 11, 1998; and 6) Presidential Proclamation 5928 of December 27, 1988, 54 Fed. Reg. 777.

Sec. 3 **Establishment, Delegation and Administration.** Kingman Reef National Wildlife Refuge is hereby established. The authority of the Secretary for the civil administration of the Refuge is hereby delegated through the Assistant Secretary, Fish and Wildlife and Parks to the Director. The Refuge shall consist of the emergent areas of Kingman Reef and also of its surrounding submerged lands and waters out to the twelve (12) nautical mile Territorial Sea Boundary. The Director shall manage the Refuge under all applicable laws, policies and regulations that govern the National Wildlife Refuge System. Refuge management shall be undertaken consistent with the administrative control and jurisdiction exercised by the Secretary of the Navy pursuant to Executive Order 6935 of December 29, 1934, and Executive Orders 8682 and 8729 of February 14, 1941, and April 2, 1941, until and unless such administrative control and jurisdiction is extinguished.

Sec. 4 **Effective Date.** This Order is effective immediately.

[signature]

Secretary of the Interior

Date: January 18, 2001

TOTAL P.05

EXHIBIT "39"

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **KINGMAN REEF ATOLL INVESTMENTS, L.L.C., a Hawaii limited liability company; KINGMAN REEF ATOLL DEVELOPMENT, L.L.C., a Hawaii limited liability company,** | **NO. 06-828L** |
| | **Judge Marian Blank Horn** |
| **Plaintiffs,** | |
| **v.** | **CERTIFICATE OF SERVICE** |
| **THE UNITED STATES OF AMERICA** | |
| **Defendants.** | |

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing document will be duly served upon the following parties at their last known address by electronic filing and by DHL Express courier service and/or by U.S. Mail, postage prepaid, on February 22, 2007:

| | ELECTRONIC FILING | DHL EXPRESS | U.S. MAIL |
|---|---|---|---|
| The Honorable Marian Blank Horn<br>Judge, United States Court of Federal Claims<br>717 Madison Place, NW, Room 103<br>Washington, DC 20005<br>(2 Courtesy Copies) | | X | |
| Donna S. Fitzgerald, Esq.<br>Trial Attorney<br>Natural Resources Section, Environment & Natural Resources Division<br>United States Department of Justice<br>P.O. Box 663<br>Washington, D.C. 20044-0663<br>Email: Donna.Fitzgerald@usdoj.gov | X | X | |

| | | |
|---|---|---|
| Edward H. Kubo, Jr., Esq.<br>United States Attorney<br>Thomas A. Helper, Esq.<br>Assistant United States Attorney<br>Room 6-100, PJKK Federal Building<br>300 Ala Moana Blvd.<br>Honolulu, Hawaii 96850<br>Email: Tom.Helper@usdoj.gov<br>Attorneys for Defendants | X | X<br>(Without Exhibits) |

DATED: Honolulu, Hawaii, February 22, 2007.

BROOKS TOM PORTER & QUITIQUIT, LLP

By /S/ Christian P. Porter
CHRISTIAN P. PORTER, Hawaii Bar No. 3744
Attorney for Plaintiffs
KINGMAN REEF ATOLL INVESTMENTS, L.L.C. and
KINGMAN REEF ATOLL DEVELOPMENT, L.L.C.
Telephone No.: (808) 526-3011
Facsimile No.: (808) 523-1171