Of Counsel:
BROOKS TOM PORTER & QUITIQUIT, LLP

Christian P. Porter, Hawaii Bar No. 3744
2125 Davies Pacific Center
841 Bishop Street
Honolulu, HI 96813
Ph: 808-526-3011
Fax: 808-523-1171
Email: cporter@btpqlaw.com

Therese Y. Cannata, CA Bar No. 88032
Cannata, Ching & O'Toole LLP
899 Ellis Street
San Francisco, CA 94109
Ph: 415-409-8900
Fax: 415-409-8904
Email: tcannata@ccolaw.com

Attorneys for Plaintiffs
KINGMAN REEF ATOLL INVESTMENTS L.L.C. and
KINGMAN REEF ATOLL DEVELOPMENT LLC.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **KINGMAN REEF ATOLL INVESTMENTS, L.L.C., et al.,** | **No. 06-828L** |
| **Plaintiffs,** | **PLAINTIFFS' KINGMAN REEF ATOLL INVESTMENTS, L.L.C.'S AND KINGMAN REEF ATOLL DEVELOPMENT LLC'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |
| **v.** | |
| **THE UNITED STATES OF AMERICA; Defendant.** | |
| | **Judge Marian Blank Horn** |

# TABLE OF CONTENTS


TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INDEX TO EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

I.. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A. THE FULLARD-LEO FAMILY'S TITLE TO KINGMAN REEF . . . . . 2

B. THE EXECUTIVE ORDERS AND WORLD WAR II . . . . . . . . . . . . . . 3

C. THE GOVERNMENT ADMINISTERED KINGMAN REEF CONSISTENT WITH THE FULLARD-LEO FAMILY'S OWNERSHIP RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

D. THE GOVERNMENT'S UNCONSTITUTIONAL TAKING OF THE PROPERTY IN JANUARY 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

A. THE MOTION MUST BE DENIED UNLESS IT IS BEYOND DOUBT, BASED ON THE FACTS PRESENTED, THAT THE COURT HAS NO JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

B. THERE WAS NO TAKING, AND THE STATUTE OF LIMITATIONS DID NOT BEGIN TO RUN, IN 1934 OR 1941 . . . . . . . . . . . . . . . . . . . 12

1. THE GOVERNMENT'S JURISDICTION OVER KINGMAN REEF IS NOT OWNERSHIP . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

2. THERE WAS NOT, AND COULD NOT BE, A TAKING UNDER THE PICKETT ACT . . . . . . . . . . . . . . . . . . . . . . . . . . 14

3. TAKINGS CASE LAW SHOWS THAT THE EXECUTIVE ORDERS DID NOT CONSTITUTE A TAKING OF KINGMAN REEF IN 1934 OR 1941 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

4. UNDER THE SUPREME COURT'S *PENN CENTRAL* ANALYSIS, THERE WAS NO GOVERNMENTAL TAKING OF KINGMAN REEF IN 1934 OR 1941 . . . . . . . . . . . . . . . . . . . . . . 21

5. THE CORRESPONDENCE BETWEEN PLAINTIFF'S PREDECESSOR IN INTEREST AND THE GOVERNMENT DID NOT ESTABLISH A TAKING . . . . . . . . . . . . . . . . . . . . . . 23

C. EVEN IF THE 1934 AND 1941 EXECUTIVE ORDERS "INTERFERED WITH" PLAINTIFFS' PROPERTY RIGHTS, THERE WAS NO PERMANENT TAKING UNTIL 2001 . . . . . . . . . . . . . . . . . . . . . . . . . 25

1. ANY GOVERNMENTAL "INTERFERENCE" WITH KINGMAN REEF WAS AT MOST A SERIES OF CONTINUING CLAIMS THAT DID NOT CULMINATE AND BECOME CLEAR UNTIL 2001 . . . . . . . . . . . . . . . . . . . . . . . . 25

2. TO THE EXTENT THAT THE GOVERNMENT'S ACTIONS BEFORE 2001 MAY HAVE "INTERFERED WITH" PLAINTIFFS' PROPERTY RIGHTS, ANY CLAIM THAT MIGHT HAVE ACCRUED WAS FOR, AT MOST , A PARTIAL OR TEMPORARY TAKING, AND PLAINTIFFS RETAINED OWNERSHIP OF THE PROPERTY . . . . . . . . . . . . . . . . . . . . . 28

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## TABLE OF AUTHORITIES

### FEDERAL CASES


*767 Third Avenue Associates v. U.S.*, 48 F.3d 1575 (Fed. Cir. 1995) . . . . . . . . . . . 19,20

*Bagwell,* 21 Cl.Ct. 722 (Cl.Ct. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,12

*BW Parkway vUnited States*, 29 Fed. Cl. 669, 676 (1993) . . . . . . . . . . . . . . . . . . . . . . . 24

*Castro v. U. S.*, 205 Ct.Cl. 534, 500 F.2d 436 (Cl.Ct. 1974) . . . . . . . . . . . . . . . . . . 26,28

*Catellus Development Corporation v. United States*, 26 Cl. Ct. 210 (Cl.Ct. 1992) . . . . 20

*Columbia Basin Land Protection Association v. Schlesinger*, 643 F.2d 585 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Creppel v. United States*, 41 F.3d 627 (Fed.Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Cuban Truck and Equipment Company v. United States*, 333 F.2d 873, 878 (Ct. Cl. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Ewald v. United States*, 14 Cl.Ct. 378, 382 (Cl.Ct. 1988) . . . . . . . . . . . . . . . . . . . . . . . 11

*John R. Sand & Gravel Company v. United States*, 457 F.3d 1345 (Fed.Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17,18,24,30

*Juda v. United States,* 6 Cl.Ct. 441,451 (Cl.Ct. 1984) . . . . . . . . . . . . . . . . . . . . . 11,26,29

*Kemp v. United States*, 65 Fed. Cl. 818 (Cl. Ct. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Newhall v. Sanger*, 92 U.S. 761 (1875) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Nollan v. California Coastal Commission*, 483 U.S. 825 (1987) . . . . . . . . . . . . . . . 18,23

*Northern Lumber Co. v. O'Brien*, 204 U.S. 190 (1907) . . . . . . . . . . . . . . . . . . . . . . . . 15

*Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978) . 2,13,21,22,23

*Pewee Coal Co. v. United States*, 115 Cl.Ct. 626, 88 F.Supp. 426 (Cl.Ct.1950) . . . . . 17

*Roth v. United States*, 73 Fed. Cl. 144 (Cl.Ct. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Schultz v. United States* 5 Cl.Ct. 412, 419 (Cl.Ct 1984) . . . . . . . . . . 24

*Southern Utah Wilderness Alliance v. Bureau of Land Management*, 425 F.3d 735 (10th Cir. 2005) . . . . . . . . . . 27

*Terteling v. United States*, 334 F.2d 250, 254 (Ct. Cl. 1964) . . . . . . . . . . 21,26

*United States v. Dickinson*, 331 U.S. 745 (1947) . . . . . . . . . . 24,26,28

*United States v. Fullard-Leo*, 331 U.S. 256 (1947) . . . . . . . . . . 4

*United States v. Gossett*, 416 F.2d 565 (9th Cir. 1969) . . . . . . . . . . 15,16,17

*United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985) . . . . . . . . . . 19

**FEDERAL STATUTES**

16 U.S.C. § 1271 . . . . . . . . . . 24

28 U.S.C. § 2501 . . . . . . . . . . 1,2

Act of June 25, 1910, Ch. 421, 36 Stat. 847 . . . . . . . . . . 14

**RULES**

32 CFR 761.4(d)(2); 41 Fed.Reg.28, 957 (1976) . . . . . . . . . . 5

Federal Rules of Civil Procedure, Rule 12(b)(1) . . . . . . . . . . 1

**OTHER**

Executive Order No. 6935 . . . . . . . . . . 4

Executive Order 8682 . . . . . . . . . . 4,5

Executive Order No. 10264 . . . . . . . . . . 14

25 Op. U.S. Aty Gen. 292, 294 (1904) . . . . . . . . . . 14

# INDEX TO EXHIBITS

EXHIBITS ATTACHED TO PLAINTIFF'S COMPLAINT:

| Exhibit No. | Description |
|---|---|
| 1 | April 28, 1922, Island of Palmyra Copra Company Board meeting minutes |
| 2 | May 3, 1922, Island of Palmyra Copra Company letter from L. Fullard-Leo, President, and E. Fullard-Leo, Secretary - Treasurer, to Lorrin A. Thurston, its agent |
| 3 | May 10, 1922, Certificate of Claim to Kingman Reef by Lorrin A. Thurston, agent for the Island of Palmyra Copra Co., Ltd. |
| 4 | May 13, 1922 letter from Mr. Thurston to Mrs. Ellen Fullard-Leo |
| 5 | July 15, 1922 letter from E. Fullard-Leo, Secretary-Treasurer, the Island of Palmyra Copra Company, Ltd., to the Honorable Charles E. Hughes, Secretary of State, Washington, D.C. |
| 6 | August 14, 1922, Resolution of the Island of Palmyra Copra Company, Ltd. |
| 7 | September 28, 1922 letter from the Department of State, Washington, D.C. to the Island of Palmyra Copra Company, Ltd. acknowledging the August 24, 1922 letter. |
| 8 | July 9, 1926 letter to the Archives Commission from Lorrin A. Thurston |
| 9 | July 24, 1926 letter from the Archives of Hawaii to L.A. Thurston, Esq. |
| 10 | August 5, 1931 letter to Captain S.O. Swainson from L. Fullard-Leo |
| 11 | September 30, 1931 letter to L. Fullard-Leo from R.L. Faris, Acting Director, Department of Commerce, U.S. Coast and Geodetic Survey |
| 12 | December 29, 1934 Executive Order 6935 signed by President Franklin D. Roosevelt. |
| 13 | February 14, 1941 Executive Order 8682 signed by President Franklin D. Roosevelt. |
| 14 | April 2, 1941 Executive Order 8729 signed by President Franklin D. Roosevelt. |

15 April 18, 1941 Memorandum from the Chief of Naval Operations to the Commandant, Thirteenth Naval District.

16 Real property tax information (8-27-1941)

17 Several newspaper articles published regarding Copra Co.'s acquisition of Kingman Reef (1922 - 1995)

18 Pertinent pages of the check register and checks evidencing payment of real property taxes (1922 - 1958)

19 Notices of Real Property Assessments, Tax Bills and Real Property Returns (1938 - 1950)

20 August 19, 1991 memorandum prepared by Jim Maragos, The Nature Conservancy, Re minutes of meeting held at The Nature Conservancy.

21 August 1, 1997 letter from Peter Savio, President, Palmyra Development Co., Inc. to Mr. Joe Dettling

22 August 1997 Preliminary Project Proposal, Line Islands Units (Palmyra Atoll and Kingman Reef)

23 October 2, 1997 memorandum from the Director, United States Department of the Interior, Fish and Wildlife Service

24 October 3, 1997 letter to the U.S. Army Corps of Engineer at Fort Shafter, from Robert F. Smith, Pacific Islands Manager, U.S. Department of the Interior Fish and Wildlife Service

25 October 17, 1997 Memorandum on U.S. Department of Commerce, National Oceanic and Atmospheric Administration letterhead to WPFMC - Kitty M. Simonds, from GCSW - Judson J. Feder

26 November 1997 United States General Accounting Office Report to the Chairman, Committee on Resources, House of Representatives, U.S. Insular Areas, Application of the United States Constitution

27 August 25, 2000 letter from Department of the Navy, Office of the Assistant Secretary to the U.S. Department of the Interior

28 October 26, 2000 letter , from the United States Senate Committee on Appropriations to Bruce Babbitt, Secretary of the Interior

| | |
|---|---|
| 29 | October 26, 2000 letter to the U.S. Department of Agriculture from U.S. Senate Committee on Appropriations |
| 30 | November 17, 2000 Deed conveying Kingman Reef to Plaintiff |
| 31 | November 17, 2000 Lease between Kingman Reef Atoll Investments, LLC, Lessor, and Kingman Reef Atoll Development, LLC, Lessee |
| 32 | November 17, 2000 License Agreement between Kingman Reef Atoll Development, LLC, Licensor, and Kingman Reef Enterprises, LLC, Licensee |
| 33 | December 11, 2000 Environmental Assessment, U.S. Fish & Wildlife Service |
| 34 | December 11, 2000 Conceptual Management Plan, U.S. Fish & Wildlife Service |
| 35 | December 12, 2000 New Release by U.S. Fish & Wildlife Service |
| 36 | December 19, 2000 letter from Short Cressman & Burgess PLLC to National Wildlife Refuge System |
| | December 23, 2000 letter from Mr. Fullard-Leo to U.S. Fish & Wildlife Service and National Wildlife Refuge System |
| | December 29, 2000 letter from Western Pacific Regional Fishery Management Council to U.S. Fish & Wildlife Service |
| | January 4, 2001 letter from Brooks Tom Porter & Quitiquit to National Wildlife Refuge System and U.S.Fish & Wildlife Service |
| | January 11, 2001 letter Western Pacific Regional Fishery Management Council to U.S. Fish & Wildlife Service |
| 37 | January 11, 2001 letter from U.S. Department of Interior, Fish and Wildlife Service to Brooks Tom Porter & Quitiquit |
| 38 | January 17, 2001, U.S. Department of the Interior Fish and Wildlife Service's "Finding of No Significant Impact" dated January 17, 2001 |
| 39 | January 18, 2001 Order No. 3223 signed by the Secretary of the Interior, United States Department of the Interior |

EXHIBITS ATTACHED TO DEFENDANT'S ANSWER:

| Exhibit No. | Description |
| --- | --- |
| C. | Letter dated April 20, 1937 from L. And Ellen Fullard-Leo to the Honorable Samuel Wilder King. |
| D. | Letter dated March 29, 1938 from Townsend & Lewis to the Secretary of the Navy. |
| E. | Letter dated April 26, 1938 from G.J. Rowcliff, Judge Advocate General of the Navy, to Messrs. Townsend & Lewis. |

## I. <u>INTRODUCTION</u>

The Fifth Amendment requires the United States of America ("the government") to pay just compensation when it takes private property for public use. This case involves the taking by the government in January 2001 of property known as Kingman Reef Atoll ("Kingman Reef"), which is owned by Plaintiff Kingman Reef Atoll Investments, L.L.C.[1] The complaint was filed on December 6, 2006. The government has filed a motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure, contending that the six-year time period in which to bring this action pursuant to 28 U.S.C. section 2501 has expired. In its moving papers, the government concedes that the Fullard-Leo Family owned Kingman Reef prior to the unlawful taking. The issue presented in this motion is whether a permanent taking accrued as early as 1934, pursuant to the 1934 Execute Order, <u>*or*</u> in January 2001 pursuant to an order by the Secretary of the Interior establishing the subject property as a wildlife refuge.

Neither the Executive Orders nor any conduct by the government in the years between 1922 and 2001 constituted an actionable taking of Kingman Reef. Contrary to the government's position, neither the 1934 or 1941 Executive Orders, nor the1938 letters between the government and plaintiffs' predecessors in interest, constituted an actual taking commencing the running of the six-year statute of limitations. Specifically, the government's motion must be denied for the following reasons: <u>First</u>, there was no taking until 2001, because the placing of Kingman Reef under the jurisdiction and control for administration purposes does not vest ownership rights in Kingman Reef in the government. <u>Second</u>, there can be no taking under the Pickett Act which, by its terms, does not affect private lands, and Kingman Reef had been privately owned by the

---

[1] As explained more fully *infra*, KRAI's predecessor in interest is the Fullard-Leo family. Plaintiff Kingman Reef Atoll Development L.L.C. ("KRAD") is a lessee of KRAI. Throughout this brief, KRAI and KRAD shall be collectively referred to as "Plaintiffs."

Fullard-Leo family since 1922. Third, the Executive Orders did not effectuate a taking of Kingman Reef, because they did not divest the Fullard-Leo family of possession or control, or exclude them from Kingman Reef. Fourth, prior to January 18, 2001, there was no governmental action that would give rise to an actionable taking under the *Penn Central* analysis. Fifth, even if the Executive Orders interfered with plaintiffs' ownership interests in Kingman Reef, those orders were at most only a partial and/or temporary taking, or part of a series of events in a continuing claim, and there was no permanent taking of Kingman Reef until January 18, 2001.

The complaint in this case alleges a taking on January 18, 2001. As discussed below, there is substantial evidence — well beyond a preponderance — that the statute of limitations under 28 U.S.C. 2501 started to accrue on January 18, 2001. The complaint, being filed on December 6, 2006, is timely.

## II. STATEMENT OF THE CASE

### A. The Fullard-Leo Family's Title to Kingman Reef

Kingman Reef is a low-lying coral reef atoll that is comprised of two small areas of emergent land, surrounding reefs, lagoon and waters. Kingman Reef is an unincorporated United States territory located approximately 900 nautical miles southwest of Hawaii in the Pacific Ocean, essentially half-way between the Hawaiian Islands and Samoa. (Complaint ¶ 26.)

The history of Kingman Reef is well documented in various publications as well as official government records.[2] Kingman Reef was allegedly first discovered in 1798 by Captain

---

[2] Though the government has repeatedly claimed to have searched and found no record of the Fullard-Leo family's title to Kingman Reef, as of at least February 11, 1938, the government (specifically the U.S. Navy) had an *indexed* memorandum with documents setting forth the chronology of events demonstrating that the Fullard-Leo family's vested title in Kingman Reef. (Porter Decl., Ex. B.)

Edmund Fanning, and allegedly rediscovered by Captain W.E. Kingman in 1853. But it remained *unclaimed* property – claimed neither by country nor persons -- until 1922, when a private company from the U.S. Territory of Hawaii claimed Kingman Reef as a U.S. possession and concurrently took full and legal title to the property in the manner prescribed by the U.S. State Department. Later in 1922, that company transferred title to the Fullard-Leo family, which enjoyed all the privileges of private ownership in Kingman Reef from1922 until November 17, 2000, when KRAI acquired ownership. (*See* Complaint, Appendix, Doc. 6.)[3] For purposes of this motion, the government does not dispute that the Fullard-Leo family, plaintiffs' predecessors in interest, had title prior to 1934.

Though it has a limited amount of emergent land, Kingman Reef has significant commercial value. Its commercial uses include ecotourism, recreational fishing, commercial fishing operations and a transfer station for fishing operations (*i.e.* fishing vessels coming in from distant areas, transferring the fish to a smaller boat and transporting it to Honolulu). (A. Fullard-Leo Decl. ¶ 3; Savio Decl. ¶ 6) In 2000, plaintiffs entered into a commercial fishing lease with a private company. (A. Fullard-Leo Decl. ¶ 24) The U.S. Fish and Wildlife Service ("FWS") and The Nature Conservancy, both acting on behalf of the U.S. Department of the Interior ("DOI"), have made several offers to purchase Kingman Reef. (Savio Decl. ¶ 15; Porter Decl., Ex. C.)

**B. The Executive Orders and World War II**

On December 29, 1934, President Franklin D. Roosevelt signed Executive Order 6935,

---

[3] From 1922 through 1959, the Fullard-Leo family paid real property taxes to the Territory of Hawaii for both Palmyra Atoll and Kingman Reef on the same tax key. After 1959, Hawaii state taxes were not levied because neither Palmyra Atoll nor Kingman Reef were included in the lands of the State of Hawaii. (Complaint, Appendix Docs. 18 and 19.)

which placed Kingman Reef under the jurisdiction of the Secretary of the Navy for administrative purposes.[4] The government, and specifically the U.S. Navy, was interested in Palmyra and Kingman Reef for military purposes throughout the years leading up to World War II. In the case of the Palmyra Atoll, the government used the property as a military base during the war, and attempted to permanently take it from the Fullard-Leo family by filing an action to quiet title in the U.S. District Court. The U.S. Supreme Court decided title to Palmyra in favor of the Fullard-Leo family. *See, United States v. Fullard-Leo, et al.*, 331 U.S. 256, 67 S.Ct. 1287 (1947). In the case of Kingman Reef, the government exchanged correspondence for a brief time in the late 1930's, arguing with the Fullard-Leo family about who might own the property. Then, perhaps in light of the outcome of the Palmyra case, or because Kingman Reef became less important strategically after the war, the government entirely dropped the subject for the next 60 years. (Answer, Appendix, Ex. C, D, E; Complaint, Appendix, Doc. 11).

Through Executive Order 8682, dated February 14, 1941, as amended by Executive Order 8729 dated April 2, 1941, the government established the Naval Defensive Sea Areas and Naval Airspace Reservations over the waters surrounding Kingman Reef and a number of other Pacific islands, including Palmyra, "and the airspaces over the said territorial waters and islands," for national defense purposes. The 1941 Executive Order did not impose restrictions over the emergent land and submerged reefs at Kingman Reef. In response to the Secretary of the

---

[4] The government did not regard the mere act of placing a geographic area under the "administrative authority" of an agency of the government as synonymous with government ownership. While the government acknowledged that Palmyra was privately owned by the Fullard-Leo family, it was concurrently administered by the Navy until 1961, when the government transferred administrative jurisdiction over Palmyra to DOI, while still acknowledging the Fullard-Leo family owned Palmyra. (Complaint, Appendix, Doc. 26, page 6.)

Interior's concerns about undue burdens of residents of the areas (Porter Decl., Ex. C, the U.S. Navy responded and clarified as follows:

> 1. . . . The Department of Interior has been assured that the Navy Department has no desire or intention to unnecessarily restrict the activities of the United States citizens or nationals about their lawful occasions. The details of the administration should be worked out *with the idea of cause the least possible interference with vital industry or vested interests.*
> 2. . . . The object of the executive order [8682] was to give the commandant necessary authority to control subversive activities and safeguard the national defense. The *amount of control necessary* can best be judged by the commandant or his representative in command locally.

(Complaint, Appendix, Doc.15., [emphasis added].) The U.S. Navy stated the intent of the Executive Orders to direct the commandants of the districts concerned to prepare regulations: "At that time, the attention of the commandant will be invited to the necessity for the minimum of interference with vital industries and vested interests." (Porter Decl., Ex. D.) No such regulations were published for Kingman Reef.

After World War II, concerns about national security in the Kingman Reef area diminished. Consistent with the intent of the executive orders, as described by the government (section C., *supra*), the Naval Airspace Reservation was suspended in 1976. 32 CFR 761.4(d)(2); 41 Fed. Reg. 28,957 (1976) By memorandum dated July 7, 1987, the Navy noted that the Kingman Reef Naval Defensive Sea Area had also been suspended. (Porter Decl. Ex. E.) In the early 1990's, the government began to review whether Executive Orders 8682 and 8683 should be permanently repealed because, in essence, the U.S. government was objecting to similar sea space restrictions by foreign governments. (Porter Decl., Ex. F.) The Navy abandoned virtually all interest and activity in the Kingman Reef area. In October 1999, a representative of the U.S. Navy stated: "I am unaware of any Navy usage [of Kingman Reef] in

recent history. It may have been occupied during WWII." (Porter Decl., Ex. O.)

### C. The Government Administered Kingman Reef Consistent With the Fullard-Leo Family's Ownership Rights.

In 1991, representatives of FWS and The Nature Conservancy ("TNC") met with Peter Savio, agent for the Fullard-Leo family, to discuss the sale and development of both Palmyra and Kingman Reef. Jim Maragos, then of The Nature Conservancy (now with FWS) initiated the meeting and prepared a memorandum dated August 19, 1991, summarizing what was discussed. The memorandum stated, among other things, that Mr. Savio mentioned that the [Fullard-Leo family] claimed Kingman Reef and that "the USFWS is keenly interested in Kingman." (Complaint, Appendix, Doc. 13.)

In the Preliminary Project Proposal dated August 1997 (attached to a memorandum dated October 2, 1997, from the FWS Director, approving the establishment of the Palmyra Atoll National Wildlife Refuge and Kingman Reef National Wildlife Refuge), the government specifically acknowledged that Fullard-Leo family controlled access to Kingman Reef *and* the government was preparing plans to purchase the property from the Fullard-Leo family:

- Any "explorers wishing to visit Kingman Reef *must secure permission* from the Fullard-Leo family and the U.S. Coast Guard."

- "Kingman Reef was annexed on behalf of the United States in 1922, by the Palmyra Copra Company (Fullard Leo family), and the family claims ownership. . . ."

- "The **Landowners** are reportedly willing to sell their lands to prevent heirs from acquiring a large inheritance tax debt".

- "Similarly, the **price for fee title** to Kingman Reef is unknown. Due to the negligible commercial real estate value, it might be possible to include it in the purchase price negotiated for Palmyra"

- "[T]he price for fee title to Kingman Reef is unknown."

(Complaint, Appendix, Docs. 22 and 23)

By letter dated October 3, 1997, to the U.S. Army Corps of Engineers, Robert F. Smith, Pacific Islands Manager for FWS noted, among other things, that Director Clark had given FWS approval to begin detailed planning toward the acquisition of Palmyra Atoll and Kingman Reef as units of the National Wildlife Refuge System.

On the same day, Mr. Smith sent a handwritten note to Peter Savio, stating, "Peter, the attached represents approval from our director in Washington, Jamie Clark, to proceed with the detailed planning necessary for our acquisition. *Note that we desire to acquire both Palmyra and Kingman, if that is the seller's desire*." (Savio Decl. Ex. C; emphasis added. )

In a memorandum dated October 17, 1997, by Judson Feder, an attorney with National Oceanic and Atmospheric Administration's (an agency within the Department of Commerce ("DOC"),stating, "the Fullard-Leo family owns Palmyra Island and Kingman Reef." (Complaint, Appendix, Doc. 25.) Notably, between 1991 and 1997, the principal discussion between Mr. Savio, on behalf of the Fullard-Leo family, and the government was not about ownership of the Kingman Reef itself but rather about who controlled the fishing rights within the three mile zone. The Fullard-Leo family wanted to restrict fishing in this area, and FWS appeared to support that conservation effort.[5] The DOC agencies, National Oceanic and Atmospheric Administration ("NOAA") and National Marine Fishery Service ("NMFS"), opposed such restrictions on fishing. Neither agency appeared to be aware of any restrictions on access to these areas, except those that might be imposed by the property owners (*i.e.* the Fullard-

[5] By letter to Mr. Savio dated September 5, 1991, Robert Smith of FWS addressed this issue, thanking Mr. Savio for his "interest in conservation of wildlife resources at Palmyra and Kingman Reef." (Porter Decl., Ex. G.)

Leo family). (Complaint, Appendix, Doc. 25.) [6]

In November 1997, the United States General Accounting Office ("GAO") continued to acknowledged the Fullard-Leo Family's control and ownership of Kingman Reef. The GAO's "Report to the Chairman, Committee on Resources, House of Representatives, U.S. Insular Areas, Application of the United States Constitution, (November, 1997)," specifically noted that Kingman Reef had been claimed by the Fullard-Leo Family in 1922. (Complaint, Appendix, Doc. 26.) Indeed, the author of this report, T.E. Manase Mansur, stated in his letter to Mr. Savio, dated August 12, 1997: "Thank you for sending the information clarifying the rightful title of the Fullard-Leo's to Palmyra and Kingman Reef. The brief is well documented regarding the basis for clear title to the entire area of Palmyra and Kingman, including the surrounding reef." (Porter Decl., Ex. J.)

On October 26, 2000, the U.S. Senate Committee on Appropriations sent letters to Bruce Babbitt, then Secretary of the Interior, and Dan Glickman, then Secretary of Agriculture, stating that Congress provided additional funding for "high priority land acquisitions" including, but not limited to "Palmyra Atoll/Kingman Reef." (Complaint, Appendix, Doc. 28.)

Over the past 30 years, the Fullard-Leo family and Peter Savio received calls from persons referred from the U.S. Navy, U.S. Coast Guard and/or the NMFS from persons and/or entities interested in entering upon and traversing across Kingman Reef. The Fullard-Leo family and Mr. Savio were asked to and did give permission to third parties from the private and pubic

---

[6] Exhibit I to Mr. Porter's declaration is a memorandum dated November 7, 1996, prepared by the Customs Service for Mark Collins, a licensee of the Fullard-Leo family, who was planning a fishing operation in and around Palmyra and Kingman Reef. Again, no mention is made of any governmental restriction on access or ownership rights.

sector (*e.g.*, HAM radio operators, scuba divers, photographers) to access Kingman Reef.[7] (Savio Decl. ¶¶ 8-12; A. Fullard-Leo Decl. ¶¶ 9-10; D. Fullard-Leo Decl. ¶ 9. When unauthorized uses of Kingman Reef were discovered, the Fullard-Leo Family took appropriate action to stop those uses (*e.g.*, stopped person from Hilo, Hawaii who was fishing commercially in and around Kingman Reef without permission.) (Savio Decl., ¶13; A. Fullard-Leo Decl. ¶11.)

Members of the Fullard-Leo family traveled to Kingman Reef at their own expense in order to survey the property. In 1940's, Leslie Fullard-Leo went to Kingman Reef on a ship called "Joyita" and in the 1950's again visited the property via ship. In the late 1980's, Ainsley Fullard-Leo accompanied the U.S. Coast Guard during one of its law enforcement air patrols to Palmyra and Kingman Reef. In October 1995, Dudley Fullard-Leo's son, Bryant Fullard-Leo, accompanied Mark Collins, a commercial fisherman, to Kingman Reef to survey in and around Kingman Reef over a 2 week-period. In 1997 or 1998, Ainsley Fullard-Leo and Dudley Fullard-Leo traveled to Palmyra and on the way had the pilot circle Kingman Reef to inspect and ensure that no unauthorized uses were evident. In 1998 or 1999, Ainsley Fullard-Leo and his wife inspected Kingman Reef via air. In the 1980's, Peter B. Savio went to Kingman Reef at the request of the government in a U.S. Air Force plane to inspect Kingman Reef and Palmyra. (A. Fullard-Leo Decl. ¶¶ 18-19, 21-23; Savio Decl. ¶ 20; D. Fullard-Leo Decl.¶¶ 11-13, 16, 18.) It never occurred to the Fullard-Leo family to seek authorization from any governmental entity for these visits because they were the rightful owners, and no representative of the government ever

---

[7] In 1998, U.S. Navy Capt. Chuck Brady, who represented NASA and was assisting TNC and FWS in the acquisition of Palmyra, asked Ainsley Fullard-Leo for permission to test communications radio equipment at Kingman Reef. It appears that Captain Brady was there for official and personal reasons because he was a HAM radio hobbyist. (A. Fullard-Leo Decl. ¶ 15; Porter Decl. Ex. W.)

told any member of the Fullard-Leo family that such authorization was necessary or appropriate.

On November 17, 2000, title to Kingman Reef was transferred from the Fullard-Leo family to KRAI, the Fullard-Leo family's limited liability company. The deed was properly filed and recorded in the United States District Court for the District of Hawaii on November 17, 2000 as Document No. 27. No similar deed has been filed and recorded by the government for the subject property. After acquiring title to Kingman Reef, KRAI entered into a lease with KRAD for the purpose of facilitating economic development opportunities for Kingman Reef. On November 17, 2000, KRAD entered into a license agreement with Kingman Reef Enterprises, L.L.C. a Washington limited liability company, for the operation of a commercial fishing base camp at Kingman Reef and to conduct commercial fishing in and around the waters of Kingman Reef for a term of thirty years. (Complaint, Appendix, Docs 31, 32.)

**D. The Government's Unconstitutional Taking of the Property in January 2001**

Plaintiffs' ownership interests in Kingman Reef remained wholly undisturbed by the government until January 18, 2001. On that date, the government declared Kingman Reef to be a national wildlife refuge without consent of the owners of record and without compensation of any kind to the owners. The government's taking of Kingman Reef coincided with the establishment of the Palmyra Wildlife Refuge and the purchase of that property from the Fullard-Leo family.

On January 17, 2001, FWS issued a Finding of No Significant Impact ("FONSI") which concluded that although the Kingman Reef NWR was a major federal action it would not significantly affect the quality of the human environment. In the FONSI, FWS summarily dismissed Plaintiff's well-documented private ownership interests in Kingman Reef. On January

18, 2001, just one day after issuance of the FONSI and just two days before the inauguration of President Bush and the change of administrations, former Secretary of the Interior Bruce Babbitt signed Secretarial Order No. 3223 designating Kingman Reef as a National Wildlife Refuge.

The property interests of KRAI (ownership) and KRAD (leasehold), which are believed to have a current market value well in excess of $54,500,000.00, have been directly confiscated, taken, and rendered wholly and completely worthless by the Kingman Reef NWR. The Order for the Kingman Reef NWR claims ownership contrary to KRAI's well-documented and governmentally acknowledged property interests in Kingman Reef. The Order for the Kingman Reef NWR effectively bars plaintiffs from entering, using or economically developing Kingman Reef. The government has not offered any compensation for Plaintiff's property taken by the Kingman Reef NWR.

## III. ARGUMENT

### A. The Motion Must Be Denied Unless It is Beyond Doubt, Based on the Facts Presented, That The Court Has No Jurisdiction.

In the context of a motion to dismiss, "[a]lthough according to case law the plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence, a complaint should not be dismissed 'unless it is beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief.'" *Kemp v. United States*, 65 Fed. Cl. 818, 821 (Cl. Ct. 2005); *quoting Bagwell v. United States,* 21 Cl.Ct. 722, 725 (Cl. Ct. 1990) (citations omitted.) Thus, the denial of a taking claim on the basis of the defense of limitations is warranted only when the facts alleged and presented by affidavit demonstrate conclusively that such a decision is required as a matter of law. *Id.; Ewald v. United States*, 14 Cl.Ct. 378, 382 (Cl.Ct. 1988), *citing, Juda v. United States,* 6 Cl.Ct. 441, 450 (Cl.Ct. 1984).

As shown below, the government has not met that burden. Plaintiffs have presented strong evidence – well beyond a preponderance – that their taking claim accrued on January 18, 2001, when the Executive Order permanently and completely deprived plaintiffs of any possessory and ownership interests in Kingman Reef that they may have had at that time. The government does not, for purposes of this motion, dispute that plaintiffs ever had title to Kingman Reef. Rather, the government contends that earlier actions by the government – in 1934 and 1941 – deprived plaintiffs of any ownership interest in Kingman Reef that they may have once had.

Plaintiffs have submitted ample evidence – again, well beyond a preponderance -- that the 1934 and 1941 Executive Orders did not divest plaintiffs of title or possession of Kingman Reef, that no actions of the government diminished plaintiffs' economic interest in Kingman Reef, and that there was no governmental taking before 2001. The government disputes this, but does not and cannot, based on the evidence and allegations now before the court, demonstrate conclusively that the taking claim accrued before 2001. Therefore, dismissal of the complaint based on the statue of limitations would be improper. *Bagwell,* 21 Cl.Ct. at 725-26.

### B. There Was No Taking, and the Statute of Limitations Did Not Begin to Run, in 1934 or 1941.

#### 1. The Government's Jurisdiction Over Kingman Reef is Not Ownership

In his 1934 Executive Order, President Franklin D. Roosevelt declared that Kingman Reef (as well as Wake, Johnston, and Sand Islands) was "reserved, set aside, and placed under the ***control and jurisdiction*** of the Secretary of the Navy ***for administrative purposes***." (Emphasis added.) This Executive Order said nothing about, and had no effect on, ownership; it was simply a decree, based on the sovereign power of the United States government over these

islets, that the Navy was authorized to exercise its governmental jurisdiction over them. Because this Executive Order did not constitute a claim of property ownership to Kingman Reef, it did not constitute a taking of private property.

Sovereignty and ownership are two entirely separate concepts. Property ownership gives one a wide range of rights over his land, including the right to exclude others, to use it for lawful purposes, and to sell it. Sovereignty, on the other hand, refers to the governmental exercise of jurisdiction over territory, including individual parcels owned by private individuals as well as public land. Countries, municipalities, and other governmental entities typically exercise jurisdiction over many pieces of private property owned by individual property owners. The rights accompanying the private ownership of land are subject to the power of those governmental entities – through statute, executive orders, taxing authority, regulations and police powers – all of which can have significant effects on the title owner's ability to use, dispose of and profit from his property, without divesting the owner of title. *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124 (1978).

Allocating the "control and jurisdiction...for administrative purposes" over a location to an administrative agency does not logically or necessarily mean that the agency "owns" that location. Palmyra, for instance, continued to be privately owned by the Fullard-Leo family after President Roosevelt placed it under the control and jurisdiction of the Navy, *see* Government Accounting Agency in 1940, *U.S. Insular Areas: Application of the U.S. Constitution* 42 n.13 (GAO/OGC-98-5, Nov. 1997) (Complaint, Appendix doc. 26.) Even after the courts explicitly recognized that Palmyra Island was owned as private property by the Fullard-Leos, *United States v. Fullard-Leo*, 331 U.S. 256 (1947), and after the government compensated the Fullard-Leos for

its unlawful taking of Palmyra during the war, Palmyra remained administered by the Navy, and then DOI. (*See* discussion at p. 4, n. 4, *supra.)*

American Samoa is another example. It has been under the control and jurisdiction of various federal agencies -- first the Navy and more recently the DOI -- but no one has ever suggested that this control has divested private landowners of their property rights. 25 Op. U.S. Att'y Gen. 292, 294 (1904); Executive Order No. 10264 (1951.) Similarly, Guam was put "under the control of the Department of the Navy" for administrative purposes in 1898, when the United States first acquired that island. 25 Op. U.S. Att'y Gen. 292, 293-94 (1904). Again, during the many decades when the U.S. Navy exercised jurisdiction and control over Guam for administrative purposes, no one ever thought that the United States owned all the real estate in Guam as a private property owner, and most of the land in Guam has always been understood to be privately owned.

**2. There Was Not, and Could Not Be, a Taking Under the Pickett Act.**

The government argues that the 1934 Executive Order must be viewed as a "taking" because that Order cited the Pickett Act of June 25, 1910, which authorized the withdrawal or reservation of "any of the public lands of the United States," 36 Stat. 847, and thus evidenced the government's belief that Kingman Reef was part of the "public lands of the United States" in 1934. This is a very thin reed to rely upon. The possibility that the executive branch of the government may have believed that Kingman Reef was "public land" does not equate to an actual taking by the government. Even if President Roosevelt mistakenly believed that Kingman Reef was not privately owned, and was "public land," the Executive Order did not, by its terms or its effect, transfer ownership from the Fullard-Leo family to the federal government.

To the extent the Executive Order may have been based on the assumption that Kingman Reef was "public lands" within the meaning of the Pickett Act of 1910, that Act neither authorizes nor effectuates a taking of private land. As the government concedes, the purpose and effect of the Pickett Act is to authorize the withdrawal and reservation of "public lands of the United States for public purposes." (Def. MPA at 13.) The United States Supreme Court has consistently held that "public lands" mean only those federal lands which are subject "to sale or other disposal under general laws," *Columbia Basin Land Protection Assn. v. Schlesinger*, 643 F.2d 585, 602 (9th Cir. 1981); *citing Northern Lumber Co. v. O'Brien*, 204 U.S. 190, 196 (1907). Public lands do *not* include "land to which any claims or rights of others have attached." *Colombia Basin, supra*, 643 F.2d at 602; *Northern Lumber* Co., 204 U.S. at 196; *citing Newhall v. Sanger*, 92 U.S. 761. Thus, the only lands that could be withdrawn or reserved under the Pickett Act were public lands as to which no private claims or rights attached. *Id.*

The government does not dispute, for purposes of this motion, that the Fullard-Leo family owned Kingman Reef in 1934. (Def. MPA at 1-2.) The Pickett Act did not provide authority for the taking of any property, including Kingman Reef, that was privately owned. Thus, the fact that the Executive Order cites the Pickett Act, while arguably supporting the government's argument that President Roosevelt believed Kingman Reef was not privately owned, does not support the government's argument that the Pickett Act provided the basis for an actual taking of private land.

*United States v. Gossett*, 416 F.2d 565 (9th Cir. 1969), *cert. denied*, 397 U.S. 961 (1970), the only case the government cites in support of its novel argument, did not involve a takings claim. *Gossett* did not hold, and cannot support the argument, that executive orders setting aside

public lands can ever constitute a taking of private land. In *Gossett*, the United States sued to quiet title to land the defendant claimed to have acquired by adverse possession from the State of California in 1952. The United States contended that the defendant could not have acquired title to the land, because it had been withdrawn from public entry more than twenty years earlier by 1929 and 1931 Executive Orders setting aside land for the Boulder Canyon Project.

In *Gossett*, unlike in this case, there was no evidence that the land in question was privately owned, or did not belong to the federal government, when the Executive Orders set it aside for a public purpose. The court concluded that the Executive Orders constituted *prima facie* evidence (*not* conclusive proof) that the land was public federal land at the time of those orders, and the defendant presented no evidence that the State of California owned the land at that time. In fact, the State of California disclaimed ownership of the land, which the court found had "great significance." 41 F.2d at 568. Furthermore, the court noted, "[a]ssuming, *arguendo*, that title once rested in the state of California, still no attempt is made to show how appellants obtained title from the state." *Id.* Here, in sharp contrast, plaintiffs have provided abundant evidence, *and the government concedes for purposes of this motion*, that the Fullard-Leo family owned Kingman Reef at the time of the 1934 and 1941 Executive Orders. Thus, the issue the court addressed in *Gossett* – whether the land was owned by anyone other than the United States at the time of the Executive Order – is not presented in this case.[8]

---

[8] If *Gossett* has any relevance to this motion, it supports plaintiffs' argument that there can be no taking under the Pickett Act. While the executive orders were considered evidence of ownership in *Gossett*, they were not held to wrest ownership from any private person, as the government here suggests they did. To the contrary, it was assumed by the parties and the court in *Gossett* that, if the land in question did not belong to the federal government at the time of the executive orders, then those orders did not have any effect on ownership of the land by other governments or individuals, and could not prevent the future private acquisition of that land

### 3. Takings Case Law Shows that the Executive Orders Did Not Constitute a Taking of Kingman Reef.

The other takings decisions relied upon by the government, all of which turned on the government's exclusion of plaintiffs from property they claimed as their own, demonstrate the weakness of the government's argument. Unlike in those cases, President Roosevelt's Executive Orders did not purport to or in fact operate to bar the Fullard-Leo family, or anyone else, from access to Kingman Reef.

The government relies on *Pewee Coal Co. v. United States*, 115 Cl.Ct. 626, 88 F.Supp. 426, 429 (Cl.Ct.1951), in which the President ordered the Secretary of the Interior to seize and take over operations of the plaintiff's coal mine, and the Secretary of the Interior actually did so. Unlike in *Pewee*, the Executive Orders did not authorize any federal agency to take possession of Kingman Reef. Moreover, unlike in *Pewee*, no federal agency ever did take possession of Kingman, or actually stop anyone, including plaintiffs, from going there. (*See* pp. 8-10, *supra*.)

The government's reliance on *Roth v. United States*, 73 Fed. Cl. 144, 148 (Cl. Ct. 2006) is similarly misplaced. In *Roth,* the court ruled that "a closure in which defendant physically bars access to lands comprises a physical taking." The Executive Orders neither purported to nor actually barred the Fullard-Leos from going to Kingman, and hence the *Roth* case has no applicability to the present dispute.

Similarly, the decision in *John R. Sand & Gravel Company v. United States*, 457 F.3d 1345 (Fed.Cir. 2006) does not support the government's contentions. That case held that a

---

under state law. If the court in *Gossett* had concluded that either of those executive orders had the effect of taking the land from anyone, then there would have been no need to address the issues discussed in that case.

takings claim accrued when the United States physically barred access to plaintiff's mining operation, while in the present case access was never physically barred. In fact, in *John R. Sand*, the court concluded that earlier actions by the EPA that expressed the government's intention to interfere with the plaintiff's property rights did not constitute a taking because they did not have the effect of depriving the plaintiff of any of its property rights, and did not provide a detailed time line and description of the government's future actions. 457 F.3d at 1358 n.10. Since the Executive Orders neither deprived the Fullard-Leos of possession, nor specified whether, how or when their property interests would be affected, *John R. Sand* is strong authority against the government's argument that the Executive Orders constituted a taking.

As the government's authorities show, a significant factor to be considered in deciding whether a taking has occurred is whether the government has taken possession of the property, or whether the government has excluded others from the property. Where the government's actions constitute a "permanent physical occupation," there is a taking to the extent of that occupation. *Nollan v. California Coastal Commission*, 483 U.S. 825, 831-32 (1987). In this case there is no evidence, nor does the government contend, that the government ever physically occupied Kingman Reef, and the 1934 Executive Order did not by its own operation authorize any government agency to exclude others from Kingman Reef.

Contrary to the government's assertion at pages 21-22 of its brief, the 1941 Executive Order, establishing a "Naval Defense Sea Area" and "Naval Airspace Reservation" around Kingman Reef and other islands, including Palmyra, does nothing to strengthen the government's argument that it owned Kingman Reef, because it makes no reference to any land area and refers only to the territorial waters which were under the jurisdiction of the United States. This decree

did not serve to undercut the conclusion that Palmyra was privately owned, *United States v. Fullard-Leo*, 331 U.S. 256 (1947), and, similarly, it has no relevance to the private ownership of Kingman Reef by plaintiffs.

Moreover, as a practical matter the 1941 Executive Order never resulted in any actual governmental restrictions on access to Kingman Reef. The Fullard-Leo family, their guests, and those who had their permission came and went to Kingman Reef openly and freely, and without ever being told that this was unlawful. (A. Fullard-Leo Decl. ¶26; D. Fullard-Leo Decl. 21; Savio Decl. ¶21.) The Naval Airspace Reservation was suspended, and internal Navy records show that the Navy believed that the Naval Defensive Sea Area was suspended as well, in 1976, without anyone ever publishing or enforcing any rules restricting access to Kingman Reef. (Porter Decl., Ex. E.) Thus, while the 1941 Executive Order theoretically gave the government the power to restrict access to Kingman Reef, access was never actually restricted. Theoretical power to restrict access, which never is put into action, does not give rise to a taking. "The Supreme Court has stated that 'the mere assertion of a regulatory jurisdiction by a governmental body does not constitute a regulatory taking.'" *767 Third Ave. Associates v. U.S.*, 48 F.3d 1575, 1584 (Fed. Cir. 1995), *quoting United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 126 (1985) In *767 Third Ave. Associates*, the government placed the following notice on plaintiff's property:

> THESE PREMISES HAVE BEEN CLOSED BY ORDER OF THE UNITED STATES DEPARTMENT OF THE TREASURY. ....NO ACCESS TO THESE PREMISES IS PERMITTED WITHOUT SPECIFIC AUTHORIZATION FROM THE OFFICE OF FOREIGN ASSETS CONTROL, U.S. TREASURY DEPARTMENT.

48 F.3d at 1578. The court concluded that this did not constitute a taking because the government

did not take physical possession of the property or deny the owner access to the property when he requested it.

> We do not agree that the placing of a notice on the door of the premises was "the functional equivalent of placing armed troops at the doors." Although the notice was backed by the force of law, it did not physically prevent Sage from entering the premises, and access was available when requested. Because the government did not physically occupy the premises at 767 Third Avenue, the government's actions did not rise to the level of a *per se Loretto*-type physical taking. Further, we agree with the government that, if anything, the posting of the notice imposed only a non-compensable regulatory scheme that blocked access to the premises without authorization.

48 F.3d at 1583-84. Since neither the Fullard-Leos nor their guests were ever physically prevented from going to Kingman Reef. (A. Fullard-Leo Decl.¶ 26; D. Fullard-Leo Decl. ¶ 21; Savio Decl.¶21q), there was no taking. *767 Third Ave. Associates*, 48 F.3d at 1583-84; *Holden v. U.S.*, 38 Fed. Cl. 732, 737 (1997).

In short, neither Executive Order interfered in any way with plaintiffs' use and enjoyment of their property, much less wresting effective control over Kingman Reef from them. Thus, there was no taking. *Cuban Truck and Equipment Company v. United States*, 333 F.2d 873, 878 (Ct. Cl. 1964) ("The guiding questions which must be asked are: (a) Has the Government acquired effective control over the property which it seeks to utilize for a public purpose? (b) If so, when was the extent of the taking . . . determined or determinable?"); *See also Catellus Development Corporation v. United States*, 26 Cl. Ct. 210, 214 (1992) (no accrual in taking claim until the government's actions "increased to the point where their frequency amounted to a *substantial* interference with plaintiff's use and enjoyment of the property." (emphasis in original.) Moreover, since neither of the Executive Orders took away in any tangible or practical way any of the ownership rights of the Fullard-Leo family, there were no economic or, indeed

non-economic damages, for which the Fullard-Leo family could have sued for compensation at that time, and any suit seeking compensation for unlawful taking would have been unsuccessful. *Terteling v. United States*, 334 F.2d 250, 254 (Ct. Cl. 1964) ("It is too well established to require citation of authority that a claim does not accrue until the claimant has suffered damages.")

**4. Under the Supreme Court's *Penn Central* Analysis, There Was No Governmental Taking of Kingman Reef In 1934 or 1941.**

The government does not attempt to argue that, under the Supreme Court's decision in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978), the 1934 and 1941 Executive Orders constituted a regulatory taking of Kingman Reef. In *Penn Central*, the plaintiff owners of Grand Central Terminal contended that a New York City law restricting landowners' ability to develop designated "landmark sites" constituted a taking of their property without just compensation because it prevented them from building a multistory office building over the terminal. The Supreme Court held that the Landmarks Law did not constitute a taking. The Court noted that, to further general welfare and public safety, the government often does things that adversely affect the economic interests of individuals, without taking their property.

> Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law, (citation omitted) and this Court has accordingly recognized, in a wide variety of contexts, that government may execute laws or programs that adversely affect recognized economic values. Exercises of the taxing power are one obvious example. A second are the decisions in which this Court has dismissed "taking"challenges on the ground that, while the challenged government action caused economic harm, it did not interfere with interests that were sufficiently bound up with the reasonable expectations of the claimant to constitute "property" for Fifth Amendment purposes.

438 U.S. at 125-126. The Court considered several factors in analyzing whether the Landmark Law's restriction on the development of Grand Central Terminal constituted a taking. A

consideration of those factors, in light of *Penn Central*, compels the conclusion that the government's actions prior to 2001 did not constitute a taking.

First, the Court considered the "economic impact . . . on the claimant, and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." 438 U.S. at 124. The Court concluded that, since the Landmarks Law did not interfere with the property's present use, did not prevent the owners from realizing a reasonable return on its investment, did not drastically limit the owners right to build a structure on the land, and would allow the construction of a smaller, harmonizing structure, the financial burden imposed by the law was not so great as to constitute a taking. *Id.* 135-37. Here, the 1934 and 1941 Executive Orders had no effect whatsoever on the economic benefit the Fullard-Leo family was deriving or hoped to derive from Kingman Reef. The family and their guests continued to travel there, they controlled use and access of the property, they received offers for the purchase of the property, they transferred title and interest in the property to a family-owned company, and they leased the property. (A. Fullard-Leo Decl., ¶ 24; D. Fullard-Leo Decl. ¶ 20; Complaint, Appendix, Doc. 31.)

The Court also considered "the character of the governmental action. "A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government (citation omitted), than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Id.* at 124. Here, there was no "physical invasion" of Kingman Reef by the government. There is no evidence that the government used the property for any purpose prior to January 18, 2001, except when it visited the property after obtaining permission from the Fullard-Leo family. (Savio Decl. Ex. B.) Moreover, the Executive Orders advanced a "public program . . . to promote the

common good" -- by establishing United States sovereignty over and the Navy's jurisdiction over and defense of far-flung island territories. This clearly falls within the "broad range of governmental purposes and regulations" of the *Penn Central* analysis. *Nollan*, *supra,* 483 U.S.at 435–436 (citations omitted.)

**5. The Correspondence Between Plaintiffs' Predecessor in Interest and the Government Did Not Establish a Taking.**

The government argues that the correspondence in 1937 and 1938 indicates that a taking occurred.[9] While the correspondence included a disagreement about whether the Fullard-Leo family had title to Kingman Reef, the dispute was about the Pan Am flights, which stopped after Townsend & Lewis complained to the government and threatened legal action. Since the Fullard-Leo family accomplished the purpose of the correspondence – the cessation of the Pan Am flights – there was no need for the Fullard-Leo family to pursue the matter further. There was no further dispute between the Fullard-Leo family and the government about Kingman Reef for another seventy years. The Fullard-Leos traveled to Kingman Reef, gave permission to others to visit, and were never denied access. As far as the Fullard-Leos could tell, the government had acquiesced to their wishes.

---

[9] The government mischaracterizes the correspondence. Ellen Fullard-Leo wrote a letter to Hawaii's Congressional Delegate in 1937 complaining about, and demanding compensation for, Pan-American Airways' landings at Kingman Reef. Subsequently, her attorneys threatened legal proceedings to protect her interest in Kingman Reef, and complained that the government was negligent in administering Kingman Reef. In response, the JAG's letter ignored the issue of Pan-American flights, and argued that, because Kingman Reef was a bonded guano island, and because the Navy administered Kingman Reef, her attorney's argument "was not sufficient to uphold the claim of Mrs. Fullard-Leo." Importantly, the JAG's letter did not assert that the government owned Kingman Reef, only that the Navy had a basis for administering Kingman Reef. (Answer, Appendix Ex. C, D, E.)

Nonetheless, the government contends that plaintiffs not only could have sued the government at that time for a taking, but they had to do so. This argument is contrary to the case law. Even if it may have appeared that plaintiffs had a potential takings claim by virtue of the correspondence between the government and Townsend and Lewis, this was "not a good enough reason why he must sue then or have from that moment, the statute of limitations run against him." *John R. Sand and Gravel Co., v. The United States*, 57 Fed.Cl. 182, 192 (2003) (citing *United States v. Dickinson*, 331 U.S. 745, 749 (1947) (fences were removed after plaintiff complained).[10]

Moreover, the JAG letter in which the government questioned the Fullard-Leo family's title to Kingman Reef does not *ipso facto* constitute a taking. *Schultz v. United States* 5 Cl.Ct. 412, 419 (1984). In *Schultz*, the plaintiff believed that the government had "taken" his property based on correspondence from the government stating that the plaintiff's property was going to be condemned and appraised under the Wild and Scenic Rivers Act (16 U.S.C. §§ 1271 et. seq.). The plaintiff alleged that the government's correspondence caused him to abandon his development plans for his property. *Id.* at 418. The government later informed the plaintiff that it chose not to condemn his property. *Id.* The court held that the threat of condemnation does not constitute a taking, and that a taking occurs only if and when the threat is realized. *Id.* at 418-419. *See also BW Parkway v. United States*, 29 Fed. Cl. 669, 676 (1993).

As in *Shultz*, the correspondence during 1937 and 1938 constituted nothing more than a difference of opinion, and certainly did not constitute a taking. Even if, as the government

---

[10] If there was a taking based on the Pan Am flights, it was temporary, and ended in 1938. While a claim based on that temporary taking was time-barred decades ago, it has no bearing on the permanent taking in this case, which occurred in 2001. *See* section IIIC2, *infra*.

contends, the JAG correspondence demonstrates that plaintiffs understood in 1938 that the government claimed ownership of Kingman Reef (a contention plaintiffs strongly dispute), that understanding did not give rise to a cause of action under the Fifth Amendment. As the court stated in *Shultz*, neither the landowner's belief that their right to use their land has been restricted, nor the landowner's belief that a taking is imminent, will serve to constitute a taking.

Also as in *Shultz*, the 1941 Order pertained to the air and waters around Kingman Reef, but did not purport to or actually restrict plaintiffs' right of access to their property. As stated above, correspondence in 1937 and 1938 and thereafter is evidence that the government did not act to deprive plaintiffs of their use of Kingman Reef until 2001 when it declared Kingman Reef a National Wildlife Reserve.

### C. Even If the 1934 and 1941 Executive Orders "Interfered With" Plaintiffs' Property Rights, There Was No Permanent Taking Until 2001

For the reasons set forth above, the Executive Orders had no effect on plaintiffs' property rights in Kingman Reef. However, assuming *arguendo,* that the Executive Orders did restrict plaintiffs' rights to Kingman Reef, that restriction amounted to, at most, a temporary or partial taking up to the time when it was permanently taken on January 18, 2001.

#### 1. Any Governmental "Interference" with Kingman Reef Was at Most a Series of Continuing Claims That Did Not Culminate and Become Clear Until 2001.

As discussed above, the Executive Orders and the 1937-1938 correspondence had no impact on plaintiffs' property rights, and did not constitute a taking. However, assuming *arguendo* that those actions and communications gave rise to a claim, plaintiffs were not required to sue until the culmination of those actions in 2001, when the government took Kingman Reef for the establishment of a National Wildlife Refuge. Under the continuing claims doctrine, when

a taking occurs over a period of time, the owner is entitled to wait until the full extent or duration of the taking becomes clear before bringing suit for just compensation. *Castro v. U. S.*, 205 Ct.Cl. 534, 441 (Cl.Ct 1974); *Juda v. United States,* 6 Cl.Ct. 441,451-452 (Cl.Ct. 1984); *see also United States v. Dickinson*, 331 U.S. 745, 749 (1947) (when the Government chooses not to condemn land but to bring about a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really "taken.") In *Juda,* the court found that "the material facts [there] embrace a sequence of actions over an extended time period, and include events which, in other contexts, may have been adequate to supply foundations for distinct taking claims." *Id.* at 450. The court went on to note the applicability of the *Dickinson* doctrine, finding where there is a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really "taken." *Id.* *See also Terteling v. United States*, 334F.2d 250, 254 (Ct. Cl. 1964).

In *Castro v. U. S.*, 205 Ct.Cl. 534, the government took the Mariana Islands, in Saipan, for military purposes during World War II from private owners who were removed from their properties in 1944. In 1968, the government determined that the land was no longer needed for military purposes, and it was returned to the owners. The court noted that the series of takings were "uncertain [in] extent and duration[]" and held that the limitations did not start to run against the owners for the taking by the government until it was returned in 1968, because only then was it finally possible to compute the extent and duration of taking by the United States Government. *Id.* at 440.

All continuing claims, if any, by the government prior to the establishment of the

Kingman Reef NWR in 2001 were uncertain in extent and duration. The government contends a taking took place when the 1934 Executive Order "reserved and set aside" Kingman Reef for "public purposes, thereby precluding any settlement of or private claims to the property." (Government's MPA at 15.) Since the 1934 Executive Order did not state a "public purpose" for Kingman Reef, the 1934 Executive Order at most was a temporary withdrawal, and maintained the status quo until the government decided on a public purpose use for Kingman Reef. *Southern Utah Wilderness Alliance v. Bureau of Land Management,* 425 F.3d 735, 784 (10th Cir. 2005).[11] As noted above, jurisdiction and control do not create any possessory property interests in the government. At most, Kingman Reef was withdrawn temporarily until the government decided on a public purpose for it. That did not happen until 2001, when the government finally disposed of Kingman Reef by designating it as a National Wildlife Refuge.

Since, at most, the 1934 Executive Order only temporarily preserved the "status quo," such an act did not effect a Fifth Amendment taking. Such a temporary and ambiguous event would not require plaintiffs to file suit, since the contours of the claim were not yet known. *See*

---

[11] Although the government ignores it, the distinction between "reserved" and "withdrawn" is critical. Even if Kingman Reef had been public land, the 1934 Executive Order would only have temporarily withdrawn it from public lands until the government decided on a public purpose for it. A withdrawal "temporarily suspends the operation of some or all of the public land laws, preserving the status quo while Congress or the executive decides on the ultimate disposition of the subject lands. . . . A reservation, on the other hand, goes a step further: it not only withdraws the land from the operation of the public land laws, but also dedicates the land to a particular public use, such as parks, military posts, Indian lands, etc." *Southern Utah Wilderness Alliance,* 425 F.3d at 784 (10th Cir. 2005) (citations omitted.) "[J]ust because a withdrawal uses the term 'reserved' does not mean that it reserves land 'for public uses.'" *Id.* at 785. Here, the 1934 Executive Order used the word "reserve" but there was no reservation, since the 1934 Executive Order did not reserve Kingman Reef for a specific public purpose - such as parks, dams, Indian lands or military posts. The only stated purpose of the 1934 Order was to place it "under the control and jurisdiction of the Secretary of the Navy for administrative purposes."

*Castro v. U. S.*, 205 Ct.Cl. 534 (Cl.Ct 1974). Nor were plaintiffs required to file a takings action when the government included Kingman Reef in a naval sea and air defense area in 1941. *Castro, supra,* 205 Ct.Cl. at 440 (destruction or loss of property in the course of wartime military operations or as an incident thereto does not give the owner a right to compensation under the fifth amendment.)

Plaintiffs always had a compensable property interest from 1922 until the government took Kingman Reef in 2001. To compel Plaintiffs to bring successive actions for the government's ambiguous continuous "takings" would run afoul of the rule proclaimed in *Dickinson*.

**2. To the Extent that the Government's Actions Before 2001 May Have "Interfered With" Plaintiffs' Property Rights, Any Claim That Might Have Accrued Was For, At Most, a Partial or Temporary Taking, and Plaintiffs Retained Ownership of the Property**

Assuming, though without conceding, that *some* value may have been taken from the Fullard-Leo family in 1934 and/or 1941, it could only arguably amount to a partial or temporary taking, since on January 17, 2001, Kingman Reef was still a valuable asset to plaintiffs. *Creppel v. United States,* 41 F.3d 627, 632 (1994)41 F.3d 627, 631 (1994) (temporary taking claim was time-barred under the 6-year statute, but subsequent permanent taking claim was not.).

In *Creppel*, the plaintiff landowners claimed a taking based on the Army Corps of Engineers' failure to go forward with a planned flood control project. In 1976, the Army issued an order, canceling the project, eliminating the plaintiffs' expectation of land reclamation pursuant to the project. The plaintiff successfully overturned the order in court in 1984. The EPA, however, issued a Final Determination on October 16, 1985, permanently blocking the project. The plaintiffs sued in 1991 alleging two distinct takings: (1) a temporary taking

commencing when the Order canceling the project issued in 1976, and (2) a permanent taking commencing when the EPA issued its Final Determination in 1985. The court held that the first claim was barred by the 6-year statute of limitations, but that the second claim accruing in 1985 was not. *Id.* at 631.

In holding that the permanent taking claim was not time-barred, the court reasoned that until the EPA issued its Final Determination in 1985, the property owners retained some expectation that the Project would be completed. *Id.* at 633. Because of the district court's temporary restoration of the original project in 1984, the "landowners regained the 'reasonable expectation' that their property value would increase." *Id.* The permanent taking claim therefore accrued on October 16, 1985, when the EPA finally fully vetoed the original project, thus denying the ability to make economically viable use of the property. *Id. See also Juda,* 6 Cl.Ct. at 450 (if the facts evidence a sequence of actions which supply adequate foundation for separate takings claims–each separate and distinct claim will have its own statute of limitations.).

Assuming, *arguendo,* that the 1934 or 1941 Executive Orders "interfered" (as the government argues) with plaintiffs' ownership interest in Kingman Reef, and that such interference could rise to a taking to <u>some</u> degree, that interference did not effect a permanent taking of Kingman Reef. Plaintiffs still owned Kingman Reef, as the government repeatedly acknowledged in its own documents. (Complaint, Appendix, Docs. 20, 23, 25.) In the 1990's and 2000 the government was preparing to pay the Fullard-Leo family for a fee interest, and plaintiffs leased the fishing rights around Kingman Reef in 2000. (Savio Decl. ¶ 1-5, 16; Porter Decl.Ex. V.)

Regardless of the effect, if any, of the Executive Orders on the value of Fullard-Leo

family's ownership interest in Kingman Reef , the remaining value – through sale, lease or other use, even if compromised or devalued to some extent by the Executive Orders -- was totally obliterated on January 18, 2001, when DOI completely and permanently took the property for the Kingman Reef NWR, thereby extinguishing plaintiffs' ability to make any economically viable use of the property. *John R. Sand & Gravel Co. v. United States* (2006) 457 F.3d 1345, 1357 ("A physical occupation . . . is a permanent and exclusive occupation by the government that destroys the owner's right to possession, use, and disposal of . . . property.") That was when the statute of limitations for the permanent taking began to run.

## IV. <u>CONCLUSION</u>

Plaintiffs owned Kingman Reef until January 18, 2001, when the government unlawfully took it without compensation. The government's actions prior to that time did not purport to or actually divest plaintiffs of any property rights in Kingman Reef. The claim in this case is not time-barred. The motion should be denied.

Respectfully submitted,

Dated: April 20, 2007

BROOKS TOM POTER & QUITIQUIT LLP

s/Christian P. Porter
CHRISTIAN P. PORTER
THERESE Y. CANNATA
Attorneys for Plaintiffs KINGMAN REEF ATOLL INVESTMENTS L.L.C. and KINGMAN REEF ATOLL DEVELOPMENT LLC.