# EXHIBIT C

# EXHIBIT D

REPRODUCED AT THE NATIONAL ARCHIVES

In reply refer to Initials and No.

Op13C-jc
Serial No. 61713
EG62/A16-3(401202-1)

NAVY DEPARTMENT
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
WASHINGTON

RECEIVED MAR 1? '41 Office of the Judge Advocate General

MAR 15 1941

From: The Chief of Naval Operations.
To: The Judge Advocate General.

Subject: Proposed Executive Orders establishing defensive sea areas and airspace reservations around and over the Islands of Guam, Rose, Tutuila, Palmyra, Johnston, Midway, Wake, and Kingman Reef in the Pacific Ocean, Culebra Island, Puerto Rico, Kiska and Unalaska Islands, Alaska, and adjacent to and over Kaneohe Bay, Territory of Hawaii.

Reference: (a) Actg. SecNav letter A14-1(410109) Serial No. 56113 dated March 10, 1941.

Enclosure: (A) Letter from the Assistant Director of the Budget dated February 7, 1941, with its enclosure.

1. Enclosure (A) is returned.

2. Reference (a) was prepared to give information to the Interior Department of intended procedure in Hawaii.

3. It is intended to publish to the service, by General Orders, the information concerning the establishment of Naval Defensive Sea Areas. Directives will then be issued to the commandants of the districts concerned, who will prepare regulations for their administration, subject to the approval of the Secretary of the Navy. At that time, the attention of the commandant will be invited to the necessity for the minimum of interference with vital industries and vested interests.

R. E. Ingersoll
Acting

NAVY DEPARTMENT
SEC'Y'S OFFICE - RECORD DIV.
RECEIVED
MAR 15 1941

Finished-File-Humphrey

EG62/A16-3 (401202-1)

# EXHIBIT E

dl
3700
7 July 1987

Subj: DEFENSIVE SEA AREAS AND AIRSPACE RESERVATIONS

c. Unalaska Island Naval Defensive Sea Area, Unalaska Island Naval Airspace Reservation [32 CFR 761.3(a)(2)(x)]

3. The above Defensive Sea Areas and Airspace Reservations were established by Executive Orders in 1939 and 1941.

4. All the Naval Airspace Reservations have been suspended. The Honolulu Defensive Sea Area and the Kingman Reef, Kiska Island, Kodiak Island, Unalaska Island, Wake Island (except for entry of foreign flag ships and nationals), and Kaneohe Bay (portion beyond a 500 yard buffer zone) Naval Defensive Sea Areas have also been suspended. See 32 CFR 761.4(d)(2), (6), (7). These suspensions were directed by the Chief of Naval Operations in 1976. See 41 Fed. Reg. 28,957 (1976). While the regulations do not specify who has the authority to reinstate the areas, as a general rule, the person with authority to suspend also has authority to reinstate. Consequently, the authority to reinstate the areas certainly lies with the CNO. The areas may be reinstated without notice at any time when the purposes of national defense require.

5. According to the Code of Federal Regulations [32 CFR Part 761], entry into these Defensive Areas (Defensive Sea Area or Naval Airspace Reservation) is controlled by the following Entry Control Commanders:

a. Chief of Naval Operations may authorize all persons ships or aircraft to enter all Pacific Defense Areas. [32 CFR 761.9(a)]

b. Commander in Chief, U.S. Pacific Fleet may authorize all persons, ships, or aircraft to enter all Pacific Defense Area. [32 CFR 761.9(c)]

c. Commander Third Fleet may authorize U.S. citizens and U.S. vessels to enter Kaneohe Bay, Pearl Harbor, Midway Island, Kingman Reef, and certain Filipino workers to enter Wake Island Defense Areas. [32 CFR 761.9(i)]

d. Commandant, Fourteenth Naval District and U.S. Coast Guard have joint responsibility for regulating movement of

US0080

Subj: DEFENSIVE SEA AREAS AND AIRSPACE RESERVATIONS

shipping within and security of Honolulu Defense Area. [32 CFR 761.9(i)]

e. Senior Naval Commander in defense area may grant emergency authorization in cases of emergency or distress. [32 CFR 761.9(h)]

Further delegations of entry control, as well as delegations of authority to reinstate the areas, if they exist in internal Naval directives, are not available to us at this time.

6. The authority to enforce the Defensive Sea Area and Airspace Reservations may be exercised by Commanding Officers of the installations within the Areas. They may take appropriate action to apprehend violators and are to seek disposition instructions from the Entry Control Commander. This authority to enforce the Defensive Sea Area provides the flexibility to use local Naval units rather than rely solely upon Coast Guard units for enforcement. Further, the existence of these areas eliminates the need to establish security zones where enforcement may be accomplished by Coast Guard units only.

J. P. WIESE

Copy: (r)

# EXHIBIT F

United States Department of State

*Bureau of Oceans and International Environmental and Scientific Affairs*

*Washington, D.C. 20520*

DATE: 7/23/90

RAPIDFAX TRANSMISSION 4 PAGE(S) TO FOLLOW

TO: David Grimord

MAIL ROUTING CODE Navy Jag TELEPHONE 695-0200

FAX NUMBER 695-8073

FROM: Peter Bernhardt

MAIL ROUTING CODE OES/MLP TELEPHONE (202) 647-9098

FAX NUMBER (202) 647-1106

SUBJECT:

COMMENTS:

For [illegible] -

D —
Please run the
through [illegible] —
Thank you.
[illegible]
x77078

UNCLASSIFIED

TO: The Secretary

THROUGH: D - Mr. Eagleberger

FROM: OES - E. U. Curtis Bohlen

SUBJECT: Repeal of Designation of Navy Defensive Sea Areas in the Pacific

ISSUE FOR DECISION

During World War II the President established defensive sea areas around certain U.S. territories and possessions in the Pacific Ocean which remain in effect. As the Executive Orders are contrary to international law in that they do not recognize the right of all ships to exercise the right of innocent passage in the areas, they are contrary to international law and United States navigation interests and should be repealed.

ESSENTIAL FACTORS

By Executive Orders 8682 and 8683 of February 14, 1941 the President established naval defensive sea areas around and naval airspace reservations over the islands of Palmyra, Johnston, Midway, Wake, Rose Tutuila and Guam and Kingman Reef. Under the provisions of these orders, i. e., all persons other than persons on public vessels of the United States are prohibited from entering by ship the defensive sea areas unless authorized by the Secretary of the Navy, and all aircraft other than public aircraft of the United States are prohibited from entering the defensive sea areas unless authorized by the Secretary of the Navy.

The defensive sea areas at issue comprise waters which in part constitute the territorial sea of the United States. Under international law a coastal State may prohibit air traffic in its territorial sea but may not prohibit the ships of all States from exercising the right of innocent passage therein, passage being defined, i e. as traversing in a continuous and expeditious manner the territorial sea without entering internal waters or calling at a roadstead or port facility outside internal waters. As the United States protests all illegal restrictions on the right of innocent

UNCLASSIFIED

-2-

passage promulgated by foreign States as an integral part of its freedom of information program, we should without delay abolish the defensive sea areas. As the prohibition against entry of foreign aircraft in the territorial sea is a jurisdictional prerogative already accorded the United States under international law, that part of the Executive Orders prohibiting aerial navigation therein is redundant.

RECOMMENDATION

That you sign the attached memorandum to the White House recommending repeal of Executive Orders 8682 and 8683 of February 14, 1941.

Approve________________ Disapprove________________

Attachment(s):

Proposed memorandum from you to the White House.

UNCLASSIFIED
-3-

Drafted:JPBernhardt
07/18/90 7-9098
SEOLP #288

Cleared:OES/OA:TScully
OES/O:DCloson
L/OES:ARoach
DOD:JHenriksen

UNCLASSIFIED

MEMORANDUM FOR BRENT SCOWCROFT
THE WHITE HOUSE

Subject: Repeal of Designation of Navy Defensive Sea Areas in the Pacific

By Executive Orders 8682 and 8683 of February 14, 1941 the President established naval defensive sea areas around and naval airspace reservations over the islands of Palmyra, Johnston, Midway, Wake, Rose, Tutuila and Guam and Kingman Reef. Under the provisions of these Orders all persons other than persons on public vessels of the United States are prohibited from entering by ship the defensive sea areas unless authorized by the Secretary of the Navy, and all aircraft other than public aircraft of the Untied States are prohibited from entering the defensive sea areas unless authorized by the Secrtary of the Navy.

The defensive sea areas at issue comprise waters which in part constitute the territorial sea of the United States. Under international law a coastal State may prohibit the ships of all States from exercising the right of innocent passage therein, passage being defined, i. e., as traversing in a continuous and expeditious manner the territorial sea without entering internal waters or calling at a roadstead or port facility outside internal waters. As the United States protests all illegal restrictions on the right of innocent passage promulgated by foreign States as an integral part of its freedom of information program, we should without delay abolish the defensive sea areas. As the prohibition against entry of foreign aircraft in the territorial sea is a jurisdictional prerogative already accorded the United States under international law, that part of the Executive Orders prohibiting aerial navigation therein is redundant.

J. Stapleton Roy
Executive Secretary

# EXHIBIT G

United States Department of the Interior

FISH AND WILDLIFE SERVICE
PACIFIC ISLANDS OFFICE
P.O. BOX 50167
HONOLULU, HAWAII 96850

September 6, 1991

Mr. Peter Savio
Savio Realty
931 University Avenue
Suite 202
Honolulu, Hawaii 96826

Dear Mr. Savio:

I spoke with Mr. Alvin Katekaru of the National Marine Fisheries Service (NMFS) this morning. Mr. Katekaru expects to be in radio-telephone contact with Mr. Richard Purvience of the "CRIS" on Monday morning. Apparently, the "CRIS" does not plan to leave Palmyra until after Mr. Purvience speaks with Mr. Katekaru on Monday, if then.

Apparently, Mr. Purvience is not yet convinced that you have ownership and jurisdiction over reef resources at Palmyra. He did speak to Mr. Katekaru about the collection of stony coral from Palmyra--a type of harvest activity which requires no federal permit (precious corals are regulated by NMFS). Most of the stony corals are, however, protected from excess international trade by the Convention on International Trade in Endangered Species (CITES). Additionally, the State of Hawaii regulates the harvest of coral from its waters.

It would seem that Mr. Purvience and Mr. Katekaru could benefit from some specific documents and language that would "prove up" your claim to jurisdiction over Palmyra's reef resources. I might suggest that your attorney be made a part of the Purvience-Katekaru communication on Monday, so as to persuade the "CRIS" in the direction of reef conservation as opposed to consumptive harvest.

Enclosed, per your request, are a number of documents which speak to boundary and wildlife regulation issues on our remote island refuges. Thank you for your continued interest in the conservation of wildlife resources at Palmyra Atoll and Kingman Reef.

Sincerely,

Robert P. Smith

Robert P. Smith
Field Supervisor
Pacific Islands Office

Encl.

FLF 003452

# EXHIBIT H

Office of General Counsel
Southwest Regional Office
501 W. Ocean Blvd. - Suite 4470
Long Beach, CA 90802
Telephone: (310) 980-4068
Fax: (310) 980-4084

August 8, 1995

MEMORANDUM FOR: Martin B. Hochman
Regional Counsel

FROM: Theodore M. Beuttler
Staff Attorney

SUBJECT: EEZ around U.S. Territories and Islands in the western Pacific

This memo responds to your request for a description of the EEZ around U.S. territories and possessions in the western Pacific.[1] The information is intended to assist you and the WPFMC to determine the extent of the Council's jurisdiction to manage coral reefs. Previous drafts of this memo have been reviewed by the Departments of State, Interior and Defense, and several NOAA/GC offices. Comments received from them have been incorporated here.

The memo also describes possible changes to Federal jurisdiction if the Omnibus Territories Act[2] is enacted. The Act is now pending in Congress and parts of it are discussed below.

---

[1] This memo describes and discusses the exclusive economic zone (EEZ) as defined in the Magnuson Act, 16 U.S.C. § 1802(6): "The term 'exclusive economic zone' means the zone established by Proclamation Numbered 5030, dated March 10, 1983. For purposes of applying this Act, the inner boundary of that zone is a line coterminous with the seaward boundary of each of the coastal States." In very general terms, the EEZ for domestic purposes under the Magnuson Act begins three geographical miles from shore. This should not be confused with the 12-mile territorial sea that was created by Presidential Proclamation No. 5928 of December 27, 1988. For international purposes (such as regulating foreign fishing within U.S. waters) the inner boundary of the U.S. EEZ begins at 12 nautical miles from U.S. baselines, seaward of the 12-mile territorial sea. See generally United Nations Convention on the Law of the Sea, December 10, 1982, art. 3 and Part V.

[2] H.R. 602, introduced January 20, 1995.

The Submerged Lands Act and the Territorial Submerged Lands Act

In 1953, the Submerged Lands Act granted to the States title and ownership of the lands beneath the navigable waters from the mean high tide line seaward to a distance of three geographical miles from the coast, as well as to the natural resources within such lands and waters. 43 U.S.C. §§ 1301, 1311(a).[3] The SLA also defines the seaward boundaries of the States as three geograph-ical miles from their coast lines, beginning from the ordinary low water line.[4]

The SLA applies only to the States and does not affect U.S. territories or possessions.[5] The Federal government owns the lands beneath the navigable waters of territories and holds them in trust for future states. Pollard v. Hagan, 44 U.S. 212, 11 L.Ed. 565, 3 How. 212 (1845). In 1960, the Territorial Submerged Lands Act (TSLA) was enacted to convey to the governments of Guam, the Virgin Islands and American Samoa submerged lands from the mean high tide line out to three geographical miles from their coastlines. 48 U.S.C. §§ 1704 et seq. Excepted from the conveyance are certain lands and mineral rights retained by the United States.[6] Section 1705(b).

---

[3]The SLA was enacted in response to a U.S. Supreme Court decision that held that the Federal Government owns the seabed and its resources, including oil, seaward of the low-water mark, out to a distance of three miles. U.S. v. California, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947). (The Court held that the States owned the tidelands between the low and high water marks. 332 U.S. 19, at 30.) The ownership of submerged lands adjacent to territories or possessions was not addressed in the decision.

[4]Section 1301(c). Section 1312 provides that a State's seaward boundaries may exceed three miles, if it was so provided by its constitution or laws prior to or at the time it became a member of the Union.

[5]The SLA defines "State" as any State of the Union. 43 U.S.C. § 1301(g). By contrast, the definition of "State" under the Magnuson Act includes the District of Columbia, Puerto Rico, American Samoa, the Virgin Islands, Guam, and any other commonwealth, territory or possession of the United States. 18 U.S.C. § 1802(25).

[6]The following were excepted from the transfers and retained by the United States, pursuant to Section 1705(b):
1) all deposits of oil, gas and other minerals (but the term "minerals" does not include coral, sand and gravel);
2) all submerged lands adjacent to property owned by the U.S. above the mean high tide line;
3) all submerged lands adjacent to property above the line of mean high tide acquired by the U.S. by eminent domain proceedings, purchase, exchange, or gift, after October 5, 1974 (the date of enactment of the TSLA), as authorized by the Military Construction Authorization Act;
4) all submerged lands filled in, built up, or otherwise reclaimed by the United States, prior to October 5, 1974, for its own use;
5) all tracts or parcels of submerged land containing on any part thereof any structures or improvements constructed by the United States;
6) all submerged lands that have heretofore been determined by the

Unlike the SLA, the TSLA does not establish seaward boundaries around the territories and does not recognize their fisheries jurisdiction out to three miles.[7] However, it does convey to each territory coral found within the three-mile zone. 48 U.S.C. § 1705(a) and (b). As previously discussed, there are a number of important exceptions to the conveyances. For example, the United States Government retained possession of all submerged lands adjacent to property owned by the U.S. above the mean high tide line as well as all submerged lands that are within the administrative responsibility of any agency or department of the United States other than the Department of the Interior. See § 1705(b).

Magnuson Act authority over marine fishery resources begins at the seaward boundary of each of the coastal States. 16 U.S.C. § 1802(6). For this purpose, the definition of "State" includes American Samoa, Guam, and any commonwealth, territory or possession of the United States (16 U.S.C. § 1802(25)). The term "seaward boundary" has the same meaning as it has under the Submerged Lands Act.[8] Federal management authority over coral reefs depends, therefore, on the location of the seaward boundary for the affected areas and ownership of the seabed. As explained

---

President or the Congress to be of such scientific, scenic, or historic character as to warrant preservation and administration under the provisions of the law establishing the National Park Service;
7) all submerged lands designated by the President within one hundred and twenty days after the date of enactment of the TSLA;
8) all submerged lands within the administrative responsibility of any agency or department of the U.S. other than the Department of the Interior;
9) all submerged lands lawfully acquired by persons other than the United States through purchase, gift, exchange or otherwise;
10) all submerged lands within the Virgin Islands National Park;
11) all submerged lands within the Buck Island Reef National Monument as described in Presidential Proclamation 3448.

Upon request of the Governor of Guam, the Virgin Islands, or American Samoa, the Secretary of the Interior may, with the concurrence of the agency having custody thereof, convey to the government of Guam, the Virgin Islands, or American Samoa, as the case may be, the lands described above in 2)-8), inclusive.

[7] I have not been able to locate any document or legal decision establishing a seaward boundary around U.S. territories or possessions similar to the boundary created by the SLA. However, the question of delimiting the inner boundary of the EEZ and Federal Magnuson Act authority is not an issue here, because the TSLA granted to the territories the coral found in their submerged lands, out to 3 geographical miles and the authority of the territories to manage coral would be based on ownership rather than a seaward boundary. In practice, Federal fishery management regulations appear to recognize the equivalent of a 3-mile seaward boundary around Guam, the Virgin Islands and American Samoa.

[8] Senate Conference Report No. 94-711, Joint Explanatory Statement of the Committee of Conference, 42.

below, some U.S. possessions considered here do not have a three-mile seaward boundary.

Northwestern Hawaiian Islands: The State of Hawaii consists of all islands, together with their appurtenant reefs and territorial waters, that were included in the Territory of Hawaii.[9] Admission Act of March 18, 1959, Public Law 86-3, 73 Stat. 4. Expressly excluded from the definition of "State of Hawaii" are Palmyra Island, Midway Islands, Johnston Island, Sand Island, and Kingman Reef, together with their appurtenant reefs and territorial waters. Note, 48 USCS note prec § 491.[10]

Federal authority to manage coral reefs begins at the seaward boundary of Hawaii's three-mile zone. Separate consideration is given below to the islands that were excluded from the State of Hawaii.

Guam and American Samoa: Pursuant to the TSLA, the governments of Guam and American Samoa own and have management responsibility for submerged lands and coral out to three geographical miles. 48 U.S.C. § 1705(a) and (b). In general, Federal Magnuson Act authority over coral in the EEZ's off of Guam and American Samoa begins at three geographical miles from the coastlines. Presidential Proclamation No. 4347, February 1, 1975, excepts certain submerged lands in Guam and American Samoa from transfer to the Governments of those territories, pursuant to the TSLA.

---

[9] The Organic Act providing for a government for the Territory of Hawaii was enacted on April 30, 1900. A report recommending legislation concerning the Hawaiian Islands was transmitted to Congress by the President on December 6, 1898. The report describes the "Hawaiian group" as seven inhabited islands and "eleven or twelve" small rocky or sandy shoals or reefs and it is this group, presumably, that formed the Territory at the time of the Organic Act in 1900. They are: Hawaii, Maui, Oahu, Kauai, Molokai, Lanai, Niihau, Kahoolawe, Molokini, Lehua, Nihoa, Laysan, Gardeners Island, Liscansky Island, Ocean Island, Necker Island, Palmyra Island, Kaula, and French Frigate Shoal. See, United States v. Fullard-Leo, et al., 331 U.S. 256; 67 S.Ct. 1287; 91 L.Ed. 1474 (1947), n.22.

[10] "Sec. 2. [Territory.] The State of Hawaii shall consist of all the islands, together with their appurtenant reefs and territorial waters, included in the Territory of Hawaii on the date of enactment of this Act [Mar. 18, 1959], except the atoll known as Palmyra Island, together with its appurtenant reefs and territorial waters, but said State shall not be deemed to include the Midway Islands, Johnston Island, Sand Island (offshore from Johnston Island), or Kingman Reef, together with their appurtenant reefs and territorial waters." Admission Act, 48 U.S.C. prec § 491.

In the case of American Samoa, these lands are under the administrative jurisdiction of the Departments of Commerce and Interior. In Guam, the excepted lands are under the administrative jurisdiction of the Department of the Navy. Accordingly, Federal authority over coral might include areas shoreward of the 3-mile limit.

Commonwealth of the Northern Mariana Islands: CNMI is not mentioned in the Territorial Submerged Lands Act and no specific conveyance of tidelands or submerged lands was made to the CNMI government in the Northern Marianas Covenant (Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, Public Law 94-241; 90 Stat. 263; 48 U.S.C. 1681 note).[11] The submerged lands and underlying resources adjacent to CNMI therefore remain owned by the Federal government and are subject to its management authority. However, the proposed Omnibus Territories Act would amend the TSLA to include CNMI and the CNMI government would receive ownership and management authority over the submerged lands and their resources, out to three geographical miles.

The EEZ around CNMI established under the Magnuson Act extends from 0 to 200 miles (or, where it is less that 200 nautical miles, to the seaward limit of the EEZ) and all coral reefs could be included in an FMP developed by WPFMC.

U.S. Possessions Not Having 3-mile Seaward Boundaries[12]

The following possessions were place under the administration of either the Department of Defense or the Department of Interior by Executive Orders. Although some of the Orders specify that the areas to be administered include appurtenant reefs and territorial waters, none of the possessions appear to have seaward boundaries as that term is used in the Magnuson Act and the Submerged Lands Act. This conclusion is supported by the

---

[11]The Territorial Submerged Lands Act was enacted on October 5, 1974. Congress approved the mutually negotiated "Covenant to Establish a Commonwealth of the Northern Mariana Islands (CNMI in Political Union with the United States," in 1976. However, the Covenant was not fully implemented until November 3, 1986, pursuant to Presidential Proclamation No. 5564, which terminated the trusteeship agreement.

[12]Information concerning these areas is found in the publication, Fact Sheets: United States Insular Areas, prepared by the U.S. Department of Interior, Territorial and International Affairs, revised January 1995.

fact that the Executive Orders do not convey title to submerged lands to the Federal agencies but only administrative control.

Although the Magnuson Act includes possessions in its definition of "state", the Act's legislative history does not reveal any intent to treat Federally-administered possessions as quasi-sovereign entities similar to States or Territories. In the Magnuson Act, Congress intended to distinguish between State and Federal title to property by referring to the seaward boundary established in the Submerged Lands Act. This consideration does not apply where all title (both seaward and shoreward of the 3-mile line) resides with the Federal Government, as is the case for a U.S. possession. It seems to follow, therefore, that Magnuson Act authority applies to all marine waters around a Federally-owned possession, including marine resources within bays, inlets and other marine waters located inside of baselines around these possessions.

Fisheries management is complicated by access restrictions around certain possessions for reasons of national defense. Executive Order 8682 established naval defensive sea areas in the territorial waters out to three miles around Palmyra, Johnston, Midway, Wake, and Kingman Reef. The Order and subsequent regulations at 32 CFR Part 761 restrict access by private vessels into these waters, however, restriction of access does not appear to affect management authority under the Magnuson Act. In any event, however, implementation by the Secretary of a fishery management plan must be consistent with other applicable law. 16 U.S.C. § 1854.

<u>Wake and Midway Islands:</u> Midway Atoll was officially claimed a United States insular area on August 28, 1867, pursuant to the Guano Act of August 18, 1856. The atoll is an unorganized, unincorporated insular area administered by the U.S. Navy pursuant to Executive Order 199-A, issued on January 20, 1903. The islands were designated a Naval Defense Sea Area and Airspace Reserve by Executive Order 8682, on February 14, 1941. Naval administrative control of Midway was confirmed by Executive Order 11048, September 5, 1962. Midway is defined in Executive Order 11048 to include appurtenant reefs and the territorial waters. E.O. 11048, § 302.

The Wake Island atoll was annexed by the United States in 1898. Pursuant to E.O 11048, the Secretary of the Interior was responsible for the administration of Wake Island. However, by agreement between the Department of the Interior and the

DRAFT:GCSW:TB:8/4/95

Department of the Air Force, dated June 19, 1972, the Air Force is now responsible for the administration of the Island. The definition of Wake Island includes appurtenant reefs and the territorial waters. E.O. 11048 § 302; 32 C.F.R. § 935.1.

Magnuson Act authority to manage coral reefs extends to the shorelines (more specifically, the baselines) and, possibly, to coral reefs within bays and inlets.

<u>Palmyra Atoll:</u> Palmyra Atoll was part of the Territory of Hawaii but was excluded from the boundaries of Hawaii at the time of Statehood. Palmyra Atoll is privately-owned but administered by the Department of the Interior pursuant to Executive Order 10967, October 10, 1961. As defined in the Executive Order, the atoll includes the territorial waters and the surrounding reefs. E.O. 10967 § 5.

Palmyra atoll does not have a three-mile seaward boundary and the submerged lands around the atoll were not conveyed to the owners by the United States. Magnuson Act authority over coral reefs extends to the baselines.

<u>Jarvis, Baker and Howland Islands:</u> These islands became U.S. possessions pursuant to the Guano Act of 1856. They were placed under the control and jurisdiction of the Secretary of the Interior by Executive Order 7358, dated May 11, 1936. The islands are national wildlife refuges administered by the Department of Interior and are not within the jurisdiction of any State or territory.

The brief descriptions of the islands in E.O. 7358 does not include the territorial sea or appurtenant reefs. Federal management authority over marine fishery resources extends to the baselines around the islands and, possibly, to coral reefs within bays and inlets.

<u>Johnston Atoll:</u> Johnston Atoll is an unorganized, unincorporated territory of the United States that was annexed in 1858 as a guano island under the Guano Act of 1856. By Executive Order 6935, dated December 29, 1934, Johnston and Sand Islands and the reefs surrounding them were placed under the control and jurisdiction of the Secretary of the Navy for administrative purposes. The Atoll was designated as a Naval Defensive Sea Area and Airspace Reservation on February 14, 1941, by Executive Order

8682, and extends from "...the extreme high-water marks [to] the three-mile marine boundaries." E.O. 8682, as corrected by E.O. 3729, April 2, 1941. By MOU executed on May 30, 1973, management was transferred to the Defense Nuclear Agency.

The Defensive Sea Area and the administrative area restrict access to territorial waters by private vessels but do not limit Magnuson Act authority over marine resources and Johnston Atoll does not have a three-mile seaward boundary for Magnuson Act purposes. Federal Magnuson Act authority to manage coral reefs extends to the baselines around the islands and, possibly, to coral reefs within bays and inlets.

## Omnibus Territories Act (H.R. 602)

Islands, reefs and territorial waters to be transferred to the State of Hawaii. The Omnibus Territories Act (Act) is now pending in Congress and would greatly reduce the scope of Federal jurisdiction described above by transferring to the State of Hawaii jurisdiction over several islands currently owned or administered by the United States.

Section 302 of the Act reads as follows:

> Sec. 302. Additions to State of Hawaii.
> (a) In General. - The State of Hawaii shall include Baker Island, Jarvis Island, Johnston Atoll, Kingman Reef, Howland Island, the Midway Islands, and Palmyra Atoll.
> (b) Jurisdiction. - The islands specified in subsection (a) shall be subject to the jurisdiction of the State of Hawaii to the same extent as and in the same manner that such jurisdiction applies to all other areas within the State of Hawaii.
> (c) Rights of United States. - The inclusion of islands, appurtenant reefs, and territorial waters in the State of Hawaii by this section shall be subject to existing rights of use, ownership, management, and operation by the Government of the United States.

Section 306 of the Act defines each of the islands and atolls mentioned in § 302(a), and specifically includes their appurtenant reefs and territorial waters.

It is unclear what the scope and extent of the reservation clause would be under § 302(c) and whether the United States would retain any rights in the seabed, its resources and the territorial sea, beyond the rights it reserved for itself under the Submerged Lands Act.[13] If the SLA represents the nature of the conveyance proposed in the Omnibus Territories Act, the State would receive ownership and management authority over the submerged lands and their resources out to three geographical miles and the inner boundary of the EEZ established by the Magnuson Act around each island would begin at three geographical miles.

CNMI. The Act would also amend the Territorial Submerged Lands Act to include CNMI and transfer to the CNMI government the seabed and its resources out to three geographical miles. Section 401. As a result, CNMI would then appear to have the same rights to the submerged lands and their resources as well as primary management authority of fisheries in the three-mile zone, as are now enjoyed by Guam and American Samoa. As a result, the inner boundary of the EEZ as defined by the Magnuson Act would begin at 3 geographical miles.

cc: Hilda DiazSoltero, F/SWR
Rod McInnis, F/SWR
Jay Johnson, GC
Margo Jackson, GCOS
Judson Feder, GCF
Pat Kraniotis, GCIL

[13] For example, the SLA excepted from State ownership and control all structures and improvements constructed by the United States in the exercise of its navigational servitude (43 U.S.C. § 1313(c)) and retained all navigational servitude and rights in and powers of regulation and control of submerged lands and navigable waters for purposes of commerce, navigation, national defense, and international affairs (§ 1314(a)).

# EXHIBIT I

UNITED STATES GOVERNMENT
# Memorandum

DEPARTMENT OF THE TREASURY
UNITED STATES CUSTOMS SERVICE

DATE: NOV 0 7 1996

FILE: VES-7-01/03-RR:IT:EC
227213 GEV

TO : Port Director
U.S. Customs Service
Honolulu, Hawaii
ATTN: Vessel Entry and Clearance Specialist Lee Ann Satele

FROM : Acting Chief, Entry and Carrier Rulings Branch

SUBJECT: Transportation of Fish Through Palmyra Island

This is in response to your memorandum dated August 26, 1996 (your file no. VES-1-HO:VECS), requesting our opinion and assistance in answering a letter to you dated August 16, 1996, from Mark Collins, President, C-Fresh Seafoods, Inc. ("C-Fresh") wherein he requests Customs guidance regarding the laws and/or regulations pertaining to a joint fishing venture. In addition to a copy of Mr. Collins' letter, you attached copies of the following correspondence: a letter dated August 2, 1996, to Mr. Collins from Martin B. Hochman, Southwest Regional Counsel, National Oceanic and Atmospheric Administration (NOAA); a letter dated June 6, 1996, to Mr. Brian Hallman, Office of Marine Conservation, U.S. Department of State, from Kitty M. Simonds, Executive Director, Western Pacific Regional Fishery Management Council; and a letter dated June 5, 1996, to Ms. Simonds from Mr. Collins.

You should also know that we have received a letter dated November 6, 1996, from Samuel Schley of CapTech Corporation, Washington, D.C. (a consultant to C-Fresh) forwarding a copy of a Congressional bill (S.39) and an excerpt from the Congressional Record of September 27, 1996, attesting to its final passage in both the Senate and House of Representatives. Mr. Schley contends that this legislation will enable Customs to render a decision in this matter that is favorable to his client.

The facts as we understand them are as follows. C-Fresh will be working with Hawaii International Seafood based in Honolulu, Hawaii, in a joint venture. Specifically, foreign-flag fishing vessels fishing outside the U.S. Exclusive Economic Zone (EEZ) will deliver their catches to C-Fresh's facility at Palmyra Island. Subsequent to their receipt of these fish, C-Fresh will weigh and package them, then deliver them to the air field on Palmyra Island where they will be flown by cargo plane to the Hawaii International Seafood facility located at the Honolulu International Airport. From there the fish will be distributed to wholesale and retail markets by Hawaii International Seafood. Mr. Collins requests an interpretation of those laws

applicable to this operation. Specific reference in the aforementioned correspondence is made to the Jones Act and the Nicholson Act, both of which are administered by Customs. These statutes are included in our discussion of this matter set forth below.

Title 46, United States Code Appendix, § 883 (46 U.S.C. App. § 883), the merchandise coastwise law, often called the "Jones Act", provides, in part, that no merchandise shall be transported between points in the United States embraced within the coastwise laws, either directly or via a foreign port, or for any part of the transportation, in any vessel other than a vessel built in and documented under the laws of the United States and owned by persons who are citizens of the United States (i.e., a coastwise-qualified vessel). See also §§ 4.80 and 4.80b, Customs Regulations (19 CFR §§ 4.80, 4.80b). This statute has been found to apply even to the transportation of merchandise from point to point within a harbor. Pursuant to 19 U.S.C. § 1401(c), the word "merchandise" means goods, wares and chattels of every description and includes merchandise the importation of which is prohibited. Furthermore, Public Law 100-329 (102 Stat. 588) amended § 883 to apply to the transportation of "valueless material..."

Points embraced within the coastwise laws include all points within the territorial waters of the United States, including points within a harbor, as well as artificial islands, installations, and devices permanently or temporarily attached to the seabed of the outer continental shelf for the purpose of exploring for, developing or producing resources therefrom. The territorial waters of the United States consist of the territorial sea, defined as the belt, 3 nautical miles wide, seaward of the territorial sea baseline, and to points located in internal waters, landward of the territorial sea baseline, in cases where the baseline and coastline differ. (It should be noted that although Presidential Proclamation 5928 of December 27, 1988, extended the U.S. territorial sea to 12 miles, this extension is only for international purposes. Thus, Customs and U.S. Coast Guard law enforcement activities are not altered as a result of the proclamation.)

In regard to Mr. Collins' concerns, although the Jones Act is applicable to Palmyra Island (see Headquarters ruling letter 104623, dated May 22, 1980, and Headquarters memorandum 104576, dated September 12, 1980, copies attached) thereby necessitating the use of a qualified vessel as discussed above to transport fish from Palmyra Island to Hawaii or any other U.S. point, there appear to be no Jones Act implications with respect to the operation he proposes. The foreign-flag vessel unloading fish at Palmyra Island is not engaged in the transportation of merchandise between two coastwise points but rather is unloading fish at Palmyra Island (a coastwise point) that it caught outside the U.S. EEZ (i.e., beyond the 3-mile U.S. territorial sea, a location that is not a coastwise point as discussed above). Furthermore, the transportation of fish from Palmyra Island to Honolulu is stated to be by aircraft, a mode of transportation outside the parameters of the Jones Act which addresses the movement of merchandise not by air but by water, or by land and water. More importantly, this activity constitutes fishing rather than coastwise trade as will be further discussed below.

Parenthetically, we note that the transportation of merchandise between U.S. points by a foreign aircraft may constitute a violation of the air cabotage law, a statute administered by the Department of Transportation (DOT). (See § 122.165, Customs Regulations (19 CFR § 122.165) and note that the citation therein should be to 19 U.S.C. §§ 1644, 1644a rather than to 49 U.S.C. App. § 1508(b)) Should you learn of the use of foreign aircraft in this matter, in the interest of expediency we suggest you contact Mr. Peter Schwartzkopf, Office of the General Counsel, DOT at 202-366-5621, or write that agency directly at the following address:

Office of Aviation Enforcement & Proceedings
U.S. Department of Transportation
1100 Seventh St., S.W.
Washington, D.C. 20590

With respect to the applicability of the laws pertaining to the fisheries in regard to Mr. Collins' proposal, you should know that the Commercial Fishing Industry Vessel Anti-Reflagging Act of 1987 (the "Act", Pub. L. 100-239; 101 Stat. 1778) amended 46 U.S.C. § 12101(6) by changing the definition of "fisheries" set forth therein to include the "processing, storing, and transporting (except in foreign commerce)" of fish and related fishery resources in United States navigable waters and the United States EEZ, as well as the catching-related activities provided for in the former definition. Accordingly, the new definition of fisheries, now set forth in 46 U.S.C. § 12101(a) reads as follows:

> "fisheries" includes processing, storing, <u>transporting</u> (except in foreign commerce),planting, cultivating, catching, taking, or harvesting fish, shellfish, marine animals, pearls, shells, or marine vegetation in the navigable waters of the United States or in the exclusive economic zone. (Emphasis added)

The U.S. EEZ is defined in Presidential Proclamation 5030 of March 10, 1983 (48 FR 10605), as extending outward for 200 nautical miles from the baseline from which the territorial sea is measured. As discussed in Headquarters letter 104186, dated September 6, 1979 (copy attached), the EEZ (the successor entity to the Fisheries Conservation Zone referenced therein) extends around Palmyra Island.

Title 46, United States Code, § 12108(b) limits the employment in the fisheries to a vessel issued a certificate of documentation with a fishery endorsement, "subject to the laws of the United States regulating the fisheries" (see e.g., the Magnuson Fishery Conservation and Management Act of 1976 (MFCMA), 16 U.S.C. 1801 <u>et seq</u>., administered by the Department of Commerce, NOAA, National Marine Fisheries Service (NMFS) under which a foreign vessel may obtain a permit from NMFS to engage in fishing in the EEZ). Under 46 U.S.C. § 12108(a), only a vessel eligible for documentation (i.e., over 5 net tons and owned by a citizen) which was built

in the United States may be endorsed for the fisheries. Pursuant to 46 U.S.C. § 12108(b), subject to the laws of the United States regulating the fisheries, only a vessel so endorsed may engage in the fisheries.

Accordingly, a foreign-flag fishing vessel may engage in fisheries activities either outside the EEZ surrounding Palmyra Island without any authorization from the U.S. Government, or inside Palmyra Island's EEZ provided the vessel has the requisite permit discussed above. The submissions of Mr. Schley contain no evidence that the Congressional bill to which he refers was enacted into law. However, assuming arguendo, its enaction, Customs position in this matter would remain unchanged since § 106 of the bill to which Mr. Schley refers merely augments the procedures necessary for obtaining the aforementioned permits. Compliance with such procedures to the satisfaction of NMFS would suffice for Customs to the extent of our involvement in this matter.

Notwithstanding any authorization of foreign-flag vessels to engage in fishing activities in the EEZ, the provision relating to the landing of fish or fish products in the United States in the Nicholson Act (the Act of September 2, 1950, as amended, Ch. 842, 64 Stat. 577; 46 U.S.C. App. § 251(a)) has not been changed since its enactment in 1950. Under the Nicholson Act, which, as previously stated, is within the purview of the Customs Service (see 19 CFR § 4.96(b)), no foreign-flag vessel shall land in a port of the United States its catch of fish taken on board the vessel on the high seas, or fish products processed therefrom, or any fish or fish products taken on board the vessel on the high seas from a vessel engaged in fishing operations or in the processing of fish or fish products. Since this prohibition is directed against foreign-flag vessels, a United States-flag, foreign-built vessel (which usually could not be documented for the coastwise or fisheries trade and therefore could not engage in the fisheries within the EEZ) could land in the United States fish it had caught or received on the high seas without violating the Nicholson Act.

Consequently, the issuance of the aforementioned NMFS permits does not, in and of itself, obviate the provisions of the Nicholson Act. However, we note that Marine Circular No. 124, Supplement No. 1, dated November 15, 1955 (also cited as Customs Circular VES-7-MA, dated November 15, 1955, copy attached) sets forth Customs opinion that the prohibition against foreign-flag vessels in the Nicholson Act does not apply to Palmyra Island. Customs has consistently followed this position. (see, e.g., Headquarters letters 100969, dated January 22, 1974, 101093, dated April 18, 1974, 101820, dated October 16, 1975, and 104186, dated September 6, 1979) Accordingly, under Mr. Collins' proposal, a foreign-flag vessel may land fish at Palmyra Island without incurring a violation of the Nicholson Act.

# EXHIBIT J

August 12, 1997

Mr. Peter B. Savio
President
Palmyra Development Co. In.
931 University Ave., Suite 105
Honolulu, HI 96826

Dear Peter:

Thank you for sending the information clarifying the rightful title of the Fullard-Leo's to Palmyra and Kingman Reef. The brief is well documented regarding the basis for clear title to the entire area of Palmyra and Kingman, including surrounding reefs.

As we discussed, the General Accounting Office is completing an extensive report regarding the application of the Constitution and federal laws in territories of the United States at the request of Committee on Resources Chairman Don Young. The House of Representatives has designated the Committee with primary jurisdiction for all territories. There is considerable interest in Congress in insuring that private property rights of U.S. citizens are protected. That certainly includes the Fullard-Leo's rights to Palmyra and Kingman currently and under any future legislation which would affect the formal jurisdiction of these islands.

Please keep me posted about any other matters which may arise regarding Palmyra and Kingman. I am particularly concerned about the timely environmental clean up you mentioned of old storage tanks, etc. by the Department of Defense pursuant to Federal Law.

I will forward you and the Fullard-Leo's copies of the completed GAO report. Hopefully, the report will be finalized within the next two months.

Please give my regards to Ainsley.

Sincerely,

Manase

T.E. Manase Mansur
Adviser on Insular and International Affairs

*1324 Longworth HOB, Washington, D.C., 20515 Ph: (202) 226-7400 Fax: 225-5929*
*E-mail: manase.mansur@mail.house.gov*