# EXHIBIT P

# BRIEFING STATEMENT

PREPARED FOR: Director

STATE: U.S. Unincorporated Possession

SUBMITTED: March 30, 2000

TITLE: Kingman Reef Ownership Status and Federal Jurisdictions

ISSUE: Determine a means to acquire Kingman Reef as a unit of the Pacific Remote Islands NWR Complex

BACKGROUND/STATUS:

October 1997, the Preliminary Project Proposal to proceed with detailed planning for the establishment of Kingman Reef National Wildlife Refuge was approved. In early April 2000, underwater coral reef surveys, including those for contaminants and hazardous waste, will be complete.

Kingman Reef is 33 miles northwest of Palmyra Atoll and is approximately 900 miles south of Honolulu. It is a low-lying, roughly triangular atoll-like reef, that is uninhabited. There is no permanent terrestrial land, although emergent lands total several acres and comprise a sand spit that serves as a sea turtle nesting area. The submerged coral reefs and other marine habitats support large numbers of migratory Pacific seabirds, and a rich diversity of marine vertebrates, invertebrates, and algal species.

Outstanding issues remain relative to private ownership claims and federal jurisdictional claims.

## OWNERSHIP STATUS

Kingman Reef is an unorganized and unincorporated U.S. possession. The U.S. acquired sovereignty over Kingman Reef pursuant to the Guano Act of 1856. Fee title interest rests with the Federal Sovereign. It is currently under the jurisdiction of the U.S. Navy.

The Fullard-Leo family is claiming private ownership. In 1922, the American flag was hoisted over Kingman Reef at the request of the Fullard-Leo family for the purpose of taking formal possession.

People wishing to visit Kingman Reef must secure permission from the Fullard-Leo family. However, the U.S. Government does not recognize the family's imputed right to act in this manner.

## FEDERAL JURISDICTIONS

U.S. Department of Defense

Executive Order 6935 (1934) places Kingman Reef under the control and jurisdiction of the Secretary of the Navy for administrative purposes (see attached). The U.S. Navy has a limited right-of-use - the Office of Insular Affairs (OIA) interprets "control and jurisdiction" as limited to Navy's needs or use. Civil administrative power of affairs is retained by OIA through 43 U.S.C. 1458.

Executive Order 8682 (1941) establishes the territorial waters surrounding Kingman Reef (a three-mile boundary) as a naval defense sea area, and the air space above the waters as a naval airspace reservation for purposes of national defense (see attached).

U.S. Department of Commerce
Under the Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. 1801), the Western Pacific Regional Fisheries Management Council manages the territorial waters surrounding the reef (beginning three nautical miles out from the reef and ending at mile 200). The jurisdiction and management of territorial waters associated with National Wildlife Refuges are ongoing issues yet to be resolved with the Department of Commerce.

U.S. Department of Interior
Until the Navy formally states it no longer has a use for Kingman Reef, the Office of Insular Affairs will continue listing the Reef as being under the jurisdiction of the Navy.

BUREAU PERSPECTIVE:

There are two means by which the Service could acquire Kingman Reef from the Navy - presuming the Navy no longer has a need for the site (this is our current understanding). Because of the high likelihood that the Navy no longer needs the Reef, the Service would not pursue a cooperative agreement to establish a management overlay.

The first alternative is to have the Navy relinquish its use and control of the Reef. Upon Navy's notice to Interior, the Reef would immediately come under Interior's administration in accordance with 43 U.S.C. 1458. The Service could then receive full administrative jurisdiction and responsibility of Kingman Reef and its territorial waters through a Secretary's Order. This is how the Service acquired Navassa Island from the Office of Insular Affairs when the U.S. Coast Guard relinquished its use.

The advantage of proceeding with an action under 43 U.S.C. 1458 is that it is a relatively simple and quick action that would not require Commerce's involvement nor Presidential involvement. The termination of use by the Navy of Kingman Reef would not constitute a disposal of excess Federal real property. Therefore, the Federal Property Management Act of 1949, including the involvement of the General Services Administration are not applicable.

The second alternative is to have an Executive Order issued that would transfer the control and jurisdiction from the Navy to Interior. The new executive order would dissolve the Kingman Reef Naval Defense Sea Area and the Kingman Reef Naval Airspace Reservation. The executive order could also stipulate that the Service would administer Kingman Reef, including the submerged lands and territorial waters, as a National Wildlife Refuge. This is how the Service acquired Midway Islands.

The advantage of proceeding with an executive order is that it would definitively establish roles and responsibilities. It would also provide the Service with an opportunity to ensure that the waters from 3 to 12-nautical miles are under the control of Interior and within the boundary of the National Wildlife Refuge - thus eliminating future potential disputes with the Department of Commerce.

Two ongoing concerns remain:

1) the private ownership claims made by the Fullard-Leo family, though unsubstantiated, may need to be resolved; and

2) the jurisdictional question over managing the waters, including the fishery resources should be resolved, so that the Service may properly control access, regulate human activities, and have the administrative lead for regulating any commercial harvest in areas that affect the resources of the proposed Refuge.

CONTACTS: Francesca Ryan, FWS, WO/RE (703) 358-1811
Georgia Shirilla, FWS, Region 1 (503) 231-2236
David Wesley, GARD - North Pacific Coast / Pacific Islands (501) 231-XXXX

# EXHIBIT Q

Author: Robert P Smith at 1PO-PIE
D...e: 04/17/2000 12:09 PM
...l
R...eipt Requested
TO: Rosalyn Worthan at DOI, william_brown@ios.doi.gov at -INTERNET, Dan Ashe at FWS, karen_sprecher_keating@ios.doi.gov at -INTERNET, molly_ross@ios.doi.gov at -INTERNET, PETE_RAYNOR@ios.doi.gov at -INTERNET, Jeffery M Donahoe at FWS, roger_mcmanus@ios.doi.gov at -INTERNET, Anne Badgley at FWS, justin_johnson@ios.doi.gov at -INTERNET, Patricia Ball at FWS, jessica_jenkins@ios.doi.gov at -INTERNET, jackie_ellis@ios.doi.gov at -INTERNET, Dave Wesley at FWS, Georgia Shirilla at FWS, Catherine Sheppard at FWS
Subject: Re: Meeting Request - Kingman

------------------------------------ Message Contents

We are available anytime either Tuesday or Wednesday. It will be more humane for those of us in the islands to start the conference call in the afternoon EDT. We are now six hours earlier than Washington D.C. I now hear the time being proposed is 4pm EDT On Tuesday--Mahalo!

For what its worth, our early thinking from the field goes as follows:

1. Interior should get Kingman Reef from Navy through using the "Midway model" i.e., an initial MOU between Interior and Navy which sets out a roadmap for the transfer, and then:

2. A new Executive Order, similar to the E.O. establishing Midway NWR.

3. Our NEPA compliance for the new refuge should take place prior to the new E.O.

4. I believe the proposal for the new refuge (and the one which we take to Commerce) should be the Kingman Reef fast lands and 3-nm around those lands as a refuge boundary. Again, this is exactly what Navy has now, and follows the Midway model. If Commerce wants to get more reef/ocean into marine protection status (no take zone, etc.), they could do so beyond the 3-nm Naval Defense Seas--soon-to-become refuge boundaries. I believe there will be some pressure for Commerce to establish a broader marine protection area vis-a-vis mandates of the E.O. on coral reef protection and the Coral Reef Task Force.

In the face of the blow back from the HINWR boundary issue, I believe it is important to appear reasonable at Kingman. Certainly an initial ask for only what the Navy now has, fast land plus 3-nm, is reasonable. We should get no bona fide kick from the commercial fishing industry, since ostensibly they have never had access to Naval Defense Seas at Kingman Reef for commercial fishing purposes. Again, the "Midway model" for refuge boundaries at Kingman Reef would naturally exclude commercial fishing, with Naval Defensive Seas, just as in the case with Midway Atoll NWR.

If the language in a new E.O. wants to expand marine refuge boundaries beyond 3-nm, I think that's great, I do believe that a more cautious approach initially may seem more reasonable, such as that outlined above.

The final unknown to this proposal is reaction from the Fullard-Leo family, who have had an historic claim to ownership at Kingman Reef. Does Navy or Interior contact them early in the process? Should we ask for their proof of ownership as part of the Navy/FWS transfer process?

Somebody let us know the final telephone call time/date. At least one potential participant, who has recently been to Kingman, would like to call in from a remote location. Is it possible for this call to be on AT&T "call me" conference call?

Aloha,
Robert

P.S.
I'm going to try to get everyone some digital photos of Kingman Reef today.
RPS

________________________________ Reply Separator ___________________________________
Subject: Meeting Request - Kingman
Author: Rosalyn Worthan at DOI
Date: 04/17/2000 7:13 AM

Importance: High

---------------------------------

Rosalyn Worthan
04/14/2000 04:57 PM

To: William Brown/SIO/OS/DOI@DOI, Roger McManus/SIO/OS/DOI@DOI, PETE RAYNOR@DOI, KAREN SPRECHER KEATING@DOI, Dan Ashe/ARW/R9/FWS/DOI@FWS, Anne Badgley/RO/R1/FWS/DOI@FWS, Molly Ross/ASFW/OS/DOI@DOI, Justin Johnson/PMB/OS/DOI@DOI, Robert P Smith@FWS
Patricia Ball/ARW/R9/FWS/DOI@FWS, Jessica Jenkins/SIO/OS/DOI@DOI, Jackie s/SIO/OS/DOI@DOI

How Does Wednesday, April 19 at 4:00p.m. EST look for everyone?

Subject: Meeting Request - Kingman

I apologize for the lateness of this request. Stephen would like to have a meeting/conference call on the above subject on Tuesday, April 19 at time when we get everyone in a room and by phone. I will be out of the office on Monday, but will be reachable through e-mail. Please let me know as soon as you get this message, what time you have available on Tuesday and possibly Wednesday.

Thanks for your cooperation.

Rosalyn

** Note to Pete and Karen - - please feel free to bring an others you feel need to be included in this meeting.

# EXHIBIT R

United States Department of the Interior

FISH AND WILDLIFE SERVICE

Pacific Islands Ecoregion
300 Ala Moana Boulevard, Room 3-122
Box 50088
Honolulu, Hawaii 96850

JUN 14 2000

Memorandum

To: See Distribution

From: Pacific Islands Manager, Pacific Islands Ecoregion
Honolulu, Hawaii

Subject: Proposed Kingman Reef National Wildlife Refuge: Internal Review of Draft Environmental Assessment and Land Protection Plan and Draft Conceptual Management Plan

Requested Response Date: June 23, 2000

Attached for your review and comment are the subject documents. We are hoping to distribute the draft documents to the public by early July, 2000. Please coordinate your comments with Phyllis Ha directly. She may be contacted by calling (808) 541-2749 or by facsimile transmission at (808) 541-2756.

A special note for folks in the Regional Office: Kingman Reef is still claimed to be privately owned by the Fullard-Leo family. I do not feel comfortable about sending this document out for public review without first sharing it with the Fullard-Leo family and getting their reaction. I would like to give them a one-week review period at the very end of June as soon as we incorporate the internal review comments.

Thank you for your assistance in this matter.

Robert P. Smith

Attachments

Distribution: w/ attachments: (next page)

# EXHIBIT S



Phyllis Ha

12/16/2000 04:35 PM

To: Forrest Cameron/RO/R1/FWS/DOI@FWS, Georgia Shirilla/RO/R1/FWS/DOI@FWS, Charles Houghten/RO/R1/FWS/DOI@FWS, Cathy Osugi/RO/R1/FWS/DOI@FWS

cc:

Subject: Re: Kingman Ownership Inquiry-Mr. Zultan

Thanks for the update, Forrest.

I understand Georgia is assigned to look this up? What are we going to do to resolve this issue in time?

We could amend the Final EA in the "ownership" section to include language that states:

"A private family has claimed ownership to Kingman Reef and submerged lands, although no documentation supporting the ownership claim was found during title searches that were done by the Navy (U.S. GAO 1997), and none was provided to the Service at final printing. The Service will fully evaluate any claims to ownership by a third party prior to Refuge establishment, and would amend the Refuge proposal, as necessary.

If a private ownership is proved, the Service would re-evaluate its ability to establish the Refuge through acquisition of an interest at Kingman Reef, in compliance with its national willing-seller policy, and other applicable laws."

---

My concern is this: Are we going to move forward with completing our decision document, or let this claim stall the proposal? If the former, how do we address the claim, and yet acknowledge it's there. If the latter, we would not make the deadline.

--

Thanks,

Phyllis

# EXHIBIT T

Western
Pacific
Regional
Fishery
Management
Council

FILE COPY

JAN 2001
RECEIVED

29 December 2000

Phyllis Ha
Pacific Islands Refuge Office
US Fish & Wildlife Service
Box 50088
Honolulu
HI 96850

Dear Ms Ha:

The Council has recently received the Environmental Assessment proposing a wildlife refuge at Kingman Reef. The Council requests that the comment period be extended from one month to two months with a cut-off date of February 11th 2000.

We are very concerned that insufficient time has been allotted for public comment. This release of this document over the Christmas period is ill-timed to bring the document to the attention of concerned individuals. This is particularly true for the fishermen in Hawaii who are especially busy during the festive season and many of whom may who also may be at sea during the comment period.

We also understand that ownership of the island may be vigorously contested in court, and in connection with this there are other legal issues concerning rights to commercial fishing around the island. Further, there is no urgency about the need to protect Kingman and its environs, based on the recent NMFS/USFWS survey of the marine and terrestrial ecosystems earlier this year, which were found to be in "pristine condition". We look forward to hearing from you. Mahalo!

Sincerely,

Kitty M. Simonds

Kitty M. Simonds
Executive Director

A Council Authorized by the Magnuson Fishery Conservation and Management Act of 1976
1164 BISHOP STREET · SUITE 1400 · HONOLULU · HAWAII 96813 USA · TELEPHONE (808) 522-8220 · FAX (808) 522-8226
www.wpcouncil.org

# EXHIBIT U

U.S. Fish & Wildlife Service

# News Release

*Pacific Islands Ecoregion*
*External Affairs Office*

300 Ala Moana Blvd., Room 3-122, Box 50088, Honolulu, Hawaii 96850
Phone: 808 541 2749 Fax: 808 541 2756

For Release: January 18, 2001
Contact: Barbara Maxfield — 808 541 2749 or 342 5600

PIE-01-12

## Two New National Wildlife Refuges Approved in the Pacific

The establishment of two new National Wildlife Refuges has been approved by the U.S. Fish and Wildlife Service, extending enhanced protection to the lands and waters of two of the most undeveloped atolls in the Pacific Ocean. Palmyra Atoll and Kingman Reef – part of the Line Islands in the central equatorial Pacific – include both terrestrial and marine habitats for numerous species of wildlife, including seabirds, shorebirds, sea turtles, reef fishes, marine mammals, and terrestrial crabs. The atolls are located about 1,000 miles south of Hawaii.

"I am pleased that these magnificent underwater coral gardens will now get the protection they richly deserve," Secretary of the Interior Bruce Babbitt said. "Safeguarding our nation's coral reefs has been one of the priorities of this administration, and today we have ensured that some of the most pristine coral reefs in U.S. waters will be forever protected within the National Wildlife Refuge System."

Secretary Babbitt also praised the role that The Nature Conservancy played in negotiating the purchase of Palmyra Atoll from private landowners. "This latest addition to the National Wildlife Refuge System will be a lasting legacy for [former Nature Conservancy President] John Sawhill, who saw the incredible value of protecting Palmyra as one of the last undeveloped atolls in the Pacific," he said.

"Today we have ensured that some of the best examples of coral reef ecosystems, as well as one of the largest *Pisonia* rainforests and a significant seabird nesting site, will be forever protected within the National Wildlife Refuge System," said Anne Badgley, Pacific Regional Director for the Service.

Boundaries for the refuges, as approved by the Fish and Wildlife Service Director, include emergent lands, tidal lands, and submerged lands and waters within the 12-nautical mile U.S. territorial seas. The approximately 3 acres of coral islets at Kingman Reef and its surrounding submerged lands were transferred today by the Secretary from the Interior Department's Office of Insular Affairs to the Fish and Wildlife Service to actually establish the new refuge.

The boundaries for Kingman Reef National Wildlife Refuge include three unvegetated coral islets and approximately 483,700 acres of submerged lands and waters, including 25,874 acres of coral reef habitat. "The refuge will protect a spectacular diversity of coral reef fishes, corals, and other marine organisms, as well as provide habitat for migratory seabirds and shorebirds and threatened green sea turtles," explained Regional Director Badgley.

– more –

More than 16,000 acres of coral reef habitat will be protected within the 515,232 acres of tidal submerged lands at Palmyra Atoll National Wildlife Refuge. "The heavy rainfall in this equatorial :on provides for lush vegetation on these islets, including rare stands of *Pisonia* rainforest," said ;ional Director Badgley. "Palmyra hosts the second-largest nesting colony of red-footed boobies in world and large colonies of other seabirds, including 750,000 sooty terns. These birds rely on the rounding waters to provide the food they and their chicks need, and it's critical that the entire atoll system be protected."

Palmyra also provides habitat for threatened and endangered sea turtles, marine mammals, ;ratory shorebirds, pelagic and reef fishes, manta and eagle rays, giant clams, and a host of terrestrial bs. "The former landowners, the Fullard-Leo family of Hawaii, greatly restricted access to Palmyra l, in doing so, safeguarded its tremendous natural resources," Regional Director Badgley said. "I've y seen pictures of coconut crabs, some as large as basketballs, and they certainly are impressive!"

The 680 acres of emergent lands at Palmyra Atoll are owned by The Nature Conservancy, a vate conservation organization. The Fish and Wildlife Service is negotiating with TNC to purchase a jor part of the atoll, and both entities would work together to conserve the atoll's rich biological ersity. The submerged lands and waters at Palmyra were administered by the Office of Insular Affairs l, like those at Kingman, were transferred to the Fish and Wildlife Service today.

The U.S. Fish and Wildlife Service is the principal Federal agency responsible for conserving, protecting, l enhancing fish, wildlife, and plants and their habitats for the continuing benefit of the American people. The v manages the 93-million-acre National Wildlife Refuge System that encompasses more than 530 national dlife refuges, thousands of small wetlands and other special management areas. It also operates 66 national fish cheries, 64 fishery resource offices, and 78 ecological services field stations. The agency enforces Federal dlife laws, administers the Endangered Species Act, manages migratory bird populations, restores nationally nificant fisheries, conserves and restores wildlife habitat such as wetlands, and helps foreign governments with ir conservation efforts. It also oversees the Federal Aid program that distributes hundreds of millions of dollars in cise taxes on fishing and hunting equipment to state fish and wildlife agencies.

*– FWS –*

# EXHIBIT V

SHORT CRESSMAN & BURGESS PLLC
Michael R. Garner, Hawaii Bar No. 1768
Richard A. Du Bey, Washington Bar No. 8109
John J. Houlihan, Jr., Washington Bar No. 30285
999 Third Avenue, Suite 3000
Seattle, WA 98104
Ph. 206-682-3333
Attorneys for Plaintiffs Palmyra Pacific Seafoods, LLC and Kingman Reef Enterprises LLC

BROOKS TOM PORTER & QUITIQUIT, LLP
Christian Porter, Hawaii Bar No. 3744
Donna H. Yamamoto, Hawaii Bar No. 5881
2125 Davies Pacific Center
841 Bishop Street
Honolulu, HI 96813
Ph. 808-526-3011
Attorney for Plaintiffs Kingman Reef Atoll Investments, LLC and Kingman Reef Atoll Development, LLC

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

MAR 07 2002

at 3 o'clock and 34 min. P M
WALTER A. Y. H. CHINN, CLERK

UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| KINGMAN REEF ATOLL INVESTMENTS, L.L.C. *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES DEPARTMENT OF INTERIOR et al.<br><br>Defendants. | NO. CV 01-00122 SOM-LEK<br><br>ORIGINAL AFFIDAVIT OF FRANK SORBA IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT; CERTIFICATE OF SERVICE<br><br>DATE: March 18, 2002<br>TIME: 9:00 a.m.<br>JUDGE: Susan Oki Mollway<br><br>Trial Date: May 21, 2002 |

# ORIGINAL AFFIDAVIT OF FRANK SORBA IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

SHORT CRESSMAN & BURGESS PLLC
Michael R. Garner, Hawaii Bar No. 1768
Richard A. Du Bey, Washington Bar No. 8109
John J. Houlihan, Jr., Washington Bar No. 30285
999 Third Avenue, Suite 3000
Seattle, WA 98104
Ph. 206-682-3333

BROOKS TOM PORTER & QUITIQUIT
Christian Porter, Hawaii Bar No. 3744
2125 Davies Pacific Center
841 Bishop Street
Honolulu, HI 96813
Ph. 808-526-3011
Attorney for Plaintiffs Kingman Reef Atoll Investments, LLC and Kingman Reef Enterprises, LLC

UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| KINGMAN REEF ATOLL INVESTMENTS, L.L.C. *et al.*<br>Plaintiffs,<br>v.<br>THE UNITED STATES DEPARTMENT OF INTERIOR et al.<br>Defendants. | NO. CV 01-00122<br>AFFIDAVIT OF FRANK SORBA IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT |

STATE OF WASHINGTON )
) SS.
COUNTY OF KING )

I, FRANK SORBA being first duly sworn on oath, states as follows:

1. I am over 18 years of age, have personal knowledge of the facts contained in this affidavit, and am competent to testify.

2. Kingman Reef is a remote coral atoll located approximately 1,000 miles south of Hawaii and about 30 miles from the Palmyra Atoll. Given its extremely remote location, it is difficult to travel to Kingman Reef. Palmyra is accessible by airplane or a three day boat voyage from Hawaii. Kingman Reef is accessible by boat from Palmyra, three days voyage from Hawaii or by aircraft over-flight.

3. The Fullard- Leo Family owned the Palmyra Atoll until its sale to The Nature Conservancy in October of 2000. The Fullard Leo family has owned Kingman Reef since its annexation to the sovereign jurisdiction of the United States in 1922.

4. In 1999, my company Palmyra Pacific Enterprises, LLC entered into a license agreement with Palmyra Development Co., Inc. and sublicensed all of the rights to my other company, Palmyra Pacific Seafoods, LLC ("PPS"). Palmyra Development held the master lease for Palmyra with the Fullard-Leo family. The license agreement allowed PPS to operate a commercial fishing operation based on the Palmyra Atoll to fish in the waters in and around Palmyra and Kingman Reef subject to certain prohibitions to protect the coral reef environment.

5. PPS invested over $3,500,000.00 in its operation on Palmyra. During 2000, PPS harvested fish in the waters off of Kingman Reef.

6. In November, 2000, my company Kingman Reef Enterprises, LLC ("KRE") entered into a license with Kingman Reef Development LLC to establish a similar fishing operation in and around Kingman Reef.

7. In conjunction with the Family's environmental stewardship and protection of Palmyra and Kingman Reef, the licenses under which PPS and KRE operate contain restrictive provisions governing business operations to protect the coral reef ecosystems.

The licenses contain detailed conditions, prohibitions and restrictions on the use of Kingman Reef and Palmyra in accordance with the Master Lease requirements including:

(i) prohibiting commercial fishing within the 100 fathom mark of Palmyra or Kingman Reef;

(ii) prohibiting any and all fishing, commercial or sport, within the lagoons of Kingman Reef and Palmyra;

(iii) prohibiting any fishing activities that damages the coral reefs of Kingman Reef or Palmyra;

(iv) fishing for or collection of tropical fish for aquarium trade, sharks, porpoises, rays, turtles, clams or corals was strictly prohibited and even such species collected as by-catch from permitting fishing were to be returned to the ocean with a minimum of injury;

(v) prohibition of discharging any fishing vessel waste within 3 miles of Kingman Reef or Palmyra;

(vi) prohibition of any vessel maintenance or repairs within 3 miles of Kingman Reef or Palmyra;

(vii) prohibition of any waste discharge into Kingman Reef lagoon;

(viii) mandate changes to operations in the event the operations cause ecological or environmental harm to Kingman Reef;

(ix) limiting the number and size fishing vessels;

(x) requiring operations to be conducted in a manner that minimizes any impacts to Kingman Reef;

(xi) prohibiting any uses of Kingman Reef other than for a fishing base that would be noxious or detrimental to the environment or ecosystems of Kingman Reef;

(xii) prohibiting the removal of any live or dead coral, shells or other reef structures or inhabitants; and

(xiii) requiring Kingman Reef Enterprises, LLC to make every effort to be sensitive to and protect the flora, fauna, natural beauty and environment of Kingman Reef and its surrounding waters.

8. Kingman Reef Enterprises, LLC intends to fully pursue its fishing rights in and around Kingman Reef after the Kingman Reef Wildlife Refuge designation is invalidated for failure to comply with NEPA and the APA.

9. I participated in the Kingman Reef National Wildlife Refuge designation process in order to ensure that our real property ownership interests in Kingman Reef were protected as well as to ensure that the designation was appropriate and complied with applicable law so that the natural resources at Kingman Reef would be legally protected.

I certify under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

[signature] 2/27/02
FRANK SORBA

SUBSCRIBED AND SWORN TO before me this 27th day of February, 2002.

BARBARA J. DAY
COMMISSION EXPIRES
NOTARY PUBLIC
10-23-04
STATE OF WASHINGTON

[signature: Barbara J. Day]
Printed Name: Barbara J. Day
NOTARY PUBLIC in and for the State of Washington, residing at Seattle
My Appointment expires: 10/23/04

AFFIDAVIT OF FRANK SORBA IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT - 4

UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| KINGMAN REEF ATOLL INVESTMENTS, L.L.C., a Hawaii limited liability company; KINGMAN REEF ATOLL DEVELOPMENT, L.L.C., a Hawaii limited liability company; KINGMAN REEF ENTERPRISES, L.L.C., a Washington limited liability company; and PALMYRA PACIFIC SEAFOODS, L.L.C., a Washington limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES DEPARTMENT OF INTERIOR; THE HONORABLE GALE NORTON, in her official capacity as Secretary of the Interior; THE UNITED STATES FISH & WILDLIFE SERVICE; MARSHALL JONES in his official capacity as director of Fish & Wildlife Service;<br>DANIEL ASHE in his official capacity as Chief of National Wildlife Refuge System, Fish & Wildlife Service,<br><br>Defendants. | NO. CV01-00122 SOM LEK<br><br>CERTIFICATE OF SERVICE |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the ORIGINAL AFFIDAVIT OF FRANK SORBA IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT was duly served on the following party at their last known address by depositing same in the United States Mail, postage prepaid, on March 7, 2002.

NEPA 00312

EDWARD H. KUBO, JR.
United States Attorney
District of Hawaii
THOMAS A. HELPER
Assistant U.S. Attorney
300 Ala Moana Boulevard
Room 6-100
Honolulu, HI 96850
Attorneys for Defendants

DATED: Honolulu, Hawaii, March 7, 2002

CHRISTIAN P. PORTER
DONNA H. YAMAMOTO
Attorneys for Plaintiffs
KINGMAN REEF ATOLL INVESTMENTS, LLC
AND KINGMAN REEF ATOLL DEVELOPMENT, LLC

# EXHIBIT W

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

- - -

KINGMAN REEF ATOLL INVESTMENTS, L.L.C., a Hawaii limited liability company,

Plaintiff,

vs.

THE UNITED STATES OF AMERICA; THE UNITED STATES DEPARTMENT OF INTERIOR; THE HONORABLE GALE A. NORTON, in her official capacity as Secretary of the Interior; THE UNITED STATES FISH & WILDLIFE SERVICE; STEVEN A. WILLIAMS, in his official capacity as Director of United States Fish & Wildlife Service; JOHN DOES 1-10, JANE DOES 1-10, AND DOE PARTNERSHIPS, CORPORATIONS, GOVERNMENTAL UNITS or OTHER ENTITIES 1-10,

Defendants.

CERTIFIED COPY

No. CV05-00151 JMS/BMK

DEPOSITION OF

CHARLES COOK

BURBANK, CALIFORNIA

MARCH 26, 2007

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

REPORTED BY: JOSEPH R. LOMBARDI, CSR NO. 12641

FILE NO.: A1007EE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

- - -

| | |
|---|---|
| KINGMAN REEF ATOLL INVESTMENTS, L.L.C., a Hawaii limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>THE UNITED STATES OF AMERICA; THE UNITED STATES DEPARTMENT OF INTERIOR; THE HONORABLE GALE A. NORTON, in her official capacity as Secretary of the Interior; THE UNITED STATES FISH & WILDLIFE SERVICE; STEVEN A. WILLIAMS, in his official capacity as Director of United States Fish & Wildlife Service; JOHN DOES 1-10, JANE DOES 1-10, AND DOE PARTNERSHIPS, CORPORATIONS, GOVERNMENTAL UNITS or OTHER ENTITIES 1-10,<br><br>Defendants. | No. CV05-00151 JMS/BMK |

Deposition of CHARLES COOK, taken on behalf of Plaintiff, at 2900 North San Fernando Boulevard, Conference Room, Burbank, California, commencing at 9:29 A.M., Monday, March 26, 2007, before Joseph R. Lombardi, CSR No. 12641.

A P P E A R A N C E S:

For Plaintiff:

CANNATA, CHING & O'TOOLE LLP
BY: THERESE Y. CANNATA
899 Ellis Street
San Francisco, California 94109
(415) 409-8900

BROOKS, TOM, PORTER & QUITIQUIT LLP
BY: DONNA H. YAMAMOTO
841 Bishop Street
Honolulu, Hawaii 96813
(808) 526-3011

For The United States of America:

UNITED STATES DEPARTMENT OF JUSTICE
ENVIRONMENT & NATURAL RESOURCES DIVISION
NATIONAL RESOURCES SECTION
BY: DONNA SHEEHAN FITZGERALD
601 D Street Northwest, Room 304
Washington, D.C. 20004
(202) 305-0476

For Charles Cook:

COX, CASTLE & NICHOLSON LLP
BY: ANDREW K. FOGG
2049 Century Park East, 28th Floor
Los Angeles, California 90067
(310) 277-4222

boat out to Kingman Reef that you know of?

A. Not that I know of.

Q. Did you ever ask permission of the Fullard-Leo family to include in one of your trips to Palmyra permission to go to Kingman Reef if you wanted to?

MR. FOGG: Asked and answered.

MS. CANNATA: It's a different question, I think.

Q. Go ahead?

A. Would you repeat it.

Q. Yes.

(Whereupon, the record was read by the reporter.)

THE WITNESS: I don't remember that.

BY MS. CANNATA:

Q. Had you ever heard from anybody that persons wishing to visit the Kingman Reef had to secure permission from the Fullard-Leo family? Had you ever heard that before today?

A. I guess the only real example I had was when Chuck Brady, the astronaut, wanted to go out there.

Q. And --

A. That was on our first trip to the atoll in October 1997. Ainsley and Betty Fullard-Leo were on the trip, as was an astronaut named Chuck Brady. We were

visiting the atoll for the first time.

Mr. Brady is a ham radio guy. He wanted to go to Kingman Reef, and I think he asked Ainsley if he could go while he was out there.

Q. And what came of that?

A. If I recall, Mr. Brady radioed a fishing boat that was fishing around the atoll at night and asked if the fishermen would take him out to the atoll for hire, and that's about all I know because I think he and Ainsley worked out something.

MR. FOGG: To Kingman Reef?

THE WITNESS: To Kingman Reef. I'm sorry. What did I say?

MR. FOGG: The atoll.

BY MS. CANNATA:

Q. To Kingman Reef?

A. Yes. I'm sorry.

Q. As far as you know, he took the trip?

A. Yes. I think he did.

Q. And what was Mr. Brady doing on the trip to begin with, on the trip to Palmyra?

A. Testing communications equipment for NASA.

Q. Was this during the fund-raising part of it?

A. This was the very first trip.

Q. Do you know when this was?

A. October of '97.

Q. Okay. There's a section in this document called "Threats." Do you see that?

A. (Witness shakes head up and down.)

Q. Go down to where it -- yes?

A. Yes.

Q. Go down to where it says "Kingman Reef."

A. Yes.

Q. It says, "The primary threats to the natural resources are oil spills, shipwrecks and poaching." Independent of this document --

A. Yes.

Q. Independent of this document, do you agree with that statement? I say independent of the document to avoid objection from counsel, but my basic question is do you agree with that statement?

A. Not really.

Q. Why?

A. I have no knowledge of oil tankers and ships going that close to Kingman Reef. Maybe the Fish and Wildlife Service has knowledge. I don't. I don't have that kind of knowledge.

Q. Okay. Go to page 6 where it says "Kingman Reef." Do you see that?

A. Yes.

# EXHIBIT X

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

- - -

CERTIFIED COPY

| | |
|---|---|
| KINGMAN REEF ATOLL INVESTMENTS, L.L.C., a Hawaii limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>THE UNITED STATES OF AMERICA; THE UNITED STATES DEPARTMENT OF INTERIOR; THE HONORABLE GALE A. NORTON, in her official capacity as Secretary of the Interior; THE UNITED STATES FISH & WILDLIFE SERVICE; STEVEN A. WILLIAMS, in his official capacity as Director of United States Fish & Wildlife Service; JOHN DOES 1-10, JANE DOES 1-10, AND DOE PARTNERSHIPS, CORPORATIONS, GOVERNMENTAL UNITS or OTHER ENTITIES 1-10,<br><br>Defendants. | No. CV05-00151 JMS/BMK<br><br>DEPOSITION OF<br><br>CHARLES COOK<br><br>BURBANK, CALIFORNIA<br><br>MARCH 26, 2007 |

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

REPORTED BY: JOSEPH R. LOMBARDI, CSR NO. 12641

FILE NO.: A1007EE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

- - -

| | |
|---|---|
| KINGMAN REEF ATOLL INVESTMENTS, L.L.C., a Hawaii limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>THE UNITED STATES OF AMERICA; THE UNITED STATES DEPARTMENT OF INTERIOR; THE HONORABLE GALE A. NORTON, in her official capacity as Secretary of the Interior; THE UNITED STATES FISH & WILDLIFE SERVICE; STEVEN A. WILLIAMS, in his official capacity as Director of United States Fish & Wildlife Service; JOHN DOES 1-10, JANE DOES 1-10, AND DOE PARTNERSHIPS, CORPORATIONS, GOVERNMENTAL UNITS or OTHER ENTITIES 1-10,<br><br>Defendants. | No. CV05-00151 JMS/BMK |

Deposition of CHARLES COOK, taken on behalf of Plaintiff, at 2900 North San Fernando Boulevard, Conference Room, Burbank, California, commencing at 9:29 A.M., Monday, March 26, 2007, before Joseph R. Lombardi, CSR No. 12641.

A P P E A R A N C E S:

For Plaintiff:

CANNATA, CHING & O'TOOLE LLP
BY: THERESE Y. CANNATA
899 Ellis Street
San Francisco, California 94109
(415) 409-8900

BROOKS, TOM, PORTER & QUITIQUIT LLP
BY: DONNA H. YAMAMOTO
841 Bishop Street
Honolulu, Hawaii 96813
(808) 526-3011

For The United States of America:

UNITED STATES DEPARTMENT OF JUSTICE
ENVIRONMENT & NATURAL RESOURCES DIVISION
NATIONAL RESOURCES SECTION
BY: DONNA SHEEHAN FITZGERALD
601 D Street Northwest, Room 304
Washington, D.C. 20004
(202) 305-0476

For Charles Cook:

COX, CASTLE & NICHOLSON LLP
BY: ANDREW K. FOGG
2049 Century Park East, 28th Floor
Los Angeles, California 90067
(310) 277-4222

Q. Did you take notes at meetings typically?
A. No. I'm not a big note taker.
Q. All right. On average, during the time period that you were the director of the Palmyra project, how often did you speak with Robert Smith on average, say in one week?
A. Perhaps once a week or once every two weeks. We talked about a lot of other stuff to.
Q. What other stuff?
A. Fishing, hunting.
Q. Okay.
A. Our Tennessee roots, Tennessee families, parents, kids.
Q. Small talk?
A. Not small talk, but non-business talk.
Q. Non-business talk. Sorry. I didn't mean to mischaracterize it.
As you reflect back on those conversations, and I ask you to, do you recall Mr. Smith ever talking about the Fullard-Leos' claim to title of the Kingman Reef property?
A. No.
Q. Did Mr. Smith ever tell you that he believed that the United States government owned the Kingman Reef property?

A. He told me he believed the military owned the property.

Q. Did he ever tell you that he told Peter Savio that the U.S. military owned the property?

A. I don't have any knowledge of that at all.

Q. After Mr. Smith told you that he believed that the U.S. Government owned the property, did you ever see any documentation that supported that view?

MR. FOGG: Other than anything generated by your lawyer.

THE WITNESS: Pardon?

MR. FOGG: Other than anything generated by your lawyer.

THE WITNESS: No.

BY MS. CANNATA:

Q. After Mr. Smith told you that he believed that the U.S. Government owned the Kingman Reef property, did Mr. Savio ever approach you again about having the Nature Conservancy buy the Kingman Reef from the Fullard-Leo family?

A. I don't recall that he did.

Q. Did Mr. Savio -- after that communication with Mr. Smith, did Mr. Savio ever refer to the Kingman Reef as being owned by the Fullard-Leo family after that point in time?

A. Yes. He reiterated that many times.
Q. In conversations that you had with him?
A. Yes.
Q. Did you ever stop him and say no?
A. No.
Q. Did you ever correct him at all?
A. No.
Q. Did you ever tell him that Mr. Smith had told you something contrary to that?
A. Could you repeat that.

(Whereupon, the record was read by the reporter.)

THE WITNESS: No. I don't recall him saying that. I think you probably understand this. I had the Fish and Wildlife Service telling me that the military owned the property. I had Mr. Savio telling me that the Fullard-Leos owned the property.

MR. FOGG: By "property" you're referring to Kingman Reef?

THE WITNESS: By "property" I refer to both Palmyra and Kingman Reef. My job was, I think, to acquire, see through a successful acquisition of the Palmyra Atoll. I wanted to maintain relationships with Peter and the family. I wanted to maintain relationships with the Fish and Wildlife Service.

I did not want to engage or facilitate a debate or second guess or speculate about the ownership of Kingman Reef. My focus was the acquisition of Palmyra Atoll.

BY MS. CANNATA:

Q. Okay. I'll let you finish.

A. You keep coming back to the same issues. I just thought I would try to put it in context of the position that I was in as a lead negotiator for Palmyra Atoll, and once we acquired Palmyra Atoll, we may want to sell part of it to the Fish and Wildlife Service, not necessarily. If they came up with the money, we might sell part of it. I was trying to maintain good relationships with both parties and successfully acquire Palmyra Atoll.

Q. And I want to just come back to two points on that in a second.

A. Okay.

Q. With respect to the Fullard-Leo family, did you feel that, if you tried to correct them or pass on the information that the government had a different position concerning the ownership of Kingman Reef, that it would offend them?

A. I don't know what I -- I didn't really speculate. As I said earlier, I didn't have a dog in that hunt, and I didn't need to go there. I didn't want

to go there. I didn't know how they would have reacted.
Q. Did you feel an obligation to let Peter know that at some point in time he was going to be facing a challenge to the Fullard-Leos claim of title?
A. No.
Q. Did you decide you weren't going to tell him any information for any reason?
A. No.
Q. Other than to maintain good relations?
A. No.
Q. Now, with respect to the good relations with the Fish and Wildlife Service, you had partnered I think in the past -- the Nature Conservancy had partnered in the past with the Fish and Wildlife Service to acquire property; right?
A. That's correct.
Q. Was there any indication to you that passing on the information to Mr. Savio would somehow jeopardize the years of relationship that the Nature Conservancy had with the Fish and Wildlife Service?
A. No.
Q. Let's look at another document.
A. Any particular point I should be reading here?
Q. Just read the general document. You don't have to study it. Just thumb through it. I don't think your