Of Counsel:
BROOKS TOM PORTER & QUITIQUIT, LLP

Christian P. Porter, Hawaii Bar No. 3744
2125 Davies Pacific Center
841 Bishop Street
Honolulu, HI 96813
Ph: 808-526-3011
Fax: 808-523-1171
Email: cporter@btpqlaw.com

Therese Y. Cannata, CA Bar No. 88032
Cannata Ching & O'Toole LLP
899 Ellis Street
San Francisco, CA 94109
Ph: 415-409-8900
Fax: 415-409-8904
Email: tcannata@ccolaw.com

Attorneys for Plaintiffs
KINGMAN REEF ATOLL INVESTMENTS L.L.C. and
KINGMAN REEF ATOLL DEVELOPMENT L.L.C.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **KINGMAN REEF ATOLL INVESTMENTS, L.L.C., et al.,** | **No. 06-828L** |
| **Plaintiffs,** | **DECLARATION OF PETER SAVIO IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS UNDER FRCP 12(B)(1)** |
| **v.** | |
| **THE UNITED STATES OF AMERICA; Defendant.** | **Judge Marian Blank Horn** |

**DECLARATION OF PETER SAVIO**

I, Peter Savio, hereby declare as follows:

1. I am the owner of Savio Realty, Ltd. , the President of Palmyra Development Co., Inc., and a member of plaintiff Kingman Reef Atoll Development L.L.C. I make this declaration based on my personal knowledge and am competent to testify as to the facts as stated herein.

2. From the 1950's-1960's to the mid-1980's, my mother Mary Savio, in her capacity as a real estate agent represented the Fullard-Leo family in various real property transactions.

3. Beginning in about 1970, I assisted my mother in the representation of the Fullard-Leo family.

4. In the mid-1980's, my mother retired and I took over representation of the family; from that time through and including the present date I have served as their real estate agent.

5. Since the 1980's, Savio Realty, Ltd. of which I am the owner and/or the Palmyra Development Co., Inc., of which I am the President, and Hawaiian Island Homes of which I am the owner and principal broker, have represented the Fullard-Leo family, and in particular, Leslie Vincent Fullard-Leo, Dudley Leinani Fullard-Leo and Ainsley Kahealani Fullard-Leo (collectively, "the Fullard-Leo family") in all transactions, inquiries, and/or other matters involving both Palmyra Island and Kingman Reef.

6. Kingman Reef's economic value and/or commercial use includes ecotourism, recreational fishing tourism, commercial fishing operations and a transfer station for fishing operations (*i.e.* fishing vessels coming in from distant areas, transferring the fish to a smaller boat and transporting it to Honolulu).

7. In 1991, I met with The Nature Conservancy ("TNC") to discuss, among other things, the sale and development of Kingman Reef. Jim Maragos, then with TNC, prepared a memorandum summarizing our meeting, dated August 19, 1991. He forwarded it to me for review and I made hand written corrections that reflected my understanding of what was stated at the meeting. Attached as **Exhibit A** is a true and correct copy of that memorandum with my hand interlineations. I specifically recall that during that meeting the U.S. Fish and Wildlife Service ("FWS") stated that it was keenly interested in Kingman Reef, and that we discussed whether the Fullard-Leo family would be interested in selling both Palmyra Atoll and Kingman Reef to TNC or the government. No one at that meeting questioned the Fullard-Leo family's legal title to Kingman Reef or suggested that the government owned Kingman Reef.

8. In the past 30 years, the Fullard-Leo family and/or I received at least ten (10) referrals from the Navy, possibly more. That is, a person would call me requesting permission to go to Kingman Reef, I would ask how he got my name, and he told me that a representative of the U.S. Navy (at Pearl Harbor) referred him. Not everyone who inquired about visiting Kingman Reef actually went there because it is logistically difficult to travel there. Because the Fullard-Leo family owns the fee title to Kingman Reef, the U.S. Navy, to my knowledge, referred such inquiries to the Fullard-Leo family and/or to me.

9. Some of the parties seeking permission to enter onto Kingman Reef, were HAM radio operators. Specifically, the various operators sought permission to broadcast from Kingman Reef. In order for their broadcasts from a particular location to be considered legitimate, however, they must obtain permission to broadcast from the legal owner of the property. Thus, the operators would contact the U.S. Navy to ascertain the identity of the legal

owner of Kingman Reef, and the Navy then referred them to the Fullard-Leo family. I received similar referrals during this same time period from the United States Coast Guard.

10. For anyone traveling to Kingman Reef, on instructions of the Fullard-Leo family, I required that the visitor obtain written permission and execute a release form.

11. During the negotiations for the sale of Palmyra Atoll, representatives of TNC and FWS traveled to Palmyra. At least one of these persons, Mr. Chuck Brady, visited Kingman Reef as well. Because there were continuing discussions about also selling Kingman Reef, we granted written permission for the group to visit both Palmyra and Kingman Reef. Attached as **Exhibit B** is a true and correct copy of the permission and release form used for a visit in 1997.

12. Also, during this time, the United States National Marine Fisheries Service ("NMFS") referred at least one fisherman seeking permission to enter Kingman Reef to the Fullard-Leos and/or me.

13. I have also had communications, by telephone and through letters, with representatives of the FWS (Robert Smith) and Western Pacific Region Fishery Management Council (Kitty Simonds) concerning fishery management issues in and around Kingman Reef. I spoke to them about the Fullard-Leo family's ownership of Kingman Reef and the family's right to control access to the waters in and around the property. At no point in time did Mr. Smith or Ms. Simonds indicate to me that they questioned the Fullard-Leo family's title to Kingman Reef or suggest that some person or entity other than the family owned the property.

14. Over the years, the Fullard-Leo family, as the legal owners of Kingman Reef, have received inquiries from both the U.S. Department of the Interior, FWS, the City & County of Honolulu, and the State of Hawaii to purchase Kingman Reef. I represented the Fullard-Leo

family in those negotiations and discussions.

15. On or about October 3, 1997, I received the handwritten note from Robert Smith of FWS, asking to purchase Kingman Reef. Attached as **Exhibit C** hereto is a true and correct copy of that note.

16. I was the lead negotiator on behalf of the Fullard-Leo family for the proposed purchase of Palmyra Atoll by TNC and FWS. Mr. Cook of the TNC and Mr. Smith of FWS participated in those negotiations. Both Mr. Cook and Mr. Smith asked me on several occasions whether they could also purchase Kingman Reef. At one point, Mr. Cook suggested a price but I advised him that his number was too low for the Fullard-Leo family to even start down the road of discussing a sale of that property. At no point during my discussions with Mr. Smith and Mr. Cook did either of them indicate that they questioned (or denied) the Fullard-Leo family's title to Kingman Reef.

17. The first information that I received concerning the government's decision to take the property without compensating the Fullard-Leo family was in December 2000, when FWS announced it's proposed establishment of the Kingman Reef Wildlife Refuge.

18. As the Fullard-Leos' agent, I took appropriate action to stop unauthorized entry on or to Kingman Reef. For example, I intervened several times to stop a person from Kailua-Kona, Hawaii who was fishing commercially in and around Kingman Reef without permission.

19. Chuck Brady, Captain, U.S. Navy who provided support services for The Nature Conservancy, visited Kingman Reef twice in the late 1990's and on each visit requested permission to go to Kingman Reef.

20. In the 1980's, I was contacted by a representative of the government (possibly

from the U.S. Department of Interior) concerning the government's intent to buy property (i.e. islands) for displaced residents of the Bikini Islands. The government representatives indicated to me that they were interested in buying Palmyra Atoll and Kingman Reef subject to confirming that these areas were suitable. In connection with the government's inquiry, I went to Kingman Reef in a U.S. Air Force plane to inspect Kingman Reef and Palmyra Atoll. We did not land but we flew over Kingman Reef and I answered questions from the persons representing the Bikini Islands concerning the property.

21. At no time has the government ever restricted me from entering Kingman Reef itself, its airspace or surrounding waters, nor has the government ever indicated to me that I, acting as the Fullard-Leo family's agent, was not authorized or able to sell, convey or transfer any of its interest in Kingman Reef.

I declare under penalty of perjury under the laws of the United States and the State of Hawaii that the foregoing is true and correct.

DATED: Honolulu, Hawaii, this 20th day of April 2007.

/s/
PETER SAVIO

# EXHIBIT A

# MEMORANDUM

TO: Palmyra Atoll file
CC: Kelvin Taketa, ~~Peter Savio~~, Robert Smith, John Ford, Georgia Shirilla
FROM: Jim Maragos
DATE: August 19, 1991
SUBJECT: Minutes of 7/26/91 meeting on Palmyra Atoll held at TNC (DRAFT)

---

1. Representatives of The Nature Conservancy, Peter Savio Realty, U.S. Fish and Wildlife Service, and M & E Pacific met at 1300-1500 hours on 26 July 1991 at the Smith Street office to discuss proposed development and conservation plans for Palmyra Atoll. An attendance sheet is attached.

2. Peter Savio reviewed the TNC letter of 17 June 1991 and offered the following comments on behalf of his firm and the owners. He also sought clarification on some of the language in the letter.

   A. The owners are nervous about collaborating with the federal government due to previous misfortunes. However, they support the development concept and do not object to USFWS/TNC involvement as long as Savio Development is involved and active. The owners do <u>not</u> favor a large scale development.

   B. If Savio pulls out of the project, then the owners would not want USFWS/TNC as partner for further attempts at development and conservation. The owners are concerned that the federal government may try to condemn the atoll once the feds have a foothold.

   C. The owners are also concerned that the feds will renege on an agreement to allow for development of Cooper Island.

   D. Thus, Savio suggested a "buy out" option where TNC would be reimbursed, say $500,000, to relinquish interest and compensate for commitment of resources for the Palmyra project.

   E. Savio is open to other suggestions on resolving the owners objections.

3. Savio also reviewed the status of the project planning and provided copies of preliminary planning documents prepared by M & E. He did not agree with the concept as illustrated in the M & E report because too much space was taken up for housing and the plan for Cooper Island lacked a rural 19th century character as desired by Savio. He also wants to keep the atoll "interesting" for visitors. Quality, not quantity (number of units) is the goal.

4. Savio's arrangement with the owners is a 75 year lease with an option to buy within the first 5 years (4 years left). The owners also retain an "escape" clause which remains in effect for 3 years (2 years left). The owners would no longer be involved after Savio buys the atoll.



EXHIBIT "1D"

5. Both the owners and Savio envision Cooper Island being used for residential/vacation development (NTE 3 stories) with the remainder of the atoll designated as a reserve or park except for Sand Island, a small portion of Home Island, and navigation areas and anchorages in the west lagoon.. Heirs of Judge Henry Cooper may have title to the parcels on Home Island and Savio intends to buy them out. (leave them as is or clarify what they own. no intention to buy them out.)

6. Savio doesn't want to run the park or reserve. He would like to see TNC/USFWS operate the park and he intends to raise or earmark the funds to support long-range management.

7. The big issue is Savio's mind is who controls what since two separate land "managers" will be operating jointly on the atoll. A balance needs to be achieved where one party does not have an unreasonable amount of control over the other.

8. Savio intends to sell 250+ lots for $250,000 each (approximately) to raise the funds to restore/establish infrastructure and buy the atoll from the owners.

9. Savio mentioned that the owners believe they control all reefs and the territorial seas off Palmyra Atoll and they also claim Kingman Reef, the next atoll to the northwest. The owners may be interested in dedicating Kingman Reef for conservation. The reef has little or no dry land and is not suitable for development. (and or selling it for that purpose)

10. Savio intends to establish rules applicable to the future owners during the lease period for both ocean and land areas at Palmyra.

11. Proposed infrastructure improvements include restoring and paving the overgrown runway to accommodate Aloha Airline sized jet traffic. Savio cited an optimum load for each jet plane at about 120 passengers. Aloha is willing to fly to Palmyra once the runway is restored.

12. In working with TNC/USFWS, Savio would like to develop a plan to insure that Cooper Island development is compatible with the rest of the atoll as a reserve, and that compatible uses of the reserve by residents and authorized visitors be identified and agreed upon. The reserve and the atoll's natural resources will attract most visitor/buyers.

13. USFWS mentioned the threat of air strikes (collisions between birds and planes) if high levels of nesting continue on Cooper's runway. Savio would like to restore the old fighter strips in the south lagoon as prime nesting habitat for birds, consistent with previous high level use by nesting seabirds before the fighter islands were overgrown with vegetation.

14. USFWS pointed out that significant bird populations also occur elsewhere on Cooper Island. Maragos noted high population levels of nesting red-footed Boobies on trees lining the shoreline and large populations of black noddies in the crowns of coconut

trees and other large trees. Sea turtle nesting on the northwest beach of Cooper Island was also acknowledged. Smaller nesting colonies of sooty terns may occupy some of the flat lagoon-facing lands south of the runway. Savio/M & E have already identified a proposed reserve area that corresponds to the turtle nesting sites.

15. Savio noted that the jet runway will need to be paved and he prefers concrete over asphalt because long-term maintenance will be less costly. Clearing of the main runway has attracted birds (ground nesters).

16. Kelvin Taketa envisioned a single conservation easement with two parts, one controlled by Savio and the other by TNC/USFWS. Stewardship zones and guidelines (for public use) need to be set up. Enforcement of guidelines or regulations is also an issue: who will do it? How? Savio mentioned that pets/alien species would be banned from the atoll. In any case, one agreement needs to be drawn up with clear obligations articulated for both parties.

17. Savio passed on other perceptions by the owners. The TNC letter appears to grant TNC power to rule from the top. They wan to explore an alternative hierarchy if Savio's development fails. The worst case scenario in the owners mind is that USFWS is part "owner" and then goes after the rest once Savio is out.. Condemnation is a dirty word to the owners.

18. Kelvin Taketa acknowledged the risks to be taken by the owners and Savio indicated the need to seek permission from the owners to implement a plan as envisioned by TNC.

19. Savio indicated that the sales price for the atoll is $36 million. The owners are willing to reduce the cost to $33 million if USFWS is willing to buy. Working a deal with Savio and the owners may be a much cheaper way for TNC and the USFWS to establish strong conservation programs on the atoll.

20. Savio believes that Cooper Island offers the development potential, and it makes good economic sense to develop only Cooper Island. Somewhere between 200-300 single family lots are proposed with 2-3 bungalow hotels, one village center on the ocean side of Cooper, excluding Strawn Point. The lots would be priced at $200 - 250K each. The maximum or "design" population on the atoll at any one time is estimated at 800.

21. It is not clear at this stage what federal approvals are needed. The sewage treatment plant and outfall will probably involve permits or approvals from the Corps of Engineers and U.S. EPA. Hawaii's statehood act specifically excludes Palmyra, and a presidential executive order signed by John Kennedy gives DOI administrative jurisdiction over the atoll.

22. Kelvin raised several issues and topics for further discussion and eventual agreement:

Transportation: people, goods, within the island
Energy
Waste Management: liquid, solid
Location for development
Types of uses

23. Savio indicated that people transportation would be primarily by boat and planes. Within the atoll, there would be a few hauling vehicles, but most transportation would be by foot or bicycle. Cars would not be allowed.

24. M & E Pacific is designing the power and wastewater systems. Injection wells, cesspools, or septic tanks are not feasible because of low elevation and nearness of groundwater to the ground surface. They are proposing a sequencing batching plant achieving secondary treatment quality. The sewage would then be conveyed by outfall to the deep ocean, most likely off the south side of the atoll near Engineer Island. M & E believes prevailing currents set to the west, but Maragos noted that the equatorial counter current runs east. Clearly there is a need to determine which direction prevailing currents run. The plant would be designed to accommodate 1,200 people. M & E mentioned the success of a Japanese engineered sewage treatment plant off the Hamakua coast after which the Palmyra STP would be patterned.

25. Savio proposed setbacks off the shoreline to insure there is adequate buffering of structures against waves, storm surges and other natural hazards. Savio welcomed any ideas and brainstorming on facilities design and siting.

26. In wrapping up the meeting, Jim Maragos identified five areas for future discussion and analysis and asked the group to designate participants and leaders to address these in more detail:

a) timing issue/buyout options (Kelvin, Robert, Suzanne, Peter and Edward)
b) uses on Cooper Island that would be compatible with the function and operation of the proposed refuge (John Engbring - lead)
c) acceptable uses on the refuge areas (reefs, lagoon, and islands) and access by visitors and residents of Cooper (Ken McDermott - lead)
d) assessment infrastructure impacts, mitigation, and development options (all participants, starting with the review of the M & E July 1991 report; copies were provided to USFWS and TNC; Jim will collate)
e) scheduling and scoping of field work (deferred).

27. The group felt that the other issues needed to be explored more fully before proceeding with field work. Certainly aerial photography could be flown initially to assist in all subsequent phases of planning, analysis and design. The biggest issue of course is how the timing of the agreement would be structured (item "a" above). The buy-out option proposed by Savio should be seriously considered. Transfer of Kingman Reef by the owners to the USFWS could also serve as compensation or mitigation for other impacts, and the USFWS is keenly interested in Kingman.

Not sure if family would agree. May consider if donation would offset tax liability of Palmyra sale.

28. The group agreed to finish the above analyses within one month and then convene follow-up meetings. Ultimately, the exercise would lead to a clear understanding by each party of what the other side requires and can live with in terms of future development and use of the atoll. This could then lead to a written agreement enabling the effort to proceed to the next step.

29. The draft minutes were recorded and compiled by J.E. Maragos, Director, Conservation Science, The Nature Conservancy, Pacific Regional Office, Phone: 537-4508; fax: 545-2019. Please phone/fax any corrections to the draft of the minutes by 31 August so they can be finalized and sent out to all parties.

30. Attendance Sheet:

Anne Ulaszewski (M & E Pacific, Inc.) 521-3051
Jim Maragos (TNC Pacific) 537-4508
John Engbring (USFWS) 541-2749
Peter Savio (Savio Realty) 942-7701
Suzanne Case (TNC, Regional Counsel) (415)777-0487
Robert P. Smith (USFWS) 541-2749
Dail Rhee (M & E Pacific) 521-3051
Andrew Yuen (USFWS) 541-2749
Georgia Shirilla (USFWS) (503)231-2236
Kelvin Taketa (TNC, Regional Director) 537-4508
Beth Flint (USFWS) 541-1201
Jerry Leinecke (USFWS) 541-1201
Edward R. Brooks (Foley, Maehara et al - Savio's attorney) 526-3011
Ken McDermott (USFWS) 526-3011

# EXHIBIT B

**BROOKS TOM MILLER & PORTER**

ATTORNEYS AT LAW
2700 GROSVENOR CENTER
737 BISHOP STREET
HONOLULU, HAWAII 96813

TELEPHONE: (808) 526-3011
TELECOPIER: (808) 523-1171
(808) 526-0121

OCT 1997
RECEIVED
Fish & Wildlife Enforcement
Honolulu, HI 96850

LETTER OF TRANSMITTAL

TO: Mr. Robert Smith
U.S. Dept. of the Interior
Fish and Wildlife Service
Pacific Islands Ecoregion
300 Ala Moana Blvd. Room 3108
Honolulu, Hawaii 96813

DATE: October 10, 1997

RE: Fullard-Leo/Palmyra

FROM: Arlene S. Kishi

The Following Is (Are) Transmitted Herewith:

| Quantity | Description |
|---|---|
| 1 copy | right of entry letter agreement |
| 4 copies | Assumption of Risk and Release |

( ) For Your Information
( ) For Review & Comment
( ) For Correction
( ) For Distribution
( ) For Recordation
( ) For Payment
(X) For Necessary Action
( ) Per Your Request
( ) Per Our Conversation
( ) Approved
( ) Disapproved
(X) See Remarks Below
(X) For Signature & Return
( ) For Signature & Forwarding
( ) For Signature & Necessary Action

We have already received by fax the signed pages from The Nature Conservancy and The Orvis Company. As such, we would appreciate if you could have the letter agreement and the Assumption of Risk and Releases signed by your agency and the persons participating in the trip, and call me when they are ready to be picked up. We are having the Fullard-Leos and Palmyra Development sign separate copies. Thank you for your assistance.

By *Arlene S. Kishi*
Arlene S. Kishi

Δ π EXHIBIT 10
Deponent
Date Rptr.
WWW.DEPOBOOK.COM

FLF 001642

October 17, 1997

U.S. Department of the Interior
Fish and Wildlife Service
Pacific Islands Ecoregion
300 Ala Moana Blvd.
Room 3108
Honolulu, Hawaii 96813

Attn: Robert P. Smith, Manager

The Nature Conservancy
Coastal & Marine Program
88 First Street
Suite 600
San Francisco, California 94105

Attn: Chuck Cook, Director

The Orvis Company
Manchester, Vermont 05254

Attn: Gwenn Perkins

Re: Palmyra

Ladies and Gentlemen:

This Agreement sets forth the terms and conditions covering your entry onto and use of the coral-covered atoll commonly referred to as "Palmyra". Palmyra consists of a group of about fifty islets located in the Pacific Ocean approximately 1,000 miles south of the Hawaiian Islands, at Latitude 5 degrees, 52 minutes North and Longitude 162 degrees 06 minutes West, approximately. Palmyra includes the territorial waters, surrounding reefs, beaches and lagoons, and extends 5-2/3 sea miles in an east-west direction and 1-1/3 sea miles in a north-south direction.

1. LESLIE VINCENT FULLARD-LEO, Trustee under that certain unrecorded Living Trust of Leslie Vincent Fullard-Leo dated February 12, 1986, as amended; DUDLEY LEINANI FULLARD-LEO, Trustee of the Dudley Leinani Fullard-Leo Palmyra Trust dated December 29, 1995; AINSLEY A.K. FULLARD-LEO, Trustee of the

Ainsley A.K. Fullard-Leo Revocable Living Trust, as amended in its entirety on April 30, 1992, and PALMYRA DEVELOPMENT CO., INC. (collectively, "Permitter") hereby grants to you and the employees and invitees who have signed the Assumption of Risk and Release attached hereto as Attachment 1 (collectively, "Permittee") permission to enter upon and across Palmyra and the adjoining property commonly known as "Kingman Reef" (collectively, the "Property") for the following purposes in connection with Permittee's possible purchase of the Property:

a. surveying and evaluating (including by catch-and-release fishing and scuba diving) in-shore and off-shore gamefish habitats and fish stocks;

b. reviewing and inspecting existing infrastructure on the Property;

c. surveying forested lands and bird populations;

d. searching beaches for signs of turtle nesting activities; and

e. attempting to communicate from the Property by short-wave radio.

Permittee agrees to confine its activities at the Property to the purposes represented above. Without limiting the generality of the foregoing, Permittee represents and warrants that Permittee will not enter the Property for purposes of researching the possible use of the Property for temporary or permanent storage of nuclear waste or other Hazardous Materials (as defined in paragraph 17 below). Breach of these conditions will void this permit and may preclude future permission to enter the Property.

2. Following receipt by Permitter of an executed copy of this letter agreement ("Agreement"), Permittee may enter onto and use the Property for the purposes specified in this Agreement from October 16, 1997 through October 25, 1997; provided, however, that this permit may be terminated or suspended by Permitter for good cause any time by 48-hour notice to Permittee. Permitter encourages Permittee to obtain insurance to cover the activities of Permittee in connection with the Property, and if such insurance is obtained, Permittee shall deliver to Permitter, together with the executed Agreement, a certificate thereof naming Permitter as an additional insured.

3. All personal property taken onto or placed upon the Property by Permittee shall remain the property of Permittee and shall be removed by Permittee before leaving the Property.

4. Permittee shall carry out and dispose of all debris and trash caused by or resulting form any activities or use by Permittee in connection with the Property and leave the area in a clean and orderly condition. If Permittee fails to dispose of its debris and trash or to remove its personal property or to leave the area in the same condition as existed before entry, Permitter may (but shall not be obligated to) dispose of such debris and trash, remove such personal property and/or restore the area to the same condition as existed before Permittee's entry, and Permittee shall be responsible for all charges and expenses incurred by Permitter. Permitter shall not be responsible for any personal property left on the Property by Permittee.

5. Permittee will abide by and fully comply with all applicable laws, statutes, ordinances, rules and regulations made by Permitter and any governmental authority, while upon, crossing or using the Property or otherwise exercising its rights under this Agreement. Permittee will also obey all reasonable verbal instructions given by the resident manager of the Property.

6. Permitter makes no representations as to the condition of the Property to be entered upon by Permittee hereunder and does not represent or warrant the same to be in a safe or proper condition for the above-mentioned purposes or for any other purpose whatsoever. Permittee understands that the Property is in its natural state and may not be safe for its entry and use and assumes all risks from any source on and about the Property.

Without limiting the generality of the foregoing, Permittee acknowledges that the Property was used by the United States military during World War II for military activities. Other than such use, the Property has been virtually uninhabited and undeveloped. As such, the condition of the Property and its airstrip, buildings, grounds, plants, animals, fish, waters, lagoons and reefs, is unknown and could possibly be unsafe or dangerous. This includes, but is not limited to, the possible existence of unexploded bombs, animals and fish caught and fruits and vegetables picked at the Property which may be poisonous, and the condition of the waters in and around the Property for drinking, swimming, fishing or other purposes. In addition, Permittee acknowledges there are no medical facilities, equipment or supplies at the Property, and there is no assurance that any

food, beverages (including drinking water) or other provisions will be available at the Property.

7. Permittee has determined that the purposes described in this Agreement are fully appropriate and has further determined that the persons working on behalf of Permittee are operating within the scope of their employment and official responsibilities and that Permittee is fully responsible for their conduct, actions and all resulting consequences while on the Property. Consistent with this representation, Permittee shall release, indemnify and hold harmless Permitter, its affiliated entities, and their respective employees, officers, directors and agents against and from all losses, damages, claims, demands, suits and costs, including reasonable attorney's fees and expenses (collectively "Losses"), for personal injury, including but not limited to death, and property damage or loss arising out of, caused by or resulting from any activities by Permittee in connection with the Property.

8. Activities not within the described purposes or outside of the Property area shall not be permitted under this Agreement.

9. Permittee shall not interfere with any work being performed, or other operations being carried out, or use being engaged in, on, or about the Property by, on behalf of, or authorized by Permitter.

10. Permittee agrees to at all times, with respect to the Property, use due care for public and personal safety. Permittee shall not harm or take any animals, marine life, plants or trees from the Property, except that Permittee may remove from the Property small samples of seaweed/limu and plankton for scientific observation and may perform catch-and-release fishing at the Property. Permittee shall be responsible for any such harm and shall compensate Permitter for all losses and expenses attributable to such harm or taking.

11. Permittee assumes the risk of all personal injury, losses and damages, and waives all claims, demands and rights to recovery for injury or damage, including but not limited to death arising out of injury or damage, on or about said premises, or caused by or resulting from any activities or use by Permittee in connection with said premises. Permittee shall be responsible for any claims for damage or injury caused by or resulting from any act or omission of the Permittee in connection with the Permittee's use of the premises described herein; provided, however, that the liability of any federal agency which is a

Permittee shall be as provided in the Federal Tort Claims Act (62 Stat. 869-986, 28 U.S.C. 2671-2681).

12. Permittee shall cause all individuals entering the property as employees, guests, agents or invitees of Permittee to read and execute the attached Assumption of Risk and Release form and return the executed copies to Permitter, c/o Palmyra Development Co., Inc., 931 University Avenue, Suite 105, Honolulu, Hawaii 96826, prior to entry, and shall indemnify and hold Permitter harmless from any loss, liability, claim or demand due to the failure to obtain such signed Assumption of Risk and Release form. Only those persons who sign the Assumption of risk and Release form shall be allowed onto the Property.

13. Permittee acknowledges that Permitter is permitting entry onto the Property at no charge to Permittee. Permittee will provide to Permitter at no charge a copy of all reports, studies, photographs, video tapes and sound recordings of the Property which are made by Permittee as a result of the trip.

14. Unauthorized investigations or use of study results for other than the stated purposes shall not be permitted without the prior written approval of Permitter, which may be given or withheld in Permitter's sole and absolute discretion.

15. This Agreement is the entire agreement of the parties with respect to the subject matter hereof and cannot be modified or canceled except by written instrument signed by both parties. This Agreement shall be interpreted in accordance with the laws of the State of Hawaii and the courts located in Honolulu, Hawaii shall have the jurisdiction over all disputes hereunder. Each party acknowledges that it has not entered into this Agreement in reliance upon any representation (written or oral, express or implied) of the other party not contained herein.

16. Permittee acknowledges that Palmyra Development Co., Inc. has entered into a License Agreement with C. Fresh Seafoods, Inc. ("Licensee"), pursuant to which Licensee has a license to engage in certain activities at the Property, including, but not limited to, establishing a base camp, commercial fishing, deep water sport fishing and diving. Permittee agrees that all indemnities made by Permittee in this Agreement in favor of Permitter, will run in favor of Licensee.

In addition, all of the indemnification provisions contained in this Agreement shall survive the term of this Agreement.

17. Permittee shall not cause or permit the release or discharge of any hazardous substances (as defined by 42 U.S.C. §9601(14) or petroleum products (or derivatives thereof) during the Permittee's performance of work associated with this Agreement. If any such release or discharge occurs, Permittee shall immediately advise Permitter in writing. If remediation of any such releases or discharges is required, then Permittee shall remediate such releases or discharges to the extent required by applicable federal, state and local laws and regulations. Permittee also agrees to cooperate with Permitter, to the extent allowed by law, in the submission of a claim pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §2671, et seq.

The term "Hazardous Material Laws" as used in this Agreement shall mean all federal, state or local laws, ordinances or regulations, now or hereafter in effect, relating to environmental conditions, industrial hygiene or Hazardous Material on, within, under or about the Property or any improvements thereon.

The term "Hazardous Materials" as used in this Agreement shall mean any and all radioactive materials, asbestos, organic compounds known as polychlorinated biphenyls, chemicals known to cause cancer or reproductive toxicity, pollutants, contaminants, hazardous wastes, toxic substances, and any and all other substances or materials defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," or "toxic substances," under any Hazardous Materials Laws.

18. Permittee shall take every reasonable precaution to preserve and leave unaltered all places, if any, of historic and/or archaeological interest, and all objects, if any, of historic and/or archaeological interest, including without limitation antiquities and specimens of ancient art or handicraft which may be found in or on the Property. Upon the discovery of such objects or of any human remains in or on the Property, Permittee will leave the same untouched and will immediately notify Permitter of the type and location of such discovery.

19. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument. The submission of a party's signature transmitted by facsimile (or similar electronic transmission facility) shall be considered as an "original" signature for purposes of this Agreement. The party transmitting the facsimile shall immediately transmit by mail or by other delivery service the original signature page in the original and duplicate originals of this Agreement.

20. This Agreement may not be assigned, in whole or in part, by operation of law or otherwise, by Permittee without the prior written consent of Permitter, which consent may be given or withheld in Permitter's sole and absolute discretion.

21. Nothing in this Agreement shall be considered as offer to sell, lease or license the Property to Permittee, or an agreement or an indication of willingness to negotiate or accept a proposal from Permittee to purchase, lease or license the Property. There is currently no agreement or understanding of any kind between Permitter and Permittee regarding the sale, lease or license of the Property, and Permittee agrees that (a) any costs or expenses incurred and to be incurred by Permittee, were and will be incurred at Permittee's risk, and (ii) any decisions made and to be made by Permittee, were and will be made at Permittee's risk. Permittee acknowledges that Permitter is free to negotiate and enter into agreements with others regarding the Property, and that any negotiations that may commence between Permitter and Permittee may be terminated at any time without liability to any party.

22. Permitter owns all "treasure" (as hereinafter defined) located in and around the Property. Permittee shall immediately notify Permitter of any treasure discovered by Permittee, and shall not remove any items of treasure. For purposes of this Agreement, the term "treasure" shall mean all artifacts, antiquities, coins, bullion, jewels, and other valuable (whether for historic or other reasons) personal property which was not brought to the Property by Permittee.

23. Neither Permitter nor Permittee, nor their respective agents, representatives, employees, partners, officers or directors, shall disclose the subject matter or terms of this Agreement without the prior written consent of the other party, which may be withheld for any reason in such other party's sole discretion. None of the parties hereto shall issue any news release or make any other public statement, in each case relating to or connected with or arising out of this Agreement or the matter contained in this Agreement, without obtaining the prior approval of the other parties to the contents and the manner of presentation and publication thereof. All information, studies and reports relating to the Property obtained by Permittee, either by entry upon or examination and inspection of the Property, shall be confidential and will not be reproduced or disclosed to any person without the prior written consent of Permitter.

24. Any violation of the terms of this Agreement by Permittee will cause irreparable harm to Permitter, thereby

entitling Permitter to specific performance and/or an injunction, together with costs and attorneys' fees payable by Permittee, in addition to all other remedies available at law or in equity.

If the foregoing meets with your approval, kindly indicate your agreement by signing the original of this letter and returning the same to Palmyra Development Co., Inc., 931 University Avenue, Suite 105, Honolulu, Hawaii 96826. Should you require further assistance, please call Mr. Peter Savio at (808) 942-7701.

______________________
LESLIE VINCENT FULLARD-LEO,
Trustee

______________________
DUDLEY LEINANI FULLARD-LEO,
Trustee

______________________
AINSLEY A.K. FULLARD-LEO,
Trustee

PALMYRA DEVELOPMENT CO., INC.

By______________________
Peter Savio, President

Permitter

U.S. DEPARTMENT OF THE INTERIOR
FISH AND WILDLIFE SERVICE

By______________________
Name______________________
Title______________________

THE NATURE CONSERVANCY

By_______________________________
Name_____________________________
Title____________________________

THE ORVIS COMPANY

By_______________________________
Name_____________________________
Title____________________________

Permittee

# ASSUMPTION OF RISK AND RELEASE

I would like to enter the property owned by LESLIE VINCENT FULLARD-LEO, Trustee under that certain unrecorded Living Trust of Leslie Vincent Fullard-Leo dated February 12, 1986, as amended; DUDLEY LEINANI FULLARD-LEO, Trustee of the Dudley Leinani Fullard-Leo Palmyra Trust dated December 29, 1995; AINSLEY A.K. FULLARD-LEO, Trustee of the Ainsley A.K. Fullard-Leo Revocable Living Trust, as amended in its entirety on April 30, 1992, and leased by PALMYRA DEVELOPMENT CO., INC. (the "Permitter") known as "Palmyra" (the "Property") and described in that certain letter agreement dated January ___, 1998 (the "Agreement") for the purposes described in the Agreement.

By signing below, I acknowledge that I have read and I understand, agree to and will be bound by, all of the terms contained in the Agreement. I recognize that there are special risks and dangers in my proposed activity and in entering onto the Property, and these risks can result in accidents causing personal or bodily injury, death, or damage to or loss of personal property. Being fully aware of these risks and facts, (I) I certify that I am fully capable of participating in this activity and that I do not have a physical or medical condition which would endanger myself or others from my participation in this activity; and (ii) I hereby voluntarily agree to assume all such risks and be responsible for any bodily harm, injury (including death) or loss, including loss of personal property, to myself, resulting from my participation in such activity.

Further, I hereby release and will hold harmless the Permitter and The Nature Conservancy, and each of their respective employees, agents, contractors, and subcontractors from any and all claims for injury (including death), damage or loss of any nature whatsoever arising or resulting from my entry onto the property and participation by me in this activity.

THIS AGREEMENT SHALL BE EFFECTIVE DURING THE ENTIRE PERIOD OF MY PARTICIPATION IN THIS ACTIVITY, AND IS BINDING UPON ME, MY HEIRS, SUCCESSORS AND REPRESENTATIVES. IF A MINOR (UNDER 21 YEARS OF AGE), THIS AGREEMENT IS SIGNED ON MY BEHALF BY MY PARENT OR GUARDIAN.

Date_______________________

_______________________________
[illegible]ger
U.S. Fish and Wildlife Service

ASSUMPTION OF RISK AND RELEASE

I would like to enter the property owned by LESLIE VINCENT FULLARD-LEO, Trustee under that certain unrecorded Living Trust of Leslie Vincent Fullard-Leo dated February 12, 1986, as amended; DUDLEY LEINANI FULLARD-LEO, Trustee of the Dudley Leinani Fullard-Leo Palmyra Trust dated December 29, 1995; AINSLEY A.K. FULLARD-LEO, Trustee of the Ainsley A.K. Fullard-Leo Revocable Living Trust, as amended in its entirety on April 30, 1992, and leased by PALMYRA DEVELOPMENT CO., INC. (the "Permitter") known as "Palmyra" (the "Property") and described in that certain letter agreement dated October ___, 1997 (the "Agreement") for the purposes described in the agreement.

By signing below, I acknowledge that I have read and I understand, agree to and will be bound by, all of the terms contained in the Agreement. I recognize that there are special risks and dangers in my proposed activity and in entering onto the Property, and these risks can result in accidents causing personal or bodily injury, death, or damage to or loss of personal property. Being fully aware of these risks and facts, (I) I certify that I am fully capable of participating in this activity and that I do not have a physical or medical condition which would endanger myself or others from my participation in this activity; and (ii) I hereby voluntarily agree to assume all such risks and be responsible for any bodily harm, injury (including death) or loss, including loss of personal property, to myself, resulting from my participation in such activity.

Further, I hereby release and will hold harmless the Permitter and each of its employees, agents, contractors, and subcontractors from any and all claims for injury (including death), damage or loss of any nature whatsoever arising or resulting from my entry onto the property and participation by me in this activity.

THIS AGREEMENT SHALL BE EFFECTIVE DURING THE ENTIRE PERIOD OF MY PARTICIPATION IN THIS ACTIVITY, AND IS BINDING UPON ME, MY HEIRS, SUCCESSORS AND REPRESENTATIVES. IF A MINOR (UNDER 21 YEARS OF AGE), THIS AGREEMENT IS SIGNED ON MY BEHALF BY MY PARENT OR GUARDIAN.

Date Oct 13, 1997

Robert R. Smith
Robert Smith
U.S. Fish and Wildlife Service

ASSUMPTION OF RISK AND RELEASE

I would like to enter the property owned by LESLIE VINCENT FULLARD-LEO, Trustee under that certain unrecorded Living Trust of Leslie Vincent Fullard-Leo dated February 12, 1986, as amended; DUDLEY LEINANI FULLARD-LEO, Trustee of the Dudley Leinani Fullard-Leo Palmyra Trust dated December 29, 1995; AINSLEY A.K. FULLARD-LEO, Trustee of the Ainsley A.K. Fullard-Leo Revocable Living Trust, as amended in its entirety on April 30, 1992, and leased by PALMYRA DEVELOPMENT CO., INC. (the "Permitter") known as "Palmyra" (the "Property") and described in that certain letter agreement dated October ____, 1997 (the "Agreement") for the purposes described in the agreement.

By signing below, I acknowledge that I have read and I understand, agree to and will be bound by, all of the terms contained in the Agreement. I recognize that there are special risks and dangers in my proposed activity and in entering onto the Property, and these risks can result in accidents causing personal or bodily injury, death, or damage to or loss of personal property. Being fully aware of these risks and facts, (I) I certify that I am fully capable of participating in this activity and that I do not have a physical or medical condition which would endanger myself or others from my participation in this activity; and (ii) I hereby voluntarily agree to assume all such risks and be responsible for any bodily harm, injury (including death) or loss, including loss of personal property, to myself, resulting from my participation in such activity.

Further, I hereby release and will hold harmless the Permitter and each of its employees, agents, contractors, and subcontractors from any and all claims for injury (including death), damage or loss of any nature whatsoever arising or resulting from my entry onto the property and participation by me in this activity.

THIS AGREEMENT SHALL BE EFFECTIVE DURING THE ENTIRE PERIOD OF MY PARTICIPATION IN THIS ACTIVITY, AND IS BINDING UPON ME, MY HEIRS, SUCCESSORS AND REPRESENTATIVES. IF A MINOR (UNDER 21 YEARS OF AGE), THIS AGREEMENT IS SIGNED ON MY BEHALF BY MY PARENT OR GUARDIAN.

Date Oct. 13/97

Charles E. Brady Jr.

Dr. Charles Brady
U.S. Fish and Wildlife Service

# ASSUMPTION OF RISK AND RELEASE

I would like to enter the property owned by LESLIE VINCENT FULLARD-LEO, Trustee under that certain unrecorded Living Trust of Leslie Vincent Fullard-Leo dated February 12, 1986, as amended; DUDLEY LEINANI FULLARD-LEO, Trustee of the Dudley Leinani Fullard-Leo Palmyra Trust dated December 29, 1995; AINSLEY A.K. FULLARD-LEO, Trustee of the Ainsley A.K. Fullard-Leo Revocable Living Trust, as amended in its entirety on April 30, 1992, and leased by PALMYRA DEVELOPMENT CO., INC. (the "Permitter") known as "Palmyra" (the "Property") and described in that certain letter agreement dated October ___, 1997 (the "Agreement") for the purposes described in the agreement.

By signing below, I acknowledge that I have read and I understand, agree to and will be bound by, all of the terms contained in the Agreement. I recognize that there are special risks and dangers in my proposed activity and in entering onto the Property, and these risks can result in accidents causing personal or bodily injury, death, or damage to or loss of personal property. Being fully aware of these risks and facts, (I) I certify that I am fully capable of participating in this activity and that I do not have a physical or medical condition which would endanger myself or others from my participation in this activity; and (ii) I hereby voluntarily agree to assume all such risks and be responsible for any bodily harm, injury (including death) or loss, including loss of personal property, to myself, resulting from my participation in such activity.

Further, I hereby release and will hold harmless the Permitter and each of its employees, agents, contractors, and subcontractors from any and all claims for injury (including death), damage or loss of any nature whatsoever arising or resulting from my entry onto the property and participation by me in this activity.

THIS AGREEMENT SHALL BE EFFECTIVE DURING THE ENTIRE PERIOD OF MY PARTICIPATION IN THIS ACTIVITY, AND IS BINDING UPON ME, MY HEIRS, SUCCESSORS AND REPRESENTATIVES. IF A MINOR (UNDER 21 YEARS OF AGE), THIS AGREEMENT IS SIGNED ON MY BEHALF BY MY PARENT OR GUARDIAN.

Date 11 October 1997

Barbara A. Maxfield
Barbara Maxfield
U.S. Fish and Wildlife Service

ASSUMPTION OF RISK AND RELEASE

I would like to enter the property owned by LESLIE VINCENT FULLARD-LEO, Trustee under that certain unrecorded Living Trust of Leslie Vincent Fullard-Leo dated February 12, 1986, as amended; DUDLEY LEINANI FULLARD-LEO, Trustee of the Dudley Leinani Fullard-Leo Palmyra Trust dated December 29, 1995; AINSLEY A.K. FULLARD-LEO, Trustee of the Ainsley A.K. Fullard-Leo Revocable Living Trust, as amended in its entirety on April 30, 1992, and leased by PALMYRA DEVELOPMENT CO., INC. (the "Permitter") known as "Palmyra" (the "Property") and described in that certain letter agreement dated October ___, 1997 (the "Agreement") for the purposes described in the agreement.

By signing below, I acknowledge that I have read and I understand, agree to and will be bound by, all of the terms contained in the Agreement. I recognize that there are special risks and dangers in my proposed activity and in entering onto the Property, and these risks can result in accidents causing personal or bodily injury, death, or damage to or loss of personal property. Being fully aware of these risks and facts, (I) I certify that I am fully capable of participating in this activity and that I do not have a physical or medical condition which would endanger myself or others from my participation in this activity; and (ii) I hereby voluntarily agree to assume all such risks and be responsible for any bodily harm, injury (including death) or loss, including loss of personal property, to myself, resulting from my participation in such activity.

Further, I hereby release and will hold harmless the Permitter and each of its employees, agents, contractors, and subcontractors from any and all claims for injury (including death), damage or loss of any nature whatsoever arising or resulting from my entry onto the property and participation by me in this activity.

THIS AGREEMENT SHALL BE EFFECTIVE DURING THE ENTIRE PERIOD OF MY PARTICIPATION IN THIS ACTIVITY, AND IS BINDING UPON ME, MY HEIRS, SUCCESSORS AND REPRESENTATIVES. IF A MINOR (UNDER 21 YEARS OF AGE), THIS AGREEMENT IS SIGNED ON MY BEHALF BY MY PARENT OR GUARDIAN.

Date 11 Oct 97

Elizabeth N. Flint
Elizabeth Flint
U.S. Fish and Wildlife Service

# EXHIBIT C

To: Peter Savio

Fax #:

From: Robert P. Smith

Subject:

Date: Oct. 3 947-5429

Pages: 2, including this page.

FACSIMILE

Peter, the attached represents approval from our director in Washington, Jamie Clark, to proceed with detailed planning necessary for our Acquisition. Note that we desire to Acquire both Palmyra and Kingman, if that is the sellers' desire. I will transmit this to Col. Ralph Graves of the Corps with a cover letter emphasizing the need to do clean-up work.

From the desk of...
Robert P. Smith
...slands Ecoregion Manager
U.S. Fish and Wildlife Service
300 Ala Moana Blvd. Rm. 3108
Honolulu, HI 96813
Tel 808-541-2749

S 005786

PS 000001