have a current market value well in excess of $54,500,000.00, have been directly confiscated, taken, and rendered wholly and completely worthless by the Kingman Reef NWR. The Order for the Kingman Reef NWR claims ownership contrary to KRAI's well-documented and governmentally acknowledged property interests in Kingman Reef. The Order for the Kingman Reef NWR effectively bars plaintiffs from entering, using or economically developing Kingman Reef. The government has not offered any compensation for plaintiffs' property taken by the Kingman Reef NWR.

## III. ARGUMENT

### A. The Motion Must Be Denied Unless It is Beyond Doubt, Based on the Facts Presented, That The Court Has No Jurisdiction.

In the context of a motion to dismiss, "[a]lthough according to case law the plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence, a complaint should not be dismissed 'unless it is beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief.'" Kemp v. United States, 65 Fed. Cl. 818, 821 (Cl. Ct. 2005); quoting, Bagwell v. United States, 21 Cl. Ct. 722, 725 (1990) (citations omitted). Thus, the denial of a taking claim on the basis of the defense of limitations is warranted only when the facts alleged and presented by affidavit demonstrate conclusively that such a decision is required as a matter of law. Id.; Ewald v. United States, 14 Cl. Ct. 378, 382 (1988), citing, Juda v. United States, 6 Cl. Ct. 441, 450 (1984).

As shown below, the government has not met that burden. Plaintiffs have presented strong evidence – well beyond a preponderance – that their taking claim accrued on January 18, 2001, when the Secretarial Order permanently and completely deprived plaintiffs of any

possessory and ownership interests in Kingman Reef that they may have had at that time. The government does not, for purposes of this motion, dispute that plaintiffs ever had title to Kingman Reef. Rather, the government contends that earlier actions by the government – in 1934 and 1941 – deprived plaintiffs of any ownership interest in Kingman Reef that they may have once had.

Plaintiffs have submitted ample evidence – again, well beyond a preponderance – that the Executive Orders did not divest plaintiffs of title or possession of Kingman Reef, that no actions of the government diminished plaintiffs' economic interest in Kingman Reef, and that there was no governmental taking before 2001. The government disputes this, but does not and cannot, based on the evidence and allegations now before the court, demonstrate conclusively that the taking claim accrued before 2001. Therefore, dismissal of the complaint based on the statue of limitations would be improper. Bagwell v. United States, 21 Cl. Ct. at 725 – 26.

### B. There Was No Taking, and the Statute of Limitations Did Not Begin to Run, in 1934 or 1941.

#### 1. The Government's Jurisdiction Over Kingman Reef is Not Ownership.

In his 1934 Executive Order, President Franklin D. Roosevelt declared that Kingman Reef (as well as Wake, Johnston, and Sand Islands) was "reserved, set aside, and placed under the ***control and jurisdiction*** of the Secretary of the Navy ***for administrative purposes***." (emphasis added). This Executive Order said nothing about, and had no effect on, ownership – it was simply a decree, based on the sovereign power of the United States government over these islets, that the Navy was authorized to exercise its governmental jurisdiction over them. Because the 1934 Executive Order did not constitute a claim of property ownership to Kingman Reef, it did not constitute a taking of private property.

Sovereignty and ownership are two entirely separate concepts. Property ownership gives one a wide range of rights over his land, including the right to exclude others, to use it for lawful purposes, and to sell it. Sovereignty, on the other hand, refers to the governmental exercise of jurisdiction over territory, including individual parcels owned by private individuals as well as public land. Countries, municipalities, and other governmental entities typically exercise jurisdiction over many pieces of private property owned by individual property owners. The rights accompanying the private ownership of land are subject to the power of those governmental entities – through statute, executive orders, taxing authority, regulations and police powers – all of which can have significant effects on the title owner's ability to use, dispose of and profit from his property, without divesting the owner of title. Penn Central Transportation Co. v. New York City, 438 U.S. 104, 124, 98 S. Ct. 2646 (1978).

Allocating the "control and jurisdiction...for administrative purposes" over a location to an administrative agency does not logically or necessarily mean that the agency "owns" that location. Palmyra, for instance, continued to be privately owned by the Fullard-Leo family after President Roosevelt placed it under the control and jurisdiction of the Navy, See, Government Accounting Agency in 1940, U.S. Insular Areas: Application of the U.S. Constitution 42 n.13 (GAO/OGC-98-5, Nov. 1997) (Complaint, Appendix Doc. 26.) Even after the courts explicitly recognized that Palmyra Island was owned as private property by the Fullard-Leos, Fullard-Leo, 331 U.S. 256, and after the government compensated the Fullard-Leos for its unlawful taking of Palmyra during the war, Palmyra remained administered by the Navy, and then DOI. (See, discussion at p. 4, n. 4, *supra.)*

American Samoa is another example. It has been under the control and jurisdiction of

various federal agencies – first the Navy and more recently the DOI – but no one has ever suggested that this control has divested private landowners of their property rights. 25 Op. U.S. Att'y Gen. 292, 294 (1904); Exec. Order No. 10264, 3 C.F.R. 765 (1951). Similarly, Guam was put "under the control of the Department of the Navy" for administrative purposes in 1898, when the United States first acquired that island. 25 Op. U.S. Att'y Gen. 292, 293-94 (1904). Again, during the many decades when the U.S. Navy exercised jurisdiction and control over Guam for administrative purposes, no one ever thought that the United States owned all the real estate in Guam as a private property owner, and most of the land in Guam has always been understood to be privately owned.

**2. There Was Not, and Could Not Be, a Taking Under the Pickett Act.**

The government argues that the 1934 Executive Order must be viewed as a "taking" because that Order cited the Pickett Act of June 25, 1910, which authorized the withdrawal or reservation of "any of the public lands of the United States," 36 Stat. 847, and thus evidenced the government's belief that Kingman Reef was part of the "public lands of the United States" in 1934. This is a very thin reed to rely upon. The possibility that the executive branch of the government may have believed that Kingman Reef was "public land" does not equate to an actual taking by the government. Even if President Roosevelt mistakenly believed that Kingman Reef was not privately owned, and was "public land," the 1934 Executive Order did not, by its terms or its effect, transfer ownership from the Fullard-Leo family to the federal government.

To the extent the 1934 Executive Order may have been based on the assumption that Kingman Reef was "public lands" within the meaning of the Pickett Act of 1910, that Act neither authorizes nor effectuates a taking of private land. As the government concedes, the purpose and

effect of the Pickett Act is to authorize the withdrawal and reservation of "public lands of the United States for public purposes." (Def. MPA at 13.) The United States Supreme Court has consistently held that "public lands" mean only those federal lands which are subject "to sale or other disposal under general laws," Columbia Basin Land Protection Assn. v. Schlesinger, 643 F.2d 585, 602 (9th Cir. 1981); citing, Northern Lumber Co. v. O'Brien, 204 U.S. 190, 196, 27 S.Ct. 249 (1907). Public lands do *not* include "land to which any claims or rights of others have attached." Colombia Basin, 643 F.2d at 602; Northern Lumber Co., 204 U.S. at 196; citing, Newhall v. Sanger, 92 U.S. 761 (1875). Thus, the only lands that could be withdrawn or reserved under the Pickett Act were public lands as to which no private claims or rights attached. Id.

The government does not dispute, for purposes of this motion, that the Fullard-Leo family owned Kingman Reef in 1934. (Def. MPA at 1– 2.) The Pickett Act did not provide authority for the taking of any property, including Kingman Reef, that was privately owned. Thus, the fact that the 1934 Executive Order cites the Pickett Act, while arguably supporting the government's argument that President Roosevelt believed Kingman Reef was not privately owned, does not support the government's argument that the Pickett Act provided the basis for an actual taking of private land.

United States v. Gossett, 416 F.2d 565 (9th Cir. 1969), pet. cert. denied, 397 U.S. 961 (1970), the only case the government cites in support of its novel argument, did not involve a takings claim. Gossett did not hold, and cannot support the argument, that executive orders setting aside public lands can ever constitute a taking of private land. In Gossett, the United States sued to quiet title to land the defendant claimed to have acquired by adverse possession from the State of California in 1952. The United States contended that the defendant could not

have acquired title to the land, because it had been withdrawn from public entry more than twenty years earlier by 1929 and 1931 Executive Orders setting aside land for the Boulder Canyon Project.

In Gossett, unlike in this case, there was no evidence that the land in question was privately owned, or did not belong to the federal government, when the Executive Orders set it aside for a public purpose. The court concluded that the Executive Orders constituted *prima facie* evidence (*not* conclusive proof) that the land was public federal land at the time of those orders, and the defendant presented no evidence that the State of California owned the land at that time. In fact, the State of California disclaimed ownership of the land, which the court found had "great significance." Gosset, 416 F.2d at 568. Furthermore, the court noted, "[a]ssuming, *arguendo*, that title once rested in the state of California, still no attempt is made to show how appellants obtained title from the state." Id. Here, in sharp contrast, plaintiffs have provided abundant evidence, *and the government concedes for purposes of this motion*, that the Fullard-Leo family owned Kingman Reef at the time of the 1934 and 1941 Executive Orders. Thus, the issue the court addressed in Gossett – whether the land was owned by anyone other than the United States at the time of the Executive Order – is not presented in this case.[9]

---

[9] If Gossett has any relevance to this motion, it supports plaintiffs' argument that there can be no taking under the Pickett Act. While the Executive Orders were considered evidence of ownership in Gossett, they were not held to wrest ownership from any private person, as the government here suggests they did. To the contrary, it was assumed by the parties and the court in Gossett that, if the land in question did not belong to the federal government at the time of the executive orders, then those orders did not have any effect on ownership of the land by other governments or individuals, and could not prevent the future private acquisition of that land under state law. If the court in Gossett had concluded that either of those executive orders had the effect of taking the land from anyone, then there would have been no need to address the issues discussed in that case.

### 3. Takings Case Law Shows that the Executive Orders Did Not Constitute a Taking of Kingman Reef.

The other takings decisions relied upon by the government, all of which turned on the government's exclusion of plaintiffs from property they claimed as their own, demonstrate the weakness of the government's argument. Unlike in those cases, President Roosevelt's Executive Orders did not purport to or in fact operate to bar the Fullard-Leo family, or anyone else, from access to Kingman Reef.

The government relies on United States v. Pewee Coal Co., 341 U.S. 114, 116, 71 S. Ct. 670 (1951), in which the President ordered the Secretary of the Interior to seize and take over operations of the plaintiff's coal mine, and the Secretary of the Interior actually did so. Unlike in Pewee, the Executive Orders did not authorize any federal agency to take possession of Kingman Reef. Moreover, unlike in Pewee, no federal agency ever did take possession of Kingman, or actually stop anyone, including plaintiffs, from going there. (See, pp. 8-10, *supra*.)

The government's reliance on Roth v. United States, 73 Fed. Cl. 144, 148 (2006) is similarly misplaced. In Roth, the court ruled that "a closure in which defendant physically bars access to lands comprises a physical taking." The Executive Orders neither purported to nor actually barred the Fullard-Leos from going to Kingman. Hence, the Roth case has no applicability to the present dispute.

Similarly, the decision in John R. Sand & Gravel Company v. United States, 457 F.3d 1345 (Fed.Cir. 2006), pet. cert. filed 75 U.S. L.W. 3474 (Feb. 26, 2007) does not support the government's contentions. That case held that a takings claim accrued when the United States physically barred access to plaintiff's mining operation. In the present case access was never

physically barred. In fact, in John R. Sand, the court concluded that earlier actions by the EPA that expressed the government's intention to interfere with the plaintiff's property rights did not constitute a taking because they did not have the effect of depriving the plaintiff of any of its property rights, and did not provide a detailed time line and description of the government's future actions. 457 F.3d at 1358 n.10. Since the Executive Orders neither deprived the Fullard-Leos of possession, nor specified whether, how or when their property interests would be affected, John R. Sand is strong authority against the government's argument that the Executive Orders constituted a taking.

As the government's authorities show, a significant factor to be considered in deciding whether a taking has occurred is whether the government has taken possession of the property, or whether the government has excluded others from the property. Where the government's actions constitute a "permanent physical occupation," there is a taking to the extent of that occupation. Nollan v. California Coastal Commission, 483 U.S. 825, 831-32, 107 S. Ct. 3141 (1987). In this case there is no evidence, nor does the government contend, that the government ever physically occupied Kingman Reef, and the 1934 Executive Order did not by its own operation authorize any government agency to exclude others from Kingman Reef.

Contrary to the government's assertion at pages 21– 22 of its brief, the 1941 Executive Order, establishing a "Naval Defense Sea Area" and "Naval Airspace Reservation" around Kingman Reef and other islands, including Palmyra, does nothing to strengthen the government's argument that it owned Kingman Reef because it makes no reference to any land area and refers only to the territorial waters which were under the jurisdiction of the United States. This decree did not serve to undercut the conclusion that Palmyra was privately owned, United States v.

Fullard-Leo, 331 U.S. 256, and, similarly, it has no relevance to the private ownership of Kingman Reef by plaintiffs.

Moreover, as a practical matter the 1941 Executive Order never resulted in any actual governmental restrictions on access to Kingman Reef. The Fullard-Leo family, their guests, and those who had their permission came and went to Kingman Reef openly and freely, and without ever being told that this was unlawful. (A. Fullard-Leo Decl. ¶ 26; D. Fullard-Leo Decl. ¶ 22; Savio Decl. ¶ 21.) There was no enforcement at any time of any rules restricting access to Kingman Reef. (Porter Decl., Ex. E.) Thus, while the 1941 Executive Order theoretically gave the government the power to restrict access to Kingman Reef, access was never actually restricted. Theoretical power to restrict access, which never is put into action, does not give rise to a taking. "The Supreme Court has stated that 'the mere assertion of a regulatory jurisdiction by a governmental body does not constitute a regulatory taking.'" 767 Third Ave. Associates v. United States, 48 F.3d 1575, 1584 (Fed. Cir. 1995), quoting, United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 126, 106 S.Ct. 455 (1985). In 767 Third Ave. Associates, the government placed the following notice on plaintiff's property:

> THESE PREMISES HAVE BEEN CLOSED BY ORDER OF THE UNITED STATES DEPARTMENT OF THE TREASURY. ....NO ACCESS TO THESE PREMISES IS PERMITTED WITHOUT SPECIFIC AUTHORIZATION FROM THE OFFICE OF FOREIGN ASSETS CONTROL, U.S. TREASURY DEPARTMENT.

767 Third Ave. Associates, 48 F.3d at 1578. The court concluded that this did not constitute a taking because the government did not take physical possession of the property or deny the owner access to the property when he requested it.

We do not agree that the placing of a notice on the door of the premises was

> "the functional equivalent of placing armed troops at the doors." Although the notice was backed by the force of law, it did not physically prevent Sage from entering the premises, and access was available when requested. Because the government did not physically occupy the premises at 767 Third Avenue, the government's actions did not rise to the level of a *per se Loretto*-type physical taking. Further, we agree with the government that, if anything, the posting of the notice imposed only a non-compensable regulatory scheme that blocked access to the premises without authorization.

767 Third Ave. Associates, 48 F.3d at 1583-84. Since neither the Fullard-Leos nor their guests were ever physically prevented from going to Kingman Reef. (A. Fullard-Leo Decl. ¶ 26; D. Fullard-Leo Decl. ¶ 22; Savio Decl. ¶ 21), there was no taking. 767 Third Ave. Associates, 48 F.3d at 1583-84; Holden v. U.S., 38 Fed. Cl. 732, 737 (1997).

In short, neither Executive Order interfered in any way with plaintiffs' use and enjoyment of their property, much less wresting effective control over Kingman Reef from them. Thus, there was no taking. Cuban Truck and Equipment Company v. United States, 333 F.2d 873, 878 (Ct. Cl. 1964), pet. cert. denied, 382 U.S. 844 (1965) ("The guiding questions which must be asked are: (a) Has the Government acquired effective control over the property which it seeks to utilize for a public purpose? (b) If so, when was the extent of the taking . . . determined or determinable?"); See also, Catellus Development Corporation v. United States, 26 Cl. Ct. 210, 214 (1992) (no accrual in taking claim until the government's actions "increased to the point where their frequency amounted to a *substantial* interference with plaintiff's use and enjoyment of the property.") (emphasis in original.) Moreover, since neither of the Executive Orders took away in any tangible or practical way any of the ownership rights of the Fullard-Leo family, there were no economic or, indeed non-economic damages, for which the Fullard-Leo family could have sued for compensation at that time, and any suit seeking compensation for unlawful taking would have

been unsuccessful. Terteling v. United States, 334 F.2d 250, 254 (Ct. Cl. 1964) ("It is too well established to require citation of authority that a claim does not accrue until the claimant has suffered damages").

### 4. Under the Supreme Court's *Penn Central* Analysis, There Was No Governmental Taking of Kingman Reef In 1934 or 1941.

The government does not attempt to argue that, under the Supreme Court's decision in Penn Central Transportation Co., 438 U.S. 104, the 1934 and 1941 Executive Orders constituted a regulatory taking of Kingman Reef. In Penn Central, the plaintiff owners of Grand Central Terminal contended that a New York City law restricting landowners' ability to develop designated "landmark sites" constituted a taking of their property without just compensation because it prevented them from building a multistory office building over the terminal. The Supreme Court held that the Landmarks Law did not constitute a taking. The Court noted that, to further general welfare and public safety, the government often does things that adversely affect the economic interests of individuals, without taking their property.

> Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law, (citation omitted) and this Court has accordingly recognized, in a wide variety of contexts, that government may execute laws or programs that adversely affect recognized economic values. Exercises of the taxing power are one obvious example. A second are the decisions in which this Court has dismissed "taking"challenges on the ground that, while the challenged government action caused economic harm, it did not interfere with interests that were sufficiently bound up with the reasonable expectations of the claimant to constitute "property" for Fifth Amendment purposes.

Penn Central Transportation Co., 438 U.S. at 125-126. The Court considered several factors in analyzing whether the Landmark Law's restriction on the development of Grand Central Terminal constituted a taking. A consideration of those factors, in light of Penn Central, compels the

conclusion that the government's actions prior to 2001 did not constitute a taking.

First, the Court considered the "economic impact . . . on the claimant, and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." Penn Central Transportation Co., 438 U.S. at 124. The Court concluded that, since the Landmarks Law did not interfere with the property's present use, did not prevent the owners from realizing a reasonable return on its investment, did not drastically limit the owners right to build a structure on the land, and would allow the construction of a smaller, harmonizing structure, the financial burden imposed by the law was not so great as to constitute a taking. Id. at 135-37. Here, the 1934 and 1941 Executive Orders had no effect whatsoever on the economic benefit the Fullard-Leo family was deriving or hoped to derive from Kingman Reef. The family and their guests continued to travel there, they controlled use and access of the property, they received offers for the purchase of the property, they transferred title and interest in the property to a family-owned company, and they leased the property. (A. Fullard-Leo Decl., ¶ 24; D. Fullard-Leo Decl. ¶ 20; Complaint, Appendix, Doc. 31.)

The Court also considered "the character of the governmental action. "A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government (citation omitted), than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." Penn Central Transportation Co., 438 U.S. at 124. Here, there was no "physical invasion" of Kingman Reef by the government. There is no evidence that the government used the property for any purpose prior to January 18, 2001, except when it visited the property after obtaining permission from the Fullard-Leo family. (Savio Decl. Ex. B.) Moreover, the Executive Orders

advanced a "public program . . . to promote the common good" -- by establishing United States sovereignty over and the Navy's jurisdiction over and defense of far-flung island territories. This clearly falls within the "broad range of governmental purposes and regulations" of the Penn Central analysis. Nollan, 483 U.S. at 435–436 (citations omitted).

**5. The Correspondence Between Plaintiffs' Predecessor in Interest and the Government Did Not Establish a Taking.**

The government argues that the correspondence in 1937 and 1938 indicates that a taking occurred.[10] While the correspondence included a disagreement about whether the Fullard-Leo family had title to Kingman Reef, the dispute was about the Pan Am flights, which stopped after Townsend & Lewis complained to the government and threatened legal action. Since the Fullard-Leo family accomplished the purpose of the correspondence – the cessation of the Pan Am flights – there was no need for the Fullard-Leo family to pursue the matter further. There was no further dispute between the Fullard-Leo family and the government about Kingman Reef for another seventy years. The Fullard-Leos traveled to Kingman Reef, gave permission to others to visit, and were never denied access. As far as the Fullard-Leos could tell, the government had acquiesced to their wishes.

---

[10] The government mischaracterizes the correspondence. Ellen Fullard-Leo wrote a letter to Hawaii's Congressional Delegate in 1937 complaining about, and demanding compensation for, Pan-American Airways' landings at Kingman Reef. Subsequently, her attorneys threatened legal proceedings to protect her interest in Kingman Reef, and complained that the government was negligent in administering Kingman Reef. In response, the JAG's letter ignored the issue of Pan-American flights, and argued that, because Kingman Reef was a bonded guano island, and because the Navy administered Kingman Reef, her attorney's argument "was not sufficient to uphold the claim of Mrs. Fullard-Leo." Importantly, the JAG's letter did not assert that the government owned Kingman Reef, only that the Navy had a basis for administering Kingman Reef. (Answer, Appendix Ex. C, D, E.)

Nonetheless, the government contends that plaintiffs not only could have sued the government at that time for a taking, but they had to do so. This argument is contrary to the case law. Even if it may have appeared that plaintiffs had a potential takings claim by virtue of the correspondence between the government and Townsend & Lewis, this was "not a good enough reason why he must sue then or have from that moment, the statute of limitations run against him." John R. Sand and Gravel Co., 57 Fed. Cl. at 192 (2003) (citing United States v. Dickinson, 331 U.S. 745, 749, 67 S. Ct. 1382 (1947) (fences were removed after plaintiff complained).[11]

Moreover, the JAG letter in which the government questioned the Fullard-Leo family's title to Kingman Reef does not *ipso facto* constitute a taking. Schultz v. United States, 5 Cl. Ct. 412, 419 (1984). In Schultz, the plaintiff believed that the government had "taken" his property based on correspondence from the government stating that the plaintiff's property was going to be condemned and appraised under the Wild and Scenic Rivers Act (16 U.S.C. §§ 1271 et. seq.). The plaintiff alleged that the government's correspondence caused him to abandon his development plans for his property. Id. at 418. The government later informed the plaintiff that it chose not to condemn his property. Id. The court held that the threat of condemnation does not constitute a taking, and that a taking occurs only if and when the threat is realized. Id. at 418 – 419. See also, BW Parkway Associates Ltd. Partnership v. U.S., 29 Fed. Cl. 669, 676 (1993), pet. cert. denied, 514 U.S. 1015 (1995).

As in Shultz, the correspondence during 1937 and 1938 constituted nothing more than a difference of opinion, and certainly did not constitute a taking. Even if, as the government

[11] If there was a taking based on the Pan Am flights, it was temporary, and ended in 1938. While a claim based on that temporary taking was time-barred decades ago, it has no bearing on the permanent taking in this case, which occurred in 2001. See, section IIIC2, *infra.*

contends, the JAG correspondence demonstrates that plaintiffs understood in 1938 that the government claimed ownership of Kingman Reef (a contention plaintiffs strongly dispute), that understanding did not give rise to a cause of action under the Fifth Amendment. As the court stated in Shultz, neither the landowner's belief that their right to use their land has been restricted, nor the landowner's belief that a taking is imminent, will serve to constitute a taking.

Also as in Shultz, the 1941 Order pertained to the air and waters around Kingman Reef, but did not purport to or actually restrict plaintiffs' right of access to their property. As stated above, correspondence in 1937 and 1938 and thereafter is evidence that the government did not act to deprive plaintiffs of their use of Kingman Reef until 2001 when it declared Kingman Reef a National Wildlife Reserve.

### C. Even If the 1934 and 1941 Executive Orders "Interfered With" Plaintiffs' Property Rights, There Was No Permanent Taking Until 2001

For the reasons set forth above, the Executive Orders had no effect on plaintiffs' property rights in Kingman Reef. However, assuming *arguendo,* that the Executive Orders did restrict plaintiffs' rights to Kingman Reef, that restriction amounted to, at most, a temporary or partial taking up to the time when it was permanently taken on January 18, 2001.

#### 1. Any Governmental "Interference" with Kingman Reef Was at Most a Series of Continuing Claims That Did Not Culminate and Become Clear Until 2001.

As discussed above, the Executive Orders and the 1937– 1938 correspondence had no impact on plaintiffs' property rights, and did not constitute a taking. However, assuming *arguendo* that those actions and communications gave rise to a claim, plaintiffs were not required to sue until the culmination of those actions in 2001, when the government took Kingman Reef

for the establishment of a National Wildlife Refuge. Under the continuing claims doctrine, when a taking occurs over a period of time, the owner is entitled to wait until the full extent or duration of the taking becomes clear before bringing suit for just compensation. Castro v. U. S., 205 Ct. Cl. 534, 500 F.2d 436, 441 (1974); Juda, 6 Cl. Ct. at 451– 452; see also, Dickinson, 331 U.S. at 749 (when the Government chooses not to condemn land but to bring about a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really "taken.") In Juda, the court found that "the material facts [there] embrace a sequence of actions over an extended time period, and include events which, in other contexts, may have been adequate to supply foundations for distinct taking claims." Juda, 6 Cl. Ct at 450. The court went on to note the applicability of the Dickinson doctrine, finding where there is a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really "taken." Id. See also, Terteling v. United States, 334 F.2d 250, 254 (Ct. Cl. 1964).

In Castro v. U. S., 205 Ct.Cl. 534, the government took the Mariana Islands, in Saipan, for military purposes during World War II from private owners who were removed from their properties in 1944. In 1968, the government determined that the land was no longer needed for military purposes, and it was returned to the owners. The court noted that the series of takings were "uncertain [in] extent and duration[]" and held that the limitations did not start to run against the owners for the taking by the government until it was returned in 1968, because only then was it finally possible to compute the extent and duration of taking by the United States Government. Id. at 440.

All continuing claims, if any, by the government prior to the establishment of the Kingman Reef NWR in 2001 were uncertain in extent and duration. The government contends a taking took place when the 1934 Executive Order "reserved and set aside" Kingman Reef for "public purposes, thereby precluding any settlement of or private claims to the property." (Def.'s MPA at 15.) Since the 1934 Executive Order did not state a "public purpose" for Kingman Reef, the 1934 Executive Order at most was a temporary withdrawal, and maintained the status quo until the government decided on a public purpose use for Kingman Reef. Southern Utah Wilderness Alliance v. Bureau of Land Management, 425 F.3d 735, 784 (10th Cir. 2005).[12] As noted above, jurisdiction and control do not create any possessory property interests in the government. At most, Kingman Reef was withdrawn temporarily until the government decided on a public purpose for it. That did not happen until 2001, when the government finally disposed of Kingman Reef by designating it as a National Wildlife Refuge.

Since the 1934 Executive Order only temporarily preserved the "status quo," such an act did not effect a Fifth Amendment taking. Such a temporary and ambiguous event would not

---

[12] Although the government ignores it, the distinction between "reserved" and "withdrawn" is critical. Even if Kingman Reef had been public land, the 1934 Executive Order would only have temporarily withdrawn it from public lands until the government decided on a public purpose for it. A withdrawal "temporarily suspends the operation of some or all of the public land laws, preserving the status quo while Congress or the executive decides on the ultimate disposition of the subject lands. . . . A reservation, on the other hand, goes a step further: it not only withdraws the land from the operation of the public land laws, but also dedicates the land to a particular public use, such as parks, military posts, Indian lands, etc." Southern Utah Wilderness Alliance, 425 F.3d at 784 (citations omitted.) "[J]ust because a withdrawal uses the term 'reserved' does not mean that it reserves land 'for public uses.'" Id. at 785. Here, the 1934 Executive Order used the word "reserve" but there was no reservation, since the 1934 Executive Order did not reserve Kingman Reef for a specific public purpose - such as parks, dams, Indian lands or military posts. The only stated purpose of the 1934 Order was to place it "under the control and jurisdiction of the Secretary of the Navy for administrative purposes."

require plaintiffs to file suit, since the contours of the claim were not yet known. See, Castro, 205 Ct. Cl. 534. Nor were plaintiffs required to file a takings action when the government included Kingman Reef in a naval sea and air defense area in 1941. Id. at 440 (destruction or loss of property in the course of wartime military operations or as an incident thereto does not give the owner a right to compensation under the fifth amendment.)

Plaintiffs always had a compensable property interest from 1922 until the government took Kingman Reef in 2001. To compel plaintiffs to bring successive actions for the government's ambiguous continuous "takings" would run afoul of the rule proclaimed in Dickinson.

**2. To the Extent that the Government's Actions Before 2001 May Have "Interfered With" Plaintiffs' Property Rights, Any Claim That Might Have Accrued Was For, At Most, a Partial or Temporary Taking, and Plaintiffs Retained Ownership of the Property.**

Assuming, though without conceding, that *some* value may have been taken from the Fullard-Leo family in 1934 and/or 1941, it could only arguably amount to a partial or temporary taking, since on January 17, 2001, Kingman Reef was still a valuable asset to plaintiffs. Creppel v. United States, 41 F.3d 627, 632 (Fed. Cir. 1994) (temporary taking claim was time-barred under the 6-year statute, but subsequent permanent taking claim was not.).

In Creppel, the plaintiff landowners claimed a taking based on the Army Corps of Engineers' failure to go forward with a planned flood control project. In 1976, the Army issued an order, canceling the project, eliminating the plaintiffs' expectation of land reclamation pursuant to the project. The plaintiff successfully overturned the order in court in 1984. The EPA, however, issued a Final Determination on October 16, 1985, permanently blocking the project. The plaintiffs sued in 1991 alleging two distinct takings: (1) a temporary taking commencing

when the Order canceling the project issued in 1976, and (2) a permanent taking commencing when the EPA issued its Final Determination in 1985. The court held that the first claim was barred by the 6-year statute of limitations, but that the second claim accruing in 1985 was not. Id. at 631.

In holding that the permanent taking claim was not time-barred, the court reasoned that until the EPA issued its Final Determination in 1985, the property owners retained some expectation that the Project would be completed. Id. at 633. Because of the district court's temporary restoration of the original project in 1984, the "landowners regained the 'reasonable expectation' that their property value would increase." Id. The permanent taking claim therefore accrued on October 16, 1985, when the EPA finally fully vetoed the original project, thus denying the ability to make economically viable use of the property. Id. See also, Juda, 6 Cl. Ct. at 450 (if the facts evidence a sequence of actions which supply adequate foundation for separate takings claims–each separate and distinct claim will have its own statute of limitations).

Assuming, *arguendo,* that the Executive Orders "interfered" (as the government argues) with plaintiffs' ownership interest in Kingman Reef, and that such interference could rise to a taking to some degree, that interference did not effect a permanent taking of Kingman Reef. Plaintiffs still owned Kingman Reef, as the government repeatedly acknowledged in its own documents. (Complaint, Appendix, Docs. 20, 23, 25.) In the 1990's and 2000 the government was preparing to pay the Fullard-Leo family for a fee interest and plaintiffs leased the fishing rights around Kingman Reef in 2000. (Savio Decl. ¶ 1-5, 16; Porter Decl. Ex. J.)

Regardless of the effect, if any, of the Executive Orders on the value of Fullard-Leo family's ownership interest in Kingman Reef , the remaining value – through sale, lease or other

use, even if compromised or devalued to some extent by the Executive Orders -- was totally obliterated on January 18, 2001, when DOI completely and permanently took the property for the Kingman Reef NWR, thereby extinguishing plaintiffs' ability to make any economically viable use of the property. John R. Sand, 457 F.3d at 1357 ("A physical occupation . . . is a permanent and exclusive occupation by the government that destroys the owner's right to possession, use, and disposal of . . . property."). That was when the statute of limitations for the permanent taking began to run.

## IV. CONCLUSION

Plaintiffs owned Kingman Reef until January 18, 2001, when the government unlawfully took it without compensation. The government's actions prior to that time did not purport to or actually divest plaintiffs of any property rights in Kingman Reef. The claim in this case is not time-barred. The motion should be denied.

Respectfully submitted,

Dated: May 4, 2007

s/Christian P. Porter
CHRISTIAN P. PORTER
Brooks Tom Porter & Quitiquit, LLP
2125 Davies Pacific Center
841 Bishop Street
Honolulu, HI 96813
Tel: 808-526-3011
Fax: 808-523-1171
Email: cporter@btpqlaw.com