# EXHIBIT 1

C

**Effective: [See Text Amendments]**

UNITED STATES CODE ANNOTATED
TITLE 16. CONSERVATION
**CHAPTER 28--WILD AND SCENIC RIVERS**
**➡§ 1271. Congressional declaration of policy**

It is hereby declared to be the policy of the United States that certain selected rivers of the Nation which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values, shall be preserved in free-flowing condition, and that they and their immediate environments shall be protected for the benefit and enjoyment of present and future generations. The Congress declares that the established national policy of dam and other construction at appropriate sections of the rivers of the United States needs to be complemented by a policy that would preserve other selected rivers or sections thereof in their free-flowing condition to protect the water quality of such rivers and to fulfill other vital national conservation purposes.

Current through P.L. 110-19 approved 04-23-07

Copr. © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

# EXHIBIT 2

C

**Effective: July 07, 2004**

UNITED STATES CODE ANNOTATED
TITLE 28. JUDICIARY AND JUDICIAL PROCEDURE
PART VI--PARTICULAR PROCEEDINGS
**CHAPTER 165--UNITED STATES COURT OF FEDERAL CLAIMS PROCEDURE**

**➡§ 2501. Time for filing suit**

Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.

Every claim under section 1497 of this title shall be barred unless the petition thereon is filed within two years after the termination of the river and harbor improvements operations on which the claim is based.

A petition on the claim of a person under legal disability or beyond the seas at the time the claim accrues may be filed within three years after the disability ceases.

A suit for the fees of an officer of the United States shall not be filed until his account for such fees has been finally acted upon, unless the Government Accountability Office fails to act within six months after receiving the account.

Current through P.L. 110-19 approved 04-23-07

Copr. © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3

exclusive. The franchise hereby granted shall not be construed to be exclusive and shall be subject to all general laws now in force or which may hereafter be enacted respecting railway companies.

"SEC. 12. This act shall go into effect and be law from and after the date of its approval by the governor of the Territory of Hawaii, subject, however, to the approval of the Congress of the United States. Time of taking effect.

"Approved this twenty-sixth day of April, A. D. 1909.

"WALTER F. FREAR,
"Governor of the Territory of Hawaii."

SEC. 2. That Congress may at any time alter, amend, or repeal said Act. Amendment, etc.

Approved, June 25, 1910.

---

June 25, 1910.
[H. R. 24912.]
[Public, No. 302.]

**CHAP. 420.**—An Act Granting certain public lands to the State of Colorado for the use of the State Agricultural College, for agriculture, forestry, and other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the Secretary of the Interior is hereby authorized and directed to convey to the State of Colorado, for the use and benefit of the State Agricultural College, at Fort Collins, Colorado, for experimental, educational, and kindred uses in forestry, agriculture, horticulture, grazing, stock raising, and such other uses included in the work of experiments and instruction at said college, and the experiment station connected therewith, one thousand six hundred acres of vacant, unoccupied, unentered, and nonmineral land, or so much thereof as the state board of agriculture may select and designate, upon the payment therefor of the sum of one dollar and twenty-five cents per acre. Public lands. Granted to Colorado for State Agricultural College.

SEC. 2. That said land shall be selected by said state board of agriculture from any vacant, unoccupied, and unentered, nonmineral public land in township seven north, ranges seventy, seventy-one, seventy-two, seventy-three, and seventy-four west, of the sixth principal meridian, in the county of Larimer, State of Colorado, and the tracts so selected shall not contain less than forty nor more than one hundred and sixty acres each. Selection.

Approved, June 25, 1910.

---

June 25, 1910.
[H. R. 24070.]
[Public, No. 303.]

**CHAP. 421.**—An Act To authorize the President of the United States to make withdrawals of public lands in certain cases.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the President may, at any time in his discretion, temporarily withdraw from settlement, location, sale, or entry any of the public lands of the United States including the District of Alaska and reserve the same for water-power sites, irrigation, classification of lands, or other public purposes to be specified in the orders of withdrawals, and such withdrawals or reservations shall remain in force until revoked by him or by an Act of Congress. Public lands. Temporary withdrawals by President for power sites, irrigation, etc., authorized.

SEC. 2. That all lands withdrawn under the provisions of this Act shall at all times be open to exploration, discovery, occupation, and purchase, under the mining laws of the United States, so far as the same apply to minerals other than coal, oil, gas, and phosphates: *Provided*, That the rights of any person who, at the date of any order of withdrawal heretofore or hereafter made, is a bona fide occupant or claimant of oil or gas bearing lands, and who, at such date, is in diligent prosecution of work leading to discovery of oil or gas, shall not be affected or impaired by such order, so long as such occupant or claimant shall continue in diligent prosecution of said work: *And provided further*, That this Act shall not be construed as a recognition, Mining rights continued. Exceptions. *Provisos.* Rights of bona fide oil or gas claimants. Status of prior claims.

abridgment, or enlargement of any asserted rights or claims initiated upon any oil or gas bearing lands after any withdrawal of such lands made prior to the passage of this Act: *And provided further*, That there shall be excepted from the force and effect of any withdrawal made under the provisions of this Act all lands which are, on the date of such withdrawal, embraced in any lawful homestead or desert-land entry theretofore made, or upon which any valid settlement has been made and is at said date being maintained and perfected pursuant to law; but the terms of this proviso shall not continue to apply to any particular tract of land unless the entryman or settler shall continue to comply with the law under which the entry or settlement was made: *And provided further*, That hereafter no forest reserve shall be created, nor shall any additions be made to one heretofore created within the limits of the States of Oregon, Washington, Idaho, Montana, Colorado, or Wyoming, except by Act of Congress.

Homestead, etc., settlements excepted.

Restriction on new forest reserves.

SEC. 3. That the Secretary of the Interior shall report all such withdrawals to Congress at the beginning of its next regular session after the date of the withdrawals.

Report of withdrawals to Congress.

Approved, June 25, 1910.

---

June 25, 1910. [H. R. 24143.] [Public, No. 304.]

CHAP. 422.—An Act To create, establish, and enforce a miner's labor lien in the Territory of Alaska, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That every miner or other laborer who shall labor in or upon any mine or mining ground for another in the Territory of Alaska in digging, thawing, conveying, hoisting, piling, cleaning up, or any other kind of work in producing any mineral-bearing sands, gravels, earth, or rock, gold or gold dust, or other minerals, or shall aid or assist therein by his labor as cook, engineer, fireman, or in cutting and delivering wood used in said work, or in work in any like capacity in producing the dump, shall, where his labor directly aided in such production, have a lien upon the dump or mass of mineral-bearing sands, gravels, earth, or rocks, and all gold and gold dust, or other minerals therein, and all gold and gold dust extracted therefrom, for the full amount of wages for all the time which he was so employed as such laborer in producing the said dump, within one year next preceding his ceasing to labor thereon; and to the extent of thel abor of the said miner or other laborer actually employed or expended thereon, within one year next prior to ceasing to labor thereon, the said lien shall be prior to and preferred over any deed, mortgage, bill of sale, attachment, conveyance, or other claim, whether the same was made or given prior to such labor or not: *Provided*, That this preference shall not apply to any such deed, mortgage, bill of sale, attachment, conveyance, or other claim given in good faith and for value prior to the approval of this Act.

Alaska. Miner's labor lien. Persons entitled.

Preference of lien.

*Proviso.* Prior valid deeds, etc., not affected.

SEC. 2. That every laborer, within ninety days after the completion of the performance of the work or labor mentioned in the foregoing section who shall claim the benefit thereof, must, personally or by some other person for him, file for record in the recording precinct where the labor was performed a claim of lien containing a statement of his demand under oath, substantially in the following form:

Notice to be filed.

Form.

NOTICE OF LABORER'S LIEN.

Territory of Alaska, ——— precinct, ss:

——— ———, claimant, against ——— ———, defendant.

Notice is hereby given that ——— ———, claimant, claims a lien upon (describing the dump or mass of mineral-bearing sands, gravels, earth, or rock, and its location with reasonable certainty) in the ———

# EXHIBIT 4

(62 Stat. 799; 18 U.S.C. 2152); (2) for entering military, naval or Coast Guard property for prohibited purposes or after removal or exclusion therefrom by proper authority (62 Stat. 765; 18 U.S.C. 1382); (3) for violation of regulations imposed for the protection or security of military or naval aircraft, airports, air facilities, vessels, harbors, ports, piers, waterfront facilities, bases, forts, posts, laboratories, stations, vehicles, equipment, explosives, or other property or places subject to the jurisdiction, administration, or in the custody of the Department of Defense, any department or agency of which said department or agency consists, or any officer of employee of said department or agency (sec. 21 of the Internal Security Act of 1950 (50 U.S.C. 797) and Department of Defense Directive 5200.8 of 20 August 1954 (19 FR 5446)); and (4) for knowingly and willfully making a false or misleading statement or representation in any matter within the jurisdiction of any department or agency of the United States (18 U.S.C. 1001).

[28 FR 13778, Dec. 18, 1963, as amended at 35 FR 10008, June 18, 1970; 36 FR 21889, Nov. 17, 1971; 41 FR 28957, July 14, 1976]

## § 761.4 Special provisions.

(a) Entry into islands in the Kwajalein Atoll under military jurisdiction is controlled by the Department of the Army. Inquiries concerning entries into islands under military control in the Kwajalein Atoll should be directed to: National Range Commander, U.S. Army Safeguard System Command, ATTN: SSC-R, P.O. Box 1500, Huntsville, AL 35807.

(b) Entry into Eniwetok Atoll is controlled by the Defense Nuclear Agency. Inquiries concerning entries into Eniwetok Atoll should be directed to: Commander, Field Command, Defense Nuclear Agency, Kirtland Air Force Base, NM 87115.

(c) Entry into Johnston Atoll is controlled by the Defense Nuclear Agency. Inquiries concerning entries into Johnston Atoll should be directed to: Commander, Johnston Atoll (FCDNA), APO San Francisco, CA 96305.

(d) *Suspension of restrictions.* Restrictions imposed under the authority of the above cited Executive Orders on entry into the following Naval Defensive Sea Areas and Naval Airspace Reservations and Administrative Areas have been suspended subject to reinstatement without notice at any time when the purposes of national defense may require.

(1) All Naval Airspace Reservations, except the Guantanamo Bay Naval Airspace Reservation

(2) Honolulu Defensive Sea Area.

(3) Kiska Island Naval Defensive Sea Area.

(4) Kodiak Island Naval Defensive Sea Area.

(5) Unalaska Island Naval Defensive Sea Area.

(6) Wake Island Naval Defensive Sea Area except for entry of foreign flag ships and foreign nationals.

(7) The portion of Kaneohe Defensive Sea Area lying beyond a 500 yard buffer zone around the perimeter of the Kaneohe Marine Corps Air Station (Mokapu Peninsula) and eastward therefrom to Kapoho Point, Oahu.

(e) Suspension of restrictions on entry into a naval airspace reservation, naval defensive sea area, or naval administrative area, does not affect the authority of a commanding officer or other appropriate commander to control entry into or passage through any base, station, or other installation or area, including port or harbor facilities under Navy control.

[41 FR 28957, July 14, 1976]

## § 761.5 Definitions.

(a) *Defense area.* A naval defensive sea area, naval airspace reservation, or naval administrative area established by Executive order of the President.

(b) *Department of Defense.* The Department of Defense, including the Departments of the Army, Navy, and Air Force.

(c) *Entry authorization.* A document which authorizes a ship, aircraft, or person to enter a defense area.

(d) *Entry Control Commander.* A commander empowered to issue entry authorizations for one or more defense areas (see § 761.9).

(e) *Excluded person.* A person who does not hold a currently valid entry authorization for the area concerned and who has been notified by an Entry Control Commander that authority for

# EXHIBIT 5

consideration of the litigant's response, the court concludes that a violation has occurred.

Subdivision (d). Rules 26(g) and 37 establish certification standards and sanctions that apply to discovery disclosures, requests, responses, objections, and motions. It is appropriate that Rules 26 through 37, which are specially designed for the discovery process, govern such documents and conduct rather than the more general provisions of Rule 11. Subdivision (d) has been added to accomplish this result.

Rule 11 is not the exclusive source for control of improper presentations of claims, defenses, or contentions. It does not supplant statutes permitting awards of attorney's fees to prevailing parties or alter the principles governing such awards. It does not inhibit the court in punishing for contempt, in exercising its inherent powers, or in imposing sanctions, awarding expenses, or directing remedial action authorized under other rules or under 28 U.S.C. § 1927. *See Chambers v. NASCO*, — U.S. — (1991). Chambers cautions, however, against reliance upon inherent powers if appropriate sanctions can be imposed under provisions such as Rule 11, and the procedures specified in Rule 11—notice, opportunity to respond, and findings—should ordinarily be employed when imposing a sanction under the court's inherent powers. Finally, it should be noted that Rule 11 does not preclude a party from initiating an independent action for malicious prosecution or abuse of process.

## Rule 12. Defenses and Objections—When and How Presented—By Pleading or Motion—Motion for Judgment on Pleadings

**(a) When Presented.**

(1) Unless a different time is prescribed in a statute of the United States, a defendant shall serve an answer

(A) within 20 days after being served with the summons and complaint, or

(B) if service of the summons has been timely waived on request under Rule 4(d), within 60 days after the date when the request for waiver was sent, or within 90 days after that date if the defendant was addressed outside any judicial district of the United States.

(2) A party served with a pleading stating a cross-claim against that party shall serve an answer thereto within 20 days after being served. The plaintiff shall serve a reply to a counterclaim in the answer within 20 days after service of the answer, or, if a reply is ordered by the court, within 20 days after service of the order, unless the order otherwise directs.

(3)(A) The United States, an agency of the United States, or an officer or employee of the United States sued in an official capacity, shall serve an answer to the complaint or cross-claim— or a reply to a counterclaim—within 60 days after the United States attorney is served with the pleading asserting the claim.

(B) An officer or employee of the United States sued in an individual capacity for acts or omissions occurring in connection with the performance of duties on behalf of the United States shall serve an answer to the complaint or cross-claim—or a reply to a counterclaim—within 60 days after service on the officer or employee, or service on the United States attorney, whichever is later.

(4) Unless a different time is fixed by court order, the service of a motion permitted under this rule alters these periods of time as follows:

(A) if the court denies the motion or postpones its disposition until the trial on the merits, the responsive pleading shall be served within 10 days after notice of the court's action; or

(B) if the court grants a motion for a more definite statement, the responsive pleading shall be served within 10 days after the service of the more definite statement.

**(b) How Presented.** Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter, (2) lack of jurisdiction over the person, (3) improper venue, (4) insufficiency of process, (5) insufficiency of service of process, (6) failure to state a claim upon which relief can be granted, (7) failure to join a party under Rule 19. A motion making any of these defenses shall be made before pleading if a further pleading is permitted. No defense or objection is waived by being joined with one or more other defenses or objections in a responsive pleading or motion. If a pleading sets forth a claim for relief to which the adverse party is not required to serve a responsive pleading, the adverse party may assert at the trial any defense in law or fact to that claim for relief. If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

**(c) Motion for Judgment on the Pleadings.** After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

# EXHIBIT 6

C

EXECUTIVE ORDER 10264

TRANSFER OF THE ADMINISTRATION OF AMERICAN SAMOA FROM THE SECRETARY OF THE NAVY TO THE SECRETARY OF THE INTERIOR

June 29, 1951

WHEREAS the Island of Tutuila of the Samoan group and all other islands of the group east of longitude 171 degrees west of Greenwich, known as American Samoa, were placed under the control of the Department of the Navy by Executive Order No. 125-A of February 19, 1900; and

WHEREAS the joint resolution of February 20, 1929, 45 Stat. 1253, provides that until the Congress shall provide for the government of such islands all civil, judicial, and military powers shall be vested in such person or persons and shall be exercised in such manner as the President of the United States may direct; and

WHEREAS a committee composed of the Secretaries of State, War, the Navy, and the Interior recommended on June 18, 1947, that administrative responsibility for American Samoa be transferred to a civilian agency of the Government at the earliest practicable date as determined by the President; and

WHEREAS plans for the orderly transfer of administrative responsibility for American Samoa from the Secretary of the Navy to the Secretary of the Interior are embodied in a memorandum of understanding between the Department of the Navy and the Department of the Interior, approved by me on September 23, 1949, and it is the view of the two departments, as expressed in that memorandum, that such transfer should take effect on or about July 1, 1951; and

WHEREAS the transfer of administration of American Samoa from the Secretary of the Navy to the Secretary of the Interior, effective July 1, 1951, appears to be in the public interest:

NOW, THEREFORE, by virtue of the authority vested in me by the said joint resolution of February 20, 1929, and as President of the United States, it is ordered as follows:

1. The administration of American Samoa is hereby transferred from the Secretary of the Navy to the Secretary of the Interior, such transfer to become effective on July 1, 1951.

2. The Department of the Navy and the Department of the Interior shall proceed with the plans for the transfer of administration of American Samoa as embodied in the above-mentioned memorandum of understanding between the two departments.

3. When the transfer of administration made by this order becomes effective, the Secretary of the Interior shall take such action as may be necessary and appropriate, and in harmony with applicable law, for the administration of civil government in American Samoa.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4. The executive departments and agencies of the Government are authorized and directed to cooperate with the Departments of the Navy and Interior in the effectuation of the provisions of this order.

5. The said Executive order of February 19, 1900, is revoked, effective July 1, 1951.

HARRY S. TRUMAN

THE WHITE HOUSE,

June 29, 1951.

Exec. Order No. 10,264, 1951 WL 5040 (Pres.Exec.Order), 16 FR 6417

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 7

Westlaw.



Exec. Order No. 11,045, 1962 WL 8849 (Pres.Exec.Order), 27 FR 8511

(Publication page references are not available for this document.)

H

Executive Order 11045

DISCONTINUING THE GUAM ISLAND NAVAL DEFENSIVE SEA AREA AND GUAM ISLAND NAVAL AIRSPACE RESERVATION

August 21, 1962

By virtue of the authority vested in me as President of the United States, it is ordered as follows:

SECTION 1. The Guam Island Naval Defensive Sea Area and the Guam Island Naval Airspace Reservation, heretofore existing under the provisions of Executive Order No. 8683 of February 14, 1941, as amended, are hereby discontinued.

SEC. 2. To the extent not heretofore rendered inapplicable, the following are hereby revoked:

(1) Executive Order No. 8683 of February 14, 1941.

(2) Executive Order No. 8729 of April 2, 1941.

(3) Executive Order No. 10341 of April 8, 1952.

JOHN F. KENNEDY

THE WHITE HOUSE,

August 21, 1962.

Exec. Order No. 11,045, 1962 WL 8849 (Pres.Exec.Order), 27 FR 8511

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 8

United States Attorney General

GUAM AND TUTUILA--MILITARY GOVERNORS--COMMISSIONS.

December 17, 1904.

*292 The Secretary of the Navy may issue commissions to the naval officers serving as military governors of the islands of Guam and Tutuila.

The SECRETARY OF THE NAVY.

SIR:

I have your letter of the 10th instant, stating that 'for administrative reasons the issuance of commissions to the military governors of Guam and Tutuila appears desirable, it in view of the history and status of these islands such action may properly be taken,' and requesting my opinion as to whether commissions may issue to the naval officers serving as governors of those islands.

The form of commission you inclose, and which it is proposed to issue, reads as follows:

'* * * That reposing special trust and confidence in the fidelity and abilities of _____ I do appoint him governor of _____ and do authorize and empower him to execute and fulfill the duties of that office according to law and to have and to hold the said office, with all the powers and privileges thereunto of right appertaining, unto him, the said _____, during the pleasure of the President of the United States for the time being. * * *

'_____ _____.

'By the President:

'_____ _____,

'Secretary of State.'

The political status of these islands is anomalous. Neither the Constitution nor the laws of the United States have been extended to them, and the only administrative authority existing in them is that derived mediately or immediately from the President as Commander in Chief of the Army and Navy of the United States.

On December 23, 1898, the President placed the island of Guam under the control of the Department of the Navy, with direction that the Secretary 'will take such steps as may be necessary to establish the authority of the United States and to give it the necessary protection and government;' and in pursuance of the authority thus conferred, *293 the then Secretary appointed a naval officer as 'naval governor of the island of Guam, this duty being in addition to your (his) duty as commander of a division of the Asiatic fleet.'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

And on February 19, 1900, the President likewise turned over to your Department the control of the Island of Tutuila and the other islands of the Samoan Group belonging to the United States, for the purposes of a naval station. A naval officer was detailed by the Secretary to assume command of such station, the order concluding as follows:

'Your position as commandant will invest you with authority over the islands in the group within the limits of the station.'

In the one case, therefore, a naval governor was appointed, and in the other the commandant was invested with gubernatorial functions over the islands in the group embraced within the limits of the station.

I think there can be no question as to the regularity of the appointment. (See 9 Opin., 463.) Can the President, then, commission as governors those officers whom he, through his Secretary of the Navy, has already appointed as such?

While it was said in Marbury v. Madison (1 Cranch, 137) that 'the acts of appointing to office, and the commissioning the person appointed, can scarcely be considered as one and the same,' it is obvious, in the present case, that the power of commissioning is one necessarily incidental to the right of appointment. A commission in either of these cases is no more than evidence, in another form, of the original appointment (Marbury v. Madison, supra), and if, as indicated, the officers have in fact been appointed as, and are exercising the functions of governors, I can see no legal objection to issuing them commissions as such. (See 24 Opin., 697).

Your question is, therefore, answered in the affirmative.

Respectfully,

W. H. MOODY.

25 U.S. Op. Atty. Gen. 292, 1904 WL 560 (U.S.A.G.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.