# Exhibit "B"

NAVY DEPARTMENT

EXECUTIVE OFFICE OF THE PRESIDENT

BUREAU OF THE BUDGET

WASHINGTON, D. C.

FEB 7 1941

FEB 10 1941
Office of ...

My dear Mr. Secretary:

FEB 8 1941 EF 62/A16-3(401202-D)

Reference is made to the letters of the Acting Secretary of the Navy of November 30 and December 2, 1940 transmitting drafts of five proposed Executive Orders establishing defensive sea areas and airspace reservations around and over the islands of Guam, Rose, Tutuila, Palmyra, Johnston, Midway, Wake, and Kingman Reef in the Pacific Ocean, Culebra Island, Puerto Rico, Kiska and Unalaska Islands, Alaska, and adjacent to and over Kaneohe Bay, Territory of Hawaii.

There is forwarded herewith, for your information and such action as you may find appropriate, a letter of February 4, 1941 from the Secretary of the Interior concerning the proposed orders, which is self-explanatory.

You will note that the Secretary assumes that proper provision will be made under the authority given the Secretary of the Navy so as to permit bona fide residents of the areas reasonable means of transportation and communication to and from the islands. The Secretary also points out that the raising of blue foxes on Kiska Island is of considerable economic importance to the natives of the island, and he recommends that provision be made to permit travel and communication to and from the island insofar as it would be consistent with the purpose of the proposed order. He also invites attention to the fishing industry carried on at Kaneohe Bay, Hawaii, which affects the livelihood of more than 1,200 people and he suggests that suitable provision be made by the Secretary of the Navy to permit the use of those waters under suitable regulation for bait fishing, pond fish culture and noncommercial fishing.

The drafts of Executive Orders are being forwarded this date to the Attorney General for his consideration.

Very truly yours,

John B. Blandford Jr.

Assistant Director.

The Honorable,
The Secretary of the Navy.

Enclosure.

Finished-File-Humphrey

FLD 00620

# Exhibit “C”

REPRODUCED AT THE NATIONAL ARCHIVES

In reply refer to Initials and No.

Op13C-jc
Serial No. 61713
EG62/A16-3(401202-1)

NAVY DEPARTMENT
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
WASHINGTON

RECEIVED MAR 18 '41 Office of Judge Advocate General

MAR 15 1941

From: The Chief of Naval Operations.
To: The Judge Advocate General.

Subject: Proposed Executive Orders establishing defensive sea areas and airspace reservations around and over the Islands of Guam, Rose, Tutuila, Palmyra, Johnston, Midway, Wake, and Kingman Reef in the Pacific Ocean, Culebra Island, Puerto Rico, Kiska and Unalaska Islands, Alaska, and adjacent to and over Kaneohe Bay, Territory of Hawaii.

Reference: (a) Actg. SecNav letter A14-1(410109) Serial No. 56113 dated March 10, 1941.

Enclosure: (A) Letter from the Assistant Director of the Budget dated February 7, 1941, with its enclosure.

1. Enclosure (A) is returned.

2. Reference (a) was prepared to give information to the Interior Department of intended procedure in Hawaii.

3. It is intended to publish to the service, by General Orders, the information concerning the establishment of Naval Defensive Sea Areas. Directives will then be issued to the commandants of the districts concerned, who will prepare regulations for their administration, subject to the approval of the Secretary of the Navy. At that time, the attention of the commandant will be invited to the necessity for the minimum of interference with vital industries and vested interests.

R. E. Ingersoll
Acting

NAVY DEPARTMENT
SEC'Y'S OFFICE - RECORD DIV.
RECEIVED
MAR 15 1941

Finished-File-Humphrey

EG62/A16-3 (401202-1)

# Exhibit "D"

**From:** Kilian, Mike
**Sent:** Wednesday, October 06, 1999 12:55 PM
**To:** Dong, Steve M; Pacht, Dennis
**Subject:** RE: Need your Help.

As I mentioned earlier, Navy was designated the responsible federal agency to 'own' Kingman Reef for lack of any other appropriate interested agencies. We are stuck with it. If now, we have another interested agency such as USFWS, then Navy should have no problem transferring custodial responsibility to DoI. As long it is in federal ownership, Navy can deal with national security concerns involving the island.

I am unaware of any Navy usage in recent history. It may have been occupied during WWII.

I would open it up to NAVREGION. It is their call as to whether or not Navy has any operational requirement to retain plant account responsibility for the island.

-----Original Message-----
**From:** Dong, Steve M
**Sent:** Wednesday, October 06, 1999 12:17 PM
**To:** Kilian, Mike; Pacht, Dennis
**Subject:** Need your Help.

Got a call from DASN Cassidy. Our conversation regarding the Phoenix Islands has been corrected or recalibrated. The land in question is Kingman Reef. Appreciate if you can research and provide me data regarding the island and current or present usage. Do we want it. By discussions with Dennis the answer was no. Can we get rid of it? Are there others that should be included...Should I open this up to NAVREGION

Please keep close hold for now. Need Data for DASN Cassidy ASAP. Will call him back tomorrow AM. Thanks. Dennis/Mike perhaps you need to come up and be part of the call.

Steve

# Exhibit "E"

dl
3700
7 July 1987

Subj: DEFENSIVE SEA AREAS AND AIRSPACE RESERVATIONS

c. Unalaska Island Naval Defensive Sea Area, Unalaska Island Naval Airspace Reservation [32 CFR 761.3(a)(2)(x)]

3. The above Defensive Sea Areas and Airspace Reservations were established by Executive Orders in 1939 and 1941.

4. All the Naval Airspace Reservations have been suspended. The Honolulu Defensive Sea Area and the Kingman Reef, Kiska Island, Kodiak Island, Unalaska Island, Wake Island (except for entry of foreign flag ships and nationals), and Kaneohe Bay (portion beyond a 500 yard buffer zone) Naval Defensive Sea Areas have also been suspended. *See* 32 CFR 761.4(d)(2), (6), (7). These suspensions were directed by the Chief of Naval Operations in 1976. *See* 41 Fed. Reg. 28,957 (1976). While the regulations do not specify who has the authority to reinstate the areas, as a general rule, the person with authority to suspend also has the authority to reinstate. Consequently, the authority to reinstate the areas certainly lies with the CNO. The areas may be reinstated without notice at any time when the purposes of national defense require.

5. According to the Code of Federal Regulations [32 CFR Part 761], entry into these Defensive Areas (Defensive Sea Area or Naval Airspace Reservation) is controlled by the following Entry Control Commanders:

a. Chief of Naval Operations may authorize all persons ships or aircraft to enter all Pacific Defense Areas. [32 CFR 761.9(a)]

b. Commander in Chief, U.S. Pacific Fleet may authorize all persons, ships, or aircraft to enter all Pacific Defense Area. [32 CFR 761.9(c)]

c. Commander Third Fleet may authorize U.S. citizens and U.S. vessels to enter Kaneohe Bay, Pearl Harbor, Midway Island, Kingman Reef, and certain Filipino workers to enter Wake Island Defense Areas. [32 CFR 761.9(i)]

d. Commandant, Fourteenth Naval District and U.S. Coast Guard have joint responsibility for regulating movement of

01
3700
7 July 1987

Subj: DEFENSIVE SEA AREAS AND AIRSPACE RESERVATIONS

shipping within and security of Honolulu Defense Area. [32 CFR 761.9(i)]

e. Senior Naval Commander in defense area may grant emergency authorization in cases of emergency or distress. [32 CFR 761.9(h)]

Further delegations of entry control, as well as delegations of authority to reinstate the areas, if they exist in internal Naval directives, are not available to us at this time.

6. The authority to enforce the Defensive Sea Area and Airspace Reservations may be exercised by Commanding Officers of the installations within the Areas. They may take appropriate action to apprehend violators and are to seek disposition instructions from the Entry Control Commander. This authority to enforce the Defensive Sea Area provides the flexibility to use local Naval units rather than rely solely upon Coast Guard units for enforcement. Further, the existence of these areas eliminates the need to establish security zones where enforcement may be accomplished by Coast Guard units only.

J. P. WIESB

Copy: (r)

# Exhibit "F"

United States Department of the Interior

FISH AND WILDLIFE SERVICE
PACIFIC ISLANDS OFFICE
P.O. BOX 50167
HONOLULU, HAWAII 96850

September 6, 1991

Mr. Peter Savio
Savio Realty
931 University Avenue
Suite 202
Honolulu, Hawaii 96826

Dear Mr. Savio:

I spoke with Mr. Alvin Katekaru of the National Marine Fisheries Service (NMFS) this morning. Mr. Katekaru expects to be in radio-telephone contact with Mr. Richard Purvience of the "CRIS" on Monday morning. Apparently, the "CRIS" does not plan to leave Palmyra until after Mr. Purvience speaks with Mr. Katekaru on Monday, if then.

Apparently, Mr. Purvience is not yet convinced that you have ownership and jurisdiction over reef resources at Palmyra. He did speak to Mr. Katekaru about the collection of stony coral from Palmyra--a type of harvest activity which requires no federal permit (precious corals are regulated by NMFS). Most of the stony corals are, however, protected from excess international trade by the Convention on International Trade in Endangered Species (CITES). Additionally, the State of Hawaii regulates the harvest of coral from its waters.

It would seem that Mr. Purvience and Mr. Katekaru could benefit from some specific documents and language that would "prove up" your claim to jurisdiction over Palmyra's reef resources. I might suggest that your attorney be made a part of the Purvience-Katekaru communication on Monday, so as to persuade the "CRIS" in the direction of reef conservation as opposed to consumptive harvest.

Enclosed, per your request, are a number of documents which speak to boundary and wildlife regulation issues on our remote island refuges. Thank you for your continued interest in the conservation of wildlife resources at Palmyra Atoll and Kingman Reef.

Sincerely,

Robert P. Smith
Field Supervisor
Pacific Islands Office

Encl.

# Exhibit “G”

UNITED STATES GOVERNMENT
# Memorandum

DEPARTMENT OF THE TREASURY
UNITED STATES CUSTOMS SERVICE

DATE: NOV 07 1996

FILE: VES-7-01/03-RR:IT:EC
227213 GEV

TO : Port Director
U.S. Customs Service
Honolulu, Hawaii
ATTN: Vessel Entry and Clearance Specialist Lee Ann Satele

FROM : Acting Chief, Entry and Carrier Rulings Branch

SUBJECT: Transportation of Fish Through Palmyra Island

This is in response to your memorandum dated August 26, 1996 (your file no. VES-1-HO:VECS), requesting our opinion and assistance in answering a letter to you dated August 16, 1996, from Mark Collins, President, C-Fresh Seafoods, Inc. ("C-Fresh") wherein he requests Customs guidance regarding the laws and/or regulations pertaining to a joint fishing venture. In addition to a copy of Mr. Collins' letter, you attached copies of the following correspondence: a letter dated August 2, 1996, to Mr. Collins from Martin B. Hochman, Southwest Regional Counsel, National Oceanic and Atmospheric Administration (NOAA); a letter dated June 6, 1996, to Mr. Brian Hallman, Office of Marine Conservation, U.S. Department of State, from Kitty M. Simonds, Executive Director, Western Pacific Regional Fishery Management Council; and a letter dated June 5, 1996, to Ms. Simonds from Mr. Collins.

You should also know that we have received a letter dated November 6, 1996, from Samuel Schley of CapTech Corporation, Washington, D.C. (a consultant to C-Fresh) forwarding a copy of a Congressional bill (S.39) and an excerpt from the Congressional Record of September 27, 1996, attesting to its final passage in both the Senate and House of Representatives. Mr. Schley contends that this legislation will enable Customs to render a decision in this matter that is favorable to his client.

The facts as we understand them are as follows. C-Fresh will be working with Hawaii International Seafood based in Honolulu, Hawaii, in a joint venture. Specifically, foreign-flag fishing vessels fishing outside the U.S. Exclusive Economic Zone (EEZ) will deliver their catches to C-Fresh's facility at Palmyra Island. Subsequent to their receipt of these fish, C-Fresh will weigh and package them, then deliver them to the air field on Palmyra Island where they will be flown by cargo plane to the Hawaii International Seafood facility located at the Honolulu International Airport. From there the fish will be distributed to wholesale and retail markets by Hawaii International Seafood. Mr. Collins requests an interpretation of those laws

applicable to this operation. Specific reference in the aforementioned correspondence is made to the Jones Act and the Nicholson Act, both of which are administered by Customs. These statutes are included in our discussion of this matter set forth below.

Title 46, United States Code Appendix, § 883 (46 U.S.C. App. § 883), the merchandise coastwise law, often called the "Jones Act", provides, in part, that no merchandise shall be transported between points in the United States embraced within the coastwise laws, either directly or via a foreign port, or for any part of the transportation, in any vessel other than a vessel built in and documented under the laws of the United States and owned by persons who are citizens of the United States (i.e., a coastwise-qualified vessel). See also §§ 4.80 and 4.80b, Customs Regulations (19 CFR §§ 4.80, 4.80b). This statute has been found to apply even to the transportation of merchandise from point to point within a harbor. Pursuant to 19 U.S.C. § 1401(c), the word "merchandise" means goods, wares and chattels of every description and includes merchandise the importation of which is prohibited. Furthermore, Public Law 100-329 (102 Stat. 588) amended § 883 to apply to the transportation of "valueless material."

Points embraced within the coastwise laws include all points within the territorial waters of the United States, including points within a harbor, as well as artificial islands, installations, and devices permanently or temporarily attached to the seabed of the outer continental shelf for the purpose of exploring for, developing or producing resources therefrom. The territorial waters of the United States consist of the territorial sea, defined as the belt, 3 nautical miles wide, seaward of the territorial sea baseline, and to points located in internal waters, landward of the territorial sea baseline, in cases where the baseline and coastline differ. (It should be noted that although Presidential Proclamation 5928 of December 27, 1988, extended the U.S. territorial sea to 12 miles, this extension is only for international purposes. Thus, Customs and U.S. Coast Guard law enforcement activities are not altered as a result of the proclamation.)

In regard to Mr. Collins' concerns, although the Jones Act is applicable to Palmyra Island (see Headquarters ruling letter 104623, dated May 22, 1980, and Headquarters memorandum 104576, dated September 12, 1980, copies attached) thereby necessitating the use of a qualified vessel as discussed above to transport fish from Palmyra Island to Hawaii or any other U.S. point, there appear to be no Jones Act implications with respect to the operation he proposes. The foreign-flag vessel unloading fish at Palmyra Island is not engaged in the transportation of merchandise between two coastwise points but rather is unloading fish at Palmyra Island (a coastwise point) that it caught outside the U.S. EEZ (i.e., beyond the 3-mile U.S. territorial sea, a location that is not a coastwise point as discussed above). Furthermore, the transportation of fish from Palmyra Island to Honolulu is stated to be by aircraft, a mode of transportation outside the parameters of the Jones Act which addresses the movement of merchandise not by air but by water, or by land and water. More importantly, this activity constitutes fishing rather than coastwise trade as will be further discussed below.

Parenthetically, we note that the transportation of merchandise between U.S. points by a foreign aircraft may constitute a violation of the air cabotage law, a statute administered by the Department of Transportation (DOT). (See § 122.165, Customs Regulations (19 CFR § 122.165) and note that the citation therein should be to 19 U.S.C. §§ 1644, 1644a rather than to 49 U.S.C. App. § 1508(b)) Should you learn of the use of foreign aircraft in this matter, in the interest of expediency we suggest you contact Mr. Peter Schwartzkopf, Office of the General Counsel, DOT at 202-366-5621, or write that agency directly at the following address:

Office of Aviation Enforcement & Proceedings
U.S. Department of Transportation
1100 Seventh St., S.W.
Washington, D.C. 20590

With respect to the applicability of the laws pertaining to the fisheries in regard to Mr. Collins' proposal, you should know that the Commercial Fishing Industry Vessel Anti-Reflagging Act of 1987 (the "Act", Pub. L. 100-239; 101 Stat. 1778) amended 46 U.S.C. § 12101(6) by changing the definition of "fisheries" set forth therein to include the "processing, storing, and transporting (except in foreign commerce)" of fish and related fishery resources in United States navigable waters and the United States EEZ, as well as the catching-related activities provided for in the former definition. Accordingly, the new definition of fisheries, now set forth in 46 U.S.C. § 12101(a) reads as follows:

> "fisheries" includes processing, storing, transporting (except in foreign commerce),planting, cultivating, catching, taking, or harvesting fish, shellfish, marine animals, pearls, shells, or marine vegetation in the navigable waters of the United States or in the exclusive economic zone. (Emphasis added)

The U.S. EEZ is defined in Presidential Proclamation 5030 of March 10, 1983 (48 FR 10605), as extending outward for 200 nautical miles from the baseline from which the territorial sea is measured. As discussed in Headquarters letter 104186, dated September 6, 1979 (copy attached), the EEZ (the successor entity to the Fisheries Conservation Zone referenced therein) extends around Palmyra Island.

Title 46, United States Code, § 12108(b) limits the employment in the fisheries to a vessel issued a certificate of documentation with a fishery endorsement, "subject to the laws of the United States regulating the fisheries" (see e.g., the Magnuson Fishery Conservation and Management Act of 1976 (MFCMA), 16 U.S.C. 1801 et seq., administered by the Department of Commerce, NOAA, National Marine Fisheries Service (NMFS) under which a foreign vessel may obtain a permit from NMFS to engage in fishing in the EEZ). Under 46 U.S.C. § 12108(a), only a vessel eligible for documentation (i.e., over 5 net tons and owned by a citizen) which was built

in the United States may be endorsed for the fisheries. Pursuant to 46 U.S.C. § 12108(b), subject to the laws of the United States regulating the fisheries, only a vessel so endorsed may engage in the fisheries.

Accordingly, a foreign-flag fishing vessel may engage in fisheries activities either outside the EEZ surrounding Palmyra Island without any authorization from the U.S. Government, or inside Palmyra Island's EEZ provided the vessel has the requisite permit discussed above. The submissions of Mr. Schley contain no evidence that the Congressional bill to which he refers was enacted into law. However, assuming arguendo, its enaction, Customs position in this matter would remain unchanged since § 106 of the bill to which Mr. Schley refers merely augments the procedures necessary for obtaining the aforementioned permits. Compliance with such procedures to the satisfaction of NMFS would suffice for Customs to the extent of our involvement in this matter.

Notwithstanding any authorization of foreign-flag vessels to engage in fishing activities in the EEZ, the provision relating to the landing of fish or fish products in the United States in the Nicholson Act (the Act of September 2, 1950, as amended, Ch. 842, 64 Stat. 577; 46 U.S.C. App. § 251(a)) has not been changed since its enactment in 1950. Under the Nicholson Act, which, as previously stated, is within the purview of the Customs Service (see 19 CFR § 4.96(b)), no foreign-flag vessel shall land in a port of the United States its catch of fish taken on board the vessel on the high seas, or fish products processed therefrom, or any fish or fish products taken on board the vessel on the high seas from a vessel engaged in fishing operations or in the processing of fish or fish products. Since this prohibition is directed against foreign-flag vessels, a United States-flag, foreign-built vessel (which usually could not be documented for the coastwise or fisheries trade and therefore could not engage in the fisheries within the EEZ) could land in the United States fish it had caught or received on the high seas without violating the Nicholson Act.

Consequently, the issuance of the aforementioned NMFS permits does not, in and of itself, obviate the provisions of the Nicholson Act. However, we note that Marine Circular No. 124, Supplement No. 1, dated November 15, 1955 (also cited as Customs Circular VES-7-MA, dated November 15, 1955, copy attached) sets forth Customs opinion that the prohibition against foreign-flag vessels in the Nicholson Act does not apply to Palmyra Island. Customs has consistently followed this position. (see, e.g., Headquarters letters 100969, dated January 22, 1974, 101093, dated April 18, 1974, 101820, dated October 16, 1975, and 104186, dated September 6, 1979) Accordingly, under Mr. Collins' proposal, a foreign-flag vessel may land fish at Palmyra Island without incurring a violation of the Nicholson Act.