IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

\- - -

KINGMAN REEF ATOLL INVESTMENTS, L.L.C., a Hawaii limited liability company,

Plaintiff,

vs.

THE UNITED STATES OF AMERICA; THE UNITED STATES DEPARTMENT OF INTERIOR; THE HONORABLE GALE A. NORTON, in her official capacity as Secretary of the Interior; THE UNITED STATES FISH & WILDLIFE SERVICE; STEVEN A. WILLIAMS, in his official capacity as Director of United States Fish & Wildlife Service; JOHN DOES 1-10, JANE DOES 1-10, AND DOE PARTNERSHIPS, CORPORATIONS, GOVERNMENTAL UNITS or OTHER ENTITIES 1-10,

Defendants.

No. CV05-00151 JMS/BMK

DEPOSITION OF

CHARLES COOK

BURBANK, CALIFORNIA

MARCH 26, 2007

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

REPORTED BY: JOSEPH R. LOMBARDI, CSR NO. 12641

FILE NO.: A1007EE

Exhibit 5 to Def.'s Reply Brief
KRAI v. US, No. 06-828L (Fed. Cl.)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

\- - -

KINGMAN REEF ATOLL INVESTMENTS, L.L.C., a Hawaii limited liability company,

Plaintiff,

vs. ) No. CV05-00151 JMS/BMK

THE UNITED STATES OF AMERICA;) THE UNITED STATES DEPARTMENT OF INTERIOR; THE HONORABLE GALE A. NORTON, in her official capacity as Secretary of the Interior; THE UNITED STATES FISH & WILDLIFE SERVICE; STEVEN A. WILLIAMS, in his official capacity as Director of United States Fish & Wildlife) Service; JOHN DOES 1-10, JANE) DOES 1-10, AND DOE PARTNERSHIPS, CORPORATIONS, GOVERNMENTAL UNITS or OTHER ENTITIES 1-10,

Defendants.

Deposition of CHARLES COOK, taken on behalf of Plaintiff, at 2900 North San Fernando Boulevard, Conference Room, Burbank, California, commencing at 9:29 A.M., Monday, March 26, 2007, before Joseph R. Lombardi, CSR No. 12641.



APPEARANCES:

For Plaintiff:
CANNATA, CHING & O'TOOLE LLP
BY: THERESE Y. CANNATA
899 Ellis Street
San Francisco, California 94109
(415) 409-8900
BROOKS, TOM, PORTER & QUITTQUIT LLP
BY: DONNA H. YAMAMOTO
841 Bishop Street
Honolulu, Hawaii 96813
(808) 526-3011

For The United States of America:
UNITED STATES DEPARTMENT OF JUSTICE
ENVIRONMENT & NATURAL RESOURCES DIVISION
NATIONAL RESOURCES SECTION
BY: DONNA SHEEHAN FITZGERALD
601 D Street Northwest, Room 304
Washington, D.C. 20004
(202) 305-0476

For Charles Cook:
COX, CASTLE & NICHOLSON LLP
BY: ANDREW K. FOGG
2049 Century Park East, 28th Floor
Los Angeles, California 90067
(310) 277-4222



INDEX


WITNESS: CHARLES COOK

| EXAMINATION | PAGE |
|---|---|
| BY MS. CANNATA | 6, 203 |
| BY MS. FITZGERALD | 199 |

EXHIBITS

PLAINTIFF'S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Amended Notice of Deposition of Charles Cook | 6 |
| 2 | Amended Notice of Deposition of the Nature Conservancy | 6 |
| 3 | Memorandum | 38 |
| 4 | Predecisional Draft | 61 |
| 5 | Draft | 65 |
| 6 | Preliminary Project Proposal Memorandum | 67 |
| 7 | Preliminary Project Proposal Memorandum | 78 |
| 8 | Letter to Lt. Colonel Ralph H. Graves | 105 |
| 9 | Fax to Peter Savio | 108 |
| 10 | Letter of Transmittal | 129 |
| 11 | Agreement For Purchase and Sale of Real Property | 133 |
| 12 | National Wildlife Refuge in the Pacific Memo | 141 |
| 13 | Briefing Statement | 145 |




INDEX (CONTINUED)


EXHIBITS

PLAINTIFF'S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 14 | Fax to Pat Carroll | 148 |
| 15 | Fax to Charles Cook | 152 |
| 16 | Letter to Robert Smith | 155 |
| 17 | Meeting on USFWS Refuges | 160 |
| 18 | Agreement for Purchase and Sale of Real Property | 164 |
| 19 | Short Forms of Agreement for Purchase And Sale of Real Property | 168 |
| 20 | Briefing Statement | 170 |
| 21-A | Letter to Bruce Babbitt | 173 |
| 21-B | Letter to Bruce Babbitt | 173 |
| 22 | Proposed Palmyra Atoll and Kingman Reef National Wildlife Refuges | 178 |


INFORMATION TO BE SUPPLIED:
(NONE)

Exhibit 5 to Def.'s Reply Brief
KRAI v. US, No. 06-828L (Fed. Cl.)



CHARLES COOK,
having first been duly sworn, was
examined and testified as follows:

EXAMINATION

BY MS. CANNATA:
Q. Good morning, Mr. Cook. My name is Therese Cannata, and I represent the plaintiff in this action. You've been subpoenaed here today, and I have marked as Exhibits 1 and 2, a copy of which I'm going to hand you now, the notice of deposition and your subpoena, and I want to just confirm that you're here pursuant to subpoena.

(Whereupon, the above-referenced documents were marked by the certified shorthand reporter as Plaintiff's Exhibits 1 and 2, for identification only, copies of which are attached hereto, and will become a permanent part of this record.)

BY MS. CANNATA:
Q. And I also understand your counsel is concurrently voluntarily producing you in the event there's any irregularity in the subpoena?
MS. CANNATA: Is that right?



MR. FOGG: That's correct.
BY MS. CANNATA:
Q. Let me -- have you ever had your deposition taken before?
**A. No, I haven't.**
Q. All right. Let me go over -- I'm sure your attorney has gone over this with you, but -- and you're represented here by Mr. Andrew Fogg?
**A. Fogg. That's correct.**
Q. And I'm sure he's gone over this, but let me go over a few of the basics with you. There is a court reporter here taking down everything that we say. That means we have to speak one person at a time.
**A. Okay.**
Q. From time to time there will be questions asked and your counsel may intervene with an objection, other counsel present may intervene with an objection. At that point, we all have to sort of let them state their objection. You have to wait. I have to wait. We respond and so forth, but it's always one at a time so the court reporter can get down everything that we say.
**A. Okay.**
Q. You need to state yes and no or maybe or some words, but nodding will not be recorded. Gestures will not be record. If you're pointing to something, I'll so



indicate that for the record, but generally "huh-uh" doesn't work either. It has to be a clear answer in some way or another.
We are in a formal setting, meaning the transcript will be provided to you at some point. You'll be allowed to review it. However, as I ask questions, please make sure that you understand what I'm asking. If you don't, I'll be happy to rephrase it. It is not my intent to ask questions that are unclear or to get unclear answers. So we're trying to get your most accurate recollection here.
**A. Okay.**
Q. And it's very important that you make sure you understand my question before answering because later on, even if you make corrections, I can comment on those at trial. So it's important that we're on the same page here.
**A. Okay.**
Q. I'm going to be marking documents from time to time, and the court reporter will mark them, and he will hand them to you, and we'll say something to you. We'll say either, "Look at all of it," or "Look at a certain page" and so forth, and your counsel may intervene and say, "I would like you to look at the entire document."
It is your right as a witness, I think, to read



the entire document in any instance. So even if I say "Look at page 5," if you need to look at the whole document, you need to just say that's what you want to do so you have the proper context to answer the questions.
**A. Okay.**
Q. There are -- you're welcome -- there is one level of informality in depositions that's different from trial, that is, you can ask for a break when you need to to just take a stretch, talk with your counsel, call your office or whatever. We will try to break about every hour to hour and a half to let people stretch for about five minutes, but in terms of a formal break, that won't happen until the lunch hour.
**A. Okay.**
Q. The only thing I ask is that you not ask for a break in the middle of a question, meaning I've asked a question, give the answer, and then we break unless it's an issue of privilege and your counsel will show you the path on that one.
Let's see. I'm trying to think if there is anything else. Are you taking any medications which might impair or affect your ability to recall and accurately testify here today?
**A. No.**
Q. Is there any reason why you think you cannot

Exhibit 5 to Def.'s Reply Brief
KRAI v. US, No. 06-828L (Fed. Cl.)

A1007EE
CHARLES COOK MARCH 26, 2007

proceed here today?
A. No.
Q. All right. For the record, and by discussions with both counsel present here, we're going to simultaneously convene the deposition of you personally as a percipient witness in this case as well as you, Mr. Cook, as a designee of the Nature Conservancy on some topics that we'll go over with in Exhibit 2.
We note for the record that plaintiffs are not waiving their right under the Federal Rules of Civil Procedure to take a deposition for up to seven hours of a witness, but I don't think it's going to take 14 hours, meaning two depositions, seven hours each. I think that our purpose here is to convene them simultaneously so we can complete this deposition in one day.
A. Okay.
Q. So any questions before we proceed?
A. No.
Q. All right. Mr. Cook, would you please take a look at Exhibit 1, and I just want to confirm that you're here pursuant to a subpoena. Is that accurate?
A. Oh, other documents. All right.
Q. Yep.
A. Looks good.
Q. You're here pursuant to the subpoena?

Page 10

A. Yes, I am.
Q. Now, would you look at Exhibit 2.
A. Okay.
Q. I want to ask you if you've seen Exhibit 2, and I want to call your attention to -- I'm sorry. It is Exhibit 2, and I want to call your attention to page -- it's not going to be on the page. It's going to be topics of inquiry and unfortunately someone didn't put page numbers on this. It's Exhibit A, and past the subpoena you see Attachment A, and go a little further, and there's topics of inquiry. There are 11 topics of inquiry. Have you looked at these prior to today?
A. Yes.
Q. All right. Are you prepared to testify about these topics today to the best of your ability?
A. To the best of my knowledge, yes.
Q. Are you the sole designee of the Nature Conservancy on these topics of inquiry, meaning is there anybody else that also has knowledge that has been designated?
A. I don't know of anyone else.
MR. FOGG: He is the sole designee.
BY MS. CANNATA:
Q. We'll come back to this in a little while, but what I first want to do is go over a little bit of your

Page 11

educational and work history. First of all, could you please state your full name for the record.
A. Charles William Cook, Jr.
Q. And what is your business address?
A. 111 West Topa Topa Street. That's two words, T-o-p-a T-o-p-a, Ojai, California, O-j-a-i, 93023, and you can put the Nature Conservancy in there. I forgot that.
Q. All right. And briefly what is your educational history post high school?
A. I have an undergraduate degree and a BS degree in animal science and an MS degree from the University of Tennessee, both degrees, and add biology and ecology.
Q. All right. And what year did you receive your MS?
A. '76.
Q. Okay. And let's now look -- was there anything further educational?
A. No.
Q. Degrees or certifications?
A. No.
Q. Okay. So let's move to your work history. If you could briefly summarize your post-college work history.
A. The first job was with the state of Tennessee

Page 12

involved in the Department of Conservation in the Scenic Rivers program. Around 1981 I started with the Nature Conservancy as the assistant state director of the Tennessee Nature Conservancy, and in 1982 became the director of the Tennessee Nature Conservancy.
I think in 1986 I moved to Texas, and I was director of land acquisition and protection for Texas and did that until 1990 where I took a sabbatical with the Nature Conservancy and traveled around the Pacific islands for six months, and at that time decided to work with the Hawaii program, and we launched what we call the Asian Pacific program of the Nature Conservancy, and I moved to Palau, Micronesia.
Q. What year was that?
A. Pardon me?
Q. When did you move?
A. I think it was 1990.
Q. 1990. Okay. How do you spell Palau?
A. P-a-l-a-u; Palau, Micronesia. And then during that period overseas I began working in Indonesia as well and lived in Jakarta, Indonesia and Palau half time each year between '90 and '97.
Q. Okay.
A. I moved to Oakland, California; and that's when we got involved with the Palmyra project, and I became

Page 13

Exhibit 5 to Def.'s Reply Brief
KRAI v. US, No. 06-828L (Fed. Cl.)

transaction kept at the San Francisco office while you were working as the director of the Palmyra Atoll project?
A. **No. I think the records were at my office.**
Q. In Oakland?
A. **In Oakland.**
Q. And when you closed down that office, what did you do with your records?
A. **I think I told you Mr. Mackinnon had the records.**
Q. So did you arrange for those records to be shipped over to Ms. Mackinnon who was in the San Francisco office, or was she in Oakland?
A. **She was in San Francisco.**
Q. Did you arrange for your records to be shipped over to Ms. Mackinnon?
A. **I think they were boxed over. I don't think there were that many records, and I think they were put in boxes and carried over.**
Q. Can you give me an estimate how many boxes?
A. **I don't remember.**
Q. Would you say under a dozen?
A. **I don't remember. I may not have even done it. It could have been done by the staff.**
Q. Did you have a staff person in the Oakland



office?
A. **No, I didn't.**
Q. So someone would have had to come over --
A. **From the San Francisco office.**
MR. FOGG: Let her finish her question.
BY MS. CANNATA:
Q. And I'll tell you why I'm inquiring. From your answer, it would suggest that there was correspondence showing offers to purchase for certain prices and yet I've not seen any of that from the TNC production.
MR. FOGG: Actually, Counsel, the documents that were produced by TNC -- all of the correspondence regarding offers — the letters in the two boxes that include correspondence with regard to offers, rejections, counteroffers, all the documents they had were produced.
MS. FITZGERALD: Can I just make a comment on the record on the Fish and Wildlife Service Production in this case? It has been with respect to Kingman Reef not Palmyra Atoll, which has been made clear to plaintiffs and Judge Kurren over the past year and a half as we produced initial disclosures from the Fish and Wildlife Service.
MS. CANNATA: I don't want to take time on the record with that. We'll deal with that later.
Q. Let me ask a -- if you don't mind, I want to



take about a two- or three-minute break.
MR. FOGG: Sure.
(Whereupon, a recess was taken.)
MS. CANNATA: We're back on the record here.
Q. I just want to ask you a couple of quick follow-up questions on documents. Did you maintain a personal file — a working file or something like that on the Palmyra Atoll acquisition?
A. **No.**
Q. And was there a distinction between files that were maintained for the acquisition versus files maintained as your director of the Palmyra Atoll project?
A. **No.**
Q. How do you define the Palmyra Atoll project? What does that encompass?
A. **The project encompasses -- we usually look at things on a biological or oceanographic system. I would say Palmyra Island is 675 or so emergent land acres from an ecological system. It has lagoons and coral reefs.**
Q. And the project is defined by that? Meaning — I wasn't asking you to tell me geographically, but what was the Palmyra project?
A. **Pretty much as I described it to you.**
Q. It references a particular geographic location?
A. **I would say more biological or oceanographic.**



**So it's the emergent land. It's lagoons, and it's the coral reefs.**
Q. Were any other islands involved -- islands or atolls involved in the Palmyra project?
A. **No.**
Q. What about Kingman Reef? Are you familiar with that?
A. **I am familiar with it.**
Q. Did you consider that to be in the Palmyra project as you were directing it at the TNC?
MS. FITZGERALD: Can you please say that.
THE WITNESS: No.
Sorry. I've got to get used to it. I do eye contact.
BY MS. CANNATA:
Q. Tell me what you know about the Kingman Reef, if anything?
A. **Most of what I know about it is biological. I know it's about 30 miles from Palmyra. I know that it is a much smaller system. When I say "system," not much land. I think there's a sandspit out there. I think there's a single lagoon, and I think there's a -- I don't know if you call it a barrier reef or coral reef that's associated with it.**
Q. Have you ever visited Kingman Reef?

Exhibit 5 to Def.'s Reply Brief
KRAI v. US, No. 06-828L (Fed. Cl.)

A. No.
Q. Did you ever go by it when you were going to Palmyra?
A. I've flown over it. It's only 30 miles. You can see it from the air on a clear day.
Q. Did the TNC ever have an interest -- strike that.
Did the TNC ever have an interest in purchasing the Kingman Reef?
A. No.
Q. Did you ever inquire with the Fullard-Leos if they were interested in selling the Kingman Reef?
A. No. It was the other way around.
Q. What do you mean by that?
A. Peter Savio informed me that they owned Palmyra and Kingman Reef and that it might be for sale.
Q. After -- when did he inform you of that?
A. I don't recollect.
Q. How did the topic come up?
A. I think we were talking about Palmyra and its ownership status, and he mentioned to me they paid property taxes on Palmyra and Kingman Reef at certain times in its history.
Q. Did he indicate they were then paying property taxes at that time?



A. I'm sorry?
Q. Did he indicate -- you said "certain times in history." What times in history?
A. He just said they paid property taxes.
Q. Who else was present when Mr. Savio said that Kingman Reef might be for sale?
A. I don't recall, but he and I had many lunches one-on-one, and my guess was it was one-on-one.
Q. And after he said it might be for sale, did you pursue it at all? Did you respond in any way?
A. Not that I recall. You have to -- my mind-set, after he told me that the family owned both, was to respect what he said, honor what he said, and assume good intent.
You've got to remember, my job was to see through a successful acquisition of Palmyra Atoll, and from my experience, the way you do that is that you keep a very good working and business relationship with the landowners and their representatives.
My business was to acquire Palmyra, first of all. Second of all, my business was to maintain good relationships with the family and their representatives, and so I do that usually by assuming good intent and good faith that what they tell me is true unless otherwise proven not true. A working relationship is very



important in these acquisitions.
Q. So I think my question was -- I understand what you're saying. I'm not sure if that's exactly what I was asking. We may not be on the same page.
A. Okay.
Q. After he said the Kingman Reef was possibly for sale, did you -- how, if at all, did you respond specifically? I understand what your intent in responding was, but how specifically did you respond?
MR. FOGG: I think it's ambiguous. If you can clarify, respond to whom?
BY MS. CANNATA:
Q. Well, I don't know. That's the point. How, if at all, did you respond? You might have gone back to your headquarters. You might have spoken to Savio.
A. I don't remember responding.
Q. Okay. Did you have discussions with anyone concerning the purchase of Kingman Reef after Mr. Savio said it might be for sale?
A. There was a discussion with the Fish and Wildlife Service who asked for Nature Conservancy assistance to acquire Palmyra and that they were going to work with the military and Navy to try to get the property transferred to them or, I believe, a long term management agreement.



Q. With respect to Palmyra?
A. With respect to Kingman. They asked -- you want me to repeat that?
Q. Sure.
A. They asked the Nature Conservancy to help them on the acquisition of Palmyra from the Fullard-Leo family, and they said they were working on the acquisition of Kingman Reef either through transfer of the title through the military or a long-term management agreement.
Q. With whom?
A. With the military or Fish and Wildlife Service.
Q. When did they tell you that?
A. It was Robert Smith in a phone call, and I do not recollect when it was.
Q. Was it before you purchased Palmyra or TNC purchased --
A. It would have definitely been before.
Q. Would you say it would have been before serious negotiations for Palmyra were underway?
A. I don't remember that.
Q. Let's look at some documents. If you could take a look at this document which I'll indicate for the record is a memorandum dated August 19, 1991 from -- let's see -- to the Palmyra Atoll file, and then there's

the Secretary of the Department of Interior, Mr. Babbitt concerning the Palmyra purchase?
**A. One.**
Q. One time?
**A. One.**
Q. And that was the meeting?
**A. That's correct.**
Q. No phone calls?
**A. That's correct.**
Q. No e-mails?
**A. That's correct.**
Q. And beyond that then, your principal contact was Mr. Robert Smith, and Georgia Shirilla?
**A. That's correct.**
Q. Is there anyone else you can think of that you would have had any contact of significance with that you haven't mentioned so far concerning the Palmyra acquisition or the Palmyra project?
**A. I don't recall anyone. Oh, excuse me. Mr. Dan Ashe.**
Q. And what organization or entity was he with or department?
**A. He was the -- I think Deputy Director of the U.S. Fish and Wildlife Service.**
Q. And what, if anything, did you discuss with

Page 50

Mr. Ashe?
**A. Issues related to fishing in a National Wildlife Refuge. And the future use of Palmyra and the National Wildlife Refuge.**
Q. Now, turning to Robert Smith and your contact with him, I can see by the documents you had a fair amount of contact concerning the project?
**A. I'm sorry?**
Q. You had a fair amount of contact with Robert Smith concerning the Palmyra project?
**A. That's correct.**
Q. And did you also discuss with Mr. Smith anything concerning the Kingman Reef other than what you mentioned in that one phone conversation?
**A. No.**
Q. So the only time you ever had any discussion of the Kingman Reef with Mr. Smith would have been that one phone conversation you've already testified to; is that correct?
**A. I can't say that for certain. I think from the business and substance standpoint, what I heard from him was, "You go try to acquire Palmyra and help the Fish and Wildlife Service. We're going to work on Kingman Reef with the Navy."**
**And there may have been conversations, but I**

Page 51

**don't think they were of substance.**
Q. Okay. And so the way it was -- and did Mr. Smith indicate that you should let Mr. Savio know that the government didn't acknowledge the Fullard-Leo family ownership interest?
**A. He didn't ask me to send any message for the Fish and Wildlife, and that's not my responsibility.**
Q. Did you ever tell Mr. Savio that Mr. Smith had shared with you that the government doesn't recognize their ownership interest -- let me rephrase that.
Did you ever tell Mr. Savio in your discussions with him -- and I take it at the foundation point you had a number of discussions with Mr. Savio; is that correct?
**A. That's correct?**
Q. And a number of meetings with him?
**A. That's correct.**
Q. Did you ever, at any of those discussions or any of those meetings, tell him about the conversation you had with Mr. Smith concerning the Kingman Reef?
**A. I don't remember what I told him. As I tried to explain earlier, my business was to try to successfully acquire Palmyra Atoll. The Nature Conservancy did not have a dog on Kingman Reef. To me that was background noise. That was not part of my focus objectives, and so I wasn't concerned with it. From a Nature Conservancy's**

Page 52

**perspective we had one concern, and that was the successful acquisition of the Palmyra Atoll.**
Q. Okay. My question is -- and I just want to make sure, you said you cannot recall -- as you sit here now, you cannot recall having a conversation or telling Mr. Savio about your conversation with Mr. Smith concerning the Kingman Reef; is that correct?
**A. That's correct.**
Q. Okay. Did you ever ask Mr. Savio whether or not the owners or -- strike that.
Did you ever ask Mr. Savio whether or not the Fullard-Leos would be interested in dedicating the Kingman Reef for conservation?
**A. I don't remember that.**
Q. Did you ever have a conversation with him concerning that general topic?
**A. I may have had a conversation because we were interested in the conservation of all Pacific atolls.**
Q. In what context?
**A. I don't remember. I said I may have. I don't recall specifically. What I would add to that question is that the threat to Palmyra Atoll was very high. It has a runway, 65,000-foot airstrip.**
Q. The threat?
**A. The threat to its conservation status. It has**

Page 53

A1007EE
CHARLES COOK MARCH 26, 2007

Exhibit 5 to Def.'s Reply Brief
KRAI v. US, No. 06-828L (Fed. Cl.)

identification only, a copy of which is attached hereto, and will become a permanent part of this record.)
THE WITNESS: I'm sorry. There it is. June of '93.
BY MS. CANNATA:
Q. And also at the top there's some sort of handwriting. I think it says 6/18/93, but I don't know.
**A. I do not recall seeing this document.**
Q. All right. All right. I'll give you another exhibit. Let me ask a question -- a quick question. Do you ever recall talking to Mr. Taketa about the Palmyra project?
**A. Certainly. He was my boss --**
Q. Did you ever talk to him --
**A. -- for a while. I knew him quite well.**
Q. Did you ever talk to him about the acquisition of the Palmyra property?
**A. We talked mostly about values. He was more interested in what it was worth and what we were paying.**
Q. What about Dr. Maragos? Did you talk to him about -- I'm not talking about a particular document, but just about the acquisition of the Palmyra property.
**A. I don't remember exactly. Jim had left us. I think he was working with the Fish and Wildlife Service**

Page 66

**when I started talking with Mr. Savio in '97. We did ask him to help us write up some papers about the biological values, conservation values of Palmyra Atoll. He's one of the best coral reef scientists on the planet earth.**
Q. Did you ever discuss the Kingman Reef with Mr. Taketa?
**A. Not that I recall.**
Q. What about Mr. Maragos -- Dr. Maragos?
**A. Probably some of the ecological attributes.**
Q. Okay. Let's mark another one. This is Exhibit 6. This is a document -- it seems to date back to October of 1991 by the director.
(Whereupon, the above-referenced document was marked by the certified shorthand reporter as Plaintiff's Exhibit 6, for identification only, a copy of which is attached hereto, and will become a permanent part of this record.)
THE WITNESS: Are you sure that's not '97?
BY MS. CANNATA:
Q. '97. Excuse me. So this might be around the time you were involved. I want to know if you've ever seen this document prior to today. I'll indicate it was produced by the TNC files?
**A. This document looks familiar.**

Page 67

Q. All right. So you think you've seen it prior to today?
**A. I think I have.**
Q. Is that your handwriting on it -- anywhere on it?
**A. My handwriting? That's my handwriting up on the right-hand side to Kim Harris.**
Q. And who is Kim Harris?
**A. Kim Harris is a Nature Conservancy employee who does land acquisition for the Hawaii Nature Conservancy.**
Q. And why did you forward this -- is it Ms. Harris?
**A. To Kim Harris.**
Q. Is it a man or woman?
**A. It's a woman.**
Q. Why did you forward this to Ms. Kim Harris?
**A. I don't remember, but from reading the letter here, I would say to express concerns about possible contamination problems, raises a red flag, and I would talk to Suzanne Case and other acquisition people, Kim, my colleague.**
Q. Is Ms. Harris a part of the legal team, or where does she fit in?
**A. She's a land acquisition specialist.**
Q. And what does that mean in TNC language?

Page 68

**A. That means she acquires property for the Nature Conservancy. So she knows all the legal issues, transactional issues, valuation issues, title opinion, hazardous waste, all the A through Z's that we deal with when we acquire a piece of property.**
Q. And is she an attorney or --
**A. I don't think she is.**
Q. Her expertise is in the whole area?
**A. I don't think she is an attorney.**
Q. The reference here is a preliminary project proposal for the establishment of the Palmyra Atoll National Wildlife Refuge and the Kingman Reef National Wildlife Refuge. Do you see that?
**A. Yes, I do.**
Q. And was it your understanding that something was going to happen with the Kingman Reef in this time period -- in the 1997 time period?
MS. FITZGERALD: I just want to object to foundation. This is not a document that seems to be generated or produced by the Nature Conservancy.
MS. CANNATA: It was produced by --
MS. FITZGERALD: But it wasn't drafted by a Nature Conservancy person.
MS. CANNATA: I understand.
Q. Do you want me to repeat the question?

Page 69

Exhibit 5 to Def.'s Reply Brief
KRAI v. US, No. 06-828L (Fed. Cl.)

A. Sure.
Q. I referenced the subject matter -- the preliminary project proposal for the establishment of the Palmyra Atoll National Wildlife Refuge and the Kingman Reef National Wildlife Refuge. Did you understand from this memo that something was going to be happening with the Kingman Reef in this 1997 time period or something was proposed to happen to it?
**A. Well, I go back to my conversation with Robert Smith. He asked the Nature Conservancy to acquire -- work on the acquisition of the Palmyra Atoll while they were going to be working on the acquisition of the Kingman Reef with the Navy. So yes. I was aware that something was going on.**
Q. And why -- if you know, why was the Department of Interior trying to acquire the Kingman Reef?
**A. I don't know.**
Q. Did Mr. Smith tell you?
**A. I don't remember him telling me exactly. I inferred that it had high conservation value.**
Q. Why did you infer that?
**A. Because it's a very important ecological area.**
Q. The Kingman Reef?
**A. Yes, it is. Fish and Wildlife Service is very interested in seabirds, and I think they actually have an**



**outer Pacific island refuge system. So it wouldn't surprise me if they were interested in outer Pacific islands.**
Q. When you made the evaluation that the Kingman Reef had no particular ecological or environmental threats going on there, did you base that on a review of anything written by anyone?
**A. Just my instincts.**
Q. Just your instincts. Did Mr. Smith tell you he anticipated a potential title dispute with the Fullard-Leo family concerning the Kingman Reef?
**A. No.**
Q. Did he indicate to you that the Department of Interior, the Fish and Wildlife Service had concerns about a potential title dispute with the Fullard-Leo family?
**A. I don't remember that conversation, no.**
Q. Okay. Let's look at another exhibit. Before we leave this, let me ask you a quick question. Maybe it won't be quick. I don't know.
You said that Mr. Smith said that Nature Conservancy would work on acquiring Palmyra, and the Field and Wildlife Service would work on acquiring Kingman Reef. So the question I have is, once the Nature Conservancy was going to acquire the Palmyra, what



were you going to do with it? Were you going to continue to own it? Turn it over to the Field and Wildlife service? What was your understanding how it was to be acquired and then transferred, if at all?
**A. Well, our preferred option was to acquire the Atoll and get Fish and Wildlife Service to buy part of it back, but -- which is exactly what happened over time, but the reality is that we bought the atoll without any assurances from Congress that they were going to appropriate money to the Fish and Wildlife Service for Palmyra.**
**And so we were fully aware of the risk involved that we were going to pay $30 million, and we may or may not get any money back from Fish and Wildlife, but because it's so isolated and inaccessible, we were definitely hoping to have a partner to share the management and transportation and logistic responsibilities with. It was our hope but not our guarantee.**
Q. So you were looking for a partner to share the acquisition cost, but also a partner to share some of the long-term management expense?
**A. Absolutely.**
Q. Did the Fish and Wildlife Service ultimately become a partner in terms of management?



**A. Yes.**
Q. In what sense?
**A. Well, they had provided a lot of biologists to help with the problem we have there with the Pisonia tree, P-i-s-o-n-i-a, native Pisonia forest, which has got some stress and mortality issues, and they have helped on the science and the management aspects.**
**They -- the federal government, presumably Fish and Wildlife Service owns the submerged land around Palmyra Atoll, and they would be a managing partner of the submerged land, and the Nature Conservancy's second objective above and beyond conservation at Palmyra Atoll was to use the facility for science and research, and we envisioned the Fish and Wildlife Service as a partner in that science and research effort.**
Q. Are they a partner in that at this point in time?
**A. Yes, they are.**
Q. How is it -- what's going on with it today, if you know?
**A. I haven't kept up with it. In general, I would say that it is a marine research consortium. I could tell you some of the members if you're interested.**
Q. Yes.
**A. The University of Hawaii,**