# EXHIBIT 1

ND14/EG61/A17

___/___

Dec 6 1937

From: Commandant, Fourteenth Naval District.
To: The Judge Advocate General of the Navy.

Subject: Kingman Reef and Palmyra Island in the Pacific Ocean - Private Ownership.

Reference: (a) Judge Advocate General's letter ___ (Kingman Reef) A9-___ (371015) ___ dated 15 October 1937.

Enclosures:
(A) Pamphlet "How the Territory of Hawaii Grew and What Domain it Covers".
(B) Photostatic copy of Original Certificate of Title No. 444 dated Oct. 4, 1912.
(C) Photostatic copy of Transfer Certificate of Title No. 2116 dated Oct. 4, 1912.
(D) Photostatic copy of Transfer Certificate of Title No. 9756 dated Oct. 8, 1930.
(E) Blueprint of Map 2 of Land Court Application No. 223, Territory of Hawaii, dated Nov. 2, 1937.
(F) Photostatic copy of Commission to Mr. Lorrin A. Thurston from Island of Palmyra Copra Co. to annex "Kingman's Reef" for the United States and to claim same for above company, dated May 3, 1922.
(G) Photostatic copy of Proclamation of Annexation of Kingman's Reef and claim for the Island of Palmyra Copra Co. by Lorrin A. Thurston.
(H) Photostatic copy of Certification of Annexation of Kingman's Reef in the name of the United States and in behalf of the interests of the Island of Palmyra Copra Co., Ltd., dated May 10, 1922.
(I) Photostatic copy of letter to the Secretary of State, Washington, D.C., from Secretary-Treasurer, The Island of Palmyra Copra Co., Ltd., dated July 15, 1922.
(J) Photostatic copy of letter to the Secretary of State, Washington, D.C., from Secretary-Treasurer, The Island of Palmyra Copra Co., Ltd., dated Aug. 24, 1922.
(K) Photostatic copy of letter to The Island of Palmyra Co. from the Second Asst. Secretary of State, Washington, D.C., dated Sept. 28, 1922.
(L) Certified copy of Transfer of Property of Island of Palmyra Copra Co. to Ellen Fullard-Leo, dated Aug. __, 1922.
(M) Copy of letter from Mr. Lorrin A. Thurston to the Archives Commission, Territory of Hawaii, dated July



INITIALS APPEARING ON RIGHT HAND MARGIN INDICATE THE OFFICER SO INITIALING HAS READ AND APPROVED THIS CORRESPONDENCE

---

9, 1926.

(N) Copy of letter from Board of Commissioners of Public Archives, Territory of Hawaii, to L.A. Thurston, Esq., dated July 24, 1926.

(O) Certificate of Tax Values and Taxes Due, Palmyra Island and Kingman's Reef, owned by Ellen and Leslie Fullard-Leo, dated Aug. 14, 1922.

(P) Certificate of Tax Values and Taxes Due, Palmyra Island, owned by Alfred Dykes Cooper et al, dated Nov. 30, 1937.

(Q) Extracts from records of Land Office, Territory of Hawaii, relative to ownership of Palmyra Island.

(R) Copy of record of Land Court Title No. 223, from 1912 to 1973.

1. In reference (a) the Judge Advocate General requested information as to the private ownership of or interest in Kingman Reef and Palmyra Island as disclosed by the records of the Fourteenth Naval District, and further requested that the Commandant forward such information or copies of papers or documents bearing thereon as may be available.

2. Copies of such papers and documents are forwarded herewith as enclosures (A) to (R), inclusive, of this letter.

3. Pages 23-25, inclusive, of Enclosure (A) contain a brief but accurate history of Palmyra island and according to the records of the Land Court of the Territory of Hawaii, the ownership of Palmyra Island, with the exception of two islets, numbers One and Two, known as "Home Islets", Land Court Map No. 223, is vested in Mr. and Mrs. Fullard-Leo of Honolulu. The two excepted islets, numbers One and Two, are owned by the heirs of the late Henry ___ Cooper, former owner of Palmyra Island complete.

4. The history of Kingman Reef is given briefly as follows:

On May 3, 1922, the Island of Palmyra Copra Company, of which Mr. L. Fullard-Leo was President and his wife, Ellen Fullard-Leo, was Secretary-Treasurer, commissioned Mr. Lorrin A. Thurston of Honolulu to take possession of Kingman Reef on behalf of the United States and to claim same for the above mentioned company, (Enclosure (F)).

ND14/EG61/A17 Dec 6, 1937
Subject: Kingman Reef and Palmyra Island in the Pacific Ocean - Private Ownership.

---

Mr. Thurston landed on Kingman Reef on May 10, 1922 and carried out this commission as will be noted in Enclosures (___) and (H). Two letters were forwarded by the Island of Palmyra Copra Company to the Secretary of State, Washington, D.C. informing him of the company's action with reference to Kingman Reef. (Enclosures (I) and (J)). Receipt of these letters was acknowledged by the Secretary of State but no mention was made of the company's claim to Kingman Reef for its own use (Enclosure (K)).

On August 14, 1922, the Island of Palmyra Copra Company transferred all property in its possession to Ellen Fullard-Leo. (Enclosure (L)).

Substantiation of the original visit for annexation is contained in Enclosures (___) and (___).

As will be noted in Enclosures (___) and (___), the Territory of Hawaii has continued to collect taxes on Kingman Reef from Ellen and Leslie Fullard-Leo as the alleged owners of Palmyra Island and Kingman Reef since 1923, although Kingman Reef is not accepted as a part of the Territory of Hawaii. (Page ___ of Enclosure (___)).

5. It is understood that Mr. L. Fullard-Leo is preparing to submit a claim for ownership to Kingman Reef in the near future based upon the original claim of the Island of Palmyra Copra Company, which was financed largely by himself and his wife.

[Signature Not Readable]

INITIALS APPEARING ON RIGHT HAND MARGIN INDICATE THE OFFICER SO INITIALING HAS READ AND APPROVED THIS CORRESPONDENCE

# EXHIBIT 2

ISLAND OF PALMYRA COPRA COMPANY

315 Hawaiian Trust Building,
Honolulu, T.H.

BE IT KNOWN TO ALL PEOPLE

that on the __10th__ day of May A.D. 1922, the undersigned, agent of the ISLAND OF PALMYRA COPRA CO., L___ (an Hawaiian Corporation), landed from the motor-ship "Palmyra" doth, on this __10__ day of May A.D. 1922 take formal possession of this Island called "Kingman's Reef" situated in Longitude __162 . 18__ West and in Latitude __6 . ___3__ North, on behalf of the United States of America, and claim the same for said Company.

______*Lorrin A. Thurston,*_____Agent,

The Island of Palmyra Copra Co., ____

Witnesses

____[Signature Not Readable]________

____[Signature Not Readable]________

____[Signature Not Readable]________

____[Signature Not Readable]________

____[Signature Not Readable]________

# EXHIBIT 3

COPY OF CERTIFICATION OF ANNEXATION BY L.A. THURSTON - May 10, 1922

I hereby certify that the foregoing is a correct copy of the certificate of possession of "Kingmans Reef" the original of which is deposited in a glass jar on the island of the Easterly end of the reef, together with a copy of the Honolulu Star Bulletin of May 3 and the Honolulu Advertiser of May 4, and an American flag which had first been hoisted on a pole on the island at the time of making the proclamation of possession, which with the statement of procedure is on the back of this certificate.

Statement of Procedure upon the annexation of "Kingmans Reef" to the United States of America, by and on behalf of the Island of Palmyra Copra Company, Ltd., a Hawaiian Corporation, as an agent of said company to procede on the company's motor-ship, Palmyra to proceed to "Kingmans Reef' and take possession of the same on behalf of the United States of America, and claim the same as the property of said company.

In accordance with said instructions I left Honolulu, on the "Palmyra" 28 tons displacement on May 4. Pleasant trade wind weather. Entire distance to Kingman approximately 930 miles from Honolulu.

May 9. At 12:45 P.M. sighted the breakers and shortly afterwards the island at the East end of the reef. Weather cloudy, cleared at noon. Ship ran along southeast and south side troling for fish, for about 5 miles breakers or shoal continuously along edge of interior lagoon across which at a distance of about two miles, the surf could be seen breaking heavily. Anchored in 5 fathoms and fished until 4 o'clock. Fish plentiful. At 4:00 P.M. hoisted anchor and proceeded west, looking for opening into lagoon. Heavy rain squall shut out vision and anchored in 4 fathoms on south side of reef. Rain continued with light northeast trade wind. All hands turned in. Current running about 2 to 3 knots an hour to northwest. At 11:00 P.M. discovered anchor rope had parted - cut by the coral, and ship drifting northwest at right angles to the wind. Dropped 2nd anchor in 14 fathoms of water and spent night there.

May 10. Rainy, cleared at 8 A.M. Found we had drifted northwest across the barrier reef on south side of lagoon and were at anchor in the lagoon, about a mile from 2nd anchorage and close to reef. 8 A.M. raised anchor and proceeded eastward through lagoon-breakers north side and shore water south side - - soon sighted island and surf ahead. Ran to within about 700 to 800 of island. Landed 300 feet from inner edge of reef - 46 fathoms. No bottom visible immediately along side reef. Perfectly smooth up to and onto reef, not a ripple even.

9:15 A.M. The six whitemen, Capt. Lemmel, Mate Padgett and four of our party landed. Interval of about 400 feet of shoal between lagoon and island, partly awash, with water averaging 18 inches-holes up to six feet deep. Very rough walking over wonderful growth of living oral of many species, brilliant lined anemones up to a foot in diameter of many hues and a mass of giant claims (tridacna) up to 8 inches in diameter, all opening upward, the animal being of brilliant blues, purples and greens.

# EXHIBIT 4

7 July 1987

Subj: DEFENSIVE SEA AREAS AND AIRSPACE RESERVATIONS

C. Unalaska Island Naval Defensive Sea Area, Unalaska Island Naval Airspace Reservation [32 CFR 761.3(a)(2)(x)]

3. The above Defensive Sea Areas and Airspace Reservations were established by Executive Orders in 1939 and 1941.

4. All the Naval Airspace Reservations have been suspended. The Honolulu Defensive Sea Area and the Kingman Reef, Kiska Island, Kodiak Island, Unalaska Island, Wake Island (except for entry of foreign flag ships and nationals), and Kaneohe Bay (portion beyond a 300 yard buffer zone) Naval Defensive Sea Areas have also been suspended. See 32 CFR 761.4(d)(2), (6), (7). These suspensions were directed by the Chief of Naval Operations in 1976. See 41 Fed. Reg. 28,957 (1976). While the regulations do not specify who has the authority to reinstate the areas, as a general rule, the person with authority to suspend also has authority to reinstate. Consequently, the authority to reinstate the areas certainly lies with the CNO. The areas may be reinstated without notice at any time when the purposes of national defense require.

5. According to the Code of Federal Regulations [32 CFR Part 761], entry into these Defensive Areas (Defensive Sea Area or Naval Airspace Reservation) is controlled by the following Entry Control Commanders:

a. Chief of Naval Operations may authorize all persons ships or aircraft to enter all Pacific Defense Areas. [32 CFR 761.9(a)]

b. Commander in Chief, U.S. Pacific Fleet may authorize all persons, ships, or aircraft to enter all Pacific Defense Area. [32 CFR 761.9(c)]

c. Commander Third Fleet may authorize U.S. citizens and U.S. vessels to enter Kaneohe Bay, Pearl Harbor, Midway Island, Kingman Reef, and certain Filipino workers to enter Wake Island Defense Areas. [32 CFR 761.9(i)]

d. Commandant, Fourteenth Naval District and U.S. Coast Guard have joint responsibility for regulating movement of

7 July 1987

Subj: DEFENSIVE SEA AREAS AND AIRSPACE RESERVATIONS

shipping within and security of Honolulu Defense Area. [32 CFR 761.9(i)]

e. Senior Naval Commander in defense area may grant emergency authorization in cases of emergency or distress). [32 CFR 761.9(h)]

Further delegations of entry control, as well as delegations of authority to reinstate the areas, if they exist in internal Naval directives, are not available to us at this time.

6. The authority to enforce the Defensive Sea Area and Airspace Reservations may be exercised by Commanding Officers of the installations within the Areas. They may take appropriate action to apprehend violators and are to seek disposition instructions from the Entry Control Commander. This authority to enforce the Defensive Sea Area provides the flexibility to use local Naval units rather than rely solely upon Coast Guard units for enforcement. Further, the existence of these areas eliminates the need to establish security zones where enforcement may be accomplished by Coast Guard units only

J. P. WIESE

copy: ___(r)