Reproduced at the National Archives

LE

DEPARTMENT OF STATE

THE LEGAL ADVISER

MEMORANDUM

November 7, 1934.

811.014/312

STATUS OF CERTAIN GUANO AND OTHER ISLANDS IN THE PACIFIC

The memorandum of the Chief of Naval Operations referred to in the memorandum from The White House of October 16, 1934, lists the following islands and indicates the ownership thereof:

| | |
|---|---|
| Cocos | - Costa Rica |
| Galapagos | - Ecuador |
| Clipperton | - February 1930, King of Italy as arbiter awarded to France as against Mexico. |
| Palmyra | - United States |
| Kingman Reef | - United States |
| Fanning | - Great Britain |
| Christmas | - Undetermined. Claimed by Great Britain and United States. |
| Washington | - do. |
| Jarvis | - do. |
| Howland | - do. |
| Baker | - do. |
| Marcus | - Japan. |

The Department has received, from the Acting Secretary of the Navy, a letter of October 16, 1934, (file 811.014/311) in which reference is made to re-

quests

1103 5 of 43

(Not scanned on computer file)

EXHIBIT YI-1

Reproduced at the National Archives



United States, and shall be punished according to the laws of the United States relating to such ships or vessels and offenses on the high seas, which laws for the purpose aforesaid are extended over such islands, rocks, and keys". R. S. § 5577 authorizes the President, at his discretion, to employ the land and naval forces of the United States to protect the rights of the discoverer or his widow, heir, executor, administrator or assigns.

R. S. § 5578 provides: "Nothing in this title contained shall be construed as obliging the United States to retain possession of the islands, rocks, or keys, after the guano shall have been removed from the same."

The Department has consistently taken the position with regard to these guano islands that, as stated in its letter of July 13, 1914, to Mr. H. Melville Walker (811.0141/13), "the Government of the United States claims no sovereignty or territorial rights over such island, but merely protects citizens of the United States who discover guano thereon, in the prosecution of their enterprise, which extends only to the appropriation and disposal of guano". Similar statements were contained in the Department's letter of September 2, 1882, to Mr. Brown, and numerous other communications since that date, up to and including its letter of July 1, 1934, to Mr. Vernon Le Young Ardiff (811.014/295).

In

1103 9 of 43

EXHIBIT N-1

Reproduced at the National Archives

-4-

In the opinion of the Attorney General of May 8, 1873 (14 Ops. Atty. Gen. 608), which relates to guano islands, he states: "Upon application to the office of the Secretary of State, I am told that it has been the course of that Department to recognize such islands only while occupied for the purpose of procuring guano, and therefore upon the cessation of such occupancy they may become open again to discovery, possession, et cetera."

Although, as has been seen, the Guano Act provides that nothing contained therein shall be construed as obliging the United States to retain possession of the islands, rocks or keys after the guano shall have been removed from the same, it contains no specific provisions as to how the islands shall be released. The implication in the above statement, made by the Department in 1873 when the question of guano islands was a fairly fresh subject with it, would appear to be that after an American citizen had ceased to occupy an island for the purpose of obtaining guano it was no longer regarded by the Department as appertaining to the United States.

These guano islands were referred to by Chief Justice Fuller in his dissenting opinion in Downes v. Bidwell (182 U. S. 244, 372) as "terra nullius".

In a letter dated July 1, 1911, addressed to the

Secretary

1103 10 of 43

EXHIBIT A-1

Reproduced at the National Archives



Secretary of Commerce, the Attorney General stated in part:

> "There is nothing in the act of Congress of August 18, 1856, from which it can be said that it was intended by said act to recognize title in the discoverer" (of the guano) "or to assume on behalf of his Government complete title, but on the contrary, it is clear that the act meant only to protect the discoverer for the purpose of obtaining and shipping guano and that the Guano Islands were in no sense to become a part of the territorial domain of the United States."

The Circuit Court of the United States for the District of Maryland, in the case of Grefflin v. Navassa Phosphate Company (35 Fed. 474), took a position similar to that adopted by the Department that sovereignty of the islands was not acquired under the Guano Act and stated in part:

> "Looking to the language and purpose of the act of Congress, which is entitled 'An Act to authorize protection to be given to citizens of the United States who may discover deposits of guano,' we find nothing which indicates that it was the intention of Congress to claim title to or to recognize in the discoverer, who was to be protected in the exclusive occupancy of the island for the purpose of obtaining and shipping guano therefrom, any title to the land; on the contrary, the provisions of the law entirely negative any idea that such islands were in any sense to become part of the territorial domain of the United States. It is clear that the United States extends its protection to the discoverer and his assigns solely to enable him to obtain the guano. The act of Congress does not authorize or countenance the establishment of any form of governmental authority or local tribunal; it does not look to colonization or permanent settlement. It treats these islands, as in fact they are, as unsuited for

permanent

Reproduced at the National Archives



permanent settlement by civilized communities, and as only temporarily occupied for the purpose of obtaining the guano. In order that while thus temporarily occupied by citizens of the United States the occupants may not be without some lawful means of suppressing disorders, the act provides that all offenses or crimes committed by persons who may land on any such island or in the waters adjacent thereto shall be deemed to have been committed on the high seas on board a merchant vessel of the United States, and be punished according to the laws of the United States relating to such vessels and offenses on the high seas. It seems to us impossible to escape the conclusion that all that was intended was to afford governmental sanction and protection to the exercise of a commercial privilege, by which guano might be obtained and furnished for the use of agriculture in the United States. * * *"

An examination of the debates in the Senate at the time the bill, which later became the Guano Islands Act, was under consideration discloses that those in charge of it did not consider that sovereignty would be acquired of the guano islands by the act. Senator Seward who proposed the bill stated in part:

"The bill itself then provides that whenever the guano shall be exhausted, or cease to be found on the islands, they should revert and relapse out of the jurisdiction of the United States."

Senator Mason stated:

"These guano islands, it is well understood, have no value in the world except for the deposit on them - what has been put there by the birds. The bill provides that, when the deposit is removed, if it ever shall be, the title of the United States shall cease, and the islands be abandoned." (Congressional Globe, 34th Congress, 2d Session, 1856, page 1740)

Of course, where the United States, under the conditions set forth in the act, has recognized that a guano

island

1103 12 of 43

EXHIBIT A-1

Reproduced at the National Archives



> "By the law of nations, recognized by all civilized states, dominion of new territory may be acquired by discovery and occupation, as well as by cession or conquest; and when citizens or subjects of one nation, in its name, and by its authority or with its assent, take and hold actual, continuous and useful possession, (although only for the purpose of carrying on a particular business, such as catching and curing fish, or working mines,) of territory unoccupied by any other government or its citizens, the nation to which they belong may exercise such jurisdiction and for such period as it sees fit over territory so acquired."

As has been seen above, the extent of the actual occupation and use of the three islands by American citizens is somewhat uncertain. In any event, such occupation and use by Americans as may have existed, ceased probably 50, 60 or more years ago. It is obvious, therefore, that they have not held actual and continuous useful possession. If, since their abandonment by the Americans, they had been taken over by the British and occupied continuously, it would be difficult at this late date to assert very forcibly a claim. If, as appears from the report of the expedition of the U.S.S. TANGAR and WHIPPOORWILL in 1924, the Islands are now uninhabited and not used for any purpose, they might be regarded as now abandoned and the present British claim would be no better than our own to the Islands. They would, therefore, appropriately be the subject of discussion with the British Government.

In

EXHIBIT M-1

Reproduced at the National Archives



PALMYRA

Palmyra (Palmyros) or Samarang Island is an island 5 2/3 x 5 1/2 miles square, situated about 963 miles south of Honolulu and 33 miles south of Kingman's Reef. It was discovered by Captain Sawle of the American vessel PALMYRA on November 6 or 7, 1802.

Captain W. W. Taylor, in an affidavit of February 12, 1859, relating to the discovery of guano on a number of Pacific Islands, listed both Palmyros and Samarang Islands with a slight difference in longitude and latitude. Both of these islands, as listed by Captain Taylor, are covered by Bond No. 9 of February 8, 1860, filed by the United States Guano Company, and both Islands appear on the Treasury Department's lists of guano islands appertaining to the United States. On the list of August 23, 1867, there is also a notation that a certificate for these islands was issued to the United States Guano Company. No other evidence of issue of such certificate has been found. Samarang, it seems, is another name for Palmyra.

No evidence has been found to indicate that either the United States Guano Company or the American Guano Company, whose agent is reported to have taken possession of the Island in 1859, ever occupied the Island for the purpose of moving guano or for any other purpose.

It

1103 29 of 43

EXHIBIT A-1

Reproduced at the National Archives



It appears that in the latter part of the 1850's, Captain Zenas Bent and J. Wilkinson, naturalized citizens of Hawaii, settled on Palmyra Island and made improvements on it. In 1862 they petitioned the Hawaiian Minister of the Interior to extend sovereignty of the Hawaiian Kingdom over the whole Island and, on February 26, 1862, the Hawaiian King issued a letter of authority authorizing Bent to take possession of the Island as Hawaiian territory. This he did on April 15, 1862, while sailing on the Schooner LOUISA, leaving a notice to that effect in a bottle on the Island. In addition he built a dwelling house there and a curing house for bêche de mer. A proclamation was issued by the Hawaiian Minister of the Interior on June 18, 1862, claiming that possession had been taken of the Island and that it is "henceforth to be considered and respected as part of the Domain of the King of the Hawaiian Islands."

Since 1862 Palmyra Island has been owned by citizens or corporations of Hawaii, and the conveyances of the Island have all been duly recorded in Honolulu.

It was included in the list of Hawaiian Islands and dependencies transmitted to the Secretary of State by Mr. Carter, Commissioner of the Hawaiian Provincial Government in February, 1893, and also in a similar list compiled by the Commission appointed by the President pursuant to

Public

EXHIBIT A-1

1103 30 of 43

Reproduced at the National Archives



Public Resolution No. 51, approved July 7, 1898, entitled "Joint Resolution to provide for annexing the Hawaiian Islands to the United States." The Joint Resolution itself, however, does not mention the islands by name, but refers to the Hawaiian Islands and its dependencies.

It is clear that Palmyra was under the sovereignty of the Hawaiian Government in 1898 and became, therefore, a possession of the United States upon the annexation of the Islands.

On May 10, 1923, the Department, in a letter to the Frontier Press Company (811.014/88) stated:

> "Palmyra Island legally passed under the full sovereignty of the United States upon the annexation of the Hawaiian Islands by this country which took place on August 12, 1898. Palmyra Island now forms a part of the territory of Hawaii."

The substance of this statement has been repeated from time to time since that date.

The Pacific Island Pilot (1920), Volume III, page 215, published by the Hydrographic Department of the British Admiralty, states that Palmyra Island was "formally annexed to Great Britain by Commander Nichols, H. M. S. CORMORANT on the 28th of May, 1889, in view of the possibility of its adoption as a landing station for the Pacific cable. It was surveyed for that purpose, but Fanning Island having been found a more suitable place for this cable station, Palmyra was abandoned, and has since 1898 been in the

possession

EXHIBIT N-1

1103 31 of 43

Reproduced at the National Archives



possession of the Government of the United States of America."

In the 1932 Statesman's Yearbook, page 426, Palmyra Island is labeled as a British possession. However, in the British Foreign Office publication of 1920 entitled "British Possessions in Oceania", No. 144, page 24, it is noted that the United States claims the Island. The "Dominions Office and Colonial Office List of 1934" which purports to list the various British possessions, does not mention Palmyra. It is improbable that Great Britain would attempt to assert any claim to the Island at this date.

EXHIBIT N-1

1103 32 of 43

Reproduced at the National Archives



KINGMAN'S REEF
(Kingman, Maria Shoal, Caldeu Reef, "Dangers Rock")

Kingman's Reef is situated about 33 miles north of Palmyra Island. At high tide it is submerged, save possibly for a few hundred square feet.

This Reef is said to have been first seen and reported by Captain Kingman on the American ship SHOOTING STAR.

It was included in Captain Taylor's list of alleged guano islands of February 12, 1857, under the name of "Dangers Rock" and was bonded by the United States Guano Company on February 8, 1860, and "Danger" or "Dangers" Rock appears in the lists of guano islands appertaining to the United States, compiled by the Treasury Department, with the usual notation on the list of August 23, 1867, that a certificate for it was issued to the United States Guano Company. There is no other record of such a certificate having been issued and it seems almost certain that no guano was ever removed from the Island.

On July 15, 1922, the Island of Palmyra Copra Company, a Hawaiian Corporation, notified the State Department that it had annexed Kingman's Reef in the name of the United States and for its own use on May 10, 1922.

No other action appears to have been taken with respect to the incorporation of the Island into the territory of Hawaii or the United States. (See Ex Order #6935 12-29-34 putting it under Navy Dept.)

While

1103 33 of 43

EXHIBIT N-1

Reproduced at the National Archives



While it does not appear that any other country has claimed Kingman's Reef, it might be well for this Government to take some affirmative action to show definitely that it is a part of the territory of the United States. The mere mention of it in an Act of Congress as American territory would be sufficient.



EXHIBIT A-1

DECLASSIFIED
Authority EO10501
By JW NARA Date 7-24-02

Reproduced at the National Archives

ADDRESS REPLY TO
THE SECRETARY OF THE NAVY
AND REFER TO INITIALS
AND No.
(SC)A21-5

NAVY DEPARTMENT
WASHINGTON

Division of FAR EASTERN AFFAIRS FEB 15 1936 Department of State

1936 FEB 14 AM 10 51

FEB 13 1936

Confidential

Office of the Economic Adviser FEB 18 1936 DEPARTMENT OF STATE

DIVISION OF COMMUNICATIONS AND RECORDS FEB 18 1936 DEPT. OF STATE

HISTORICAL ADVISER

LEGAL ADVISER FEB 17 1936 DEPARTMENT OF STATE

Sir:

For your information I am forwarding a copy of a confidential letter just received from the Commandant of the Fourteenth Naval District relative to the ownership of Palmyra Island and Kingman's Reef.

811.014/433

Respectfully,

H. L. Roosevelt

Acting Secretary of the Navy

Incl.

The Honorable,

The Secretary of State.

DIVISION OF WESTERN EUROPEAN AFFAIRS FEB 20 1936 DEPARTMENT OF STATE

FILED FEB 24 1936

H/LP

TREATY DIVISION FEB 24 1936 DEPARTMENT OF STATE

File

1021 1 of 3

~~1007~~

EXHIBIT K-6

DECLASSIFIED
Authority EO10601
By JW NARA Date 7-24-02

Reproduced at the National Archives

ND14/Palmyra
(139)

CONFIDENTIAL

Secret-Confidential File
RECEIVED
FEB 10 1936 13
NAVY DEPARTMENT
FILE No. (SC)A21-5

PJS/LL

January 24, 1936

From: Commandant, 14th Naval District.
To : Chief of Naval Operations.

Subject: Ownership of Palmyra Island and Kingman's Reef.

Reference: (a) Letter from Intelligence Officer, 14th Nav. Dist. to Director of Naval Intelligence via Comdt. 14th Nav. Dist., Index No.102-200 file B-16, dated February 5, 1922.
(b) Letter of Intelligence Officer, 14th Nav. Dist. to Director of Naval Intelligence, via Comdt. 14th Nav. Dist. file B-16 SPK/F dated Aug. 30, 1922.

1. In the above referenced correspondence a report was made of the lease of Palmyra Island by Judge Henry E. Cooper of Honolulu to the Palmyra Copra Co. and later sale of Palmyra Island to Mr. and Mrs. E. Fullard-Leo after the failure of the Palmyra Copra Co. Mr. and Mrs. E. Fullard-Leo are still the owners of Palmyra Island and the Commandant understands that they have entered a claim locally covering the ownership of Kingman's Reef. Mr. Leo is British born but an American citizen by naturalization. Mrs. Leo is British born and has not become an American citizen.

2. The Commandant has been informed by Mr. Leo that he has been offered $80,000 for Palmyra Island by Mr. Gatty, representing an airplane operating company, probably the Pan American Airways, although this latter statement was not definitely made by Mr. Leo.

3. The above is forwarded for information of the Chief of Naval Operations, in view of the possibility of the Navy developing Palmyra Island, which will probably re-



Copy No. ........

EXHIBIT K-6

1021 2 of 3

DECLASSIFIED
Authority E.O 10601
By JW NARA Date 7-24-02
Reproduced at the National Archives

CONFIDENTIAL
F1/ND14/Palmyra (139) 24 January, 1936.

quire negotiations with Mr. and Mrs. Leo.

H. E. YARNELL.



1021 3 of 3

EXHIBIT K-6