# MEMORANDUM

TO: Palmyra Atoll file
CC: Kelvin Taketa, ~~Peter Savio~~, Robert Smith, John Ford, Georgia Shirilla
FROM: Jim Maragos
DATE: August 19, 1991
SUBJECT: Minutes of 7/26/91 meeting on Palmyra Atoll held at TNC (DRAFT)

---

1. Representatives of The Nature Conservancy, Peter Savio Realty, U.S. Fish and Wildlife Service, and M & E Pacific met at 1300-1500 hours on 26 July 1991 at the Smith Street office to discuss proposed development and conservation plans for Palmyra Atoll. An attendance sheet is attached.

2. Peter Savio reviewed the TNC letter of 17 June 1991 and offered the following comments on behalf of his firm and the owners. He also sought clarification on some of the language in the letter.

   A. The owners are nervous about collaborating with the federal government due to previous misfortunes. However, they support the development concept and do not object to USFWS/TNC involvement as long as Savio Development is involved and active. The owners do not favor a large scale development.

   B. If Savio pulls out of the project, then the owners would not want USFWS/TNC as partner for further attempts at development and conservation. The owners are concerned that the federal government may try to condemn the atoll once the feds have a foothold.

   C. The owners are also concerned that the feds will renege on an agreement to allow for development of Cooper Island.

   D. Thus, Savio suggested a "buy out" option where TNC would be reimbursed, say $500,000, to relinquish interest and compensate for commitment of resources for the Palmyra project.

   E. Savio is open to other suggestions on resolving the owners objections.

3. Savio also reviewed the status of the project planning and provided copies of preliminary planning documents prepared by M & E. He did not agree with the concept as illustrated in the M & E report because too much space was taken up for housing and the plan for Cooper Island lacked a rural 19th century character as desired by Savio. He also wants to keep the atoll "interesting" for visitors. Quality, not quantity (number of units) is the goal.

4. Savio's arrangement with the owners is a 75 year lease with an option to buy within the first 5 years (4 years left). The owners also retain an "escape" clause which remains in effect for 3 years (2 years left). The owners would no longer be involved after Savio buys the atoll.



EXHIBIT "D"

EXHIBIT A

5. Both the owners and Savio envision Cooper Island being used for residential/vacation development (NTE 3 stories) with the remainder of the atoll designated as a reserve or park except for Sand Island, a small portion of Home Island, and navigation areas and anchorages in the west lagoon.. Heirs of Judge Henry Cooper may have title to the parcels on Home Island and Savio intends to buy them out. (Lease them as is or clarify what they own. no intention to buy them out.)

6. Savio doesn't want to run the park or reserve. He would like to see TNC/USFWS operate the park and he intends to raise or earmark the funds to support long-range management.

7. The big issue is Savio's mind is who controls what since two separate land "managers" will be operating jointly on the atoll. A balance needs to be achieved where one party does not have an unreasonable amount of control over the other.

8. Savio intends to sell 250+ lots for $250,000 each (approximately) to raise the funds to restore/establish infrastructure and buy the atoll from the owners.

9. Savio mentioned that the owners believe they control all reefs and the territorial seas off Palmyra Atoll and they also claim Kingman Reef, the next atoll to the northwest. The owners may be interested in dedicating Kingman Reef for conservation, (lead on selling it for that purpose) The reef has little or no dry land and is not suitable for development.

10. Savio intends to establish rules applicable to the future owners during the lease period for both ocean and land areas at Palmyra.

11. Proposed infrastructure improvements include restoring and paving the overgrown runway to accommodate Aloha Airline sized jet traffic. Savio cited an optimum load for each jet plane at about 120 passengers. Aloha is willing to fly to Palmyra once the runway is restored.

12. In working with TNC/USFWS, Savio would like to develop a plan to insure that Cooper Island development is compatible with the rest of the atoll as a reserve, and that compatible uses of the reserve by residents and authorized visitors be identified and agreed upon. The reserve and the atoll's natural resources will attract most visitor/buyers.

13. USFWS mentioned the threat of air strikes (collisions between birds and planes) if high levels of nesting continue on Cooper's runway. Savio would like to restore the old fighter strips in the south lagoon as prime nesting habitat for birds, consistent with previous high level use by nesting seabirds before the fighter islands were overgrown with vegetation.

14. USFWS pointed out that significant bird populations also occur elsewhere on Cooper Island. Maragos noted high population levels of nesting red-footed Boobies on trees lining the shoreline and large populations of black noddies in the crowns of coconut



EXHIBIT A

trees and other large trees. Sea turtle nesting on the northwest beach of Cooper Island was also acknowledged. Smaller nesting colonies of sooty terns may occupy some of the flat lagoon-facing lands south of the runway. Savio/M & E have already identified a proposed reserve area that corresponds to the turtle nesting sites.

15. Savio noted that the jet runway will need to be paved and he prefers concrete over asphalt because long-term maintenance will be less costly. Clearing of the main runway has attracted birds (ground nesters).

16. Kelvin Taketa envisioned a single conservation easement with two parts, one controlled by Savio and the other by TNC/USFWS. Stewardship zones and guidelines (for public use) need to be set up. Enforcement of guidelines or regulations is also an issue: who will do it? How? Savio mentioned that pets/alien species would be banned from the atoll. In any case, one agreement needs to be drawn up with clear obligations articulated for both parties.

17. Savio passed on other perceptions by the owners. The TNC letter appears to grant TNC power to rule from the top. They wan to explore an alternative hierarchy if Savio's development fails. The worst case scenario in the owners mind is that USFWS is part "owner" and then goes after the rest once Savio is out. Condemnation is a dirty word to the owners.

18. Kelvin Taketa acknowledged the risks to be taken by the owners and Savio indicated the need to seek permission from the owners to implement a plan as envisioned by TNC.

19. Savio indicated that the sales price for the atoll is $36 million. The owners are willing to reduce the cost to $33 million if USFWS is willing to buy. Working a deal with Savio and the owners may be a much cheaper way for TNC and the USFWS to establish strong conservation programs on the atoll.

20. Savio believes that Cooper Island offers the development potential, and it makes good economic sense to develop only Cooper Island. Somewhere between 200-300 single family lots are proposed with 2-3 bungalow hotels, one village center on the ocean side of Cooper, excluding Strawn Point. The lots would be priced at $200 - 250K each. The maximum or "design" population on the atoll at any one time is estimated at 800.

21. It is not clear at this stage what federal approvals are needed. The sewage treatment plant and outfall will probably involve permits or approvals from the Corps of Engineers and U.S. EPA. Hawaii's statehood act specifically excludes Palmyra, and a presidential executive order signed by John Kennedy gives DOI administrative jurisdiction over the atoll.

22. Kelvin raised several issues and topics for further discussion and eventual agreement:



EXHIBIT A

Transportation: people, goods, within the island
Energy
Waste Management: liquid, solid
Location for development
Types of uses

23. Savio indicated that people transportation would be primarily by boat and planes. Within the atoll, there would be a few hauling vehicles, but most transportation would be by foot or bicycle. Cars would not be allowed.

24. M & E Pacific is designing the power and wastewater systems. Injection wells, cesspools, or septic tanks are not feasible because of low elevation and nearness of groundwater to the ground surface. They are proposing a sequencing batching plant achieving secondary treatment quality. The sewage would then be conveyed by outfall to the deep ocean, most likely off the south side of the atoll near Engineer Island. M & E believes prevailing currents set to the west, but Maragos noted that the equatorial counter current runs east. Clearly there is a need to determine which direction prevailing currents run. The plant would be designed to accommodate 1,200 people. M & E mentioned the success of a Japanese engineered sewage treatment plant off the Hamakua coast after which the Palmyra STP would be patterned.

25. Savio proposed setbacks off the shoreline to insure there is adequate buffering of structures against waves, storm surges and other natural hazards. Savio welcomed any ideas and brainstorming on facilities design and siting.

26. In wrapping up the meeting, Jim Maragos identified five areas for future discussion and analysis and asked the group to designate participants and leaders to address these in more detail:

a) timing issue/buyout options (Kelvin, Robert, Suzanne, Peter and Edward)
b) uses on Cooper Island that would be compatible with the function and operation of the proposed refuge (John Engbring - lead)
c) acceptable uses on the refuge areas (reefs, lagoon, and islands) and access by visitors and residents of Cooper (Ken McDermott - lead)
d) assessment infrastructure impacts, mitigation, and development options (all participants, starting with the review of the M & E July 1991 report; copies were provided to USFWS and TNC; Jim will collate)
e) scheduling and scoping of field work (deferred).

27. The group felt that the other issues needed to be explored more fully before proceeding with field work. Certainly aerial photography could be flown initially to assist in all subsequent phases of planning, analysis and design. The biggest issue of course is how the timing of the agreement would be structured (item "a" above). The buy-out option proposed by Savio should be seriously considered. Transfer of Kingman Reef by the owners to the USFWS could also serve as compensation or mitigation for other impacts, and the USFWS is keenly interested in Kingman.

Not sure if family would agree. may consider if "donation" would offset tax liability of Palmyra sale.

EXHIBIT A

28. The group agreed to finish the above analyses within one month and then convene follow-up meetings. Ultimately, the exercise would lead to a clear understanding by each party of what the other side requires and can live with in terms of future development and use of the atoll. This could then lead to a written agreement enabling the effort to proceed to the next step.

29. The draft minutes were recorded and compiled by J.E. Maragos, Director, Conservation Science, The Nature Conservancy, Pacific Regional Office, Phone: 537-4508; fax: 545-2019. Please phone/fax any corrections to the draft of the minutes by 31 August so they can be finalized and sent out to all parties.

30. Attendance Sheet:

Anne Ulaszewski (M & E Pacific, Inc.) 521-3051
Jim Maragos (TNC Pacific) 537-4508
John Engbring (USFWS) 541-2749
Peter Savio (Savio Realty) 942-7701
Suzanne Case (TNC, Regional Counsel) (415)777-0487
Robert P. Smith (USFWS) 541-2749
Dail Rhee (M & E Pacific) 521-3051
Andrew Yuen (USFWS) 541-2749
Georgia Shirilla (USFWS) (503)231-2236
Kelvin Taketa (TNC, Regional Director) 537-4508
Beth Flint (USFWS) 541-1201
Jerry Leinecke (USFWS) 541-1201
Edward R. Brooks (Foley, Maehara et al - Savio's attorney) 526-3011
Ken McDermott (USFWS) 526-3011



EXHIBIT A