IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| KINGMAN REEF ATOLL INVESTMENTS, L.L.C., a Hawaii limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>THE UNITED STATES OF AMERICA; THE UNITED STATES DEPARTMENT OF THE INTERIOR; GALE A. NORTON, in her official capacity as Secretary of the Interior; THE UNITED STATES FISH AND WILDLIFE SERVICE; MATTHEW HOGAN, in his official capacity as Director of United States Fish and Wildlife Service; JOHN DOES 1-10, JANE DOES 1-10, and DOE PARTNERSHIPS, CORPORATIONS, GOVERNMENTAL UNITS or OTHER ENTITIES 1-10,<br><br>Defendants. | CIVIL NO. 05-00151 JMS/BMK<br><br>ORDER GRANTING DEFENDANTS' MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT |

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

The United States of America, the United States Department of the Interior, Gale Norton in her official capacity as Secretary of the Interior, the

United States Fish and Wildlife Service ("FWS"), and Matthew Hogan in his official capacity as Director of FWS (collectively, "Defendants") move to dismiss this action pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim. In the alternative, Defendants move for summary judgment pursuant to Rule 56(b). Plaintiff Kingman Reef Atoll Investments, L.L.C. ("Plaintiff") filed this action under the federal Quiet Title Act ("QTA"), 28 U.S.C. § 2409a, seeking to quiet title to Kingman Reef Atoll.[1] Defendants argue that Plaintiff's claim is time-barred by the QTA's 12-year statute of limitations, and that as a result, this court lacks jurisdiction to hear Plaintiff's claim. Based on the following, the court GRANTS Defendants' motion to dismiss for lack of subject matter jurisdiction.

## II. BACKGROUND

### A. Factual Background

Kingman Reef is a low-lying, coral reef atoll comprised of small emergent land spits and partially exposed coral reefs that surround a deep central lagoon, located approximately 930 miles south of Honolulu, Hawaii. The atoll, whose nearest neighbor is Palmyra, is not suitable for human habitation. In 2001, it was designated as a National Wildlife Refuge managed by FWS within the

[1] Kingman Reef falls within the jurisdiction of the District of Hawaii. 28 U.S.C. § 91.

Department of the Interior.

***1. The Fullard-Leo Family's Claim to Kingman Reef Atoll (1922)***

The first western contact at Kingman Reef was reportedly by Captain Edmund Fanning in 1798 and later by Captain W.E. Kingman in 1853. In 1922, Lorrin A. Thurston claimed Kingman Reef in the name of the United States for his employer, the Island of Palmyra Copra Company, a corporation under the laws of the Territory of Hawaii. Leslie Fullard-Leo was the Island of Palmyra Copra Company's president and Ellen Fullard-Leo was its secretary and treasurer. Plaintiff Kingman Reef Atoll Investments, L.L.C. is managed by members of the Fullard-Leo family and claims title to Kingman Reef.

***2. Executive Orders (1934 and 1941)***

On December 29, 1934, President Roosevelt issued Executive Order 6935, which placed several islands in the Pacific Ocean under the control and jurisdiction of the Secretary of the Navy. The Executive Order states in part:

> By virtue of and pursuant to the authority vested in me by the act of June 25, 1910, ch. 421, 36 Stat. 847, as amended by the act of August 24, 1912, ch. 309, 37 Stat. 497, and as President of the United States, it is ordered that . . . Kingman Reef located in the Pacific Ocean . . . together with the reefs surrounding all the aforesaid islands, as indicated upon the diagram hereto attached and made a part of this order, be, and they are hereby, reserved, set aside, and placed under the control and jurisdiction of the Secretary of the Navy for

> administrative purposes[.]
>
> This order shall continue in full force and effect unless and until revoked by the President or by act of Congress.

Executive Order 6935, *see* App. A. The authorizing legislation of 1910 referenced in the Executive Order, the Pickett Act, states in part:

> That the President may, at any time in his discretion, temporarily withdraw from settlement, location, sale, or entry any of the public lands of the United States[2] . . . and reserve the same for water-power sites, irrigation, classification of lands, or other public purposes to be specified in the orders of withdrawals, and such withdrawals or reservations shall remain in force until revoked by him or by an Act of Congress.

Pickett Act of June 25, 1910, Chapter 421, 36 Stat. 847. Although the Pickett Act was repealed by the Federal Land Policy and Management Act of 1976, Pub. L. No 94-579, § 704(a), 90 Stat. 2792, all previous withdrawals and reservations under the Picket Act were expressly preserved and "remain in full force and effect

---

[2] Because the Pickett Act does not define "public lands," the court follows the traditional meaning; that is, lands that are subject to sale or disposal under general laws, excluding those to which any claims or rights of others have attached.

> The United States Supreme Court has consistently held that "public lands" means lands which are subject "to sale or other disposal under general laws," and does not include "(a)ll land, to which any claims or rights of others have attached." This has been held to be the meaning habitually used in acts of Congress, unless a statute explicitly provides for a different meaning for the term. Moreover, this meaning has been used continually in many congressional acts that the Secretary of the Interior has had to interpret.

*Columbia Basin Land Protection Ass'n v. Schlesinger*, 643 F.2d 585, 602 (9th Cir. 1981) (citations omitted).

Case 1:06-cv-00128-MBH-MK Document 31-13 Filed 08/28/2007 Page 5 of 28

until modified under the provisions of this Act or other applicable law." § 701(c), 90 Stat. 2786.

Executive Orders 8682[3] and 8729,[4] issued in 1941, established a Naval Defensive Sea Area ("NDSA") and Naval Airspace Reservation over several Pacific islands, including Kingman Reef. None of the three Executive Orders has been revoked and the Navy maintains control and jurisdiction over Kingman Reef under existing regulations. *See* 32 C.F.R. § 761.3(a)(2)(v) & (b)(2) (2006) (Kingman Reef and Kingman Reef NDSA identified as under Navy authority).

***3. Use and Control of Kingman Reef from 1934 to 2000***

On April 20, 1937, Leslie and Ellen Fullard-Leo wrote to Samuel Wilder King, Hawaii's Delegate to Congress, indicating that the Fullard-Leos believed the State Department or Navy Department owned Kingman Reef, but that

---

[3] Executive Order 8682 states in part: "At no time shall any person . . . enter any of the naval defensive sea areas herein set apart and reserved, nor shall any vessel or other craft . . . be navigated into any of the said areas, unless authorized by the Secretary of the Navy."

[4] Executive Order 8729 reads:

> The phrase 'the territorial waters between the extreme high-water marks in the three-mile marine boundaries' occurring in the first paragraph of Executive Orders Nos. 8680, 8682, and 8683 of February 14, 1941, establishing certain naval defensive sea areas and naval airspace reservations, is hereby corrected to read 'the territorial waters between the extreme high-water marks and the three-mile marine boundaries'.

they were entitled to compensation for annexing the atoll. Regarding Kingman Reef, the Fullard-Leos stated:

> Its ownership presumably rests with the State or Navy Department, since by one of these, use of it has been given to the Pan-American Airways, and has on two occasions been used during their trial flight this month to Auckland, N.Z.
> . . .
> In annexing Kingman's Reef it was necessary to send our boat there three times -- the cost of this together with taxes and accrued interest over a period of fifteen years lead us to believe that we are entitled to compensation in the sum of forty thousand dollars.

Defs.' Ex. 7, *see* App. B. King then received a letter from Claude A. Swanson, Secretary of the Navy, on May 29, 1937, which references the 1934 Executive Order and states: "The records of the Navy Department do not indicate that there were any vested rights on Kingman Reef in favor of private interests on the date of the issuance of this Executive Order[.]" Pl's. Ex. N-2, Ainsley Fullard-Leo Decl.

On March 29, 1938, attorneys for the Fullard-Leos wrote to the Secretary of the Navy, acknowledging that the government denied the existence of any private property rights in Kingman Reef based on the 1934 Executive Order. The letter from attorneys Townsend and Lewis states:

> As indicated in our letter of January 25th to the Secretary of State, it would seem that, as a result of the Executive Order of December 29, 1934, the Secretary of the Navy apparently concluded that the Department of State had denied the

> existence of the private property interests in Kingman's Reef claimed by Mrs. Ellen Fullard-Leo. . . . It seems unnecessary to restate the costs incurred by Mrs. Fullard-Leo in connection with the annexation of Kingman's Reef for and in behalf of the United States, or to recount the steps taken by her to establish her presently existing legal rights to the private property interests in the atoll.

Defs'. Ex. 8, *see* App. C. The Navy responded in an April 26, 1938 letter to Townsend and Lewis, rejecting the Fullard-Leos' claim to any interest in Kingman Reef:

> Reference is made to your letter of March 29, 1938, addressed to the Secretary of the Navy with respect to the alleged interests of Mrs. Ellen Fullard-Leo in the Island known as Kingman Reef located in the Pacific Ocean approximately thirty-three miles northwest of the Palmyra Islands and about 930 miles south of Honolulu.
>
> . . .
>
> The records show that Kingman Reef . . . is a bonded guano island, it having been listed by affidavit of Captain W. W. Taylor on February 12, 1858, and his rights, through several assignments, were transferred to the United States Guano Company, and the island was bonded on February 8, 1860[.]
>
> It will be noted that the island, including its reefs and tide and submerged lands, was under the control and jurisdiction of the United States long before the claim of Mrs. Fullard-Leo arose, and by Executive Order No. 6935, dated December 29, 1934, it was placed under the control and jurisdiction of the Navy Department. Under the circumstances, the showing made is not sufficient to uphold the claim of Mrs. Fullard-Leo.

Defs.' Ex. 9, *see* App. D. Following this rejection of their claim to Kingman Reef,

the Fullard-Leos did not challenge the 1934 Executive Order or seek to quiet title to Kingman Reef. Throughout the years, the Navy handled requests for access to Kingman Reef's waters and airspace. *See* Defs.' Exs. 15-26. Permission to enter the Kingman Reef NDSA is granted by an "Entry Control Commander" at Pearl Harbor. *See* 32 C.F.R. § 761.9; Defs.' Ex. 9.

The Fullard-Leo family, primarily through its agent Peter Savio, also received requests and granted permission to access Kingman Reef. *See* Savio Decl. ¶¶ 6-7; Austin Decl. ¶ 2. Plaintiff claims that private citizens, as well as members of the federal, state, and local governments, treated Plaintiff and its predecessor-in-interest as the owner of Kingman Reef. *See* Pl's. Exs. D, G, Porter Decl.;[5] Martin Decl. ¶ 4; Pl's. Exs. C, D, Savio Decl. Savio claims that he received several inquiries from private persons, as well as The Nature Conservancy ("TNC"), FWS, the State of Hawaii, and the City and County of Honolulu about purchasing, leasing, or licensing Kingman Reef and Palmyra.

---

[5] Exhibit G to the Porter Declaration is a memorandum regarding "Fishery Management Jurisdiction over waters off Midway Atoll, Palmyra Island, and Kingman Reef" from Judson Feder at the National Oceanographic and Atmospheric Administration ("NOAA"), dated October 17, 1997. The memorandum states in part: "The Fullard-Leo family owns Palmyra Island and Kingman Reef, and may claim ownership or jurisdiction over ocean resources and/or submerged lands seaward of the low-water mark." The memorandum appears to relate only to fisheries management under the Department of Commerce and does not address the Navy's control and jurisdiction over Kingman Reef or the Department of Interior's efforts to acquire Kingman Reef as a National Wildlife Refuge.

Savio Decl. ¶ 2.

### *4. Establishment of Kingman Reef National Wildlife Refuge*

In the early 1990s, Savio met with FWS and TNC to discuss the sale of Palmyra and Kingman Reef. Savio Decl. ¶ 3. According to Savio,

> [T]he FWS and TNC stated that they were interested in Kingman Reef, and that they asked whether the Fullard-Leo family would be willing to donate Kingman Reef for conservation purposes. . . . To my knowledge, no one at that meeting, or at any time during the subsequent negotiations over the course of the next ten years, ever told me they questioned the Fullard-Leo family's legal title to Kingman Reef Atoll or suggested that the government owned Kingman Reef.

*Id.*

Savio also received a response letter, dated August 12, 1997, from T.E. Manase Mansur, Adviser on Insular and International Affairs at the United States House of Representatives, regarding the Fullard-Leos' claim. The letter states:

> Thank you for sending the information clarifying the rightful title of the Fullard-Leo's [sic] to Palmyra and Kingman Reef. The brief is well documented regarding the basis for clear title to the entire area of Palmyra and Kingman, including surrounding reefs.
>
> As we discussed, the General Accounting Office is completing an extensive report regarding the application of the Constitution and federal laws in territories of the United States at the request of the Committee on Resources Chairman. . . . I will forward you and the Fullard-Leo's [sic] copies of the

completed GAO report.

Pl's. Ex. F, Savio Decl.

On October 2, 1997, the Director of FWS approved a proposal to evaluate the establishment of National Wildlife Refuges on Palmyra and Kingman Reef. *See* Pl's. Ex. F, Porter Decl. The proposal notes that "[e]xplorers wishing to visit Kingman Reef must secure permission from the Fullard-Leo family and the U.S. Coast Guard," and that the Fullard-Leo family "claims ownership." *Id.* It further states that the FWS "is proposing to study fee title acquisition of Kingman Reef," and that "the price for fee title to Kingman Reef is unknown." *Id.* On October 3, 1997, Robert Smith, Pacific Islands Eco-Region Manager for FWS, sent a fax to Savio notifying him of the approval to begin planning: "Note that we desire to acquire both Palmyra and Kingman, if that is the seller's desire." Pl's. Ex. B, Savio Decl.

At the time, Smith of FWS believed that the Fullard-Leo family owned Kingman Reef. *See* Smith Dep. Tr. at 66, Pl's. Ex. MM, Porter Decl. Smith explained that "during the intervening year between '97 and '98, that The Nature Conservancy's attorney . . . had done extensive research on the ownership of Kingman . . . [which] had revealed that the Fullard-Leo family . . . did not own Kingman Reef." *Id*. at 67, Pl's. Ex. MM, Porter Decl. According to Plaintiff, the

position that the Fullard-Leos did not own Kingman Reef was not disclosed to the family by TNC or FWS because they feared it would negatively impact the Palmyra transaction.

Plaintiff claims that the government sought and approved funding for the acquisition of Kingman Reef (presumably to acquire it from the Fullard- Leos or Plaintiff). *See* Pl's. Ex. Z, Porter Decl. In fact, the FWS's Budget Justifications for fiscal year 2001 lists the "Kingman Reef Wildlife Refuge" as an approved item for acquisition and states that "Kingman Reef will be acquired via a no-cost transfer from the Department of Defense." Pl's. Ex. Z-6, Porter Decl.

Throughout the late 1990s, TNC negotiated with the Fullard-Leo family to purchase Palmyra Atoll, while FWS eventually sought acquisition of Kingman Reef from the Navy. *See* Defs.' Ex. 28. On August 25, 2000, the Navy transferred custody, control, and jurisdiction of Kingman Reef to the Department of the Interior, without reimbursement. Defs.' Ex. 29. On December 11, 2000, FWS issued a draft environmental assessment for the proposed refuge at Kingman Reef. Defs.' Ex. 1. The Secretary of the Interior signed Order No. 3223, establishing the Kingman Reef National Wildlife Refuge, to be administered by FWS, on January 18, 2001. Plaintiff claims that it first learned of the government's claim to Kingman Reef on December 11, 2000, when FWS

announced the planned refuge.

## B. Procedural Background

Plaintiff filed this action to quiet title to Kingman Reef in 2005, pursuant to the federal QTA, 28 U.S.C. § 2409a.[6] Defendants filed their first motion to dismiss on August 8, 2005. Following the February 21, 2006 hearing on Defendants' motion, the court denied Defendants' motion without prejudice and allowed limited discovery on the issue of abandonment.

Defendants filed the instant motion on June 4, 2007, and urge the court to dismiss the action (or in the alternative, for summary judgment) based on the lack of subject matter jurisdiction. Defendants argue that the QTA's 12-year statute of limitations has run and this court is without jurisdiction to hear Plaintiff's quiet title claim. Secondarily, Defendants seek dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) because Plaintiff cannot claim fee simple title to the territorial sea around Kingman Reef or the lands below the mean high water mark. Plaintiff, on the other hand, claims that the government abandoned any claim of interest to Kingman Reef and that

---

[6] Plaintiff also has an action pending before the United States Court of Federal Claims, *Kingman Reef Atoll Investments LLC, et al. v. United States*, No. 06-828L. In this second action, Plaintiff claims that the establishment of the Kingman Reef National Wildlife Refuge in 2001 resulted in an uncompensated taking of its property. *See* Defs.' Mem. in Supp. 4.

Kingman Reef has always been owned by Plaintiff or its predecessors-in-interest.

Based on the following, the court GRANTS Defendants' motion to dismiss for lack of subject matter jurisdiction.[7]

## III. STANDARD OF REVIEW

A federal court may dismiss a complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). "[U]nlike a Rule 12(b)(6) motion, in a Rule 12(b)(1) motion, the district court is not confined by the facts contained in the four corners of the complaint -- it may consider facts and need *not* assume the truthfulness of the complaint[,]" and the existence of disputed material facts will not preclude the court from evaluating the existence of subject matter jurisdiction. *Americopters, LLC v. Fed. Aviation Admin.,* 441 F.3d 726, 732 n.4 (9th Cir. 2006). Accordingly, the court may use affidavits and other forms of competent evidence offered by the parties in order to resolve the disputed jurisdictional issues without converting the motion to dismiss into one for summary judgment. *See Sudano v. Fed. Airports Corp.*, 699 F. Supp. 824, 825-26 (D. Haw. 1988); *see also Arbaugh v. Y & H Corp.*, 126 S.Ct. 1235, 1244 (2006) ("If subject-matter jurisdiction turns on contested facts, the trial judge may be

[7] Because the court grants Defendants' motion pursuant to Rule 12(b)(1), the court does not reach Defendants' Rule 12(b)(6) claim for dismissal. Further, the court does not convert Defendants' motion to dismiss into one for summary judgment.

authorized to review the evidence and resolve the disputes on [his or] her own.”).

When, as here, subject matter jurisdiction is challenged in a motion to dismiss, the plaintiff has the burden of proving jurisdiction. *Tosco Corp. v. Communities for a Better Env’t*, 236 F.3d 495, 499 (9th Cir. 2001).

## IV. ANALYSIS

### A. The QTA’s Statute of Limitations

Originally, the doctrine of sovereign immunity barred quiet title actions against the United States. Enacted in 1972, the QTA provides the exclusive means by which adverse claimants can challenge the United States’ title to real property. *See Block v. North Dakota*, 461 U.S. 273, 286 (1983). Section 2409a(g) of the QTA contains a 12-year statute of limitations:

> Any civil action under this section, except for an action brought by a State, shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.

The limitations period embodied within the QTA is a strictly construed jurisdictional prerequisite to suit rather than an affirmative defense. *See Skranak v. Castenada*, 425 F.3d 1213, 1216 (9th Cir. 2005) (“Such bar is jurisdictional. The Quiet Title Act is a waiver of sovereign immunity. If the statute of limitations

has run on a waiver of sovereign immunity, federal courts lack jurisdiction."); *Adams v. United States*, 255 F.3d 787, 796 (9th Cir. 2001) (holding that a district court's grant of summary judgment to the government on a Quiet Title Act claim was improper because the statute of limitations had run, removing jurisdiction).

Plaintiff's claim is barred if it or its predecessor failed to commence the action within 12 years of the date they knew or should have known of the claim of the United States. *United States v. Beggerly*, 524 U.S. 38, 48 (1998). Knowledge or notice of such a claim is subject to a test of reasonableness. *McIntyre v. United States*, 789 F.2d 1408, 1411 (9th Cir. 1986). "Knowledge of the claim's full contours is not required. All that is necessary is a reasonable awareness that the Government claims some interest adverse to the plaintiff's." *Knapp v. United States*, 636 F.2d 279, 283 (10th Cir. 1980). "If a claimant asserts fee title to disputed property, notice of a government claim that creates even a cloud on that title may be sufficient to trigger the limitations period." *Michel v. United States,* 65 F.3d 130, 132 (9th Cir. 1995).[8] Even where the government's

---

[8] *Michel* distinguishes the degree of notice required in cases where the claimant asserts less than full legal title to the property:

> [W]hen the plaintiff claims a non-possessory interest such as an easement, knowledge of a government claim of ownership may be entirely consistent with a plaintiff's claim. A plaintiff's cause of action for an easement across government land only accrues when the government, adversely to

(continued...)

interest is based on a null deed, such governmental interest, even without legal title, constitutes a cloud on plaintiff's title sufficient to satisfy the notice provision. *See Knapp*, 636 F.2d at 283; *see also Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 769 (4th Cir. 1991) ("The crucial issue in the statute of limitations inquiry is whether the plaintiff had notice of the federal claim, not whether the claim itself is valid.").

The QTA is retroactive; that is, if the passage of 12 years from the date of accrual occurred before October 25, 1972, when Congress passed the QTA, the action is foreclosed. *See Donnelly v. United States*, 850 F.2d 1313, 1318 (9th Cir. 1988); *Stubbs v. United States*, 620 F.2d 775 (10th Cir. 1980). Further, the QTA is not subject to the doctrine of equitable tolling. *Beggerly,* 524 U.S. at 48.

Unless Plaintiff initiated this suit within 12 years of its accrual, this court is without jurisdiction to entertain or test the merits of the claims and must

---

[8](...continued)

> the interests of plaintiffs, denies or limits the use of the roadway for access to plaintiffs' property.

*Michel*, 65 F.3d at 132 (citation and quotation signals omitted). *See also McFarland v. Norton*, 425 F.3d 724, 726-27 (9th Cir. 2005) ("If [plaintiff] were asserting fee title to [the property], notice of a government claim that created even a cloud on that title may be sufficient to trigger the limitations period. An easement, of course, is different. . . . Because [plaintiff] claims title to an easement, his action accrued only when he or his predecessors-in-interest knew or should have known the government claimed the exclusive right to deny their historic access[.]") (citation and quotation signals omitted).

Case 1:06-cv-00128-MS-BMK Document 38 Filed 08/28/2007 Page 17 of 28

dismiss the action. *See United States v. Mottaz*, 476 U.S. 834, 841 (1986). Plaintiff filed its Complaint on March 4, 2005; therefore, Plaintiff's QTA suit must be dismissed if it knew or should have known of the United States' adverse claim by March 4, 1993.

The Fullard-Leos (Plaintiff's predecessors-in-interest) knew or should have known of the United States' claim as a result of the 1934 Executive Order and based on the correspondence between the Fullard-Leos and the government in 1937 and 1938. First, the Fullard-Leos had notice of the United States' claim over Kingman Reef from the 1934 Order that placed the atoll under the control and jurisdiction of the Navy. Executive Order 6935 clearly states that Kingman Reef was "reserved, set aside, and placed under the control and jurisdiction of the Secretary of the Navy for administrative purposes," pursuant to the President's authority to withdraw and reserve public lands for public purposes. Thus, the Fullard-Leos knew the land was considered public land and that jurisdiction was given to the Navy. Based on both the clear language and the government's undisputed publication of the 1934 Executive Order, the Fullard-Leos knew or should have known that the government claimed an interest in Kingman Reef. *See, e.g.*, *United States v. Gossett*, 416 F.2d 565, 568 (9th Cir. 1969) ("The fact that the Executive Orders, withdrawing this land from public entry, were issued in

1929 and 1931 is convincing evidence that the Government was claiming ownership and exercising dominion over the property in those years."); *Guam v. United States*, 744 F.2d 699, 701 (9th Cir. 1984) (stating that publication of an executive order in the Federal Register constitutes formal notice in an action to quiet title); *see also Warren v. United States*, 234 F.3d 1331, 1335-36 (D.C. Cir. 2000) (holding that "the most significant instance of . . . notice" arose when President Woodrow Wilson issued a proclamation reserving the property at issue).

Further, the Fullard-Leos' own letter to Samuel Wilder King appears to acknowledge the government's "ownership" of Kingman Reef. "[Kingman Reef's] ownership presumably rests with the State or Navy Department, since by one of these, use of it has been given to the Pan-American Airways." Defs.' Ex. 7, *see* App. B. The Fullard-Leos' attorneys also wrote to the Navy: "As indicated in our letter of January 25th to the Secretary of State, it would seem that, *as a result of the Executive Order of December 29, 1934*, the Secretary of the Navy apparently concluded that the Department of State had *denied the existence of the private property interests in Kingman's Reef claimed by Mrs. Ellen Fullard-Leo*." Defs.' Ex. 8, *see* App. C. (emphasis added). The government's position that the Fullard-Leos had no private interest in Kingman Reef should have been equally clear based on the Navy's letter to their attorneys indicating that, based on the

1934 Executive Order, "the showing made is not sufficient to uphold the claim of Mrs. Fullard-Leo." Defs.' Ex. 9, *see* App. D.

Plaintiff argues that the notice of the government's claim was not sufficient because Kingman Reef has never been federal property. Plaintiff misses the point. The case law is clear: "All that is necessary is a reasonable awareness that the Government claims some interest adverse to the plaintiff's." *Knapp v. United States*, 636 F.2d 279, 283 (10th Cir. 1980). "Even invalid government claims trigger the QTA limitations period." *Spirit Lake Tribe v. North Dakota*, 262 F.3d 732, 738 (8th Cir. 2001); *see also Knapp*, 636 F.2d at 283; *Richmond, Fredericksburg & Potomac R.R. Co.*, 945 F.2d at 769.

Based on the 1934 Executive Order, the Fullard-Leos' 1937 letter to Samual Wilder King, and the 1938 correspondence with the Navy, the Fullard-Leos knew or should have known the government claimed some interest in Kingman Reef. Plaintiff's cause of action expired -- at the latest -- by 1949 or 1950 (12 years after the 1937 and 1938 correspondence with the government). As a result, Plaintiff's quiet title action filed in 2005 is untimely.

The court next turns to Plaintiff's argument that the statute of limitations should not bar its claim because the government abandoned its interest in Kingman Reef.

## B. Abandonment

If the government abandoned its interest in Kingman Reef and subsequently reasserted its interest, the later assertion is treated as a new claim for statute of limitations purposes. *Shultz v. Department of Army*, 886 F.2d 1157, 1161 (9th Cir. 1989), explains that

> [t]he statute of limitations provision in the Quiet Title Act cannot reasonably be read to imply that if the government has once asserted a claim to property, twelve years later any quiet title action is forever barred. If the government has apparently abandoned any claim it once asserted, and then it reasserts a claim, the later assertion is a new claim and the statute of limitations for an action based on that claim accrues when it is asserted.

"[T]he government's outright abandonment effectively removes the cloud on a plaintiff's title and extinguishes his obligation to file a quite title action within 12 years." *Spirit Lake Tribe*, 262 F.3d at 739.

### *1. Standard for Abandonment*

#### *a. Congressional Authorization*

The Property Clause of the Constitution invests Congress with plenary power to dispose of real property of the United States. *See* U.S. CONST. art. IV, § 3, cl. 2.

> Power to release or otherwise dispose of the rights and property of the United States is lodged in the Congress by the

> Constitution. Subordinate officers of the United States are without that power, save only as it has been conferred upon them by Act of Congress or is to be implied from other powers so granted.

*Royal Indem. Co. v. United States*, 313 U.S. 289, 294 (1941) (citations omitted); *see also Warren v. United States*, 234 F.3d 1331, 1338 (D.C. Cir. 2000) ("In the first place, the Government cannot abandon property without congressional authorization."). Congress can delegate or authorize government agencies or officials to dispose of government property.[9] The government cannot be held to have abandoned property based on the conduct of officials not authorized to affect government property interests.

> And even assuming that Government agencies have been negligent in failing to recognize or assert the claims of the Government at an earlier date, the great interests of the Government in this ocean area are not to be forfeited as a result. The Government, which holds its interests here as elsewhere in trust for all the people, is not to be deprived of those interests by the ordinary court rules designed particularly for private disputes over individually owned pieces of property; and *officers who have no authority at all to dispose of Government property cannot by their conduct cause the Government to lose its valuable rights by their acquiescence, laches, or failure to act*.

---

[9] *See, e.g., Kern Copters, Inc. v. Allied Helicopter Serv., Inc.*, 277 F.2d 308, 313 (9th Cir. 1960) ("Congress has the power to provide for the disposition of property of the United States, and the power must be exercised by the authorized authority, and in the authorized manner. . . . Inactivity, or neglect, upon the part of Government officers is insufficient to cause the Government to lose its property.") (citation and quotations signals omitted).

*United States v. California*, 332 U.S. 19, 39-40 (1947) (emphasis added).

*b. Abandonment of the Original Claim*

Plaintiff argues that because Kingman Reef is not owned by the United States, Congress is without power to dispose of it. In this situation, where the ownership of property is disputed, Plaintiff argues that abandonment can be proven by governmental action short of Congressional authorization. The court agrees.

Where both parties claim ownership to property, an abandonment by the government of its *original* claim of right is necessary to prove an abandonment of the government's claim. This is necessarily true because abandonment cannot be viewed in a vacuum, but must be examined in the context of the government's original claim of right. In this case, applying this contextual analysis, the court looks to the 1934 Executive Order as the government's original claim and determines if the government has abandoned that claim.[10]

---

[10] The court rejects Plaintiff's broader view of what may constitute abandonment. Specifically, Plaintiff claims that the government can abandon its claim of interest by acknowledging Plaintiff's property rights, or by neglecting to enforce, extinguishing, or relaxing a restriction, without any reference to the government's original claim of right. *See* Pl's. Mem. in Opp'n 20. In support of this theory, Plaintiff relies on *Michel* and *Schultz*, in which the plaintiffs sought to quiet title to an easement. In *Michel*, the Ninth Circuit remanded to the district court to determine whether an agreement between the plaintiff and the government regarding plaintiff's "historic right of access" to an easement "could be construed as an abandonment of the government's claim that it had the exclusive right to control access." *Michel*, 65 F.3d at 133.
(continued...)

### 2. *Plaintiff Has Not Met Its Burden of Demonstrating that the Government Abandoned Kingman Reef*

#### a. *No Congressionally Authorized Abandonment*

It is undisputed that the 1934 Executive Order has never been revoked by the President or by act of Congress. Plaintiff instead rests its abandonment theory on the Navy's alleged failure to restrict access to Kingman Reef and based on confusion within some agencies as to who owned Kingman Reef. Plaintiff's evidence is not sufficient to meet its burden of proving abandonment.

Plaintiff has not alleged that anyone who was authorized to dispose of Kingman Reef abandoned it on behalf of the government. Plaintiff's only evidence relates to various government employees who believed or assumed that Plaintiff owned Kingman Reef. For instance, Robert Smith at FWS believed that

---

[10](...continued)
There was no written agreement between Plaintiff here and an authorized government official acknowledging Plaintiff's "historic right of access" as there was in *Michel*. Nor is this a case in which Plaintiff merely seeks the co-use with the government of an easement. In *Schultz*, the Ninth Circuit remanded for a determination of whether the Army's failure to restrict access to a road constituted an abandonment of the right-of-way. *Schultz*, 886 F.2d at 1160-61. *Michel* and *Schultz,* both concerning easements, provide little guidance to a claim of fee ownership. Less is required to prove the abandonment of an interest in an easement than a fee simple interest. *See* RESTATEMENT OF PROPERTY § 504, cmt. a. ("[E]asements may be abandoned more readily than can most interests in land. . . . In many cases, of which the ownership of land in fee is an example, an abandonment, if permitted, would result in a void in the ownership of the affected thing, the filling of which would be largely a question of chance and would probably produce grave uncertainty of title. In such cases, abandonment, if permitted at all, is permitted only under rules stricter than those which prevail in the case of the abandonment of easements. ").

the Fullard-Leo family owned Kingman Reef, but later believed the government owned it. *See* Smith Dep. Tr. at 66-69, Pl's. Ex. MM, Porter Decl. The FWS proposal to study a refuge at the atoll notes that "[e]xplorers wishing to visit Kingman Reef must secure permission from the Fullard-Leo family and the U.S. Coast Guard," and that the Fullard-Leo family "claims ownership." *See* Pl's. Ex. F, Porter Decl. Finally, a memorandum from a NOAA employee states that the "Fullard-Leo family owns Palmyra Island and Kingman Reef, and may claim ownership or jurisdiction over ocean resources and/or submerged lands seaward of the low-water mark." Pl's. Ex. G, Savio Decl. Plaintiff does not claim that any of these officials intended to abandon Kingman Reef on behalf of the government, or that any of them was authorized under law to do so.[11] Further, Plaintiff has not

---

[11] To the extent that these facts support Plaintiff's claim that the that the government should be estopped from using the 12-year limitations period to bar Plaintiff's claim, Plaintiff has not met its burden. First, it is not certain that equitable estoppel applies in QTA cases. *See United States v. Beggerly*, 524 U.S. at 49-50 (1998) (Stevens, J., concurring) ("We are not confronted with the question whether a doctrine such as fraudulent concealment or equitable estoppel might apply if the Government were guilty of outrageous misconduct that prevented the plaintiff, though fully aware of the Government's claim of title, from knowing of her own claim. Those doctrines are distinct from equitable tolling, and conceivably might apply in such an unlikely hypothetical situation. The Court need not (and, therefore, properly does not) address that quite different type of case.") (citations omitted).

In any event, allegations that FWS employees and non-governmental TNC employees treated Kingman as belonging to Plaintiff (so as to not jeopardize the Palmyra transaction), even if true, would not be sufficient for an estoppel claim against the government under the circumstances. Plaintiff has neither set forth sufficient evidence of "affirmative misconduct going beyond mere negligence" nor has Plaintiff satisfied the elements required for estoppel: "(1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be

(continued...)

pointed to any statute or regulation under which these government actors could be authorized to dispose of government property.

Plaintiff's claim that the government "silently acquiesced to plaintiff's claim of ownership," is similarly without merit. Pl's Mem. in Opp'n 33. Government employees "cannot by their conduct cause the Government to lose its valuable rights by their acquiescence, laches, or failure to act." *United States v. California*, 332 U.S. at 40; *see also Kern Copters Inc. v. Allied Helicopter Serv., Inc.*, 277 F.2d 308, 313 (9th Cir. 1960) ("Inactivity, or neglect, upon the part of Government officers is insufficient to cause the Government to lose its property.").

Plaintiff's argument that the government failed to restrict access to Kingman Reef is simply irrelevant to whether an authorized official abandoned the United States' claim to the atoll. Although there is no evidence in the record that the Navy regularly patrolled Kingman Reef, the 1934 and 1941 Executive Orders, Navy regulations, and operating instructions, which remain in effect, make clear

---

[11](...continued)
acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury." *Morgan v. Gonzales*, 2007 WL 2127707, at *5 (9th Cir. July 20, 2007). At best, Plaintiff has presented evidence of confusion and mistake on the part of some government employees. Further, none of the alleged conduct nullifies the fact that Plaintiff's predecessors-in-interest knew as early as 1937-1938 that the government rejected the Fullard-Leos' claim of ownership.

that the Navy controlled and continues to control entry into Kingman Reef NDSA. *See* Defs.' Reply 14. Under the circumstances, Plaintiff's claim that the government failed to restrict access is not sufficient to prove abandonment of Kingman Reef.

Plaintiff also argues that government officials treated Kingman Reef as belonging to Plaintiff's predecessors-in-interest, even going so far as offering to purchase and seeking federal funds to finance the purchase of Kingman Reef. The record does not support Plaintiff's claim; it appears that FWS sought congressional funding for the acquisition of Palmyra, *see* Pl's. Ex. Z-9, Porter Decl., while Kingman Reef was be acquired by a "no-cost transfer" from the Navy. *See* Pl's. Ex. Z-6, Porter Decl. Plaintiff fails to prove a Congressionally authorized abandonment.

*b. No Abandonment of the Original Claim*

Even accepting as true Plaintiff's claim that Kingman Reef is not federal property, and, hence, cannot be abandoned by Congress, Plaintiff fails to show that there has been an abandonment of the government's original claim of right to Kingman Reef. Plaintiff sets forth no evidence of abandonment of the government's claim (as traced to the 1934 Executive Order), according to the terms of the Executive Order or the underlying legislation.

First, the 1934 Executive Order itself states: "This order shall continue in full force and effect unless and until revoked by the President or by act of Congress." It is undisputed that the Executive Order has never been revoked.

Second, there has been no abandonment in accordance with the legislation underlying the 1934 Executive Order. The Pickett Act, which authorized the 1934 Executive Order, was repealed by the Federal Land Policy and Management Act of 1976, Pub. L. No 94-579, § 704(a), 90 Stat. 2792, but all previous withdrawals and reservations under the Picket Act were expressly preserved and "remain in full force and effect until modified under the provisions of this Act or other applicable law." *Id.* § 701(c), 90 Stat. 2786. Because the government's reservation of Kingman Reef, based on the 1934 Executive Order, remains in full force and Plaintiff does not allege that it has been modified under the Federal Land Policy and Management Act of 1976 or other applicable law, Plaintiff fails to prove abandonment of the government's original claim.[12]

Plaintiff has failed to meet its burden of proving abandonment. There

---

[12] Even if this court held that the Department of the Navy, the federal entity with jurisdiction over Kingman Reef, could abandon the government's claim of interest, Plaintiff's argument would nonetheless fail. Plaintiff sets forth no evidence that any official within the Department of the Navy -- whether authorized or not -- ever abandoned the government's original claim of right to Kingman Reef. Although some Navy employees at the Pearl Harbor Naval Base apparently referred requests from the public to visit Kingman Reef to Peter Savio, *see* Savio Decl. ¶ 7, there is no evidence of confusion regarding control and jurisdiction over Kingman Reef among any higher-ranking Navy officials.

is no evidence of abandonment of the government's original claim of right; there has been no presidential revocation of the 1934 Executive Order, no act of Congress, and no change under the relevant legislation.[13] Plaintiff's Complaint is untimely pursuant to 28 U.S.C. § 2409a(g) and the court is therefore without jurisdiction.

## V. CONCLUSION

Based on the foregoing, the court GRANTS Defendants' motion to dismiss for lack of subject matter jurisdiction. The Clerk of Court is directed to close this case file.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, August 27, 2007.

/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Kingman Reef Atoll Investments, L.L.C. v. United States, et al.*, Civ. No. 05-00151 JMS/BMK, Order Granting Defendants' Motion to Dismiss, Or, In the Alternative, For Summary Judgment

---

[13] To the extent Plaintiff argues that the government could not abandon Kingman Reef because Plaintiff holds legal title to it, the court does not reach this argument. "The crucial issue in the statue of limitations inquiry is whether the plaintiff had notice of the federal claim, not whether the claim itself is valid. The merit of the claim is irrelevant to operation of the bar of a statute of limitations." *Guam*, 744 F.2d at 701 (citation and quotation signals omitted); *see also Nevada v. United States,* 731 F.2d 633, 636 (9th Cir. 1984) ("To succeed in such a challenge, Nevada would have to show that the United States lacked titled to the lake bed, which is exactly what Nevada is foreclosed from doing by the Quiet Title Act's limitations bar.").