IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| KINGMAN REEF ATOLL INVESTMENTS, L.L.C., a Hawaii limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>THE UNITED STATES OF AMERICA; THE UNITED STATES DEPARTMENT OF INTERIOR; THE HONORABLE GALE A. NORTON, in her official capacity as Secretary of the Interior; THE UNITED STATES FISH & WILDLIFE SERVICE; STEVEN A. WILLIAMS, in his official capacity as Director of United States Fish & Wildlife Service; JOHN DOES 1-10, JANE DOES 1-10, and DOE PARTNERSHIPS, CORPORATIONS, GOVERNMENTAL UNITS or OTHER ENTITIES 1-10,<br><br>Defendants. | CIVIL NO. CV05-00151 JMS/BMK |

DEPOSITION OF ROBERT P. SMITH

Taken on behalf of Plaintiff Kingman Reef Atoll Investments, L.L.C., at the Nani Loa Volcano Resort, Sandalwood Lanai, 93 Banyan Drive, Hilo, Hawaii, 96720, commencing at 9:55 a.m. on Monday, April 2, 2007.

KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 9

REPORTED BY: JOAN IZUMIGAWA, CSR No. 136
Notary Public, State of Hawaii

APPEARANCES:

For Plaintiff Kingman Reef Atoll Investments, L.L.C.:

CHRISTIAN P. PORTER, ESQ.
DONNA H. YAMAMOTO, ESQ.
Brooks Tom Porter & Quitiquit, LLP
2125 Davies Pacific Center
841 Bishop Street
Honolulu, Hawaii 96813
Ph: (808) 526-3011

For Defendants:

THOMAS A. HELPER, ESQ.
Assistant United States Attorney
300 Ala Moana Boulevard, Room 6-100
Honolulu, Hawaii 96850
Ph: (808) 541-2850

Witness address: 19-4330 Wright Road
Volcano, HI 96785



I N D E X


| | |
|---|---|
| EXAMINATION BY: | |
| Mr. Porter | 4 |
| EXHIBITS FOR IDENTIFICATION: | |
| Exhibit 25 | 91 |
| Exhibit 26 | 94 |
| Exhibit 27 | 98 |
| Exhibit 28 | 152 |
| Previously marked exhibits: | |
| Exhibit 3 | 40 |
| Exhibit 4 | 76 |
| Exhibit 5 | 76 |
| Exhibit 7 | 103 |
| Exhibit 13 | 127 |
| Exhibit 8 | 131 |
| Exhibit 9 | 132 |
| Exhibit 10 | 134 |
| Exhibits 21A, 21B | 138 |
| Exhibit 16 | 145 |
| Exhibit 20 | 147 |




ROBERT P. SMITH,
Being first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. PORTER:
Q. Can you state your name for the record.
A. Robert Parker Smith.
Q. Mr. Smith, before we went on the record, you handed me back a package that you said you received from -- I don't know if it was in the mail or if someone had dropped it off to you, but it was a check for $12 made out to you for a mileage fee. There's also a witness fee for $40 and -- the subpoena I think you can hang on to, which is the -- for your deposition today.
A. Okay.
Q. And also the notice. It's just the formal paperwork.
A. Yes, sir.
And just as a clarification, the checks and the subpoena were actually delivered to me twice: once by mail from your office and the second time, the time that we're referring to now, by a process server. And I just choose to return the checks.



Thank you.
Q. Okay.
MR. PORTER: Is it okay with you, Mr. Helper, or do you have any objections?
MR. HELPER: I have no objections to that. I just want the record clear that the reason he's returning the checks is because of not any hostility toward the plaintiff, but as a matter of fact, he doesn't want their money because he likes them.
MR. PORTER: Thank you very much.
THE WITNESS: All right.
Q. BY MR. PORTER: Just for the record, what's your residence address?
A. My residence address is 19-4264 Wright Road, W R I G H T. However, our wonderful county of Hawaii has recently changed the street number, and I don't yet have that memorized nor correctly posted. I think it's 19-4330, but that's coming from memory.
Q. That's here?
A. It's Volcano, Hawaii, yes.
Q. Have you ever had your deposition taken before?
A. Not that I recall.
Q. All right. Part of the process is that -- sometimes I pause in the middle of a question and so

Page 66

focus was on Palmyra. We never ventured to Kingman Reef. I've never been there. I've only seen it from the -- from an airplane.

So my memory says that the 1997 expedition was an assessment expedition and that it focused on Palmyra, and to the extent there was any discussion of Kingman Reef, it was ancillary discussion having to do with, you know, "We own that, too. Do you want that, too?" Et cetera.

The context here is -- from '91 --

THE WITNESS: Maybe all this will blow away.

A. From '91 until certainly '97 -- I've brought you up to date now -- certainly I believed that the Fullard-Leo family owned Kingman Reef and --

Q. BY MR. PORTER: Did anybody up to that point in time in your presence state to the Fullard-Leo family, "No, that's not true"?

A. Not to my memory, no.

Q. Like Chuck Cook? Did he say, "Hey, you're off base, Peter"?

A. Not to my memory, no. And I'll just have the record note you asked me up to 1997, the first expedition.

Q. Yes. Exactly.

A. Now, to finish my answer to your question --

Page 67

And I think this will finish it -- we had another expedition in '98, and that one was getting more serious because we knew more about the resources. We felt as though Palmyra would make a -- just a jim dandy co-op project.

And at that -- my memory is that during that expedition, there was a kind of a cathartic moment for me as a administrator and as someone who ought to know what's going on, and that was the disclosure by someone from The Nature Conservancy -- And it may have been Chuck, but I honestly can't remember exactly who told me -- that during that intervening year between '97 and '98 that The Nature Conservancy's attorney, Suzanne Case, had done extensive research on the ownership of Kingman; because I was then and probably continued to be -- I can't remember -- a cheerleader for getting both properties and both nearby marine environments. I felt as though they adhered to the conservation -- the principles of conservation biology and they should be protected for fish and wildlife.

The cathartic moment was that Suzanne's legal research had revealed that the Fullard-Leo family, at least in her view, did not own Kingman Reef. Now, I took that as information that came from

Page 68

a source that I respected.

It was not until after I would return from that expedition that I would ever get that corroborated through my own chain of command, my own bosses, which would have been John Doebel and the Realty Division. And to be honest with you, I don't recall, you know, with such clarity exactly when that word came that indeed Suzanne's research, in the view of the government, was correct.

But that -- I think that -- I hope that answers your question.

Q. Yes. It helps in terms of just the benchmarks and information.

If I can focus on that second expedition, where there was that discussion for that first time and that information was given to you by someone and you're not sure if it was Chuck Cook.

A. Yes.

Q. Sounds like it was someone else. Was that discussed with -- well, strike that.

Let me ask you first --

A. Okay.

Q. -- at the 1998 expedition do you recall if any of the Fullard-Leo family members went with you?

A. Well --

Page 69

Q. I know you said at the first one, there was Ainsley and Betty. You had a specific recollection --

A. May I answer it this way?

Q. Yeah.

A. I cannot imagine us going to Palmyra without Ainsley being along.

Q. Why do you say that?

A. Because he -- he owned the place. Because certainly I was a government official. And he made no bones -- in a very nice way, he made no bones about him -- his suspicion of the government generally and -- being on his property in particular. Ainsley had a -- a set of rules that were pretty darn good rules, actually, about behavior, how to treat resources on Palmyra. And my recollection is: Every trip I went there up until perhaps the -- the actual purchase had occurred -- and again, that gets fuzzy, but that Ainsley was along. Certainly for those first several trips.

Q. So assuming that Ainsley is there and you're at this -- the '98 expedition and this information is given to you, does anybody then convey that information to Ainsley, saying, "Hey, Nature Conservancy's attorney, Suzanne Case, has done some

Page 114

I'm just asking for your recollection and not guessing or speculating, but was there a discussion with The Nature Conservancy about including Kingman in the purchase price of Palmyra?
MR. HELPER: You mean that he participated in?
MR. PORTER: Yes.
Q. BY MR. PORTER: Let's start there. Did you participate in any discussions with TNC?
A. Not to my recollection.
Q. Do you know if anyone that you have personal knowledge of -- was anybody within Fish & Wildlife under your supervision tasked to work with TNC to include Kingman as part of the purchase price of Palmyra?
A. Not to my --
MR. HELPER: Let me object. I think it's vague and lacks foundation.
A. Not to my recollection.
Q. BY MR. PORTER: Did you have a specific discussion with Chuck Cook in or about 1997 or 1998 about Mr. Cook focusing his efforts through TNC to acquire Palmyra Atoll and that you were going to then focus your efforts on securing Kingman Reef?
A. I've got to -- I either have to talk to Tom

Page 115

about something or -- I don't -- I don't know. So --
Q. Unless it's attorney-client privilege, it's not a privilege so you have to state --
A. Okay. I don't want to state it -- I don't want to give you an answer that's misleading, and it has to do with the way you phrased the question.
Q. That's fair. What is misleading about my question? Then I can help rephrase it.
A. The -- the way you -- the way you phrased your question would have -- would have the -- would have the party reading this transcript believe that I initiated a discussion with Chuck Cook about focusing on the acquisition of Palmyra.
My recollection was that The Nature Conservancy -- I don't know whether it was Chuck or not -- initiated the discussion with me which was coincident with this cathartic revelation that their legal research had revealed that the Fullard-Leo family did not own Kingman Reef.
And the discussion, to paraphrase, was something like, "Robert, we know you're a cheerleader for the acquisition of Palmyra and Kingman Reef. However, the Conservancy wants to focus on Palmyra. That's where we believe there is a strong basis for the exchange of dollars for land. That's what we

Page 116

want to focus on. You go for Kingman Reef. Have a good time. But in terms of the cooperative project that we're working on, we want to focus on Palmyra."
Q. How was that conveyed to you? Was that in writing?
A. Just almost exactly like I told you, and it was on -- it was on the atoll.
Q. That was during that second expedition?
A. I think so. That is my belief. It was during the second expedition.
Q. Your best recollection is: That came from either Chuck Cook or someone else --
A. Or someone who -- someone who conveyed to me this research on -- that Suzanne Case had done.
Q. Did they ever tell you why she had done the research?
A. Well, certainly it was implied that she had done the research because the Conservancy was seriously considering a purchase of Palmyra Atoll and, at perhaps my urging and the urging of others that work for me, including Kingman Reef. But when they did their research and they believed that the Fullard-Leo family had nothing to sell at Kingman Reef because they didn't own Kingman Reef, then they chose to rein in the scope of their willingness to do

Page 117

a cooperative agreement.
And you've got to remember: The Nature Conservancy is writing the first check here. The government can always back out. The Nature Conservancy can always back out, too. So -- and the appropriations might not ever come. So you have to look at it in terms of the Conservancy. Once the check is written, they own it, and they -- it was my general impression that they don't want to write a check for something for which there's no deed, and -- and they, I suppose, wanted to focus their purchase efforts on something that they believed could be transferred with a merchantable title.
Q. What was your impression at that point as far as what was going to happen with Kingman Reef? They're telling you, "We're going to focus on" -- I'm paraphrasing and this is a bad paraphrasing. "But given the fact that the Fullard-Leo family can't sell us Kingman -- or sell Kingman, we're going to focus our efforts and our money on Palmyra," right?
A. Yeah. I mean, "Given the fact that the Fullard-Leo family do not own Kingman to sell according to the Conservancy's research, we -- but we're still very excited about the Palmyra project and are going to focus our efforts -- And ultimately

levels, and to the degree to which I know about them, it's just because I was a cheerleader for Kingman Reef and I very tangentially was aware of, you know, some of these high-level meetings and discussions.
Q. BY MR. PORTER: Do you know who with Department of --
MR. HELPER: I move to strike the answer, to the extent it went outside his personal knowledge, as lacking in foundation.
Q. BY MR. PORTER: Do you know who at the Department of the Navy was the contact person for that purpose?
A. I believe -- well, the -- there had to be many, of course, but I believe Secretary Babbitt's person that he talked to was a fellow named William Cassidy. I think that was his last name.
Q. Do you know where he was based out of?
A. Washington, I would presume. And Mr. Cassidy was the assistant secretary of the Navy for base relocation and closure and -- and I might get -- these titles are long and cumbersome so I may get that one wrong. But I do believe that -- that the -- that the highest level of discussion that I know of -- that I'd heard about would have occurred between those two gentlemen.



MR. HELPER: Same objection and move to strike.
Q. BY MR. PORTER: How would you have heard about those discussions?
A. Because those two guys had breakfast together in Honolulu, and I think I picked up that information from one of the aides of one or the other.
Q. By "those two guys" you mean Secretary Babbitt --
A. And Cassidy.
Q. Was Bill Cassidy, as far as you knew, someone that was a government employee, or was he a Navy officer?
A. Government employee. Probably a political appointee but --
Q. Just if you have personal knowledge.
A. From my own personal knowledge, he was not in uniformed service. He was civil service or, as they say in the business, schedule C, which was a political appointment.
Q. There's a briefing statement that was prepared for Secretary Babbitt. Let me show you that. I think it's previously marked as Exhibit 13.
MR. PORTER: Donna, can you check to make



sure? It's from tab 17.
A. May I chuck this over here?
Q. BY MR. PORTER: Yes, sir. Thank you.
MR. HELPER: What number?
MS. YAMAMOTO: This is Number 13.
MR. PORTER: Previously marked 13?
MS. YAMAMOTO: Yes.
MR. PORTER: Previously marked Exhibit 13.
Q. BY MR. PORTER: I want to show you what's been previously marked as Exhibit 13.
A. Hmm. Okay.
Q. Have you had a chance to look at what was previously marked as Exhibit 13?
A. Yes.
Q. Have you seen that document before?
A. I probably have. The answer is: Most likely, yes.
Q. It's referenced as a briefing statement prepared for Secretary Babbitt submitted August 18, 1998 --
A. Right.
Q. -- regarding the proposed Kingman Reef National Wildlife Refuge?
A. Yes.
Q. Down here under "Background/Status" --



there's a contact -- strike that.
At the bottom of this document, there's a "Contact: Robert P. Smith, Pacific Islands Manager."
A. Yes.
Q. Is that you?
A. Yes.
Q. Did you generate this, or did someone in your office help you prepare it?
A. My best guess is that this was generated in my office.
Q. It says, "Kingman" -- 3 bullet points down it says, "Kingman Reef is an unincorporated U.S. possession and is not within the State of Hawaii. Title review would be needed to clarify ownership." Do you see that?
A. Yes.
Q. Do you know what was meant by that at that point in time?
A. Exactly what it says.
Q. Do you have any other information besides what's stated in the document?
A. No.
Q. It says, "The Kingman Reef acquisition should be pursued after the acquisition of Palmyra Atoll."

Page 130

A. Right.
Q. Is that in line with what we were discussing earlier about the implicit understanding that Palmyra should close first before any references to Kingman or a possible acquisition of Kingman were brought up?
MR. HELPER: Objection. Vague. Lacks foundation.
A. It wouldn't surprise me.
And if I could just add that Palmyra was the real prize here. Kingman Reef, if we got it, fine. If we didn't, fine. I -- I think it's an important area, but Palmyra was the real -- the real thing. So I don't think anyone wanted to -- wanted to upset any apple carts with our partners or anyone else at Palmyra just for the sake of, you know, pointing out that Kingman Reef would be a nice place to have, too.
MR. HELPER: I'm sorry. Move to strike to the extent that answer was outside his personal knowledge, what other people intended.
THE WITNESS: Yeah. Okay. Thank you.
Q. BY MR. PORTER: By preparing it for Secretary Babbitt, was this around the time that Secretary Babbitt was expressing the interest that you had previously testified to about the coral reefs and trying to preserve coral reefs?

Page 131

A. Yeah. I -- I believe it was. I believe it fairly much coincided with his telephone call to our Honolulu office.
Q. Did you sit down personally with Secretary Babbitt to go over the possible acquisition of Kingman?
A. I did not.
Q. Do you recall if there was any type of memo or any other type of document that was generated that outlined the issue of ownership of Kingman Reef and this transferring and how title could be transferred, then, from Department of the Navy to Department of the Interior?
A. I don't recall anything in writing. May have been; I just don't recall. Like I don't recall a lot of these documents.
Q. Now, going back to what was previously marked, let's just jump back to October of '97. This was previously marked Exhibit 8. Is that your signature at the bottom --
A. Yes, it is.
Q. Now, down at the bottom -- the second to the last paragraph, it says, "I will be traveling to Palmyra on October 14, and will return on October 28," of '97. As far as benchmarks, do you know if

Page 132

this is the -- your first trip to Palmyra, or would it have been the second trip?
A. I honestly thought this was my first trip.
Q. Okay. Because up there at the top, it also talks about -- at the top of this previously marked Exhibit 8, in the first paragraph, second to the last sentence, "We are also working with Mr. Chuck Cook of The Nature Conservancy, and at this point foresee TNC actually tendering an offer for the property."
A. Right.
Q. And, "If that is successful, the Service will repay TNC in the future with dollars appropriated by Congress" --
A. Right.
Q. -- "through the Land and Water Conservation Fund." Does that help in terms of gauging that this is around the time of the first trip in '97, and then you had the second one in '98?
A. Not really. Gosh, I'm starting to wonder now if we went in '96. I just -- you know, I'm -- I -- this -- this falls in the category of a senior moment, I guess.
Q. Let me just show you another document here that was previously marked. Let me show you another document that was previously marked as Exhibit 9.

Page 133

You can put that off to the side.
A. Yeah.
Q. You can just tell me if you recognize that document.
A. I recognize my handwriting.
Now, may I ask. Did this transmit that?
Q. I'm not sure.
A. Oh.
Q. I'm just --
A. So you don't know what page 2 was?
Q. Correct.
A. I can just tell you that's my handwriting.
Q. All right.
MR. HELPER: Is there a question pending?
MR. PORTER: No. He's reading and I'm looking -- sorry.
A. I might --
MR. HELPER: Wait for a question.
THE WITNESS: Okay. I was just going to clarify something.
Q. BY MR. PORTER: Do you want to clarify something that you've already put on the record or --
A. Yeah.
Q. Okay.
A. I see here that my title is -- it looks like

**U.S. Department of Justice**

Environment and Natural Resources Division

DSF:dsf

*General Litigation Section*
*P.O. Box 663*
*Ben Franklin Station*
*Washington, DC 20044-0663*

*Telephone (202) 305-0437*
*Facsimile (202) 305-0506*

By E-mail and U.S. Mail

July 3, 2007

Ms. Therese Cannata
Cannata, Ching & O'Toole
899 Ellis St.,
San Francisco, CA 94109
Phone: 415-409-8900
Fax: 415-409-8904
E-mail: Tcannata@ccolaw.com

Re: Kingman Reef Atoll Investments, LLC v. USA, CV05-00151 (D. Hawaii)

Dear Ms. Cannata:

This letter responds to your letter of June 21, 2007. We are disappointed that, after almost two years of discovery in this case, after the discovery period has closed, and after defendants have filed their motion to dismiss and for summary judgment, plaintiff would seek a delay of the briefing, and a continuance of the previously scheduled hearing.[1/] We are opposed to any further delay in the briefing schedule at this late date. We respond to the individual points of your letter below.

As to the document production in this case, as we have said several times, our search and production has been limited to files and documents pertaining to Kingman Reef. We have not separately searched for and produced documents related to Palymra Atoll, because it is a separate property that is not the subject of this suit, and is unrelated to the issues raised by defendants' pending dispositive motions.[2/] While certain documents discuss both properties, such as Fish and Wildlife

---

[1/]Plaintiff seeks a continuance in order to obtain additional Rule 30(b)(6) testimony from the Navy. As explained below, we object.

[2/]Contrary to the assertions you have made to the Court, the deposition testimony and documents produced in this case, which you are familiar with, make clear that defendants never attempted to purchase Kingman Reef from the Fullard-Leo family.

("FWS") Service planning documents that discuss the creation of the refuges at both Palymra Atoll and Kingman Reef, Palmyra Atoll remains unrelated to this lawsuit.[3/]

As to the scope of the search, the following offices were searched for documents: At Department of the Interior ("DOI"), defendants searched DOI and FWS offices in Washington D.C., the Solicitor's Office in Washington D.C., the FWS Region 1 Office, Portland, Oregon, and the Pacific Islands FWS Office in Honolulu. Navy searched the following organizations for responsive records: Naval Facilities Engineering Command, Pacific; Commander, Navy Region, Hawaii; Office of the Secretary of Defense (OSD) (Policy); OPNAV N45 (Environmental Readiness Division, Chief of Naval Operations)(This office has responsibility for implementing Navy environmental policy worldwide); Naval Facilities Engineering Command Headquarters; Counsel's Office, Commander in Chief, U.S. Pacific Fleet; the offices of the Assistant Secretary of the Navy (Installations & Environment); the International and Operational Law Division of the Office of the Judge Advocate General of the Navy, and the Naval Historical Center in Washington D.C.. In addition, the Navy searched for any accession groups at the Federal Records Center in San Bruno, California that include "Kingman Reef" in the subject line.

We also contacted the State Department, and produced the few relevant documents it held last year. Finally, you subpoenaed documents from NOAA, and NOAA has responded. My clients have informed me that the searches the personnel conducted were thorough, and that they have produced all of the documents regarding Kingman Reef. While we have a continuing obligation to produce any additional documents we find, and we have been acting in accordance with that obligation, we disagree with your assertion that there are "gaps" in the government production of documents in this case, or that our responses to your discovery requests were incomplete.[4/]

Moreover, you now criticize the production of documents from DOI, most of which you have had for over a year, for failing to include "original folders" and "folder covers," and for failing

---

[3/]Consequently, we decline your request that we produce FOIA responses the government has made to third parties regarding Palmyra Atoll.

[4/]In fact, we responded to your discovery requests in November, 2006. For you to now assert, seven months later, and after the close of discovery, that the responses are incomplete or non-responsive, is not only without merit, but your objections are untimely.

to identify the specific office that produced each particular document. We do not know what you mean by "folder covers" or "original folders." The documents were produced in the form that they were retained in the specific federal repository. At this late stage of the litigation, it would be impossible for us to trace each document to a particular file. Suffice to say, you have had most of these documents for well over a year, and have never asked us to trace each document to a particular office in the federal government. Moreover, there is no indication as to how tracing each document to an individual file has any relevance to the issues raised by defendants' pending dispositive motion.

We have the same response to your criticism regarding the privilege logs, and the redactions. The privilege logs, which you have had for some time, provide the relevant information regarding the source, recipient, and subject matter of the document to support the asserted privilege, be it attorney-client or deliberative process.

Nevertheless, we answer your specific questions as follows:

I will need to check with DOI regarding Document #8, and expect to get back to you early next week. As to Document #9, one can tell from the text of the document produced (a March 22, 2001 letter from Suzanne Case at The Nature Conservancy ("TNC") to Anne Badgley, FWS Regional Director) that the attachments are a copy of the Purchase and Sale Agreement between The Nature Conservancy and the Fullard-Leo family, which your client presumably already has, and a copy of the Licensing Agreement for fishing operations at Palmyra Atoll between Palymra Development Company, Inc. and Palmyra Pacific Enterprises LLC. As to the licensing agreement, TNC has asked us to retain its confidentiality, and we see no relevance between that document and your quiet title lawsuit to Kingman Reef. As to Documents #11 and 13, we responded to these very same questions in a February 8, 2007 letter to you. Please refer to that letter.

As to your criticisms of the February 8, 2007 privilege log, as we noted above, the privilege log provides the requisite information. In other words, the entry on the log provides information on the source, recipient, and subject matter of the document, thus demonstrating that the document is an inter-agency or intra-agency deliberation.[5/] Without knowing what specific information you believe is missing, and as to which specific document identified on the log, we cannot provide any more of a

---

[5/]Some of the identified documents are drafts. Moreover, some of the documents were also withheld as attorney-client privilege, and the basis for that privilege is likewise demonstrated by the entries in the privilege log.

response. Moreover, you cannot claim that we waived any and all assertions of deliberative process by pointing generally to hundreds of documents, none of which you identify. We deny that we have waived the assertion of the privilege.

As to your questions on page 4 of your letter regarding various attachments, as explained in the log, the attachments are no longer attached to the document, and thus, we cannot provide them to you. We produced the documents in the manner they were provided to us by the agency personnel, and we did not remove the attachments from the documents, unless they were privileged. In those cases, the privilege assertion is noted on a log.[6] As to your criticism regarding redacted documents, you did not specify which documents you are concerned about, and therefore, we cannot respond. Again, you have had the majority of these documents for over a year. If you had any legitimate concern with the government's earlier productions, you should have and could have raised it earlier.

You also ask us to produce a file purportedly held by FWS employee Phyllis Ha regarding Palmyra that "contains highly relevant information on the issue of abandonment." We have no idea what file you are referring to, nor does Ms. Ha. Any documents held by Ms. Ha and relevant to Kingman Reef have been produced as part of the government's initial disclosures.[7]

As to Ms. Ha's deposition testimony that Kingman Reef was input into FWS's Land Acquisition Priority System ("LAPS"), Ms. Ha advises that that testimony was a mistake, and that she is correcting her deposition testimony to reflect that. Kingman Reef was never put into LAPS, and DOI advises that there are no

---

[6] You also mis-characterize many of the entries on the log, and represent that there were attachments or other documents, such as "appraisal(s)" of Kingman Reef, or "background documents," when that is not how the log entries read.

[7] We understand from speaking with Ms. Ha that, at her deposition, you asked her for documents she mentioned regarding the "administrative record." The documents Ms. Ha was referring to are general memorandum governing the compilation of administrative records for Administrative Procedure Act (APA) cases brought pursuant to 5 U.S.C. §§ 701 et seq. This is not an APA case, and the guidance has no bearing on the issues raised by defendants' dispositive motions, and we note that you have not asked for the documents in your letter. Nevertheless, as it is not unreasonably burdensome for us to produce the limited number of documents Ms. Ha has on this topic, we will provide you with a copy of non-privileged documents later this week.

documents relevant to the LAPS system that mention Kingman Reef.

Also, your letter asks for documents from the "budget shop," and documents regarding the "April 18, 1998" document, we responded to these issues in a June 29, 2007 letter to you, which included responsive documents.[8] As to your request for e-mail correspondence between Robert Smith and Georgia Shirilla, that correspondence was sent and received at the direction of the attorneys in this case in preparation for the discovery in this case, and is attorney workproduct. As to correspondence between Robert Smith and Chuck Cook, defendants do not have copies of any such correspondence, but I will check directly with Robert Smith about your request.

As to your request for a response to the letter from Bill Kannamer to Department of the Navy attached to your letter, Navy has searched its files, and cannot locate a response. As to your request for "documents prepared or collected by [Solicitor's Office] attorneys in connection with [the] legal opinion" that your client did not own Kingman Reef, DOI advises that its Solicitor's Office does not have any written legal opinions on the issue of ownership of Kingman Reef. The Solicitor's Office in Washington D.C. has advised that it has located a draft response to a December 22, 2000 letter from Christian Porter to FWS, and four draft Executive Orders. These documents were produced from the files of Robin Friedman, an attorney in the Office of the Solicitor, United States Department of the Interior, and defendants are withholding all of them as attorney work-product.[9]

As to your request for the "environmental impact assessment" referred to in the November 8, 1998 letter (which you contend was

---

[8] Contrary to your assertions, defendants did not represent to Magistrate Judge Kurren at the May 14, 2007 hearing that we were "still looking for documents to produce to [plaintiff] as part of defendants' initial disclosures." Instead, we advised Judge Kurren that, consistent with our statements on the record at the deposition of John Doebel, we were searching for any additional versions of the April 1998 "briefing statement," in order to ensure that we conducted as thorough a search as possible for relevant documents.

[9] We disagree with your assertion that if a party asserts a legal position or conclusion in public, it has thus waived all privileged communications behind the legal position or conclusion. Such a reading of the attorney-client privilege would essentially eviscerate the privilege.

provided to Peter Savio by Robert Smith, but is actually a letter from certain members of the Senate to the Chairman of the Subcommittee on Interior, Committee on Appropriations, U.S. House of Representatives), that document pertains to Palmyra Atoll, not Kingman Reef, and is therefore not relevant to this case.

As to "record of communications" between The Nature Conservancy ("TNC") and FWS regarding the research done by TNC attorney ("TNC") attorney Suzanne Case, we have no such records, and I believe the deposition testimony in this case indicated that TNC and FWS communicated verbally on this issue. To the extent you are dis-satisfied with the document search from TNC pursuant to the subpoena you issued to it, you will need to proceed directly with TNC.

Finally, we disagree that Lt. Salvador was not competent to testify, and we do not agree to produce another 30(b)(6) witness on behalf of the Navy, and at government expense. A Rule 30(b)(6) witness testifies not as to personal knowledge, but as to the knowledge of the agency with respect to the designated topics in the notice.[10/] E.E.O.C. v. Thorman & Wright Corp., -- F.R.D. -- , 2007 WL 1638602 (D. Kan. 2007). As you know, Lt. Salvador signed defendants' earlier discovery responses regarding access requests to Kingman Reef, and because of his position, he would be aware of any requests to the Navy for access submitted while he has been in that position, and the protocol Navy follows regarding access requests. Moreover, defendants prepared him to address the topics on the Rule 30(b)(6) Notice to the United States regarding access to Kingman Reef, and he so testified. There is no genuine dispute here that the Navy has controlled access to Kingman Reef and its Naval Defensive Sea Areas for decades, and therefore, your continuing request for discovery on this topic is unreasonable.

Please let me know if you have any questions or comments.

Sincerely,

Donna S. Fitzgerald

Donna S. Fitzgerald
Trial Attorney
Direct dial: 202-305-0476

---

[10/] In fact, as we advised you and noted to the Court when we objected to your Rule 30(b)(6) Notice served on the United States, it is impossible for defendants to produce a witness with personal knowledge of any and all access requests handled by the Navy from 1934 forward.

cc: Christian Porter, Brooks, Tom, Porter, & Quitiquit
Donna Yamamoto, Brooks, Tom, Porter, & Quitiquit
Michael Ching, Cannata & Ching
Tom Helper, U.S. Attorney's Office

PALMYRA ISLAND & KINGMAN REEF

Extract from Ltr. CO NAS, Pearl Harbor to Buaero
File No. 109-40-RDK-RH of 13 July 1922

Subject: Annual Report for Fiscal Year 1921-22

Page #6

"(5) Palmyra Expedition (September 15-26, 1921)
An expeditionary force, incharge of the Commanding Officer, departed Pearl Harbor, September 15, 1921, aboard the U.S.S. EAGLE 40, carrying on board an N-9 seaplane, to accomplish the following purposes:-

(1) To secure defininte information concerning the Palmyra Island Group that might be of value in the event of war.

(2) To obtain photographs for construction of mosaic map of Palmyra

(3) To ascertain extent and condition of Kingman's Reef, which has been reported by ship masters as supporting vegatation.

(4) To further this station's policy of visiting, and compiling data upon all points of potential value in the 14th Naval District

(5) Secondarily to above, to succor the three inhabitants of these islands, who were gravely straitened as to provisions and clothing.

The expedtion was entirely successful as the following facts were established:-

(1) The preparations made for the trip and the manner of stowing and handling the plane were entirely satisfactory and demonstrate the feasibility of small craft such as Eagle Boats or Destroyers carrying planes of the general type of an N-9 on deck, for service at distant points.

File No. EG12/Kingman
(2) Seaplanes, but not land planes, can be successfully operated from the Palmyra Group.

Doc. No. (
(3) By the blasting out of coral heads, and a small amount of dredging, the whole of which would not require a large expenditure of funds, the three Palmyra lagoons could be converted into a deep, spacious and

safe harbor. It is the intention of the Palmyra Copra Company to blast a channel into the western lagoon if the progress of the venture of cultivating coconuts there warrants the expenditure.

(4) Kingmans Reef at low tide shows a small rock, not more than two feet above water and at times awash, and a larger object, which seems to be a sand island about fifty yards long and three feet high. There is no vegetation of any kind on the reef. At high tide the whole is probably submerged or awash. It is probable the reef is slightly larger than shown on the chart.

(5) For operations of this character, a destroyer is preferable to an Eagle Boat because of larger cruising radius, greater speed, superior sea-worthiness and increased comfort of officers and men.

(6) The raising of antenna on Eagle Boats, coupled with the practice of extreme care in the maintenance and adjustment of the apparatus, increases enormously the rated range of these small sets.

File No. EG12/Kingman
Doc. No.

UNITED STATES FLEET
BASE FORCE MINE SQUADRON TWO (E-2-27)HDD-WJP
U.S.S. WHIPPOORWILL

Pearl Harbor, T.H.,
15 July, 1926.

From: Commanding Officer.
To : Commander Mine Squadron Two.

Subject: Report of Preliminary Survey of Kingman's Reef.

Reference: (a) Your letter file AM35/H1-1(N-1) of 7 June, 1926.

Inclosure: (A) Development of Kingman's Reef.

1. In compliance with the above reference the Whippoorwill after obtaining a D.T. seaplane from the Naval Air Station for mapping and the necessary supplies from Pearl Harbor, proceeded from Honolulu at 0905, 21 June, 1926, with Mr. Lorrin A. Thurston and Mr. William G. Anderson, civilians, as passengers and Lieutenant D. N. Logan, U.S.N., three mechanics and a photographer from the Air Station, Pearl Harbor.

2. After clearing Honolulu Harbor, course was set 193 degrees true, speed 10 knots, with expectation of a westerly drift. However a southerly wind was experienced nearly all the way and no set observed. At 2000 on 24 June, the course was changed to 299 degrees true and speed reduced to eight knots in order not to approach the reef during darkness.

The morning of the twenty fifth was clear with a light easterly breeze and a good fix was obtained. From the position of the morning fix the reef should be sighted on the port bow about 0900.

3. About 0909 the ship was stopped and a sounding taken - (no bottom at 300 fathoms). A sun sight was taken at this time and the sumner line out the center of the plotted position of the reef; the course was changed to the direction of the sumner line (156 degrees true) and speed reduced to three knots. At 0946 breakers were sighted dead ahead. The ship proceeded ahead slowly, working the leads and keeping the breakers open to port, heading for green water which was picked up shortly after sighting the breakers and at 1015 sighted Kingman's Island bearing 160 degrees true. Bottom was obtained at 85 fathoms when about 1000 yards from the green water and was immediately followed by a sounding of 13 fathoms. We were on the northern side of the reef but from this angle and the low altitude of the sun, the reef was very deceptive and it looked as though better water was on the southern side of the reef, The ship was worked on and off sounding around the western end of the reef to the southern side. When about two miles, 230 degrees true from the Island, the ship was eased in until about 800 yards from the breakers with no bottom at 300 fathoms. However a good view of the lagoon and reef could be had as the sun was now very high and the

File No. LG 12-/ Kingman
Doc. No. 9

only entrance appeared to be from the westward, as surf was breakin on the northeastern, eastern and southern reefs. The ship proceeded back along the wouthern reef with the expectation of locating an anchorage for the night as it was getting late in the afternoon and to heavy a swell running to attempt to lower the plane for observation. When nearing the western end of the reef the ship was eased in and upon approaching the reef on soundings the green water appeared to be about 500 yards wide with good water on the other side. The water was very clear and bottom could be seen in 15 fathoms. The ship was slowly worked across the reef, the least water obtained being 6 fathoms and most doundings were 8 to 10 fathoms. After crossing the reef, the ship headed northeast for about one mile then the southwestern reef was paralleled and we proceeded on soundings of over 15 fathoms until we anchored at 1607 about one mile, 270 degrees true from the Island in 20 fathoms, coral bottom. The seaplane and boats were lowered and the plane took the air for half an hour for observations.

4. On the 26th it was very squally with heavy surf on the reef and nothing was done except to visit the Island where the American flag and record of annexation in May of 1922 by Mr. Thurston were found in a glass container as were the records of a visit by Mr. Anderson in 1924.

5. On the 27th, bench mark, tide guage and main triangulation stations were established and base line measured, a base line of 1150 feet, 219 degrees true from the Island being selected as the best under existing conditions. On the 28th and 29th of June, signal stations were erected and transit angles taken from all stations; soundings being started late in the afternoon of the 29th and continued until the inner edges of the northeastern, eastern and southern reefs were developed and the outer edges plotted approximately as shown on enclosure "A".

Tide and current data was taken as were observations for determining position of the Island.

6. The continual low cloud formation and frequent rain squalls prevented the successful mapping of the reef from the air although a few mapping pictures were taken, also several obliques, which are being developed by the Air Service.

7. On the morning of July 3, the ship shifted anchorage towards the western end of the lagoon and planted one "Dan" mining buoy on the southern reef and one on the northern reef with the intention of developing the remainder of the southern leg and the northwestern leg, using these buoys and the ship as stations, but the day turned out to be squally and little was accomplished and the ship shifted back to the inner chchorage late in the afternoon, leaving the buoys in place with intention of going ahead on the 4th. But the 4th proved a repetition of the 3rd with an increasing wind and a general outlook for bad weather.

File No. EG12/Kingman



KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 12

US0038

Subject: Report of Preliminary Survey of Kingman's Reef.

8. About noon of the 4th the weather cleared a little but as our food supply was getting low and weather conditions looked unfavorable, I decided to abandon the development of the western reef and return to Pearl Harbor. At 1155 we got underway and on reaching the western end of the lagoon found that our buoys had gone adrift and could not be located. Departure was made over the northwestern reef, the motor launch going about 100 feet ahead of the ship taking sounds as the weather was none too clear but with calm water within the lagoon and on the reef. The reef was about 700 yards in width, where crossed and the least water recorded was 5-1/2 fathoms, with bottom plainly visible the entire width.

9. A heavy sea was running outside the reef and much difficulty was had in hoisting the motor boat due to the ship rolling heavily and the two spare wings for the seaplane, which were stowed in the wherry skids, were damaged.

The wind and sea gradually increasing until 0800, 5 July when a heavy sea was running with wind force six from the northwest which was held until we reached latitude 12 north.

10. General character:

The reef is of Atoll character, triangular in shape, with base to the southward and apex to the northward, about 9 miles long east and west by 5 miles north and south at the widest point, narrowing towards each end and the rim varying in width from 500 to 2000 yards with an Island 130 by 90 feet at the eastern end. It dries from one to three feet on its northeastern and eastern edges and for about 4 miles on the southern edge with constant breakers on the outer rim. The approach is steep-to and drops off very suddenly on the lagoon side to depths of 10 fathoms and over. The lagoon is about 7 miles long and 3-1/2 miles wide and the general depths are from 10 to 40 fathoms except for a few shoals which are shown on enclosure "A"; with good holding ground. It is believed an entrance can be made to the lagoon at almost any place on the northwestern leg which is about 4-1/2 miles long and on the western end of the southern leg of the reef in depths of not less than six fathoms, the Whippoorwill entered the lagoon over the western end of the southern leg and left over the northwestern leg; the least water obtained was six fathoms on entering and five and one half on leaving. The water within the lagoon during our visit was perfectly calm while a moderate sea was running outside the reef and the wind was blowing from 1 to 4 with frequent rain squalls. The position of the Island as determined by observations from the ship is: Latitude 6 degrees, 24 minutes and 57 seconds North, Longitude 162 degrees, 20 minutes and 00 seconds West.

File No. G12/Kingman

11. General conclusions as to military value:

Doc. No.

It is believed a channel of over six fathoms exists and should the occasion ever arise for our fleet to disappear from sight in the vicinity of the Hawaiian Islands, Kingman's Reef would afford an excellent base as the northeastern eastern and wouthern reefs give absolute protection from torpedo attack while the northwestern reef would be easy to patrol. It would be a most excellent base for



KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 12

US0039

Subject: Report of Preliminary Survey of Kingman's Reef.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

destroyers, submarines or aircraft should it ever be desirable to establish a patrol to the southward of the Hawaiian Islands. It is well off the usual trade routes and large enough to give an excellent anchorage to our whole fleet.

12. Recommendation for final survey:

The general character of the reef, work to be performed and weather conditions make the establishment and visibility of station very difficult. It is therefore recommended that the main triangulation stations be erected to a height of 30 feet and of tripod type. That the secondary stations be of iron pipe, guyed with wire secured to three concrete blocks or similar weight of about 150 lbs. and erected to a heighth of 20 feet.

That about six buoys be planted on the westernreef and that two or three flat bottom boats be taken along for work on the reef.

It is also suggested that a drag be used on the western leg of the reef.

W. J. POLAND

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

File No. Kingman
Doc. No. 9