UNITED STATES FLEET
FLEET BASE FORCE - MINE SQUADRON TWO
U. S. S. LUDLOW (FLAGSHIP)

E1-18(SECRET)

Pearl Harbor, T. H.,
13 June, 1927.

From: Commander Mine Squadron Two.
To : Chief of Naval Operations.
Via : Commandant, 14th Naval District.
Commander Fleet Base Force.
Commander in Chief, U.S. Fleet.

Subject: Survey of Kingman Reef.

Reference: (a) Cominron Two letr. E1-18(Secret) of 27 July 1926 and indorsements thereon.
(b) Hydrographic Office letr. Q.H.78 E1-18(42344) Nav 12-RAW-AR of 16 November 1926, (Secret).

Inclosure: (A) Report of Officer in Charge of Survey (Copy for each addressee).
(B) Blueprint from tracing made from smooth sheet (Copy for each adressee).
(C) Mosaics made on preliminary survey (Copy for each adressee).

1. In compliance with references and schedule of Mine Squadron Two approved by Commander in Chief, U.S. Fleet, WHIPPOORWILL and TANAGER sailed from Pearl Harbor for Kingman Reef on 13 April, 1927. Date of sailing of LUDLOW and BURNS was delayed until 20 April by orders from Chief of Naval Operations and Commandant, 14th Naval District.

2. LUDLOW and BURNS arrived at Kingman Reef the afternoon of 24 April. WHIPPOORWILL and TANAGER had erected the fixed triangulation signals and sounding from two 36' and two 30' motor launches was commenced 25 April.

3. Seven Dan Buoys were planted on the western end of the reef but proved to be unsatisfactory due to difficulty in locating them accurately and seeing them. Consequently, LUDLOW, BURNS and TANAGER shifted berth and moored bow and stern so as to act as signals. This was satisfactory and made it possible to complete the soundings.

4. The services of Lieutenant Commander S.W. Tay, U.S.N.R.F., who has had wide experience in Coast and Geodetic survey work, were of great value. Special credit is due to Lieutenant Commander E. Griffin and Lieutenant Commander Tay for their efficient work in accomplishing the difficult triangulation work on the reef where sea was breaking.

File No. A6-12/Kingman
Doc. No. 27



KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 13

US0065

FLEET BASE FORCE - MINE SQUADRON TWO
U. S. S. LUDLOW (FLAGSHIP)

Cominron Two to Opnav.
H1-18(SECRET) 13 June, 1927.

SECRET

Subject: Survey of Kingman Reef.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

5. The preliminary survey conducted in 1926 by Lieutenant .J. Roland, U.S. Navy, proved to be accurate and exceedingly helpful. Lieutenant Roland also did splendid work in getting signals erected in time for the Squadron to commence sounding 25 April.

6. Kingman Reef affords a safe, smooth anchorage except in westerly weather and may prove of future value to the Fleet. Large quantities of edible fish easily caught by all vessels of the Squadron were most acceptable in varying diet on the cruise.

7. Original of smooth sheet has been forwarded direct to Hydrographic Office. Record books and all recorded data concerning the survey will be retained in LUDLOW until receipt of smooth sheet is acknowledged when they will also be forwarded.

H. JONES.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

5311-E
SECRET
S-9-B

FIRST ENDORSEMENT J/G
HEADQUARTERS, FOURTEENTH NAVAL DISTRICT,
PEARL HARBOR, T. H.

[stamp] 25 1927

From: Commandant, Fourteenth Naval District.
To: Chief of Naval Operations.
Via: (1) Commander Fleet Base Force.
(2) Commander-in-Chief, U. S. Fleet.

1. Forwarded.

2. Inclosures (B) and (C) are forwarded under separate cover, by registered mail.

JNO. D. McDONALD.

File No. EG12/Kingman
Doc. No. 27

Comdt 14ND

KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| KINGMAN REEF ATOLL INVESTMENTS, L.L.C., a Hawaii limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>THE UNITED STATES OF AMERICA; THE UNITED STATES DEPARTMENT OF INTERIOR; THE HONORABLE GALE A. NORTON, in her official capacity as Secretary of The Interior; THE UNITED STATES FISH & WILDLIFE SERVICE; STEVEN A. WILLIAMS, in his official capacity as Director of United States Fish & Wildlife Service; JOHN DOES 1-10; JANE DOES 1-10; and DOE PARTNERSHIPS, CORPORATIONS, GOVERNMENTAL UNITS or OTHER ENTITIES 1-10,<br><br>Defendants. | CIVIL NO. CV05-00151 JMS/BMK |

DEPOSITION OF DENNIS PACHT
May 2, 2007

REPORTED BY:
Marjann Shawler, RPR, CSR 182
Notary Public, State of Hawaii


KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 14

Taken on behalf of the Plaintiff Kingman Reef Atoll Investments, L.L.C., pursuant to Notice, on Wednesday, May 2, 2007, commencing at 10:00 a.m., at the offices of Brooks Tom Porter & Quitiquit, LLP, 841 Bishop Street, Suite 2125, Honolulu, Hawaii 96813.

APPEARANCES:

For the Plaintiff:

MICHAEL M. CHING, ESQ.
Cannata Ching & O'Toole, LLP
899 Ellis Street
San Francisco, California 94109
(415) 409-8900

DONNA H. YAMAMOTO, ESQ.
Brooks Tom Porter & Quitiquit, LLP
2125 Davies Pacific Center
841 Bishop Street
Honolulu, Hawaii 96813
(808) 526-3011

For All Named Defendants:

RANDALL Y.K. YOUNG, ESQ.
Assistant United States Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawaii 96813
(808) 541-2850



INDEX


| EXAMINATION: | PAGE |
|---|---|
| BY MS. CHING | 5 |

EXHIBITS MARKED FOR IDENTIFICATION:

| | | |
|---|---|---|
| 126 | Notice of Taking Oral Deposition | 7 |
| 127 | Executive Order (1934) | 24 |
| 128 | Order no. 3223, Kingman Reef | 41 |
| 129 | Letter, Zeigler to Anders, 1/5/82 | 44 |
| 130 | Letter, Johnson to Edwards, 4/26/83 | 44 |
| 131 | Executive Order 8682 | 50 |
| 132 | Executive Order 8729 (1941) | 50 |
| 133 | E-mail chain, Yamashita and Pacht, 12/98 | 59 |
| 134 | E-mail, Pacht to Kamerman, 12/22/98 | 64 |
| 135 | E-mail, Shirilla to various, 4/10/00 | 65 |
| 136 | E-mail, Ha to various, 12/16/00 | 77 |
| 137 | E-mail, Pacht to Shirilla, 6/14/00 | 86 |
| 138 | Defensive Sea Areas/Airspace Reservations | 89 |
| 139 | Handwritten notes, H. Goddfrey, 7/19/77 | 91 |
| 140 | E-mail chain, Kilian and Dong, 10/99 | 95 |





EXHIBITS MARKED FOR IDENTIFICATION (cont'd):

| | | |
|---|---|---|
| 141 | Memo, Transfer of Kingman Reef, 12/21/99 | 99 |
| 142 | E-mail chain, Smith and Egeland, 02/00 | 100 |
| 143 | Memo, Wery to Potts, 4/13/95 | 101 |
| 144 | Letter, Holaday to Berry, 8/25/00 | 103 |
| 145 | Memo, Munsell to Naval Operations, 2/17/00 | 105 |
| 146 | Letter, U.S. Senate to Babbitt, 10/26/00 | 107 |




DENNIS PACHT,
having been called as a witness and being first duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. CHING:
Q. Would you please state your name, and spell your last name for the record.
A. Dennis Pacht, P-a-c-h-t.
Q. Good morning, Mr. Pacht. My name is Michael Ching. I represent the plaintiffs in this particular matter. Before we get started, I just want to ask you if you've ever had your deposition taken before?
A. No.
Q. Okay. Before we get started, I just want to go over some basic rules of the road here. You have your attorney, Mr. Young, here. So I'm sure that he can help advise you as we go along here.
As you can see, we have a court reporter here taking down everything we say. It is important that we speak slowly and clearly, something that I try to do all the time, and that we speak one at a time, because she can only take down one of us at a time. It is important that we don't speak over each other. You need to answer audibly because she can't take down

Page 14

A. Yes, correct.
Q. Who would you be leasing the property to?
A. To either individuals out there or to corporations.
Q. Generally for what purpose?
A. The leases were principally for business purposes, hotels.
Q. And the Land Management Office, just to clarify, was it a particular branch of the government that you were with then?
A. It was part of the Trust Territory of the Pacific Islands which was a trusteeship created by the United Nations after World War II to administer Micronesia, the area known as Micronesia.
Q. So, if you know, was the guiding kind of authority there international law or U.S. law?
A. U.S. law. There was a local code.
Q. What was that code called; do you recall?
A. Trust Territory Code, I believe.
Q. In 1979, that's when you started employment at the Department of the Navy?
A. Correct.
Q. As a civilian?
A. Yes.
Q. What was your first position in 1979 with

Page 15

the Navy?
A. It was called realty specialist, as a GS-12.
Q. And as a realty specialist in 1979 with the Department of the Navy, what would be your duties?
A. We worked on three areas. One was land acquisitions, land disposals and land management type projects.
Q. As far as land acquisitions, what would that basically encompass?
A. When the Navy had a requirement for either ownership or a leasing of property, we would negotiate for either the purchase or lease of the property.
Q. What types of property would the Navy want to purchase?
A. One that comes to mind at the moment was an area known as Waikane over on the northern part of this island, Oahu. It was a former range which could not be cleaned up to make it safe. So when the Navy -- actually the Marine Corps used it, it was under lease and eventually we decided instead of trying to clean it up -- or because it couldn't be cleaned up, rather, we needed to purchase it to be able to exclude people from the area for safety purposes.
Q. Who owned Waikane at that time?
A. It was a local family by the name of Kamaka.

Page 16

Q. And then did the Navy eventually acquire that property?
A. Yes.
Q. I think the second category you mentioned was land disposal?
A. Right.
Q. Just explain to me a little bit about what that is.
A. When the Navy no longer has a need for property, there is various processes you go through. There is -- we generally categorize property either as Class 1 or Class 2 property; Class 1 property being land and Class 2 being facilities, buildings and so forth, and there are different processes you go through for disposal of two particular types of property.
Q. Could you give me some examples of how the Navy would dispose of property, land? We'll just talk about Class 1 property.
A. There are two different -- well, I have been involved in two different ways. Well, there are actually three ways.
Q. Okay.
A. One is -- and the most prevalent way would be if you would be reporting it to the General Services Administration, and you fill out forms and so forth and

Page 17

describe the property, et cetera, and you send the disposal package off to GSA, and they are in charge of the actual disposal of it.
Second method is through BRAC, base closure, such as out at Barbers Point here, where authority for the disposals are delegated to the individual departments. So we would then be doing the actual disposals ourselves versus GSA.
Q. BRAC would be shutting down military bases and facilities?
A. Yes.
Third one is minor where the value is less than 15,000, we have special delegated authority to dispose of property ourselves. And not much here is worth less than 15,000, so it is not used very often.
Q. When you say "special authority" to dispose, for example?
A. It is delegated GSA authority when the value is less than 15,000.
Q. So essentially when it is 15 grand, GSA just doesn't want to deal with it?
A. Exactly.
Q. Just too small, doesn't hit their radar screen?
A. That's right.

Page 18

Q. What was the third?
A. Management. That's more or less a leasing program. When property is temporarily not needed for military purposes, we have authority to lease it out for various purposes.
Q. Is there another position that you moved into at the Department of the Navy?
A. Through promotions, I was promoted to GS-13 level and then eventually to my current GS-14 level.
Q. Did your duties change when you were promoted to a GS-13?
A. No.
Q. So you --
A. Just the complexity of the projects.
Q. So still doing --
A. -- same work, yes, right.
Q. And how about when you were promoted to GS-14 level?
A. I gained supervisory responsibilities but doing essentially the same work, but additionally supervising people doing the same kind of work also.
Q. Land management, land acquisition and disposal?
A. That's correct.
Q. I'm just curious. When were you promoted to

Page 19

GS-14?
A. I believe in 2003.
Q. Is there another person who heads up your department, or are you --
A. Yes.
Q. Who would that be?
A. The current person is -- his name is James Leary, L-e-a-r-y.
Q. Same business address?
A. Yes.
Q. And just so I can see kind of how everything falls, do you come right under Mr. Leary?
A. Yes.
Q. And there are probably multiple supervisors under Mr. Leary?
A. Two.
Q. I guess that would be a couple. All right.
A. Right.
Q. And then how many under your direction?
A. Approximately ten.
Q. Who are those people?
A. There are, I believe, five realty specialists, one surveyor, one cadastral person, two student summer hires. I'm not sure if that adds up to ten or not.

Page 20

Q. I think that's close enough.
I just want to go back to your file of -- can I just call them Kingman Reef documents that you have that you reviewed in preparation for today's depo?
A. Sure.
Q. Were there any documents in there concerning title to Kingman Reef?
A. Only the 1934 Executive Order.
Q. In your work, do you also search and/or examine title of particular pieces of property; is that part of your job description?
A. If we need a title search, we contract for it with a local title company.
Q. Who is that company?
A. Various ones in town.
Q. Did you do a title search for Kingman Reef?
A. No.
Q. Did you do a title search for Kingman Reef at any time?
A. No.
Q. Were you ever asked to do a title search for Kingman Reef?
A. No.
Q. So if you were asked to do a title search for Kingman Reef, would you personally know how to go

Page 21

about doing that?
A. No.
Q. Have you seen any documents besides the 1934 Executive Order that would demonstrate a chain of title to Kingman Reef?
A. No.
Q. Were you at any time ever asked to inquire about any documents that referenced or reflect chain of title for Kingman Reef?
A. No.
Q. Are you aware of whether the Navy has any documents that would reflect a chain of title for Kingman Reef?
MR. YOUNG: I believe the witness already testified he reviewed the 1934 Executive Order.
Q. BY MR. CHING: You can go ahead.
A. That's the only document that I am aware of.
Q. So is it fair to say that file of Kingman Reef documents is, to your knowledge, the only documents that pertain to Kingman Reef that the Navy would have?
A. Please restate.
Q. The file of documents that you reviewed that were called the Kingman Reef documents, would those be the entirety of documents relating to Kingman Reef in

Page 34

just talking about indicia, something different than actual ownership, right?
MR. YOUNG: Do you understand the question?
THE WITNESS: Sort of.
MR. CHING: Let me rephrase. I don't want you to go confused.
A. It is not as though there was a deed you can go back and look at and say, oh, yeah, the title passed from so-and-so to the federal government on such-and-such a date. That's not the situation here.
Q. BY MR. CHING: What would the government need to do in order to secure ownership of Kingman Reef?
MR. YOUNG: Objection. Calls for a legal conclusion, but he can give his opinion.
A. I frankly do not know.
Q. BY MR. CHING: But it is your opinion that the 1934 Executive Order did confer ownership on the United States?
A. No.
Q. Did you -- have you reached any conclusion about ownership of Kingman Reef at any time?
A. I've never researched it.
Q. Let me see if I can just sum up then with this. You are saying under the 1934 Executive Order,

Page 35

it was -- it gave the Navy administrative jurisdiction and control, right, which under that umbrella of administrative jurisdiction -- is that right?
A. Yes.
Q. Under that umbrella of jurisdiction -- administrative jurisdiction and control, we have housekeeping, maintenance, protection and police powers, right?
A. Yes.
Q. And that those, in your mind, are indications of ownership, correct?
A. Yes.
Q. But that's not actual ownership -- or you have not formed any opinion about actual ownership?
A. That's correct.
Q. Would you be able to form an opinion or conclusion, as you sit here today, based on what we know about the executive order --
A. No.
Q. -- about ownership of Kingman Reef?
A. No.
Q. Why is that?
A. I don't have available to me all of the documentation.
Q. What else would you need to see?

Page 36

A. Whatever is available, you know. As I said, I've never conducted a search.
Q. Would you consider yourself knowledgeable in issues of title and ownership of real property?
A. I have some knowledge. I can't say that I have any legal training in it or any particular training in it.
Q. Between 1934 and January 2001, what did the Navy do, specifically do, to carry out its authority of administrative jurisdiction and control?
A. I have no personal knowledge.
MR. CHING: That's all I'm asking for, Counsel, just whether they did anything in the housekeeping, you know, duties.
MR. YOUNG: Well, he has answered.
Q. BY MR. CHING: Nothing?
A. I have no personal knowledge.
Q. Maintenance; did the Navy do anything between 1934 and 2001 that would constitute maintenance of Kingman Reef?
A. I have no personal knowledge, although what would you do on a reef that's under water most of the time.
Q. That's a good point.
How about protection; did the Navy do

Page 37

anything by way of protecting Kingman Reef?
A. No personal knowledge.
Q. Have you heard from any third parties about the Navy doing something to protect Kingman Reef?
MR. YOUNG: Objection. Hearsay.
You can answer.
A. No personal knowledge.
Q. BY MR. CHING: From third parties regarding maintenance issues?
A. No personal knowledge.
Q. Anything hearing from third parties about housekeeping issues?
MR. YOUNG: Same objection.
But you can answer.
A. No personal knowledge.
Q. BY MR. CHING: What about police powers; did the Navy do anything between 1934 and 2001 to exercise its police powers over Kingman Reef?
A. No personal knowledge.
Q. Did you hear from any third parties?
A. No.
Q. All these categories, housekeeping, maintenance, protection, and police powers, between 1934 and 2001, are there any documents that you know of that might describe or pertain to the Navy exercising

Page 54

A. Please restate.
MR. CHING: Could you read that back, please.
(The reporter read back the record as follows: Question: Does the creation of the Kingman Reef Naval Airspace Reservation and the Kingman Reef Naval Defense Sea Area equate to ownership in your mind?)
MR. YOUNG: Objection. Calls for a legal conclusion.
You can answer if you are able to.
A. My understanding, it does not.
Q. BY MR. CHING: It does not?
A. Yes.
Q. Do you know or do you have any information to suggest this 1941 Executive Order affects the emergent lands of Kingman Reef?
A. The submerged lands, is that what you said?
Q. Emergent.
A. Emergent? No.
Q. No? We're just talking about air and sea, right?
A. Yes.
Q. I may have already asked this, but just so I can kind of segue in, your testimony today is that

Page 55

you've never done any title research regarding Kingman Reef at any time; is that right?
A. That's correct.
Q. So no one has ever asked you to look at the title issues of Kingman Reef specifically in connection with the creation of the Kingman Reef National Wildlife Refuge?
A. That's correct.
Q. If someone were to do that research on title, who would it be?
MR. YOUNG: Do you mean for the Navy?
MR. CHING: Let's do that. Thank you, Counsel.
Q. BY MR. CHING: For the Navy.
Let me rephrase that. Strike that.
If there was ever a question about title over a piece of property, who on behalf of the Navy would research that issue?
A. We would hire a title company through contract.
Q. In this case where Kingman Reef was under the jurisdiction and control of the Navy, any issues regarding title to Kingman Reef then you are saying would be referred to a title company?
A. If there were an issue, yes. Initially,

Page 56

sure.
Q. And would that inquiry come to your office for a title search on a property like Kingman Reef?
A. Yes.
Q. So if there ever were a question about title, you would know about it?
A. Yes.
Q. So is it safe to say if you didn't hear about an issue of title regarding Kingman Reef that the government didn't look into it?
A. Please --
Q. Strike that.
Would you be the only office that would get an inquiry from any branch of the government regarding the ownership of Kingman Reef?
A. Such an inquiry could come in anywhere in the Navy, but it would probably be referred to our office.
Q. To you?
A. Yes.
Q. Maybe inquiry from Fish and Wildlife Service would still come to your office?
A. Yes.
Q. Were you aware that prior to January 1, 2001 -- strike that.

Page 57

Prior to January 18, 2001, were you aware that there was a dispute to title of Kingman Reef?
A. No.
Q. Do you have an understanding today that there is a dispute to title of Kingman Reef?
A. Yes.
Q. How do you know that, by virtue of this litigation?
A. I'm here.
Q. When did you first learn there was a dispute to title of Kingman Reef?
A. Probably in 2001.
Q. Mid-2001 -- let me do this: Sometime after January 18, 2001?
A. Yes.
Q. Let's say that an inquiry came in to research title on Kingman Reef. Who would be the person at your office to render that opinion?
A. No one in the real estate office -- well, legal opinions as to title are done by our counsel's office.
Q. Just to understand, you guys would refer the question out to a title company, get the response, forward the response over to your counsel, who would then prepare an opinion?

Page 58

A. Yes.
Q. And then forward that on to whoever made the request?
A. Yes.
Q. If there is a dispute over title -- let's say it is a dispute over title of Kingman Reef -- would your office, as a matter of course, perform an inquiry on that title of the property?
A. We would likely be asked to provide whatever records we had to counsel's office.
Q. Can you think of an instance where there was a dispute to title that was -- regarding a property under the jurisdiction and control of the Navy that you did not research?
A. Can you restate the question?
Q. Sure.
In this case there is a dispute over the land of Kingman Reef -- strike that.
Can you ever think of a situation or an instance where there was a dispute to title over property in which the Navy had jurisdiction and control that you did not perform a title search on?
MR. YOUNG: I think that's a compound question.
But if you can understand what he is asking, answer.

Page 59

A. Offhand, I'm not aware of -- since I have been with the Navy, of a dispute on title other than this instance of Kingman Reef.
Q. BY MR. CHING: So this is basically it?
A. Yes, right.
MR. CHING: Let's mark this as next in order, 133.
(Marked for identification Exhibit No. 133.)
Q. BY MR. CHING: Have you had a chance to review Exhibit 133?
A. Still reviewing.
Q. Let me just identify it for the record. 133 is a two-page document Bates-stamped USID0002485 and USID0002486.
A. Okay.
Q. Do you recognize this?
A. Yes.
Q. What is Exhibit 133?
A. It is an exchange of e-mail messages between myself and person by the name of Byrnes Yamashita.
Q. Who is Byrnes Yamashita?
A. He is a planner with our command.
Q. Just briefly, what does a planner do?

Page 60

A. Prepares master plans for naval bases.
Q. Do you have any reason to doubt these communications happened in or about December 22nd, 1998?
A. No.
Q. Let me shortcut this. What's going on in this series of e-mails?
A. There is a publication -- CIA publication known as the World Fact Book which is published periodically and talks about different areas of the world, and they were asking whether or not anything had changed from previous publications.
Q. Take a look at I guess it would be the second e-mail there on page 2485 where it says, "Yes, we've handled this in the past."
A. Yes.
Q. That's your communication, right?
A. Yes.
Q. When you say, "Yes, we've handled this in the past," what are you referred to?
A. Previous updates of the fact book.
Q. You see in that second paragraph where you say, "Somehow doubt if it appears on anyone's plant account records," what did you mean by that?
A. Just that it did not appear in the database -- that I did not think -- or I doubted it appeared in the database of Navy assets. Whether it did or didn't, I didn't look up.

Page 61

Q. The database of Navy assets, what type of information would be in that database of Navy assets?
A. It is just an electronic database of properties that are owned by the Navy -- or controlled by the Navy. Sorry.
Q. Is there a difference?
A. All federal -- the lands the Navy uses are owned by the federal government and are under the administrative control of the Navy.
Q. All of them?
A. Yes, other than, say, leased property.
Q. So if it is not -- so am I understanding correctly that if the Navy owns a piece of property, it is in the database of Navy assets?
A. Not necessarily.
Q. Who upkeeps the database of Navy assets?
A. Our office does for the properties in the Pacific.
Q. So your office -- if Kingman Reef was owned by the Navy, then it would be in the database of Navy assets at your office?
A. Not necessarily.

Page 66

Q. BY MR. CHING: So have you seen this document before?
A. I don't think so.
Q. You know who Georgia Shirilla is, right?
A. Yes.
Q. Who is Georgia Shirilla?
A. She's a realty specialist with Fish and Wildlife Service, I think in Portland.
Q. Do you recall having a conversation with her in or about April of 2000?
A. Yeah.
Q. And what was that conversation about?
A. About the transfer of the Kingman Reef from the Navy to Interior, Fish and Wildlife Service.
Q. Let's talk about a little bit about that transfer. When were you first contacted regarding a potential transfer of the administrative jurisdictional control over Kingman Reef through the Department of the Interior?
A. I think early in 2000.
Q. January or February?
A. I don't recall the exact month.
Q. Would this April 2000 conversation be maybe the first or close to it?
A. No. It would have been previous to this.

Page 67

Q. Who first contacted you about that transfer?
A. Our headquarters, the Naval Facilities Engineering Command headquarters.
Q. Any one in particular there?
A. I don't recall who it was.
Q. Did anyone else -- let me just ask: Did Georgia Shirilla directly contact you about that transfer?
A. We had subsequent conversations about the transfer once we became aware that Fish and Wildlife was interested in obtaining the reef.
Q. When did you become aware of that?
A. In early 2000.
Q. Do you know why Fish and Wildlife wanted to retain -- or to obtain the jurisdiction and control of Kingman Reef?
A. They were interested in including it as part of their wildlife program.
Q. So as of early -- as of early 2000, you knew that the Fish and Wildlife Service was planning to create the Kingman Reef National Wildlife Refuge?
A. Not by that name.
Q. What name would you know it as?
A. At the time there was a great interest to the federal government about preserving coral reefs,

Page 68

and it was part of that effort.
Q. What name did you understand it to be?
MR. YOUNG: Objection. Assumes a fact not in evidence.
A. All I knew of it as was the transfer -- proposed transfer of Kingman Reef.
Q. BY MR. CHING: And for what purpose?
A. For preservation of the area.
Q. And did you have an understanding of how they would preserve that?
A. No.
Q. Did you have a general understanding of how the Fish and Wildlife Service would preserve coral reefs out in the middle of the Pacific?
A. Not really, no. Just including -- I don't know. I have no idea what they would do.
Q. Did wildlife refuge --
A. Somehow management of the area.
Q. Did wildlife refuge ever come up?
A. I don't recall one way or the other, but it was for preservation of coral reefs. That was the underlying reason for the transfer.
Q. Does it surprise you that a wildlife refuge was established to preserve those coral reefs?
A. No.

Page 69

Q. And prior to January 2001, you've never heard anyone from the Fish and Wildlife say that they wanted Kingman Reef so they could basically create a wildlife refuge? They just wanted to preserve it; is that what you are saying?
A. That's generally my understanding.
Q. So you had no idea that plans were being made to establish a wildlife refuge over Kingman Reef?
A. That's correct.
Q. Let's talk about the transfer. Did you have any options -- what is it about -- what was your role in coming up with a plan for the transfer, if you will? Did you come up with a plan for the transfer?
A. Yes.
Q. And that was your role in all of this?
A. Yes.
Q. So tell me about that.
A. First, there was the -- first step was determining whether or not there was a continuing Navy requirement for the property after we received the request for transfer. I went through that process, and there was an indication by the Navy operators that they had no continuing requirement for it.
I then did a screening notice of other DOD agencies to see if they were interested in it, because

Page 70

under DOD policy we're supposed to offer excess properties to other DOD agencies first before reporting it as excess to the department.
I then began preparation of a report of excess of the property to GSA in accordance with normal disposal procedures. Subsequently, it was determined that because the area is outside of GSA's jurisdiction that we could do the transfer directly. So I forwarded all of the background material to our headquarters in Washington.
Q. You are talking directly to the Department of the Interior?
A. No, to our headquarters, to Naval Facilities Engineering Command headquarters.
That was the end of my participation.
Q. So fair to say that what you did was you kind of came up with the how-do-you-do-it part of it, kind of the plan of what needs to be done to get it transferred?
A. No. I initially did the -- prepared drafts of the paperwork to report it to GSA, and GSA would have effected the transfer. But being as it was concluded that GSA did not have a role in the transfer, I forwarded all of the background material to our headquarters, who then took the -- who then worked with

Page 71

our secretariat to develop the transfer document.
Q. So did you have any part of the transfer document -- preparation of the transfer document?
A. No.
MR. CHING: Let's go off the record very briefly.
(A discussion was held off record.)
Q. BY MR. CHING: What does it mean when the Navy deems something excess?
A. It means it has no further operational requirement for the property.
Q. Do you know if the Navy had any operational requirement for Kingman Reef at any time? Let me back up. Let me lay some foundation.
What is a naval operational requirement?
A. A need for a use of the property or control or what have you.
Q. What type of use?
A. Normally it is for active, you know, naval purposes.
Q. For example, Navy base?
A. A naval base, a weapons base, what have you.
Q. Storage of waste or whatever?
A. Right.
Q. Did Kingman Reef at any time have an

Page 72

operational --
A. I can't speak to that.
Q. In any case, by early 2000 it was considered excess at that point?
A. That's correct, yes.
Q. And you are not sure if the Navy had an operational purpose at any time at Kingman Reef?
A. I can't speak to that. Navy Region Hawaii would have to address that issue.
Q. Second full paragraph where Georgia Shirilla says: "I called Dennis Pacht, who was head of the real property branch of the Navy in Honolulu. Dennis confirmed that this (sic) was happening."
What is she referring to "this"?
A. The transfer.
Q. You see that last sentence, same paragraph, where it says: "Dennis was working on his package to the GSA"?
A. Yes.
Q. Is that what you were talking about that you forwarded on to, I guess, naval headquarters, for lack of a better term?
A. No.
Q. Okay.
A. It was the normal disposal package that we

Page 73

would give to GSA when we thought we were going to use that disposal route. As I said, subsequently it was concluded that we did not need to use GSA because it was not within GSA's area of responsibility, and so the conclusion was that we would do a direct transfer from Navy to Interior, and GSA would play no -- would have no role.
Q. Why did the GSA have no role in this particular transfer?
A. Because their area of responsibility is defined in their statute creating GSA as to a very specific area, such as the 50 states, Guam, Puerto Rico, and I believe the northern Mariana Islands, and it does not include Kingman Reef or the other islands out in the Pacific which are U.S. possessions.
Q. So why did you -- I guess it is fair to say you prepared the packet to send to the GSA, and then after that, after the preparation or when it was taking place, you found out we don't need to send it to the GSA?
A. There were continuing internal discussions at the time as to what the appropriate disposal method was.
Q. And what was that -- you might have already answered, but just for my benefit, what was the

Page 74

triggering point to say now we're not going to send it to the GSA?
A. I don't really know. That decision was made back in Washington.
Q. Do you recall having this conversation with Georgia Shirilla, right, that being --
A. Pretty much, yeah.
Q. Take a look at the fourth full paragraph: "Dennis agreed with me," who I presume is Shirilla, "that the Federal Property Act does not apply and the GSA should not be involved."
A. Right.
Q. What discussion did you have with Ms. Shirilla?
A. It is essentially what I've already stated, that the Federal Property Act, which is the act which created GSA and defines their area of responsibility, our reading of it -- we're both laymen, but our reading of it was because Kingman Reef was not identified as an area within their responsibility, they wouldn't be involved.
Q. You see the second sentence where it says: "We are not disposing a possession of the United States."
Did you have a discussion with Ms. Shirilla

Page 75

about that, what she's saying there?
A. I don't recall that specifically, no.
Q. Do you know what -- does the phrase "we are not disposing a possession of the United States" have any bearing or relation to the first sentence which says that you agreed with Ms. Shirilla that Federal Property Act did not apply and GSA should not be involved in the transfer?
A. I wasn't the author of this, so I don't exactly know what she meant.
Q. As you sit here today, do you see any connection between those two?
A. I can't right here today, no.
Q. In your experience, do you know what it means to be not disposing of possession of the United States; do you know what those words mean?
A. I'm not quite sure what she's referring to, no.
Q. The last full paragraph where it says, "I told Dennis that we talked to Insular Affairs and they reported to us that the Navy could terminate its executive order through a letter," and then it goes on.
Was there a plan -- what executive orders are we talking about there?
A. I don't really know. I assume she meant the

Page 76

1934 Executive Order.
Q. Was it your opinion that as part of the transfer that a new executive order -- a new executive order would be established and essentially the 1934, 1941 executive orders would be withdrawn?
A. Yes.
Q. Why did you think that was -- did you think that was necessary?
A. Yes, I did. Part of the package that I forwarded to Washington, our headquarters, was a draft of such an executive order.
Q. And do you know why that executive -- the draft of the executive order never came to be?
A. I have no personal knowledge.
Q. And why did you think that that was important?
A. To get it off of Navy books completely.
Q. Kind of housecleaning on your part?
A. Right. Right.
Q. Two more quick questions.
What types of documents were in that packet that you were going to send to the GSA?
A. There was what's called a Form 118, which is a standard report of excess. There was a description of the reef, probably a copy of the '34 Executive

Page 77

Order. That's about it.
Q. How about the documents that you sent over to Washington when the GSA thing was scrapped; what were in those docs?
A. There was copies of the executive orders, copies of some history of the island, and the draft executive order.
Q. And all those documents, meaning the packet to the GSA and the packet that was eventually sent to Washington, all comprised of documents that are within the Kingman Reef file that you reviewed in anticipation of your deposition today?
A. That's correct.
MR. CHING: Okay. Why don't we take a break, a lunch break.
(Recess from 12:34 p.m. to 1:20 p.m.)
MR. CHING: We're back. Welcome back.
Q. BY MR. CHING: Let's see if we can get through some of these documents, and we'll be nearly there.
A. Sure.
MR. CHING: We'll mark next in order 136, I think.
(Marked for identification Exhibit No. 136.)

Page 78

Q. BY MR. CHING: For the record, one-page document, Bates number USID0000143.
Mr. Pacht, take a look at that and let me know when you are all set.
A. Okay.
Q. Have you seen this document before?
A. No.
Q. For the record, I'll just represent it is an e-mail from a Phyllis Ha, H-a, dated December 16, 2000, to various recipients here, one being Ms. Georgia Shirilla.
Mr. Pacht, do you know who Phyllis Ha is?
A. No.
Q. Have you ever heard that name before?
A. No.
Q. I want to direct your attention to the first -- I guess the first full paragraph: "I understand Georgia is assigned to look this up."
Let me back up. Strike that.
Do you see -- can you tell me what the substance of this e-mail is?
A. Sort of talking about the claim by a private family.
Q. Fullard-Leo family?
A. I assume so.

Page 79

Q. So it is basically we're talking about ownership in this particular document, correct?
A. Yes.
Q. And where it says "I understand Georgia is assigned to look this up," she's assigned to look up presumably the ownership issue; is that correct? Is that your reading of this?
MR. YOUNG: Objection. Document speaks for itself.
A. I assume that's what it means.
Q. BY MR. CHING: Georgia, though, has never had any -- Ms. Shirilla has never had any discussions with you concerning the issue of ownership that's being reflected in this e-mail in Exhibit 136; did she?
A. I believe we just discussed the fact that there was a claim at one point in time. As to the specifics of the claim or the validity of it, I don't think we ever discussed.
Q. And you testified earlier that any inquiries on title, and in this case specifically Kingman Reef, would come to your office, correct?
A. That's correct.
Q. And Ms. Shirilla never approached you with this issue?
A. As to specifics, no.

Page 80

Q. What about as to nonspecifics, what did she say to you?
A. We just discussed the claim in general, that it existed. As to her asking us for any documentation or proof of federal ownership, I don't recall anything of that nature.
Q. At what point would your office start an investigation of title; how would that happen?
A. In this case, we had no reason to in that the claim came along after the Navy had transferred the property to Fish and Wildlife Service.
Q. But the Navy still retained -- Department of the Navy still retained jurisdiction and control pursuant to the 1934 Executive Order?
A. Yes. That's correct, but the Navy really had no further interest in the -- had no further concern with the property.
Q. But technically you still had the administrative jurisdiction and control of the property pursuant to the 1934 order?
A. That's correct.
Q. It would have been -- your office would have been responsible to research that title issue?
A. We were never asked to.
Q. So the triggering event would be a formal

Page 81

request?
A. Yes.
Q. And you never got that request?
A. No.
Q. It would be a written request?
A. No written request.
Q. Would it require a written request?
A. Probably, yes, before we would spend any significant time on it.
Q. So is it the custom and practice of your office to not take it upon yourself to investigate title where there is an issue of disputed title?
A. It would depend on the circumstances.
Q. How about in the circumstance of when -- what about in this particular circumstance where the Department of the Navy was transferring jurisdiction and control to Interior?
A. We never undertook a title search.
Q. Does the transfer of jurisdiction and control -- strike that.
Does the issue of disputed title have any bearing on the transfer of the administrative jurisdiction and control from the Navy to the Interior?
MR. YOUNG: Objection. Assumes facts not in evidence.