IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| KINGMAN REEF ATOLL INVESTMENTS, L.L.C., et al., | ) | |
| Plaintiffs, | ) | No. 06-828L |
| v. | ) | |
| | ) | Judge Marian Blank Horn |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS**

Pursuant to Rules 26 and 34 of the Rules of the United States Court of Federal Claims ("RCFC"), Defendant hereby supplements its prior responses to Plaintiff's first set of requests for production of documents by producing documents marked as US0240 through US0321.

The document marked as US0240–US0291 is the *Annual Report of Lands Under Control of the U.S. Fish & Wildlife Service as of September 30, 2006*. This report makes reference to Kingman Reef and is therefore responsive to plaintiffs' request for production numbers 1 and 18, and may be responsive to other requests as well. A full copy of the 2006 report is included for Plaintiffs' reference. However, because most of this report is not responsive to Plaintiffs' requests nor relevant to this case, Defendant is also producing only the relevant excerpts of the same report for 2001, 2002, 2003, 2004 and 2005. These excerpts are marked as US0292–US0320.

In addition, Defendant is producing a copy of a satellite image of Kingman Reef that was taken on September 17, 2007. The copy of this satellite image is marked as US0321, and is

responsive to Plaintiffs' request for production numbers 14 and 18, and may be responsive to other requests as well.

In supplementing its prior discovery responses with the production of the documents identified above and enclosed herewith, Defendant does not waive the objections stated in its original responses to Plaintiffs' requests for production.

Dated: December 13, 2007

Respectfully submitted,

RONALD J. TENPAS
Acting Assistant Attorney General
Environment & Natural Resources Division

Kristine S. Tardiff

KRISTINE S. TARDIFF
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
53 Pleasant Street, 4th Floor
Concord, NH 03301
TEL (603) 230-2583
FAX (603) 225-1577
E-MAIL kristine.tardiff@usdoj.gov

OF COUNSEL:

Mariel Combs
Attorney-Advisor
United States Department of the Interior
Office of the Solicitor
Pacific Northwest Region
500 NE Multnomah St., Suite 607
Portland, OR 97232

Robert J. Smith
Assistant Chief (Environmental Litigation)
Navy Litigation Office
720 Kennon Street, SE, Room 236
Washington Navy Yard, DC 20374-5013

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 13th day of December, 2007, a copy of the foregoing **Defendant's Supplemental Response to Plaintiffs' First Set of Requests for Production of Documents** was served via first class U.S. mail, postage prepaid, to the following counsel of record for Plaintiffs and Plaintiffs' Of Counsel:

Christian P. Porter
Donna Yamamoto
Brooks Tom Porter & Quitiquit, LLP
2125 Davies Pacific Center
841 Bishop Street
Honolulu, HI 96813
Email to: cporter@btpqlaw.com

Therese Y. Cannata
Michael Ching
Cannata, Ching & O'Toole, LLP
100 Pine Street, Suite 1775
San Francisco, CA 94111
Email to: tcannata@ccolaw.com

Kristine S. Tardiff

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| KINGMAN REEF ATOLL INVESTMENTS, L.L.C., et al., | ) | |
| Plaintiffs, | ) | No. 06-828L |
| v. | ) | |
| | ) | Judge Marian Blank Horn |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSES TO PLAINTIFFS' REQUESTS FOR PRODUCTION OF DOCUMENTS (SET TWO)**

Pursuant to Rules 26 and 34 of the Rules of the United States Court of Federal Claims ("RCFC"), Defendant hereby responds to Plaintiff's Requests for Production of Documents (Set Two).

1. Copies of the U.S. General Services Administration's worldwide inventory of federal real property for each year that Kingman Reef Atoll appeared on said list.

DEFENDANT'S RESPONSE:

Defendant objects to this request as overly broad in that the request seeks copies of a "worldwide inventory of federal real property" when the only real property at issue in this case is Kingman Reef. Defendant further objects on the ground of relevance because the question of whether Kingman Reef is identified on any such lists is not relevant to the underlying question of title to or ownership of Kingman Reef. Subject to and without waiving these objections, Defendant responds as follows.

Request for Production No. 1 seeks "copies" of GSA's "worldwide inventory of real property," and refers to this inventory as a "list." The documents reasonably matching this description are:

1. Summary Report of Real Property Owned and Leased by the United States Throughout the World, for years 1996 to 2000 ("Summary Report");
2. Overview of the United States Government's Owned and Leased Real Property, Federal Real Property Profile, for years 2002 to 2004 ("Overview"); and
3. The Federal Real Property Report, an Overview of the U.S. Federal Government's Real Property Assets ("Real Property Report"), for years 2005 and 2006.

There is no reference to any property owned by United States in Kingman Reef Atoll in any of these documents. However, it is important to note the following. First, both the Summary Reports and the Overviews identified above were compiled by GSA based upon the voluntary submission of data by federal agencies. Therefore, GSA makes no representation that these

listings are exhaustive in terms of their identification of property owned and leased by the United States. Second, it was not until Executive Order 13327, dated February 6, 2004, that federal executive branch departments and agencies were directed to submit data for the creation of a single comprehensive database to be established and maintained by GSA. Finally, Executive Order 13327 excepted from reporting requirements "public domain land (including lands withdrawn for military purposes) or land reserved or dedicated for national forest, national park, or national wildlife refuge purposes except for improvements on those lands." See E.O. 13327, Section 2 ("For the purposes of this [executive] order, Federal real property shall exclude: . . . public domain land (including lands withdrawn for military purposes) or land reserved or dedicated for national forest, national park, or national wildlife refuge purposes except for improvements on those lands . . . .")

Kingman Reef was designated as a National Wildlife Refuge in 2001. See Secretarial Order No. 3223 (Jan. 18, 2001). Accordingly, Kingman Reef is excepted from the reporting requirements under Executive Order 13327.

2. All documents maintained by the U.S. Department of the Interior, Bureau of Land Management demonstrating that Kingman Reef Atoll was public land of the United States.

DEFENDANT'S RESPONSE:

Defendant's search of records maintained by the Bureau of Land Management ("BLM") did not produce any documents responsive to this request. BLM offices contacted include the BLM California State Office, the BLM Eastern States Office, and the Washington Office, Division of Lands, Realty and Cadastral Survey.

3. All documents that refer, relate to or discuss the September 28, 1922 letter from the U.S. Department of State acknowledging the letter from the Copra Company regarding annexation and claimed ownership by the Copra Co in Kingman Reef Atoll, a copy of which is attached hereto as Exhibit A.

DEFENDANT'S RESPONSE:

Defendant objects to this request on that ground that the request covers a period of time that includes historical records and/or information no longer in the possession of the Department of State or other agencies that have been involved with Kingman Reef. Historical records are primarily maintained by the federal government at The National Archives & Records Administration. The National Archives is the nation's repository for official government records that have been determined to have "sufficient historical or other value to warrant their continued preservation by the Federal Government . . . ." 44 U.S.C. § 2901(11). With a few exceptions not relevant to this case, these records are open to the public. To the extent that this Request for Production No. 3 (Set Two) asks for the production of documents that are contained in the National Archives, Defendant objects on the ground that such documents are public records that are equally accessible to both parties. Without waiving this objection, Defendant's search for relevant records has included the National Archives in College Park, Maryland, the regional National Archives facility in San Bruno, California, and President Franklin D. Roosevelt's Presidential Library.

Subject to and without waiving this objection, Defendant refers to and incorporates by reference all of the documents that were disclosed or produced by the parties in Kingman Reef Atoll Investments LLC ("KRAI") v. United States, No. CV05-00151 (D. Hawaii). In addition, Defendant has located some additional documents from the regional National Archives &

Records Administration in San Bruno, California ("NARA-San Bruno"). The holdings of this Pacific Region NARA facility "are comprised of Federal records from northern and central California, Nevada (except Clark County), Hawaii, American Samoa and the Trust Territory of the Pacific Islands[.]" See http://www.archives.gov/pacific/san-francisco/. Although the documents obtained from NARA-San Bruno are believed to be duplicative of documents previously disclosed or produced by the parties, out of an abundance of caution Defendant marked and produced copies of the documents obtained from NARA-San Bruno as US00001 to US0148.

To the extent that this request for production is asking Defendant to review all of the documents previously disclosed or produced by the parties in the quiet title action or in this case, Defendant objects to such a request on the ground that the documents are in possession of both parties and the burden of locating any responsive documents is substantially the same for Plaintiffs as it is for Defendant. Without waiving this objection, Defendant responds that documents produced by Plaintiff KRAI in the quiet title action include a letter of February 12, 1938 to Messrs. Townsend & Lewis, from Green H. Hackworth, Legal Advisor to the Secretary of State (FLD00071-FLD000774). This 1938 letter, which is in response to a letter requesting "the Department's assistance in obtaining proper recognition of Mrs. Fullard-Leo's position as owner of Kingman's Reef," states that "The Department on September 28, 1922 merely acknowledged the two communications [of July 15, 1922 and August 24, 1922]. It took no other action." (FLD00073).

Dated: November 19, 2007

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

Kristine S. Tardiff
KRISTINE S. TARDIFF
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
53 Pleasant Street, 4th Floor
Concord, NH 03301
TEL (603) 230-2583
FAX (603) 225-1577
E-MAIL kristine.tardiff@usdoj.gov

OF COUNSEL:

Mariel Combs
Attorney-Advisor
United States Department of the Interior
Office of the Solicitor
Pacific Northwest Region
500 NE Multnomah St., Suite 607
Portland, OR 97232

Robert J. Smith
Assistant Chief (Environmental Litigation)
Navy Litigation Office
720 Kennon Street, SE, Room 236
Washington Navy Yard, DC 20374-5013

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 19th day of November, 2007, a copy of the foregoing **Defendant's Response to Plaintiffs' Requests for Production of Documents (Set Two)** was served via first class U.S. mail, postage prepaid, with a courtesy copy by electronic mail, to the following counsel of record for Plaintiffs and Plaintiffs' Of Counsel:

Christian P. Porter
Donna Yamamoto
Brooks Tom Porter & Quitiquit, LLP
2125 Davies Pacific Center
841 Bishop Street
Honolulu, HI 96813
Email to: cporter@btpqlaw.com

Therese Y. Cannata
Michael Ching
Cannata, Ching & O'Toole, LLP
100 Pine Street, Suite 1775
San Francisco, CA 94111
Email to: tcannata@ccolaw.com

Kristine S. Tardiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

```
- - - - - - - - - - - - - - x
                             :
KINGMAN REEF ATOLL           :
INVESTMENTS, L.L.C., a       :
Hawaii limited liability     :
company,                     :
                             :
          Plaintiff,         :
                             :
    v.                       :  CIVIL NO. CV05-00151 JMS/BMK
                             :
THE UNITED STATES OF         :
AMERICA; THE UNITED STATES   :
DEPARTMENT OF INTERIOR; THE  :   DEPOSITION OF JEFF GOOD
HONORABLE GALE A. NORTON,    :
in her official capacity as  :    TUESDAY, MAY 15, 2007
Secretary of the Interior;   :
THE UNITED STATES FISH &     :      WASHINGTON, D.C.
WILDLIFE SERVICE; STEVEN A.  :
WILLIAMS, in his official    :
Capacity as Director of      :
United States Fish &         :  ATKINSON-BAKER, INC.
Wildlife Service; JOHN       :  COURT REPORTERS
DOES 1-10, JANE DOES 1-10,   :  1-800-288-3376
and DOE PARTNERSHIPS,        :  www.depo.com
CORPORATIONS, GOVERNMENTAL   :
UNITS or OTHER ENTITIES      :
1-10,                        :
                             :
          Defendants.        :
                             :
- - - - - - - - - - - - - - x
```

REPORTED BY: Cheryl McGrory

FILE NO.: A103B47

KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 17

The deposition of JEFF GOOD, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to Notice, at AdvantEdge Business Center, 1250 24th Street, N.W., Suite 300, Washington, D.C., convened at 10:00 a.m., before Cheryl McGrory, a notary public in and for the District of Columbia, when were present on behalf of the parties:



APPEARANCES:

On behalf of the Plaintiffs:

THERESE Y. CANNATA, ESQ.
DONNA YAMAMOTO, ESQ.
Cannata, Ching & O'Toole, L.L.P.
899 Ellis Street
San Francisco, California 94109
(415) 409-8900

On behalf of the Defendants:

DONNA SHEEHAN FITZGERALD, ESQ.
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
601 D. Street, Northwest
Washington, D.C. 20004
(202) 305-0476

Also Present: Jeff Bray



C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFFS | DEFENDANTS |
|---|---|---|
| JEFF GOOD | | |
| By Ms. Cannata | 11,67 | |
| By Ms. Fitzgerald | | 59 |


E X H I B I T S


| EXHIBITS | MARKED FOR IDENTIFICATION |
|---|---|
| No. 147 - Designee | 8 |
| No. 148 - Notice of Deposition | 8 |
| No. 149 - Document dated September 12, 1955 | 47 |
| No. 150 - Document dated February 8, 1990 | 50 |
| No. 151 - Document dated September 18, 1990 | 50 |
| No. 152 - Document dated November 18, 1991 | 50 |
| PME 45 - Document dated January 11, 1950 | 43 |
| PME 46 - Plan for John R. Manning, cruise 24 | 43 |
| PME 138 - Document dated July 7, 1987 | 50 |
| PME 7 - Letter from the Director, Fish & Wildlife Service, U.S. Dept. of Interior | 56 |
| PME 82 - Letter to Phyllis Ha from J.J. McClelland, Jr. | 58 |




P R O C E E D I N G S

MS. CANNATA: We are on the record, and this is the deposition of Jeff Good, who's a designee, and I think -- I've noticed him individually because he also, it turns out, was a percipient witness, but I believe he's also a U.S.A. designee. And what --

MS. FITZGERALD: Well, let me make a comment on that.

MS. CANNATA: Yes.

MS. FITZGERALD: He is apparently, in -- in your mind, a percipient witness, and I did notice that you, yourself, decided to notice him as an individual.

MS. CANNATA: Right.

MS. FITZGERALD: We identified him --

MS. CANNATA: Right.

MS. FITZGERALD: -- as a designee responsive to the Rule 30(b)(6) --

MS. CANNATA: Right.

MS. FITZGERALD: -- Notice on the United States.

MS. CANNATA: Well, it's my understanding that --

MS. FITZGERALD: No, it's not. I'm just clarifying the defendant's position. You decided to notice him in his individual capacity, so apparently you're going to be asking him questions of his personal knowledge, as well as questions related to the 30 -- Rule 30(b)(6) Notice. Correct?
MS. CANNATA: That is correct. That's what I --
MS. FITZGERALD: And --
MS. CANNATA: -- just said.
MS. FITZGERALD: And will your questions to him clarify in what capacity you are asking him those questions?
MS. CANNATA: We can do that. Sure. I think it'll be clear, because sometimes I'm going to be asking him in a designee capacity the -- the percipient capacity, is -- my understanding is that he has had communications with Ainsley Fullard-Leo, for example.
MS. FITZGERALD: And where are you getting that understanding from?
MS. CANNATA: His journal, Mr. Fullard-Leo's journal. It may be a different Jeff Good. We're going to



find out.
MS. FITZGERALD: So those questions will be Commander Good in his personal capacity; correct?
MS. CANNATA: I should say Commander Good. I'm sorry. Yes, I will ask him, and I was going to indicate that. First I was going to -- basically, the way I was going to proceed is to go through the designee issues and -- and then conclude with a few minor questions on the percipient, because I think there are a few minor questions on percipient, but that's all. I mean, I don't know if he's the same person or not. I -- I simply -- you know, I'm going to ask.
MS. FITZGERALD: That's fine, as long as it's clear on the record that you decided he's a percipient witness.
MS. CANNATA: I don't think I -- I decide who are percipient witnesses. I -- I try to identify percipient witnesses when they appear. I mean, I can't make percipient witnesses. But anyway, that -- that works.
All right. Let's -- if you could indicate for me -- you said on the record you would indicate what you're



designating him for.
MS. FITZGERALD: Yes. Commander Good is being designated to the Rule 30(b)(6) notice to United States of America specifically for the questions that identify the Coast Guard in the questions.
MS. CANNATA: Oh, okay.
MS. FITZGERALD: That would be numbers 5, 15 and 16.
MS. CANNATA: Okay. Thank you very much for that clarification.
And what I'll do is I'll mark that notice so we have an extra copy as part of the record. Okay.
Let's mark the designee as Number 147.
(Exhibit No. 147 was marked for identification.)
MS. CANNATA: And then I'm going to also mark 148.
(Exhibit No. 148 was marked for identification.)
MS. FITZGERALD: So, Ms. Cannata, can I make clear you're -- Exhibit 147 as the --



MS. CANNATA: Designee.
MS. FITZGERALD: But it says Second Amended Notice --
MS. CANNATA: Oh.
MS. FITZGERALD: -- and we actually have a Fourth Amended Notice.
MS. CANNATA: You're right about that. I don't know. You know, you ask for documents to be copied. Except for the -- Ms. Fitzgerald, let me just ask, are the categories any different on this? I think on the second amended they were -- they were pretty much the same. Number 5 relates to the Coast Guard, and number 15 -- yeah, Number 15 pertains to the Coast Guard, and for number 16. So I think they're the same, at least on their designee issues. And my apologies if this was a copying error in my office. I think the -- the correct one has been marked -- and I can state this for the record. The correct exhibit number for the U.S. designee has been marked as an exhibit to Ms. Shirilla's deposition, because she was also a U.S.A. designee. And that's C -- S-H-I-R-I-L-L-A. And, to be honest, I don't see it on my list, so I don't know what



KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 17

that exhibit number was. So I do apologize. It was not updated since, but I do know we marked it in Shirilla's deposition. I could look it up on my computer later this morning and get that number for the record. So it --

MS. FITZGERALD: Okay.

MS. CANNATA: -- was marked. The fourth amended was marked.

MS. FITZGERALD: Well, I think, for purposes of this deposition, this exhibit -- we ought to treat Exhibit 147 as applicable only for paragraphs 5, 15 and 16 --

MS. CANNATA: I'm fine with that.

MS. FITZGERALD: -- because those are the questions --

MS. CANNATA: Yeah.

MS. FITZGERALD: -- that Mr. -- Commander Good is being designated as a U.S.A. --

MS. CANNATA: I think it's a --

MS. FITZGERALD: -- 30(b)(6) witness for.

MS. CANNATA: -- very good suggestion, and -- and so stipulated.

Okay. Will you swear the witness in.



Whereupon,

JEFF GOOD

was called for examination by counsel for Plaintiffs and, after having been duly sworn by the notary public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS

BY MS. CANNATA:

**Q Good morning, Mr. Good -- Commander Good. My name is Therese Cannata, and I'm an attorney representing the plaintiff in the matter that is indicated in the caption on the subpoena, rather the deposition notice, notices that we've marked as Exhibit 147 and 148. And we do have our stipulation concerning 147 already stated on the record.**

**I am going to go over a few things. I understand that you're an attorney. Is that right?**

A Yes.

**Q And have you ever participated as a witness or an attorney in a deposition?**

A No.

**Q All right. Well, let me go over a few of the**



**basics. I'm sure that --**

A Oh, excuse me. As an attorney I have, not as --

**Q You have.**

A -- a witness.

**Q All right. So I'm not going to go through very much of the basics here with you. I'll simply note that we're having a record made of this deposition and it will be made available to you to make corrections and that if do have any questions as we proceed, of me, meaning that you're not clear about what my question is, would like me to repeat it, please feel free to do that. Also, as is my custom, although this is a somewhat formal proceeding because you're on the record, I do wish you to treat it informally for purposes of requesting a break. If you need it for any reason, let me know. If you need to confer with counsel, let me know about that. Otherwise we'll just proceed and try to get through this -- this is going to be a relatively short deposition, I think -- and we'll move on. And I apologize for getting started a little bit late this morning. Traffic problems do occur from time to time.**

**Let's see. Let me ask you if you could briefly**



**summarize for me your educational background.**

A I'm a graduate of the U.S. Coast Guard Academy, and I received a masters of business administration and Juris Doctor from University of Hawaii.

**Q Okay. And what year did you receive your law degree?**

A 1992.

**Q And would you briefly now state your work history?**

A I --

**Q Just give me the approximate years, if you could.**

A Starting with...?

**Q Starting with, I assume, post-Coast Guard Academy. Would that be --**

A Okay. I was on Coast Guard and Navy ships for four years, from 1982 to 1986. From 1986 to 1989 I was in the law enforcement office in Coast Guard 14th District in Honolulu. I was in law school from '89 to '92. From '92 to '98 I was -- or, excuse me, from '92 to 2000 I was a staff attorney for the Coast Guard in Portsmouth and





KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 17

A That's the -- it's criminal justice. It's the internal administration of the Coast Guard, so everything having to do with courts marshal.

**Q Okay. Okay. All right. Let's look at briefly, if we could, Exhibit 147, page 5, item 5. Looking at the -- are you familiar with what a Rule 30(b)(6) designee deposition is?**

A Yes.

**Q All right. So I won't -- I won't go into that. You've been designated for these three items, and I do want to ask you a few questions about it. First off, have you ever heard of a place called Kingman Reef?**

A Yes.

**Q And how have you heard of that place?**

A I've -- I've overflown it in Coast Guard aircraft. There was also an exclusive economic zone around Kingman Reef and Palmyra Island that we conducted periodic patrols of.

**Q You said what kind of zone? An exclusive --**

A Exclusive economic zone.

**Q Okay. And what's the significance of that for**



**the Coast Guard?**

A Gives the U.S. jurisdiction over resources within 200 miles -- or, actually, it's not exactly 200 miles around --

**Q Roughly?**

A -- Kingman, but -- so it gives the U.S. jurisdiction to enforce fisheries laws.

**Q Um-hmm.**

MS. FITZGERALD: I'm going to clarify for the record that his answer on that is not as a Rule 30(b)(6) witness. This Rule 30(b)(6) Notice does not have anything reflecting a witness to testify regarding jurisdiction --

MS. CANNATA: Okay.

MS. FITZGERALD: -- or -- or exclusive economic zone issues.

MS. CANNATA: Okay. I'm just trying to clarify his testimony. Sure. That's fine.

BY MS. CANNATA:

**Q And -- and so you were -- and -- and -- let's see. Where were we here? Oh. We were talking about Kingman Reef. You said you've done -- you've flown over**



**it. Have you ever traveled there by boat --**

A No, I haven't.

**Q -- or ship? Okay. Is there any reason -- do you -- do you -- in the -- in any of the instances in which you did -- you flew over it, did you ever come into contact with any member of the Fullard-Leo family?**

A I'm sorry, could you repeat that?

**Q In any instances where you flew over Kingman Reef -- well, let me ask a foundational question. You've also flown over Palmyra?**

A Yes.

**Q Have you ever visited Palmyra personally?**

A No.

**Q And, again, the purpose of -- of these areas was for patrol purposes, right, these flight -- these -- these flights?**

A Yes.

**Q Okay. Have you ever come in contact with any member of the Fullard-Leo family during your tenure in Hawaii in the Coast Guard?**

A Yes.



**Q All right. Can you tell me the context in which you did so?**

A In about 1986 I was -- and I assume this is all of my personal knowledge?

**Q This is -- yeah, your percipient side.**

A All right. When I first got there the -- my boss -- his name was William Dozier -- gave me some of the history of Palmyra Island, advised that it was owned by the Fullard-Leos. Palmyra has a very nice lagoon, sheltered lagoon, that boats periodically stop over, and we had received periodic information that boats would use Palmyra as a transshipment point for hashish coming from Southeast Asia, where one boat would drop it off and another boat would come and pick it up later. So we had an interest in what boats were in Palmyra at any given time, trying to keep track of who was coming and going.

**Q Um-hmm.**

A William Dozier instructed me to contact Ainsley and establish a relationship with him and essentially information sharing, where he would pass information to the Coast Guard on what boats he knew were using Palmyra. And





KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 17

A103B47

JEFF GOOD MAY 15, 2007

we also passed information to Ainsley. Whenever we overflew the island we would routinely identify the boats and usually take pictures of them, and we would pass that information to Ainsley.

**Q Okay. And what about Kingman Reef? Did you also conduct flyovers of -- you call them flyovers? I want to make sure I understand the phrases that the -- the way -- what they're called.**

A Well, it was -- it was a patrol. Certainly there's no place to land --

**Q Air patrols? You call them air patrols?**

A The Coast Guard had no aircraft that could land --

**Q Right.**

A -- either of those places. It was too far for a helicopter and a C-130 can't land there. So, right, we would --

**Q Okay.**

A -- fly over.

**Q Okay. I just want to make sure I use the right terminology. I'll just call it air patrols.**



A Fine.

**Q The -- you said you did an air -- you did some air patrols, or the Coast Guard did air patrols, of Kingman Reef; is that --**

A That's correct.

**Q And did you exchange information with Mr. Fullard-Leo concerning Kingman Reef?**

A No.

**Q Did you ever fly over Kingman Reef with Mr. Ainsley Fullard-Leo on board?**

A Not me personally.

**Q Did the Coast Guard, to --**

A The Coast Guard --

**Q -- your knowledge?**

A -- did transport Ainsley, on at least one occasion flew him over Palmyra.

**Q And what about Kingman Reef?**

A I -- I don't know. Routinely the -- the aircraft, because Kingman is so close to Palmyra, usually the aircraft -- that would be -- one patrol would go from Honolulu, fly down, patrol the EEZ around King -- Kingman



Reef and Palmyra --

**Q Um-hmm.**

A -- together and fly back. On the specific time that we flew Ainsley down, I don't recall --

**Q Okay.**

A -- exactly where they went.

**Q Do you ever remember having any discussions with Mr. Ainsley Fullard-Leo about boats or -- or marine vessels being spotted around the Kingman Reef lagoon area?**

A No, I don't.

**Q What was your understanding of -- of the ownership of Kingman Reef back in -- in -- and this -- can we identify the time period that you've indicated? You said that there was a -- to your knowledge, Mr. Fullard-Leo accompanied the Coast Guard on a flight over Palmyra, and you said it could possibly be Kingman but you don't have any personal knowledge of that. Is that right?**

MS. FITZGERALD: I'm going to object. I -- I think that mischaracterizes his testimony.

MS. CANNATA: Let me restate it.

BY MS. CANNATA:



**Q Just so I understand, first off, let's identify a time period. What time period are you talking about?**

A It would have been when I was in the law enforcement office, so between 1986 and 1989.

**Q Okay. And let me see if I understand what you're saying about the -- the instance in which Mr. Fullard-Leo was on board a Coast Guard flight. It was -- the trip was over Palmyra, and it could have been over Kingman Reef because of its proximity of Palmyra; is that right?**

A That's correct.

**Q But you're not certain one way or the other?**

A That's correct.

**Q What understanding, if any, did you have concerning the Fullard-Leo family's ownership of Kingman Reef?**

MS. FITZGERALD: Objection. Assumes facts not in evidence.

THE WITNESS: We were not aware of any ownership claim that the Fullard-Leos had to Kingman Reef.

BY MS. CANNATA:





KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 17

**Q Did Mr. Fullard-Leo ever inform you that he wanted to be apprised if the Coast Guard saw vessels in the Kingman Reef lagoon or area?**
A No.
**Q Did Mr. Fullard-Leo ever tell you that he believed his family did own Kingman Reef?**
A No.
**Q Did you ever receive any information from anyone to the effect that the Fullard-Leo family claimed ownership of Kingman Reef?**
A Not until these proceedings.
**Q What was your understanding about the ownership of Kingman Reef back between 1986 and 1989?**
A We didn't have any understanding of what the ownership was other than it was U.S. territory, it was a U.S. possession in the Pacific and had an exclusive economic zone. So the exact ownership of the land area was not of concern to us.
**Q Um-hmm. Okay. Do you know whether the Coast Guard ever referred requests to access Kingman Reef to the Fullard-Leo family or Peter Savio?**



A Not to our knowledge.
**Q Did you have any -- were you aware of any records maintained by the Coast Guard concerning Kingman Reef and access to Kingman Reef?**
A We have records on Kingman Reef. They don't have to do with access to Kingman Reef.
**Q What kind of records do you have on Kingman Reef?**
A In the Rescue Coordination Center they have files on all of the areas within the -- their area of operations, which contains basic information about the operating area if they ever have to conduct a search and rescue case in that area.
**Q Um-hmm.**
A So the Rescue Coordination Center does have a file on Kingman Reef --
**Q Um-hmm.**
A -- but essentially the only information that was in the file was out of the CIA Factbook.
**Q Oh, okay. More -- more geographic information and -- and logistics, if you had to enter into that area?**



A Right.
**Q Right. What about information concerning contact by outside parties such as third parties? Were there any places in the Coast Guard records where -- let me see if I can phrase this correctly. Did the Coast Guard from time to time receive inquiries by citizens -- meaning non -- non-government employees -- to travel to Kingman Reef?**
A Not to our knowledge.
**Q Okay. Did the Coast Guard have any oversight over the ingress and egress of Kingman Reef, meaning people coming and going?**
A No.
**Q Did the Coast Guard monitor or patrol the comings and goings of vessels in the Kingman Reef area for the same reasons you mentioned before for, for example, suspected drug trafficking?**
A Not specifically Kingman Reef, no.
**Q Okay. Did -- were there -- were -- was there concern that the Kingman Reef area was also a drop-off point or exchange point for drug trafficking?**



A No.
**Q Okay. So Palmyra was the main focus?**
A Yes.
**Q Okay. Did the -- in the -- in the -- in the flyovers that you mentioned before, why if at all did the Coast Guard conduct a flyover of the Kingman Reef area?**
A To patrol the exclusive economic zone looking for illegal fishing boats.
**Q Okay.**
A So, at the time, and I believe still today, there's no authorized foreign fishing in an EEZ in Hawaii --
**Q Okay.**
A -- or in the U.S. possessions in the Pacific.
**Q Okay.**
A So we conducted patrols, and if there were a foreign boat with gear in the water, that would be a violation.
**Q Okay.**
MS. FITZGERALD: Again, to clarify, that answer is provided in his personal capacity. The Rule 30(b)(6)





KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 1

Notice to the United States does not ask for any questions from the Coast Guard regarding exclusive economic zones or patrolling within that.

MS. CANNATA: Well, on the issue of patrolling, I think -- I think it somewhat covers, because we asked about access to Kingman Reef; but, on the EEZ, I agree, there's nothing about that.

MS. FITZGERALD: Well, regarding access, Commander Good provided a response to that.

MS. CANNATA: Sure. I think we're -- we're -- you know, no need to get into a semantics argument over -- with this. I think we're -- getting inquiries being -- and he's answered our question, so we're satisfied.

MS. FITZGERALD: Well, I -- I realize that you're satisfied that he's answering your questions, but my objection for the record is that because you've noticed him in both his personal capacity and as a Rule 30(b)(6) witness, it's important to be clear that his answers regarding exclusive economic zone are not being provided in the capacity of a Rule 30(b)(6) witness.

MS. CANNATA: I understand.



BY MS. CANNATA:

**Q Let's see. We are -- now, we were talking about the foreign fishing vessels. How -- in a flyover, how can you tell if it's a foreign fishing vessel from up above?**

A Sometimes they'll have a flag --

**Q Okay.**

A -- that they're flying.

**Q All right.**

A And normally the home port is written on the stern.

**Q Okay. So -- and so, photographs are taken?**

A Oh, yes.

**Q Do you know whether the Coast Guard has ever provided photographs of vessels taken in the Kingman Reef area to the Fullard-Leo family?**

A Not to our knowledge.

**Q Okay. But photographs of the Palmyra -- photos taken of the Palmyra area were provided to the Fullard-Leo family?**

A Yes.

**Q All right. Let's take a look at number 15 and 6, on page 6 -- 15 and 16. And, actually, this is part of the designation, but it was also one of the reasons we noticed you individually as well. The -- as far -- as I understand your answer of -- on the inquiry of number 15, which is whether the Coast Guard transported Ainsley Fullard-Leo and Dudley Fullard-Leo or Peter Savio to or over Kingman Reef, the answer is you have no knowledge of that happening; is that right?**

A No. We did transport Ainsley --

**Q Over Kingman --**

A -- over -- over -- well -- yeah, you're correct. We certainly flew him over Palmyra.

**Q Right.**

A There's no record of that flight, so I don't know if they actually went over Kingman or not.

**Q And that does bring me to ome of my next questions: How does the Coast Guard track its patrol flights? What records are kept of such flights?**

A There is a patrol log and a flight log, which are normally maintained for three years.

**Q Um-hmm. And so those would not -- if -- for --**





**for records going back to the 1980s or 1990s, those records would not be around at this point --**

A No, they --

**Q -- in 2007?**

A -- would not.

**Q Are they routinely destroyed? Or are they intermittently destroyed? What is the destruction -- the destruction custom and practice?**

A Right. They're routinely destroyed after three years.

**Q Are there instances where even though the intent is to keep them for only three years, the records somehow are maintained because people hadn't gotten around to destroying them?**

A That's certainly possible.

**Q And, if so, where would those records be stored at this point?**

MS. FITZGERALD: This line of questioning is really calling for speculation on the part of Commander Good.

You can answer if you know, but --



KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 17

MS. CANNATA: Sure.
MS. FITZGERALD: -- that's my objection.
THE WITNESS: The flight logs and patrol logs are stored at the local station so the Coast Guard station that flew all the C-130s around the Pacific was Coast Guard Air Station Barbers Point.
BY MS. CANNATA:
**Q Air Station Barbers Point?**
A Right.
**Q Have you ever had any telephone communications with Ainsley Fullard-Leo?**
A Yes.
**Q All right. And can you describe those, please, what you recall. I assume you're just -- I'll put them in this general time period -- so we'll start there -- between eighty -- '86 and '89.**
A Eighty-nine.
**Q Yeah.**
A We talked probably at least half a dozen to ten times. Whenever we flew a patrol, an aircraft, that went over Palmyra, we would take pictures of it, and I sent



those. And also if -- I didn't send pictures every time we did a patrol, but when we did do patrols the aircraft would identify the description and the name of any boats that were in the lagoon at Palmyra. So I had telephone conversations with Ainsley, passing him the name and the information on the boats that were there. He also called me periodically to pass information that he had got through other sources on boats that were present in Palmyra. And I also, on at least one occasion, invited him to fly on a C-130 over Palmyra, and there were several phone calls involved in that as far as scheduling that and getting him on board the aircraft.
**Q And what was the purpose of inviting him on that occasion? You said at least once, but --**
A Because we had a good relationship with him and we wanted him to continue keep pass -- to keep passing us information on boats that were in Palmyra that he got information on. So we wanted to maintain that relationship. And I believe he asked if he could go along on a flight at one time.
**Q Okay. We're -- based on -- on Mr. Fullard-Leo's**



**journal, I'm informed that -- that one such trip was in 1986.**
MS. FITZGERALD: I'm going to object because you're not showing the witness the journal and you're essentially telling him what the journal says.
MS. CANNATA: I'm not finished the question, though. Let me finish the question.
BY MS. CANNATA:
**Q I'm informed that there was a trip in approximately September of 1986. Is that consistent with your recollection, that one of -- one such trip with Mr. Fullard-Leo that you arranged for him to go with the Coast Guard flight was in September or the fall of 1986?**
MS. FITZGERALD: I'm going to object. You're not showing him the entry, and you're also mischaracterizing his testimony. I don't think he said there was more than one trip.
MS. CANNATA: He said at least one, I believe was the phrase.
BY MS. CANNATA:
**Q Anyway, is that consistent with your**



**recollection?**
A Yes.
**Q Mid-1989's?**
A Well, it was -- it was shortly after I arrived there --
**Q Yeah.**
A -- that I developed a relationship with Ainsley. And I -- I got to Hawaii in August of 1986.
**Q Okay.**
A So that would be consistent.
**Q Okay. Have you ever had any discussions with anyone -- let me ask one question. You mentioned a Mr. Dozier?**
A Yes.
**Q And who is that?**
A William Dozier.
**Q Yes.**
A Last name is D-O-Z-I-E-R.
**Q Okay.**
A He was the chief of the law enforcement branch from, I believe, '85 to -- I don't recall exactly when --





KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 17

BY MS. CANNATA:
**Q Commander Good, I want to mark as one further exhibit, this will be Exhibit 153.**
MS. CANNATA: I have to correct myself for the record. This is going to be PME 182. For the record, PME 182. It's been previously marked. Sorry about that.
THE COURT REPORTER: 182?
MS. CANNATA: Eighty-two. Sorry, 82. I'm very sorry.
(PME Exhibit No. 82 was marked for identification.)
BY MS. CANNATA:
**Q And during the break I had you take a look at it to save a little bit of time, but please take a look at what's been previously marked as Exhibit 82, and I want to ask if you've ever seen this document prior to today.**
A No, I haven't.
**Q All right. And do you know who the author is, J. J. McCleveland, Junior, Rear Admiral?**
A Yes.
**Q And was he -- did you work with him when you**

Page 58

**were stationed in Hawaii?**
A No.
**Q All right. And at or about the time the Kingman Reef Wildlife Refuge was established, were you involved in any of the legal opinions provided by the U.S. Coast Guard concerning that wildlife refuge?**
A No.
MS. CANNATA: All right. That's all I have.
MS. FITZGERALD: I have a few follow-up questions.
EXAMINATION BY COUNSEL FOR DEFENDANTS
BY MS. FITZGERALD:
**Q Commander Good, when you were answering Ms. Cannata's questions earlier you mentioned providing photos to Mr. Ainsley Fullard-Leo regarding Palmyra. Can you explain what those photos were for?**
A The photos were specifically of boats anchored in the lagoon at Palmyra. And, as I recall, Ainsley expressed interest in actually having photos of the boats that were in Palmyra lagoon. Normally, if I called him up after a patrol I would just tell him a general description

Page 59

of the boat, like a 65-foot sailboat and the name and the home port, but on occasions we did have high-resolution, black and white photos of the boats that were anchored, and I recall we did pass them to him on occasion.
**Q And the intent for providing those photos was with respect to the drug smuggling patrols?**
A That's correct. It had to do with Palmyra lagoon itself. And the photos also had some of the surrounding land mass. When -- when I tasked the aircraft crews to go down there and take photos, I was asking them to take photos of the boats that were anchored in the lagoon, but there would also be, you know, surrounding area of Palmyra. And -- and, as I recall, Ainsley also had some concerns about squatters, essentially. So, to the extent the photos covered part of Palmyra, we'd send them to him also.
**Q And that would be squatters on Palmyra Atoll?**
A Correct.
**Q So the photos had nothing to do with fishing rights around Palmyra Atoll?**
A That's correct.

Page 60

**Q And the photos had nothing to do with fishing around Kingman Reef?**
A No, we did not send him photos of boats that were fishing. It was just boats anchored in Palmyra.
**Q Okay. Did you ever transport Ainsley Fullard-Leo specifically to Kingman Reef?**
A No.
**Q Did you ever transport Ainsley Fullard-Leo specifically over Kingman Reef to view Kingman Reef?**
A No. The -- the purpose in arranging the flights was so he could get a look at Palmyra Island.
**Q Did Ainsley Fullard-Leo ever ask you to transport him specifically to Kingman Reef?**
A No.
**Q Did Ainsley Fullard-Leo ever ask you to transport him specifically over Kingman Reef to view Kingman Reef?**
A No.
**Q Did you have any contact with anyone else in the Fullard-Leo family or anyone representing them regarding flights over Kingman Reef or Palmyra Atoll?**

Page 61



KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 7

A No. Ainsley is the only person I talked to, as I recall.

**Q Did the information sharing that you spoke about earlier with Ainsley Fullard-Leo have anything to do with Kingman Reef?**

A No.

**Q Does the Coast Guard have any control over access to Kingman Reef?**

A No.

**Q What is the Coast Guard's role with respect to Kingman Reef?**

A We're responsible for enforcing U.S. federal law in the areas under our jurisdiction, which is the navigable waters. So we have control below the high water mark of land, essentially, so we had no jurisdiction over any land itself.

**Q You mentioned earlier that you patrolled the exclusive economic zone; is that correct?**

A Yes.

**Q Yes, that's correct?**

A Yes.



**Q Thank you. I want to refer your attention to Previously Marked Exhibit 38.**

MS. FITZGERALD: It's this one. It's actually -- I think the sticker says 138. The sticker --

MS. CANNATA: Oh. It should be 38, yeah.

MS. FITZGERALD: Yes.

MS. CANNATA: It should be 38. It may be 138. Hold on one second. It think it was marked -- I think it is -- I think it was 138. It's been previously marked as 138. That's my understanding. That is correct.

MS. FITZGERALD: Okay.

BY MS. FITZGERALD:

**Q And I want to refer your attention to paragraph D at the bottom of the first page, which actually goes over onto the second page. Ms. Cannata asked you a question about that earlier, and you provided a response regarding naval defensive sea areas. Do you recall that --**

A Right. Yes.

**Q Do you want to clarify anything about that?**

MS. FITZGERALD: I'm going to object. You're coaching the witness. You had a conversation -- for the



record, you had a long conversation with him outside of this room. I understand that conversation's attorney-client privilege and I'm not going to inquire as to what it was, but I think that the way your question is is obvious you're coaching the witness to give a prearranged answer to some sort of clarification.

MS. FITZGERALD: And I'm going to object. The witness is here to testify with respect to the Coast Guard, and the Coast Guard's policy is he's been designated as a Rule 30(b)(6) for the Coast Guard, and your questions to him were with respect to the Navy, the naval defensive sea areas. It is entirely appropriate for us to clarify the basis for his answer, and that's what we're doing now.

MS. CANNATA: Proceed. I put my objection on the record.

BY MS. FITZGERALD:

**Q Do you recall answering Ms. Cannata's questions about the sentence at the bottom of page 1, going on to page 2?**

A Yes.

**Q Do you recall making any references to naval**



**defensive sea areas?**

A Right. When I said they're not being enforced, I should say that the Coast Guard had no role and was not asked to enforce the Honolulu sea defensive area. Whether the Navy was actually patrolling it, I don't know, but the Coast Guard had no active role in patrolling.

**Q Okay. And that would be patrolling the naval defensive sea areas?**

A Well, paragraph D is -- is talking specifically about the Honolulu defensive area, which is the South Shore of Oahu. So -- but that would apply to any of the naval defensive sea areas. During my tenure there, from '86 to '89, the Coast Guard was not asked to patrol any naval sea defensive areas or control entry in any of those areas.

**Q And you -- your testimony here today is not with respect to anything regarding the Navy, is that right, what the Navy did?**

A Correct.

**Q And do you know what the Navy did during that time period?**

A I don't know everything they did.