IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| KINGMAN REEF ATOLL INVESTMENTS, L.L.C., et al., | ) | |
| Plaintiffs, | ) | No. 06-828L |
| v. | ) | |
| | ) | Judge Marian Blank Horn |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**ERRATA – EXHIBIT 7**
**TO**
**DEFENDANT'S MOTION FOR A PROTECTIVE ORDER (DOC. 53)**

Defendant United States hereby submits this errata to its Motion for a Protective Order (Doc. 53), filed this date. Exhibit 7 to Defendant's Motion should have contained excerpts from both Volume I and Volume II of the Deposition of Georgia Shirilla. The filed copy of Exhibit 7 erroneously contained two copies of the excerpted pages from Volume II. To correct this error, attached are the excerpts from Volume I that are cited in Defendant's brief, and that should have been included in the original filing.

Dated: March 11, 2008

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

s/ Kristine S. Tardiff

KRISTINE S. TARDIFF
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
53 Pleasant Street, 4th Floor
Concord, NH 03301
TEL (603) 230-2583
FAX (603) 225-1577
E-MAIL kristine.tardiff@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

KINGMAN REEF ATOLL )
INVESTMENTS, LLC a Hawaii )
limited liability company, )
)
Plaintiff, )
)
vs. ) Civil No. CV05-00151JMS/BMK
)
THE UNITED STATES OF )
AMERICA; THE UNITED STATES )
DEPARTMENT OF INTERIOR; )
THE HONORABLE GALE A. )
NORTON, in her official )
capacity as Secretary of )
the Interior; THE UNITED )
STATES FISH & WILDLIFE )
SERVICE; STEVEN A. )
WILLIAMS, in his official )
Capacity as Director of )
United States Fish & )
Wildlife Service, et als., )
)
Defendants. )

Volume I
DEPOSITION OF
GEORGIA SHIRILLA

Taken in behalf of Plaintiff

April 25, 2007
1000 NE Multnomah
Portland, Oregon
10:05 a.m.

ATKINSON-BAKER, INC.
COURT REPORTERS
www.depo.com
(800) 288-3376

REPORTED BY: GWEN A. DICKSON, RPR
FILE NO.: A1035DC

APPEARANCES:

For the Plaintiff:

CANNATA CHING & O'TOOLE
BY: THERESE Y. CANNATA, ESQ.
899 Ellis Street
San Francisco, CA 94109
415.409.8900

BROOKS TOM PORTER & QUITIQUIT
BY: DONNA H. YAMAMOTO, ESQ.
841 Bishop Street, #2125
Honolulu, HI 96813

For the Defendants:

US DEPARTMENT OF JUSTICE
BY: DONNA SHEEHAN FITZGERALD, ESQ.
601 D St., NW
Washington, DC 20004
202.305.0476

Also Present:
Mariel J. Combs, Esq.
Department of the Interior



INDEX

Georgia Shirilla
EXAMINATION BY: PAGE

Ms. Cannata 4

EXHIBITS

No. 96 Deposition Notice 4
No. 97 Deposition Notice 11
No. 98 Deposition Notice 11
No. 99 Subject Card/Dec. '35 65
No. 100 Subject Card/Feb. 65

No. 101 Draft Proposal 192
No. 102 Miller memo 193
No. 103 Wallace memo 200
No. 104 Busekrus e-mail 219
No. 105 Wery e-mail 221

PME Exhibits referenced:
Nos.: 3, 4, 5, 7, 8, 9, 13, 22, 26, 28



* * *

GEORGIA SHIRILLA,
called as a witness having first been sworn/affirmed to tell the truth, the whole truth, and nothing but the truth by the Reporter, testifies as follows:

(Deposition Exhibit No. 96 was marked for identification.)

EXAMINATION

BY MS. CANNATA:

**Q. Good morning, Ms. Shirilla. My name is Therese Cannata and I'm here on behalf of the plaintiff to take your deposition today, and I'm going to go over a few preliminaries with you.**

**Have you ever had your deposition taken before?**

A. I have not.

**Q. Well, and I'm sure you've gone over some rules with counsel, but let me just go over some that will be helpful here today.**

**We are here and a record is being taken of everything that we say. If we want to say something off the record, then counsel and I will agree to go off the record, but in general everything we say in this room in a somewhat**



**informal meeting will be taken down by the Court Reporter.**

**It is an informal setting in the sense that we can stop the record, take a break, you can go confer with counsel if you need to and so forth. But it's formal in the sense that when we're on the record it is being taken down and you are under oath.**

**At the conclusion of your deposition a transcript will be made of everything that we say on the record at this deposition and you will have an opportunity to read it and to review it and to make corrections if either you misspoke or if there was a transcription problem or something like that.**

**If you make a correction as to substance, meaning it isn't a transcription problem but it is something that you thought about later on and you have a different answer, I can comment on that at trial. So it is important that you understand my question and that if you don't understand it, just have me repeat or clarify it. I'm perfectly happy to do that.**

**The purpose today is to get your best most accurate recollection of events as they transpired over the many years preceding of the filing of this**





KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 7 (Errata)

case so. So I'm happy to rephrase it.
From time to time your counsel may object as to the form of a question and I will say after that objection to form to either rephrase and you can answer it. If, however, your counsel says I object and I instruct based on privilege that's a separate issue and I think your counsel will advise you on that. But the idea is that you don't testify and I wouldn't tell you to just answer the question because you've been instructed not answer and there may be an exchange between your counsel and I at that point about the nature of the privilege or whatever. When there's an exchange, in that sense you should hold up and not answer and counsel and I will then get back to you in a minute.
And what happens often in those kind of exchanges is we agree on something and then I will say What's your answer? And you will say What's the question? So we're always happy to repeat the question or have the Court Reporter read it back.
Beyond that, if you want to take a break at any time, please let me know. If we are in the middle of a question and it's not an issue of privilege I would ask you to answer the question



before taking the break so that there's -- and if you do take breaks when a question is pending and it's not privileged I'm going to ask the Court Reporter to make note of the fact that there's a consultation with counsel before answering the question but I don't anticipate that to be a big issue.
I think that covers all the logistics other than we cannot talk at the same time so the Court Reporter is taking down what I say and what counsel says and also that you have to say yes or no out loud because the Court Reporter doesn't take down our gestures. So that's about it.
Do you have any questions?
A. No, I do not.
Q. Okay. And are you taking any kind of medication that could impair or affect your ability to testify accurately and truthfully here today?
A. I am not.
Q. You did mention prior to the start of this deposition that you have a physical condition, cataracts, that could affect your ability to review documents in some way; is that right?
A. I can read.
Q. Okay.



A. I just need to bring the documents closer to my eyes and it takes me a little longer to read documents than it did before my cataracts developed.
Q. Perfect. And I will then let you know, I'll get the documents in front of you, you can take as long as you need to review them. We're not on a speed train here. And I will try to direct you to the page that we're really focused on.
When I do direct you to a page of a multiple page document, that doesn't mean that you can't go back and look at other pages. I'm simply telling you what I want to talk about in that document, but if you want to look at it and get greater context, that's fine. That will be up to you, and counsel may direct you to look at other areas and you can take as long as you need to look at the document. And if you need some special lighting, if this lighting is not appropriate, let us know. All right? We'll proceed with that.
Would you please state your full name for the record?
A. Georgia Lynn Shirilla.
Q. And would you state your business address?
A. 911 Northeast 11th Avenue.



Q. And telephone?
A. (503)231.2236.
Q. I have marked as Exhibit 96 just your Notice of Deposition and you are here pursuant to a notice and we did not re-subpoena you but we thank you for attending today and you're here with your counsel, Donna Fitzgerald. Correct?
A. Yes, I am.
Q. What is your position at the -- and you're employed by the Fish & Wildlife Service?
A. Yes.
Q. What is your position there?
A. My position is supervisory realty specialist. I serve as the chief of the branch of realty.
MS. FITZGERALD: Counsel, make a clarification on her notice.
As you know, Ms. Shirilla is also being produced by the United States in response to your 30(B)(6) notice of deposition to the Fish & Wildlife Service and also with respect to certain topics in your 30(B)(6) notice to the United States of America. Both of those were served on us as fourth amended notices.
MS. CANNATA: Right. And I have those here



KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 7 (Errata)

and I was going to mark those next.
MS. FITZGERALD: Okay.
MS. CANNATA: Just getting her title here.
MS. FITZGERALD: Okay.
MS. CANNATA: And may I have your stipulation, Counsel, that to save time it would be more efficient here, we're going to take all three of those depositions concurrently so that we can just not have to overlap the areas?
MS. FITZGERALD: Yes, that's correct.
MS. CANNATA: Okay.
By the way, that will be a mutual stipulation should you notice a 30(B)(6) on that.
MS. FITZGERALD: I didn't understand.
MS. CANNATA: Mutual meaning that you, in the same situation, we will extend the same courtesy so we can do it more efficiently.
MS. FITZGERALD: I don't intend that we will be noticing 30(B)(6)'s.
MS. CANNATA: I figured that. Just wanted to make sure you knew it was mutual.
BY MS. CANNATA:
**Q. So supervisory realty specialist. Right?**
A. Yes.
**Q. And you clarified that and you said**

Page 10

**something else after that and I was making a note of something. What was the clarification?**
A. That I serve as the chief of the branch of realty.
**Q. Is that a rotating position or permanent one?**
A. Permanent.
**Q. And how long have you served as the chief of that position?**
A. About two and three quarters years.
**Q. So this is 2007, so some time in 2004?**
A. July.
**Q. July 2004. I'm going to mark these other notices, then I'll get some background information.**
**(Deposition Exhibit Nos. 97 & 98 marked for identification.)**
**Q. This is more a formality that your counsel has notified us of but you have been designated as the -- by defendants as the designee for a rule 30(B)(6) notice directed to the Fish & Wildlife Service and the United States of America.**
A. Yes.
**Q. And by noting these, I have marked the notices for each one, and I want to ask you have you seen Exhibit 97 prior to today?**

Page 11

**And for the record Exhibit 97 is the Fourth Amended Notice of the deposition of the United States Fish & Wildlife Services.**
A. Yes, I have seen this.
**Q. And you reviewed it?**
A. Yes, I have.
**Q. And the same with respect to Exhibit 98 which is the same, a 30(B)(6) notice directed to the United States of America.**
A. Yes, I've seen this.
**Q. All right. We'll get back to the preliminaries. What I would like to do briefly is review your educational background starting with high school and going forward.**
A. I graduated from Hermiston High School, small town in eastern Oregon in 1967. I then went to Lewis and Clark College here in Portland where I obtained a bachelor of science in business administration in 1971.
**Q. And where to after that?**
A. Then I went on to Fish & Wildlife Service.
**Q. Okay.**
A. I took courses at community colleges, real estate courses, but it wasn't a graduate program

Page 12

per se.
**Q. Real estate relating courses?**
A. Yes.
**Q. What is your area of real estate? When you say you took courses, what were you studying in the real estate area?**
A. Principals and practices of real estate.
**Q. And what do you mean by that?**
A. That was the basic real estate courses, two terms, offered by a local community college.
**Q. Are you a licensed real estate agent or broker?**
A. No, I'm not.
**Q. Have you ever had a license to do so?**
A. No.
**Q. What year -- you say you finished college in 1971, what year did you take those courses at the community college in real estate? Or years.**
A. '72, '73 possibly.
**Q. And now let's review your work history if we could starting, I guess, in 1971.**
A. If I may back up a couple years?
**Q. Yeah.**
A. During the summer is when I started at Fish & Wildlife Service. I worked two summers in

Page 13

**Q. Do you recognize Exhibit 99? Have you ever seen it prior to today?**
A. I don't remember seeing it.
**Q. And what about Exhibit 100 referencing ownership of Palmyra and Kingman Reef, have you ever seen Exhibit 100 prior to today?**
A. I don't remember seeing it.
**Q. Have you ever seen a subject card like this, meaning the form without the same typed in information?**
A. No.
**Q. Did you undertake an effort at some point in time to investigate the title to Palmyra island?**
A. Yes.
**Q. Did you ever undertake to investigate the title to Kingman Reef?**
A. Yes.
**Q. So let's go through those efforts individually. First let's speak of Palmyra. What did you do to confirm or investigate the title of Palmyra?**
A. I reviewed a great deal of documents. We worked on the acquisition in the case of Palmyra. We ordered a title report. And as I said earlier, reviewed a great deal of historical documents.

Page 66

**Q. Okay. Ordered title report and looked at historical documents. Anything else?**
A. That's what's coming to mind.
**Q. Why were you investigating the title to Palmyra?**
A. For the potential acquisition by the Fish & Wildlife Service.
**Q. Was it your understanding -- when were you doing this?**
A. I think I started in the latter part of the 1990s, maybe 1998, late 1998.
**Q. Was it your understanding in this time period in late 1998 that The Nature Conservancy was going to purchase Palmyra?**
A. They were hoping to and were looking at different options.
**Q. What was your understanding about the status of the negotiations to acquire Palmyra?**
A. May I ask what time?
**Q. Yes. Let me ask a different foundation question.**
**In late 1998 who owned Palmyra, to the best of your knowledge?**
A. The federal government owned the submerged lands and waters.

Page 67

**Q. And who owned the island?**
A. The emergent lands were owned by two different ownerships, the majority being the Fullard-Leos and small two islets owned by the Cooper family to the best of my knowledge.
**Q. How did you acquire the knowledge of ownership of the emergent lands?**
A. May I again ask time period?
**Q. Initially. In other words, how did you initially acquire this knowledge?**
A. Reviewing different documents.
**Q. What documents, if you can recall?**
A. I remember reading part of the Supreme Court decision.
**Q. And I'm just asking by way of example. I understand that you don't have the list of documents in front of you. Did you have a title review file by the way?**
A. We have -- we set up acquisition files.
**Q. Okay.**
A. Including title documents.
**Q. And the acquisition file is different than the general file you described earlier. Right?**
A. The general files are per project.
**Q. And then within the general file, sort of the scheme of things there's a specific acquisition file. Right?**

Page 68

A. Normally.
**Q. And in this case there was?**
A. Yes.
**Q. Okay. And in the acquisition file there would have been the title review documents that you looked at?**
A. Yes. Files. There was quite a bit of documentation.
**Q. Files plural?**
A. Yes.
**Q. This may be a really tough question because I realize you have a lot of property acquisitions besides this one, but how many files do you think there were for Palmyra acquisition?**
A. A few feet.
**Q. Were they stored in banker's boxes or file cabinets at the time of the acquisition?**
A. Both.
**Q. How many banker's boxes, do you know?**
A. I don't recall.
**Q. Would you say more than five? More than six?**
A. No, I don't think that many.

Page 69



KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 7 (Errata)

A1035DC
GEORGIA SHIRILLA APRIL 25, 2007

**Q. Okay. Two or three?**
A. Maybe.
**Q. Estimating. Okay. And I understand this is an estimate. What about file drawers, how many file drawers did the files take up?**
A. They were in the boxes as well.
**Q. Right. Excluding boxes now. Just saying -- because as I understand it there was some in boxes and there was some in the file drawers. Right?**
A. Right.
**Q. And I'm just saying now we've sort of said maybe an estimate of maybe two or three boxes. So how many file drawers, if --**
A. If you were to put the box in the files?
**Q. No. Excluding the boxes. Saying in addition to the two or three boxes, how many file drawers?**
A. Maybe half of a standard.
**Q. Meaning a horizontal?**
A. We've converted from the pull-out to the horizontal.
**Q. So this would be half of a horizontal?**
A. Approximately.
**Q. Are they organized by volume or other types**



**of subject categories?**
A. Other types.
**Q. Can you give me an example?**
A. Some of them are duplicates because we had a Freedom of Information request.
**Q. Okay. But for the nonduplicates. Let's eliminate the duplicates at this point and talk about the other categories. Are they not arranged in volumes but they have specific titles on them?**
A. They may have probably both.
**Q. Can you give me an example of the other titles?**
A. There may be the regular case file with track number.
**Q. Okay.**
A. There may be a file of maps, expansion folder with maps.
**Q. Okay.**
A. And I think there's an expansion folder of miscellaneous title documents.
**Q. Okay. So maps of miscellaneous title. And you said one that was more general information. Right?**
A. The typical track file.
**Q. Okay. What is in the tracked file?**



A. This is the file I was talking about earlier that has typically the four sections.
**Q. Okay. That's the four-section file. Okay. We don't have to revisit that. I understand. Thank you.**
**Do you maintain an index of the files for the particular acquisition files here, meaning Palmyra?**
A. Could you restate that?
**Q. Yes. Do you have an index of the files, like a master file index of some kind?**
A. We do have a master file list.
**Q. Of the Palmyra files?**
A. Some, if not all. There may be some work files.
**Q. What are work files?**
A. Miscellaneous documents, notes.
**Q. From peoples desk basically where they are taking things off the desk when they finish with the project and put it in the file folder for attention?**
A. Could come from different sources.
**Q. But it's a way to retain paper but not -- they don't fit in a particular category.**
A. Usually.



**Q. Did you have a work file?**
A. Yes.
**Q. Several probably on this project?**
A. On Palmyra.
**Q. Yes.**
A. Yes.
**Q. And does the work file show up on the master file index as just so-and-so's work file?**
A. Sometimes it does, sometimes it doesn't.
**Q. Where is the master file index kept? Is it kept electronically?**
A. Yes.
**Q. Is it also kept in hard copies somewhere?**
A. Yes.
**Q. What about e-mails? Now I understand there's a gap here that e-mails were sort of not happening for starting in 2001 for a short period of time, but in the late 1990s were -- what was the retention policy in your office, meaning from your perspective, concerning e-mails?**
A. That we kept the e-mails that we felt had substance. Some of the more general person-to-person e-mails that we didn't need to keep in the hard copy files.
**Q. What was the policy, if you know,**





KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 7 (Errata)

**concerning the ones that were not printed and kept in the hard file meaning the ones that stayed electronic, did those get saved or retained in some other way?**
A. Sometimes. But there was a period of time, I don't remember if it was when we changed programs.
**Q. Okay.**
A. I remember putting, you know, the folder system files, filing subject folders.
**Q. Right.**
A. And losing a lot of files through some action that I don't know what it was.
**Q. Meaning when you went back to look at some of your folders during a system transition, some of your folders were no longer there?**
A. Emptied.
**Q. Okay. And did you make inquiry as to what happened to them, meaning have someone try to recover them from a hard drive or anything of that nature?**
A. No.
**Q. Do you know whether any inquiries were made to recover such documents?**
A. I don't know.

Page 74

MS. FITZGERALD: Ms. Cannata, I want to state for the record we've made it clear that the documents that we produced in this case during the initial disclosure phase were in regards to Kingman Reef only. We made that very clear at the Chuck Cook deposition on March 26. So if you have any questions or concerns about that, we'd ask that you raise them now so that we can address that, but your questioning to Ms. Shirilla seems to be indicating that you think we have withheld something that we did not tell you and that's simply not the case.

MS. CANNATA: Well, I think that the difficulty we have - and for the record Mr. Cook's deposition, and I don't want to take up the witnesses time, is that there are, I would say, countless, at this point, documents where Palmyra and Kingman Reef are used on the same document. It would appear to me that the government was treating them the same. They appeared on the same congressional appropriation together. They appeared on proposals together. They appeared in memorandums together. They appeared on, for example, the very first previously marked Exhibit Number 3 that we just looked at.

Page 75

So I believe that the government, and I continue to believe, the government was obligated to produce all documents concerning the establishment of the Palmyra/Kingman Reef Atoll because they appear to have run on the same track within the government. And I find it hard -- I would find it hard if I were producing the documents on behalf of the government to distinguish which ones related to Kingman Reef and which ones didn't and as a precaution I would have produced all of them.

As a matter of fact I can see throughout the government's documents production and to some extent that call was made that there were a lot of just Palmyra or just Kingman Reef and combined them. So it's hard for me to tell where the line was drawn by the government and I'm only trying to establish the universe of documents. It's my custom and practice not to take up time on a deposition record meeting and conferring but merely to determine what exists through the percipient witnesses and go back to counsel and see if we have to fill in.

I'm not suggesting the government has not met its burden because I don't know at this point

Page 76

whether the government has not met its burden and obligation. I believe there are gaps and I particularly believe that the most likely source of gaps tends to be in the sector of e-mails, because e-mail retention and e-mail retrieval is difficult both in the private and government sector and I'm sure it's quite difficult in the government sector.

MS. FITZGERALD: Well, in response to that, I will say that the initial disclosures that we made from the Fish & Wildlife Service and the Navy focused almost primarily on Kingman Reef because this was the only piece of property that was identified in the complaint. So we generated the searches based on the property identified in the complaint which is Kingman Reef. The properties are two distinct properties. This quiet title action does not pertain to Palmyra Atoll.

MS. CANNATA: I agree.

MS. FITZGERALD: So the initial disclosure is consistent with Rule 26 and the definition of what the initial disclosures are intended to be focused on Kingman Reef, both at the Fish & Wildlife and at the Navy. We made that very clear throughout this process.

In more recent disclosures of documents,

Page 77



KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 7 (Errata)

and I'm speaking primarily of NOAAs documents, those have included, my understanding, of some Palmyra documents or at least NOAA did look for Palmyra-type documents. NOAA did that because of a subpoena that was served on NOAA specifically asked for documents related to both Kingman Reef and Palmyra Atoll. We made it very clear when we had our teleconference with Judge Curran that we did not think that we should be in a position of having to conduct or respond to discovery on Palmyra Atoll because those were two distinct properties. He authorized the deposition questions on Palmyra Atoll.

So any questioning that has come out in the depositions after the March 22 teleconference regarding Palmyra we have not objected to because Judge Curran authorized it. But our initial disclosure focused on Kingman Reef and Palmyra Atoll and we've been very clear on that from the beginning.

MS. CANNATA: To the extent there are documents out there that we ultimately have to go back and get, we have to go back and get. This is limited discovery. It's not the ultimate discovery in this case that leads up to trial. It's the

Page 78

limited discovery pertaining to a particular motion to dismiss that will be continued essentially by the government in the future filing and heard on August 6, 2007. So at this point we inquired and got this witness in front of us and are inquiring on the age of files.

And, again, I cannot definitively say where I think there are gaps in production, but I think there are some. And I'll take those up in separate and confer with you which I assume will cure if there are gaps. We will. Or -- and we can take that up and you may take the position that you don't have to produce them or revisit the question and agree that there is some link in overlap. I don't know where we're going to end up on that. We will make as best a case as possible to ask you to produce more and I hope we succeed.

MS. FITZGERALD: I can tell you our position right now, as it has been all along, is we have been fully compliant with all documents production requests.

MS. CANNATA: I take you at your word in good faith endeavored to do so and the only thing human beings being what they are, while we may all proceed in good faith to produce all documents

Page 79

requiring that sometimes we have to go back and revisit. That's what the discovery process lends itself to and allows counsel to explore what else exists out there and to -- before the time that we have to submit matters to the triers of fact resolve gaps in the production. So that's what the process is about and that's what we're walking down now.

MS. FITZGERALD: Like I said, I think we've been fully compliant with all documents production requests including the requirement to produce initial disclosures in this case.

MS. CANNATA: Okay.

BY MS. CANNATA:

**Q. All right. Now I want to talk to you a little bit about -- would you like anything else?**

A. I appreciate that. Just a little time.

MS. CANNATA: We are coming to a little after 12. I suggest we go to 12:30 if that's okay with counsel and the witness.

MS. FITZGERALD: That's fine.

THE WITNESS: Fine by me.

**Q. Fine. Just a few more things. Go through a sort of a segment which would be nice. Okay. Let's see. We were talking about e-mails before**

Page 80

**and master file index.**

**Now, you said that you look at historic documents and I was getting a few examples from you about some of the historic documents that you looked at and you said one of them would have been the part of the United States Supreme Court decision concerning Palmyra. Did you also look at documents - and one of the reasons, by the way, I showed you Exhibit 99 and 100 is to see if you had reviewed historic documents from the United States Navy concerning Palmyra. Did you look at documents that were generated by the Department of Navy at some point in the history of our country concerning the title to Palmyra?**

A. Generated by Navy?

**Q. Yes. In letters, as I say Subject Cards here where they are saying something about title, I think. Memos, reports. Anything.**

A. I don't recall any.

**Q. When you say you looked at historic documents can you give me then any other examples besides the Supreme Court decision of documents that you reviewed, historic documents concerning Palmyra?**

A. May I ask again the time period?

Page 81



KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 7 (Errata)

**Q. Yes. When you're initially doing -- you said this is in, I think you indicated, and I want to make sure, that you were doing your investigation concerning the title to Palmyra in the late 1990s, perhaps late 1998. So let me -- is that correct?**
A. Right.
**Q. So were you doing any investigation of the title to Palmyra prior -- did you do any investigation of the title of Palmyra prior to 1998?**
A. I might have seen an old executive order.
**Q. Okay. In what context would you have been looking at that?**
A. The Defensive Sea Executive Order that covered several areas.
**Q. You might have seen that prior to your title -- I'm asking, in other words, you were looking at a document pertaining to the title to Palmyra prior to late 1998. Is that what you're saying?**
A. I might have seen that -- I don't know when I first saw those executive orders is what I'm saying.
**Q. What context would you have been looking at**



**the executive orders of Palmyra if not for a title search or a title investigation?**
A. Other than a title -- it would have been title.
**Q. Okay. You may have already answered it but I want to make sure I've been clear. Did you conduct any title investigation concerning the title and ownership of Palmyra prior to late 1998?**
A. I'm not sure when I started looking at documents. I received some documents from The Nature Conservancy that related to Palmyra.
**Q. Okay. What did you receive from The Nature Conservancy concerning Palmyra?**
A. I don't recall which ones. There were a lot of documents. I don't remember sources of some of those documents.
**Q. Who did you receive them from?**
A. I received some of them from Suzanne Case.
**Q. When did you receive those documents roughly?**
A. Late 1990s.
**Q. Do you know why she sent them to you? In other words, was there any indication to you from someone else as to why she sent them?**
A. We had started discussions on different



scenarios about Fish & Wildlife Service and The Nature Conservancy acquiring Palmyra.
**Q. Was it your understanding when you received these documents that Ms. Case had done some of her own investigation into the title of Palmyra?**
A. Yes.
**Q. Did she provide a concluding or any kind of memorandum or e-mail along with it?**
A. Not -- no.
**Q. How did you know her purpose or what she found out, through communications with her? Oral communications?**
A. Yes.
**Q. Did you correspond with her by e-mail?**
A. I don't think so, no.
**Q. You said, when I was trying to -- when I was asking about what was transmitted to you from The Nature Conservancy, you gave a fairly general answer. Can you think of anything specific that was in the packet sent to you by The Nature Conservancy concerning Palmyra?**
A. I do remember a -- I think it was a Federal Register notice.
**Q. Okay.**
A. That minumets (phonetic) of title for



Palmyra.
**Q. What did you say?**
A. I'm not saying it correctly. Instruments of title.
**Q. Okay.**
A. From Palmyra were to be filed in the U.S. District Court.
**Q. Okay. Anything else? In other words, anything else concerning her investigation of title?**
A. For Palmyra?
**Q. Yes.**
A. I don't remember specific items.
**Q. Anything -- what did you do with those documents after you received them?**
A. I reviewed them.
**Q. And then what?**
A. Well, we eventually ordered our own title report.
**Q. But what did you do with the documents? Did you subfile them or put them somewhere?**
A. They are in our files.
**Q. Which file did they get to, if you know?**
A. I don't know.
**Q. Do you know what the logical -- based on**







KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 7 (Errata)

**the filing scheme in place at that time at Fish & Wildlife Service that you were aware of, do you know where they might most likely have gone to?**
A. No. They were not put into the standard files.
**Q. Okay. Where --**
A. Because I was collecting them.
**Q. Okay.**
A. And keeping them together.
**Q. Collecting what?**
A. Background information.
**Q. Okay. So did you keep it in a working file?**
A. Folders.
**Q. Working folders. How were those folders labeled or titled so that you can find them again?**
A. I kept them physically together.
**Q. With any kind of label?**
A. Some may have labels, some may not.
**Q. What kind of label would you have put on them?**
A. Palmyra.
**Q. Would you have put your initials on them so that they would be distinguished as working folders?**

Page 86

A. No, not necessarily. Maybe.
**Q. And where are those files now, if you know?**
A. They are in my office.
**Q. Still in the same original file folders?**
A. Some yes, some no.
**Q. Why have some of them been moved?**
A. Because we had the Freedom of Information request.
**Q. Right. And what does that do to file integrity?**
A. Well, it was a large amount of documents --
**Q. Okay.**
A. -- that we had collected and made duplicates, maybe triplicates, of and we didn't receive any money or didn't get full payment for production.
**Q. Okay.**
A. And we just held onto those duplicates and triplicates.
**Q. Who did you not receive funds for the production from? Who was supposed to pay?**
A. Mr. Sorba and/or his company.
**Q. Okay. But the file folders that you spoke of where you have the -- your investigation of**

Page 87

**title, as you put it, I think you said, collecting background information concerning the title and ownership of Palmyra, those files are still in your office in effect. I realize they may have been copied for other productions but those files, the way you have them, are pretty much in your office?**
A. They are in the office of realty.
**Q. In the office of realty. Correct. And do they have a label now? Are they just in boxes that say "Palmyra" on them?**
A. Some do, some maybe don't.
**Q. Have you undertaken any searches of those files for document production in this litigation on behalf of the -- not going to ask you who requested you or why, but did you physically search those boxes for anything?**
A. I might have.
**Q. Okay. Do you know whether any documents have been produced out of those files?**
A. I don't believe so.
**Q. I want to now turn to Kingman Reef. And my understanding is that you did a title investigation of Kingman Reef. Correct?**
A. I reviewed title-related documents.
**Q. You reviewed title-related documents**

Page 88

**meaning title-related documents concerning property known as Kingman Reef?**
A. Yes.
**Q. Right?**
A. Yes.
**Q. When did you do that?**
A. I don't know when I first saw the 1934 executive order. I would say mid nineties. Maybe mid to late nineties.
**Q. Why did you review title to Kingman Reef in the mid to late nineties?**
A. We were starting to talk about it as a proposal.
**Q. Who was starting to talk about it as a proposal?**
A. Different individuals at Fish & Wildlife Service.
**Q. Can you name anyone in particular?**
A. Robert Smith.
**Q. Anyone else?**
A. Possibly Scott Weiss.
**Q. Anyone else? If you can tick off the list to the best of your recollection.**
A. That's all that's coming to mind.
**Q. All right. And what was talked about**

Page 89

**specifically? And I want to go sort of to the -- I realize we're talking about, you said mid to late nineties so I won't pinpoint you to a time but can you point me to the initial discussions and tell me what was initially discussed?**
A. That we're looking at acquiring Kingman Reef. When I say "acquiring" I mean that in a broad sense.
**Q. Um-hum.**
A. That it was already under U.S. ownership --
**Q. You had determined --**
A. -- to establish it as a National Wildlife Refuge.
**Q. Had you determined that it was already under U.S. ownership?**
A. Yes.
**Q. How did you determine that?**
A. The executive order of 1934.
**Q. Just that one document?**
A. Yes.
**Q. When did you determine that?**
A. When I first reviewed the executive order and I think I did some checking to see if it was ever terminated and found that it was still in

Page 90

effect.
**Q. How did you see -- when did you check to see if it had ever been terminated?**
A. Late nineties.
**Q. Who assisted you in that process?**
A. I don't know if anybody did.
**Q. Did you call a particular department to determine that?**
A. No, not to my knowledge.
**Q. How did you check? By what process?**
A. I think I both talked to the Navy.
**Q. Okay.**
A. And I might have done some checking on the computer.
**Q. What did you check on the computer?**
A. Executive orders.
**Q. What file were you looking under?**
A. I don't recall.
**Q. How do you find executive orders? I mean, were you Googling it like the ordinary course or was this an internal government process?**
A. It could have been Thomas. I don't recall.
**Q. When you say Thomas what do you mean?**
A. There's a website for public documents.

Page 91

**Q. Okay.**
A. I don't recall if that was used in this particular case.
**Q. So maybe that but not likely?**
A. I don't recall --
**Q. Okay.**
A. -- which it was.
**Q. Can't recall at all. Okay. I understand.**
**Who at the Department of Navy did you talk to, if you can recall?**
A. Dennis Pacht.
**Q. Were you talking to Dennis Pacht about the Naval air and defensive areas as well?**
A. Probably at one time or the other, yes.
**Q. 1941 executive act or executive orders?**
A. Some time, yes.
**Q. But you also talked to him about the 1934 order?**
A. Yes.
**Q. Did you exchange e-mails with Mr. Pacht concerning the 1934 executive order?**
A. I don't recall.
**Q. Did you exchange e-mails with Mr. Pacht concerning the 1941 executive orders?**
A. I don't recall.

Page 92

**Q. Did you receive any documentation from Suzanne Case concerning the title to Kingman Reef?**
A. I think she sent me a copy of the 1934 executive order.
**Q. What else did Suzanne Case send you, if anything?**
A. Of Kingman Reef?
**Q. Yes.**
A. She sent me copies of the fishing license.
**Q. For what?**
A. For Kingman Reef. That covered Kingman Reef and Palmyra.
**Q. A fishing license?**
A. Um-hum.
**Q. What kind of fishing license?**
A. To Mr. Frank Sorba.
**Q. A license agreement. Got it.**
MS. FITZGERALD: Georgia, you need to say yes or no.
**Q. Yes a license agreement?**
A. Yes.
**Q. What else did she send you? You listed the 1934 executive order, you listed a fishing license agreement or two. I'm not sure.**
A. I'm not recalling any particular document,

Page 93





KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 7 (Errata)

other documents on Kingman Reef.
**Q. What about a memorandum?**
A. No.
**Q. No memorandum. What about an e-mail?**
A. No.
**Q. What about a title report?**
A. No.
**Q. What about a research memorandum meaning her legal research into title?**
A. No.
**Q. What did Ms. Case tell you about her title search and title investigation concerning the Kingman Reef?**
A. I recall a phone conversation with her talking more about Palmyra and I remembered talking about Kingman Reef and that it was her conclusion that it was United States ownership, they wouldn't be involved. And I agreed, I concurred with her conclusion.
**Q. What did she tell you about Kingman Reef? More specifically, if you can recall, why did she -- did she say why she drew that conclusion?**
A. Primarily the executive order 1934.
**Q. Did you prepare any memorandum to the file confirming that you had determined that the title**



**to Kingman Reef vested in the United States government based on the 1934 executive order?**
A. Not a memorandum. I don't believe I did a memorandum to the file.
**Q. Did anybody, to your knowledge, prepare a memorandum to the file indicating that title to Kingman Reef vested in the United States government based essentially on the 1934 executive order?**
A. Yes. I did prepare documents to that effect.
**Q. Okay. And what kind of documents did you prepare?**
A. Well, what comes to mind was land and water fund briefing books.
**Q. Land and water fund briefing books?**
A. Um-hum.
**Q. What are those?**
A. That's a document that you have brought up in other depositions --
**Q. Okay.**
A. -- that we prepare. I think the example you have was 2001.
**Q. Oh, you mean those briefing memorandums?**
A. Briefing statements. Memorandums, yes.
**Q. They are not books. They are like**



**memorandums. Right?**
A. They are made into a notebook.
**Q. They are made into a notebook?**
A. I believe.
**Q. Where do those briefing notebooks go? I mean, they are brought together in a notebook on a particular property --**
A. We sent them back to our central office and they put them together.
**Q. So there would be in existence -- are they divided by topic or are they divided by --**
A. Projects.
**Q. So there would be a briefing book, a briefing statement book on Kingman Reef; is that right?**
A. You have it. Of record.
**Q. We have the briefing book or the briefing documents?**
A. The briefing documents.
**Q. And but there is a book on it; is that right? Meaning they have all been gathered in one place, is that right, on Kingman Reef?**
A. Yeah. For all different -- a variety of projects. Nationwide that we're working on.
**Q. Let me see if I can understand how the**



**books are put together. Are the books put together like annually? Is it the 1999 briefing statement book or how are they divided up?**
A. They are done annually.
**Q. So a briefing book would consist of all the briefing statements for a year, for a particular year; is that right?**
A. Correct.
**Q. Covering a number of topics. Right?**
A. Number of projects.
**Q. Projects. Okay. Now, I notice there are briefing statements directed to the Secretary of Interior and then there are also briefing statements to the director - and I assume the director of Fish & Wildlife are the context of the document. Are those all put in the same briefing book or are they separated out?**
A. We're talking two different types of reports.
**Q. So what kind of briefing statement are you talking about? Is this one that's directed to a particular person or entity?**
A. I don't know what the full distribution list is that's done in the D.C. office --
**Q. Yes.**





KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 7 (Errata)

working on.
**Q. But you -- so this would have been prepared in 1997 is what you're saying?**
A. The spring of 1997 most likely.
**Q. Okay. And who prepared it?**
A. I might have been the preparer.
**Q. How can you tell?**
A. I can't. It's all recall.
**Q. Who in your office was in charge of preparing the LWCF briefing memorandums in -- for Palmyra and Kingman Reef? I guess this one pertains to Kingman Reef I should add.**
A. I remember doing later versions. Different people are assigned different projects.
**Q. Okay.**
A. And I don't remember working on Kingman Reef that early in 1997. I was involved in another very large project at that time.
**Q. Which project?**
A. It was acquisition of the Kona Forest Unit at Hakalau.
**Q. You mentioned that. Yes. Okay. Who was in charge of Kingman Reef in 1997 for acquisition?**
A. For acquisition?
**Q. Yes.**



A. I don't know if somebody had been specifically assigned. It could have been me or Scott Weiss. Maybe Scott Weiss. I'm not sure at that time.
**Q. Anyone else, other possible candidates here?**
A. We're talking about the acquisition part of it?
**Q. Yeah. Actually, let me be clear because I want to make sure I'm being clear in my question.**
**If this document exhibit previously marked Exhibit 26 was prepared in the spring of 1997 and you think it's possible that you might have been the author but you're not certain. I'm looking for other potential candidates who might have been the author?**
A. Most likely Scott Weiss.
**Q. Would there be any other possible candidates other than you or Scott Weiss?**
A. I don't believe so.
**Q. Now, I think that we went on -- we started talking about this document because I asked about where you would have indicated that the -- that you had drawn a conclusion that by virtue of the 1934 executive order title to Kingman Reef vested in**



**U.S. government and you indicated that it would be on these LWCF statements, briefing statements. Right?**
A. You lost me on that question. I'm sorry.
**Q. How we got to this point is that when I asked you, I asked you a question and I believe the question was to this effect: Where -- did you ever indicate on the documents that you prepared that title to the Kingman Reef vested in the United States government based on the 1934 executive order? And you indicated yes. And I asked you for some examples and you referenced the land and water fund briefing notes and that's how we got all the way over here.**
**So my question is - and I'm going to -- is did you indicate -- did you or Scott Weiss, I guess, indicate in Exhibit 26 that the Kingman Reef, title to Kingman Reef vested in U.S. government based on the 1934 order?**
A. This isn't the land and water report that I remember preparing. It was a later one.
**Q. Okay. I got another one. I think this is a previously marked one that goes to 2001. Let me see. This has been previously marked Exhibit 22.**
**(Deposition Exhibit No. PME 22 was marked**



**for identification.)**
MS. CANNATA: While the witness is looking at this I want to indicate, Ms. Fitzgerald, on the record that from time to time the document actually pulled is a duplicate but there can sometimes be a difference in the Bates stamp number meaning that everything in the document is the same as the one previously marked but the Bates stamp number may be different.
And I believe that it is possible that previously marked Exhibit 22 may have been Bates stamped number FWS which is one of the Freedom of Information Act productions as opposed to U.S. ID which is a Bates stamp sequence we placed on your initial disclosure document so we can track them on a page-by-page basis but when we put the two side by side I believe the documents are otherwise identical. But I wanted to indicate that possible discrepancy for the record. So if you're looking through the transcript and you noted that, that's how I've traced it.
MS. FITZGERALD: Okay.
**Q. Have you seen exhibit previously marked Exhibit 22 prior to today?**
A. Yes.





KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 7 (Errata)

**Q. Are you the author of previously marked Exhibit 22?**
A. I do remember, yes.
**Q. And did you indicate on this document that based on the 1934 executive order the title to Kingman Reef vested in the United States government?**
MS. FITZGERALD: Counsel, I'm going to object. I don't think that Ms. Shirilla previously testified that it was her understanding that title vested as of the date of the 1934 executive order. I don't believe that was her testimony here today and I believe your questioning to her is mischaracterizing what she said here today.
**Q. I don't want to go back and revisit it, Ms. Shirilla. If you want to clarify based on a comment by your counsel, I think your counsel is suggesting that she heard your testimony differently than I heard it. I asked you -- you said that you -- but I will go back and lay some foundation.**
**You indicated that you did a title investigation concerning Kingman Reef. Right?**
A. I reviewed the 1934 executive order.
**Q. Did you look at any other documents that**

Page 106

**assisted you in determining the title to Kingman Reef? Title and ownership.**
A. I have subsequently.
**Q. But prior to making your determination that ownership vested in the United States government, at some point in time you determined --**
A. I believe that title vested in the United States prior to the 1934 executive order.
**Q. Okay. But all right. But so let me go back then. Why do you say -- let's go back in time.**
**There's a point in time where you decided that title to Kingman Reef vested in the U.S. government. Right? You made that conclusion?**
A. Yes.
**Q. When did you make that conclusion?**
A. I don't remember the first time I saw the executive order.
**Q. Did you have that conclusion in mind when you spoke with Suzanne Case about title to Kingman Reef?**
A. Yes.
**Q. And that would have been in the late 1990s?**
A. Yes.
**Q. So as of the late 1990s you had drawn a**

Page 107

**conclusion that title to Kingman Reef vested in the U.S. government. Is that accurate?**
A. That's accurate.
**Q. Upon what did you base that opinion?**
A. The 1934 executive order.
**Q. Anything else?**
A. No. I reviewed subsequent documents.
**Q. I'll ask you about that, but at that point in time your conclusion was based on the 1934 executive act?**
A. Yes.
**Q. What was your conclusion about how that act vested title? How did you --**
A. I don't believe that that act vested title. I believe that title was already vested in the United States prior to that executive order.
**Q. Okay. And why do you say that?**
A. Because it was already public lands that the president of the United States drew that executive order, presented the decision to transfer the control and jurisdiction of those specific federal public lands to the Department of Navy.
**Q. And why do you say it was already public lands? How did you determine that?**
A. It was according to the authority in the

Page 108

executive order.
**Q. Anything --**
A. They had to be public lands for the President of the United States to transfer custody -- excuse me, control and jurisdiction to a specific federal agency.
**Q. So what you're saying is that based on the wording in the executive order which you said referenced public land or something in the executive order told you that the President of the United States, President Roosevelt, I believe, had made a determination -- I should say Franklin Delano Roosevelt, had made a determination that Kingman Reef was public lands?**
A. It was already public lands.
**Q. And did you go behind that determination to determine if that was an accurate determination on the part of executive branch of our government?**
A. This is a common way for the territories, I know our refuges out in the remote islands, how they were established. They were territorial lands that the president, through the specific executive orders, transferred custody, control, jurisdiction, however the wording may be, to a specific federal agency.

Page 109





KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 7 (Errata)

make sure that we're on the same page when we're going through a topic.
Let me ask you a few follow-up questions, if I can. And you mentioned that a title report, that someone ordered a title report for Palmyra when you were talking about the Palmyra acquisition and a title investigation; is that right?
A. Yes.
Q. Who did you order the title report from?
A. Title Guaranty of Hawaii.
Q. Do you know who underwrites them? Is that First American Fidelity?
A. I was thinking that they underwrote their own but I can't say for sure.
Q. They may well. Just wanted to see if they were linked to one of the other bigger companies. May be a big company as well.
Did you ever order a title report concerning Kingman Reef?
A. I did not.
Q. Is there a list of public lands that's maintained by the U.S. government?
A. Not to my knowledge.
Q. How does one go about finding out if something's public lands, in fact public lands?

Page 114

A. I think you probably have to go to different sources.
Q. If you want to determine that how would you do that?
A. For mainland I would go to Bureau of Land Management.
Q. BLM. Right?
A. BLM.
Q. Just learned about that in another case. All right. For mainland. What about for the Hawaiian Islands?
A. I would go to -- there's no public domain lands to my knowledge in Hawaii. I think I would go to the state or city and county. Probably the state.
Q. And have you ever undertaken an investigation of real property in Hawaii in which you're trying to determine whether it's in fact public lands in the course of your experience at Fish & Wildlife?
A. We, as far as getting title reports, get those only on non federal or public lands.
Q. For title reports then, as I understand it, meaning privately owned property, you get a title report from a title insurance company?

Page 115

A. Yes.
Q. But for publicly held lands, when you're trying to investigate whether in fact it is a public land as opposed to privately owned, how do you -- what is your custom and practice in terms of making that determination? And I'm going to ask you to speak about your custom and practice with respect to Hawaiian Island investigations.
A. You're talking within the State of Hawaii?
Q. Well, when -- I understand that the Palmyra and Kingman Reef are not within the State of Hawaii and are, I guess, part of a series of islands called the Line Islands; is that right?
A. Yes.
Q. They are also considered to be territory of the United States with a lower case T as I understand it, not a capital T?
A. You see as both.
Q. You see it as both. What is the difference between territory with a lower case T and territory with a capital T, if any?
A. I don't know.
Q. That's something that somebody else knows, I guess.
A. I don't know if there is a difference.

Page 116

Q. Okay.
A. But if you're talking about --
Q. Is Palmyra a territory?
A. Yes.
Q. Is it a territory as the way in the way in which Puerto Rico is a territory, if you know?
A. I don't know about Puerto Rico. I don't know about Puerto Rico. I know Palmyra is a territory.
Q. Is it a territory in the same way that Hawaii was a territory?
A. I don't know if it is exactly.
Q. The same. Do you believe it's different?
A. I don't know. Either way.
Q. Do you know the difference between an incorporated or unincorporated territory?
A. It's my understanding that unincorporated means that it was never a part or governed by or incorporated by another government except federal.
Q. This has to do with sovereignty, not ownership. Right? The difference you're speaking of is about the governing of a land, not about the ownership. Right?
A. It could be both, but yes.
Q. Right. It could be both. I mean, you

Page 117





KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 7 (Errata)

**could both govern and own. I understand that.**
A. Yes.
**Q. But when you speak of incorporated versus unincorporated and you mention it was never a part of or governed by a state or body other than the United States government.**
A. That's my understanding.
**Q. That's speaking as to the issue of sovereignty; is that right?**
A. I guess so.
**Q. Okay. Not title, in other words.**
A. Correct.
**Q. Now, going back to your custom and practice, have you ever undertaken title research concerning whether or not property in the Hawaiian island area - whether the Line islands, Hawaii, the state, or the northwestern islands - whether any of those areas are public property or not, public lands?**
A. I've discussed them with other federal agencies and their origins. Including their origins.
**Q. Can you give me an example of property other than Kingman Reef and Palmyra -- strike that.**
**Other than Kingman Reef in which you would**

Page 118

**have undertaken an investigation to determine its ownership status?**
A. Johnston Atoll.
**Q. And what did you determine about Johnston Atoll?**
A. Federally owned.
**Q. How did you determine that?**
A. Executive orders.
**Q. Anything else?**
A. No.
**Q. Did you ever go behind the executive orders for the Johnston Atoll to determine if they were accurate, meaning they had - those executive orders issued by the executive branch of our government - had been accurately issued or determined?**
MS. FITZGERALD: I'm going to object to that question as assuming facts not in evidence.
You can go ahead and answer.
A. I guess I don't really understand your terminology about going behind something.
**Q. Sure. Let me see if I can state it differently. Now I'll keep talking -- looking for a custom and practice so I'll ask with respect to Johnston Atoll. Did you speak to any federal agencies to determine its ownership status?**

Page 119

A. Yes.
**Q. Who did you speak to? What entity?**
A. GSA.
**Q. Who at GSA do you typically contact?**
A. It varies.
**Q. What department do you go to?**
A. The real estate.
**Q. And what -- why do you go there? What is the significance of going there?**
A. Well, it varies. The situation we're talking about Johnston?
**Q. Sure.**
A. They were involved -- they were assisting Air Force, Air Force was desirous of terminating their use.
**Q. Okay.**
A. And GSA was assisting them.
**Q. Okay.**
A. And we have an interest in it.
**Q. Okay. Have you ever undertaken an investigation of title in which there's an executive order declaring public lands and you investigate whether in fact that executive order is accurate or not?**
A. I don't know of executive orders declaring

Page 120

public lands. I believe that the lands that are subject to the types of executive orders I'm familiar with were already public lands.
**Q. Are you aware of any instance in which the U.S. government has declared land to be public lands and has later been corrected by a court of law and has been told in fact it was not public lands?**
A. I don't know if you're referring to the Palmyra supreme court.
**Q. Well, that would be one example in my mind but I'm asking if you have any in mind.**
A. I'm aware that that happened.
**Q. So Palmyra was an instance in which the executive branch of the government or some branch of the government declared that Palmyra was a publicly owned land, public lands, but a court determined later that it was not public lands is your understanding? Is that your understanding?**
A. Yes.
**Q. When you were speaking with Suzanne Case about Kingman Reef and you said that she mentioned that she believed that the 1934 executive order was evidence of pertaining to her determination of title; is that right?**

Page 121

A. It was a part of it, yes.
**Q. What other evidence, if any, did she identify?**
A. I don't remember any.
**Q. Did she indicate that she made any inquiry beyond the face of the 1934 executive order to make her determination that title to Kingman Reef was held by the United States government?**
A. I don't recall.
**Q. Did you make any inquiry beyond the face of the 1934 executive order to determine that Kingman Reef was held in ownership by the United States government?**
A. An inquiry as to who? Are we talking Suzanne Case?
**Q. Rephrase because it wasn't clear.**
**Did you -- when you were determining and doing your investigation of Kingman Reef, did you make any investigation -- did you conduct any investigation other than the review of the 1934 executive order to determine whether or not Kingman Reef was in fact a publicly held land?**
A. What time period are we speaking?
**Q. At any point in time, first off.**
A. At any point in time?

Page 122

**Q. Yes.**
A. We did do additional research --
**Q. Okay.**
A. -- into Kingman Reef.
**Q. Okay. So if I can understand the timeline. The initial point would be the late 1990s I think you indicated that you saw the executive order?**
A. Yes.
**Q. Now there's additional research that was conducted; is that right?**
A. Correct.
**Q. And what is that additional research? First off, when was that, how many years after the initial determination or conclusion?**
A. Three, four, five.
**Q. Three to five years later?**
A. Yeah, approximately.
**Q. Can you pinpoint the approximate year?**
A. I'm going to do a little explanation.
**Q. Yes.**
A. In the year 2000 we submitted our draft environmental assessment to the public for their comment which outlined our position of ownership as to Kingman Reef.
In response to that we received a letter back from the Fullard-Leo's representative, Mr. Houlihan and possibly another law firm, stating that they believe their clients owned Kingman Reef. Responding to that, we asked them to share with us their proof of ownership; that we believe that Kingman Reef was federally owned. And we asked if they would be willing or had a desire to meet with us.

Page 123

They sent in a package of miscellaneous items that they said substantiated and proved their ownership. There was, in my estimation, my opinion, very little information and nothing that showed proof of title within that package and I was kind of surprised how little there was. There was nothing showing any basis of title.
So we, I think, had a couple of phone conversations or somebody from the agency about setting up a meeting to talk about this and I don't know if there were dates discussed but that invitation was never accepted, and shortly thereafter they filed a lawsuit against us which altered, of course, our ability to discuss anything with them directly.
So when that occurred I kept thinking about how little information they provided and I

Page 124

thought to myself how can they possibly think that what they sent me had any proof of title as a part of it? And I just thought, god, there's got to be more. So I think I might have asked the navy if they had any additional documents but I was talking to people from my Washington office and, you know, about the only thing was a letter, I think, to the state department and they writing back and saying we acknowledge receipt of your letter. There was no award of title in whatever form that it might have taken.
So people from my office in D.C. went to two or three different locations, I think it was archives, National Archives, I think there was a navy place, Library of Congress, and they went through some of these old files and did indeed find that there was more to the story; that back in the thirties the Fullard-Leos went to the navy and said we think we own it, and the navy wrote back, we've researched all the documents and we find you don't. And that was signed by a judge advocate. Is it general -- JAG, I think. I can't remember the exact title. And we found other letters, you know, that they were notified in the thirties that, hey, you don't own it.

Page 125





KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 7 (Errata)

In fact, there were other letters they, in my reading of those letters, said we recognize we don't own it, so now we would like to ask you for reimbursement for our expenses. I don't know if they were ever paid. But they were told, I think, my estimation, quite clearly in the thirties, that they did not have title. They the Fullard-Leos did not have title.
**Q. Thank you for that explanation. That gives me a place to start here. But let me ask a preliminary question.**
**You said a moment ago -- well you said that you don't know if they were ever paid any money. Did you inquire of anyone as to whether the U.S. government ever paid any money for the acquisition of title?**
A. I didn't see any documentation that indicated that they were paid for their expenses at Kingman Reef.
**Q. And now you indicated that you initiated this on your own but not in response to the lawsuit; is that right? Or was it in response to the lawsuit?**
A. It was --
**Q. Or part and part?**

Page 126

A. Well, there are two lawsuits other than the ones that are going on now.
**Q. Yes.**
A. The first one was pertaining to if we did or did not comply with our National Environmental Policy Act requirements, NEPA, the planning document.
**Q. Yes.**
A. And then oh, I don't know, less than a year or so there was the second takings case.
**Q. The quiet title action?**
A. No. It was a takings case. This is the first quiet title action.
**Q. Okay. By the Fullard-Leo family. Right? Are you talking about Mr. Sorba or just the Fullard-Leo family when you're talking about lawsuits?**
A. Well, those two, the Fullard-Leos.
**Q. Now, so you -- but I guess my question is did you undertake this research to -- in response to the litigation or did you undertake the research in -- sort of on a more of a personal curiosity?**
A. It was, I think, both.
**Q. Did you prepare any kind of memorandum concerning your conclusions?**

Page 127

A. No, I did not.
**Q. Do you know if anyone else did other than counsel?**
A. No, they did not.
**Q. And I think you said that Suzanne Case never presented you with any kind of memorandum regarding her analysis of title, did she?**
A. No, she did not.
**Q. Did Suzanne Case ever indicate to you that she had reviewed old navy files in the Archives or anything of that nature concerning ownership?**
A. She had indicated to me that she was reviewing files. I don't remember her specifying if they were navy; clearly she was reviewing Fullard-Leo files.
**Q. Did she say she reviewed files obtained from the Archives?**
A. She didn't say either way.
**Q. Did she say where she had gotten the files that she was reviewing or the records?**
A. I only remember her saying that she was reviewing Fullard-Leo files for Palmyra acquisition.
**Q. Okay. For Palmyra. And I wanted to focus on Kingman Reef. I believe at one point Ms. Case**

Page 128

**informed you she was also investigating the title to Kingman Reef; is that right?**
A. I understand that she did look into that as well.
**Q. Did she tell you why she was looking into Kingman Reef?**
A. Not specifically; but they were being discussed as two possible refuge proposals.
**Q. Okay. Was there a discussion at any point in time that The Nature Conservancy would acquire Kingman Reef?**
A. It was federal ownership.
**Q. But before the determination of federal ownership did Ms. Case investigate whether or not it was privately owned and therefore the TNC would be acquiring --**
A. I don't know.
**Q. Did she ever tell you -- do you know if there was a point in history where Fish & Wildlife and the TNC were assuming it was privately owned before the determination that it was publicly owned?**
A. Never at Fish & Wildlife. I can't speak to TNC.
**Q. Did anyone from TNC ever tell you that**

Page 129

**there was a point in time where TNC believed it was privately owned?**
A. I don't believe so.
**Q. Did anyone from -- I guess my question is then if it was publicly held land then obviously TNC would not be acquiring it. Right?**
A. It's much easier for another federal agency to acquire federal lands.
**Q. Right. So did Ms. Case give you any explanation as to why she would be looking into the title of Kingman Reef? I mean, she's a private -- I guess they are a private non-profit corporation.**
A. I don't know why she did that.
**Q. She didn't say to you?**
A. I don't recall that coming up.
**Q. Did Fish & Wildlife ask her to investigate the title at Kingman Reef?**
A. Not to my knowledge.
**Q. Do you know whether any Department of Interior agency other than Fish & Wildlife asked her to inquire about Kingman Reef?**
A. I don't believe so.
COURT REPORTER: Please slow down, you're talking over each other.
**Q. Now, I want to go back to something you**

Page 130

**said a moment ago to see if I can understand it.**
**You said you went back and you looked at some of the records from the U.S. government. And you said there was no award of title. Is that what you said. Right?**
A. Anything. Award of title or something along those lines. Small A. Small T.
**Q. You have looked at, I guess, titles also to many properties over your many years in the acquisition unit. Right?**
A. Yes.
**Q. And you had occasion to order title reports for privately owned land. Correct?**
A. Yes.
**Q. And you've had occasion to work with other agencies of the federal government to acquire federally or publicly owned lands. Right?**
A. Yes.
**Q. And have you ever in your experience had to, other than Kingman Reef, had to investigate or had occasion to investigate whether or not something was in fact publicly versus privately owned, meaning there was a question mark, a dispute as to who owned it?**
A. No, not that I can recall.

Page 131

**Q. So Kingman Reef would be your first investigation of property in which there was a claim on the one hand -- there was a claim it was privately owned and on the other, your belief that it was publicly owned. Right?**
A. I felt all along that the claim was an old claim that didn't go anywhere.
**Q. Okay.**
A. So I did not feel, you know, that was -- they claimed that back in the 1920s. It was a historical claim. It was noted as a matter of history. I did not feel that the federal ownership was in dispute.
**Q. Well, I take it you found -- you didn't think the dispute was a valid dispute but you knew, were you informed at some point in time that there was a private party claiming ownership?**
A. Earlier.
**Q. Yes.**
A. I felt that was a claim from the 1920s.
**Q. Did you understand in 2000 and 2001 that there was an ongoing claim by the Fullard-Leo family, a current claim, not a historical claim they made back in the 1920s, but a claim in the present decade that they currently owned the**

Page 132

**property?**
A. Mr. Houlihan who was representing them in the response I was telling you about to --
**Q. Yes.**
A. -- our request for public comments --
**Q. Yes.**
A. -- told us that.
**Q. That was the first information you had about that?**
A. Yes.
**Q. And you did not hear about that from any other source prior to that?**
A. I have seen references to this early old claim.
**Q. All right. In other words, when the refuge process proceeded in late 2000 just prior to the departure of the Clinton administration and the arrival of the Bush administration, in that window I guess we're talking December 2000 and January 2001, are you saying - just want to understand you - that your belief, prior to the letter from counsel, I guess, was that the Fullard-Leo claim was -- Fullard-Leo family was not currently claiming ownership of the property but that it was a historic claim? Something back in the paperwork?**

Page 133



KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 7 (Errata)

**the proposal and page five of the proposal.**
A. Page one and what?
**Q. Page one and five.**
A. Okay.
**Q. Have you had a chance to look at this document?**
A. Those sections.
**Q. Yes. Have you ever seen this document prior to today?**
A. I'm sure I have.
**Q. And when did you first see it?**
A. That I don't know. But late nineties on.
**Q. Okay. Late nineties on. Okay. Do you know if you saw it in or around the time that it was produced or generated?**
A. I don't know.
**Q. Who is Mr. Clark?**
A. That is a lady.
**Q. Ms. Jamie Clark. Excuse me.**
A. And she was our director.
**Q. Who was the regional director at region one at that point?**
A. Who was the --
**Q. It says to Regional Director, Region 1 from Director and then it signs Ms. Clark.**

Page 138

A. Who was the regional director in 1997? Hate to admit it but I don't remember. I just don't remember for sure.
**Q. What is the reference to at the top of the page? Do you recognize the handwriting?**
A. No.
**Q. Do you recognize -- is the insignia USFWS Realty, is that a fax trailer that comes from your office?**
A. Is there a number?
**Q. Is U.S. Fish & Wildlife Service Realty, is that your office?**
A. I would think it looks like it's a 503.
**Q. Is this --**
A. That probably would be ours, yes.
**Q. So 503 is the area code for the regional office?**
A. Yeah.
**Q. Okay. When you received this document -- strike that.**
**Looking at the Preliminary Project Proposal, who drafted this?**
A. I don't know for sure. Usually these are done in the most part in the field.
**Q. In the field by whom, do you know?**

Page 139

A. It depends on what it is. Usually like project leaders or refuge managers or people most familiar with the proposal would take the first --
**Q. I will represent to you I think what we have been told at least by one witness, Mr. Smith, that these kinds of documents were drafted at regional. So we're getting ping-ponged a little trying to find the author.**
**Do you have any idea who the candidates might be?**
A. I think it's between the both of them. I think normally the field writes them. There's not a set directive to anybody to do it.
**Q. Yes.**
A. But normally with those, the people that work in the field have a little more information about the project area and what scenarios they are talking about.
**Q. Who --**
A. So I don't know who specifically prepared this, whether it be land protection planners or refuge managers.
**Q. Who reviews it for -- and approves it for final form?**
A. Final form, do you mean --

Page 140

**Q. For submission to the director.**
A. Probably goes through several reviews.
**Q. Your office included?**
A. Division of realty, yes.
**Q. And did you review this in draft form and approve it?**
A. I don't remember that.
**Q. Did you ever see that -- you did see this, though, sometime in the late 1990s?**
A. Yes.
**Q. The proposal?**
A. Yes.
**Q. Did you have any part in drafting, if you can recall?**
A. I can't recall.
**Q. Did you include in this document your evaluation of the title to --**
A. I can't recall being involved with it.
**Q. Had you done your evaluation of the title to Kingman Reef at the time this document was prepared?**
A. When was it prepared? August of '97.
**Q. Yes.**
A. Could you restate your question?
**Q. Yes. Had you done your evaluation of the**

Page 141





KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 7 (Errata)

A1035DC
GEORGIA SHIRILLA APRIL 25, 2007

**title to Kingman Reef at the time that that document had been prepared? Had you completed it?**
A. I think I was familiar with the executive order by then, yes.
**Q. So you had evaluated by this point in time that Kingman Reef was publicly owned land; is that right?**
A. That was my belief.
**Q. And you had shared that with others at Fish & Wildlife?**
A. I don't recall who I shared it with at this time.
**Q. So I can understand the framework. Once you completed your investigation as to the title and ownership of Kingman Reef, how did you publish it to your coworkers and at Fish & Wildlife, if at all?**
A. I don't think it was like a written publication to people. It was in discussions.
**Q. I'm sorry. I talked over you. Apologize. Let me stop. I interrupted you.**
**Let me rephrase the question. I didn't mean public in the formal sense of like a book. I meant like what, if any, writing did you produce to communicate to others at Fish & Wildlife that you**

Page 142

**had completed your investigation as to the ownership and title and you had drawn a conclusion?**
A. I don't recall putting it into writing until perhaps some of the land and water briefing statements.
**Q. Okay.**
A. Maybe one of the other briefing statements we were talking about.
**Q. Okay. But not until then?**
A. I don't recall.
**Q. Okay. But you did make Mr. Wesley, Scott Wesley among others aware of your findings and conclusion?**
A. I believe you mean Scott Weiss.
**Q. Excuse me. Scott Weiss.**
A. I do believe we talked about it, yes.
**Q. Did you make Mr. Smith -- did you communicate what you learned to Mr. Robert Smith who was at the regional office in Hawaii?**
A. I --
**Q. I mean who was at the Hawaii-based office.**
A. I did have a discussion with Mr. Smith about that.
**Q. And that would have been prior to this document?**

Page 143

A. Latter 1990s. I don't have a specific date.
**Q. Okay. Would you kindly look at page five of this document. There was a reference to Kingman Reef. Do you see it?**
A. Yes.
**Q. It states, quote, Explorers wishing to visit Kingman Reef must secure permission from the Fullard-Leo family and the U.S. Coast Guard.**
**Do you see that?**
A. Yes, I see that.
**Q. Do you know whether you saw this writing, this particular portion of the proposal prior to it being submitted to the director?**
A. I don't know either way.
**Q. Did you undertake any effort to correct this upon seeing it in final form?**
A. I don't know. I don't recall.
**Q. Do you know where this information comes from, the phrase that the issue about securing permission from the Fullard-Leo family, do you know where that came from?**
A. I don't know where it came from. I think I've seen it before.
**Q. Okay. When you say you think you've seen**

Page 144

**that before, where have you seen it?**
A. I don't recall.
**Q. Did you see it prior to this proposal?**
A. I don't recall.
**Q. Now, this is a document generated by the United States government; is that right, this proposal?**
A. Yes.
**Q. It's not generated by any kind of private entity; is that right?**
A. Right.
**Q. And it is a document that goes through a number of hands in the United States government. Correct? Meaning Fish & Wildlife.**
A. Within Fish & Wildlife Service, yes.
**Q. Do you know if it had any approval at levels outside of Fish & Wildlife such as in upper -- in the other departments of the Department of Interior?**
A. I don't know but I doubt it.
**Q. And this was a private submission. Right? It was not a public document. Right? Meaning this was circulated within Fish & Wildlife but not published in any Federal Register; is that correct?**
A. This -- I don't believe this document was

Page 145


KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 7 (Errata)

**Fullard-Leo family had actually signed over title of Palmyra to The Nature Conservancy by that point in time?**
A. I don't recall just when TNC acquired their title.
**Q. You understood, I take it, that TNC was in an option period with the Fullard-Leo family starting from January 2000 to November 2000?**
A. I know they had an option period. I don't remember when they -- I don't recall when they actually took title.
**Q. Okay. I think we've got the deed somewhere. Does it -- do you recall approximately when the purchase of Palmyra closed?**
A. That's just what I was saying, I don't recall the actual closing date.
**Q. Do you know if it was in -- would it be -- would it refresh your recollection if I told you it was some time in November 2000?**
A. It was on or near the time we were there.
**Q. Okay. Was it your understanding that the public announcement of the establishment of the Kingman Reef refuge was not to be made until the Fullard-Leo family had signed over title to Palmyra?**

Page 170

MS. FITZGERALD: Objection; assumes facts not in evidence.
**Q. Do you want to hear it back?**
A. Oh, definitely.
(The pending question is read back.)
A. I have no knowledge of that.
**Q. Let me go to the document here, previously marked Exhibit 13.**
**(Deposition Exhibit No. PME 13 was marked for identification.)**
**(Discussion held off the record.)**
MS. FITZGERALD: I just want to state for the record that it looks like what you handed me is two pages of the same thing.
MS. CANNATA: Oh. Excellent then we have an extra copy. I'll hand Donna an extra one. That's one of those instances we have them through two productions. So now we have multiple copies.
One's a little bigger, that's why I like the first one.
MS. FITZGERALD: Actually they don't have different dates but the font size is different.
MS. CANNATA: Yes. I think it's just the way it reproduces when you print something off a PDF disk.

Page 171

MS. FITZGERALD: Okay.
BY MS. CANNATA:
**Q. Have you seen this document prior to today? And for the record, before you answer, it is a briefing statement prepared for Secretary Babbitt, I believe, by Robert Smith dated August 18, 1998, concerning the Kingman Reef National Wildlife Refuge.**
MS. FITZGERALD: Just want to clarify for the record, Ms. Cannata, it's not clear that Robert Smith prepared it. I understand his name is at the bottom.
MS. CANNATA: I think he so testified, I believe, but we'll ask. She might have another perspective on that.
**Q. Ms. Shirilla, do you know who prepared this?**
A. No, I don't.
**Q. Have you seen this prior to today?**
A. I don't remember this.
**Q. Do you have any reason to believe that Mr. Smith did not prepare this document if his name appears at the bottom of it?**
A. Oftentimes the preparer is not the contact person.

Page 172

**Q. Okay. Do you know who typically would prepare a briefing statement for the Secretary of Interior Bruce Babbitt?**
A. It varies.
**Q. Can you give me a list of candidates here for the Kingman Reef project at least?**
A. It could be people in the Honolulu office as Robert Smith or --
**Q. Phyllis Ha?**
A. Phyllis Ha, Jerry Leinecke, Beth Flint. It varies who is available at given times when they need something.
**Q. Is this something that would be prepared and approved at the regional office level?**
A. Some are. Some are not.
**Q. What level of authorization and review has to happen before a document like this can go up to the secretary of the interior?**
A. Usually it would be approved by one supervisor at a minimum.
**Q. At the local office?**
A. Yes. Or the regional office if it's prepared there.
**Q. I think my question is it necessary for the regional office to approve a memo going all the way**

Page 173





KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 7 (Errata)

**to the secretary of interior or can you go directly from the Hawaii office?**
A. Usually it would be approved by the regional office.
**Q. Meaning a communication --**
COURT REPORTER: Slow down, please.
**Q. Meaning a communication to the secretary of interior, a briefing statement, would go through the regional -- from Hawaii through the regional office for approval before going to the secretary?**
A. Usually.
**Q. Do you remember reviewing and approving this document in or about 1998?**
A. I do not remember this.
**Q. Have you seen it prior to today at all?**
A. I don't remember ever seeing it.
**Q. Where it says, quote, The Kingman Reef acquisition should be pursued after the acquisition of Palmyra, close quote. Do you see that?**
A. I see that.
**Q. Was that your understanding that it was to be pursued after the acquisition of Palmyra Atoll?**
A. No, it was not my understanding.
**Q. No one ever communicated that to you?**
A. No, we were pursuing them, I would say,



simultaneously.
**Q. When did the Fish & Wildlife make its first announcement to the public that it was actively pursuing the acquisition of Kingman Reef?**
A. The environmental assessments for both projects went out, I think, about the same time.
**Q. And that would be on or about December 11, 2000. Correct?**
A. Yes.
**Q. And that was after title to Palmyra had been transferred to the TNC from the Fullard-Leo family. Correct?**
A. I believe so, yes.
**Q. And so the first public announcement of the Kingman Reef refuge happened after the Fullard-Leo family transferred title of Palmyra. Correct?**
A. I believe so. I don't remember the year that TNC came in to title. I believe it was under purchase agreement at a minimum.
**Q. Do you know of any writing -- strike that.**
**Do you know -- rephrase it all together.**
**It states just above that, that Kingman Reef is an unincorporated U.S. possession and is not within the State of Hawaii and stating, quote, title review would be needed to clarify ownership,**



**close quote. Review would be needed to clarify ownership. Do you see that?**
A. I see that.
**Q. Was it your understanding as of August of 1998 that there were -- that there were questions about ownership?**
MS. FITZGERALD: I object to the question as lacking foundation.
MS. CANNATA: I'll rephrase it.
MS. FITZGERALD: Let me get my objection on the record.
MS. CANNATA: I'll withdraw and rephrase it.
MS. FITZGERALD: Okay.
**Q. Did you believe in August of 1998 that title review would be needed to clarify ownership of Kingman Reef?**
A. I believe at that time it was my belief that Kingman Reef was under U.S. ownership.
**Q. Did you ever contact or -- strike that.**
**Did you ever prepare any kind of memorandum to the secretary of interior or anyone at the Department of Interior to the effect that you had already concluded that title review was complete and that the U.S. government owned Kingman Reef?**



MS. FITZGERALD: Object to the question as lacking in foundation.
You can go ahead and answer.
A. I don't recall. I could have prepared some briefing statements to that effect.
**Q. But you don't recall specific ones?**
A. Not specific ones.
MS. FITZGERALD: Ms. Cannata, for the record I think you said it's your representation that Robert Smith said in his deposition that he prepared this document?
MS. CANNATA: I believe that's the case but you're saying that you're checking the transcript and he didn't?
MS. FITZGERALD: Well, we don't have the transcript in front of us but I think there's a question on the defendant's side as to whether Robert Smith did testify to that effect or if he said he wasn't sure if he did prepare it or not.
MS. CANNATA: I'm trying to think of that particular document, Counsel. I believe that your statement may be closer to it, that he thought that he at least had some input into it but I think that he also on this document and virtually all others deferred to the regional office for the final

approval and review and that's why it was our belief that even if he drafted it, it would never have been sent to the secretary of interior without some approval by Ms. Shirilla's office.
MS. FITZGERALD: And --
MS. CANNATA: So it couldn't have gone -- in other words, what I understood from his transcript is it could not have gone directly from Robert Smith to the secretary of interior. It had to go through Ms. Shirilla's office. So that's why we posed the question the way we did.
I don't know if I was clear in my representation, Ms. Shirilla, but that's my understanding of what Mr. Smith's testimony is, that regional had control over this kind of communication at the end of the day and that whatever it said it would be edited and approved and finalized by regional.
MS. FITZGERALD: Well, I think your questioning lacks foundation because the document is not signed or dated.
MS. CANNATA: Well, if you're suggesting that Mr. Babbitt never received it, that will be confirmed when we take his deposition because that's certainly one of the concerns I have is that

Page 178

the government's going to assert in this case that Mr. Babbitt never saw this document and that's one of the most critical questions I want to ask him.
BY MS. CANNATA:
**Q. Okay. I want to go back to your visit to Palmyra. I had a couple more questions about that.**
**Did you ever hear that there was an investigation about sort of a mass killing of birds on Palmyra by the Fish & Wildlife, birds and nesting areas? And I believe it was being conducted, by the way, by GSA.**
A. I don't recall anything like that, no.
**Q. Do you recall ever reviewing any memorandum in which witnesses reported that Robert Smith ordered that a bunch of birds be killed and their nesting areas be destroyed in order to clean off and clean out the runway?**
A. No, I don't remember anything like that at all.
**Q. Do you recall asking GSA to basically stop that investigation and put it aside and not conclude it?**
A. Don't remember.
MS. FITZGERALD: I'm going to object. The

Page 179

question assumes facts not in evidence.
You can go ahead and answer.
**Q. Right.**
A. I don't remember hearing about anything like that at all. And I don't know why GSA would be involved in such a situation.
**Q. Well, do you remember hearing that GSA -- well, first off, do you remember hearing from anyone that there was a complaint by a citizen that Fish & Wildlife had destroyed these nesting areas and birds in order to clear the runway and make it basically ready for airplanes to land?**
A. I don't remember that, no.
**Q. And when you landed on the runway in October of 2000 it was clear and it was usable at that point. Right?**
A. Yes. I believe it was cleared prior to our arrival.
**Q. Did anyone from TNC ever tell you that there was a problem about that, that there was a concern about the killing of some birds?**
A. Not killing of birds, no. Removing them when planes land, getting them away while planes land, but not killing.
**Q. Let me rephrase my question then.**

Page 180

**Did you ever hear from anyone that Fish & Wildlife directed that birds nesting areas be cleared away from the runway areas so they wouldn't get in the way of airplanes?**
A. I don't know about nesting areas but shoo-ing the birds off to the side.
**Q. Shoo-ing the birds off to the side is what you heard?**
A. I believe so.
**Q. Did you hear that they were actually killed?**
A. No, I never heard that.
**Q. How were they shoo-ed away?**
A. I don't know.
**Q. How were the nesting areas removed?**
A. I don't know if they were removed.
**Q. Okay. Do you know if there was ever an investigation -- strike that.**
**Did you ever see any writing, e-mail or otherwise, about any investigations being conducted on Palmyra concerning the destruction of wildlife such as birds?**
A. Could you restate that? I didn't remember the first part of your question.
**Q. That's okay. Long question and long**

Page 181



KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 7 (Errata)

afternoon.
**Do you recall any investigation -- strike that.**
**Do you recall seeing any e-mail or writing of any kind concerning an investigation about a killing of wildlife at Palmyra?**
A. I do not remember seeing anything like that.
**Q. Or a destruction of wildlife at Palmyra?**
A. Neither.
**Q. Okay. Did you ever receive a letter from a private citizen or review any summaries of interviews of private citizens concerning a destruction of wildlife on Kingman Reef concerning the clearing of the runway?**
A. I don't remember --
MS. FITZGERALD: Objection. The question assumes facts not in evidence. And you're referring to Kingman Reef, I think you mean a runway on Palmyra.
MS. CANNATA: Thank you. Good point. I didn't hear myself say that. Rephrase it.
**Q. Did you ever -- did you ever review any memo, receive any communication from a citizen complaining about a destruction of bird and**

Page 182

**wildlife in an effort by Fish & Wildlife to clear the airplane runway at Palmyra?**
A. I don't remember anything like that at all.
**Q. And finally do you recall reviewing any summaries of interviews of private citizens concerning killing of wildlife to clear the runway at Palmyra?**
MS. FITZGERALD: Objection; assumes facts not in evidence.
**Q. I should say destruction of wildlife.**
A. I don't remember anything like that.
**Q. Do you recall Mr. Fullard-Leo ever complaining about that?**
A. No.
**Q. Did you ever have any discussions with Robert Smith about that issue?**
A. No.
**Q. When you were at Palmyra did you attend any fundraisers hosted by The Nature Conservancy?**
A. No.
**Q. Who prepared the meals there, if you know? Was there anyone in charge of meal preparation?**
A. There were some -- a group of people that prepared the meals.

Page 183

**Q. Was it headed by a chef from Alaska? Had you heard about that?**
A. I don't remember where the chef was from.
**Q. But there was a chef there?**
A. There were cooks, yeah.
**Q. And were there any private donors there at the time, meaning other than Fish & Wildlife was it only government representatives and then the one TNC manager or were there also private donors there?**
A. There were no, to my knowledge, private owners. It was our group and there were a couple other people on the islands at that time.
**Q. Was Kingman Reef discussed with anyone during that meeting or during --**
A. Not that I remember.
**Q. -- time?**
MS. FITZGERALD: Just let her finish the question.
MS. CANNATA: I didn't do a very good question. That's the afternoon. Just happens.
**Q. Did anyone discuss Kingman Reef during your four-day stay at Palmyra?**
A. Not that I remember. We flew over it and there's Kingman Reef.

Page 184

**Q. Yes.**
A. That was all that I remember.
**Q. All right. Did you ever discuss with Suzanne Case your further research? I think you said earlier that you went back and looked at other records, archives and other records concerning the Fullard-Leo's ownership; did you ever have a discussion with Suzanne Case about that?**
A. I had another phone call with her where I made mention of some of the documentation that we found.
**Q. And what did you discuss about that?**
A. The letters from the Fullard-Leos. I think I mentioned that we found -- I don't think I mentioned them specifically but that we found good proof that the Fullard-Leos did try to make claim and did not -- were not successful.
**Q. And did Ms. Case talk to you about what's called the statute of limitations in that conversation?**
A. I don't believe Ms. Case brought that up.
**Q. Did you?**
A. To her?
**Q. Yes.**
A. I don't believe it was a subject of that

Page 185

**Miller. And I'll tell you as to the date, I'm having trouble, try to get it enlarged. It could be 1935. It could also be '55 or '56. Very hard to read that.**
A. I have seen this document before.
**Q. Okay.**
A. I'm having a hard time with that date as well.
**Q. And at the bottom it says -- do you know who W.T. Miller is?**
A. I do not.
**Q. Were you able to determine that by review of other government records at the time --**
A. I was not.
**Q. -- at the time you reviewed this document?**
A. Could you repeat?
**Q. Were you able to determine the identity of this person at the time you reviewed this document or found this?**
A. I did not try.
**Q. Do you know where you found this document or where you first found it?**
A. I think this was one of the documents that was found in one of the locations in D.C.
**Q. At the end it says -- it asks a question,**

Page 194

**quote, Is the ownership of Kingman Reef in dispute?**
**Do you know whether or not in the history in terms of looking at documents starting in 1922 forward whether the United States' claim to this property was inconsistent sometimes claiming ownership, sometimes not?**
MS. FITZGERALD: I object. The question is overly broad in asking her to answer with respect to documents that cover almost a hundred years.
**Q. Did you note between the period of -- I'll rephrase it to be a little clearer but I think it's a fair question.**
**Did you note in your review of documents dating from 1922 to the, say, to the late 1990s, that the government's claim of ownership to Kingman Reef was inconsistent, meaning sometimes claiming ownership, sometimes not?**
MS. FITZGERALD: I object as assuming facts not in evidence.
You can go ahead and answer.
A. From the documents I saw the government always claimed ownership prior to the 1934 executive order.
**Q. And after?**
A. Definitely after.

Page 195

**Q. Always after as well?**
A. Always after.
**Q. Do you know whether Mr. Miller was a member of the government?**
A. I do not know who Mr. Miller is.
**Q. Okay. Have you ever reviewed any of the crew's reports from the NOAA missions to the Hawaiian islands?**
A. Not that I can recall.
**Q. Were you aware of any instances in which representatives of Fish & Wildlife participated in NOAA visits to Palmyra and Kingman Reef in the 1990s or 2000?**
A. Not really, no.
**Q. Were you aware of any instances in which Fish & Wildlife representatives traveled with Ainsley Fullard-Leo to Kingman Reef?**
A. I think there were trips.
**Q. To Kingman Reef?**
A. Oh, to Kingman Reef?
**Q. Yes.**
A. No. I'm thinking of Palmyra. Thank you for correcting me on that. I'm getting a little tired.
**Q. That's okay.**

Page 196

A. Yeah, to Palmyra. I don't know of any trips to Kingman Reef.
**Q. I'd like to show you what's been previously marked as Exhibit 4.**
**(Deposition Exhibit No. PME 4 was marked for identification.)**
**Q. Show you previously marked as Exhibit 4 and this is a very long proposal but I want to ask you again have you ever seen this draft proposal prior to today?**
A. I probably have. I'm so surprised there's so many preliminary project proposals.
**Q. Yes.**
A. I had no idea there were this many.
**Q. For the record, this one dates back to May 1992. And, again, we're trying to determine the author of some of these but I'll take it that you were not the author in 1992 of this. Right?**
A. I was not the author. Correct.
**Q. Now, in this report, unlike the other -- point out to you in Exhibit 101 there's a reference to the fact that the Navy, United States owns Kingman Reef. And call your attention to page 19. I believe that's correct it's 19. Page 20. Turn to page 20 of Exhibit 101.**

Page 197

A. Okay.
**Q. You'll note on page 20, bottom of the page 20. It states quote - and this is the 1994 preliminary project - it states: Kingman Reef is owned and administered by the U.S. Department of Navy. Do you see that?**
A. Yes. I see that.
**Q. We get to this next report in, in this early report in 1992 and there is no -- there seems to be no reference that I could find in this to any statement as to the ownership of Kingman Reef although it does note that Palmyra is owned by the Fullard-Leo family.**
**But if you'll look at page 22 now of Exhibit 4, it puts Palmyra Atoll and Kingman Reef together, and refers to the landowners.**
**Now, I don't know if at that time - and maybe you can educate me - did you ever come across any records dating back to 1992 in which the Fish & Wildlife Service viewed Palmyra and Kingman Reef as owned, both of them owned by the Fullard-Leo family?**
MS. FITZGERALD: Object as lack of foundation. Georgia has not had a chance to look at this entire document; in fact, she's not looking



at the right page. I think you were referring to page 22 of Exhibit 4. She's on page 21. So I'd like her to have a chance to at least look at the page you're referring to.
**Q. Yes. Look at section 12A.**
A. Okay.
**Q. It refers to Palmyra and Kingman Reef together. It refers to the landowners.**
**Now, my question is in looking sort of at historic documents and proposal as you commenced your work on the Kingman Reef project, did you find various proposals in which the representation as to the ownership of Kingman Reef was in some instance the Navy or other instances the Fullard-Leo family?**
A. I've seen reports that I believe were inaccurate.
**Q. And these were reports prepared by representatives of the U.S. government. Correct?**
A. I believe so, yes.
**Q. All right. And do you know why these reports were inaccurate?**
A. No, I don't.
**Q. Were you ever able to -- was there -- did you inquire of anyone what happened, why were they inaccurate?**



A. I think this goes back to my earlier testimony about when I started to get involved with these projects that there were discussions that it was my opinion that Kingman Reef was owned and continued to be owned by the United States.
**Q. Okay. Now, did you -- let's see. I'm going to show you what's been previously marked as Exhibit 5.**
**(Deposition Exhibit No. PME 5 was marked for identification.)**
**Q. Ms. Shirilla, I'm going to ask if you recognize the handwriting, trying to figure out who wrote the hand interlineations.**
A. I don't recognize the handwriting.
**Q. Okay. As of -- I think this is consistent with your testimony, in 1993 you were not working on the Kingman Reef project. Right?**
A. Not to my recollection.
MS. CANNATA: I'd like to mark as Exhibit 103.
(Deposition Exhibit No. 103 was marked for identification.)
**Q. Ms. Shirilla, I'd like you to take a look at what's been marked as Exhibit 103 which is a memorandum to the file dated December 30, 1993 from**



**James E. Wallace of the Cadastral Engineering technician produced by the government in this case. Then there's a memorandum from PAC -- well, from Jim Wallace to Jim Farish regarding Kingman Reef dated January 28, 1986.**
**I'm going to ask if you've ever seen this document prior to today?**
A. I have seen these documents.
**Q. When did you first get it or see it?**
A. I don't remember.
**Q. Did you see it prior to December of 2000?**
A. I don't remember.
**Q. Did you review -- did you review this in connection with your research on the Kingman Reef?**
A. I'm not sure which research.
**Q. You indicated that initially you primarily looked at, as I recall and you correct me if I'm wrong, you looked at the 1934 executive order and maybe some information concerning statehood for Hawaii. And did you look at any anything else to reach your conclusion before your research later on that you described? Did you look at any else to confirm title?**
A. At that time?
**Q. Yes. At that time.**

A1035DC
GEORGIA SHIRILLA APRIL 25, 2007

A. I don't recall which documents that I had at that time other than the 1934 executive order.
**Q. Okay. Now, whatever documents you had prior to your more extensive research which would have been post-dated the comment period, the more extensive research was after the comment period. Right?**
A. The research into the archives.
**Q. In fact, it was after the lawsuits were filed. Right?**
A. One of the lawsuits, maybe not the second lawsuit.
**Q. At least after the commencement of litigation concerning Kingman Reef. Right?**
A. I believe so.
**Q. But what I'm talking about is your research that predated the formal proposal of the public announcement of the Kingman Reef refuge. So just cut it off. You see the timeline I'm using? Anything sort of done prior to December of 2000.**
A. Okay.
**Q. Because that's the public comment period starts on December 11, 2000. Right?**
**So we got the timeline in mind. The documents -- where do you have or where did you**

Page 202

**keep the documents reflecting your title research which predated December 2000?**
A. We have copies of the 1934 executive order in the Kingman Reef files.
**Q. Got it. Did you have a file as you did in Palmyra in which you included all your title research concerning Kingman Reef?**
A. On an ongoing basis.
**Q. So if you did subsequent research you'd keep adding to it?**
A. Yes.
**Q. Did you produce that file in this case?**
A. The documents, yes, that I have.
**Q. The entire file?**
A. Yes.
**Q. And was this among those documents?**
A. I don't know. I think -- I don't know. I've seen it before but I don't know which batch of documents.
**Q. Okay. Is the file in which you keep information concerning the title to Kingman Reef, does it have a title on there? Something to the effect of Title to Kingman Reef or Ownership to Kingman Reef? Does it have a label?**
A. There are several folders.

Page 203

**Q. Right. What are they entitled?**
A. We talked about that earlier. They --
**Q. Talked about Palmyra earlier. Now Kingman Reef.**
A. This is specifically about Kingman Reef.
**Q. Got it.**
A. And the documents are in different folders.
**Q. Are they -- is your -- are the documents concerning your research about the title and ownership of Kingman Reef, are those documents in what you called a working file?**
A. I wouldn't give it that name. One of our files.
**Q. I think earlier you mentioned that sometimes you have files that are called working files at the department.**
A. They are not called that.
**Q. They are that.**
A. They are that.
**Q. What are they called if I were to go ask for them?**
A. Files.
**Q. Files concerning. Do they have labels of any kind that would help us pinpoint?**

Page 204

A. No. If you were to ask for our files they would then - and were included in what we gave to you.
**Q. So if there was a file that had contained in it records of title and ownership of Kingman Reef, do you know what the name of that file is?**
A. It wasn't one file.
**Q. It was several files.**
A. Right.
**Q. And what were those files entitled?**
A. They may not have had titles or labels.
**Q. They would have been --**
A. It may have said Kingman Reef. Maybe just kept in the box with the other records we were accumulating that we gave to you.
**Q. Could they have been in unlabeled folders? Am I understanding you correctly they might not have been in labeled folders?**
A. Correct.
**Q. When you did your investigation as to what the Fullard-Leo family did in 1922 concerning the property what did you learn?**
A. In the records --
**Q. That you found.**
A. -- that Mr. -- well, that we found and

Page 205





KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 7 (Errata)

that Mr. Houlihan provided us -- are we talking Kingman Reef?
**Q. Kingman Reef.**
A. Okay. In the records that Mr. Houlihan provided there were newspaper articles.
**Q. Records that you found. What I want to combine is - make sure of my question.**
**You said that after you got Mr. Houlihan's file, you found it to be very paltry basically, not very much there is what you said. Not anything that --**
A. That showed title.
**Q. Right. So you went and do your own research and went into the archives?**
A. Yes.
**Q. Now after that was all done and you gathered up documents that reflected certain history of the Fullard-Leo and Kingman Reef, what is it you learned that the Fullard-Leos did in 1922 concerning Kingman Reef, if anything?**
MS. FITZGERALD: I'm going to make an objection for the record. Georgia started to answer that very --
MS. CANNATA: I may have misunderstood.
MS. FITZGERALD: -- same question a few



moments ago, then you interrupted her and gave her a different answer, not the one she gave you, and then restated your question with a lot more explanation. So I just want to make sure she was answering your question.
MS. CANNATA: I may have misunderstood you, Ms. Shirilla, and your counsel may well be correct. I don't want to --
MS. FITZGERALD: I think what was problematic is she said she was referring to documents from Mr. Houlihan's files and you said -- you gave her an answer saying no, what you found. And that's not what she told you.
**Q. But just so you understand, my question goes to the grand total, not from what you just learned from Mr. Houlihan. But in any event, please proceed with your answer.**
A. Not talking about what Mr. Houlihan provided.
**Q. Okay.**
A. From the research that we did in the repository in D.C., I don't remember any documents that talked about what the Fullard-Leos did in 1922.
**Q. Did you ever come across a document**



**prepared by the Navy, it was basically an indexed document and it had -- it was basically a stack of documents concerning Fullard-Leo, the title to Kingman Reef and it was -- it had a page listing index and then attached to it were a bunch of documents?**
MS. FITZGERALD: Object. If you have that document to show the witness, you can do that, but you're assuming that this document exists.
MS. CANNATA: Actually, I think it was attached to Mr. Porter's declaration filed recently. I didn't bring that today because I wasn't sure this witness -- I wasn't aware that this witness would be pertinent to that document. So let me see if I can describe it and see if she came across it, but it does exist and it was attached to Mr. Porter's declaration.
**Q. It's a document prepared by the Navy in the 1930s that's a memorandum sort of index, a list of documents, and attached to it are basically documents pertaining to Kingman Reef, Fullard-Leo family communications, et cetera. And it pertains -- and I believe the header on there is titled To Kingman Reef or words to that effect.**
A. I don't recall ever seeing that.



**Q. Okay. Would you look at page three of this exhibit. It has 214 at the bottom of it. Line item number four. I think as I recall you stated earlier that you saw no evidence that title had ever been passed to the Fullard-Leo family, title to the properties, the Kingman Reef property; is that right?**
A. I have never seen any type of land award, certificate of title, patent, anything that acknowledged or established title in the name of the Fullard-Leo to Kingman Reef.
**Q. Based on your experience, and as I said, you've been with the real estate division for some time, what is it that you needed to see for the passing of title to -- that you believed you needed to see for the passing of title of this Line Island to the Kingman Reef family? You said an award?**
A. I needed to see an official act done by the appropriate government authority.
In the mainland, for example, you'll see federal and state patents. In Hawaii, the Kingdom of Hawaii you would see land awards or something similar. In the Territory of Hawaii you would see certificates of title. That might not be the actual correct name.



KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 7 (Errata)

**Q. But something like that?**
A. But an official act by the appropriate governmental authority.
**Q. Did you ever see any documentation in which the Fullard-Leos indicated that they had consulted with the attorney general of the Territory of Hawaii concerning how to affix their title?**
A. I did see a statement or that in a letter from them.
**Q. Did -- in the course of your research did you see any memorandum in which the United States Navy or Coast Guard indicated that this -- the Fullard-Leo family should be contacted for permission to visit Kingman Reef?**
A. Could you restate that?
(The pending question is read back.)
A. I'm somewhat confused by your request of any memorandum. I've seen quotes that the Fullard-Leos say that but I find that that's inconsistent with what I believed to be true.
**Q. Did you also see quotes by representatives or documents prepared by representatives of the U.S. government to that effect?**
A. I have seen that or a similar statement in reports that I believe is inaccurate or taken from,



lifted from some other report.
We heard differently. We heard from the Navy and in the early 1990s that Mr. Savio was out making statements like that but the Navy says that's not true and they should -- any request for access to Kingman should be going only to the Navy.
**Q. And in your research and in your contact and you've personally spoken with representatives of the U.S. Navy; is that correct?**
A. Yes.
**Q. And who did you speak with?**
A. I talked to Dennis Pacht about that as well.
**Q. Who else did you speak with in the Navy?**
A. I think just Dennis Pacht.
**Q. Did you speak to anyone at Pearl Harbor about their records or recollections concerning Kingman Reef?**
A. No, I did not. Although I don't -- when you say Pearl Harbor are you talking, I guess, about the naval --
**Q. Yes.**
A. That's where --
MS. FITZGERALD: I'm going to object --
MS. CANNATA: Someone's cell phone is



ringing.
(Discussion held off the record.)
MS. FITZGERALD: Objection to the question because I think that's very broad. The Navy, there's a large contingency of Navy employees at Pearl Harbor so I don't think it's clear exactly.
MS. CANNATA: What's the concern? I haven't asked her anyone. I didn't say who. I mean, she just tells me; if there is someone, I'll ask her who it is.
Let's have the question back.
(The pending question is read back: Did you speak to anyone at Pearl Harbor about their records or recollections concerning Kingman Reef.)
A. If you're talking about the Naval installation at Pearl Harbor.
**Q. Yes.**
A. I did speak with Dennis Pacht about that.
**Q. Anyone else besides Dennis Pacht?**
A. I think just Dennis Pacht is who I spoke to directly about it, but we also had that message from a lieutenant colonel who I believe was also from Pearl Harbor had called Andy Yuen and wanted us to know that Mr. Savio was out telling people



that they had to ask permission and that that was not right or correct and that if anybody wanted permission, should go and contact the Navy.
**Q. Did you have an understanding that the naval person contacted Andy Yuen and Beth Flint or did Beth Flint and Andy Yuen contact the Navy for that information?**
A. I'd have to look at the record.
**Q. It was a record prepared by Fish & Wildlife. Correct?**
A. Yes.
**Q. And did you ever interview the person who supposedly said that to Beth and Andy Yuen?**
A. I did not personally no.
**Q. Did you ever talk to Beth Flint and Andy Yuen about that?**
A. I don't recall.
**Q. And so in talking -- and that was, by the way, I think in the 1990s. Wasn't it probably late '92, early '93, somewhere in there?**
A. I believe so.
**Q. Did Beth Flint and Andy Yuen tell you that earlier in 1992 they had gone on a NOAA voyage to Palmyra and Kingman Reef?**
A. I don't remember that. That occurs where

we do go on some NOAA voyages, I don't know if they went on the NOAA voyage to Kingman Reef.
**Q. And Palmyra?**
A. Or Palmyra.
**Q. And did they tell you that they went to Palmyra with Ainsley Fullard-Leo on that voyage?**
MS. FITZGERALD: Objection; asked and answered. She already said she didn't know if they went.
**Q. Did Any Yuen or Beth Flint ever tell you that they went on a voyage to Palmyra and they actually went by Kingman Reef with Ainsley Fullard-Leo?**
A. I know that Beth Flint was on Palmyra with Ainsley Fullard-Leo on one or maybe two occasions. I wasn't told that it was NOAA or they went by Kingman Reef.
**Q. Did Ms. Flint and Mr. Yuen tell you that prior to contacting the Navy, that Mr. Fullard-Leo told them that he owned Kingman Reef?**
A. I don't know.
MS. FITZGERALD: Objection; assumes facts not in evidence.
**Q. Did they tell you that?**
A. No, they did not tell me that.

Page 214

**Q. Did you ever see a copy of the deed in 1925 of - or a document in 1925 whereby Palmyra transferred title to the Fullard-Leo family -- the Palmyra company transferred title to Kingman Reef to the Fullard-Leo company?**
A. No.
MS. FITZGERALD: Object; assumes facts not in evidence, but go ahead and answer.
A. I think I saw a deed but I don't think it transferred title to them so I'm not sure how to answer that.
**Q. Sure. What did you see and how do you characterize it?**
A. I saw what I believe to be an invalid deed.
**Q. An invalid transfer?**
A. Yeah.
**Q. And how did you determine that it was an invalid transfer?**
A. Because I don't believe they ever had title.
**Q. And did -- when you -- did you also see records of minutes of the Palmyra company concerning what you called the invalid transfer of title to the Fullard-Leo family?**

Page 215

A. I have seen minutes. Maybe one or two sets of minutes.
**Q. Now, in your communications with Dennis Pacht of the United States Navy, did Mr. Pacht tell you that the Navy's control over Kingman Reef was inconsistent at best?**
MS. FITZGERALD: Objection; assumes facts not in evidence.
A. He did not tell me that.
**Q. Did he use words to those effects?**
A. No, he did not tell me that.
**Q. Did he tell you that it was -- that from time to time the Navy would refer people to Peter Savio to get permission to go to Kingman Reef?**
MS. FITZGERALD: Objection; assumes facts not in evidence.
A. He did not tell me that.
**Q. Did he tell you that he had personally interviewed anyone in the U.S. Navy concerning their procedure and protocol concerning visits to Kingman Reef?**
A. Could you restate that?
**Q. Yes. Did he tell you that he had personally interviewed any person at Pearl Harbor concerning the Pearl Harbor Navy protocol for**

Page 216

**visits to Kingman Reef?**
A. He did not tell me he had interviews.
**Q. Do you know of anyone who has interviewed or reviewed the records at Pearl Harbor to determine what the Navy protocol concerning visits to Kingman Reef was between 1922 and December of 2000?**
MS. FITZGERALD: I object. Lack of foundation. I don't know why Georgia would have any knowledge as to what the Navy has done for that time period.
MS. CANNATA: Here's my concern, Counsel, she's made a determination that the Fullard-Leo family did not have title to the property. She had communications with Dennis Pacht concerning the control and title to the property and other issues with the U.S. Navy. So I'm simply trying to determine if this witness knows of any such information. She may not. The answer -- you're suggesting that because I'm asking it, there's no reason why she should know but I have to ask the question to determine if she does know. That's all.
I would tend to agree with you, she's not a representative of Navy. But if she's conducting

Page 217

**Legislative Affairs.**
**Would you take a look at this and tell me whether you've seen this before today?**
A. I might have seen this.
**Q. When did you first see it?**
A. I don't know.
**Q. There's a reference in paragraph -- of item number two stating, quote, Regarding use of Kingman Reef we are not aware of any current use of Kingman Reef by the Navy, close quote.**
**Do you see that?**
A. I see that.
**Q. Was that what Mr. Pacht also informed you of in 19 -- in your communications with him in the late 1990s early 2000?**
MS. FITZGERALD: Objection; assumes facts not in evidence.
**Q. Well, let me rephrase it.**
**Did Mr. Pacht inform you of that in words to that effect?**
A. We had discussions that they were ready to excess their property.
**Q. Did you hear from Mr. Pacht that the Navy was not -- that he was not aware of any current use of Kingman Reef by the Navy?**



A. I don't believe he made that statement to me.
**Q. Or words to that effect?**
MS. FITZGERALD: Is there a question pending?
**Q. Did he use words to that effect?**
A. Not to my recollection.
**Q. Okay. I'm going to show you what's been previously marked as Exhibit 8.**
**(Deposition Exhibit No. PME 8 was marked for identification.)**
**Q. Please take a look at this document and I'll note for the record this is a document dated October 3, 1997 from Robert Smith to Lieutenant Colonel Ralph Graves of the U.S. Army Corps of Engineers.**
A. Okay.
**Q. Have you ever seen this prior today?**
A. Yes.
**Q. When did you first see it?**
A. I don't recall.
**Q. Would it have been in or around 1997?**
A. It could have been.
**Q. Was it contemporaneous with the date of the memorandum or based on some post-litigation**



**research?**
A. I don't know.
**Q. Okay.**
A. Within a year or two, I would guess.
**Q. Within a year or two of the --**
A. The date of the memo.
**Q. Okay. And is it in your Kingman Reef file? Do you have a copy of it in your Kingman Reef file or how did you get it?**
A. I believe it was in the Kingman Reef files.
**Q. Did you ever learn from anyone --**
A. Or the Palmyra files.
**Q. Okay.**
A. We're talking Palmyra files, I think.
**Q. Okay. Did you ever hear from anyone that -- well, this document also refers to Kingman Reef, though, doesn't it?**
**Let me ask one question. I think it might be important. Did you search the Palmyra files to determine whether there were any Kingman Reef files in that that needed to be produced?**
A. I didn't go through all of my Palmyra files.
**Q. Okay.**



A. I had some files that I thought maybe had information on both.
**Q. Okay.**
A. And I did check those out.
**Q. Okay. We can discuss with counsel.**
**Did you ever hear from anyone that The Nature Conservancy at one point in time was proposing to buy both Palmyra and Kingman Reef?**
A. Not that they were proposing to buy Kingman Reef.
**Q. So as far as you know The Nature Conservancy -- did Chuck Cook ever tell you whether he had made an offer to purchase Kingman Reef?**
A. Chuck Cook told me in a phone conversation that he had or was thinking about offering them a little bit of money.
**Q. For Kingman Reef?**
A. To quiet them about Kingman Reef.
**Q. When did he tell you that?**
A. I'm not really sure when it was. I don't know if it was a part of their negotiations for Palmyra or not. But close to that time.
**Q. Somewhere in that time period. And do you know whether he ever got around to putting a number on the table?**



KRAI v. US, No. 06-828L (Fed. Cl.)
Def.'s Motion for a Protective Order
Exhibit 7 (Errata)