# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

KINGMAN REEF ATOLL INVESTMENTS, LLC a Hawaii limited liability company,

Plaintiff,

vs.

THE UNITED STATES OF AMERICA; THE UNITED STATES DEPARTMENT OF INTERIOR; THE HONORABLE GALE A. NORTON, in her official capacity as Secretary of the Interior; THE UNITED STATES FISH & WILDLIFE SERVICE; STEVEN A. WILLIAMS, in his official Capacity as Director of United States Fish & Wildlife Service, et als.,

Defendants.

Civil No. CV05-00151JMS/BMK

Volume I
DEPOSITION OF
GEORGIA SHIRILLA

Taken in behalf of Plaintiff

April 25, 2007
1000 NE Multnomah
Portland, Oregon
10:05 a.m.

ATKINSON-BAKER, INC.
COURT REPORTERS
www.depo.com
(800) 288-3376

REPORTED BY: GWEN A. DICKSON, RPR
FILE NO.: A1035DC

APPEARANCES:

For the Plaintiff:

CANNATA CHING & O'TOOLE
BY: THERESE Y. CANNATA, ESQ.
899 Ellis Street
San Francisco, CA 94109
415.409.8900

BROOKS TOM PORTER & QUITIQUIT
BY: DONNA H. YAMAMOTO, ESQ.
841 Bishop Street, #2125
Honolulu, HI 96813

For the Defendants:

US DEPARTMENT OF JUSTICE
BY: DONNA SHEEHAN FITZGERALD, ESQ.
601 D St., NW
Washington, DC 20004
202.305.0476

Also Present:
Mariel J. Combs, Esq.
Department of the Interior

Page 2

INDEX

Georgia Shirilla


| EXAMINATION BY: | PAGE |
|---|---|
| Ms. Cannata | 4 |


EXHIBITS


| | | |
|---|---|---|
| No. 96 | Deposition Notice | 4 |
| No. 97 | Deposition Notice | 11 |
| No. 98 | Deposition Notice | 11 |
| No. 99 | Subject Card/Dec. '35 | 65 |
| No. 100 | Subject Card/Feb. | 65 |
| No. 101 | Draft Proposal | 192 |
| No. 102 | Miller memo | 193 |
| No. 103 | Wallace memo | 200 |
| No. 104 | Busekrus e-mail | 219 |
| No. 105 | Wery e-mail | 221 |

PME Exhibits referenced:
Nos.: 3, 4, 5, 7, 8, 9, 13, 22, 26, 28


Page 3

* * *

GEORGIA SHIRILLA,
called as a witness having first been
sworn/affirmed to tell the truth, the whole
truth, and nothing but the truth by the
Reporter, testifies as follows:
(Deposition Exhibit No. 96 was marked for
identification.)

EXAMINATION

BY MS. CANNATA:

**Q. Good morning, Ms. Shirilla. My name is Therese Cannata and I'm here on behalf of the plaintiff to take your deposition today, and I'm going to go over a few preliminaries with you.**

**Have you ever had your deposition taken before?**

A. I have not.

**Q. Well, and I'm sure you've gone over some rules with counsel, but let me just go over some that will be helpful here today.**

**We are here and a record is being taken of everything that we say. If we want to say something off the record, then counsel and I will agree to go off the record, but in general everything we say in this room in a somewhat**

Page 4

**informal meeting will be taken down by the Court Reporter.**

**It is an informal setting in the sense that we can stop the record, take a break, you can go confer with counsel if you need to and so forth. But it's formal in the sense that when we're on the record it is being taken down and you are under oath.**

**At the conclusion of your deposition a transcript will be made of everything that we say on the record at this deposition and you will have an opportunity to read it and to review it and to make corrections if either you misspoke or if there was a transcription problem or something like that.**

**If you make a correction as to substance, meaning it isn't a transcription problem but it is something that you thought about later on and you have a different answer, I can comment on that at trial. So it is important that you understand my question and that if you don't understand it, just have me repeat or clarify it. I'm perfectly happy to do that.**

**The purpose today is to get your best most accurate recollection of events as they transpired over the many years preceding of the filing of this**

Page 5

specifically? And I want to go sort of to the -- I realize we're talking about, you said mid to late nineties so I won't pinpoint you to a time but can you point me to the initial discussions and tell me what was initially discussed?
A. That we're looking at acquiring Kingman Reef. When I say "acquiring" I mean that in a broad sense.
Q. Um-hum.
A. That it was already under U.S. ownership --
Q. You had determined --
A. -- to establish it as a National Wildlife Refuge.
Q. Had you determined that it was already under U.S. ownership?
A. Yes.
Q. How did you determine that?
A. The executive order of 1934.
Q. Just that one document?
A. Yes.
Q. When did you determine that?
A. When I first reviewed the executive order and I think I did some checking to see if it was ever terminated and found that it was still in

Page 90

effect.
Q. How did you see -- when did you check to see if it had ever been terminated?
A. Late nineties.
Q. Who assisted you in that process?
A. I don't know if anybody did.
Q. Did you call a particular department to determine that?
A. No, not to my knowledge.
Q. How did you check? By what process?
A. I think I both talked to the Navy.
Q. Okay.
A. And I might have done some checking on the computer.
Q. What did you check on the computer?
A. Executive orders.
Q. What file were you looking under?
A. I don't recall.
Q. How do you find executive orders? I mean, were you Googling it like the ordinary course or was this an internal government process?
A. It could have been Thomas. I don't recall.
Q. When you say Thomas what do you mean?
A. There's a website for public documents.

Page 91

Q. Okay.
A. I don't recall if that was used in this particular case.
Q. So maybe that but not likely?
A. I don't recall --
Q. Okay.
A. -- which it was.
Q. Can't recall at all. Okay. I understand. Who at the Department of Navy did you talk to, if you can recall?
A. Dennis Pacht.
Q. Were you talking to Dennis Pacht about the Naval air and defensive areas as well?
A. Probably at one time or the other, yes.
Q. 1941 executive act or executive orders?
A. Some time, yes.
Q. But you also talked to him about the 1934 order?
A. Yes.
Q. Did you exchange e-mails with Mr. Pacht concerning the 1934 executive order?
A. I don't recall.
Q. Did you exchange e-mails with Mr. Pacht concerning the 1941 executive orders?
A. I don't recall.

Page 92

Q. Did you receive any documentation from Suzanne Case concerning the title to Kingman Reef?
A. I think she sent me a copy of the 1934 executive order.
Q. What else did Suzanne Case send you, if anything?
A. Of Kingman Reef?
Q. Yes.
A. She sent me copies of the fishing license.
Q. For what?
A. For Kingman Reef. That covered Kingman Reef and Palmyra.
Q. A fishing license?
A. Um-hum.
Q. What kind of fishing license?
A. To Mr. Frank Sorba.
Q. A license agreement. Got it.
MS. FITZGERALD: Georgia, you need to say yes or no.
Q. Yes a license agreement?
A. Yes.
Q. What else did she send you? You listed the 1934 executive order, you listed a fishing license agreement or two. I'm not sure.
A. I'm not recalling any particular document,

Page 93

other documents on Kingman Reef.
**Q. What about a memorandum?**
A. No.
**Q. No memorandum. What about an e-mail?**
A. No.
**Q. What about a title report?**
A. No.
**Q. What about a research memorandum meaning her legal research into title?**
A. No.
**Q. What did Ms. Case tell you about her title search and title investigation concerning the Kingman Reef?**
A. I recall a phone conversation with her talking more about Palmyra and I remembered talking about Kingman Reef and that it was her conclusion that it was United States ownership, they wouldn't be involved. And I agreed, I concurred with her conclusion.
**Q. What did she tell you about Kingman Reef? More specifically, if you can recall, why did she -- did she say why she drew that conclusion?**
A. Primarily the executive order 1934.
**Q. Did you prepare any memorandum to the file confirming that you had determined that the title**

Page 94

**to Kingman Reef vested in the United States government based on the 1934 executive order?**
A. Not a memorandum. I don't believe I did a memorandum to the file.
**Q. Did anybody, to your knowledge, prepare a memorandum to the file indicating that title to Kingman Reef vested in the United States government based essentially on the 1934 executive order?**
A. Yes. I did prepare documents to that effect.
**Q. Okay. And what kind of documents did you prepare?**
A. Well, what comes to mind was land and water fund briefing books.
**Q. Land and water fund briefing books?**
A. Um-hum.
**Q. What are those?**
A. That's a document that you have brought up in other depositions --
**Q. Okay.**
A. -- that we prepare. I think the example you have was 2001.
**Q. Oh, you mean those briefing memorandums?**
A. Briefing statements. Memorandums, yes.
**Q. They are not books. They are like**

Page 95

**memorandums. Right?**
A. They are made into a notebook.
**Q. They are made into a notebook?**
A. I believe.
**Q. Where do those briefing notebooks go? I mean, they are brought together in a notebook on a particular property --**
A. We sent them back to our central office and they put them together.
**Q. So there would be in existence -- are they divided by topic or are they divided by --**
A. Projects.
**Q. So there would be a briefing book, a briefing statement book on Kingman Reef; is that right?**
A. You have it. Of record.
**Q. We have the briefing book or the briefing documents?**
A. The briefing documents.
**Q. And but there is a book on it; is that right? Meaning they have all been gathered in one place, is that right, on Kingman Reef?**
A. Yeah. For all different -- a variety of projects. Nationwide that we're working on.
**Q. Let me see if I can understand how the**

Page 96

**books are put together. Are the books put together like annually? Is it the 1999 briefing statement book or how are they divided up?**
A. They are done annually.
**Q. So a briefing book would consist of all the briefing statements for a year, for a particular year; is that right?**
A. Correct.
**Q. Covering a number of topics. Right?**
A. Number of projects.
**Q. Projects. Okay. Now, I notice there are briefing statements directed to the Secretary of Interior and then there are also briefing statements to the director - and I assume the director of Fish & Wildlife are the context of the document. Are those all put in the same briefing book or are they separated out?**
A. We're talking two different types of reports.
**Q. So what kind of briefing statement are you talking about? Is this one that's directed to a particular person or entity?**
A. I don't know what the full distribution list is that's done in the D.C. office --
**Q. Yes.**

Page 97

could both govern and own. I understand that.
A. Yes.
Q. But when you speak of incorporated versus unincorporated and you mention it was never a part of or governed by a state or body other than the United States government.
A. That's my understanding.
Q. That's speaking as to the issue of sovereignty; is that right?
A. I guess so.
Q. Okay. Not title, in other words.
A. Correct.
Q. Now, going back to your custom and practice, have you ever undertaken title research concerning whether or not property in the Hawaiian island area - whether the Line islands, Hawaii, the state, or the northwestern islands - whether any of those areas are public property or not, public lands?
A. I've discussed them with other federal agencies and their origins. Including their origins.
Q. Can you give me an example of property other than Kingman Reef and Palmyra -- strike that.
Other than Kingman Reef in which you would

Page 118

have undertaken an investigation to determine its ownership status?
A. Johnston Atoll.
Q. And what did you determine about Johnston Atoll?
A. Federally owned.
Q. How did you determine that?
A. Executive orders.
Q. Anything else?
A. No.
Q. Did you ever go behind the executive orders for the Johnston Atoll to determine if they were accurate, meaning they had - those executive orders issued by the executive branch of our government - had been accurately issued or determined?
MS. FITZGERALD: I'm going to object to that question as assuming facts not in evidence.
You can go ahead and answer.
A. I guess I don't really understand your terminology about going behind something.
Q. Sure. Let me see if I can state it differently. Now I'll keep talking -- looking for a custom and practice so I'll ask with respect to Johnston Atoll. Did you speak to any federal agencies to determine its ownership status?

Page 119

A. Yes.
Q. Who did you speak to? What entity?
A. GSA.
Q. Who at GSA do you typically contact?
A. It varies.
Q. What department do you go to?
A. The real estate.
Q. And what -- why do you go there? What is the significance of going there?
A. Well, it varies. The situation we're talking about Johnston?
Q. Sure.
A. They were involved -- they were assisting Air Force, Air Force was desirous of terminating their use.
Q. Okay.
A. And GSA was assisting them.
Q. Okay.
A. And we have an interest in it.
Q. Okay. Have you ever undertaken an investigation of title in which there's an executive order declaring public lands and you investigate whether in fact that executive order is accurate or not?
A. I don't know of executive orders declaring

Page 120

public lands. I believe that the lands that are subject to the types of executive orders I'm familiar with were already public lands.
Q. Are you aware of any instance in which the U.S. government has declared land to be public lands and has later been corrected by a court of law and has been told in fact it was not public lands?
A. I don't know if you're referring to the Palmyra supreme court.
Q. Well, that would be one example in my mind but I'm asking if you have any in mind.
A. I'm aware that that happened.
Q. So Palmyra was an instance in which the executive branch of the government or some branch of the government declared that Palmyra was a publicly owned land, public lands, but a court determined later that it was not public lands is your understanding? Is that your understanding?
A. Yes.
Q. When you were speaking with Suzanne Case about Kingman Reef and you said that she mentioned that she believed that the 1934 executive order was evidence of pertaining to her determination of title; is that right?

Page 121

A. It was a part of it, yes.
**Q. What other evidence, if any, did she identify?**
A. I don't remember any.
**Q. Did she indicate that she made any inquiry beyond the face of the 1934 executive order to make her determination that title to Kingman Reef was held by the United States government?**
A. I don't recall.
**Q. Did you make any inquiry beyond the face of the 1934 executive order to determine that Kingman Reef was held in ownership by the United States government?**
A. An inquiry as to who? Are we talking Suzanne Case?
**Q. Rephrase because it wasn't clear.**
**Did you -- when you were determining and doing your investigation of Kingman Reef, did you make any investigation -- did you conduct any investigation other than the review of the 1934 executive order to determine whether or not Kingman Reef was in fact a publicly held land?**
A. What time period are we speaking?
**Q. At any point in time, first off.**
A. At any point in time?



**Q. Yes.**
A. We did do additional research --
**Q. Okay.**
A. -- into Kingman Reef.
**Q. Okay. So if I can understand the timeline. The initial point would be the late 1990s I think you indicated that you saw the executive order?**
A. Yes.
**Q. Now there's additional research that was conducted; is that right?**
A. Correct.
**Q. And what is that additional research? First off, when was that, how many years after the initial determination or conclusion?**
A. Three, four, five.
**Q. Three to five years later?**
A. Yeah, approximately.
**Q. Can you pinpoint the approximate year?**
A. I'm going to do a little explanation.
**Q. Yes.**
A. In the year 2000 we submitted our draft environmental assessment to the public for their comment which outlined our position of ownership as to Kingman Reef.
In response to that we received a letter



back from the Fullard-Leo's representative, Mr. Houlihan and possibly another law firm, stating that they believe their clients owned Kingman Reef. Responding to that, we asked them to share with us their proof of ownership; that we believe that Kingman Reef was federally owned. And we asked if they would be willing or had a desire to meet with us.
They sent in a package of miscellaneous items that they said substantiated and proved their ownership. There was, in my estimation, my opinion, very little information and nothing that showed proof of title within that package and I was kind of surprised how little there was. There was nothing showing any basis of title.
So we, I think, had a couple of phone conversations or somebody from the agency about setting up a meeting to talk about this and I don't know if there were dates discussed but that invitation was never accepted, and shortly thereafter they filed a lawsuit against us which altered, of course, our ability to discuss anything with them directly.
So when that occurred I kept thinking about how little information they provided and I



thought to myself how can they possibly think that what they sent me had any proof of title as a part of it? And I just thought, god, there's got to be more. So I think I might have asked the navy if they had any additional documents but I was talking to people from my Washington office and, you know, about the only thing was a letter, I think, to the state department and they writing back and saying we acknowledge receipt of your letter. There was no award of title in whatever form that it might have taken.
So people from my office in D.C. went to two or three different locations, I think it was archives, National Archives, I think there was a navy place, Library of Congress, and they went through some of these old files and did indeed find that there was more to the story; that back in the thirties the Fullard-Leos went to the navy and said we think we own it, and the navy wrote back, we've researched all the documents and we find you don't. And that was signed by a judge advocate. Is it general -- JAG, I think. I can't remember the exact title. And we found other letters, you know, that they were notified in the thirties that, hey, you don't own it.

In fact, there were other letters they, in my reading of those letters, said we recognize we don't own it, so now we would like to ask you for reimbursement for our expenses. I don't know if they were ever paid. But they were told, I think, my estimation, quite clearly in the thirties, that they did not have title. They the Fullard-Leos did not have title.
**Q. Thank you for that explanation. That gives me a place to start here. But let me ask a preliminary question.**
**You said a moment ago -- well you said that you don't know if they were ever paid any money. Did you inquire of anyone as to whether the U.S. government ever paid any money for the acquisition of title?**
A. I didn't see any documentation that indicated that they were paid for their expenses at Kingman Reef.
**Q. And now you indicated that you initiated this on your own but not in response to the lawsuit; is that right? Or was it in response to the lawsuit?**
A. It was --
**Q. Or part and part?**



A. Well, there are two lawsuits other than the ones that are going on now.
**Q. Yes.**
A. The first one was pertaining to if we did or did not comply with our National Environmental Policy Act requirements, NEPA, the planning document.
**Q. Yes.**
A. And then oh, I don't know, less than a year or so there was the second takings case.
**Q. The quiet title action?**
A. No. It was a takings case. This is the first quiet title action.
**Q. Okay. By the Fullard-Leo family. Right? Are you talking about Mr. Sorba or just the Fullard-Leo family when you're talking about lawsuits?**
A. Well, those two, the Fullard-Leos.
**Q. Now, so you -- but I guess my question is did you undertake this research to -- in response to the litigation or did you undertake the research in -- sort of on a more of a personal curiosity?**
A. It was, I think, both.
**Q. Did you prepare any kind of memorandum concerning your conclusions?**



A. No, I did not.
**Q. Do you know if anyone else did other than counsel?**
A. No, they did not.
**Q. And I think you said that Suzanne Case never presented you with any kind of memorandum regarding her analysis of title, did she?**
A. No, she did not.
**Q. Did Suzanne Case ever indicate to you that she had reviewed old navy files in the Archives or anything of that nature concerning ownership?**
A. She had indicated to me that she was reviewing files. I don't remember her specifying if they were navy; clearly she was reviewing Fullard-Leo files.
**Q. Did she say she reviewed files obtained from the Archives?**
A. She didn't say either way.
**Q. Did she say where she had gotten the files that she was reviewing or the records?**
A. I only remember her saying that she was reviewing Fullard-Leo files for Palmyra acquisition.
**Q. Okay. For Palmyra. And I wanted to focus on Kingman Reef. I believe at one point Ms. Case**



**informed you she was also investigating the title to Kingman Reef; is that right?**
A. I understand that she did look into that as well.
**Q. Did she tell you why she was looking into Kingman Reef?**
A. Not specifically; but they were being discussed as two possible refuge proposals.
**Q. Okay. Was there a discussion at any point in time that The Nature Conservancy would acquire Kingman Reef?**
A. It was federal ownership.
**Q. But before the determination of federal ownership did Ms. Case investigate whether or not it was privately owned and therefore the TNC would be acquiring --**
A. I don't know.
**Q. Did she ever tell you -- do you know if there was a point in history where Fish & Wildlife and the TNC were assuming it was privately owned before the determination that it was publicly owned?**
A. Never at Fish & Wildlife. I can't speak to TNC.
**Q. Did anyone from TNC ever tell you that**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

KINGMAN REEF ATOLL )
INVESTMENTS, LLC a Hawaii )
limited liability company, )
)
Plaintiff, )
)
vs. ) No. CV05-00151JMS/BMK
)
THE UNITED STATES OF )
AMERICA; THE UNITED STATES )
Department of Interior; )
THE HONORABLE GALE A. )
NORTON, in her official )
capacity as Secretary of )
the Interior; THE UNITED )
STATES FISH & WILDLIFE )
SERVICE; STEVEN A. )
WILLIAMS, in his official )
Capacity as Director of )
United States Fish & )
Wildlife Service, et als., )
)
Defendants. )

DEPOSITION OF
GEORGIA SHIRILLA
Volume II
Taken in behalf of Plaintiff

* * *

April 26, 2007
1000 NE Multnomah
Portland, Oregon
8:50 a.m.

ATKINSON-BAKER, INC.
COURT REPORTERS
www.depo.com
(800) 288-3376

REPORTED BY: GWEN A. DICKSON, RPR
FILE NO.: A1036C7

A. Could we maybe get a lamp?
**Q. Yeah, I'll call the front desk.**
**(Discussion held off the record.)**
**(Brief recess is taken.)**
**BY MS. CANNATA:**
**Q. Ms. Shirilla, would you kindly take a look at what's been marked as Exhibit 106 and 107.**
A. Yes. It's this one document. Correct?
**Q. Did I do this wrong?**
A. Here's 107. Sorry.
**Q. The first e-mail is dated October 16, 1997. Have you ever seen this e-mail prior to today, Ms. Shirilla?**
A. I don't believe so, no.
**Q. There is a reference to an information about Kingman Reef and if you look at -- the reason I showed you 106 is to put it in context. But if you look at Exhibit 107, it said: I found some stuff in our real estate division's file which I've asked my legal clerk to copy and mail to you.**
**Did you ever receive a packet of information from the Navy concerning Kingman Reef and the ownership of Kingman Reef?**
MS. FITZGERALD: I'm going to object for lack of foundation. There's been no foundation



laid that Georgia has ever seen Exhibit 107 or that this e-mail is being sent to Georgia.
MS. CANNATA: I understand. I'm not trying to imply that. Actually, I'm trying to imply that there's a packet in the U.S. government's possession from the Navy that seems to - like a file - about title and ownership to Kingman Reef. I'm trying to find out where it is and so I'm hoping that perhaps someone sent you a copy.
So it's really a search for this file. That's what I take it to mean. I may be incorrect but that's the purpose of my question.
MS. FITZGERALD: I'm going to object again. Your question is essentially testimony that there's some packet out there. You don't have any proof of that, for one, you're testifying regarding two e-mails which do not appear to have been sent to Georgia, do not have Georgia's name on them, and then you're asking Georgia to offer testimony on the e-mails. So I'm going to object to lack of foundation.
MS. CANNATA: Okay. Whatever. I'm trying to find out something so...
**Q. Did you ever at any point in time receive a packet from someone from the Navy regarding the**



**title and ownership of Kingman Reef, a packet of documents?**
A. I did not.
**Q. Did you ever receive any information from the Navy concerning the title and ownership of Kingman Reef?**
MS. FITZGERALD: Objection. Question is vague.
You can answer.
**Q. Go ahead.**
A. I had discussions about Kingman Reef.
**Q. Did you ever receive any documents from the Navy concerning title and ownership, historic documents I should say?**
A. They might have sent me a copy of the executive order, the 1934 executive order.
**Q. By the way, the 1934 executive order does not reference the word public land. Did you -- at the time that you received a copy of the 1934 executive order did you research what the Picket Act meant?**
MS. FITZGERALD: I'm going to object. The document is not being placed in front of Ms. Shirilla and you're asking her to provide testimony on a document that's she not seen.



**Q. Go ahead.**
A. I don't know the act by Picket Act, but I know that when those types of executive orders are issued and I think I mentioned yesterday that we have had those established many refuges in our system that those are federal lands.
**Q. Okay.**
A. That the executive of the United States through that order transfers custody, control or jurisdiction, whatever the case may be, to a specific federal agency for different purposes.
**Q. Okay. And did you, after seeing the 1934 executive order, seek a legal opinion concerning what it meant? Don't tell me what the legal opinion was because I have to lay a foundation if I'm going to try to suggest that that should be disclosed, but just did you see a legal opinion?**
A. I have talked to several attorneys about it.
**Q. In the Service?**
A. In the department.
**Q. Would you identify the persons to whom you spoke? Again, please do not reveal the content of your communications with them.**
A. I'm trying to think which ones. There

were two or three in the Washington office. I believe Larry Mellinger was one, I believe Robin Friedman was another. I don't know. I think it was one time talked to Allen Palisol.
**Q. Can you spell that?**
A. P-A-L-I-S-O-L, I believe. I might not be hundred percent on that one.
**Q. Okay. Anyone else?**
A. I had talked to an attorney representing the Navy.
**Q. Who is that?**
A. I'm drawing a blank of what her name was. I'm sorry Mariel is not here because I think she would remember her name.
I'm thinking -- I can't remember. Alice -- I don't remember her specific name.
**Q. Would Mr. Pacht probably know her name?**
A. Yes, I think he would.
**Q. Anyone else?**
A. I think there were others but I don't recall specific names of the other attorneys.
**Q. And these would have been attorneys that you consulted in general terms about the 1934 executive order?**
MS. FITZGERALD: Objection to the phrase



"in general terms."
**Q. About the 1934 executive order.**
A. Yes.
**Q. May I ask when you consulted these people? Again, do not disclose the content of the communications with them.**
A. I don't know when discussions started. I would guess 1999, 2000.
**Q. Okay.**
A. And 2000.
**Q. Did you receive any legal opinions from any of these individuals? Again, do not disclose the content of those.**
A. Oral opinions.
**Q. Did you receive any written opinions?**
A. Not that I recall.
**Q. Did you base your opinion or conclusion on title on advice received from counsel or on your own independent research or both?**
A. Both.
MS. FITZGERALD: I'm going to object. The question asks for attorney/client privileged information.
MS. CANNATA: I'm not asking her what the information was, I'm just asking her what formed



her opinion, not what -- not asking the content of what they told her that formed her opinion but just what formed it.
MS. FITZGERALD: But you're asking her what she did based on it and I think it's objectionable.
MS. CANNATA: I think -- for the record, I think that we can inquire about why someone did what they did; they can say on advice of counsel. And that's what I'm trying to sort out is whether she took action based on advice of counsel, which I think we're entitled to inquire about.
MS. FITZGERALD: Again, my objection is on the record.
MS. CANNATA: Sure.
**Q. So it was based on a combination as I understand it. Right?**
A. Could you restate the question?
**Q. Your opinion that you formed was based on a combination of your own independent research as well as the advice of counsel?**
MS. FITZGERALD: Objection; seeks attorney/client privileged information.
Just go ahead and answer.
A. I think I got lost in this. When you say



the opinion that I formed?
**Q. The opinion that you formed concerning the Fullard-Leo title to property or the United States government title to property; in other words, let me rephrase.**
**The opinion that you formed concerning the ownership of Kingman Reef was based upon your own independent research and the advice of counsel; is that accurate?**
A. It was first formed on my analysis and confirmed by others.
**Q. Okay. At the service who made the final decision concerning the opinion of title?**
**Does that question make sense? If it doesn't, I'll be happy to rephrase it?**
MS. FITZGERALD: I'm going to object because it assumes facts not in evidence.
**Q. Yes. And I understand that problem. I'm trying to find a way to get into the topic so I'm going to try this question, see if it makes sense.**
**Who, if anyone, at the Service made the final decision concerning the opinion of title to Kingman Reef?**
MS. FITZGERALD: Again, object; assumes

facts not in evidence and also lacks foundation.
A. I don't understand your question as far as final decision.
**Q. Yes. A decision -- at some point in time a decision -- at some point in time you learned that the Fullard-Leos asserted the claim to the property. Correct? To the Kingman Reef property.**
**Let me rephrase.**
A. Okay.
**Q. At some point in time prior to the, let's use the comment period again, prior to the comment period you learned that the Fullard-Leo family asserted an ownership claim to the Kingman Reef. Correct?**
MS. FITZGERALD: I'm going to object. This mischaracterize her testimony from yesterday and you're also getting into questions that were asked and answered at some length yesterday afternoon.
MS. CANNATA: Trying to lay a foundation for this question, though. I'm trying to back into it.
MS. FITZGERALD: Did the Court Reporter get all my objection on that?
COURT REPORTER: Yes, I did.
**Q. At some point in time prior to the comment**



**period did you obtain information that disclosed to you that the Fullard-Leo family disputed -- had a claim of title or asserted a claim of title to Kingman Reef?**
MS. FITZGERALD: Objection; mischaracterizes her testimony from yesterday and asked and answered.
**Q. Go ahead.**
A. I need to hear it again.
(The pending question is read back.)
A. A dispute.
**Q. Badly -- the word disputed was what was probably messing you up. My fault. I was phrasing incorrectly. Merging the government position and the Fullard-Leo position, so let me rephrase it.**
A. Okay.
**Q. Thank you for reading it back.**
A. Okay.
**Q. The Fullard-Leos -- at some point in time prior to the comment period did you learn that the Fullard-Leo family was claiming that it owned Kingman Reef?**
MS. FITZGERALD: Same objection.
A. Yes.
**Q. Did you thereafter - and as I understand**



**your testimony yesterday, you looked into it. Correct?**
A. I looked into the ownership --
**Q. The ownership issue. Correct?**
MS. FITZGERALD: Can you please let Georgia finish answering the question. You have talked over her several times.
MS. CANNATA: Sure.
**Q. At some point in time you looked into it. Correct?**
A. You're asking me if I looked into their claim?
**Q. Did you look into the issue of ownership?**
A. Yes.
**Q. And at some point in time you formed an opinion and conclusion about ownership. Correct?**
A. Yes.
**Q. And at some point in time you communicated that opinion about ownership to your immediate supervisor, Mr. Weiss. Is it Mr. Weiss?**
A. Yes.
MS. FITZGERALD: I'm going to object. This line of questioning we went over at length yesterday and I don't understand why you're going back into this again with this witness.



MS. CANNATA: Because you objected based on foundation and I'm going to get -- you will see in the next question that this was the foundation that you asked for.
MS. FITZGERALD: No. Yesterday afternoon we spent several hours going through this and --
MS. CANNATA: I had a question this morning --
MS. FITZGERALD: -- you're going back over the same material again.
MS. CANNATA: Agreed. But sometimes what happens is when I believe foundation's been laid the day before, you disagree, which is what we're having a problem with this morning. I think I laid the foundation yesterday, I thoroughly agree with you, but you objected based on foundation to a question I'm trying to get to concerning who made the final decision about the issue of ownership which we can tell from the documents, Ms. Fitzgerald, was clearly in a state of conflict in the government among the exchange in papers.
So I'm going to lay the foundation or you can withdraw your other objection to foundation but I have to get to this question because it's relevant.

MS. FITZGERALD: Well, we had several hours of testimony yesterday afternoon during which time Ms. Shirilla --
MS. CANNATA: I agree.
MS. FITZGERALD: -- said that the executive order informed her opinion. You're re-opening this question because you don't like the answers.
MS. CANNATA: No. That's not true. Not true.
MS. FITZGERALD: So I'm going to keep objecting but you're just going to keep asking your question.
COURT REPORTER: One at a time.
MS. CANNATA: That is fine. I don't mind you interposing your objections as long as you don't tell her how to testify. That's all I'm saying. Just say "objection, asked and answered" let's move on so we can get through this this morning.
MS. FITZGERALD: Well, I'm not telling her how to testify. What's bothering me is that you're going back over the same testimony from yesterday and trying to get her to change it. If you don't like the testimony, that's because the facts don't support you.



MS. CANNATA: What I think you're doing is you're running up the clock arguing right now and I'd like that to stop right now.
MS. FITZGERALD: And I think you are harassing our witness by bringing her back in for another half-day of testimony to go over the same testimony that you did yesterday.
MS. CANNATA: I am not trying to go over the same testimony. As a matter of fact her answers are identical to yesterday. She has not changed her testimony. She is quite consistent on this issue and now I'd like you to hear my last question so we can stop this circular argument.
I am not -- I will not respond to your next comment, so if you have one, make it, and then we will have a read back.
MS. FITZGERALD: My objection stands so go and continue.
(The pending question is read back: And at some point in time you communicated that opinion about ownership to your immediate supervisor, Mr. Weiss. Is it Mr. Weiss?)
A. My immediate supervisor was Mr. Weiss.
**Q. And did you at some point communicate that opinion to Mr. Weiss?**



A. We certainly discussed it, yes.
**Q. Did, at some point, that -- the opinion that you formed become the opinion of the Service?**
A. When you say "the opinion" as though I feel what you're asking me like I rendered this legal opinion. It was my position, it was a shared position within my agency as well as Navy that Kingman Reef was owned by the federal government.
**Q. And was any memorandum prepared indicating that that was going to be the decision of the Fish & Wildlife thereafter?**
MS. FITZGERALD: Objection to the form of the question.
A. And I think you already asked me if I had prepared a memorandum.
**Q. Not you. Was any, meaning anybody else, anybody in the Service, was a memorandum prepared indicating that this would be the opinion of the service?**
A. That was --
MS. FITZGERALD: Objection; assumes facts not in evidence.
A. I think the position that we set forth in our environmental assessment was that, was setting out our position.



**Q. And who made the final decision to approve the content of the environmental assessment report?**
A. The regional director, I would say.
**Q. Who would that be at the time?**
A. I don't remember if it was Dave Allen or his predecessor.
**Q. Who was his predecessor?**
A. That was the name of I was struggling with yesterday.
**Q. Okay.**
A. I'm embarrassed to say.
**Q. It may come up in the documents. No problem.**
A. It would come up on the planning documents, yes.
(Deposition Exhibit No. 108 was marked for identification.)
(Deposition Exhibit No. PME 14 was marked for identification.)
(Deposition Exhibit No. 109 was marked for identification.)
(Deposition Exhibit No. PME 63 was marked for identification.)
**Q. Ms. Shirilla, I'd like to call your attention to what's been previously marked 108. It**