**U.S. Department of Justice**

Environment and Natural Resources Division

DSF:dsf

*General Litigation Section*
*P.O. Box 663*
*Ben Franklin Station*
*Washington, DC 20044-0663*

*Telephone (202) 305-0437*
*Facsimile (202) 305-0506*

By E-mail and U.S. Mail

July 3, 2007

Ms. Therese Cannata
Cannata, Ching & O'Toole
899 Ellis St.,
San Francisco, CA 94109
Phone: 415-409-8900
Fax: 415-409-8904
E-mail: Tcannata@ccolaw.com

Re: Kingman Reef Atoll Investments, LLC v. USA, CV05-00151 (D. Hawaii)

Dear Ms. Cannata:

This letter responds to your letter of June 21, 2007. We are disappointed that, after almost two years of discovery in this case, after the discovery period has closed, and after defendants have filed their motion to dismiss and for summary judgment, plaintiff would seek a delay of the briefing, and a continuance of the previously scheduled hearing.[1/] We are opposed to any further delay in the briefing schedule at this late date. We respond to the individual points of your letter below.

As to the document production in this case, as we have said several times, our search and production has been limited to files and documents pertaining to Kingman Reef. We have not separately searched for and produced documents related to Palymra Atoll, because it is a separate property that is not the subject of this suit, and is unrelated to the issues raised by defendants' pending dispositive motions.[2/] While certain documents discuss both properties, such as Fish and Wildlife

---

[1/]Plaintiff seeks a continuance in order to obtain additional Rule 30(b)(6) testimony from the Navy. As explained below, we object.

[2/]Contrary to the assertions you have made to the Court, the deposition testimony and documents produced in this case, which you are familiar with, make clear that defendants never attempted to purchase Kingman Reef from the Fullard-Leo family.

Defendant's Exhibit 1 to
Def.'s Opp. to Pls.' Mot. to Compel

("FWS") Service planning documents that discuss the creation of the refuges at both Palymra Atoll and Kingman Reef, Palmyra Atoll remains unrelated to this lawsuit.[3]

As to the scope of the search, the following offices were searched for documents: At Department of the Interior ("DOI"), defendants searched DOI and FWS offices in Washington D.C., the Solicitor's Office in Washington D.C., the FWS Region 1 Office, Portland, Oregon, and the Pacific Islands FWS Office in Honolulu. Navy searched the following organizations for responsive records: Naval Facilities Engineering Command, Pacific; Commander, Navy Region, Hawaii; Office of the Secretary of Defense (OSD) (Policy); OPNAV N45 (Environmental Readiness Division, Chief of Naval Operations)(This office has responsibility for implementing Navy environmental policy worldwide); Naval Facilities Engineering Command Headquarters; Counsel's Office, Commander in Chief, U.S. Pacific Fleet; the offices of the Assistant Secretary of the Navy (Installations & Environment); the International and Operational Law Division of the Office of the Judge Advocate General of the Navy, and the Naval Historical Center in Washington D.C.. In addition, the Navy searched for any accession groups at the Federal Records Center in San Bruno, California that include "Kingman Reef" in the subject line.

We also contacted the State Department, and produced the few relevant documents it held last year. Finally, you subpoenaed documents from NOAA, and NOAA has responded. My clients have informed me that the searches the personnel conducted were thorough, and that they have produced all of the documents regarding Kingman Reef. While we have a continuing obligation to produce any additional documents we find, and we have been acting in accordance with that obligation, we disagree with your assertion that there are "gaps" in the government production of documents in this case, or that our responses to your discovery requests were incomplete.[4]

Moreover, you now criticize the production of documents from DOI, most of which you have had for over a year, for failing to include "original folders" and "folder covers," and for failing

---

[3]Consequently, we decline your request that we produce FOIA responses the government has made to third parties regarding Palmyra Atoll.

[4]In fact, we responded to your discovery requests in November, 2006. For you to now assert, seven months later, and after the close of discovery, that the responses are incomplete or non-responsive, is not only without merit, but your objections are untimely.



Defendant's Exhibit 1 to
Def.'s Opp. to Pls.' Mot. to Compel

to identify the specific office that produced each particular document. We do not know what you mean by "folder covers" or "original folders." The documents were produced in the form that they were retained in the specific federal repository. At this late stage of the litigation, it would be impossible for us to trace each document to a particular file. Suffice to say, you have had most of these documents for well over a year, and have never asked us to trace each document to a particular office in the federal government. Moreover, there is no indication as to how tracing each document to an individual file has any relevance to the issues raised by defendants' pending dispositive motion.

We have the same response to your criticism regarding the privilege logs, and the redactions. The privilege logs, which you have had for some time, provide the relevant information regarding the source, recipient, and subject matter of the document to support the asserted privilege, be it attorney-client or deliberative process.

Nevertheless, we answer your specific questions as follows:

I will need to check with DOI regarding Document #8, and expect to get back to you early next week. As to Document #9, one can tell from the text of the document produced (a March 22, 2001 letter from Suzanne Case at The Nature Conservancy ("TNC") to Anne Badgley, FWS Regional Director) that the attachments are a copy of the Purchase and Sale Agreement between The Nature Conservancy and the Fullard-Leo family, which your client presumably already has, and a copy of the Licensing Agreement for fishing operations at Palmyra Atoll between Palymra Development Company, Inc. and Palmyra·Pacific Enterprises LLC. As to the licensing agreement, TNC has asked us to retain its confidentiality, and we see no relevance between that document and your quiet title lawsuit to Kingman Reef. As to Documents #11 and 13, we responded to these very same questions in a February 8, 2007 letter to you. Please refer to that letter.

As to your criticisms of the February 8, 2007 privilege log, as we noted above, the privilege log provides the requisite information. In other words, the entry on the log provides information on the source, recipient, and subject matter of the document, thus demonstrating that the document is an inter-agency or intra-agency deliberation.[5] Without knowing what specific information you believe is missing, and as to which specific document identified on the log, we cannot provide any more of a

[5] Some of the identified documents are drafts. Moreover, some of the documents were also withheld as attorney-client privilege, and the basis for that privilege is likewise demonstrated by the entries in the privilege log.

response. Moreover, you cannot claim that we waived any and all assertions of deliberative process by pointing generally to hundreds of documents, none of which you identify. We deny that we have waived the assertion of the privilege.

As to your questions on page 4 of your letter regarding various attachments, as explained in the log, the attachments are no longer attached to the document, and thus, we cannot provide them to you. We produced the documents in the manner they were provided to us by the agency personnel, and we did not remove the attachments from the documents, unless they were privileged. In those cases, the privilege assertion is noted on a log.[6] As to your criticism regarding redacted documents, you did not specify which documents you are concerned about, and therefore, we cannot respond. Again, you have had the majority of these documents for over a year. If you had any legitimate concern with the government's earlier productions, you should have and could have raised it earlier.

You also ask us to produce a file purportedly held by FWS employee Phyllis Ha regarding Palmyra that "contains highly relevant information on the issue of abandonment." We have no idea what file you are referring to, nor does Ms. Ha. Any documents held by Ms. Ha and relevant to Kingman Reef have been produced as part of the government's initial disclosures.[7]

As to Ms. Ha's deposition testimony that Kingman Reef was input into FWS's Land Acquisition Priority System ("LAPS"), Ms. Ha advises that that testimony was a mistake, and that she is correcting her deposition testimony to reflect that. Kingman Reef was never put into LAPS, and DOI advises that there are no

---

[6] You also mis-characterize many of the entries on the log, and represent that there were attachments or other documents, such as "appraisal(s)" of Kingman Reef, or "background documents," when that is not how the log entries read.

[7] We understand from speaking with Ms. Ha that, at her deposition, you asked her for documents she mentioned regarding the "administrative record." The documents Ms. Ha was referring to are general memorandum governing the compilation of administrative records for Administrative Procedure Act (APA) cases brought pursuant to 5 U.S.C. §§ 701 <u>et seq</u>. This is not an APA case, and the guidance has no bearing on the issues raised by defendants' dispositive motions, and we note that you have not asked for the documents in your letter. Nevertheless, as it is not unreasonably burdensome for us to produce the limited number of documents Ms. Ha has on this topic, we will provide you with a copy of non-privileged documents later this week.

documents relevant to the LAPS system that mention Kingman Reef.

Also, your letter asks for documents from the "budget shop," and documents regarding the "April 18, 1998" document, we responded to these issues in a June 29, 2007 letter to you, which included responsive documents.[8] As to your request for e-mail correspondence between Robert Smith and Georgia Shirilla, that correspondence was sent and received at the direction of the attorneys in this case in preparation for the discovery in this case, and is attorney workproduct. As to correspondence between Robert Smith and Chuck Cook, defendants do not have copies of any such correspondence, but I will check directly with Robert Smith about your request.

As to your request for a response to the letter from Bill Kannamer to Department of the Navy attached to your letter, Navy has searched its files, and cannot locate a response. As to your request for "documents prepared or collected by [Solicitor's Office] attorneys in connection with [the] legal opinion" that your client did not own Kingman Reef, DOI advises that its Solicitor's Office does not have any written legal opinions on the issue of ownership of Kingman Reef. The Solicitor's Office in Washington D.C. has advised that it has located a draft response to a December 22, 2000 letter from Christian Porter to FWS, and four draft Executive Orders. These documents were produced from the files of Robin Friedman, an attorney in the Office of the Solicitor, United States Department of the Interior, and defendants are withholding all of them as attorney work-product.[9]

As to your request for the "environmental impact assessment" referred to in the November 8, 1998 letter (which you contend was

---

[8]Contrary to your assertions, defendants did not represent to Magistrate Judge Kurren at the May 14, 2007 hearing that we were "still looking for documents to produce to [plaintiff] as part of defendants' initial disclosures." Instead, we advised Judge Kurren that, consistent with our statements on the record at the deposition of John Doebel, we were searching for any additional versions of the April 1998 "briefing statement," in order to ensure that we conducted as thorough a search as possible for relevant documents.

[9]We disagree with your assertion that if a party asserts a legal position or conclusion in public, it has thus waived all privileged communications behind the legal position or conclusion. Such a reading of the attorney-client privilege would essentially eviscerate the privilege.



Defendant's Exhibit 1 to
Def.'s Opp. to Pls.' Mot. to Compel

provided to Peter Savio by Robert Smith, but is actually a letter from certain members of the Senate to the Chairman of the Subcommittee on Interior, Committee on Appropriations, U.S. House of Representatives), that document pertains to Palmyra Atoll, not Kingman Reef, and is therefore not relevant to this case.

As to "record of communications" between The Nature Conservancy ("TNC") and FWS regarding the research done by TNC attorney ("TNC") attorney Suzanne Case, we have no such records, and I believe the deposition testimony in this case indicated that TNC and FWS communicated verbally on this issue. To the extent you are dis-satisfied with the document search from TNC pursuant to the subpoena you issued to it, you will need to proceed directly with TNC.

Finally, we disagree that Lt. Salvador was not competent to testify, and we do not agree to produce another 30(b)(6) witness on behalf of the Navy, and at government expense. A Rule 30(b)(6) witness testifies not as to personal knowledge, but as to the knowledge of the agency with respect to the designated topics in the notice.[10] E.E.O.C. v. Thorman & Wright Corp., -- F.R.D. -- , 2007 WL 1638602 (D. Kan. 2007). As you know, Lt. Salvador signed defendants' earlier discovery responses regarding access requests to Kingman Reef, and because of his position, he would be aware of any requests to the Navy for access submitted while he has been in that position, and the protocol Navy follows regarding access requests. Moreover, defendants prepared him to address the topics on the Rule 30(b)(6) Notice to the United States regarding access to Kingman Reef, and he so testified. There is no genuine dispute here that the Navy has controlled access to Kingman Reef and its Naval Defensive Sea Areas for decades, and therefore, your continuing request for discovery on this topic is unreasonable.

Please let me know if you have any questions or comments.

Sincerely,
Donna S. Fitzgerald
Donna S. Fitzgerald
Trial Attorney
Direct dial: 202-305-0476

---

[10] In fact, as we advised you and noted to the Court when we objected to your Rule 30(b)(6) Notice served on the United States, it is impossible for defendants to produce a witness with personal knowledge of any and all access requests handled by the Navy from 1934 forward.



Defendant's Exhibit 1 to
Def.'s Opp. to Pls.' Mot. to Compel

cc: Christian Porter, Brooks, Tom, Porter, & Quitiquit
Donna Yamamoto, Brooks, Tom, Porter, & Quitiquit
Michael Ching, Cannata & Ching
Tom Helper, U.S. Attorney's Office

Of Counsel:
BROOKS TOM PORTER & QUITIQUIT, LLP

Christian P. Porter, Hawaii Bar No. 3744
Donna H. Yamamoto, Hawaii Bar No. 5881
David W.H. Chee, Hawaii Bar No. 5776
2125 Davies Pacific Center
841 Bishop Street
Honolulu, HI 96813
Ph: 808-526-3011
Fax: 808-523-1171
Email: cporter@btpqlaw.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| **KINGMAN REEF ATOLL INVESTMENTS, L.L.C., a Hawaii limited liability company,** | **NO. CV05-00151 JMS/BMK** |
| **Plaintiff,** | **PLAINTIFF KINGMAN REEF ATOLL INVESTMENTS, L.L.C.'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; ADDENDUM 1; ADDENDUM 2; AFFIDAVIT OF DUDLEY FULLARD-LEO; EXHIBITS "1" - "23"; AFFIDAVIT OF AINSLEY FULLARD-LEO; EXHIBITS "A" - "F"; AFFIDAVIT OF PETER SAVIO; EXHIBITS "1" - "2"; AFFIDAVIT OF CHRISTIAN P. PORTER; EXHIBITS "A" - "Q"; CERTIFICATE OF SERVICE** |
| **v.** | |
| **THE UNITED STATES OF AMERICA, et al.,** | |
| **Defendants.** | **HEARING DATE: 12/5/2005**<br>**TIME: 9:00 a.m.**<br>**JUDGE: J. Michael Seabright**<br>**(No Trial Date Set)** |

**VOLUME I OF II**

Defendant's Exhibit 2 to
Def.'s Opp. to Pls.' Mot. to Compel

## TABLE OF CONTENTS


I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

A. DEFENDANT'S MOTION TO DISMISS PURSUANT TO RULE 12(b)(1) IS IMPROPER AND MUST BE DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

1. The Standard of Review for a Motion to Dismiss under Rule 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

2. The Statute of Limitations in Quiet Title Act Is Not Jurisdictional . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

3. A Motion to Dismiss under Rule 12(b)(1) Must be Denied Where Jurisdictional and Substantive Issues are Intertwined . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

B. The QTA 12-Year Statute Of Limitations Is Not Triggered Where Plaintiff Had No Reasonable Notice Of A Claim By Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

C. The Guano Act Did Not Give the United States Property Ownership to the Guano Islands Claimed by Individuals and Did Not Trigger the QTA 12-Year Statute of Limitations. . 31

D. The Executive Orders Claiming Sovereignty Over Kingman Reef Were Not Claims to Property Ownership and Did Not Trigger the QTA 12-Year Statute of Limitations. . . . . . . . . 35

E. JAG's 1938 Letter To Plaintiff's Predecessor Based On The Executive Orders And The Guano Act Did Not Trigger The QTA 12-year Statute Of Limitation . . . . . . . . . . . . . . . . . . . 40

F. Defendants Abandoned Claims Of Ownership Of Kingman Reef Made Prior to 2001. . . . . . . . . . . . . . . . . . . . . . . . . . . 43

G. Defendants Are Estopped From Claiming That The QTA 12-Year Statute Of Limitations Has Run. . . . . . . . . . . . . . . . . . 47

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50




Defendant's Exhibit 2 to
Def.'s Opp. to Pls.' Mot. to Compel

separable. *Roberts, supra*, 812 F2d at 1177; *Augustine, supra*, 704 F.2d at 1077.

The court in *Roberts* explained:

> The relatively expansive standards of a 12(b)(1) motion are not appropriate for determining jurisdiction in a case like this, where issues of jurisdiction and substance are intertwined. A court may not resolve genuinely disputed facts where "the question of jurisdiction is dependent on the resolution of factual issues going to the merits." [Citations.] *Id.* at 1177.

In this case, Defendants have not met this threshold requirement. There is no question that Plaintiff is entitled to bring this quiet title action under the QTA. The United States has made a claim against property owned by Plaintiff. There are substantial and material disputed facts. Specifically, as more fully discussed below, Defendants assert the running of the statute of limitations to which Plaintiff has responded with substantial evidence supporting the claims of estoppel and abandonment, both of which go directly to the merits of the claim under the QTA. While these issues may also pertain to subject matter jurisdiction, they cannot be separated from the merits. The court must therefore deny or postpone Defendants' motion to dismiss to permit discovery and a full determination of the merits. See *Thornhill, supra*, 594 F.2d at 735; *Augustine, supra*, 704 F.2d at 1077.

**2. The Statute of Limitations in Quiet Title Act Is Not Jurisdictional**

Plaintiff seeks relief under the QTA which provides that federal district

of limitations defense to Plaintiff's quiet title claim. The public's interest is served by such estoppel as "the public has an interest in seeing its government deal carefully, honestly and fairly with its citizens." *Wharton*, 514 F.2d at 413.

## IV. CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that Defendants' Motion be denied or in the alternative continued to allow Plaintiff to conduct discovery in this case.

DATED: Honolulu, Hawaii, November 17, 2005.

By ______________________________

Christian Porter, Hawaii Bar No. 3744
Donna H. Yamamoto, Hawaii Bar No. 5881
David W.H. Chee, Hawaii Bar No. 5776
Therese Y. Cannata, CA Bar No. 88032
Michael M. Ching, CA Bar No. 209426
Jon M. Van Dyke, Hawaii Bar No. 1896
Attorneys for Plaintiff Kingman Reef
Atoll Investments, L.L.C.

Addendum B

Factual Analysis of Current and Proposed Pacific Coral Reef National Wildlife Refuges

**Hawaiian Islands National Wildlife Refuge.** By Executive Order No. 1019, President Theodore Roosevelt established the Hawaiian Islands National Wildlife Refuge in 1909 to protect seabirds. The executive order reserves certain named "islets and reefs" within a broad described area, also depicted on a map, stretching approximately 800 miles east to west, and 200 miles north to south. The Hawaiian Islands National Wildlife Refuge includes land forms which represent various stages in the volcano erosion and subsidence process and the subsequent formation of atolls.

Not surprisingly given the executive order's ambiguity, a management planning exercise in the mid-1980's revealed uncertainties about the extent of the refuge's marine boundary. As a result, the Service decided, based on the needs of the endangered Hawaiian monk seal, that the refuge boundary extended seaward from each named island and reef to 10 fathoms, except for Necker Island where the boundary extended to 20 fathoms. Depending on the feature, these distances seaward may be more or less than 3 nautical miles out from land; for example, on one side of Necker Island, the 20 fathom isobath is approximately 30 nautical miles from land. The Service's boundary determination is not documented in a legal instrument, and the State of Hawaii disputes it. Moreover, the Service has learned that the needs of the endangered Hawaiian monk seal exceed 10 fathoms, as do the needs of seabirds.

The Service has not yet estimated the additional coral reef acreage that would be gained by expanding the refuge to the boundary delineated in the executive order, but even expanding to three nautical miles (where it does not already extend that far) would increase the total coral reef acreage protected.

The Northwest Hawaiian Islands contain not only more coral reef habitat but also a greater diversity of coral habitat types than that found in all of the main Hawaiian Islands. They contain about 65% of the coral reef habitat in Hawaii between the shore and the 100 fathom isobath, including extensive fringing reefs, atoll reefs and lagoons, coral shoals, banks, and seamounts. These features provide shelter, food, and reproductive habitat for Hawaiian monk seals, green sea turtles, and numerous other reef organisms. Although species diversity in the Northwest Hawaiian Islands is relatively low, coral, fish, and invertebrate endemism is relatively high.

Approximately 51 species of corals are found in the Hawaiian Islands. Of interest is the occurrence of three species of Acroporid corals in the center of the island chain and their apparent absence from the northern and southern extremes of the chain. Approximately 205 species of algae, one species of seagrass (which is endemic to the Hawaiian Islands and a favored food of green sea turtles), and 240 species of reef fishes have been recorded in the Northwest Hawaiian Islands. An occurrence peculiar to these islands is the increased presence of tiger sharks inside the lagoon from June to August, when they gather to feed on fledging albatross

chicks. More than 90% of Hawaiian green sea turtles and the majority of Hawaiian monk seals breed and feed within the Hawaiian Islands National Wildlife Refuge. Bottlenosed and spinner dolphins and humpback whales are also present in the Refuge.

Existing human uses within the Hawaiian Islands National Wildlife Refuge are limited, since the refuge is off limits to the public except by special permit. Most activities consist of research and management carried out by Service and National Marine Fisheries Service (NMFS) staff. All fishing is prohibited within refuge boundaries except for a small catch and release program at Tern Island. The State of Hawaii has jurisdiction over fishing from the refuge boundary to 3 nautical miles from land. Fisheries in federal waters, from 3 to 200 nautical miles, are controlled by the Western Pacific Regional Fishery Management Council. This Council has established a Protected Species Zone to protect endangered Hawaiian monk seals that extends for 50 nautical miles around each refuge island and includes a 100 nautical mile corridor connecting the refuge islands. Pelagic longline fishing is prohibited within this zone, but other fisheries are allowed. Under the Endangered Species Act, NMFS has established Hawaiian monk seal critical habitat around each refuge island out to a depth of 20 fathoms.

**Midway Atoll National Wildlife Refuge.** By Executive Order No. 13022, President Clinton established Midway Atoll National Wildlife Refuge for various fish, wildlife, and habitat purposes. Midway is an unincorporated U.S. possession and is not part of the State of Hawaii. The refuge boundaries, which apparently conform to earlier naval reservations created by executive orders covering the islands and their "territorial waters," form a square around the atoll, roughly 20 miles on each side. (The earlier naval reservations interpreted the traditional "territorial sea" as extending 3 nautical miles seaward from the extreme high water mark of each and every emergent feature reserved for their purposes.) These boundaries adequately encompass the approximately 55,081 acres of coral reefs in this area.

Approximately 1,150 miles northwest of Honolulu, Midway Atoll is the northernmost coral atoll in the National Wildlife Refuge System and, second only to Kure Atoll, the northernmost coral atoll in the world. Midway is close to the "Darwin Point," the threshold at which coral growth rates, slowed by cold water temperature, fail to keep pace with atoll erosion and subsidence. As the movement of the Pacific tectonic plate gradually carries Midway to the northwest, the atoll will pass the Darwin Point and will sink into the sea.

Similar to the Hawaiian Islands National Wildlife Refuge, Midway Atoll's species diversity is relatively low, but endemism is relatively high. Midway's marine habitat is fairly pristine despite historical human impacts. A total of 316 invertebrate species have been identified at Midway, as well as at least 137 species of algae and one species of seagrass. In addition, 266 species of fish have been identified at Midway, of which some are either not found in the main Hawaiian Islands or are very rare. Green sea turtles, Hawaiian monk seals, and spinner dolphins are frequently encountered, while bottlenosed dolphins and humpback whales are sometimes seen in or near Midway Atoll.

The Service has established a public use program at Midway Atoll National Wildlife Refuge for wildlife-dependent educational and recreational activities. The Service prohibits commercial fishing within the refuge, but allows sportfishing (primarily catch and release). Under the Endangered Species Act, NMFS has established Hawaiian monk seal critical habitat to the 20 fathom isobath (except around Sand Island and its harbor). Fisheries in federal waters, from 3 to 200 nautical miles, are controlled by the Western Pacific Regional Fishery Management Council. To protect the endangered Hawaiian monk seals, this Council established a Protected Species Zone around the Northwest Hawaiian Islands that extends for 50 nautical miles around Kure, wherein pelagic longline fishing is prohibited but other fisheries are allowed.

**Kure Atoll.** Located 49 nautical miles northwest of Midway Atoll, Kure Atoll is the northernmost coral atoll in the world, and is the only atoll in the Hawaiian archipelago owned and managed by the State of Hawaii. Acquired by the United States as part of the Territory of Hawaii in 1898, Kure Atoll was reserved for seabird protection as part of President Theodore Roosevelt's 1909 Executive Order No. 1019 creating the Hawaiian Islands reservation. In 1936, President Franklin Roosevelt transferred jurisdiction and control of Kure Island and the surrounding reef to the U.S. Navy, and in 1952, President Truman restored this area to the Territory of Hawaii, subject to certain military uses. In 1978, the State of Hawaii designated Kure Atoll a state Seabird Sanctuary.

Like Midway Atoll, Kure Atoll is close to the Darwin Point, which is the threshold at which coral growth rates, slowed by cold water temperature, fail to keep pace with atoll erosion and subsidence, ultimately resulting in the sinking of the atoll. Generally, the marine biology of Kure Atoll is similar in many respects to that of Midway Atoll. Thirteen species of algae and 125 species of fish have been identified at Kure. Green sea turtles, Hawaiian monk seals, spinner dolphins, bottlenosed dolphins, and humpback whales swim the waters. No surveys of noncoral macroinvertebrates have been conducted at Kure.

Existing human uses at Kure Atoll are limited, because the area is off limits to the public except by special state permit. Most activities consist of research and management activities carried out by the State, Service, and NMFS. The State has jurisdiction seaward to 3 nautical miles, and the State allows several types of commercial fishing.. Fisheries in federal waters, from 3 to 200 nautical miles, are controlled by the Western Pacific Regional Fishery Management Council. To protect the endangered Hawaiian monk seals, this Council established a Protected Species Zone around the Northwest Hawaiian Islands that extends for 50 nautical miles around Kure, wherein pelagic longline fishing is prohibited but other fisheries are allowed.

**Johnston Atoll National Wildlife Refuge.** Johnston Atoll, located approximately 717 nautical miles southwest of Honolulu, is an unincorporated U.S. territory and is not part of the State of Hawaii. Johnston Atoll is one of the most isolated atolls in the world. In 1926, President Coolidge issued Executive Order No. 4467 reserving as a native bird refuge "two small islands known as Johnston island and Sand island" and an area around these islands marked on an unscaled map. Without dissolving this reservation, President Franklin D. Roosevelt in 1934

placed both islands under the U.S. Navy, and in 1941 established a Naval defensive sea area in the "territorial seas" around the islands, construed by the Navy to extend 3 nautical miles seaward from each emergent feature. In 1976, the Service and the Defense Nuclear Agency signed a memorandum of agreement granting the Service jurisdiction and responsibility over the atoll's natural resources. By recent agreement with the Base Commander, refuge jurisdiction has been extended to include all waters within the 3 nautical miles of the emergent features. This area encompasses about 95% of the coral reef. A boundary extension could enhance protection of the entire reef.

Johnston Atoll sits on a submerged coral platform more than 50 square miles (32,000 acres) in area and less than 100 feet deep. Only a portion of the fringing reef still exists, located along approximately 9 miles on the northwest side of the atoll, though numerous patch reefs and pinnacles are present throughout the lagoon. Scientists hypothesize that geological processes caused the atoll to tilt on its axis, thus submerging all but the northwest portion of the fringing reef. The military extensively modified this atoll, expanding Johnston Island from its original 46 acres to 625 acres, increasing Sand Island from 10 to 22 acres, and adding two manmade islands, Akau (25 acres) and Hikina (18 acres). Over the years, an estimated 4 million square meters of coral have been destroyed by dredging, and another 28 million square meters have been damaged by the resulting sedimentation.

Nevertheless, Johnston Atoll contains healthy coral-reef habitats, including the atoll reefs, pinnacles, mounds and platforms with high coral cover. Species composition at Johnston is largely the same as that found in Hawaii, although a few western Pacific species are present, as well as a small number that are indigenous. Thirty-three coral species have been recorded, including the dominance of table corals. Though incompletely surveyed, 221 mollusk, 75 crustacean, 12 annelid, and 37 echinoderm species have been recorded at Johnston. Invertebrates from both the western and central Pacific are present, indicating that Johnston links distributions of Polynesian and Micronesian invertebrate faunas. A total of 103 species of benthic algae and 271 species of reef fishes have been identified at Johnston. Two species of butterflyfish are considered endemic. A species of moray eel and three other deep-dwelling fish species may be endemic. Green sea turtles frequently forage for algae off the south shore of Johnston Island, and hawksbill sea turtles are infrequently seen. Hawaiian monk seals regularly visit the atoll but are not known to pup there. The extremely rare Cuvier's beaked whale is regularly seen offshore, and may actually calve in the lagoon. Humpback whales are sometimes seen near the atoll.

Existing human uses within the refuge are primarily limited to resident military personnel and contractors, who are allowed to fish, dive, and boat in designated areas under Service guidelines. The military manages sportfishing and prohibits commercial fishing within its security zone.

Johnston Atoll has been the site of nuclear testing, and it currently serves as a storage and destruction site for chemical weapons being destroyed under international treaty. The military operations and facilities, all located on Johnston Island, are expected to close by 2003, with the possibility of relinquishment of the atoll to the Service at that time. The Service may be able to

secure relinquishment of the three smaller islands sooner. The Pacific Missile Range Facility recently expressed an interest in launching target missiles from one of these three islands. This activity could significantly injury fish and wildlife resources, including coral reefs.

**Palmyra Atoll.** Palmyra Atoll, located approximately 1,057 miles south of Honolulu near the northern end of the Line Island Archipelago, is an unincorporated territory of the United States under the administrative jurisdiction of the Department of the Interior. Whereas the United States owns the territorial waters extending 3 (or 12) miles seaward, the land above the mean high tide line is privately owned by the Fullard-Leo family of Honolulu, except for two parcels on Home Island that are owned by the Cooper family. The Service is interested in establishing a refuge at Palmyra, and has prioritized this property for FY99 acquisition funding. Negotiations with the owners are ongoing.

Palmyra is a coral atoll made up of 52 islets surrounding three central lagoons. The islets are surrounded by extensive reef flats to the north, south, and west. There are no natural passes, although the Navy dredged a channel on the western side. During World War II, Palmyra functioned as a 6000-troop naval air station, with a 6000 foot coral airstrip. U.S. military dredging, filling, and construction have greatly modified the atoll.

Although comprehensive inventories of coral-reef species at Palmyra Atoll have not been done, the waters out to 3 nautical miles are estimated to encompass 97,800 acres of coral reef resources. Of particular interest at Palmyra is the spectacular development of branching corals on the shallow western reefs outside the lagoon and the amazing coral diversity, abundance, and visibility along the southern reefs. Despite major dredging activities in the lagoon areas, the outer reefs remain healthy and vibrant and support approximately 10 genera and 93 species of stony corals, roughly double the coral species diversity of that in the main Hawaiian Islands or at Johnston, Howland, Baker, or Jarvis Islands. The unusual coral community may be the result of its proximity to the equatorial countercurrent and the nutrient regime produced by runoff from the Palmyra's rainforest. Palmyra may serve as a source of coral larvae for reefs in the eastern Pacific.

Important marine mollusks include giant clams and pearl oysters. A total of 123 species of macroinvertebrates have been documented. Algal species recorded at Palmyra currently total 90. Although adequate fish surveys at Palmyra have not been done, reef fish diversity there is expected to be high and similar to nearby areas where approximately 600 species have been recorded. Green sea turtles are known to nest at Palmyra, and hawksbill sea turtles are regularly sighted at Palmyra. The pilot whale, bottlenosed dolphin, and Hawaiian monk seal have been recorded at Palmyra.

Fisheries within the 200 nautical mile zone are managed by the Western Pacific Regional Fishery Management Council.

**Kingman Reef.** Kingman Reef, located approximately 920 miles south of Honolulu at the

northern end of the Line Island Archipelago, is an unincorporated territory of the United States under the administration of the U.S. Department of the Navy. The United States annexed the reef in 1922, and placed jurisdiction in the Navy in 1934. By Executive Order No. 8682, President Franklin D. Roosevelt in 1941 established a Naval defensive sea area in the "territorial waters" around the reef, construed by the Navy to extend 3 nautical miles seaward from each emergent feature. The Fullard-Leo family, which owns most of Palmyra Atoll, also claims ownership of Kingman Reef, but the United States disputes their claim.

Kingman Reef is an almost entirely submerged coral atoll with a lagoon. The nutrient rich waters of the north equatorial countercurrent contribute to the rich ocean resources at Kingman Reef, which is reported to support a largely unexploited marine natural community including coral reef species and open water pelagic fish species. A likely "island effect" concentrates food fishes around the reef and enhances the value of the surrounding waters to foraging pelagic seabirds. Although poorly surveyed, marine species diversity is generally higher than in Hawaii. Kingman may also serve as a source of coral larvae for reefs in the eastern Pacific. Although adequate fish surveys at Kingman Reef have not been done, reef fish diversity there is expected to be high and similar to nearby areas where approximately 600 species have been recorded. Green sea turtles are known to nest at Kingman.

Fisheries within the 200 nautical mile zone is managed by the Western Pacific Regional Fishery Management Council.

**Wake Atoll.** Located approximately 2,300 miles west of Honolulu, Wake Atoll is the northernmost atoll in the Marshall Islands Archipelago and 300 miles from the closest land mass. Wake consists of 3 low-lying small coral islands (Wake, Peale, and Wilkes) in the shape of a horseshoe surrounding a shallow lagoon on 3 sides, with a coral reef encircling the islands.

Wake Atoll is a U.S. possession currently administered by the U.S. Air Force. In 1934, President Franklin D. Roosevelt placed Wake Atoll under the control and jurisdiction of the Navy by Executive Order No. 693[illegible] In 1941, by Executive Order No. 8682, President Roosevelt established a Naval defensive sea area in the "territorial waters" around Wake Atoll.

Wake Atoll's reefs provide a wide variety of coral-reef habitats totaling approximately 7,904 acres, all within 3 nautical miles from land. In general, coral coverage and species diversity are moderate. In the lagoon, water circulation is poor, and silt coverage is moderate to high. Despite this, coral heads and pinnacles are common in the lagoon, and provide excellent habitat for an abundance of giant clams, which are relatively good biological indicators of the lagoon's health.

At Wake Atoll, at least 41 species of corals, 19 species of algae, and 37 species of macroinvertebrates are known to occur. Of the 124 species of reef fishes recorded at Wake, none are considered to be endemic. Mid-sized and full-grown green sea turtles have been seen in the lagoon and on the outer reefs, respectively. Hawaiian monk seals have been sighted at Wake Island, and bottlenosed dolphins, spinner dolphins, and Cuvier's beaked whales may be present

in the surrounding waters. Reef fishes and macroinvertebrates are abundant, and the average sizes of many individuals are very large. Giant clams and huge moray eels are prolific.

No ongoing public use program exists at Wake because of military security. Military and civilian residents participate in a low-level recreational program featuring fishing, diving, and other outdoor activities. The Air Force's management plan sets aside seabird sanctuaries on Wilkes and Peale Islands, and prohibits fishing inside the lagoon. The Western Pacific Regional Fishery Management Council manages fisheries in the 200 nautical mile zone.

Although Wake Airfield has been decommissioned and is currently in the process of surplus screening within the Department of Defense, the U.S. Army currently uses Wake for its missile testing program (as it has since 1983). The Army has indicated its need to continue operations on Wake Island, but may not need Peale and Wilkes Islands. Were the Department of Defense to transfer administrative authority to the Service for these two islands, the reefs, and the Naval defensive sea, the Service would strive to enhance protection for the fish and wildlife resources and habitats.

**Rose Atoll National Wildlife Refuge.** Rose Atoll, located approximately 150 miles east-south-east of Pago Pago Harbor, American Samoa, is the easternmost Samoan Island, the southernmost National Wildlife Refuge, and one of only two refuges south of the equator. One of the smallest atolls in the world, Rose Atoll consists of 2 sandy islets, Rose and Sand, located on a coralline algal reef enclosed by a lagoon. The reef and lagoon together include approximately 1,729 acres of submerged coral reef.

Rose Atoll is part of the Territory of Samoa. The refuge was established in 1973 by cooperative agreement between the Government of American Samoa and the Service. Although the 1974 *Federal Register* notice announcing the refuge's establishment stated that the boundary generally extended only to the extreme low waterline outside the perimeter reef, President Ford the following year appears to have expanded that boundary in Proclamation No. 4347 to 3 nautical miles under the joint administration of the Department of Commerce and the Department of the Interior. The Service has administered that 3 mile boundary since the Ford Proclamation.

One of the most striking features of Rose Atoll is the pink hue of the fringing reef, caused by the dominance of a crustose, coralline algae that is also the primary reef-building species at the atoll. Rose Atoll is the only atoll in Samoa and in the National Wildlife Refuge System dominated by crustose coralline algae rather than stony corals. Rose Atoll National Wildlife Refuge includes many different habitat types, such as seaward and lagoon atoll reefs, and lagoon terraces, slopes, floor, and pinnacles. Widespread bleaching has been observed in shallow reef and ocean reef slope habitats, and recent coral mortality appears moderate to high in some areas. The cause is unclear.

Comprehensive surveys of coral reef biota at Rose Atoll National Wildlife Refuge are lacking. Studies have shown that the coral communities at Rose are distinctive and quite different from

those of other islands in Samoa. Coral cover, abundance, species richness, and diversity are low compared to other reefs in the archipelago, but high compared to the Hawaiian Islands. To date, a total of 60 coral, 22 algal, and 270 reef fish species have been identified at Rose Atoll. Thousands of macroinvertebrate species are expected to occur at Rose. Giant clams are abundant, especially on the lagoon pinnacles. Green sea turtles forage and nest at the atoll, and hawksbill sea turtles have been seen infrequently in the lagoon, but have not been observed to nest on the islands. The southern subspecies of the humpback whale, which feeds in Antarctic waters, is frequently seen in the waters around Rose Atoll. Bottlenosed dolphins are also commonly encountered outside the lagoon.

Rose Atoll receives few visitors. The Service restricts access to the atoll, and entry to the island is prohibited without prior approval. Fishing is not permitted within the 3 nautical mile refuge boundary. The Western Pacific Regional Fishery Council manages the fisheries outside the refuge boundary to 200 nautical miles. Existing uses of Rose Atoll National Wildlife Refuge are limited to research and monitoring activities carried out by the Service, NMFS, and American

those of other islands in Samoa. Coral cover, abundance, species richness, and diversity are low compared to other reefs in the archipelago, but high compared to the Hawaiian Islands. To date, a total of 60 coral, 22 algal, and 270 reef fish species have been identified at Rose Atoll. Thousands of macroinvertebrate species are expected to occur at Rose. Giant clams are abundant, especially on the lagoon pinnacles. Green sea turtles forage and nest at the atoll, and hawksbill sea turtles have been seen infrequently in the lagoon, but have not been observed to nest on the islands. The southern subspecies of the humpback whale, which feeds in Antarctic waters, is frequently seen in the waters around Rose Atoll. Bottlenosed dolphins are also commonly encountered outside the lagoon.

Rose Atoll receives few visitors. The Service restricts access to the atoll, and entry to the island is prohibited without prior approval. Fishing is not permitted within the 3 nautical mile refuge boundary. The Western Pacific Regional Fishery Council manages the fisheries outside the refuge boundary to 200 nautical miles. Existing uses of Rose Atoll National Wildlife Refuge are limited to research and monitoring activities carried out by the Service, NMFS, and American Samoa.

In 1993, a Taiwanese longline fishing vessel ran hard aground on the reef on the southwest arm of the atoll, discharging 100,000 gallons of diesel fuel. Both the fuel spill and the wreckage harmed the reef and its associated resources.

**Howland Island, Baker Island, and Jarvis Island National Wildlife Refuges.** Howland, Baker, and Jarvis islands are located approximately 1,550, 1,600, and 1,300 miles south-southwest of Honolulu, respectively. Howland Island is best known as the site at which Amelia Earhart failed to land as expected on her final flight in 1937. Howland, Baker, and Jarvis islands have been under the jurisdiction of the Department of the Interior since 1935. In 1974, the Service was given the responsibility to administer these islands as individual National Wildlife Refuges with boundaries that extend seaward 3 nautical miles from shore at each island.

Howland, Baker, and Jarvis islands are surrounded by healthy, fringing coral-reef habitat. Howland Island National Wildlife Refuge encompasses 1,235 acres of coral reefs, Baker Island National Wildlife Refuge 2,470 acres, and Jarvis Island National Wildlife Refuge 1,976 acres. The existing 3 nautical mile boundaries are considered adequate to protect the coral reef resources.

Coral-reef resources have not been very well investigated at Howland, Baker, and Jarvis islands. Recently, 33 species of corals were reported from Howland and Baker. At Baker, thickets of arborescent coral provide excellent habitat for numerous species, including sea turtles and algae, and support a reef-fish community that is healthy and of high biomass. Also, eight and nine macroinvertebrate species were reported from Howland and Baker, respectively. Giant clams are common within intertidal habitat. Jarvis is largely unsurveyed, but 90 species of mollusks have been reported there. A total of 12 species of algae were recently collected from Howland and Baker. Totals of 91 and 138 species of reef fishes have been reported for Howland and Baker,

respectively. Quantitative data on coral-reef organisms are unavailable for Jarvis. Both juvenile and adult green sea turtles are abundant at Baker and occasional at Howland. Pods of bottlenosed dolphins are seen at each island, and a killer whale was once spotted near Baker.

Fishing is prohibited within refuge boundaries. The Western Pacific Regional Fishery Management Council manages the fisheries beyond the refuge out 200 nautical miles. Entry into the refuges must be authorized by permit, and the only visitors are scientists, researchers, and occasionally ham radio operators. Service staff visit the islands at least once every 2 years.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| KINGMAN REEF ATOLL INVESTMENTS, L.L.C., a Hawaii limited liability company; KINGMAN REEF ATOLL DEVELOPMENT, L.L.C., a Hawaii limited liability company; KINGMAN REEF ENTERPRISES, L.L.C., a Washington limited liability company; and PALMYRA PACIFIC SEAFOODS, L.L.C., a Washington limited liability company, Plaintiffs, v. THE UNITED STATES DEPARTMENT OF INTERIOR; THE HONORABLE GALE NORTON, in her official capacity as Secretary of the Interior; THE UNITED STATES FISH & WILDLIFE SERVICE; MARSHALL JONES in his official capacity as Director of Fish & Wildlife Service; DANIEL ASHE in his official capacity as Chief of National Wildlife Refuge System, Fish & Wildlife Service, Defendants. | CIVIL NO. 01-00122 SOM LEK<br><br>CERTIFICATION OF ADMINISTRATIVE RECORD |

CERTIFICATION OF ADMINISTRATIVE RECORD

The undersigned, as Regional Branch Chief of Land Protection Planning, U.S. Fish and Wildlife Service, under authority conferred upon me, hereby certifies that the documents annexed hereto constitute a full and accurate transcript of the entire administrative record relating to this case.

[signature]
Benjamin V. Harrison

Date: May 14, 2001

FWS 00001

Defendant's Exhibit 4 to
Def.'s Opp. to Pls.' Mot. to Compel

Administrative Record for the Establishment of
Kingman Reef National Wildlife Refuge

| Exh. No. | Date | Description of Document |
|---|---|---|
| 1 | | [INTENTIONALLY OMITTED] |
| 2 | | [INTENTIONALLY OMITTED] |
| 3 | | [INTENTIONALLY OMITTED] |
| 4 | | [INTENTIONALLY OMITTED] |
| 5 | | [INTENTIONALLY OMITTED] |
| 6 | | [INTENTIONALLY OMITTED] |
| 7 | | [INTENTIONALLY OMITTED] |
| 8 | | [INTENTIONALLY OMITTED] |
| 9 | January 18, 2001 | Secretary's Order No. 3223 establishing the Kingman Reef NWR (1 page) |
| 10 | | [INTENTIONALLY OMITTED] |
| 11 | January 17, 2001 | Memo from Anne Badgley to Director requesting Approval of Kingman Reef NWR Acquisition Boundary, approved by Jamie R. Clark on January 18, 2001 (2 pages) |
| 12 | January 17, 2001 | Finding of No Significant Impact. Proposed Kingman Reef National Wildlife Refuge, Line Islands, Central Pacific Ocean. |
| 13 | January 17, 2001 | Statement of Compliance signed by Ben Harrison (4 pages) |
| 14 | January 17, 2001 | Environmental Compliance Certificate |
| 15 | January 16, 2001 | Outreach Plan for the establishment of Kingman Reef and Palmyra Atoll NWRs (12 pages) |
| 16 | January 11, 2001 | Comment letter from Judith Guthertz, WPRFMC, (10 pages) |



Defendant's Exhibit 4 to
Def.'s Opp. to Pls.' Mot. to Compel

| Exh. No. | Date | Description of Document |
|---|---|---|
| 17 | January 11, 2001 | Comment letter from J.J. McClelland, Jr., U.S. Coast Guard (2 pages) |
| 18 | January 11, 2001 | Comment letter from Richard A. Dubey, Short Cressman & Burgess PLLC (99 pages) |
| 19 | January 10, 2001 | Comment letter from Charles Karnella, NMFS, (1 page) citing December 10, 1998 letter from C. Karnella to R. Smith and February 12, 1999 letter from W. Hogarth to R. Smith. |
| 20 | January 10, 2001 | Comment letter from Eric Gilman, Living Oceans, National Audubon, (2 pages) |
| 21 | January 10, 2001 | Comment letter from Linda Paul, Hawaii Audubon Society (1 page) |
| 22 | January 10, 2001 | Comment letter from J. David Raney, Sierra Club (1 page) |
| 23 | January 10, 2001 | Comment letter from Joseph Dettling to Phyllis Ha and Kitty Simonds commenting on EA (7 pages) |
| 24 | January 10, 2001 | E-mail comment from Dr. Robert Wilder, Pacific Whale Foundation, (1 page) |
| 25 | January 9, 2001 | Comment letter from Raul Pedrozo, Office of the Under Secretary of Defense (2 pages) |
| 26 | January 7, 2001 | Comment letter from John LaGrange (1 page) |
| 27 | January 5, 2001 | Letter from Robert J. Wilder to Roger Griffis, supporting President Clinton's creation of Northwestern Hawaiian Islands Coral Reef Ecosystem Reserve (3 pages) |
| 28 | January 4, 2001 | Letter from Christian Porter, Brooks Tom Porter & Quitiquit, requesting copies of the EA and CMP and the references cited (2 pages) |
| 29 | 2001 | Excerpt from a Report, Western Pacific Regional Fishery Management Council. 2001. *Draft Fishery Management* |

| Exh. No. | Date | Description of Document |
|---|---|---|
| | | *Plan for Coral Reef Ecosystems of The Western Pacific Region*. December 2000. Volume 1. 346 pp. |
| 30 | December 29, 2000 | Comment letter from Senator Daniel Akaka (1 page) |
| 31 | December 29, 2000 | Comment letter from Kitty Simonds, WPRFMC, (1 page) |
| 32 | December 23, 2000 | Notice in *The Environmental Notice* regarding proposal to establish Kingman Reef NWR (2 pages) |
| 33 | December 23, 2000 | Comment letter from Marcus Fullard-Leo (2 pages) |
| 34 | December 22, 2000 | Comment letter from Christian Porter, Brooks Tom Porter & Quitiquit (3 pages) |
| 35 | December 19, 2000 | Letter from John Houlihan, Short Cressman & Burgess PLLC, To Carolyn Bohan regarding ownership of Kingman and requesting extension of comment period (6 pages) |
| 36 | December 18, 2000 | Letter from Colin Kippen, Jr., Office of Hawaiian Affairs, with no comments (1 page) |
| 37 | December 14, 2000 | E mail from Forrest Cameron to Carolyn Bohan noting a telephone conversation with Mr Zultan concerning ownership of Kingman Reef. |
| 38 | December 13, 2000 | News Article" Honolulu Advertiser,"Reef Near Palmyra sought as refuge" 12/13/00 |
| 39 | Undated | Comment letter from Capt. Steve Gates to Phyllis Ha (1 page) |
| 40 | December 13, 2000 | Comment letter from Jim Cook to Jerry Leinecke (1 page) |
| 41 | December 12, 2000 | Letter from Phyllis Ha to Gary Gill transmitting 4 copies of the EA and requesting announcement of availability in *The Environmental Notice* (4 pages) |

| Exh. No. | Date | Description of Document |
|---|---|---|
| 42 | December 12, 2000 | Fish and Wildlife Service News Release - Public Comments Sought on Kingman Reef NWR Proposal (2 page) |
| 43 | December 11, 2000 | Letter from Jerry Leinecke to Honorable Patsy Mink transmitting copy of EA (2 pages) |
| 44 | December 11, 2000 | Letter from Jerry Leinecke to Honorable Neil Abercrombie transmitting copy of EA (2 pages) |
| 45 | December 11, 2000 | Letter from Jerry Leinecke to Honorable Daniel K. Inouye transmitting copy of EA (2 pages) |
| 46 | December 11, 2000 | Letter from Jerry Leinecke to Honorable Daniel K. Akaka transmitting copy of EA (2 pages) |
| 47 | December 11, 2000 | Letter from Jerry Leinecke to Charles Karnella (NMFS) Transmitting EA for review and Section 7 Biological Evaluation Form, requesting concurrence that Establishment of refuge would not adversely affect Endangered and threatened species (6 pages) |
| 48 | December 11, 2000 | Memo from Jerry Leinecke to Field Supervisor, Division of Ecological Services, Honolulu, transmitting EA for review and Section 7 Biological Evaluation Form, requesting concurrence that establishment of refuge would not adversely affect endangered and threatened species and January 8, 2001, concurrence by Paul Henson (7 pages) |
| 49 | December 11, 2000 | Environmental Assessment. Proposed Kingman Reef National Wildlife Refuge, Line Islands, Central Pacific Ocean & mailing list |
| 50 | August 25, 2000 | Letter from Duncan Holaday, Deputy Assistant Secretary, Installations and Facilities, U.S. Navy, to Assistant Secretary of the Interior John Berry, requesting acknowledgment of DOI's acceptance of transfer of custody and accountability for Kingman Reef (2 pages) |
| 51 | August 23, 2000 | Memo from Phyllis Ha to Refuge Manager, Pacific Remote |

| Exh. No. | Date | Description of Document |
|---|---|---|
| | | National Wildlife Refuge Complex, requesting review Of Draft Intra-Service Section 7 Biological Evaluation (1 page) |
| 52 | August 11, 2000 | E-mail from Rod Low to Beth Flint and Phyllis Ha regarding Kingman Reef GPS Results (1 page) |
| 53 | July 28, 2000 | Memo from Acting Chief, Division of Refuge Planning, to Chief, Division of Realty, transmitting 8 copies of the draft EA for internal review prior to public distribution–Proposed Kingman Reef NWR–Internal Review of Land Acquisition Planning Documents |
| 54 | July 14, 2000 | E-mail from Beth Flint to Phyllis Ha, RE: Bird Population Estimate/Kingman Reef (1 page) |
| 55 | July 12, 2000 | E-mail Kingman Reef–Marine Mammal inquiry (1 page) |
| 56 | June 27, 2000 | Memo from Commander, Pacific Division, Naval Facilities Engineering Command (NAVFACENGCOM), to Commander, NAVFACENGCOM, regarding Transfer of Kingman Reef to Dept. of Interior and transmitting draft Executive Order (2 pages) |
| 57 | June 26, 2000 | Memo from Supervisory Special agent with comments on Internal Review of Draft Environmental Assessment and Land Protection Plan and Draft Conceptual Management Plan for Proposed Kingman Reef National Wildlife Refuge. |
| 58 | June 8, 2000 | E-mail from Phyllis Ha to Robert Smith RE: Turtles at Kingman Reef (1 page) |
| 59 | May 31, 2000 | Web Page regarding Kingman Reef Information, "CIA-The World Factbook 1999-Kingman Reef" (3 pages) |
| 60 | April 17, 2000 | Memo from Beth Flint to Don Palawski regarding Site Visit to Kingman Reef (1 page) |
| 61 | April 17, 2000 | Memo from Richard Wass to Don Palawski regarding Kingman Reef Survey (1 page) |

| Exh. No. | Date | Description of Document |
|---|---|---|
| 62 | April 17, 2000 | Memo from Robert Smith to Realty Chief, Region 1, transmitting Level 1 Pre-Acquisition Contaminants Survey of Kingman Reef (7 pages) |
| 63 | April 8, 2000 | Elizabeth Flint & Dominique Aycock–Equatorial Refuges Report, entitled "Equatorial Refuges Trip Report, 10 March to 7 April, 2000" (11 pages) |
| 64 | April 1, 2000 | Notes by Elizabeth Flint and Dominique Aycock on Kingman Reef visit (1 page) |
| 65 | March 31, 2000 | E-mail from Jim Maragos to Joan Besta regarding visit to Mushroom Coral Heaven at Kingman Reef (2 pages) |
| 66 | March 30, 2000 | Briefing Statement regarding Kingman Reef Ownership Status and Federal Jurisdictions (3 pages) |
| 67 | March 22, 2000 | OIA website Fact Sheets (56 pages) |
| 68 | 2000 | Report, Maragos, J.E. 2000. "Status of Coral Reefs at Kingman Reef, U.S. Line Islands." Summary reporting on the expedition to Kingman Reef on file at U.S. Fish and Wildlife Service. |
| 69 | 2000 | Report, Newbold, R. 2000. Unpublished data listing invertebrates seen during dive surveys at the U.S. Line and Phoenix Islands, March-April, 2000. 3pp. |
| 70 | 2000 | Excerpt from a Report, URS Corporation. 2000. Pelagic Fisheries of the Western Pacific Region. Draft Environmental Impact Statement Fishery Management Plan. Prepared for National Oceanic and Atmospheric Administration, National Marine Fisheries Service. Volume I. December 4, 2000. |
| 71 | 2000 | Report, Wass, R. and E. DeMartini. 2000. Unpublished data listing fishes seen during dive surveys at Kingman Reef, March-April, 2000. 10 pp. |

| Exh. No. | Date | Description of Document |
|---|---|---|
| 72 | 1999 | Report, U.S. Fish and Wildlife Service. 1999. *Report of Lands Under Control of the U.S. Fish and Wildlife Service: as of September 30, 1999.* 45 pp. |
| 73 | October 13, 1998 | Description of the status of Kingman Reef, OIA website fact sheet (2 pages) |
| 74 | August 18, 1998 | Briefing Statement or proposed Kingman Reef National Wildlife Refuge--Draft for Secretary Babbitt entitled "Proposed Kingman-Reef NWR" (1 page) |
| 75 | 1998 | Excerpt from a Report, Western Pacific Regional Fishery Management Council. 1998. *Pelagic Fisheries of the Western Pacific Region 1998 Annual Report.* Draft prepared by the Pelagics Plan Team and Council Staff. |
| 76 | December 23, 1997 | Recovery Plan for U.S. Pacific Populations of the Green Turtle (83 pages) |
| 77 | December 23, 1997 | Recovery Plan for U.S. Pacific Populations of the Hawksbill Turtle (82 pages) |
| 78 | November 1997 | GAO Report - U.S. Insular Areas (71 pages) |
| 79 | October 2, 1997 | Memo from Jamie Clark approving the proposal to proceed with detailed planning on the establishment of Palmyra Atoll NWR & Kingman Reef NWR, (1 page) |
| 80 | August 1997 | Preliminary Project Proposal for establishment of Palmyra and Kingman Reef NWRs (13 pages) |
| 81 | July 22, 1997 | Letter from Peter Savio, Palmyra Development Co., Inc. to Assistant General Counsel Dayna Shah (14 pages) |
| 82 | 1997 | Excerpt from a Book, Krupnick, J.E. 1997. *Pan American's Pacific Pioneers: a pictoral history of Pan Am's Pacific first flights 1935-1946.* Pictoral Histories Publishing Co., Missoula, MT. 319 pp. |
| 83 | 1997 | 48 USCA § 644a. United States Annotated Code. Title 48. Territories and Insular Possessions. Chapter 3- Hawaii |

| Exh. No. | Date | Description of Document |
|---|---|---|
| | | District Court. Jurisdiction of district court of cases on or within Midway, Wake , Johnston , Sand, etc. Islands: laws applicable to jury trials (4 pages) |
| 84 | July 1, 1996 | DX Bulletin No. 260 AP news story (1 page) |
| 85 | November 14, 1995 | Letter from Allen Stayman, Office of Insular Affairs to Peter Savio Palmyra Development Company., Inc. (2 pages) |
| 86 | November 9, 1995 | Fax from Peter Savio, Palmyra Development Co., Inc. to Martin Hochman, NOAA (1 page) |
| 87 | 1995 | Excerpt from a Book, Holthus, P.F. and J.E. Maragos. 1995. Marine Ecosystem Classification for the Tropical Island Pacific. Pp: 239-278. Chapter 13, In: *Marine and Coastal Biodiversity in the Tropical Island Pacific Region, Vol. 1: Species Systematics and Information Management Priorities,* Maragos, J.E., M.N.A. Peterson, L.G. Eldredge, J.E. Bardach, and H.F. Takeuchi (eds). East-West Center, Honolulu, 424 pp. |
| 88 | December 15, 1992 | Kingman Reef Access–documenting phone call with Lt. Commander Rick Russell regarding contact person for permission to go to Kingman Reef and Navy's jurisdiction over reef (1 page) |
| 89 | 1991 | Excerpt from a Book, International Union for the Conservation of Nature. 1991. *IUCN Directory of Protected Areas in Oceania*. Prepared by the World Conservation Monitoring Center. IUCN, Gland, Switzerland and Cambridge, UK. xxiii + 447 pp. |
| 90 | 1991 | Excerpt from a Book, Stanley, D. 1991. *Micronesia Handbook*. Moon Publications. Chico, CA. 238 pp. |
| 91 | 1989 | Excerpt from a Book, Munro, J.L. 1989. "Fisheries for giant clams (Tridacnidae: Bivalvia) and prospects for stock enhancement." *pp: 541-558 In:* Caddy, J.F. (Ed.) *Marine Invertebrate Fisheries*. John Wiley & Sons, New York. |

| Exh. No. | Date | Description of Document |
|---|---|---|
| 92 | December 27, 1988 | Proclamation 5928 regrading Territorial Sea of the United States of America (1 page) |
| 93 | 1987 | Excerpt from a Book, Davies, R.E.G. 1987. *Pan Am: an airline and its aircraft*. Orion Books, Crown Publishers, Inc. New York, NY. 90 pp. |
| 94 | March 10, 1983 | Proclamation 5030 regarding Exclusive Economic Zone Of the United States of America (2 pages) |
| 95 | October 19, 1982 | Title 48, Chapter 8, Guano Islands (2 pages) |
| 96 | 1980 | Journal Article, Perry, R. 1980. "Wildlife conservation in the Line Islands, Republic of Kiribati (formerly Gilbert Islands)." *Environmental Conservation*. 7: 311-318. |
| 97 | 1980 | Journal Article, Hirschberger, W. 1980. "Tridacnid clam stocks on Helen Reef, Palau, Western Caroline Islands." *Mar. Fish. Rev*. 42:8-15. |
| 98 | 1978 | Excerpt from a Book, Drake, C.L., J. Imbrie, J.A. Knauss, and K.K. Turekian. 1978. *Oceanography*. Holt, Rinehard and Winston. NY. 447 pp. |
| 99 | March 16, 1962 | Federal Register Notice - Secretarial Order No. 2862 regarding Palmyra Island Land recordation (1 page) |
| 100 | March 18, 1959 | 48 USCA Chapter 3, Hawaii Admission as State (2 pages) |
| 101 | | Excerpt from a Report, Sadler, J.C. 1959. "A Study of Some Recent Climatological Data of the Line Islands." *Proceedings of the Ninth Pacific Science Congress*, pp: 12-16. |
| 102 | January 13, 1954 | Letter from Assistant Attorney General Rankin to Honorable Guy Cordon (2 pages) |
| 103 | January 16, 1954 | Committee Print No., 5 S. 49 (2 pages) |
| 104 | March 16, 1953 | Memorandum Re: the Islands now included in the Territory of Hawaii (3 pages) |

| Exh. No. | Date | Description of Document |
| --- | --- | --- |
| 105 | March 17, 1953 | Executive Session, Statehood for Hawaii (56 pages) |
| 106 | April 29, 1953 | Letter from Assistant Secretary of the Interior Lewis to Senator Bulter (3 pages) |
| 107 | February 14, 1941 | Executive Order No. 8682 - Establishing naval defensive sea areas around and naval airspace reservations over the islands of Palmyra, Johnston, Midway, Wake, and Kingman Reef. (1 page) |
| 108 | December 29, 1934 | Executive Order No. 6935. Placing Certain Islands in the Pacific Ocean under the Control and Jurisdiction of the Secretary of the Navy (3 Pages) |
| 109 | February 28, 1899 | U.S. Senate Document No. 151 (4 pages) |
| 110 | Undated | Supplementary Memorandum of Hawaii Statehood Commission (3 pages) |
| 111 | Undated | Memorandum for Senator Earle C. Clements (9 pages) |
| 112 | Undated | pages 34 and 35 from "Boundaries of the United States and the Several States" |
| 113 | Undated | Page 27 from chapter on Applicable Principals of International Law |
| 114 | Undated | Excerpts from <u>Shore & Sea Boundaries</u>, by Shallowitz Portion of Chapter 2, "UN Conferences on the Law of the Sea" (6 pages) |
| 115 | Undated | Website summary from January 2001 Draft EIS entitled "New Federal Regulations Proposed for Fisheries in Coral Reef Ecosystems of the Western Pacific Region"(8 pages) |
| 116 | Undated | Land and Water Conservation Fund (LWCF) FY 1999 for Proposed Kingman Reef NWR (4 pages) |
| 117 | Undated | Land and Water Conservation Fund (LWCF) FY 2001 for Proposed Kingman Reef NWR (5 pages) |

*************************************************************************

| Exh. No. | Date | Description of Document |
|---|---|---|
| 118 | | [INTENTIONALLY OMITTED] |