IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **KINGMAN REEF ATOLL INVESTMENTS, L.L.C., et al.,** | ) | **No. 06-828L** |
| **Plaintiffs,** | ) | **Judge Marian Blank Horn** |
| **v.** | ) | |
| **THE UNITED STATES OF AMERICA, Defendant.** | ) | |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO COMPEL FURTHER RESPONSES AND PRODUCTION OF DOCUMENTS PURSUANT TO PLAINTIFFS' REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

CHRISTIAN P. PORTER, HI Bar No. 3744
Brooks Tom Porter & Quitquit, LLP
2125 Davies Pacific Center
841 Bishop Street
Honolulu, HI 96813
Tel: 808-526-3011
Fax: 808-523-1171
Email: cporter@btpqlaw.com

OF COUNSEL:

Therese Y. Cannata, CA Bar No. 88032
Michael M. Ching, CA Bar No. 209426
Carolyn A. Johnston, CA Bar No. 121571
Cannata, Ching & O'Toole LLP
100 Pine Street, Suite 1775
San Francisco, CA 94111
Tel: 415-409-8900
Fax: 415-409-8904
Email: tcannata@ccolaw.com

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. ABSENT A VALID CLAIM OF PRIVILEGE, THE GOVERNMENT SHOULD BE REQUIRED TO PRODUCE THE 122 DOCUMENTS PERTAINING TO KINGMAN REEF . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A. The Discovery Rules Encourage Broad Disclosure, Not Withholding On Relevance Grounds Documents that The Attorneys Have Already Collected . . . . . . . . . . . . . . . . . . . . . . . . 3

B. Producing The Documents Imposes No Burden on the Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

C. The Government's Attorneys Should Not Be Given Free Reign To Decide Which of the 122 Documents "Refer or Relate" to Issues Such as *Terra Nullius* and *Ultra Vires* . . . . . . . . . . . . . . . . . . . . . 7

II. THE DELIBERATIVE PROCESS PRIVILEGE IS NOT ABSOLUTE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## TABLE OF AUTHORITIES

Dairyland Power Coop v. United States, 77 Fed. Cl. 330 (2007) . . . . . . . . . . . . . . . . . . 14

*Dairyland Power Coop. v. United States*, 79 Fed. Cl. 709 (2007) . . . . . . . . . . . . . . . . . . 11

*In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Schreiber v. Society for Savings Bancorp, Inc.*, 11 F.3d 217 (D.C. Cir. 1993) . . . . 11, 12

*Sierra Club v. Kempthorne*, 488 F.Supp.2d 1188 (S.D. Ala. 2007) . . . . . . . . . . . . . . . . 11

*Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689 (1933) . . . . . . . 5

## FEDERAL STATUTES

RCFC 26(b)(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

RCFC 26(b)(2)(C)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## SECONDARY SOURCES

Irving R. Kaufman, *Judicial Control over Discovery*, 28 F.R.D. 111 (1962) . . . . . . . . . . 4

8 C. WRIGHT, A. MILLER & R. MARCUS, FEDERAL PRACTICE AND PROCEDURE §§ 2008, 2008.1, 2949 (2D ED. Supp. 1994) . . . . . . . . . . . . 4, 5, 6, 10

Wayne D. Brazil, *The Adversary Character of Civil Discovery: A Critique and Proposals for Change*, 31 VANDERBILT L. REV. 1295 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 9

## INTRODUCTION

In its opposition papers, the government concedes that it claims a privilege – the qualified deliberative process privilege – as to only two of the 124 documents sought by this motion. As to the other 122 documents, the government's only objection to producing them is relevance. The government agrees that these 122 documents have already been gathered and are now in the possession of the government's lawyers, and that they all pertain to Kingman Reef. The government contends that it has the unfettered right to cull through documents pertaining to Kingman Reef, and withhold 122 of them based solely on a unilateral determination that those documents do not refer on their face to the specific issues as to which this Court ordered limited discovery.

The government cites no authority for the proposition that this hair-splitting approach to document production is consistent with either the language or the purpose of the discovery rules. In fact, the discovery rules were designed to require litigants to produce all potentially relevant documents, not to look for excuses to withhold them. Where, as here, the documents are already in the lawyer's possession, and no burden or cost would be associated with their production, there is no legitimate basis for withholding them if they are not privileged.

As to the two documents the government has withheld based on the deliberative process privilege, the government concedes that they are relevant. The government also concedes that the privilege is qualified, and can be overcome where, as here, the government's interest in preserving their secrecy is outweighed by the documents' importance to the litigation.

## ARGUMENT

### I. ABSENT A VALID CLAIM OF PRIVILEGE, THE GOVERNMENT SHOULD BE REQUIRED TO PRODUCE THE 122 DOCUMENTS PERTAINING TO KINGMAN REEF

Lacking any practical justification for withholding the 122 documents, the government resorts to characterizing this motion as an effort to obtain unlimited access to any and all documents that pertain in any manner to Kingman Reef. *See, e.g.*, Defendant's Opposition to Plaintiffs' Motion to Compel With Respect to Requests For Production Numbers 21-24 ("Opp. Mem.") at 6, 7. This is simply untrue. Plaintiffs do not seek an order compelling the government to engage in an expensive or time-consuming search for documents that may or may not be relevant to the issues currently before the Court. Plaintiffs are not looking for the proverbial needle in a haystack nor asking the government to undertake that task.

To the contrary, mindful that this Court has limited discovery to specific issues, plaintiffs have confined the inquiry to 122 specific documents that: (1) the government has already collected and reviewed; (2) appear from their cursory descriptions to be potentially relevant or reasonably calculated to lead to the discovery of admissible evidence as to the issues as to which this Court has ordered discovery; (3) the government has not asserted are privileged in this case; and (4) based on the way they were described in the Hawaii case, may not in fact be privileged.

The government does not claim a privilege, and states that it has not done a privilege review of these 122 documents because it concluded that they are irrelevant, even though all of the documents "pertain to Kingman Reef generally." Opp. Mem. at 13.[1] The government claims

---

[1] The government points out that the only privilege issue before the Court in this motion is the privilege claim as to the two documents discussed in Section II, *infra*. Opp. Mem. at 3 n. 4. The government has not decided whether it would assert a privilege claim as to any of the

that it has screened these Kingman-related documents to see if they "refer or relate to title to or ownership of Kingman Reef or any other issue identified as within the scope of discovery allowed by the Court." (Opp. Mem. at 4-5). However, it is difficult to imagine how 122 documents that were relevant enough to the government's claims and defenses to a QTA claim to be identified as part of its initial disclosures in the Hawaii case could be of no potential relevance to ownership, *terra nullius* or *ultra vires* issues in this case.

The government's argument is based on the unsupported assertion that the initial disclosures in the Hawaii case were over-inclusive, and included documents that had nothing to do with the case. Opp. Mem. at 9. In fact, there is no evidence of this. The government's only support for this argument is a letter by one of the government lawyers in the Hawaii case, Donna Fitzgerald, mentioning that the disclosures were limited to documents pertaining to Kingman Reef only, and that the government had not searched for or produced documents related to Palmyra. That letter neither states nor suggests that the government's disclosures included all documents that pertained in any way to Kingman even if they had no relevance to the government's claims and defenses to the Quiet Title Act case. Opp. Mem. at 9 & Ex.1.

### A. The Discovery Rules Encourage Broad Disclosure, Not Withholding On Relevance Grounds Documents that The Attorneys Have Already Collected

The government cites no authority, other than the Court's comments during a March 30, 2007 conference call, for the proposition that documents can be culled in this manner, and

---

remaining 122 documents if the Court were to overrule the relevance objections. The government voluntarily agreed in this case to produce several documents that had been withheld on privilege grounds in the Hawaii case, and has continued to assert privilege claims as to several documents that it withheld in the Hawaii case. It therefore seems likely that the government would assert privilege claims as to some of those documents, but not all. Declaration of Therese Cannata ("Cannata Dec.") Ex. 6I at 3, 5, 9.

withheld on relevance grounds. The only authority the government cites – RCFC 26(b) – does not authorize counsel to do so. While RCFC 26(b)(2)(C) authorizes courts to limit the scope of discovery under certain circumstances, there is nothing in that rule or anywhere else in the rules that would support a party's right to withhold these documents where, as here, there is no burden associated with producing them.

This is not surprising, given the purpose of the discovery rules:

> In the words of Judge Kaufman, "[t]he clear policy of the rules is toward full disclosure.". . . The draftsmen of and commentators on the original federal rules of discovery shared the conviction that the overriding objective civil discovery was designed to accomplish was the location and disclosure of all the unprivileged evidentiary data that might prove useful in resolving a given dispute.

Wayne D. Brazil, *The Adversary Character of Civil Discovery: A Critique and Proposals for Change*, 31 VANDERBILT L. REV. 1295, 1298-99 (1978), *quoting* Irving R. Kaufman, *Judicial Control Over Discovery*, 28 F.R.D. 111, 125 (1962). "The present standard – 'relevant to the claim or defense of any party' –is still a very broad one." 8 C. WRIGHT, A. MILLER & R. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2008 (2d ed. Supp. 2008).

RCFC 26(b)(2)(C)(iii) authorizes this Court to limit discovery if "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." However, the only legitimate reasons for such a limitation on discovery, such as the prevention of duplication, burden or expense, are specified in RCFC 26(b)(2)(C). None of those factors militates against requiring the government to produce these 122 documents, since the discovery sought by this motion would not impose any burden on the government.

> These limitations must be applied discriminatingly rather than as a matter of rote, however. Justice Cardozo's words for the Supreme Court years ago remain true today: "Help for the resolution of problems of this order is not to be looked for in restrictive formulas. Procedure must have the capacity of flexible adjustments to changing groups of facts. The law of discovery has been invested at times with unnecessary mystery. There are few fields where considerations of practical convenience should play a larger role." Thus, if . . . a limitation to specific matters would frustrate the inquiry or a limitation would lead to wasted effort . . . a court is well justified in refusing a limitation.

8 C. WRIGHT, A. MILLER & R. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2949 (2d ed. 1994) (quoting *Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 693 (1933)).

The inquiry is frustrated, effort is wasted, and "considerations of practical convenience" are ill-served when a party seeking discovery of documents is required to do the impossible in order to obtain access to readily available documents that are not privileged. Obviously a party that has not seen or been given any substantive information about a document will be unable to prove that the document is relevant to a specific issue. The government chastises plaintiffs for pointing to documents that the government has actually produced to argue that documents the government continues to withhold, and which were similarly described in the privilege logs, might be relevant. Opp Mem. at 11-12. However, the government does not suggest how plaintiffs can be expected to demonstrate the relevance of documents that only the government has seen, and that were described in such a cursory fashion that plaintiffs can only guess at their content. For example, the only information in the government's privilege logs in the Hawaii case about the subject matter of many of the documents sought by this motion is "Subject: Kingman Reef." *See, e.g.*, Cannata Dec. Ex. 6B at 40 (tabs 308-311).

**B. Producing The Documents Imposes No Burden on the Government**

The "considerations of practical convenience" identified by Justice Cardozo favor granting this motion. The government does not and cannot contend that producing the documents would entail any cost or burden to the government. Plaintiffs have specified 122 documents that pertain to Kingman Reef, and that have been collected, reviewed and indexed by the government's attorneys. Common sense dictates that they should be produced if they are not privileged. *See* 8 C. WRIGHT, A. MILLER & R. MARCUS, *supra* § 2008.1 ("Courts invoking the 1983 amendment appear to take a common-sense approach to both the importance of the case and the propriety of undertaking the expense of requested discovery . . . ").

The government cites only one purely theoretical burden it might incur if compelled to produce some of the 122 documents. The government presents the hypothetical possibility that it may decide to assert the "state secrets" privilege as to five documents that are stamped "confidential." Opp Mem. at 12 n. 9. The government does not state whether or not it would assert such a privilege, and that possibility should not give this Court pause. The government did not assert the state secrets privilege as to those five documents in the Hawaii case (Cannata Dec. Ex. 6C at 3, 5), and the government does not presently indicate an intention to do so, only stating that it may choose to do so. Opp. Mem. at 12 n. 9.

Moreover, even if the state secrets privilege had been asserted in the Hawaii case, the Court should not be reluctant to grant the motion based on a presumption that the privilege claims in the Hawaii case were appropriate. In fact, there is some evidence that the government, in the Hawaii production, was aggressive and indiscriminate in its privilege claims, at least with respect to its deliberative process privilege claims. For example, the government initially

withheld a 2002 email – USID1992 (Cannata Dec. Ex. 6Q) – based on the deliberative process privilege. Cannata Dec. Ex. 6D at 6. In this case, plaintiffs specifically requested that document by date and bates number. Cannata Dec. Ex. 6F at 24. The government withdrew the objection, and produced the document. Cannata Dec. Ex. 6I at 9. An examination of that document makes one wonder how or why counsel handling the Hawaii production could possibly have viewed that document as privileged. It is reasonable to assume that other documents, equally non-privileged, were improperly withheld in the Hawaii case based on privilege claims, and are now withheld based on solely on relevance objections. If its relevance objections to the 122 documents are overruled, it is quite possible that the government will assert privilege claims as to only a small minority of them.

Moreover, the government offers no support for its assertion that the "classified" documents are not relevant to any of the issues before the court. Their descriptions reveal no information whatsoever about their content (Cannata Dec. Ex. 6C at 3, 5), but it appears from the government's discovery responses that they "generally relate to access to Naval Defensive Sea Areas, including instructions or regulations governing the issuance of entry authorizations to such areas." Cannata Dec. Ex. 6I at 7. Documents pertaining to such regulations, which were pursuant to the 1934 and 1941 Executive Orders, are potentially relevant to issues of title, ownership, *ultra vires* and *terra nullius*. The government has offered no practical reason why it should not be compelled either to produce the documents, or to establish that they are privileged.

### C. The Government's Attorneys Should Not Be Given Free Reign To Decide Which of the 122 Documents "Refer or Relate" to Issues Such as *Terra Nullius* and *Ultra Vires*

While the government asserts that it has done an adequate job of separating the wheat

from the chaff on a document-by-document basis, the government should have started with the presumption that all documents pertaining to Kingman Reef that had already been collected were relevant or reasonably calculated to lead to the discovery of admissible evidence on those issues, and therefore produced them if they were not privileged. Instead, the government used a fine filter, and withheld all documents unless, in the government's view, those documents "refer or relate to" specific issues.

Deciding not to err on the side of disclosure, as the discovery rules were designed to encourage, the government has invented a document-by-document test for deciding what is and is not relevant to ownership, or to the *terra nullius* and *ultra vires* issues. The government has not provided a sworn declaration from its counsel describing what criteria were used, but it is possible to glean from its opposition papers that the government decided to produce documents that specifically contain the word "own" in reference to Kingman Reef. The government states that it produced documents "to the extent . . . [they] make any reference to title or ownership issues." Opp. Mem. at 11. The government states that, for example, it produced an April 10, 2002 email which it contains the words "owns" and "ownership." *Id*; Cannata Dec. Ex. 6Q. It is quite possible that the government concluded that any document that did not contain those magic words was not relevant (i.e. did not "make any reference to title or ownership issues"), and on that basis, documents were withheld from production. If the government went beyond that word search and engaged in a substantive relevance screening, it is a complete mystery how the government could have decided whether an individual document might "refer or relate" to "the *ultra vires* issue as it pertains to the 1934 Executive Order; and . . . the *terra nullius* theory as it pertains to claims of title or ownership of Kingman Reef." Opp. Mem. at 2. Presumably

documents that contain the words "*terra nullius*" or "*ultra vires*" would have been produced, but it is hardly surprising that no such documents were found.

It is inevitable that different people looking at the same document, particularly attorneys representing different interests in this case, might have varying perspectives on whether a given document about Kingman Reef could shed light on the applicability of those legal theories to the facts. It is only natural that attorneys representing litigants will be unable to make such refined determinations as to relevance in an entirely neutral fashion, as Magistrate Judge Brazil observed thirty years ago:

> Such factors as traditional professional loyalties, deeply ingrained lawyering instincts, and competitive economic pressures assured that the process of gathering and organizing evidence would not take place in an essentially nonadversarial context. . . . [A]dversarial pressures and the tactics they encourage systematically operate to limit and distort the flow of evidentiary information to parties and the trier of fact and contribute significantly to the increased cost of litigation.

Wayne D. Brazil, *The Adversary Character of Civil Discovery: A Critique and Proposals for Change*, 31 VANDERBILT L. REV. 1295, 1304-05 (1978). Judge Brazil then went on to describe a phenomenon that results from these professional loyalties and institutional pressures, which has evidenced itself in this case:

> The principal goals of the responding attorney tend to be completely adversarial: to provide as little information as possible, and to make the process of acquiring that information as expensive and difficult as possible for the opposing party and lawyer. . . . [I]nstitutional rules and pressures invite counsel to conclude that doubts must be resolved against disclosure, and that opponents must be forced to expend as much of their resources as possible to obtain data favorable to their cause.

*Id.* at 1323-24.

This inability to be objective and inclination not to be forthcoming is why counsel should

not be permitted to engage in close analysis over what to produce or withhold from production based on relevance objections. The discovery rules were designed to discourage such overly restrictive approaches to relevance determinations. Again, commentators best explain the concern:

> No one would suggest that discovery should be allowed of information that has no conceivable bearing on the case. But it is not too strong to say that a request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the subject matter of the action. If protection is needed, it can better be provided by the discretionary powers of the court under rule 26(c) than by a constricting concept of relevance.

8 C. WRIGHT, A. MILLER & R. MARCUS, *supra* §2008 (footnotes omitted). The rule allowing limitation on discovery "should not be treated as separate and discrete grounds to limit discovery so much as indicia of proper use of discovery mechanisms; they do not call for counsel to undertake complex analysis." 8 *Id.* § 2008.1.

## II. THE DELIBERATIVE PROCESS PRIVILEGE IS NOT ABSOLUTE

The government devotes most of its argument to its contention that the two documents it withheld in this case based on the deliberative process privilege are predecisional and deliberative. The government all but ignores plaintiffs' main argument – that the qualified deliberative process privilege should not shield the two documents withheld in this case because the government's interest in protecting their confidentiality is outweighed by their importance to this case.

Even if the deliberative process privilege was properly invoked as to those documents, the mere fact that they reveal something about the United States Fish and Wildlife Service's ("FWS") 1998 decision-making process does not end the inquiry. The documents should be

produced if the detrimental effect of their disclosure is outweighed by the importance of the documents to the issues in this case. *Schreiber v. Soc'y for Savings Bancorp, Inc.*, 11 F.3d 217, 220-21 (D.C. Cir. 1993); *Dairyland Power Coop. v. United States*, 79 Fed. Cl. 709, 719, 720 (2007). *See also Sierra Club v. Kempthorne*, 488 F. Supp. 2d 1188, 1193 (S.D. Ala. 2007).

The fact that these two documents are highly relevant to the issues in this case can be deduced from the information now available to plaintiffs and the Court. The documents were created in 1998, at the precise time when the government changed its mind about who owned Kingman Reef. Opp. Mem. at 16. Documents created in and before 1997 consistently reflect the government's belief that the Fullard-Leo family owned Kingman, and that on that basis, the government would attempt to negotiate an appropriate purchase price.[2] Some time in 1998, the government apparently changed its mind about this, based on information that the government has not yet fully disclosed to plaintiffs.

A document the government produced in this case, which was originally attached to the two documents now withheld based on the deliberative process privilege, is one of the first documents showing that in 1998 show that the government began at that time to take the position that while "the Fullard-Leo family . . . claims ownership of Kingman Reef, . . . the United States

[2] These documents include but are not limited to: (1) an August 19, 1991 memorandum of a meeting attended by representatives of the government, The Nature Conservancy ("TNC"), and the Fullard-Leo family during which the means by which Kingman would be acquired from the Fullard-Leo family was discussed (Complaint, Index of Exhibits, Doc. 20 (Doc 1)); (2) the August 1997 Preliminary Project Proposal mentioning the Fullard-Leo family's ownership, and stating that "the price for fee title to Kingman Reef is unknown" (Complaint, Index of Exhibits, Doc. 22; (Doc 1)); and (3) the October 3, 1997 fax from FWS's regional director expressing the government's "desire to acquire both Palmyra and Kingman, if that is the seller's desire" (Declaration of Peter Savio in Support of Plaintiffs' Opposition to Defendant's Motion to Dismiss under FRCP 12(b)(1) (Doc 30, Attachment 13)).

disputes their claim." Opp. Mem. at 16 & Ex. 3 at US0506. The change in circumstances or factual discovery leading to the government's decision to "dispute" the Fullard-Leo family's claim has never been revealed in any of the documents produced to date. It is highly likely that the withheld documents, which the government concedes are relevant to the issues of ownership, *terra nullius* and/or *ultra vires*, contain information that would shed light on the basis for the government's change in position at that time.

Plaintiffs' compelling need for this information is clear. Robert Smith, who was FWS's regional director in 1997, claims that the government changed its position about ownership based on information obtained from TNC's attorneys. *See* Deposition of Robert Smith at 66:12-68:9, Exhibit 1 hereto. TNC and the government have worked together to resist plaintiffs' efforts to obtain discovery of those communications and related documents. *See* Cannata Dec. Ex. 6N at 7. The documents the government is now withholding based on the deliberative process privilege may be the only way plaintiffs can ascertain the factual basis, including the strengths and weaknesses, of the government's past and current positions on ownership of Kingman. One of the factors to be considered in favor of compelling production of documents that fall within the deliberative process privilege is the unavailability of the evidence elsewhere. *Schreiber*, 11 F.3d at 220-21. Plaintiffs have nowhere else to go to get this information.

The government has offered only the most conclusory assertion that the production of these documents would damage the government in any way. FWS Director, Mr. Hall's declaration falls far short of explaining specifically how or why the disclosure would cause irreparable harm to the functioning of government.

Plaintiffs respectfully submit that this is a clear case where the qualified privilege is

overcome, and the two documents listed in Exhibit 5 to plaintiffs' motion to compel should be produced. However, if the Court wishes, in the interests of caution, to review the documents *in camera* to satisfy itself that the relevance of the documents outweighs the need for their confidentiality, such a review would be consistent with the authorities cited by the government. *See, e.g., In re Sealed Case*, 121 F.3d 729 (D.C.Cir. 1997). Even if the Court were to conclude that broad publication of the two documents might have some chilling effect on the government's deliberative process, it could prevent such an adverse effect through the issuance of a protective order requiring plaintiffs to maintain the confidentiality of the documents. *See Dairyland Power Coop. v. United States*, 77 Fed. Cl. 330, 339 (2007).

**CONCLUSION**

For the foregoing reasons, the government should be required to produce the documents listed in Exhibits 1 through 4 of plaintiffs' moving papers, which it withheld on the basis of relevance. If the government now decides to assert a privilege as to any of these documents, it should do so in the manner required by applicable law. The government should also be compelled to produce the two documents listed in Exhibit 5 to plaintiffs moving paper, which it withheld in this case on the basis of the deliberative process privilege.

Dated: July 7, 2008

CANNATA CHING & O'TOOLE LLP

s/ Therese Y. Cannata
THERESE Y. CANNATA
Of Counsel for Plaintiffs KINGMAN REEF
ATOLL INVESTMENTS L.L.C. and KINGMAN
REEF ATOLL DEVELOPMENT LLC.

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

KINGMAN REEF ATOLL INVESTMENTS, L.L.C., a Hawaii limited liability company,

Plaintiff,

vs.

THE UNITED STATES OF AMERICA; THE UNITED STATES DEPARTMENT OF INTERIOR; THE HONORABLE GALE A. NORTON, in her official capacity as Secretary of the Interior; THE UNITED STATES FISH & WILDLIFE SERVICE; STEVEN A. WILLIAMS, in his official capacity as Director of United States Fish & Wildlife Service; JOHN DOES 1-10, JANE DOES 1-10, and DOE PARTNERSHIPS, CORPORATIONS, GOVERNMENTAL UNITS or OTHER ENTITIES 1-10,

Defendants.

CIVIL NO. CV05-00151 JMS/BMK

DEPOSITION OF ROBERT P. SMITH

Taken on behalf of Plaintiff Kingman Reef Atoll Investments, L.L.C., at the Nani Loa Volcano Resort, Sandalwood Lanai, 93 Banyan Drive, Hilo, Hawaii, 96720, commencing at 9:55 a.m. on Monday, April 2, 2007.

Page 2

REPORTED BY: JOAN IZUMIGAWA, CSR No. 136
Notary Public, State of Hawaii

APPEARANCES:

For Plaintiff Kingman Reef Atoll Investments, L.L.C.:

CHRISTIAN P. PORTER, ESQ.
DONNA H. YAMAMOTO, ESQ.
Brooks Tom Porter & Quitiquit, LLP
2125 Davies Pacific Center
841 Bishop Street
Honolulu, Hawaii 96813
Ph: (808) 526-3011

For Defendants:

THOMAS A. HELPER, ESQ.
Assistant United States Attorney
300 Ala Moana Boulevard, Room 6-100
Honolulu, Hawaii 96850
Ph: (808) 541-2850

Witness address: 19-4330 Wright Road
Volcano, HI 96785

Page 3

I N D E X

EXAMINATION BY:

| | |
|---|---|
| Mr. Porter | 4 |

EXHIBITS FOR IDENTIFICATION:

| | |
|---|---|
| Exhibit 25 | 91 |
| Exhibit 26 | 94 |
| Exhibit 27 | 98 |
| Exhibit 28 | 152 |

Previously marked exhibits:

| | |
|---|---|
| Exhibit 3 | 40 |
| Exhibit 4 | 76 |
| Exhibit 5 | 76 |
| Exhibit 7 | 103 |
| Exhibit 13 | 127 |
| Exhibit 8 | 131 |
| Exhibit 9 | 132 |
| Exhibit 10 | 134 |
| Exhibits 21A, 21B | 138 |
| Exhibit 16 | 145 |
| Exhibit 20 | 147 |

Page 4

ROBERT P. SMITH,
Being first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. PORTER:
Q. Can you state your name for the record.
A. Robert Parker Smith.
Q. Mr. Smith, before we went on the record, you handed me back a package that you said you received from -- I don't know if it was in the mail or if someone had dropped it off to you, but it was a check for $12 made out to you for a mileage fee. There's also a witness fee for $40 and -- the subpoena I think you can hang on to, which is the -- for your deposition today.
A. Okay.
Q. And also the notice. It's just the formal paperwork.
A. Yes, sir.
And just as a clarification, the checks and the subpoena were actually delivered to me twice: once by mail from your office and the second time, the time that we're referring to now, by a process server. And I just choose to return the checks.

Page 5

Thank you.
Q. Okay.
MR. PORTER: Is it okay with you, Mr. Helper, or do you have any objections?
MR. HELPER: I have no objections to that. I just want the record clear that the reason he's returning the checks is because of not any hostility toward the plaintiff, but as a matter of fact, he doesn't want their money because he likes them.
MR. PORTER: Thank you very much.
THE WITNESS: All right.
Q. BY MR. PORTER: Just for the record, what's your residence address?
A. My residence address is 19-4264 Wright Road, W R I G H T. However, our wonderful county of Hawaii has recently changed the street number, and I don't yet have that memorized nor correctly posted. I think it's 19-4330, but that's coming from memory.
Q. That's here?
A. It's Volcano, Hawaii, yes.
Q. Have you ever had your deposition taken before?
A. Not that I recall.
Q. All right. Part of the process is that -- sometimes I pause in the middle of a question and so

focus was on Palmyra. We never ventured to Kingman Reef. I've never been there. I've only seen it from the -- from an airplane.

So my memory says that the 1997 expedition was an assessment expedition and that it focused on Palmyra, and to the extent there was any discussion of Kingman Reef, it was ancillary discussion having to do with, you know, "We own that, too. Do you want that, too?" Et cetera.

The context here is -- from '91 --

THE WITNESS: Maybe all this will blow away.

A. From '91 until certainly '97 -- I've brought you up to date now -- certainly I believed that the Fullard-Leo family owned Kingman Reef and --

Q. BY MR. PORTER: Did anybody up to that point in time in your presence state to the Fullard-Leo family, "No, that's not true"?

A. Not to my memory, no.

Q. Like Chuck Cook? Did he say, "Hey, you're off base, Peter"?

A. Not to my memory, no. And I'll just have the record note you asked me up to 1997, the first expedition.

Q. Yes. Exactly.

A. Now, to finish my answer to your question --



And I think this will finish it -- we had another expedition in '98, and that one was getting more serious because we knew more about the resources. We felt as though Palmyra would make a -- just a jim dandy co-op project.

And at that -- my memory is that during that expedition, there was a kind of a cathartic moment for me as a administrator and as someone who ought to know what's going on, and that was the disclosure by someone from The Nature Conservancy -- And it may have been Chuck, but I honestly can't remember exactly who told me -- that during that intervening year between '97 and '98 that The Nature Conservancy's attorney, Suzanne Case, had done extensive research on the ownership of Kingman; because I was then and probably continued to be -- I can't remember -- a cheerleader for getting both properties and both nearby marine environments. I felt as though they adhered to the conservation -- the principles of conservation biology and they should be protected for fish and wildlife.

The cathartic moment was that Suzanne's legal research had revealed that the Fullard-Leo family, at least in her view, did not own Kingman Reef. Now, I took that as information that came from



a source that I respected.

It was not until after I would return from that expedition that I would ever get that corroborated through my own chain of command, my own bosses, which would have been John Doebel and the Realty Division. And to be honest with you, I don't recall, you know, with such clarity exactly when that word came that indeed Suzanne's research, in the view of the government, was correct.

But that -- I think that -- I hope that answers your question.

Q. Yes. It helps in terms of just the benchmarks and information.

If I can focus on that second expedition, where there was that discussion for that first time and that information was given to you by someone and you're not sure if it was Chuck Cook.

A. Yes.

Q. Sounds like it was someone else. Was that discussed with -- well, strike that.

Let me ask you first --

A. Okay.

Q. -- at the 1998 expedition do you recall if any of the Fullard-Leo family members went with you?

A. Well --



Q. I know you said at the first one, there was Ainsley and Betty. You had a specific recollection --

A. May I answer it this way?

Q. Yeah.

A. I cannot imagine us going to Palmyra without Ainsley being along.

Q. Why do you say that?

A. Because he -- he owned the place. Because certainly I was a government official. And he made no bones -- in a very nice way, he made no bones about him -- his suspicion of the government generally and -- being on his property in particular. Ainsley had a -- a set of rules that were pretty darn good rules, actually, about behavior, how to treat resources on Palmyra. And my recollection is: Every trip I went there up until perhaps the -- the actual purchase had occurred -- and again, that gets fuzzy, but that Ainsley was along. Certainly for those first several trips.

Q. So assuming that Ainsley is there and you're at this -- the '98 expedition and this information is given to you, does anybody then convey that information to Ainsley, saying, "Hey, Nature Conservancy's attorney, Suzanne Case, has done some