**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| KINGMAN REEF ATOLL INVESTMENTS, L.L.C., *Plaintiff-Appellant,* v. UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF THE INTERIOR; GALE A. NORTON, Secretary of the Interior; UNITED STATES FISH AND WILDLIFE SERVICE; STEVEN A. WILLIAMS, in his official capacity as Director of the US Fish & Wildlife Service, *Defendants-Appellees.* | No. 07-16817<br>D.C. No. CV-05-00151-JMS<br>OPINION |

Appeal from the United States District Court
for the District of Hawaii
J. Michael Seabright, District Judge, Presiding

Argued and Submitted
June 20, 2008—Honolulu, Hawaii

Filed September 4, 2008

Before: Alfred T. Goodwin, Pamela Ann Rymer, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta

## COUNSEL

Therese Y. Cannata (argued), Michael M. Ching, and Carolyn A. Johnston of Cannata, Ching & O'Toole LLP, San Francisco, California, Christian P. Porter and Donna H. Yamamoto of Brooks Tom Porter & Quitquit LLP, Honolulu, Hawaii, and Jon M. Van Dyke, Honolulu, Hawaii, for the plaintiff-appellant.

Allen M. Brabender (argued), David C. Shilton, and Donna Fitzgerald, Attorneys, Environmental and Natural Resources Division, United States Department of Justice, and Ronald J. Tenpas, Assistant Attorney General, for the defendants-appellees.

## OPINION

IKUTA, Circuit Judge:

Kingman Reef Atoll Investments, LLC (KRAI), filed this action against various United States departments and officers

in their official capacities (collectively, the "United States"), pursuant to the Quiet Title Act (QTA), 28 U.S.C. § 2409a. KRAI seeks to quiet title to Kingman Reef, a small, low-lying coral reef atoll located approximately 930 miles south of Honolulu, Hawaii. The district court dismissed KRAI's claim for lack of subject matter jurisdiction. We affirm, because KRAI's predecessor knew or should have known of the claim of the United States more than twelve years prior to KRAI's filing of the complaint in this case, and KRAI has failed to demonstrate that the United States has clearly and unequivocally abandoned its claim of interest in Kingman Reef.

## I

"Kingman Reef is a low-lying, coral reef atoll comprised of small emergent land spits and partially exposed coral reefs that surround a deep central lagoon, located approximately 930 miles south of Honolulu, Hawaii." *Kingman Reef Atoll Invs., L.L.C. v. United States*, 545 F. Supp. 2d 1103, 1105 (D. Haw. 2007). Kingman Reef's only dry land consists of coral rubble and marine shells sitting less than two meters above sea level at its highest point, making it unfit for human habitation. *See id.*

The first reported Western contact at Kingman Reef was by an American whaler in 1798; eponymous Captain W.E. Kingman later visited the reef in 1853. *Id.* The U.S. Guano Company claimed the reef in 1860, although there is no evidence that guano existed or was ever mined there.

KRAI's interest in Kingman Reef dates to 1922, when an employee of the Island of Palmyra Copra Company claimed Kingman Reef in the name of the United States for his employer to use as a fishing base. *Id.* The Palmyra Copra Company purported to cede Kingman Reef to the Fullard-Leo family that same year.[1] On October 5, 1932, a member of the

[1]The Fullard-Leo family transferred its interest in Kingman Reef to KRAI on November 17, 2000.

Fullard-Leo family approached United States officials in Oahu to inquire whether he could sell various islands including Kingman Reef to foreign buyers and whether the United States wished to purchase the islands instead. Thereafter, the United States, by the Navy and State Department, began to investigate whether Kingman Reef was a sovereign territory of the United States and, if so, whether it was owned by the United States or by the Fullard-Leo family. By a memorandum of November 7, 1934, a legal advisor of the State Department advised that "it might be well for this Government to take some affirmative action to show definitely that [Kingman Reef] is a part of the territory of the United States. The mere mention of it in an Act of Congress as American territory would be sufficient."

President Roosevelt issued Executive Order 6935 on December 29, 1934. *Kingman Reef*, 545 F. Supp. 2d at 1105. The order states:

> By virtue of and pursuant to the authority vested in me by the act of June 25, 1910 [the Pickett Act], and as President of the United States, it is ordered that . . . Kingman Reef . . . [is] hereby, reserved, set aside, and placed under the control and jurisdiction of the Secretary of the Navy for administrative purposes . . . . This order shall continue in full force and effect unless and until revoked by the President or by act of Congress.

Exec. Order No. 6935. The Pickett Act, referenced in the order, permitted the President, "at any time in his discretion, [to] temporarily withdraw from settlement, location, sale, or entry any of the public lands of the United States . . . and reserve the same for . . . public purposes to be specified in the orders of withdrawals." Pickett Act of June 25, 1910, Ch. 421, 36 Stat. 847.[2]

[2]Although the Pickett Act has been repealed, all withdrawals effected under the act "remain in full force and effect until modified" under the

Following President Roosevelt's issuance of Executive Order No. 6935 in 1934, Leslie and Ellen Fullard-Leo wrote to Samuel Wilder King, who was then serving in the United States House of Representatives as a delegate from the territory of Hawaii. In their April 20, 1937 letter, the Fullard-Leos acknowledged that Kingman Reef's "ownership presumably rests with the State or Navy Department," and requested compensation only for the cost of sending their boat to Kingman Reef "together with taxes and accrued interest over a period of fifteen years." Samuel Wilder King forwarded this request to Claude A. Swanson, Secretary of the Navy, who replied in a letter dated May 29, 1937 that "[t]he records of the Navy Department do not indicate that there were any vested rights on Kingman Reef in favor of private interests on the date of the issuance of th[e] Executive Order [6935]." On March 29, 1938, attorneys representing the Fullard-Leos sent a letter to Secretary Swanson, acknowledging the Navy's position that the family did not own Kingman Reef, and threatening legal action to establish such ownership. *See Kingman Reef*, 545 F. Supp. 2d at 1107. By letter of April 26, 1938, G. J. Rowcliff, the Judge Advocate General of the Navy, rebuffed the family's claim of ownership over Kingman Reef. Rowcliff stated:

> It will be noted that the island, including its reefs and tide and submerged lands, was under the control and jurisdiction of the United States long before the claim of Mrs. Fullard-Leo arose, and by Executive Order No. 6935, dated December 29, 1934, it was placed under the control and jurisdiction of the Navy Department. Under the circumstances, the showing made is not sufficient to uphold the claim of Mrs. Fullard-Leo.

*Id.*

---

Federal Land Policy and Management Act of 1976 or some other law. *See* Pub. L. No. 94-579 §§ 701(c), 704(a), 90 Stat. 2743, 2786, 2792; *Kingman Reef*, 545 F. Supp. 2d at 1106.

On February 14, 1941, President Roosevelt issued another executive order establishing a "Kingman Reef Naval Defensive Sea Area." Exec. Order No. 8682, *amended by* Exec. Order 8729. This Executive Order established that "[a]t no time shall any person, other than persons on public vessels of the United States, enter [the Kingman Reef area]," and delegated enforcement of the order to the Secretary of the Navy. *Id.* The Navy subsequently promulgated regulations restricting access to Kingman Reef. *See* 32 C.F.R. § 761.3(a)(2)(v), (b)(2).

In the fifty years after World War II, both the United States Navy and representatives of the Fullard-Leo family purported to grant third party requests to visit or fish at Kingman Reef. *See Kingman Reef,* 545 F. Supp. 2d at 1107-08. For example, KRAI submitted a declaration from a private citizen stating his impression that "the community of sailors and fishermen in Honolulu . . . . knew that . . . Kingman Reef belonged to the Fullard-Leo family because of the way they took care of [it] and protected [it] at their expense," and that only the Fullard-Leo family could grant permission to travel to and fish at Kingman Reef. The record contains several other declarations of similar import.

At the same time, the Navy also asserted its authority to grant access to Kingman Reef. A July 27, 1973 letter from Senator Hiram Fong, and a Navy memorandum of August 2, 1973, both in response to the request of a private citizen seeking "permission to fish on and about Kingman Reef," indicate that permission to travel to and fish at Kingman Reef could be granted only by the Navy.

The issue of rightful ownership of Kingman Reef came into greater focus in the 1990s, when the United States Fish and Wildlife Service (an agency within the Department of the Interior) began to consider acquiring Kingman Reef and nearby Palmyra Atoll (owned by the Fullard-Leo family) for the purpose of establishing a National Wildlife Refuge. *See*

*id.* at 1108-09. The Fish and Wildlife Service's preliminary investigations into acquiring the reef indicated its initial understanding that the Fullard-Leos owned the reef. For example, an internal Fish and Wildlife Service document from August 1997 states:

> Kingman Reef was annexed on behalf of the United States in 1922, by the Palmyra Copra Company (Fullard-Leo Family), and the family claims ownership. It is an unincorporated U.S. possession administered by the U.S. Department of the Navy. The Service is proposing to study fee title acquisition of Kingman Reef from the center of the atoll to the 3-nautical mile limit.

Consistent with this understanding, Fish and Wildlife Service employees obtained the Fullard-Leos' permission to access the reef, and signed indemnity and waiver agreements requested by the Fullard-Leo family. However, an August 6, 1998 confidential internal memorandum from a high-ranking Department of the Interior staff member to the Secretary indicated uncertainty as to who owned Kingman Reef. The memorandum noted that "[t]he owners of Palmyra also claim ownership of Kingman Reef, but the United States disputes this claim," and raised the possibility that the Department of the Interior could obtain ownership over Kingman Reef through "an agreement [to transfer the island from] the Department of Defense."[3] On August 25, 2000, the Fish and

[3]In addition to these communications from the Department of Interior, KRAI notes several other documents indicating various government employees' understanding that the Fullard-Leos claimed ownership to Kingman Reef. For example, a letter dated August 12, 1997, from a Congressional staffer to the House Resources Committee to an agent of the Fullard-Leos, thanked the agent for "sending the information clarifying the rightful title of the Fullard-Leo's [sic] to Palmyra and Kingman Reef" and stated that "[t]he brief is well documented regarding the basis for clear title to the entire area of Palmyra and Kingman, including surrounding reefs." In addition, the General Counsel of National Oceanic and Atmo-

Wildlife Service obtained control and jurisdiction over Kingman Reef through a no-cost transfer from the Department of the Navy. The Secretary of the Interior established the Kingman Reef National Wildlife Refuge on January 18, 2001. *See Kingman Reef*, 545 F. Supp. 2d at 1109.

On March 4, 2005, KRAI brought this action to quiet title to Kingman Reef under 28 U.S.C. § 2409a. On June 4, 2007, the United States filed a motion for dismissal for lack of subject matter jurisdiction and for failure to state a claim, Fed. R. Civ. P. 12(b)(1), (6), and for summary judgment. Fed. R. Civ. P. 56. Holding that the action was untimely under the twelve-year limitations period established by 28 U.S.C. § 2409a(g), the district court dismissed the complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). This appeal followed.

## II

The question whether subject matter jurisdiction exists is one of law that we review de novo. *United States v. Peninsula Commc'ns, Inc.*, 287 F.3d 832, 836 (9th Cir. 2002). Unless the jurisdictional issue is inextricable from the merits of a case, the court may determine jurisdiction on a motion to dismiss for lack of jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987). Under Rule 12(b)(1):

> the district court is free to hear evidence regarding jurisdiction and to rule on that issue prior to trial, resolving factual disputes where necessary. In such

spheric Administration indicated in a letter dated October 17, 1997 to the Executive Director of the Western Pacific Regional Fishery Management Council (in the context of discussing the jurisdiction of the Department of the Interior over commercial bottom fishing activities) that the Fullard-Leo family owned Kingman Reef.

> circumstances, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

*Id.* (internal quotation marks and alterations omitted). A district court's findings of fact relevant to its determination of subject matter jurisdiction are reviewed for clear error. *Peninsula Commc'ns*, 287 F.3d at 836. When "the accrual of the statute of limitations in part turns on what a reasonable person should have known, we review this mixed question of law and fact for clear error." *Rose v. United States*, 905 F.2d 1257, 1259 (9th Cir. 1990); *see also Shultz v. Dep't of Army*, 886 F.2d 1157, 1159 (9th Cir. 1989). Because estoppel is an equitable concept requiring the exercise of the district court's discretion, we review "the district court's rejection of appellants' equitable estoppel argument under the abuse of discretion standard." *Hoefler v. Babbitt*, 139 F.3d 726, 727 (9th Cir. 1998).

## III

**[1]** The Quiet Title Act of 1972, 28 U.S.C. § 2409a, waives the federal government's sovereign immunity to certain civil actions by plaintiffs seeking to quiet title to property in which the United States claims an interest. Section 2409a(a) provides, in pertinent part:

> The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights.

**[2]** The QTA's waiver of sovereign immunity is subject to numerous exceptions and restrictions, including a statute of limitations. Section 2409a(g) provides:

> Any civil action under this section, except for an action brought by a State, shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.

In this case, KRAI argues that the district court erred in dismissing KRAI's civil action on the ground that the action was time barred, and in holding that such time bar deprived the court of subject matter jurisdiction to hear KRAI's action.

### A

**[3]** KRAI argues first that the QTA's limitations period is not a jurisdictional limitation on a court's authority. We disagree. The running of the twelve-year limitations period deprives the federal courts of "jurisdiction to inquire into the merits" of an action brought under the QTA. *Block v. North Dakota*, 461 U.S. 273, 292 (1983); *Fidelity Exploration and Prod. Co. v. United States*, 506 F.3d 1182, 1186 (9th Cir. 2007). KRAI contends that *Block*'s jurisdictional ruling has been superceded by subsequent decisions of the Supreme Court holding that statutes of limitation and other requirements for bringing a claim under certain federal statutes (not including the QTA) are not jurisdictional and therefore waivable. *See generally Arbaugh v. Y&H Corp.*, 546 U.S. 500, 511-14 (2006) (holding that a statutory requirement in 42 U.S.C. §§ 2000e, 2000e-5(f) was an element of a cause of action rather than a jurisdictional requirement); *Scarborough v. Principi*, 541 U.S. 401, 413-14, 420-21 (2004) (holding that a pleading requirement in the Equal Access to Justice Act was not jurisdictional and was therefore curable through subsequent amendment); *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95-96 (1990) (holding that the time limits established by 42 U.S.C. § 2000e-16(c) for suits by federal employees against their government employers are not jurisdictional

because "the same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States."). KRAI's reliance on these cases is to no avail, because we are bound by our more recent decision in *Fidelity Exploration and Prod. Co. v. United States*, 506 F.3d 1182, 1186 (9th Cir. 2007), which reaffirmed *Block*'s jurisdictional holding in the QTA context. As we noted in *Fidelity*, in the absence of any Supreme Court decision overruling *Block*, "we must follow the Supreme Court precedent that directly controls, leaving to the Court the prerogative of overruling its own prior decisions." 506 F.3d at 1186 (citing *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)).

Moreover, the Supreme Court's recent decisions have also upheld "[j]urisdictional treatment of statutory time limits." *Bowles v. Russell*, 127 S. Ct. 2360, 2364-66 (2007). *Bowles* held that the provisions of 28 U.S.C. § 2107 governing the deadline for filing notices of appeal are "jurisdictional" and cannot be tolled. *Id.* More recently, *John R. Sand & Gravel Co. v. United States* rejected the argument that *Irwin* permits equitable tolling of all statutes of limitation on suits against the government, and held that the Federal Court of Claims' timeliness requirements were jurisdictional. 128 S. Ct. 750, 753-56 (2008). Thus, *Gravel Co.* forecloses KRAI's argument that *Irwin* created a general rule superceding *Block*'s holding as to the jurisdictional nature of the QTA's twelve-year limitations period. Nor can we accept KRAI's argument that *Irwin* and its progeny require us to reexamine Congress's intent in creating the twelve-year limitations period. The Supreme Court has already held that Congress intended the QTA's limitations period to serve interests of finality, and therefore it may not be tolled. *See Block*, 461 U.S. at 283-85; *United States v. Beggerly*, 524 U.S. 38, 49 (1998).

**[4]** KRAI next argues that the district court erred in dismissing the action on statute of limitations grounds under Rule 12(b)(1) because the statute of limitations issue was

intermeshed with the ownership issue. We disagree. In general, a district court is permitted to resolve disputed factual issues bearing upon subject matter jurisdiction in the context of a Rule 12(b)(1) motion unless "the jurisdictional issue and the substantive issues are so intermeshed that the question of jurisdiction is dependent on decision of the merits." *Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 735 (9th Cir. 1979); *accord Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983).

**[5]** Here, the question whether this action was timely was not inextricably intertwined with the ultimate merits issue of ownership. As the district court correctly noted, "[t]he crucial issue in the statute of limitations inquiry is whether the plaintiff had notice of the federal claim, not whether the claim itself is valid." *Kingman Reef*, 545 F. Supp. 2d at 1111 (internal quotation marks omitted). Thus, the district court properly addressed the jurisdictional issue of timeliness in the context of Rule 12(b)(1).

Finally, KRAI argues that the district court erred by requiring KRAI to carry the burden of establishing that its claim was timely. To support its argument that the United States bore the burden to establish an absence of jurisdiction in this case, KRAI cites to legislative history, in particular, a House of Representatives committee report recounting the Justice Department's statement that "if the United States wished to assert that the statute of limitation had run, it would then have the burden of establishing this fact." H.R. Rep. No. 92-1559 (1978), *reprinted in* 1972 U.S.C.C.A.N. 4547, 4551. Although ordinarily the defendant bears the burden of proving an affirmative statute of limitations defense, here the statute of limitations is jurisdictional, and, "[w]hen subject matter jurisdiction is challenged under Federal Rule of Procedure 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Tosco Corp. v. Comtys. for a Better Env't*, 236 F.3d 495, 499 (9th Cir. 2001). However, we need not determine who bears the burden of proving time-

liness for purposes of the QTA, because, as discussed below, the evidence overwhelmingly establishes that more than twelve years elapsed since the Fullard-Leos' claim accrued. *See Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).

**B**

**[6]** An action brought under the QTA "accrues when the landowner or his predecessors-in-interest knew or should have known of the United States' claim." *Shultz*, 886 F.2d at 1158; *see* 28 U.S.C. § 2409a(g). The QTA's "statute of limitations applies retroactively," so it is irrelevant whether KRAI's predecessors in interest, the Fullard-Leo family, was put on notice of the United States's interest before or after the enactment of the QTA. *Donnelly v. United States*, 850 F.2d 1313, 1318 (9th Cir. 1988) (citing *Block*, 461 U.S. at 284).

**[7]** The record makes clear that the Fullard-Leos had actual notice that the United States claimed an interest in Kingman Reef more than twelve years prior to the filing of the complaint in this case. As noted above, in their April 20, 1937 letter, the Fullard-Leos acknowledged that Kingman Reef's "ownership presumably rests with the State or Navy department." *Kingman Reef*, 545 F. Supp. 2d at 1106. When the Fullard-Leos subsequently threatened the Navy with legal action to establish their ownership interest, the Navy expressly rejected their claim by letter of April 26, 1938, concluding that the evidence was "not sufficient to uphold the claim of Mrs. Fullard-Leo" to Kingman Reef. *Id.* at 1107. These communications between the Fullard-Leos and the Navy Department demonstrate conclusively that KRAI's "predecessor in interest knew or should have known of the claim of the United States" by April 26, 1938, at the latest. § 2409a(g); *see Michel v. United States*, 65 F.3d 130, 132 (9th Cir. 1995).

**[8]** KRAI argues that the Fullard-Leos' correspondence with the United States Navy did not cause its claim to accrue for purposes of § 2409a(g) because "[a]ny claim that the government derived ownership of Kingman from either the Guano Act[4] or the 1934 [Executive] Order would have made no sense to any person." KRAI's attack upon the ultimate validity of the United States's claim does not overcome the fact that its QTA claim "accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States." § 2409a(g). It is irrelevant whether the United States's justifications for rebuffing the Fullard-Leos' claims of ownership and rejecting requests for compensation were meritorious; the QTA limitations period accrues as soon as the United States makes a "claim that creates even a cloud on" a plaintiff's ownership interest. *See Michel*, 65 F.3d at 132; *California ex rel. State Land Comm'n v. Yuba Goldfields, Inc.*, 752 F.2d 393, 396 (9th Cir. 1985); *see also Spirit Lake Tribe v. North Dakota*, 262 F.3d 732, 738 (8th Cir. 2001) ("The government's claim need not be clear and unambiguous. . . . All that is necessary is a reasonable awareness that the Government claims some interest adverse to the plaintiff's.") (internal quotation marks omitted). Regardless of the merits of the United States's claim to Kingman Reef, the Fullard-Leos' acknowledgment that the United States claimed ownership of the reef is sufficient for their claim to accrue under the QTA.

**[9]** Because KRAI's claim accrued as of April 26, 1938, the federal court would lack subject matter jurisdiction as of April 27, 1950, absent some exception to the statute of limitations in § 2409a(g). *See Block*, 461 U.S. at 284; *Donnelly*, 850 F.2d at 1318.

[4]The Guano Islands Act authorizes the President to "consider[ ] as appertaining to the United States" any unclaimed island "[w]henever any citizen of the United States discovers a deposit of guano" thereon. 48 U.S.C. § 1411.

### C

KRAI argues that even if its predecessors in interest should have known that the United States had claimed an interest in Kingman Reef at one time, the United States subsequently abandoned that interest and the statute of limitations under the QTA has not run on any new claim to Kingman Reef asserted by the United States. In support of its argument that the United States abandoned its interest in Kingman Reef during the period between 1938 and December 11, 2000 (the date the United States established the Kingman Reef National Wildlife Refuge), KRAI relies on two types of evidence: evidence that the United States did not restrict access to Kingman Reef, *see Shultz*, 886 F.2d at 1159, and evidence that government employees agreed that the Fullard-Leos owned the reef, *see Michel*, 65 F.3d at 132-33.

First, KRAI notes that Navy employees did not restrict the public's access to Kingman Reef. For example, Navy employees obtained the Fullard-Leos' permission to access the reef, instructed members of the public to contact the Fullard-Leos for permission to enter, and indicated a belief that the regulations restricting access to the reef area had been suspended.

KRAI relies on *Shultz* for the proposition that these actions constituted abandonment of the United States's claim of interest in Kingman Reef. In *Shultz*, we held that the plaintiffs' claim under the QTA to quiet title to plaintiffs' easement over a road adjacent to a federal military base originally accrued when Shultz had reasonable notice that the government denied Shultz's right of access to the road. If this denial had occurred more than twelve years before Shultz brought his claim, Shultz's action would have been time barred unless, after the claim accrued, "the government's failure to restrict access to the base . . . led Shultz or his predecessors-in-interest reasonably to believe that the government did not continue to claim an interest in the roadway." 886 F.2d at 1161. In other words, if the United States stopped denying

Shultz access to the use of the road, Shultz could have reasonably believed that the United States had abandoned its claim to exclusive use of the road. In such a case of abandonment, Shultz's claim would accrue "when the government reasserted a claim," not when the government originally denied Shultz's access. *Id.*

**[10]** As the district court noted, however, *Shultz* does not apply directly to this case, because KRAI is asserting an ownership interest over government property, which is different from a plaintiff's claim of an easement. *See, e.g.*, *McFarland v. Norton*, 425 F.3d 724, 726-27 (9th Cir. 2005); *Warren v. United States*, 234 F.3d 1331, 1337 (D.C. Cir. 2000) (citing *Michel*, 65 F.3d at 132). Even if a reasonable plaintiff could believe that the United States had abandoned its claim that the plaintiff did not have an easement over government property by allowing the plaintiff access to the property, *see Shultz*, 886 F.2d at 1161, a reasonable plaintiff could not believe that the United States had abandoned its claim of a possessory interest in public lands merely because it failed to enforce restrictions upon public access. *See Warren*, 234 F.3d at 1337-38. It is well established that the United States does not abandon its claims to property by inaction. *See United States v. California*, 332 U.S. 19, 40 (1947). As the Supreme Court explained:

> The Government, which holds its interests here as elsewhere in trust for all the people, is not to be deprived of those interests by the ordinary court rules designed particularly for private disputes over individually owned pieces of property; and officers who have no authority at all to dispose of Government property cannot by their conduct cause the Government to lose its valuable rights by their acquiescence, laches, or failure to act.

*Id.* Nor can the United States lose property rights through adverse possession. *See United States v. Pappas*, 814 F.2d

1342, 1343 n.3 (9th Cir. 1987) ("One cannot gain title to land of the United States through adverse possession."); *see also* § 2409a(n) (precluding QTA "suits against the United States based upon adverse possession"). In light of these settled principles, the Fullard-Leos could not have reasonably construed the United States's failure to exclude the public from Kingman Reef as an abandonment of its claim of interest. *See Kingman Reef*, 545 F. Supp. 2d at 1114 n.10. We must therefore reject KRAI's first argument that the failure of Navy employees to restrict the public's access to Kingman Reef evidences an abandonment of the government's claim.

Second, KRAI notes actions by various government employees that are consistent with KRAI's claim of ownership. For example, a number of Navy and Fish and Wildlife Service employees either acknowledged the Fullard-Leos' ownership explicitly or implied such ownership through offers to purchase the reef. KRAI relies on *Michel* for the argument that government employees' acknowledgment that the Fullard-Leos owned Kingman Reef constituted an abandonment of the United States's claim. *See* 65 F.3d at 133. In *Michel*, we considered the Michels' claimed access easement through a national wildlife refuge and held that the Michels' claim accrued when "the Michels knew or should have known the government claimed the exclusive right to deny their historic access to the trails and roads across the refuge." *Id.* at 132. Although the district court concluded that the Michels knew of the governments' denial of access more than twelve years before the Michels brought their claim, we concluded there was evidence that the government had abandoned and then reasserted its claim. Specifically, we held a letter from the government to the Michels acknowledging their " 'historic right of access' appears to abandon any previously asserted claim of exclusive control of that right." *Id.* at 133. We also held that an agreement between the Michels and the government that allowed access by the Michels as agreed to in the earlier letter "could be construed as an abandonment of the

government's claim that it had the exclusive right to control access." *Id.*

KRAI argues that the actions and communications by government employees evidencing their belief that the Fullard-Leo family owned Kingman Reef are analogous to the letter and agreement in *Michel*, and "could be construed as abandonment of the government's claim" of a property interest in Kingman Reef. We disagree. As we explained in *Shultz*, the key inquiry is whether these actions and communications would give KRAI or its predecessors in interest "reason to believe the government did not continue to claim an interest" in the property. 886 F.2d at 1161. In *Michel*, the property interest at stake was not the government's ownership interest in the property, but merely the right to deny the Michels' claimed access easement. Moreover, the government had issued the Michels both a letter and a signed agreement expressly recognizing their "historic right of access." *Michel*, 65 F.3d at 133. Under these circumstances, a reasonable person could believe that the United States had abandoned its denial of the plaintiffs' easement right.

**[11]** By contrast, where the United States's claim of interest in property stems from formal actions of the legislative or executive branch, a person could not reasonably conclude that informal remarks of agency personnel or internal agency memoranda could eliminate the cloud upon the property's title. *See Spirit Lake Tribe*, 262 F.3d at 741-42 (holding that an informal opinion memorandum by an Associate Solicitor in the Department of Interior did not establish abandonment because "intra-office memoranda do not bind the government"). In a real estate transaction, a reasonable prospective purchaser intending to buy property free of any clouds on the title would require clear evidence that all adverse claims of ownership had been relinquished, as documented by a person with appropriate authority, and would not rely on informal letters and memos from low-level employees.

**[12]** Our conclusion that some more formal step by the United States was necessary to give KRAI "reason to believe the government did not continue to claim an interest" in the property, *Shultz*, 886 F.2d at 1161, is consistent with the QTA itself, which established a formal method for the United States to disclaim any interest in property, specifically by filing such a disclaimer with the court. *See* 28 U.S.C. § 2409a(e).[5] As § 2409a(e) makes clear, Congress did not deem unofficial statements by government officials to be sufficient to eliminate the United States's claim of interest in property and to thus deprive the district court of jurisdiction under the QTA. Therefore, we agree with the Eighth Circuit that the United States cannot be deemed to have abandoned a claim of ownership for purposes of § 2409a(g) unless it "clearly and unequivocally abandons its interest," *Spirit Lake Tribe*, 262 F.3d at 739, as evidenced by documentation from a government official with authority to make such decisions on behalf of the United States.

**[13]** Here, there is no evidence in the record that an appropriate government official clearly and unequivocally abandoned the United States's interest in Kingman Reef. The district court found that KRAI presented evidence only "of confusion and mistake on the part of some government employees," as to whether the United States ultimately possessed an ownership interest in Kingman Reef, *Kingman Reef*, 545 F. Supp. 2d at 1114 n.11, and this conclusion is not clearly erroneous. The government has not rescinded the

[5]Section 2409a(e) of the QTA provides:

> If the United States disclaims all interest in the real property or interest therein adverse to the plaintiff at any time prior to the actual commencement of the trial, which disclaimer is confirmed by order of the court, the jurisdiction of the district court shall cease unless it has jurisdiction of the civil action or suit on ground other than and independent of the authority conferred by section 1346(f) of this title.

28 U.S.C. § 2409a(e).

Executive Orders designating Kingman Reef as public land under Navy protection, nor has the regulation establishing the Kingman Reef Naval Defensive Sea Area been repealed. *See* 32 C.F.R. § 761.3(a)(2)(v), (b)(2); Exec. Order Nos. 6935, 8682.[6] Neither has any United States official with authority to bind the Executive Branch clearly and unequivocally disclaimed the United States's claim of interest in Kingman Reef. Although at various times correspondence and internal memoranda from employees and officials of various Executive Branch agencies reflect an understanding that the Fullard-Leo family owned, or claimed ownership of, Kingman Reef, none of the documents in the record indicate an official determination that the United States no longer claimed a property interest in the reef or intended to disclaim such an interest. Therefore, KRAI and its predecessors in interest could not reasonably conclude that the recent informal governmental communications had eliminated the cloud upon the title to Kingman Reef created by official government actions in the 1930s. Accordingly, we reject KRAI's theory that the United States abandoned its claim.

## D

**[14]** Finally, KRAI contends that the United States was equitably estopped from raising the twelve-year limitations period of § 2409a(g) as a defense to KRAI's claim. KRAI asserts that the United States concealed its intention to annex Kingman Reef while negotiating with the Fullard-Leo family to purchase Palmyra Atoll, so that it could ensure successful purchase of Palmyra (over which it had no plausible claim of title) without expending funds to obtain Kingman Reef. We reject this argument. As we have noted, § 2409a(g) is jurisdic-

[6]KRAI notes that the Naval Airspace Reservation over Kingman Reef has been suspended. *See* 32 C.F.R. § 761.4(d)(1). However, the suspension of airspace restrictions did not repeal the Naval Defensive Sea Area reservations in their entirety. *See id.* § 761.3(a)(2)(v), (b)(2); *Kingman Reef*, 545 F. Supp. 2d at 1106.

tional under our precedents, *e.g.*, *Fidelity*, 506 F.3d at 1186, and "subject-matter jurisdiction . . . can never be forfeited or waived." *Arbaugh*, 546 U.S. at 514 (internal quotation marks omitted). KRAI notes Justice Stevens's concurring opinion in *Beggerly*, which states that the Court was "not confronted with" and "need not . . . address" the question whether "equitable estoppel might apply if the Government were guilty of outrageous misconduct that prevented the plaintiff, though fully aware of the Government's claim of title, from knowing of her own claim." 524 U.S. at 49-50 (Stevens, J., concurring). We need not address the effect, if any, of Justice Stevens's concurrence. As noted above, the district court found no evidence of outrageous conduct, and thus did not abuse its discretion in holding that KRAI failed to establish the elements of a claim of equitable estoppel. *See Morgan v. Gonzales*, 495 F.3d 1084, 1092 (9th Cir. 2007).

**AFFIRMED.**