# In the United States Court of Federal Claims

**No. 06-828L**
**June 30, 2014**

* * * * * * * * * * * * *

**KINGMAN REEF ATOLL**    *
**DEVELOPMENT, L.L.C.,**    *
        *     **RCFC 56 Motions for Summary**
       **Plaintiff,**    *     **Judgment; Takings; Equitable**
**v.**    *     **Estoppel; Lost Grant; Adverse**
      *     **Possession; Statute of Limitations.**
**UNITED STATES,**    *
       *
      **Defendant.**    *
       *

* * * * * * * * * * * * *

      **Therese Y. Cannata**, Cannata, Ching & O'Toole, LLP, San Francisco, California, for plaintiff.  With her was **Christian P. Porter**, Porter, Tom, Quitiquit, Chee & Watts, LLP, Honolulu, Hawaii, of counsel.

      **Kristine S. Tardiff**, Trial Attorney, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant.  With her were **John P. Tustin,** Trial Attorney, Environment and Natural Resources Division, **Sam Hirsch,** Acting Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice; **Robert J. Smith**, Assistant Chief, Office of General Counsel, Navy Litigation Office; **Mariel J. Combs**, Office of the Solicitor, United States Department of the Interior; **Elena Onaga**, Deputy Section Chief, Pacific Islands Section, NOAA Office of the General Counsel, United States Department of Commerce; and **Kevin A. Baumert**, Attorney-Advisory, Office of the Legal Advisor, United States Department of State, of counsel.

## O P I N I O N

**HORN, J.**

## PROCEDURAL HISTORY

      This case addresses the amended complaint filed by plaintiff, Kingman Reef Atoll Development, L.L.C. (KRAD) in 2012. Originally, Kingman Reef Atoll Investments, L.L.C. (KRAI) and KRAD brought a takings claim before this court alleging that KRAI held fee simple absolute title to Kingman Reef, an atoll in the Pacific Ocean, that KRAD held a leasehold interest, and that the United States government took their real property interest without payment of just compensation.  KRAI and KRAD alleged that this taking occurred on January 18, 2001, when the Secretary of the Interior issued Secretarial

Order No. 3223, establishing the Kingman Reef National Wildlife Refuge (Kingman Reef NWR). KRAI and KRAD sought the payment of just compensation, in the amount of $54,500,000.00, pursuant to the Fifth Amendment to the United States Constitution for the alleged taking of their private property for public use.

KRAI and KRAD alleged by prohibiting public access to Kingman Reef the Kingman Reef NWR prohibited fishing in over 450 square miles in what plaintiff alleged to be "some of the most productive open ocean fishing grounds in the world," and took all rights to access, use, enjoy, conserve, and economically develop Kingman Reef and its surrounding waters from KRAI and KRAD. KRAI and KRAD claimed that Kingman Reef's economic value and/or commercial use includes ecotourism, recreational fishing tourism, commercial fishing operations, and a transfer station for fishing operations.

KRAI is a Hawaii limited liability company that claimed to hold both legal and equitable title to the Kingman Reef atoll, as well as its lagoon, submergent and emergent coral reefs, and surrounding waters. According to KRAI and KRAD, members of the Fullard-Leo family claimed ownership of Kingman Reef in 1922, and KRAI acquired title to Kingman Reef on November 17, 2000. Dudley and Ainsley Fullard-Leo, collectively (and sometimes together with Leslie and Ellen Fullard-Leo, both deceased, and/or the Fullard-Leo family[1]) were or are managers of KRAI.

Plaintiff KRAD is a Hawaii limited liability company that is managed by Peter B. Savio, the Fullard-Leo family's real estate agent and representative. On November 17, 2000, KRAD entered into a real property lease agreement with KRAI concerning the use, economic development, and protection of Kingman Reef.

In accordance with the alleged private property rights vested by the real property lease, on November 17, 2000, KRAD also entered into a real property license agreement with Kingman Reef Enterprises, L.L.C. (KRE), a Washington limited liability company. KRAD licensed KRE to operate a commercial fishing base camp at Kingman Reef and conduct commercial fishing in and around the waters of Kingman Reef for a term of thirty years.

Defendant United States is a governmental entity whose valid exercise of sovereignty over Kingman Reef is undisputed by the parties. Kingman Reef is currently classified by the United States as an unincorporated United States Territory without an Organic Act. The United States claims fee title absolute ownership to Kingman Reef, while plaintiff KRAD claims that KRAI is the holder of fee title absolute.

---

[1] The Fullard-Leo family is also the former owner of Palmyra Atoll (or Island), located near Kingman Reef, which the family conveyed to The Nature Conservancy (TNC) in the late 1990s. Because it is a useful barometer for comparison, the history of Palmyra Island, and litigation related to its ownership is referenced below.

On March 4, 2005, and prior to filing suit in this court, KRAI brought an action to quiet title to Kingman Reef, pursuant to the Federal Quiet Title Act, 28 U.S.C. § 2409a (2012), in the United States District Court for the District of Hawaii.  See Kingman Reef Atoll Investments, L.L.C. v. United States, 545 F. Supp. 2d 1103 (D. Haw. 2007), aff'd, 541 F.3d 1189 (9th Cir. 2008).   The defendant filed a motion to dismiss, which the District Court denied, without prejudice, and the court permitted limited discovery on the issue of abandonment by the United States.  See id. at 1109.   Subsequently, defendant filed another motion to dismiss for lack of subject matter jurisdiction in the Hawaii case, arguing that plaintiff's claim accrued outside of the Quiet Title Act's twelve-year statute of limitations.   The District Court indicated that a plaintiff's quiet title claim against the United States "is barred if it or its predecessor failed to commence the action within 12 years of the date they knew or should have known of the claim of the United States," id. at 1110 (citing United States v. Beggerly, 524 U.S. 38, 48 (1998)), and that the Quiet Title Act is "retroactive," such that "if the passage of 12 years from the date of accrual occurred before October 25, 1972, when Congress passed the QTA [Federal Quiet Title Act], the action is foreclosed."   Id. at 1111 (citing Donnelly v. United States, 850 F.2d 1313, 1318 (9th Cir. 1988), cert. denied, 488 U.S. 1046 (1989); Stubbs v. United States, 620 F.2d 775 (10th Cir. 1980)).  The court found that the Fullard-Leo family, plaintiff's predecessors-in-interest, "knew or should have known of the United States' claim" regarding Kingman Reef in the 1930s and, therefore, the statute of limitations had run "at the latest—by 1949 or 1950."   Id. at 1112.  The District Court also found no evidence that the United States had abandoned its claim to Kingman Reef, so as to create a new QTA claim for the purposes of the statute of limitations.   The District Court granted defendant's motion to dismiss for lack of subject matter jurisdiction.   Id. at 1116.  The United States Court of Appeals for the Ninth Circuit affirmed the District Court's decision in Kingman Reef Atoll Investments, L.L.C. v. United States, 541 F.3d 1189, 1202 (9th Cir. 2008).

When KRAI and KRAD filed the above captioned case in this court, defendant filed an earlier motion to dismiss KRAI's and KRAD's claims for lack of jurisdiction on the grounds that the claims were time-barred under the applicable six-year statute of limitations, 28 U.S.C. § 2501 (2012).  After the Ninth Circuit's decision ruled in KRAI's quiet title action, Kingman Reef Atoll Investments, L.L.C. v. United States, 541 F.3d 1189, defendant renewed its motion to dismiss arguing that KRAI's action to quiet title in Kingman Reef was related to the above captioned case, the findings of the District Court and the Ninth Circuit should be given preclusive effect, and those findings supported defendant's position that plaintiff's claim accrued in 1938.  This court issued an opinion on June 17, 2010 which found that KRAI's and KRAD's takings action was not precluded.

Following the decision by the United States Supreme Court in United States v. Tohono O'Odham Nation, 131 S. Ct. 1723 (2011), defendant asked to revisit the issue of jurisdiction in this court, particularly regarding the application of 28 U.S.C. § 1500 (2012) to this case in this court.  This court subsequently held that it did not have jurisdiction over KRAI because KRAI had a suit pending at the United States District Court for the District of Hawaii at the time it filed suit in this court, based on substantially

the same operative facts, meaning that Section 1500 deprived this court of jurisdiction over KRAI.  KRAD, however, did not have a suit pending in another court when it filed its complaint in this court. The court, therefore, granted defendant's motion to dismiss KRAI, but denied the motion to dismiss plaintiff KRAD.  See Kingman Reef Atoll Investments, L.L.C. v. United States, 103 Fed. Cl. 660, 704-05 (2012).  KRAI subsequently notified the court that it did not intend to appeal the court's order dismissing KRAI.

Plaintiff KRAD filed an amended complaint on May 9, 2012.  In its amended complaint, KRAD alleges that KRAI holds fee simple title to Kingman Reef, and that KRAD holds a leasehold interest in Kingman Reef from KRAI, as well as a valid real property license agreement with KRE. KRAD alleges that defendant's establishment of the Kingman Reef NWR has "resulted in the taking of plaintiff's private leasehold and licensing property rights for a public purpose without just compensation." KRAD alleges a categorical, or in the alternative, a regulatory taking, for which it seeks just compensation "in an amount equal to the fair market value of plaintiff's leasehold and licensing rights and interests," plaintiff's attorneys' costs and fees, and any additional relief the court deems proper.  Thereafter, the parties fully briefed cross-motions for summary judgment. Two issues are raised by the current motions: 1) whether KRAD holds a vested property interest in Kingman Reef, and 2) whether KRAD's takings claim is time-barred by the six-year statute of limitation codified at 28 U.S.C. § 2501.

## FINDINGS OF FACT

This court previously made extensive findings of fact in the above captioned case which bear some repeating here. Subsequent to the court's earlier decision in this case, defendant submitted a Statement of Uncontroverted Facts with attached exhibits, and plaintiff responded.  Taking the parties' submissions into account, the revised facts are included below.

### Fullard-Leo Family Successors Allege They Have Acted as the Owner of Kingman Reef

In addition to annexing Kingman Reef, paying real property taxes on the land, and granting access to third parties, plaintiff alleges that, from 1922 to the present, KRAI and its predecessors-in-interest have acted consistent with their ownership of Kingman Reef.  For example, plaintiff alleges that when unauthorized uses of Kingman Reef were discovered, the Fullard-Leo family took appropriate action to stop those uses. Additionally, the Fullard-Leo family and its agent allegedly stopped the unauthorized use by a person from Hilo, Hawaii, who was fishing commercially in and around Kingman Reef without permission.

Mr. Savio, on behalf of the Fullard-Leo family and KRAI, alleges to have made voyages to Kingman Reef at the Fullard-Leo family's expense in order to survey the property. Leslie Fullard-Leo and Mr. Savio allegedly accessed Kingman Reef numerous times since the 1940s. Dudley Fullard-Leo also alleges that his brother, Leslie Fullard-

Leo, accessed Kingman Reef in the 1940s on a ship called Joyita and again by ship in the mid-to-late 1950s.  Moreover, Mr. Savio, in a sworn declaration, stated that, during the late 1980s, he traveled to and inspected Kingman Reef in a United States Air Force aircraft with representatives of the Bikini Islands as part of a proposed government project, to purchase Palmyra Atoll and Kingman Reef, and to determine if those areas were suitable for displaced residents of the Bikini Islands.  Ainsley Fullard-Leo, in a sworn declaration, stated that, in or about 1986, he "accompanied the U.S. Coast Guard during one of its laws enforcement air patrols to Palmyra and Kingman Reef."  Additionally, in a sworn declaration, Ainsley Fullard-Leo stated that he "over flew Kingman Reef on several occasions since the 1980's [sic]."  Dudley Fullard-Leo testified at his April 11, 2007 deposition in Kingman Reef Atoll Investments, L.L.C. v. United States, 545 F. Supp. 2d 1103, that he has not accessed Kingman Reef, but only flown over it, correcting a former declaration that he had actually accessed Kingman Reef numerous times since the 1940s.

From the 1960s to 1980s, Martin Vitousek, a professor at the University of Hawaii, requested permission to visit and was granted access to Kingman Reef, planting coconut trees on Kingman Reef at the Fullard-Leo family's request.  Additionally, over about a twenty-year period, and as recently as 2002, Ainsley Fullard-Leo gave permission to Bill Austin, captain of the ship Machais to visit Kingman Reef, although there also is an indication in the record of a Navy grant of permission.  In a declaration, executed on July 19, 2007, Bill Austin stated that "I have obtained permission from the Fullard-Leo family to call at Kingman Reef Atoll for about seven voyages over the years.  I know that no other authorization was required because on my first voyage in about 1966, the United States Customs and someone else (I do not recall who) told me that Kingman Reef and Palmyra were privately owned and to contact the family."

In October 1995, Bryant Fullard-Leo, Dudley Fullard-Leo's son, stated he accompanied Mark Collins, a private fisherman, to survey in and around Kingman Reef over a two week period.  Additionally, on August 1, 1997, Mr. Savio, in his capacity as president of Palmyra Development Co., Inc., wrote a letter to Joe Dettling of Kailua-Kona, Hawaii.  Mr. Dettling was allegedly fishing in and around Palmyra Island and Kingman Reef, as well as planning to use the lagoons of both islands for a seaplane and fishing operation.  Threatening legal action to enforce the Fullard-Leo family's right to exclude, Mr. Savio informed Mr. Dettling that both Palmyra Island and Kingman Reef and their "lagoons, reefs and territorial waters are private property" and advised Mr. Dettling that he "cannot enter into these areas without permission."  Subsequently, in a follow-up letter dated March 19, 1998, which Mr. Savio carbon copied to Scot Yamashita, Assistant Special Agent In Charge at the United States Department of Commerce, National Oceanic and Atmospheric Administration's (NOAA) National Marine Fisheries Service, Mr. Savio wrote to Mr. Dettling:

In earlier discussions and letters, you stated that Scot Yamashita of the National Marine Fisheries service had given you permission to fish in and around the waters at Palmyra Island.  I checked with Mr. Yamashita, and

in a letter dated August 2, 1997, he advised you that no permission was given to fish within the existing three (3) mile limit around Palmyra and Kingman Reef as established by the owners.

Later, in 1997 or 1998, Ainsley and Dudley Fullard-Leo indicated they traveled to Palmyra and, on the way, had the pilot circle Kingman Reef to inspect and ensure that no unauthorized uses were evident. In 1998 or 1999, Ainsley Fullard-Leo and his wife allegedly inspected Kingman Reef by air.

Moreover, Charles Cook of TNC stated in his March 26, 2007 deposition in Kingman Reef Atoll Investments, L.L.C. v. United States, 545 F. Supp. 2d 1103,[2] that National Aeronautics and Space Administration (NASA) Astronaut Charles "Chuck" F. Brady, Captain, United States Navy, who was both providing support services for TNC in its acquisition of Palmyra in 1991 and "[t]esting communications equipment for NASA" on his first trip to Palmyra Atoll in 1997, requested that Ainsley Fullard-Leo give him permission to access Kingman Reef to test HAM amateur radio.  Mr. Savio stated in a sworn declaration that Captain Brady "visited Kingman Reef twice in the late 1990's and on each visit requested permission to go to Kingman Reef" from the Fullard-Leo family.

Plaintiff alleges that "[t]here is no evidence that the government used the property for any purpose prior to January 18, 2001, except when it visited the property, after obtaining permission from the Fullard-Leo family."   Plaintiff also alleges that the United States Navy has repeatedly acknowledged the Fullard-Leo family's ownership of Kingman Reef and has asked for permission to have access to Kingman Reef.  Plaintiff alleges that on numerous occasions since the issuance of Executive Order No. 6935 in 1934 and Executive Order Nos. 8682 and 8729 in 1941, regarding the Navy's jurisdiction over and administration of Kingman Reef and its surrounding waters, the Navy has directed requests for authorization to visit or access Kingman Reef to the Fullard-Leo family for review and approval.   Specifically, over the past thirty years, plaintiff alleges that the Fullard-Leo family, KRAI and their agent Mr. Savio, received referrals from the United States Navy, United States Coast Guard and/or United States National Marine Fisheries Service from persons and/or entities interested in entering upon and traversing across Kingman Reef.  KRAI was asked, and did give permission, to third parties from the private and public sectors, including HAM radio operators, scuba divers, and photographers, to access Kingman Reef.  In a sworn declaration, Ainsley Fullard-Leo indicated that Petty Officer Miller of the Pearl Harbor Naval Base

---

[2] In his March 26, 2007 deposition, Mr. Cook claimed that TNC never had an interest in purchasing Kingman Reef and that it was Mr. Savio, and not TNC, who initially proposed that the acquisition of Kingman Reef be considered as a part of TNC's ongoing acquisition plan for Palmyra Atoll.  Mr. Cook did not recall the details regarding possible sale and/or acquisition of Kingman Reef, stating "my business was to try to successfully acquire Palmyra Atoll.  The Nature Conservancy did not have a dog on Kingman Reef. To me that was background noise.  That was not part of my focus objectives, and so I wasn't concerned with it.  From a Nature Conservancy's perspective we had one concern, and that was the successful acquisition of the Palmyra Atoll."

telephoned him "inquiring about the status of Kingman Reef and whether [he] was the owner because an inquiry was received from a photographer wanting" to visit and photograph Kingman Reef.

Mr. Savio, in his sworn declaration, stated that over the past thirty years, "I received at least ten (10) referrals from the Navy, possibly more.  That is, a person would call me requesting permission to go to Kingman Reef, I would ask how he got my name, and he told me that a representative of the U.S. Navy (at Pearl Harbor) referred him."  Mr. Savio further stated that the Navy and United States Coast Guard both referred HAM amateur radio operators seeking permission to broadcast from Kingman Reef to him.  Mr. Savio claimed that, "[i]n order for [HAM radio operators'] broadcasts from a particular location to be considered legitimate, however, they must obtain permission to broadcast from the legal owner of the property," which they did by first contacting the Navy or the Coast Guard to ascertain the identity of the legal owner of Kingman Reef.  Mr. Savio, in a sworn declaration, stated that, "[o]ver the years, the Fullard-Leo family, as the legal owners of Kingman Reef, have received inquiries from both the U.S. Department of the Interior, FWS [Fish and Wildlife Service], the City & County of Honolulu, and the State of Hawaii to purchase Kingman Reef.  I represented the Fullard-Leo family in those negotiations and discussions."  On instructions from the Fullard-Leo family, Mr. Savio required that any visitor to Kingman Reef obtain written permission and execute a release form.  Navy personnel who contacted Mr. Savio allegedly acknowledged that the Fullard-Leo family owned Kingman Reef and that third party requests to access Kingman Reef were to be directed to the Fullard-Leo family.  Accordingly, plaintiff alleges that KRAI's predecessors-in-interest owned Kingman Reef, that the government repeatedly acknowledged such ownership in its own documents in the 1990s and 2000, that the government was preparing to pay the Fullard-Leo family for a fee interest, and that KRAI leased out the fishing rights around Kingman Reef in 2000.

Defendant specifically denies that KRAI, the Fullard-Leo family or any of their agents, associates, or representatives were authorized at any time to grant permission to access Kingman Reef, stop commercial fishing in and around Kingman Reef, survey and/or inspect Kingman Reef.  Defendant further denies that KRAI, the Fullard-Leo family and any of their agents, associates, or representatives were authorized to visit Kingman Reef themselves without first obtaining permission from the United States Navy or the United States Department of the Interior, Fish and Wildlife Service (FWS or USFWS), because defendant alleges Kingman Reef is federal property. The record, however, contains no evidence that the federal government actually interfered with the Fullard-Leo family's access to and use of Kingman Reef between 1934 and 2001.

**Physical Description of Kingman Reef**

Kingman Reef is a low-lying coral reef atoll located in the Pacific Ocean. It is situated approximately 900 nautical miles south of Hawaii and 33 nautical miles north of the Palmyra Atoll, at Latitude 6° 24' 37" North and Longitude 162° 22' West. It is comprised of two small "spits" of emergent land/coral reefs, a central lagoon, and

surrounding submergent coral reefs and waters.  Kingman Reef has been described as "one of the most pristine coral reef ecosystems in the Pacific . . . and supports a diversity of marine invertebrates, algae, fishes, marine mammals, and sea turtles and [is] an important foraging ground for Pacific migratory seabirds." The reef, however, "is unsuitable for human habitation, due to the small size of emergent land spits and lack of fresh water."  Moreover, Kingman Reef "is awash most of the time," has been described as "a maritime hazard and the atoll is unusable for practical purposes."

**Initial Acquisition and History of Kingman Reef**

Kingman Reef was first discovered in 1798 by Captain Edmund Fanning.  The island was visited in 1853 by Captain W.E. Kingman, for whom it was named, while aboard the American ship, Shooting Star.  Subsequently, Captain W.W. Taylor, in his affidavit of February 12, 1858, listed islands in the position of Kingman Reef and Palmyra Atoll as guano islands and, along with other alleged guano islands in the Pacific, passed these islands by assignments to the United States Guano Company.  In 1860, the United States Guano Company claimed Kingman Reef, also known as "Dangers Rock," and Palmyra Atoll, also known as "Palmyros," as United States Territories under the Guano Islands Act of 1856, codified at 48 U.S.C. §§ 1411-1419 (2012).[3]

In 1933, the Office of the Legal Advisor, United States Department of State, wrote that Kingman Reef, under the alias Dangers Rock, "appears on the lists of Guano Islands appertaining to the United States compiled by the Treasury Department" on August 23, 1867.  Further, as of September 16, 1893, the United States Department of the Treasury listed both "Dangers Rock" and "Palmyros" as guano islands that were "bonded" by the Guano Company of New York, under Bond No. 9, on February 8, 1860.[4]

---

[3] Pursuant to the Guano Islands Act of 1856, if a citizen of the United States discovered guano on an unclaimed and uninhabited island and occupied the island, "such island, rock, or key may, at the discretion of the President, be considered as appertaining to the United States."  48 U.S.C. § 1411.  As a prerequisite, the discoverer had to notify the Department of State of their discovery and provide evidence that the island was not "in the possession or occupation of any other government or or the citizens of any other government."  Id. at § 1412.  Assuming the discoverer could meet those requirements, they would gain "the exclusive right of occupying such island, rocks, or keys, for the purpose of obtaining guano."  Id. at § 1414.  The Guano Islands Act specified, "[n]othing in this chapter contained shall be construed as obliging the United States to retain possession of the islands, rocks, or keys, after the guano shall have been removed from the same."  Id. at § 1419.  The Guano Islands Act, therefore, apparently was intended to extend the jurisdiction of the United States over an island only temporarily while its citizens were actively engaged in obtaining guano from the island.

[4] 1 Moore's Digest of International Law 567-68 (Washington, D.C.: Government Printing Office 1906).  Moore's Digest of International Law lists 41 guano islands of actual guano

The United States government was clearly aware of the existence and location of Kingman Reef by at least the early twentieth century. The Pacific Islands Pilot, Volume II, published in 1916 by the U.S. Hydrographic Office, included an entry for Kingman Reef, which listed the location of the atoll, described its shape and size, and indicated that Kingman Reef had been struck by the British ship Tartar in June 1874, and surveyed by the British ship Penguin in 1897. A similar entry was included in the Second Edition of the Pacific Islands Pilot, Volume II, published in 1920. Furthermore, in September 1921, the Navy sent an expeditionary force on board the U.S.S. Eagle from Pearl Harbor to Kingman Reef and Palmyra Island group with the mission, regarding Kingman Reef specifically, of "ascertain[ing] extent and condition of Kingman's Reef, which has been reported by ship masters as supporting vegetation [sic]." The Navy reported that the expedition was "entirely successful," and provided the following description of Kingman Reef:

> Kingmans Reef at low tide shows a small rock, not more than two feet above water and at times awash, and a larger object, which seems to be a sand island about fifty yards long and three feet high. There is no vegatation [sic] of any kind on the reef. At high tide the whole is probably submerged or awash. It is probable that the reef is slightly larger than shown on the chart.

In 1922, Lorrin A. Thurston, agent of the Fullard-Leo family, KRAI's predecessor-in-interest, claimed to have annexed Kingman Reef to the sovereignty of the United States and claimed legal ownership of Kingman Reef for the Island of Palmyra Copra Company (Copra Co.), a corporation under the laws of the then Territory of Hawaii, of which Leslie Fullard-Leo was President and Ellen-Fullard Leo was Secretary. At an April 28, 1922 board meeting for the Copra Co., "[i]t was reported that a plan was on foot to claim Kingman's Reef, [as it was] still believed that this Reef could be of inestimable value to [the] Company and should be claimed for the Company either on the out or homeward voyage of the Palmyra[5] during her next trip." On May 3, 1922, the Copra Co.'s Board instructed and commissioned Mr. Thurston, as its agent, to "take

---

deposits, including brief histories and data regarding their respective discoverers. See id. at 569. The data was compiled from information collected at the Department of State and elsewhere. See id. It included "islands that have not been, as well as those that have been, considered as appertaining to the United States." Notably, the data neither references Kingman Reef nor its alias Dangers Rock and, therefore, does not provide information regarding the alleged discoverer of the supposed guano deposits said to be found on the island. See id. at 569-80.

[5] By 1922, Leslie and Ellen Fullard-Leo had purchased all but two of the approximately fifty islets comprising Palmyra Island. Leslie and Ellen Fullard-Leo formed the Island of Palmyra Copra Company to harvest copra on the island, but, when copra prices dropped after World War I, the company shifted its focus to commercial fishing.

formal possession" of Kingman Reef "on behalf of the United States of America, and claim the same for this Company [Copra Co.]."  In that commission, the Copra Co. asserted that Kingman Reef had hitherto not "been claimed by any other government or people."

On May 10, 1922, Mr. Thurston landed on Kingman Reef, allegedly annexing the atoll, its reefs and lagoon to the United States and claiming ownership of the property for the Copra Co.  Mr. Thurston and five companions read aloud and signed a formal certificate of possession/annexation, which states:

> BE IT KNOWN TO ALL PEOPLE – that on the Tenth day of May A.D. 1922, the undersigned, agent of the ISLAND OF PALMYRA COPRA CO., LTD. (an Hawaiian Corporation), landed from the motor-ship "Palmyra" doth . . . take formal possession of this Island called "Kingman's Reef" . . . on behalf of the United States of America, and claim the same for said Company.

The party built a cairn of coral slabs about four feet high and flew an American flag from a pole supported by the cairn.  The formal certificate of possession, the flag, and a copy of two Hawaiian newspapers, The Honolulu Advertiser and The Honolulu Star-Bulletin, dated May 3, 1922, were placed in a glass jar that was deposited in the base of the coral cairn.  Plaintiff alleges that the annexation procedure was intended to, and did, vest fee title ownership to Kingman Reef in the Copra Co., which annexed Kingman Reef to the United States solely for the purpose of extending United States sovereignty over the island.  Plaintiff alleges that the annexation was neither intended to, nor actually vested, title in the defendant.  In support of this argument, plaintiff points to the certificate of annexation/possession signed by Mr. Thurston, which expressly stated that he claimed Kingman Reef as property of the Copra Co.  One month after Mr. Thurston's alleged annexation, in June 1922, the United States Navy Hydrographic Office acknowledged receiving a copy of an article from The Honolulu Advertiser "giving an account of the party taking possession of Kingman's Reef on May 10, 1922, in the name of the United States."

A few days later, on May 13, 1922, Mr. Thurston wrote a letter to Ellen Fullard-Leo, in which he confirmed that he had claimed fee title ownership to Kingman Reef for the Copra Co.  Further, in accordance with alleged instructions from Mr. Huber, whom Mr. Thurston identified as the "United States Attorney General" for the Territory of Hawaii,[6] Mr. Thurston instructed Ellen Fullard-Leo to file the title claim with the Department of State in Washington, D.C.  Subsequently, on July 15, 1922, Ellen Fullard-Leo, in her capacity as Secretary-Treasurer of the Copra Co., sent a letter to the

---

[6] In a 1936 Letter to the Editor of The Honolulu Advertiser, Leslie and Ellen Fullard-Leo indicated that the Copra Co. consulted Mr. Huber "as to the formalities required to annex land for the United States" prior to commissioning Mr. Thurston to travel to Kingman Reef.

Secretary of State, Charles E. Hughes, in which she advised him that the Copra Co. had annexed on May 10, 1922,

> in the name of the United States of America, and for [the Copra Co.'s] own use, an atoll island charted as "Kingman's Reef" but never before claimed. . . . According to the United States Attorney here, this notification is all that is necessary in addition to listing the same in our local tax returns, as the Palmyra Islands are a part of the county of Honolulu. Hoping that this is sufficient evidence that the same will be recorded and due credit given this Company and Territory. . . .

Ellen Fullard-Leo also enclosed a copy of the certificate of possession/annexation, a report by Mr. Thurston, and newspaper reports covering the annexation and acquisition of Kingman Reef.  Moreover, from 1922 until 1959, as per Mr. Huber's alleged instructions, the Fullard-Leo family paid real property taxes to the Territory of Hawaii for both Palmyra Atoll and Kingman Reef on the same tax key.  After Hawaii received statehood in 1959, Hawaii state taxes were not levied because Palmyra Atoll and Kingman Reef were not incorporated as a part of the lands of the State of Hawaii.  In an April 30, 1998 memorandum on Palmyra Ownership Tidelands, Suzanne Case of TNC, included Section G, titled, "Does Kingman Reef belong to the Fullard-Leos?" and stated that "[t]he Fullard-Leos paid Hawai'i [sic] property taxes on Kingman Reef until 1959."

On August 14, 1922, the Copra Co.'s Board, by unanimous resolution, conveyed its interest in Kingman Reef to Ellen Fullard-Leo for the nominal consideration of one dollar and sundry unsecured loans.[7]  Subsequently, on August 24, 1922, Ellen Fullard-Leo sent a follow-up letter to the Secretary of State, inquiring as to whether her July 15, 1922 letter had been received.  On September 28, 1922, the Department of State acknowledged receipt of July 15 and August 24, 1922 letters and enclosures regarding the Copra Co.'s alleged annexation and ownership of Kingman Reef.  In its response, although the Department of State neither disputed the Copra Co.'s claim to ownership of Kingman Reef, nor asserted that the United States owned the atoll, the letter did not explicitly recognize fee title ownership in the Fullard-Leo family.  Defendant currently alleges that the Department of State did not dispute the Copra Co.'s 1922 "claim" to fee title ownership of Kingman Reef because it was not legally obligated to do so.  Internal documents show that the Department of State initially assumed that Ellen Fullard-Leo's letter was "intended as a notice of discovery under the Guano Acts."  The Department of State's Solicitor concluded that the letter "was not a guano island or a new discovery."

---

[7] By mesne conveyances from Ellen Fullard-Leo, title to Kingman Reef was allegedly held collectively in trust by brothers Leslie Vincent, Ainsley, and Dudley Fullard-Leo, children of Leslie and Ellen Fullard-Leo. Plaintiff alleges that the Fullard-Leo family owned and held title to Kingman Reef from 1922 to November 17, 2000, when the trustee-brothers transferred title to KRAI, the family's limited liability company.  On November 17, 2000, title to Kingman Reef was conveyed by the Fullard-Leo family to KRAI by way of a quitclaim deed filed and recorded in the United States District Court for the District of Hawaii.

The Department's Division of Political and Economic Information communicated to the Solicitor:

> Although it [Kingman Reef] is shown on various charts, and its existence is thus known, its unimportance is evidenced by the fact that no reference is made to it in the gazetteers or in various books dealing with the Pacific Islands.
>
> I understand that most of the rocks are covered with water at high tide.  It is, of course, uninhabited, and is not believed to have resources of material value.  I further find no reference as to its political status.  It may be assumed that it has not sufficient value ever to have been claimed by any of the powers.

Seeking more information about Kingman Reef, in November 1922, the Chief of Naval Operations directed in an internal memo that any crafts or vessels in the vicinity of Palmyra Island and Kingman Reef "conduct investigation with a view to determining the potentialities of these places."

In November 1924, W.G. Anderson and others visited Kingman Reef, where they inspected the bottle deposited by Mr. Thurston in 1922 and left their own record in the cairn.  On June 22, 1925, Mr. Thurston wrote a letter to Admiral R.E. Coontz, U.S.N., in which he suggested that the United States Navy secure both Palmyra and Kingman Reef for "refreshment and supply stations both for naval ships and flying boats" and noted that Kingman Reef together with Palmyra "passed, by purchase, into the ownership of Mrs. E. Fullard-Leo, an American citizen, of Honolulu."  In that letter, Mr. Thurston wrote that he had "sailed direct from Honoluly [sic] to Kingman's [sic] landed and annexed the Island, in the name of the Palmyra Co., an American Company, in accordance with the terms of American law."  Mr. Thurston further wrote: "Upon my return to Honolulu in 1922, seven weeks after the annexation incident above-referred to, I found that the existence of the Island which I had reported, was questioned at Washington. . . ."  Following his assertion that he did, in fact, discover an island called Kingman Reef, Mr. Thurston suggested that the Navy should "secure for its files, definite data concerning both the Palmyras and Kingman's [sic], both as to present conditions and a rough estimate of the cost for making both places available as refreshment and supply stations, both for naval ships and flying boats."

Defendant, on the other hand, points to a statement of John L. Padgett, First Mate on the 1922 voyage to Kingman Reef, that the United States holds title to Kingman Reef under the Guano Acts.  In a May 1937 article, Seaman Padgett indicated that it was the position of the United States government in general, and the Navy in particular, that Kingman Reef did not exist.  In the article, Seaman Padgett stated:

> In 1921, the <u>Sailing Directions for the North Pacific Islands</u> gave the correct position [for Kingman Reef] but then noted – "Existence Doubtful."  This Federal Government printed book in one breadth warned all ships to

avoid the spot and in the next told the wandering seamen not to be surprised if they did not find it.  Since no one was sure it was there no one claimed it. . . . On my return to Honolulu I was called before Rear-Admiral Edward Simpson[8] and staff.   They still seemed to believe the Sailing Directions "Existence Doubtful" but after a morning of questions let me go back to my drawing board.  Shortly after this the U.S. Navy sent a Mine Sweeper down which found Kingman Reef and that made it official.

A July 29, 1926 Memorandum, in response to a request for further information on Kingman Reef, the Navy's Hydrographic Office relayed to the Chief of Naval Operations "the complete information on file in this Office concerning Kingman's Reef."  The last paragraph of the July 29, 1926 Memorandum states: "Hydrographic Office Chart No. 1262a, which shows the various island possessions and mandates in the Pacific and which was constructed after receiving advice from the State Department, clearly shows that this island or reef is United States territory."

 A year later, in June 1926, Mr. Thurston revisited Kingman Reef as a guest on the Navy's U.S.S. Whippoorwill, under the command of Lieutenant Poland, U.S.N.  Lt. Poland's report provided a detailed description of Kingman Reef, finding that it had potential value as a military base and recommending additional surveying.  During this visit, Mr. Thurston examined the record, jar and flag that he had left on Kingman Reef in 1922.  In order to protect the flags and records from disintegration, as the bottle top was rusted and cork partially rotted, Mr. Thurston removed both the 1922 and 1924 records.  By way of a July 9, 1926 letter, Mr. Thurston deposited these items with the Archives Commission of the Territory of Hawaii, located in Honolulu.  Captain Poland signed a certificate evidencing Mr. Thurston's removal of the 1922 and 1924 reports, which had been enclosed in a bottle and left in the cairn on Kingman Reef.  A copy of Captain Poland's certificate also was deposited with the Archives Commission.  Further, Mr. Thurston stated in his July 9, 1926 letter that he "understand[s] the present owner of said Kingman Island to the Mrs. E. Fullard[-]Leo of Honolulu, the successor of said Palmyra Company, Limited."

 In response, on July 24, 1926, the Archives Commission acknowledged receipt of "two glass containers – a fruit jar and beer bottle – received from" Mr. Thurston.  The response further stated that "both containers are deposited with the Archives of Hawaii commission, as objects of record, relative to the formal annexation of Kingman's Reef (Island) [sic] to the United States of America."  Moreover, the commission stated that the jars and their contents "form an official part of our Archives of Hawaii[, but are] 'subject to the order of the owner of said Kingman Island, or of the United States Government.'"  Referencing Mr. Thurston's letter, the Archives Commission also acknowledged Mrs. Ellen Fullard-Leo as the owner of Kingman Reef.

---

[8]  Admiral Simpson served as the Hydrographer for the United States Navy Hydrographic Office from March 1919 to December 1919.

The Navy conducted further surveying of Kingman Reef in April 1927.  The commanding officer's report indicated: "[i]t is felt that Kingman Reef affords an ideal base of great strategical [sic] importance and it should be further developed."

On August 5, 1931, Leslie Fullard-Leo requested that the commanding officer of the United States Geodetic Survey ship Pioneer make detailed surveys of Palmyra Island and Kingman Reef.  The United States Department of Commerce, Coast Guard and Geodetic Survey, on September 30, 1931, responded that the request would be given "careful consideration" when its then current "program in Hawaii has reached an advanced stage of completion."

**1933-1934 Department of State Reports**

On January 9, 1933, the Office of the Legal Advisor, Department of State, issued a publication titled The Sovereignty of Guano Islands in Pacific Ocean.  The purpose of this publication was to "set forth the various claims of limited jurisdiction, or of full sovereignty which have been made to the islands, with a view to determining the present status of the United States claims to territorial sovereignty over them."  Office of the Legal Advisor, The Sovereignty of Guano Islands in Pacific Ocean 580 (Washington, D.C.: Department of State 1933).  Regarding the list of guano islands found in Moore's Digest of International Law, the Legal Advisor specifically noted that, by way of information gathered from archival papers not consulted by Moore, "some of the islands described apparently do not exist, and that most of them do not now, and never did contain guano."  The Sovereignty of Guano Islands in Pacific Ocean at 579.  In the report, "Kingmans Reef" was listed under islands "not claimed by any other Government."  Id. at 571.  Although Kingman Reef was listed as appertaining to the United States in 1867, the Legal Advisor, with specific regard to the United States' claim to Kingman Reef under the Guano Act, stated:

> There is no other mention of Dangers Rock on file in the State Department.  It is not by any means certain that there is or was any guano on this island, or even that there is such an island.  It is, however, practically certain that no guano was ever removed from it, at least by claimants under the Guano Act.  Moreover, Taylor's "discovery" may well have been fictitious, and he probably did not even land there.

Id. at 624-25.

Next, the Legal Advisor discussed the United States' claim to Kingman Reef "through [a]ppropriation by an American [c]itizen."  Id. at 625.  The Legal Advisor recounted Mr. Thurston's May 10, 1922 voyage to Kingman Reef and acknowledged the Copra Co.'s July 15, 1922 notification to "the State Department that it had annexed Kingmans Reef in the name of the United States and for its own use. . . ."  Id.  Then, in reference to the information sent by the Copra Co. to the Secretary of State in 1922, the Legal Advisor stated:

> [I]t appears that the [Copra Co.] . . . had now turned to fishing and was interested in acquiring whatever island there might be on Kingmans Reef for a fishing base. . . . It appears also that an island said to be dry at high tide, and to bear no signes [sic] of any submergence by the sea, and composed of broken coral and sand, actually was found, landed upon, and formally annexed.

Id. at 626.

Later, in the "CONCLUSIONS" section of that same report, the Legal Advisor listed Kingman Reef under "ISLANDS TO WHICH THE UNITED STATES ONLY HAS A CLAIM." Id. at 875 (capitalization in original). Specifically regarding Kingman Reef, the Legal Advisor wrote:

> It is difficult to reach definite conclusions on the legal status of Kingmans Reef because of lack of information. It is not known whether or not there has been any occupation or use of the Reef by American citizens; and it is not even certain that there is an island there which is dry at high tide. However, it may be said: first, the United States has no valid claim to Kingmans Reef arising under the Guano Act; and second, the United States has an inchoate right to the Reef, possibly because of its discovery by Captain Kingman, if he was an American, as seems probable, and because of the formal possession taken by the Island of Palmyra Copra Company, and its use by that company, if there has been any such use. As yet there has been no formal sanction of the company's act by the United States. However, no other Government appears to claim Kingmans Reef, and it would seem that the United States Government could extend its jurisdiction over the island (always supposing that an actual island exists) and that it could then be considered as a part of the territory of the United States. Before any such action is taken, it might be adviseable [sic] to find out if Kingmans Reef is of any possible use to American citizens, or to the Government.

Id. at 875-76.

**President Roosevelt's 1934 Executive Order and its History**

On December 29, 1934, President Franklin D. Roosevelt issued Executive Order No. 6935. Executive Order No. 6935 was issued pursuant to authority vested in the President by the act of "June 25, 1910, ch. 421, 36 Stat. 847, as amended by the act of August 24, 1912, ch. 369, 37 Stat. 497," known at the Pickett Act, which provides in relevant part:

> That the President may, at any time in his discretion, temporarily withdraw from settlement, location, sale, or entry any of the public lands of the

United States . . . and reserve the same for water-power sites, irrigation, classification of lands, or other public purposes to be specified in the orders of withdrawals, and such withdrawals or reservations shall remain in force until revoked by him or by an Act of Congress.

Pickett Act of June 25, 1910, Chapter 421, 36 Stat. 847.   Executive Order No. 6935 ordered that "Kingman Reef, Wake Island, and Johnston and Sand Islands, together with their surrounding reefs, in the Pacific Ocean" be

reserved, set aside, and placed under the control and jurisdiction of the Secretary of the Navy for administrative purposes, subject, however, to the use of the said Johnston and Sand Islands by the Department of Agriculture as a refuge and breeding ground for native birds as provided by Executive Order No. 4467 of June 29, 1926.

Exec. Order No. 6935 (Dec. 29, 1934).[9]  The Executive Order further states that it "shall continue in full force and effect until revoked by the President or by an act of Congress." Executive Order No. 6935, while amended in 1962 with regard to Wake Island, has never been revoked.  See 32 C.F.R. § 761.3(a)(2)(v), (b)(2) (2013).

The Franklin D. Roosevelt presidential papers include an October 16, 1934 letter from Secretary of the Navy, Claude Swanson, to President Roosevelt with a memorandum and enclosures concerning the ownership or sovereignty of certain Pacific Islands.  The memorandum listed twelve Pacific islands and also "indicated the country exercising ownership or sovereignty in each case."  Both Palmyra and Kingman Reef were listed as under the United States, but the memorandum did not mention specifically whether the United States exercised ownership and/or sovereignty.  In Enclosure (B), Kingman Reef was listed as under the "Jurisdiction" of the United States and was described as having a military strategic importance for patrolling maritime steamer routes "between Honolulu . . . and Australia" and "from Panama to the Orient." Secretary of the Navy letter, Oct. 16, 1934, encl. (B) at 6.  Kingman Reef also was listed as having "possibilities for use as a fleet rendezvous, as a fueling place or as a temporary anchorage."  Franklin D. Roosevelt Papers as President; President's Official File 18-V: Department of the Navy: Wake, Johnston, Sand Islands and Midway, etc., 1933-1945 (Box 32) (Roosevelt Papers (Box 32)).  The memorandum continued to describe the physical geography, climatology, and hydrography of Kingman Reef, based on data gathered from the U.S.S. Whippoorwill's earlier survey of the area.  Secretary of

---

[9] In their various deeds and licensing agreements, the Fullard-Leo family, KRAI, KRAD, and KRE recognize that the December 29, 1934 Executive Order No. 6935 placed Kingman Reef "under the jurisdiction of the Secretary of the Navy," but in this court KRAD does not regard the Executive Order as asserting or placing title ownership with the Navy or any entity of the United States.

the Navy letter, Oct. 16, 1934, encl. (B) at 8-12.[10]   In closing, the memorandum noted: "Seaplanes can land anywhere in the lagoon when wind is from east quadrant. . . . There is plenty of room for take-off in any direction.  Water is rather deep for seaplane anchorages but mooring buoys can be planted."  Id. at 12.

On November 9, 1934, nearly two months prior to the issuance of Executive Order No. 6935, R.W.S. Hill of the Office of the Legal Advisor, Department of State, wrote a letter and memorandum in which he discussed the status of the islands in the Pacific Ocean mentioned in the October 16, 1934 letter and memorandum sent by the Secretary of the Navy to President Roosevelt.  Specifically regarding the status of the guano islands, the Legal Advisor at the Department of State wrote:

> This Department as well as the courts and the Attorney General have taken the position that the United States did not acquire sovereignty of, or title to, the guano islands under the Guano Islands Act of 1856. . . . This Department has in the past stated that it has been the course of the Department to recognize such islands only while occupied for the purpose of procuring guano, and therefore upon the cessation of such occupancy they may become open again to discovery, possession, et cetera.

Attached to Mr. Hill's November 9, 1934 letter was the memorandum, dated November 7, 1934, titled "Status of Certain Guano and Other Islands in the Pacific."  This memorandum was issued in response to the Department of the Navy letter of October 16, 1934.   Regarding issues of sovereignty, the State Department Legal Advisor stated:

> The Department has consistently taken the position with regard to these guano islands that, as stated in its letter of July 13, 1914, to Mr. H. Melville Walker (811.0141/13), "the Government of the United States claims no sovereignty or territorial rights over such island, but merely protects citizens of the United States who discover guano thereon, in the prosecution of their enterprise, which extends only to the appropriation and disposal of guano."  Somewhat similar statements were contained in the Department's letter of September 2, 1882, to Mr. Brown, and numerous other communications since that date, up to and including its letter of July 1, 1934, to Mr. Vernon Le Young Ardiff (811.014/295).

> In the opinion of the Attorney General of May 8, 1873 (14 Ops. Atty. Gen. 608), which relates to guano islands, he states: "Upon application to the office of the Secretary of State, I am told that it has been the course of that Department to recognize such islands only while occupied for the purpose of procuring guano, and therefore upon the cessation of such occupancy

---

[10] As noted above, according to the record, Mr. Thurston accompanied the U.S.S. Whippoorwill on its survey trip to Kingman Reef.

they may become open again to discovery, possession, et cetera."

. . .

The implication in the above statement, made by the Department in 1873 when the question of guano islands was a fairly fresh subject with it, would appear to be that after an American citizen had ceased to occupy an island for the purpose of obtaining guano it was no longer regarded by the Department as appertaining to the United States.

These guano islands were referred to by Chief Justice Fuller in his dissenting opinion in Downes v. Bidwell (182 U.S. 244, 372[-73]) as "terra nullius."

Specifically regarding issues of title ownership to guano islands, the State Department Legal Advisor continued:

In a letter dated July 1, 1911, addressed to the Secretary of Commerce, the Attorney General stated in part:

"There is nothing in the act of Congress of August 18, 1856 [Guano Islands Act], from which it can be said that it was intended by said act to recognize title in the discoverer" (of the guano) "or to assume on behalf of the Government complete title, but on the contrary, it is clear that the act meant only to protect the discoverer for the purpose of obtaining and shipping guano and that the Guano Islands 'were in no sense to become part of the territorial domain of the United States.'"

Toward the end of the memorandum and in specific reference to Kingman Reef, Mr. Hill reiterated that "it seems almost certain that no guano was ever removed from the Island." In the immediately preceding paragraphs, the State Department Legal Advisor continued:

On July 15, 1922, the Island of Palmyra Copra Company, a Hawaiian Corporation, notified the State Department that it had annexed Kingman's Reef in the name of the United States and for its own use on May 10, 1922.

No other action appears to have been taken with respect to the incorporation of the Island into the territory of Hawaii or the United States. While it does not appear that any other country has claimed Kingman's Reef, it might be well for this Government to take some affirmative action to show definitively that it is a part of the territory of the United States. The mere mention of it in an Act of Congress as American territory would be sufficient.

On December 13, 1934, just two weeks prior to the issuance of Executive Order

No. 6935, the Secretary of the Navy transmitted to President Roosevelt a "draft of [the] executive order placing Wake Island, Kingman Reef and Johnston and Sand Islands under the control and jurisdiction of the Secretary of the Navy." Secretary of the Navy letter, Dec. 12, 1934, at 1. As to the underlying purpose of the proposed Executive Order, the Secretary of the Navy wrote:

> There are at present on hand a number of requests from airline systems for the use of portions of the above named islands. . . for the establishment and operation of commercial trans-ocean airline facilities. It is felt that greater progress will be made by the airline systems and greater satisfaction will be obtained by the Government if all of the areas involved are placed under one and the same department. . . . [I]t is considered that the interests of the Government would be best served by also placing under the control and jurisdiction of the Navy Department the [  ] areas that are desired to be occupied by trans-ocean airline facilities, viz: Wake Island, Kingman Reef and Johnston and Sand Islands.

With regard to Kingman Reef, the Secretary of the Navy wrote that Kingman Reef was "first seen and reported by Captain Kingman on the American ship SHOOTING STAR. It was claimed for the United States by L. A. Thurston of Honolulu in 1922 and it is recognized by the Department of State as being under the sovereignty of the United States." Id. In closing, the Secretary wrote, regarding the President's authority to issue the Executive Order, that the "sovereignty of the United States over said islands is well recognized and further inquiry respecting the questions of title and jurisdiction need not be made." Id. at 2-3. It appears, however, that the Secretary did not provide any additional information as to the history of Kingman Reef and did not make any reference to Kingman Reef as a guano island. Instead, through a preceding reference, he apparently based the claim of the United States for sovereignty on the actions taken in 1922 by KRAI's predecessors-in-interest. See id. at 2. The Secretary did not assert that the United States held fee title ownership to Kingman Reef.

As noted above, on December 29, 1934, President Franklin D. Roosevelt issued Executive Order No. 6935, which "reserved, set aside, and placed [Kingman Reef] under the control and jurisdiction of the Secretary of the Navy for administrative purposes," subject also to the use of the Department of Agriculture as a refuge and breeding ground for nature birds. Subsequently, on December 31, 1934, President Roosevelt sent a memorandum to the Secretary of the Navy in which he stated:

> In relation to Navy jurisdiction over these Pacific Islands, I think it is highly adviseable [sic] that the Navy exercise that jurisdiction in some tangible form at the earliest possible moment. You might consult with the State Department and ask them if the establishment of a small supply base or the fixing up of a landing place would be adequate to sustain sovereignty.

Roosevelt Papers (Box 32): Memorandum of December 31, 1934.

**Pan American Airways 1937-1938 Flights to Kingman Reef**

An apparent reason for issuance of Executive Order No. 6935 was to place Kingman Reef under United States sovereignty and naval jurisdiction, so that the island could be used for seaplane travel.  To that end, in the mid-1930s, Pan American Airways (Pan Am) began to "look aggressively to the Pacific for its further expansion" and was granted permission to fly its sea planes to New Zealand if it could do so no later than the end of 1936.  While planning the initial test flights, Pan Am chose Kingman Reef as the overnight stopover point between Honolulu, [Hawaii] and Pago Pago, [American Samoa], because it found a mid-ocean lagoon suitable for a seaplane to land.  In 1935, Pan Am's representative, Harold Gatty, visited Kingman Reef, where he "built a small monument on the speck of dry land" and stationed a supply boat there to service the Pan Am Clipper seaplane.

In December 1935, the Navy granted Pan Am a "Revocable Permit" "to operate its commercial trans-Pacific airplane service into and over and to land on the waters of Kingman Reef and Pago Pago Harbor, American Samoa; to use certain areas at Kingman Reef and to moor a company barge and station ship of American Registry at Kingman Reef."  Pan Am's first survey, round-trip flight to Kingman Reef left Honolulu on March 23, 1937 and, after an "overnight stay at Kingman Reef, the Clipper flew on to Pago Pago."  The Clipper returned to Kingman Reef on April 8, 1937 and continued its flight to Honolulu on April 9, 1937.

The Clipper made a second round-trip flight in late 1937.  Outbound, it landed at Kingman Reef on December 23, 1937 and flew onto Pago Pago on December 24, 1937.  Inbound, the Clipper returned to Kingman Reef on January 2, 1938 and flew onto Honolulu on January 3, 1938.  Pan Am's third and final Pacific flight via Kingman Reef was in early 1938.  The Clipper flew from Honolulu to Kingman Reef on January 9, 1938 and, after an overnight stay, it flew on to Pago Pago on January 10, 1938.  After an early morning take off from Pago Pago bound for New Zealand on January 11, 1938, the Clipper exploded and was lost at sea. "After the loss of the Samoan Clipper, the dangerous route through Kingman Reef and American Samoa was abandoned."

On April 20, 1937, in correspondence, Leslie and Ellen Fullard-Leo wrote to the Hawaii congressional delegate in Washington, D.C., Samuel Wilder King, regarding the Pan Am landings at Kingman Reef.  The Fullard-Leo family wrote that Kingman Reef's "ownership presumably rests with the State or Navy Department, since by one of these, use of it has been given to Pan-American Airways, and has on two occasions been used during their trial flight this month to Auckland, N.Z."  The Fullard-Leo family also requested that Mr. King "interest[] the Government in the purchase of the Palmyra group" for the then materializing air "route to the South Pacific."

Moreover, specifically regarding Kingman Reef, the Fullard-Leo family stated: "Not only did we secure this wonderful harbor for the United States but really prevented the same being annexed for a foreign power.  Meanwhile we are still paying taxes on Kingman's which is included in the Palmyra nominal assessment."  In closing, the

Fullard-Leo family presented a claim for $40,000.00, including accrued interest, to cover the costs incurred in "annexing Kingman's Reef" by sending their boat to Kingman Reef three times, as well as to cover the tax payments that the Fullard-Leo family made during the 15-year period from 1922 to 1937.  Although the Fullard-Leo family sought first to pursue their claim through their congressional delegate, they did not rule out the possibility of making a "formal claim through legal channels," for which the award of anticipated legal fees would be requested.

Delegate King forwarded the Fullard-Leo family's letter to the Secretary of the Navy on May 19, 1937, and requested the Navy's comment on their claim.   The Secretary of the Navy responded on May 29, 1937, recounting some of the history of Kingman Reef and indicating that "[t]he records of the Navy Department do not indicate that there were any vested rights on Kingman Reef in favor of private interests on the date of the issuance of" President Roosevelt's December 29, 1934 Executive Order.

On October 15, 1937, The Judge Advocate General of the Navy (Navy TJAG) wrote to the Commandant, Fourteenth Naval District, United States Navy.  In his letter, the Navy TJAG requested "information as to the private ownership of or interest in Kingman Reef and Palmyra Island as disclosed by the records of the Fourteenth Naval District," along with "documents bearing thereon."  In response, on December 6, 1937, the Commandant wrote to the Navy TJAG on the subject of "Kingman Reef and Palmyra Island in the Pacific Ocean – Private Ownership."  The Commandant recited the history of Kingman Reef, starting first with the 1922 annexation by Mr. Thurston and the Copra Co.  Notably, he made no reference to any events regarding Kingman Reef prior to 1922.  The Commandant then wrote that receipt of the 1922 letters sent by Ellen Fullard-Leo to the Secretary of State regarding the Copra Co.'s annexation of Kingman Reef was "acknowledged by the Secretary of State but no mention was made of the claim to Kingman Reef for its own use."

In the same December 6, 1937 letter, however, the Commandant further noted that the "Territory of Hawaii has continued to collect taxes on Kingman Reef from Ellen and Leslie Fullard-Leo as the alleged owners of Palmyra Island and Kingman Reef since 1923, although Kingman Reef is not accepted as a part of the Territory of Hawaii."  In closing, the Commandant stated: "It is understood that Mr. L. Fullard-Leo is preparing to submit a claim for ownership to Kingman Reef in the near future, based upon the original claim of the [Copra Co.], which was financed largely by himself and his wife."  Subsequently, on February 11, 1938, the Navy TJAG acknowledged receipt of the Commandant's letter of December 6, 1937, stating, "[t]he information contained therein will be placed on file for future reference in the event a claim is made for ownership by private parties.  No such claim has been filed with the Navy Department to date."

A few months later, on January 25, 1938, Mr. Townsend and Mr. Lewis, attorneys for the Fullard-Leo family, sent a letter to the Secretary of State regarding Ellen Fullard-Leo's "interest . . . in the island known as Kingman's Reef. . . ."  On February 12, 1938, the Department of State responded, informing Mr. Townsend and Mr. Lewis that the letter was "transmitted to the Secretary of the Navy for his information

in the matter."  Subsequently, on March 29, 1938, Mr. Townsend and Mr. Lewis wrote directly to the Secretary of the Navy to discuss the Fullard-Leo family's claim of fee title ownership in Kingman Reef.  In that letter, Mr. Townsend and Mr. Lewis wrote:

> As indicated in our letter of January 25th to the Secretary of State, it would seem that, as a result of the Executive Order of December 29, 1934, the Secretary of the Navy apparently concluded that the Department of State had denied the existence of the private property interests in Kingman's Reef claimed by Mrs. Ellen Fullard-Leo.  We trust that the letters now in your possession will clarify the position and remove any question as to Mrs. Fullard-Leo's legal rights, which we propose to protect, so far as possible, by appropriate legal proceedings.  It seems unnecessary to restate the costs incurred by Mrs. Fullard-Leo in connection with the annexation of Kingman's Reef for and in behalf of the United States, or to recount the steps taken by her to establish her presently existing legal rights to the private property interests in the atoll.

On April 26, 1938, the Navy TJAG, by direction of the Secretary of Navy, responded to Mr. Townsend and Mr. Lewis' letter of March 29, 1938.  In that letter, the Navy TJAG acknowledged that the Fullard-Leo family's previous correspondence with the Department of State "indicates that the claim of title of Mrs. Fullard-Leo is based" on Mr. Thurston's alleged 1922 annexation of Kingman Reef to the United States and the Copra Co.  The Navy TJAG, however, went on to dispute, and expressly reject, the Fullard-Leo family's claim of ownership, stating:

> The records show that Kingman Reef, otherwise known as 'Dangers Rock,' is a bonded guano island, it having been listed by affidavit of Captain W.W. Taylor on February 12, 1858, and his right through several assignments, were transferred to the United States Guano Company, and the island was bonded on February 8, 1860 (Moore's Digest of International Law, Vol. 1, pp. 667-668).  It will be noted that the island, including its reefs and tide and submerged lands, was under the control and jurisdiction of the United States long before the claim of Mrs. Fullard-Leo arose, and by Executive Order No. 6935, dated December 29, 1934, it was placed under the control and jurisdiction of the Navy Department.  Under the circumstances, the showing made is not sufficient to uphold the claim of Mrs. Fullard-Leo.

Following this year long series of correspondence between the Fullard-Leo family, and then correspondence on their behalf, and the federal government, contact between the Fullard-Leo family and the federal government regarding Kingman Reef appears to have ceased for several decades.  The record does not appear to offer evidence of correspondence or other contact between the Fullard-Leo family and the federal government regarding Kingman Reef from 1938 to 1991.

**President Roosevelt's 1941 Executive Orders**

On February 14, 1941, President Roosevelt issued Executive Order No. 8682, as amended by Executive Order No. 8729, dated April 2, 1941, which "established and reserved as naval defensive sea areas for the purposes of national defense," the "Kingman Reef Naval Defensive Sea Area" and the "Kingman Reef Naval Airspace Reservation" by which the airspace over said territorial waters and islands were reserved as "naval airspace . . . for the purpose of national defense." Exec. Order No. 8682, 6 Fed. Reg. 1015 (Feb. 14, 1941). Executive Order No. 8682 established Naval Defensive Sea Areas over the "territorial waters between the extreme high-water marks in the three-mile marine boundaries" surrounding Kingman Reef and Palmyra, Johnston, Midway, and Wake Islands in the Pacific Ocean, as well as Naval Airspace Reservations of the "airspaces over the said territorial waters and islands. . . for purposes of national defense. . . ." Executive Order No. 8682 further stated:

> At no time shall any person, other than persons on public vessels of the United States, enter any of the naval defensive sea areas herein set apart and reserved, nor shall any vessel or other craft, other than public vessels of the United States, be navigated into any of said areas, unless authorized by the Secretary of the Navy. At no time shall any aircraft, other than public aircraft of the United States, be navigated into any of the naval airspace reservations herein set apart and reserved, unless authorized by the Secretary of the Navy.

Executive Order No. 8729 amended the phrase the "territorial waters between the extreme high-water marks in the three-mile marine boundaries," in a number of Executive Orders, including Executive Order No. 8682. Executive Order No. 8729 stated the phrase "is hereby corrected to read 'the territorial waters between the extreme high-water marks and the three-mile marine boundaries.'" Exec. Order No. 8729, 6 Fed. Reg. 1791 (Apr. 2, 1941). Neither Executive Order No. 8682 nor Executive Order No. 8729 addressed issues of title or ownership of Kingman Reef.

A February 7, 1941 letter from the Bureau of the Budget, Executive Office of the President, to the Secretary of the Navy, regarding the proposed Executive Order No. 8682, stated that the Secretary of the Interior, "assumes that proper provision will be made under the authority given the Secretary of the Navy so as to permit bona fide residents of the areas reasonable means of transportation and communication to and from the islands."

Subsequently, on March 15, 1941, the Chief of Naval Operations, United States Navy (CNO), wrote to the Navy TJAG. The CNO stated that, in preparing administrative regulations for their respective Naval Defensive Sea Areas, "commandant[s] will be invited to the necessity for the minimum of interference with vital industries and vested interests." Moreover, in an April 18, 1941 letter to the Commandant, Thirteenth Naval District, regarding the "Administration of Naval Defensive Sea Areas and Air Space

Reservations," the CNO stated:

> In the administration of these areas, it is not the intention of the Chief of Naval Operations to hamper the commandant by unnecessary regulation. The object of the executive order was to give the commandant necessary authority to control subversive activities and safeguard the national defense. The amount of control necessary can best be judged by the commandant or his representative in command locally.

Decades later, on July 14, 1976, the CNO suspended the Naval Airspace Reservation over Kingman Reef. See 32 C.F.R. § 761.4(d) (2013). Additionally, the CNO suspended the Naval Defensive Sea Area around Kingman Reef, except for the entry of foreign flag ships and nationals. 41 Fed. Reg. 28,957 (Jul. 14, 1976). These areas, however, were made "subject to reinstatement without notice at any time when the purposes of national defense may require." 32 C.F.R. § 761.4(d).

Despite the issuance of the Executive Orders in 1934 and 1941, plaintiff alleges that no restrictions regarding Kingman Reef were ever implemented. To that end, Mr. Savio, in a sworn declaration, stated:

> At no time has the government ever restricted me from entering Kingman Reef itself, its airspace or surrounding waters, nor has the government ever indicated to me that I, acting as the Fullard-Leo family's agent, was not authorized or able to sell, convey or transfer any of its interest in Kingman Reef.

Similarly, brothers Ainsley and Dudley Fullard-Leo, in sworn declarations, each stated:

> At no time have I ever been physically restricted from entering Kingman Reef, nor has the government demonstrated to me, until the taking in January 2001, that the Fullard-Leo family and/or Kingman Reef Atoll Investments, L.L.C. were unable to sell, convey or transfer any of its interest in Kingman Reef.[11]

As noted above, the record does not offer much information on actions or contact between the Fullard-Leo family and the federal government regarding Kingman Reef from 1938 to 1991. The record does reflect that on November 10, 1952, the Commander in Chief, United States Pacific Fleet, Pearl Harbor, Hawaii issued CINCPACFLT Instruction 5521.1A, which "set[] forth detailed procedures for obtaining and [sic] information on travel clearances required for" over fifteen islands and other land masses, including Kingman Reef, Japan, Philippine Islands, Hong Kong, and

---

[11] In his deposition of April 11, 2007 before the United States District Court for the District of Hawaii, Dudley Fullard-Leo stated that he had never physically been on Kingman Reef and had never visited it by ship, but had flown over it twice.

Countries and Territories in or bordering the Pacific Area.  Instruction 5521.1A set forth procedures and applications by which both United States citizens and foreign nationals, who were not United States military personnel, could receive permission to access such islands and land masses.  With regard to Kingman Reef in particular, Instruction 5521.1A first referred to Executive Order No. 8682 of February 14, 1941 and explained its contents.  Second, Instruction 5521.1A stated that it is necessary to "obtain security clearance" to access Kingman Reef through an established procedure,[12] but further noted that "Kingman Reef is not regularly inhabited."

Subsequently, on November 12, 1963, the Office of the Chief of Naval Operations issued "Regulations Governing Issuance of Entry Authorizations," OPNAV Instruction 5500.11C.[13]  These regulations reiterated that the Kingman Reef Naval Defensive Sea Area and Naval Airspace Reservation were established by Executive Order No. 8682 of February 14, 1941.  The Navy regulation also stated that Executive Order No. 6935 of December 19, 1934 placed Kingman Reef and its appurtenant reefs and territorial waters under the control and jurisdiction of the Secretary of the Navy for administrative purposes.  Regarding entry authorizations, The Navy regulation stated:

> Entry authorizations may be issued only after an Entry Control Commander . . . has determined that the presence of the person, ship, or aircraft will not, under existing or reasonably foreseeable future conditions, jeopardize the efficiency, capability or effectiveness of any military installation located within or contiguous to a defense area.
>
> . . .
>
> Requests for entry authorizations will be evaluated and adjudged as to

---

[12] Instruction 5521.1A stated that the requirements to gain permission to access Guam and the Trust Territory of the Pacific apply also to gain access to Kingman Reef.  In order to access Guam and the Trust Territory, security clearance is necessary for all entrants, except for military and civilian personnel of the United States Armed Forces and their dependents, civilians under contract with the armed forces, travelers in transit without stop-over, permanent residents of the trust territories traveling within the Territory or to Guam, and permanent residents of Guam. To receive a security clearance and permission to enter such areas, the Navy required the party seeking entry to submit to a background check and provide relevant background information, including name, address, date and place of birth, alien registration number or proof of citizenship, and employment information, as well as the duration and purpose of the proposed visit.

[13] Defendant, in the Hawaii quiet title action, Kingman Reef Atoll Investments, L.L.C. v. United States, 545 F. Supp. 2d 1103, included updated copies of OPNAV 5500.11C, listed as OPNAVINST 5500.11D of January 31, 1975 and OPNAVINST 5500.11E of September 18, 1990.  All versions of OPNAV Instruction 5500.11 presented to the court contain substantially the same information regarding entry authorization to the Navy defensive zones, including Kingman Reef.

whether the entry at the time and for the purpose stated will or will not be inimical to the purposes of national defense.

On June 21, 1973, A.W. McKelvey wrote a letter to the Honorable Hiram Fong, United States Senator, in which he stated that it has come to his "attention that the Kingman Reef is under the control of the United States Navy." In order to establish a commercial fishing operation in the Line Islands, Mr. McKelvey sought information regarding "who to contact in the Navy Department in order to obtain permission to fish on and about Kingman Reef." In response, Senator Fong directed Mr. McKelvey to Joseph Samartino, Director, Real Estate Division, Commander Naval Facilities Engineering Command, Headquarters, Commander in Chief. The parties have neither made reference to, nor presented further documentation to the court, regarding contact between Mr. McKelvey and the Navy concerning Kingman Reef.

On August 2, 1973, the Navy issued a memorandum in which it stated that if permission to enter Kingman Reef is to be granted, then it suggests specifying that there be "[p]ole and/or net fishing only. No permanent structures on atoll. Effect necessary [Coast Guard] + Navy notification."

**The Status of Kingman Reef During the 1990s**

On January 23, 1991, the Commander in Chief, United States Pacific Fleet, Pearl Harbor, Hawaii issued CINCPACFLTINST 5450.74C, which instructed the Commander of the Naval Base at Pearl Harbor to "[s]erve as Entry Control Commander with authority to approve or disapprove . . . authorization for all persons, ships, and aircraft to enter Kingman Reef."

On July 26, 1991, TNC, a private nature preservation organization, and the FWS met with Peter Savio, agent for the Fullard-Leo family and member/manager of KRAD, to discuss the sale and development of Palmyra Atoll and Kingman Reef. In an August 19, 1991 memorandum discussing the minutes from the July 26, 1991 meeting, James E. Maragos, Director, Conservation Science, of TNC's Pacific Regional Office, wrote that the buy-out option of the Fullard-Leo family's ownership interest in Kingman Reef proposed by Mr. Savio, who also informed the TNC of the Fullard-Leo family's ownership claim, should be seriously considered. Mr. Maragos further noted: "Transfer of Kingman Reef by the owners to the USFWS could also serve as compensation or mitigation for other impacts, and the USFWS is keenly interested in Kingman."

Although defendant asserts that TNC was not acting as the government's agent in any dealings it had or may have had with Mr. Savio or others, representatives from the FWS were present at the July 26, 1991 meeting and were included on the August 19, 1991 memorandum. Additionally, in a sworn declaration, Mr. Savio stated:

I specifically recall that during that meeting the U.S. Fish and Wildlife Service ("FWS") stated that it was keenly interested in Kingman Reef, and that we discussed whether the Fullard-Leo family would be interested in

selling both Palmyra Atoll and Kingman Reef to TNC or the government. No one at the meeting questioned the Fullard-Leo family's legal title to Kingman Reef or suggested that the government owned Kingman Reef.

Additionally, in the August 19, 1991 memorandum, TNC reiterated Mr. Savio's position regarding the relationship between the Fullard-Leo family and the federal government:

> The owners are nervous about collaborating with the federal government due to previous misfortunes. . . . If Savio pulls out of the project, then the owners would not want USFWS/TNC as partner for further attempts at development and conservation. The owners are concerned that the federal government may try to condemn [Palmyra Atoll] once the feds have a foothold. . . .

Additional evidence of subsequent discussions specifically regarding Kingman Reef in the years immediately following the 1991 meeting between Mr. Savio, TNC and FWS, was not presented to the court.  It appears from the record that discussions regarding the conservation of Kingman Reef actively resumed in 1997.

On December 15, 1992, Lieutenant Commander Rick Russell, United States Navy, Pearl Harbor, contacted P. Ha and Andy Yuen at the FWS regarding the granting of access to Kingman Reef.  The record of the telephone conversation stated:

> Lt. Commander Russell called to let us know that he is the person to talk to regarding permission to go to Kingman Reef.

> He called with respect to the Ham Radio expedition to Kingman that is being planned.  There seems to have been a mix-up with the information about who has jurisdiction over Kingman Reef.  It is not Peter Savio.  The Navy (COMNAVBASE Pearl Harbor) has administrative jurisdiction over Kingman Reef by delegated authority under [Executive Order] 6935[,] 29 December 1934.  (Kingman is "reserved reefs").  Lt. Commander Russell just wanted to clarify the issue.  He will call Peter Savio to inform him.

The parties neither referenced, nor provided the court with, documentation of further contact between Commander Russell, Mr. Savio, Mr. Ha or Mr. Yuen regarding this particular issue.   Specifically, the parties have neither alleged nor presented evidence to the court that Commander Russell actually contacted Mr. Savio to restrict Mr. Savio from granting access to Kingman Reef to third parties.

On March 7, 1994, John D. Clouse contacted the Commander of the Pearl Harbor Naval Base, seeking entry and transportation to Kingman Reef.  In response, on March 18, 1994, Commander Russell informed Mr. Clouse that the Navy could not provide transportation to Kingman Reef.  Mr. Clouse was informed, however, that he could enter Kingman Reef, by his own boat charter, after Commander Russell

processed the attached form application (i.e., permit) for entry of ships into areas within the jurisdiction of the Navy at Pearl Harbor.  The parties neither referenced, nor provided the court with, documentation of further contact between Mr. Clouse and the Navy.

On May 28 and 30, 1996, Michal Mickelwait of the Honolulu Sailing Company wrote the Commander of the Pearl Harbor Naval Base, on behalf of a group of travelers seeking to literally set foot on every territory and island group in the Pacific.  Mr. Mickelwait specifically sought permission for the group to enter Kingman Reef.  On May 18, 1996, G.D. Jensen, Captain, United States Navy responded to Mr. Mickelwait's request in a letter which granted permission for the group to enter Kingman Reef, during daylight hours, for a maximum duration of four hours.  The parties did not present the court with evidence that Mr. Mickelwait's group ever actually entered Kingman Reef.

Similarly, on October 6, 2000, P. Borkowski, Lieutenant Commander, United States Navy wrote a letter to David Johnson, granting permission for the ship, M/V Machias, to enter Kingman Reef from October 20, 2000 until November 1, 2000 to "conduct natural history surveys and to engage in amateur radio activities."  The record does not contain evidence that the M/V Machias actually entered Kingman Reef.

It also appears that between 1991 and 1997 the Fullard-Leo family attempted to sell to, or jointly develop, Kingman Reef with the State of Hawaii or City of Honolulu.  To that end, on August 4, 1994, Leigh-Wai Doo, Councilmember, City Council of the City and County of Honolulu, wrote to Ainsley and Dudley Fullard-Leo, as well as to Peter Savio, thanking them for

> sharing with me your time and openness of Hawaii government acquisition of Palmyra Atoll and Kingman Reef.  I continue in my strong belief, desire and effort to see Hawaii State or Honolulu City and County acquisition, or at least jointly plan with you[,] Palmyra Atoll and the Kingman Reef.  In the coming five months remaining in my City Council term I hope we achieve success to these ends.

Plaintiff alleges that this letter is evidence that the Hawaii state government recognized the validity of the Fullard-Leo family's claim of fee title ownership in Kingman Reef.

**The Establishment of the Kingman Reef NWR**

In the late 1990s, the federal government appears to have renewed its interest in Kingman Reef.  Beginning in October 1997, the FWS began to develop and issue proposals regarding the proposed establishment of the Kingman Reef NWR.  On October 2, 1997, Jamie Rappaport Clark, then Director of the FWS granted approval to the Regional Director, Region 1, FWS to "proceed with detailed planning" on the establishment of the Palmyra Atoll and Kingman Reef NWRs. Attached to that memorandum was an August 1997 Preliminary Project Proposal, which noted:

[a] Explorers wishing to visit Kingman Reef must secure permission from the Fullard-Leo family and the U.S. Coast Guard.

[b] Kingman Reef was annexed on behalf of the United States in 1922, by the Palmyra Copra Company (Fullard-Leo family), and the family claims ownership.  It is an unincorporated U.S. possession administered by the U.S. Department of the Navy.  The Service [FWS] is proposing to study fee title acquisition of Kingman Reef from the center of the atoll to the 3-nautical mile limit.

[c] The Landowners are reportedly willing to sell their lands to prevent heirs from acquiring a large inheritance tax debt.

[d] [T]he price for fee title to Kingman Reef is unknown.  Due to the negligible commercial real estate value, it might be possible to include it in the purchase price negotiated for Palmyra.

Next, on October 3, 1997, Robert P. Smith, Pacific Islands Manager for the FWS sent a handwritten facsimile to Mr. Savio in which he stated:

Peter, the attached represents approval from our director in Washington, Jamie Clark, to proceed with detailed planning necessary for our acquisition.  Note that we desire to acquire both Palmyra and Kingman, if that is the sellers' desire. I will transmit this to Col. Ralph Graves of the Corps with a cover letter emphasizing the need to do clean-up work [at Palmyra Atoll].

Concurrently, on October 3, 1997, Mr. Smith also wrote a letter to Lieutenant Colonel Ralph H. Graves, Honolulu District Engineer, United States Army Corps of Engineers, Fort Shafter, Hawaii.  Mr. Smith noted that the enclosed memorandum from Mr. Clark gave approval for the FWS to "begin detailed planning toward (hopefully) acquisition of Palmyra Atoll and Kingman Reef as units of the National Wildlife Refuge System."  Mr. Smith continued to write that the FWS is working closely with Mr. Savio, "a local realtor who represents the interests of the majority owners[,]" as well as TNC, and he "at this point foresee[s] TNC actually tendering an offer to buy the property.  If that is successful, the Service will repay TNC in the future with dollars appropriated by Congress through the Land and Water Conservation Fund."

Regarding the defendant's alleged recognition of fee title ownership in the Fullard-Leo family, Mr. Smith stated, in an April 2, 2007 deposition in the District Court for the District of Hawaii case, Kingman Reef Atoll Investments, L.L.C. v. United States, that "[f]rom '91 until certainly '97 . . . certainly [he] believed that the Fullard-Leo family owned Kingman Reef," and that no one in his presence stated that the Fullard-Leo family did not own Kingman Reef.  Mr. Smith, however, indicated that on a second expedition to Palmyra Atoll, in 1998, he had changed his position regarding the claim of fee title ownership by the Fullard-Leo family in Kingman Reef.  Mr. Smith stated that

between 1997 and 1998:

> The Nature Conservancy's attorney, Suzanne Case, had done extensive research on the ownership of Kingman; because [Mr. Smith] was then and probably continued to be . . . a cheerleader for getting both properties and both nearby marine environments. . . . [Ms. Case's] research revealed that the Fullard-Leo family, at least in her view, did not own Kingman Reef.

Although without offering any additional foundation for his conclusions, Mr. Smith further stated that following the 1998 expedition, the Realty Division of the FWS decided that, "in the view of the government," Ms. Case's research was correct and that the Fullard-Leo family did not hold title to Kingman Reef.

An October 17, 1997 report issued by NOAA, however, acknowledged the ownership by the Fullard-Leo family of Kingman Reef:

> The Fullard-Leo family owns Palmyra Island and Kingman Reef, and may claim ownership or jurisdiction over ocean resources and/or submerged lands seaward of the low-water mark.

> The exact extent of the Fullard-Leo claims is not clear, probably extending to the lagoons and reefs surrounding the islands, and perhaps extending to the "territorial" waters.  Federal submerged lands around these areas were not conveyed to the Fullard-Leo family.  It is the position of the Federal Government that the EEZ [Exclusive Economic Zone] around Palmyra and Kingman extends to the low-water mark.[14]

Further, in his November 1997 "Report to the Chairman, Committee on Resources, House of Representatives, United States Insular Areas, Application of the United States Constitution," the Associate General Counsel of the United States

---

[14] Defendant admits that the August 1997, October 2, 1997 and October 3, 1997 documents, produced by FWS, referenced above, are accurately quoted. Defendant, however, argues that any "preliminary" reports, documents or letters, including a 1997 proposal to study fee title acquisition of Kingman Reef that FWS issued in connection with the process for determining whether to designate Kingman Reef as a National Wildlife Refuge must be interpreted in light of subsequent investigations undertaken in connection with that determination and the issuance of any final reports and decisions regarding Kingman Reef. Defendant further asserts that subsequent investigations confirmed that the United States was the owner of Kingman Reef and that the claims of private ownership asserted by the Fullard-Leo family and related entities were invalid. Defendant also has stated that the author of the October 17, 1997 NOAA report was not charged with investigating or otherwise assessing title to Kingman Reef and had no authority to claim or disclaim title to federal property.  Finally, defendant states that the NOAA statement that the Fullard-Leo family owns Kingman Reef is incorrect.

General Accounting Office (GAO), the investigative arm of Congress, specifically noted that Kingman Reef had been claimed by the Fullard-Leo family.  Id. at 9.[15]  First, the GAO noted that seven of the nine United States insular areas,[16] including Kingman Reef, were initially claimed for the United States under the Guano Islands Act of 1856, codified at 48 U.S.C. §§ 1411-1419.  Report to the Chairman, Committee on Resources, House of Representatives, United States Insular Areas, Application of the United States Constitution, at 10.  The GAO stated, however, that, "[a]lthough claims were made to Palmyra Atoll and Kingman Reef under the act, the presence of guano in either area is doubtful."  Id. at 39 (citing Legal Advisor's Office, U.S. Department of State, The Sovereignty of Islands Claimed Under the Guano Act and of the Northwest and Hawaiian Islands, Midway, and Wake at 612-15, 624-25 (1933)).  In fact, the GAO reiterated that "Palmyra previously had been claimed in 1860 under the Guano Islands Act.  The claim, however, does not appear to have been accepted as valid.  It is unlikely that the claimant landed on the island or that there was even any guano on it."  Report to the Chairman, Committee on Resources, House of Representatives, United States Insular Areas, Application of the United States Constitution at 41 n.9 (citing The Sovereignty of Islands Claimed Under the Guano Act and of the Northwest and Hawaiian Islands, Midway, and Wake at 612-15, 875).

With specific regard to Kingman Reef, the GAO report concluded:

First discovered in 1798 by an American whaler, Kingman Reef was claimed in 1860 by the U.S. Guano Company, although there is no evidence that guano existed or was ever mined there.  The atoll was claimed again in 1922 by Lorrin Thurston on behalf of the Palmyra Copra Company for use as a fishing base.  The State Department concluded in 1933, in a study of islands claimed under the Guano Islands Act, that claims made under the act to Kingman Reef were not valid.  However, an American had initially discovered Kingman and no other nation claimed it.  In 1934, President Franklin Roosevelt placed the reef under the control of the Navy, formally asserting American rights to it.  During World War II, Kingman was included in a naval defensive area established by President

---

[15] The draft of the GAO report was submitted to the Department of Interior, Department of Justice, and Department of State for comment.  "Each of these agencies and offices generally agreed with the information and issues discussed in [the] draft report and offered technical comments, which [were] incorporated in the report as appropriate."  Specifically, on July 3, 1997, the Department of Interior "commend[ed the GAO] on the report's content and accuracy."  The GAO "modified the report to reflect the Department of the Interior's comments," including those from the Office of Insular Affairs and the FWS.

[16] The nine small insular areas are Palmyra Atoll, Navassa Island, Johnston Atoll, Baker Island, Howland Island, Jarvis Island, Kingman Reef, Midway Atoll, and Wake Atoll.  All islands except for Midway Atoll and Wake Atoll were claimed under the Guano Islands Act.

Roosevelt.  In 1950, the Congress enacted a law making Kingman Reef, along with several other insular areas, subject to the jurisdiction of the U.S. District Court in Honolulu for purposes of any criminal or civil cases that might arise there.

Id. at 57-58.

Regarding the Fullard-Leo family's claim of fee title ownership to Kingman Reef, the GAO noted that although Mr. Savio informed the GAO that the Copra Co. ceded all rights to Kingman Reef to the Fullard-Leo family in 1922, "Navy personnel searching Hawaiian land records in 1986 were unable to locate a formal record of a conveyance of Kingman Reef to the Fullard-Leos," although recording may not have been required.

In an August 12, 1997 letter regarding the 1997 GAO report, however, T.E. Manase Mansur, Advisor on Insular and International Affairs to the United States House of Representatives, Committee on Resources, thanked Mr. Savio for "sending the information clarifying the rightful title of the Fullard-Leo's to Palmyra and Kingman Reef. The brief is well documented regarding the basis for clear title to the entire area of Palmyra and Kingman, including surrounding reefs."  Mr. Mansur continued:

The House of Representatives has designated the Committee with primary jurisdiction for all territories.  There is considerable interest in Congress in insuring that private property rights of U.S. citizens are protected.  That certainly includes the Fullard-Leo's rights to Palmyra and Kingman currently and under any future legislation which would affect the formal jurisdiction of these islands.

Subsequently, on October 26, 2000, the United States Senate Committee on Appropriations sent letters to the Secretary of the Department of the Interior, Bruce Babbitt, and the Secretary of the Department of Agriculture, Daniel Glickman, informing them that Congress provided an "additional $179 million for high priority land acquisitions," $130 million of which was provided to the Department of the Interior (DOI) pursuant to the "Department of the Interior and Related Agencies Appropriations Act, 2001."  Pub. L. No. 106-291, 114 Stat. 922 (2000).  Apparently, DOI had requested $8.25 million for the purchase of "Palmyra Atoll/Kingman Reef (HI)."

Earlier, on October 6, 1999, Michael Killian, United States Navy, sent an email to Steven M. Dong, United States Navy, regarding information requested on Kingman Reef by the Deputy Assistant Secretary of the Navy, W.J. Cassidy.  In his response, Mr. Killian wrote that:

Navy was designated the responsible federal agency to "own" Kingman Reef for lack of any other appropriate interested agencies.  We are stuck with it.  If now, we have another interested agency such as USFWS, then Navy should have no problem transferring custodial responsibility to DOI. As long as it is in federal ownership, Navy can deal with national security

concerns involving the island.  I am unaware of any Navy usage in recent history.  It may have been occupied during WWII.

Subsequently, a March 30, 2000 Briefing Statement prepared for the Director of FWS, titled "Kingman Reef Ownership Status and Federal Jurisdictions," stated:

Kingman Reef is an unorganized and unincorporated U.S. possession. The U.S. acquired sovereignty over Kingman Reef pursuant to the Guano Act of 1856.  Fee title interest rests with the Federal Sovereign.  It is currently under the jurisdiction of the U.S. Navy.

The Fullard-Leo family is claiming private ownership.  In 1922, the American flag was hoisted over Kingman Reef at the request of the Fullard-Leo family for the purpose of taking formal possession.  This is the same family that owns Palmyra Atoll, and whose ownership was confirmed by the Supreme Court decision, United States v. Fullard-Leo, 331 U.S. 256 (1947) - the case did not address Kingman Reef.  Recently, The Nature Conservancy obtained a purchase agreement for Palmyra Atoll.

People wishing to visit Kingman Reef must secure permission from the Fullard-Leo family.  However, the U.S. government does not recognize the family's imputed right to act in this manner.

In closing, the Briefing Statement observed, as an ongoing concern, "the private ownership claims made by the Fullard-Leo family, though unsubstantiated, may need to be resolved. . . ."

Subsequently, on August 25, 2000, the Department of the Navy transferred "[c]ontrol over and administrative jurisdiction of Kingman Reef, together with all reefs surrounding such island" to the DOI.  At the time, the Navy determined that Kingman Reef was "excess" to Department of Defense requirements and that the property was "suitable for transfer to another Federal agency."  On September 1, 2000, the DOI acknowledged the acceptance of transfer, subject to President Roosevelt's Executive Orders of 1934 and 1941.

Next, on December 11, 2000, FWS issued a Draft Environmental Assessment (Draft EA) and draft Conceptual Management Plan for the proposed Kingman Reef NWR.  FWS also sought public comments on the proposal for a 30 day public comment period, ending January 11, 2001, following the release of the Draft EA.  In the Draft EA, the FWS wrote that it "will acquire land and water interests including, but not limited to, fee title, easements, leases, and other interests.  Donations of desired lands or interests are encouraged.  At Kingman Reef, the interest necessary to ensure the ability to properly manage the resources is Service [FWS] ownership of the reef and associated submerged lands and waters within the proposed Refuge boundary."

In section 2.1 of the Draft EA, titled "Overview of Kingman Reef," FWS recounted the history of Kingman Reef, stating that Captain Fanning first discovered the island in 1798 and that Captain Kingman, for whom it was named, visited in 1853.  Id. at 2-1. The FWS continued:  "The U.S. annexed the reef in 1922, and in 1934 delegated jurisdiction to the Navy."  Id.  The report neither references the Guano Islands Act nor the United States' claim of ownership under the Guano Islands Act.  Further, the report does not describe the manner by which the United States annexed Kingman Reef in 1922 and there is no discussion of Mr. Thurston's voyage to Kingman Reef.

In section 2.3.1 of the Draft EA, "Affected Social and Economic Environment: Ownership," the FWS wrote:

> Kingman Reef is not part of any state (U.S. GAO 1997).  The atoll is a United States unincorporated territory without an organic act, which is currently subject to control by the U.S. Navy.  For the past 59 years, the reefs and waters of the territorial sea (within 12 nautical miles of the extreme high tide mark) have been reserved as a Naval Defensive Sea Area for the purpose of national defense (E.O. 8682 dated February 14, 1941).  At such time as Kingman Reef is no longer needed for military purposes and the Navy terminates its military use, the Department of the Interior would regain full jurisdiction.  The Service [FWS] would subsequently establish the Refuge through a Secretarial Order transferring jurisdiction and control from the Office of Insular Affairs to the Service [FWS].

Id. at 2-2.

In section 4.2.1 of the Draft EA, "Effects of the Alternatives on the Social and Economic Environment: Effects of the alternatives on ownership," regarding the alternatives of taking no action or establishing a NWR at Kingman Reef, the FWS wrote:

> Both alternatives would continue the Federal ownership at Kingman Reef, and waters of the territorial seas.  If the Navy extinguishes its use reservation, under [the No-Action Alternative], jurisdiction and control would revert to the Office of Insular Affairs.  If the Navy extinguishes its use reservation, under [the Refuge Alternative], Kingman Reef and the waters of the territorial sea would be transferred to the Service [FWS] for use as a National Wildlife Refuge.

Id. at 4-1.  In Table 4-1 of the Draft EA, the FWS wrote that if the No-Action Alternative were taken, "Kingman Reef would remain under the control of the U.S. Navy," but that, if the Navy extinguished its use reservation, the Office of Insular Affairs would acquire jurisdiction.  Id. at 4-4.  But, if the NWR were established, "Kingman Reef would remain under Federal jurisdiction.  If the Navy extinguished its use reservation, the Service [FWS] would acquire jurisdiction."  Id.

In section 2.3.4 of the Draft EA, "Public use and visitation," the FWS wrote: "No permits have been recently issued by the Navy for members of the public to visit Kingman Reef." Id. at 2-3. The FWS also stated, at section 4.2.2, "Effects of the alternatives on land use and the local economy," that "[u]nder the No-Action [A]lternative, access to and use of Kingman Reef and its surrounding waters would continue to be regulated by the Navy and reserved for military use." Id. at 4-1.  At section 4.2.3, FWS wrote, "at present, there is no commercial fishing authorized by the Navy." Id. at 4-2.  At 4.2.4, FWS wrote that "[u]nder the No-Action alternative, access to Kingman Reef would continue to be restricted by the Navy within the territorial sea." Id.

Further, in section 3.5 of the Draft EA, the FWS stated that the establishment of the NWR with a boundary of 12 nautical miles from reefs awash at mean low tide, rather than taking no action, "would allow the Service [FWS] to provide long-term conservation and management of coral reef and other marine and terrestrial resources at Kingman Reef in perpetuity." Id. at 3-2, 3-4.

Following the release of the Draft EA, the FWS issued a news release, on December 12, 2000, titled "Public Comments Sought on Kingman Reef National Wildlife Refuge Proposal."  The release specifically stated:

> Kingman Reef is an unincorporated United States territory currently administered by the U.S. Navy.  For the past 59 years, its reefs and waters have been reserved as a Naval Defensive Sea Area.  The Navy is considering relinquishing its administration and returning it to the U.S. Department of the Interior.

Additionally, FWS wrote that the "Navy has not authorized fishing within its naval defensive seas, though a low level of commercial fishing for sharks and big-eye and yellow-fin tuna occurs within the 200-nautical mile Exclusive Economic Zone outside the Navy's jurisdiction."

Concurrent with the news release, a newspaper article by Harold Morse regarding the proposed Kingman Reef NWR appeared in the Honolulu Star-Bulletin on December 13, 2000 regarding the proposed Kingman Reef NWR, which quoted FWS officials stating that Kingman Reef was "[f]ormally annexed by the United States in 1922, it became a U.S. Naval Reservation in 1934.  Pan American World Airways used it in 1937-38 as a station for seaplanes flying between Hawaii and New Zealand." Harold Morse, Plan would turn Navy's isolated Kingman atoll into refuge, Honolulu Star-Bulletin, Dec. 13, 2000.  The article neither made mention of the Fullard-Leo family or their claim to Kingman Reef, nor stated who or which entity held ownership to Kingman Reef. Id.

On November 17, 2000, the Fullard-Leo family quitclaimed "[a]ll of Grantor's rights, title and interest in" Kingman Reef to KRAI.  The same day, KRAI leased Kingman Reef to KRAD for a period of seventy years.  In addition, with KRAI's consent, KRAD entered into a license agreement with KRE.  The license agreement stated:

The intent of the parties is that Licensee [KRE] shall have the exclusive right to use Kingman Reef for commercial fishing and related transport and support operations, as set forth in this Agreement, and that Licensor [KRAD] shall not allow Kingman Reef to be used for such operations by any others.

The license agreement indicated that Kingman Reef "is a possession of the United States and subject to federal laws, but it is not subject to the laws of any state (including the State of Hawaii) or county (including the City and County of Honolulu)."  Section 1.08 of the license agreement, however, addressed the fact that ownership of Kingman Reef either was or might become contested, stating:

**Section 1.08         Agreement Subject to Rights and Reservations of Others.**

(1) Licensor [KRAD] hereby discloses, and Licensee [KRE] acknowledges, that the federal government may have asserted or may assert claims regarding the ownership of Kingman Reef and its lagoons and territorial waters, which claims the Master Lessor [KRAI] disputes. Licensee acknowledges and agrees that Licensor has not made and does not hereby make any representations or warranties, express or implied, regarding the nature or extent of Licensor's or Master Lessor's interest in Kingman Reef or in the lagoons or territorial waters thereof.  Without limiting the generality of the foregoing, Licensor hereby discloses and Licensee hereby acknowledges, that while the Master Lessor believes that the Master Lessor has rights to Kingman Reef, the nature of the Master Lessor's interest in Kingman Reef has not been determined.  All of Licensee's rights under this Agreement shall be solely as specified in this Agreement, and Licensee acknowledges and agrees that this Agreement is subject to the extent of Master Lessor's interest in Kingman Reef. . . .

The parties agreed that, if KRE's permitted activities under the license agreement were materially disrupted by "any person or governmental authority," KRE could terminate the license agreement, provided that they made all outstanding payments.

Following issuance by the FWS of the Draft EA and Conceptual Management Plan in December 2000, KRAI and KRAD, as well as other interested parties, requested that the time for public comment be extended by thirty days.  DOI denied those

requests.[17]

    In their January 11, 2001 joint letter to the FWS, the Fullard-Leo family, KRAI, KRAD, KRE and Palmyra Pacific Seafoods stated:

> Creation of the NWR will result in a direct taking and confiscation of private property in violation of the Fifth Amendment to the United States Constitution. . . . The EA, allegedly supporting the creation of the NWR, contains numerous errors, inconsistencies, omissions and misrepresentations.  The EA is fatally flawed and cannot form the foundation for any final agency action.  In particular, the EA conceals from the public the fact that Kingman Reef is privately owned by [the] Fullard-Leo Family and that the Fullard-Leo Family is the undisputed owner of Kingman Reef.  The omission of this key fact, on its face, appears to be a bad faith effort by FWS to confiscate extremely valuable private property and push this proposed matter through on an accelerated track prior to the new Bush administration taking office.

    On January 11, 2001, Carolyn Bohan, Regional Chief, National Wildlife Refuge System at FWS responded to the Fullard-Leo family and KRAI's letters of December 22, 2000 and January 4, 2001.  The FWS wrote:

> We made the decision not to extend the comment period because it is not the means to resolve a title issue.  The end result of our planning process, if the decision is made to proceed with a refuge, is an approved refuge

---

[17] Parties that requested a thirty day extension to the public comment period for the proposed Kingman Reef NWR included the Fullard-Leo family, KRE, Palmyra Pacific Seafoods, L.L.C. (PPS), and the Western Pacific Regional Fishery Management Council (WPRFMC).  KRE's December 19, 2000 letter to the National Wildlife Refuge System notified the organization of a potential direct and regulatory taking because "KRE holds inchoate contractual fishing rights" within the 12 mile area extending from the low water mark at Kingman Reef, which is to be included in the NWR, and that "[e]stablishment of the refuge would also eliminate KRE's contractual rights to establish a base camp operation at the atoll."  PPS, in a December 19, 2000 letter to the National Wildlife Refuge System stated that, "PPS has made a significant investment in obtaining, developing and operating its commercial fishing operation from the Palmyra Atoll and within the ocean waters around Kingman Reef.  It is PPS' understanding that both Palmyra and Kingman are privately owned by the Fullard-Leo family of Hawaii.  PPS is operating under rights granted to it by the Fullard-Leo family."  The WPRFMC, on December 29, 2000, wrote to the FWS regarding Kingman Reef, stating that "ownership of the island may be vigorously contested in court, and in connection with this there are other legal issues concerning rights to commercial fishing around the island."  Despite the denial of the extension, KRAI and the Fullard-Leo family timely submitted their comments to FWS in letters dated December 22, 2000, January 4, 2001, and January 11, 2001.

boundary within which we will have authority to acquire lands and waters. After a boundary is approved, title to lands can and often does change. Title issues can continue to be raised and resolved. . . .

Your letters assert that the Fullard-Leo family are [sic] the owner of Kingman Reef.   After reviewing the matter, we have found no substantiation to this claim.  In 1934 and again in 1941, Kingman Reef was reserved, set aside, and placed under the control and jurisdiction of the Department of the Navy by Executive Orders. . . .

We are aware of no evidence that the claim the Fullard-Leo family is asserting was ever recognized by the United States.  In addition, we are aware of no evidence that the Fullard-Leos have, subsequent to the 1934 Executive Order, challenged the claim of the United States to Kingman Reef.

We need adequate, documented proof of ownership. . . . We will acknowledge [the Fullard-Leo and KRAI] claim in the final revisions to our environmental assessment; but unless we receive acceptable, written proof of ownership, our position will continue to be that Kingman Reef is Federally owned.

On January 17, 2001, the FWS issued a Finding of No Significant Impact (FONSI), which concluded that the establishment of the Kingman Reef NWR was "not a major Federal action that will significantly affect the quality of the human environment within the meaning of section 102(2)(C) of the National Environmental Policy Act of 1969 [(NEPA)], as amended."  National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. (2012).  The FONSI stated:

A private entity claimed to own title at Kingman Reef.  The Service [FWS] requested that the Office of Solicitor, Department of the Interior, review the documents provided by the legal firm representing the claimants.  The Solicitor believes the claim is not legally valid.  Therefore, the proposed Refuge would not result in a significant adverse economic or regulatory taking on the private entity.

The FONSI continued:  "The first recorded western contact at Kingman Reef was by an American seaman, Captain Fanning, in 1798.  The Reef was named after Captain Kingman, who visited in 1853.  The U.S. annexed the reef in 1922, and in 1934 delegated jurisdiction to the Navy."  (citations omitted).  The FONSI further stated:

A private entity challenged the government's claim to title at Kingman Reef.  Although the Service [FWS] is aware of previous claims of ownership by a private entity, the Navy's title research in the past (reported in GAO 1997) and our own title research did not find evidence to substantiate the claim.  During the public comment period, the private

party provided documentation regarding their ownership claim. The documents were reviewed by the Department of the Interior's Office of the Solicitor. The Solicitor believes that the legal title holder of record is the Department of the Interior, with a reservation in favor of the U.S. Navy.

On January 18, 2001, one day after the issuance of the FONSI, Secretary of the Interior Bruce Babbitt signed Secretarial Order No. 3223, which established the Kingman Reef National Wildlife Refuge, consisting of emergent areas of Kingman Reef and also of its surrounding submerged lands and waters out to the twelve (12) nautical mile Territorial Sea Boundary," to be administered by the Director of the FWS in a manner consistent with Executive Order No. 6935 of 1934 and Executive Order Nos. 8682 and 8729 of 1941.[18] The Kingman Reef NWR consists of "the emergent areas of Kingman Reef and also its surrounding submerged lands and waters out to the twelve (12) nautical mile Territorial Sea Boundary."

On January 6, 2009, by Presidential Proclamation, the Pacific Remote Islands Marine National Monument was created, which included Kingman Reef. Proclamation No. 8336, 74 Fed. Reg. 1565 (Jan. 6, 2009). The Presidential Proclamation noted that

Palmyra Atoll is a classic Darwinian atoll that formed atop a sinking Cretaceous-era volcano. Kingman Reef formed in the same manner but is considered an atoll reef because it lacks permanent fast land areas or islands. Kingman Reef contains a sheltered lagoon that served as a way station for flying boats on Hawaii-to-American Samoa flights during the late 1930s. There are no terrestrial plants on the reef, which is frequently awash, but it does support abundant and diverse marine fauna and flora. Palmyra Atoll is managed by the United States Fish and Wildlife Service as a wildlife refuge.

In 2001, the Secretary of the Interior established National Wildlife Refuges at Palmyra Atoll and Kingman Reef. Palmyra Atoll and Kingman Reef are known to be among the most pristine coral reefs in the world, with a fully structured inverted food web. Kingman Reef is the most pristine of any reef under U.S. jurisdiction. They are ideal laboratories for assessing effects of climate change without the difficulty of filtering anthropogenic impacts. Both Palmyra Atoll and Kingman Reef support higher levels of coral and other cnidarian species diversity (180-190 species) than any other atoll or reef island in the central Pacific, twice as many as are found in Hawaii or Florida.

_____

[18] As an example of the implementation of the Kingman Reef NWR, FWS issued a "Special Use Permit" to Rusty Brainard, Ph.D., on December 29, 2005, which permitted Dr. Brainard to "conduct quantitative assessments and monitoring of shallow reef fish assemblages at . . . Kingman Reef NWR[]" from January 1 to April 30, 2006.

Id. at 166-67.

**Palmyra Island**

Ownership of Palmyra Island, another atoll which lies approximately 33 nautical miles from Kingman Reef, also was litigated by the Fullard-Leo family and the United States.  Palmyra Island is comprised of more than fifty islets, "many of which are covered with trees and tropical vegetation, surrounding three deep-water lagoons." See United States v. Fullard-Leo, 66 F. Supp. 774, 775 (D. Haw. 1940), rev'd, 133 F.2d 743 (9th Cir.), cert. denied, 319 U.S. 748 (1943).  In 1862, Johnson Wilkinson and Zenas Bent, citizens of the Kingdom of Hawaii, "made a 'representation' concerning Palmyra Island to the King," of Hawaii at a meeting of the Cabinet Council, the full substance of which is unknown, but a transcript of the meeting indicates requested that the island "should be considered a Hawaiian possession & be placed under the Hawaiian Flag." Id.  The Minister of the Interior wrote to Messrs. Wilkinson and Bent, stating that that King's government "consent[ed] to the taking of possession of the island of Palmyra," and forwarding an "Authority under Royal Sign" to Mr. Bent to take possession of the island. See id.  Mr. Bent wrote to the King and the Minister of Interior on June 16, 1862, saying, "I took possession of Palmyra Island, in the name of His Majesty; and according to my instructions, I erected on the island a pole, with the Hawaiian flag wrapped round it; and I interred at the foot of it a bottle well corked, containing a paper signed by me. . . ." Id. at 776.  The Minister of Interior issued a proclamation stating that Palmyra Island "was taken possession of, with the usual formalities, by Captain Zenas Bent, he being duly authorized to do so, in the name of" the King.  Id.

Mr. Bent and Mr. Wilkerson evidently believed that, by taking possession of Palmyra Island, albeit in the name of the King, they had acquired title to the island.  In a deed, which was recorded in 1885, Mr. Bent conveyed all of his interest in Palmyra to Mr. Wilkerson.  Between 1885 and 1912, title purportedly passed among a number of parties, but in 1912, Henry E. Cooper filed a petition in the Land Court of the Territory of Hawaii, claiming ownership of Palmyra Island in fee simple and requesting registration of his title.  See id. at 777-78.  The Territory of Hawaii was summoned as a party respondent in the proceedings, but disclaimed any interest in Palmyra Island. On October 4, 1912, the Land Court filed a decree declaring Henry Cooper to be the owner of Palmyra Island in fee simple.  See id.  In August 1922, Leslie and Ellen Fullard-Leo purchased "a major portion of the island" from Mr. Cooper.  See id. Tax records showed that no taxes were paid on Palmyra Island until 1885, but were then paid by the owner of record for three consecutive years, that Mr. Cooper again paid taxes starting in 1911, and that the Fullard-Leo family had paid taxes for about ninety percent of the island starting in 1922.  See id. at 778.

The United States filed suit against the Fullard-Leos in the United States District Court for the Territory of Hawaii to quiet title to Palmyra Island.  See United States v. Fullard-Leo, 66 F. Supp. at 775.  The United States argued that, when land is discovered and taken under the authority of an existing government, title vests in the sovereign.  In the case of Palmyra Island, the United States asserted, when the island

was annexed by Mr. Wilkerson and Mr. Bent in 1862, it had become the fee simple property of the King of Hawaii, and it remained so until it passed to the Republic of Hawaii in 1894, and then to the United States under a cession treaty in 1898.  See id. at 788.  The United States maintained that Messrs. Wilkerson and Bent never obtained title to Palmyra Island.  The Fullard-Leos maintained that the King intended to extend the Kingdom's sovereignty over Palmyra Island, but granted Messrs. Wilkerson and Bent title to the island.  The District Court stated: "There is nothing inherent in the Law of Nations that requires the vesting of title to lands in the government or King when sovereignty is extended over new domain. Such a thing would often be impossible." Id. at 780.  Instead, the court reasoned, the King had the power to take absolute title of newly-discovered land, but also had the power to grant title to the discoverer.  With regard to Palmyra Island, the court stated that, "[n]o cogent proof is shown on either side of the question of prior occupation or possession," but evidence in the record, including that after 1862 Mr. Wilkerson and Mr. Bent improved the island with their own money and without seeking or obtaining permission from the King, suggested that the King recognized title in Mr. Wilkerson and Mr. Bent.  See id.  The court also noted that neither the King, the Provisional Government of Hawaii, the Republic of Hawaii, nor the Territory of Hawaii had ever made a claim of title to the island, and that both the King and the United States had treated the island as privately owned.  See id. at 781-82.  Because the burden of proof rested with the United States, and the court determined that the burden was not met, the Hawaii District Court held that "the sovereignty of the United States was extended over Palmyra Island by Annexation, but the Republic of Hawaii did not in fact or in form assert fee simple title to this land at the time of annexation, or at any other time," and the United States "does not exhibit a title which can be sustained in the Courts of the United States. . . ." Id. at 782.

The United States appealed the District Court's ruling and in 1943, the United States Court of Appeals for the Ninth Circuit reversed. See United States v. Fullard-Leo, 133 F.2d 743 (9th Cir.), cert. denied, 319 U.S. 748 (1943).  The Ninth Circuit reasoned that

> [w]hile it is possible, under principles of international law for two individuals to obtain title to such territory as they discover (see Johnson v. McIntosh, 8 Wheat. 543, 595, 21 U.S. 543, 595, 5 L. Ed. 681), such an occurrence is rare because title can also be obtained by conquest. 1 Hyde, International Law, 176 Sec. 106. If the discovered land is important, many countries could and probably would acquire it by conquest, and the knowledge that such event might happen would deter most explorers.  On the other hand, if the explorers take possession in behalf of a sovereignty, they are ordinarily able to salvage something of value from their effort with much less chance of losing it, depending, of course, on the strength of the sovereignty.

Id. at 746-47.  The Ninth Circuit found that Mr. Bent and Mr. Wilkerson were acting as agents of the King of Hawaii when they annexed Palmyra Island, thus, "the taking of possession by Bent perfected the title of the King." Id. at 747.  Title "passed to the United States by cession, unless it had been alienated by one of the Hawaiian

governments," and the court found "no proof of such alienation." Id. Because the Fullard-Leos had raised affirmative defenses which were not addressed by the trial court, however, the Ninth Circuit reversed and remanded the case. See id.

On remand, the Fullard-Leos asserted three defenses: 1) that the doctrine of lost grant[19] applied, 2) that the 1912 decree of the Land Court declaring that Henry Cooper was the fee simple owner of Palmyra Island was binding against the United States, and 3) that the Fullard-Leos were bona fide purchasers of Palmyra Island without any notice or knowledge of the United States' claim, thus the claim was barred by laches. See United States v. Fullard-Leo, 66 F. Supp. 782, 784 (D. Haw. 1944), aff'd, 156 F.2d 756 (9th Cir. 1946) (en banc), aff'd, 331 U.S. 256 (1947). The District Court for the Territory of Hawaii once again emphasized that

> [t]here is not a scintilla of evidence that the Hawaiian monarchy, the Provisional Government or the Republic of Hawaii at any time claimed that Palmyra was public land. There is no record evidence of any kind that either of those governments ever regarded Palmyra as public property. Uncontradicted evidence shows that the claim of private ownership of the island had been continuously maintained through the years to the knowledge of the Department of State, the Department of the Interior and officers of the United States navy as well as of the prior governments of Hawaii.

Id. at 786. The District Court found: 1) that the record demonstrated "a presumption that a grant issued to Bent and Wilkinson by which the Hawaiian government parted with its title," 2) that the disclaimer filed by the Territory in the Land Court was a "legal and valid act done pursuant to the power expressly conferred on the Territory by the Organic Act" and, thus, was binding on the United States, and 3) that the United States was "estopped by its laches from asserting its claim of title against the respondents who

---

[19] As more fully discussed below, the doctrine of lost grant is one way for a petitioner to quiet title to land that has been held adversely to the sovereign for a long period of time. See United States v. Fullard-Leo, 331 U.S. 256, 270 (1947) (citing United States v. Chavez, 159 U.S. 452 (1895)). The Supreme Court has held,

> it is the general rule of American law that a grant will be presumed upon proof of an adverse, exclusive, and uninterrupted possession for twenty years, and that such rule will be applied as a *presumptio juris et de jure*, wherever, by possibility, a right may be acquired in any manner known to the law.

United States v. Pendell, 185 U.S. 189, 199-200 (1902) (citations omitted). In other words, if a party can demonstrate adverse, exclusive, and uninterrupted possession for twenty years against the sovereign, a conclusive presumption applies that the party has title to the property.

purchased from Mr. Cooper and paid a valuable consideration without notice of any adverse claim."   Id. at 787-88.

The United States, once again, appealed to the Ninth Circuit, which heard the appeal en banc.   See United States v. Fullard-Leo, 156 F.2d 756 (9th Cir. 1946) (en banc), aff'd, 331 U.S. 256 (1947).  The Ninth Circuit indicated that, because the purpose of Congress when Hawaii was annexed was "to leave the ceded public lands in the control of the Territory to be administered by it for the benefit of its people . . . the occupant is entitled to the benefit of every presumption and to have all doubts resolved in his favor."  Id. at 758.  The Ninth Circuit agreed with the District Court that a lost grant should be presumed, and that the decree of the Land Court registering title in Henry Cooper was binding against the United States.  The Ninth Circuit, therefore, affirmed. See id. at 758-60.

The United States appealed the Ninth Circuit's ruling and the Supreme Court granted certiorari, and affirmed the Ninth Circuit's holding and decided that title to Palmyra Island should be quieted in the Fullard-Leos.  See United States v. Fullard-Leo, 331 U.S. 256.  The Supreme Court recounted the state of Hawaiian land law at the time that Mr. Wilkerson and Mr. Bent took possession of Palmyra Island, noting that the Minister of Interior held the power to supervise and grant title to public lands.  See id. at 266.   The Court "assume[d] . . . that the formal claim to Palmyra for the Hawaiian Kingdom made by Bent, pursuant to his commission, gave Hawaii not only sovereignty over Palmyra but also the power to grant the lands of the newly annexed islets as part of its public lands to private owners."  Id. at 268-69.  The Supreme Court held that the lost grant doctrine applied to the circumstances at hand and that a lost grant should be presumed in favor of the Fullard-Leos' predecessors-in-interest.  See id. at 271-74.  The Supreme Court then traced the chain of claimed title, finding that the chain of title was unbroken between 1862, when Mr. Bent conveyed his interest in the island to Mr. Wilkerson, and 1922, when the Fullard-Leos purchased all but two islets from Henry Cooper, and that "claim of right was manifested not only by transfers of paper title but also by actual user of the property."  Id. at 279.  The Supreme Court acknowledged that presumption of a lost grant requires "proof of an adverse, exclusive, and uninterrupted possession for 20 years," id. at 271, and that the possession of Palmyra Island was not "uninterrupted," but rather various owners of the island had visited periodically over time.  See id. at 280.  The Supreme Court held, however, that "uninterrupted and long continued possession does not require a constant, actual occupancy where the character of the property does not lend itself to such use."  Id. at 281.  Given that "[n]o other private owner claims any rights in Palmyra," the Supreme Court concluded that "the evidence of title and possession shown in this record" supported the District Court's and Ninth Circuit's holdings that the Fullard-Leos were the rightful owners of Palmyra Island, and the Supreme Court affirmed the Ninth Circuit's ruling to quiet title to Palmyra Island in the Fullard-Leos.   See id.

**DISCUSSION**

Summary Judgment

The parties have filed cross-motions for summary judgment.  In its motion for summary judgment, plaintiff argues that, "as a matter of law, plaintiff's predecessor-in-interests in interest claimed private property rights to Kingman Reef on May 10, 1922," or twelve years before the United States "formally asserted its claim to territorial sovereignty."  Defendant, in its cross-motion for summary judgment, argues that, "as a matter of law, Plaintiff does not have any private property rights in Kingman Reef that are protected by the Fifth Amendment."  Rule 56 of the Rules of the United States Court of Federal Claims (RCFC) (2013) is similar to Rule 56 of the Federal Rules of Civil Procedure (Fed. R. Civ. P.) (2014) in language and effect.  Both rules provide that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a); Fed. R. Civ. P. 56(a); see also Alabama v. North Carolina, 560 U.S. 330, 344 (2010); Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Ladd v. United States, 648 F.3d 648, 651 (Fed. Cir. 2013)  Consol. Coal Co. v. United States, 615 F.3d 1378, 1380 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 131 S. Ct. 2990 (2011); 1st  Home Liquidating Trust v. United States, 581 F.3d 1350, 1355 (Fed. Cir. 2009); Arko Exec. Servs., Inc. v. United States, 553 F.3d 1375, 1378 (Fed. Cir. 2009); Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008), reh'g and reh'g en banc denied, 556 F.3d 1329 (Fed. Cir. 2009); Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2005); Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363, 1370–71 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005); Hitkansut LLC v. United States, 115 Fed. Cl. 719, 722 (2014); Textainer Equip. Mgmt. Ltd. v. United States, 115 Fed. Cl. 708, 712 (2014); AEY, Inc. v. United States, 114 Fed. Cl. 619, 626 (2014); Leggitte v. United States, 104 Fed. Cl. 315, 317 (2012).

A fact is material if it will make a difference in the result of a case under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; see also Cebe Farms, Inc. v. United States, No. 5-965C, 2014 WL 2211432, at *6 (Fed. Cl. May 28, 2014); Kandel v. United States, 115 Fed. Cl. 752, 755 (2014); Arrañaga v. United States, 103 Fed. Cl. at 467.  Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 247–48; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed. Cir. 2001); Curtis v. United States, 144 Ct. Cl. 194, 199, 168 F. Supp. 213, 216 (1958), cert. denied, 361 U.S. 843 (1959), reh'g denied, 361 U.S. 941 (1960); P & K Contracting, Inc. v. United States, 108 Fed. Cl. 380, 389 (2012), aff'd, 534 F. App'x 1000 (Fed. Cir. 2013); Gorski v. United States, 104 Fed. Cl. 605, 609 (2012).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249; Schlup v. Delo, 513 U.S. 298, 332 (1995); Ford Motor Co. v. United States, 157 F.3d 849, 854 (Fed. Cir. 1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); Cebe Farms, Inc. v. United States, 2014 WL 2211432, at *6; K-Con Bldg Sys., Inc. v. United States, 115 Fed. Cl. 558, 570 (2014); Cohen v. United States, 100 Fed. Cl. at 469–70; Boensel v. United States, 99 Fed. Cl. 607, 611 (2011); Macy Elevator, Inc. v. United States, 97 Fed. Cl. 708, 717 (2011). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 250–52; Jay v. Sec'y of Dep't of Health & Human Servs., 998 F.2d 979, 982 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1993); Leggitte v. United States, 104 Fed. Cl. at 317–18. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted.  See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Rothe Dev. Corp. v. U.S. Dep't of Def., 262 F.3d 1306, 1316 (Fed. Cir. 2001); Hall v. Aqua Queen Mfg., Inc., 93 F.3d 1548, 1553 n.3 (Fed. Cir. 1996).  In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

> In appropriate cases, summary judgment
>
> saves the expense and time of a full trial when it is unnecessary.  When the material facts are adequately developed in the motion papers, a full trial is useless.  "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

Dehne v. United States, 23 Cl. Ct. 606, 614–15 (1991) (quoting Pure Gold, Inc. v. Syntex, (U.S.A.) Inc., 739 F.2d 624, 626 (Fed. Cir. 1984)), vacated on other grounds, 970 F.2d 890 (Fed. Cir. 1992) (citation omitted); see also Metric Constr. Co. v. United States, 73 Fed. Cl. 611, 612 (2006).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; see also Biery v. United States, No. 2013–5082, 2014 WL 2491779, at *5 (Fed. Cir. June 4, 2014); Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1244 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 555 U.S. 812 (2008); Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001), cert. denied, 534 U.S. 1109 (2002); Principal Life Ins. Co. v. United States, Nos. 7–06T, 7–706T, 8–135T & 8–605T, 2014 WL 1873398, at *5 (Fed. Cl. May 9, 2014); Gonzales-McCaulley Inv. Grp., Inc. v. United States, 101 Fed.

Cl. 623, 629 (2011).   In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied.  Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs.  See Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587–88; Yant v. United States, 588 F.3d 1369, 1371 (Fed. Cir. 2009), cert. denied, 131 S. Ct. 69 (2010); Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co., 272 F.3d 1365, 1369 (Fed. Cir. 2001), reh'g and reh'g en banc denied, 293 F.3d 1364 (Fed. Cir. 2002), cert. denied, 539 U.S. 957 (2003); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d at 1257; Wanlass v. Fedders Corp., 145 F.3d 1461, 1463 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1998); see also Am. Pelagic Co. v. United States, 379 F.3d at 1371 (citing Helifix Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339, 1345–46 (Fed. Cir. 2000)); Boensel v. United States, 99 Fed. Cl. at 611 ("'The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 255) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587–88; Casitas Mun. Water Dist. v. United States, 543 F.3d at 1283; Lathan Co. v. United States, 20 Cl. Ct. 122, 125 (1990))).  "However, once a moving party satisfies its initial burden, mere allegations of a genuine issue of material fact without supporting evidence will not prevent entry of summary judgment."  Republic Sav. Bank, F.S.B. v. United States, 584 F.3d 1369, 1374 (Fed. Cir. 2009); see also Anderson v. Liberty Lobby, Inc., 477 U.S. at 247–48.

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); see also Riley & Ephriam Constr. Co. v. United States, 408 F.3d 1369, 1371 (Fed. Cir. 2005); Crown Operations Int'l, Ltd. v. Solutia Inc., 289 F.3d 1367, 1377 (Fed. Cir.), reh'g denied (Fed. Cir. 2002); Trilogy Commc'ns, Inc. v. Times Fiber Commc'ns, Inc., 109 F.3d 739, 741 (Fed. Cir.) (quoting Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1575 (Fed. Cir. 1994), reh'g denied and en banc suggestion declined (Fed. Cir. 1995)), reh'g denied and en banc suggestion declined (Fed. Cir. 1997); Lockwood v. Am. Airlines, Inc., 107 F.3d 1565, 1569 (Fed. Cir. 1997); Dana R. Hodges Trust v. United States, 101 Fed. Cl. 549, 553 (2011).  If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof.  See Celotex Corp. v. Catrett, 477 U.S. at 322; see also Wavetronix LLC v. EIS Elec. Integrated Sys., 573 F.3d 1343, 1354 (Fed. Cir. 2009); Long Island Sav. Bank, FSB v. United States, 503 F.3d at 1244; Fla. Power & Light Co. v. United States, 375 F.3d 1119, 1124 (Fed. Cir. 2004); Schoell v. Regal Marine Indus., Inc., 247 F.3d 1202, 1207 (Fed. Cir. 2001); Am. Airlines, Inc. v. United States, 204 F.3d 1103, 1108 (Fed. Cir. 2000). However, "a non-movant is required to provide opposing evidence under Rule 56(e) only if the moving party has provided evidence sufficient, if unopposed, to prevail as a matter of law."  Saab Cars USA, Inc. v. United States, 434 F.3d 1359, 1369 (Fed. Cir. 2006).

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case, and it does not follow that summary judgment should be granted to one side or the other. See Prineville Sawmill Co. v. United States, 859 F.2d 905, 911 (Fed. Cir. 1988) (citing Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987)); see also Marriott Int'l Resorts, L.P. v. United States, 586 F.3d 962, 968–69 (Fed. Cir. 2009); B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 593 (6th Cir. 2001); Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000); Chevron USA, Inc. v. Cayetano, 224 F.3d 1030, 1037 n.5 (9th Cir. 2000), cert. denied, 532 U.S. 942 (2001); Bubble Room, Inc. v. United States, 159 F.3d 553, 561 (Fed. Cir. 1998) ("The fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other."), reh'g denied and en banc suggestion declined (Fed. Cir. 1999); Allstate Ins. Co. v. Occidental Int'l, Inc., 140 F.3d 1, 2 (1st Cir. 1998); Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997); LewRon Television, Inc. v. D.H. Overmyer Leasing Co., 401 F.2d 689, 692 (4th Cir. 1968), cert. denied, 393 U.S. 1083 (1969); Rogers v. United States, 90 Fed. Cl. 418, 427 (2009), subsequent determination, 93 Fed. Cl. 607 (2010); Consol. Coal Co. v. United States, 86 Fed. Cl. 384, 387 (2009), aff'd, 615 F.3d 1378, (Fed. Cir.), and reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 131 S. Ct. 2990 (2011); St. Christopher Assocs., L.P. v. United States, 75 Fed. Cl. 1, 8 (2006), aff'd, 511 F.3d 1376 (Fed. Cir. 2008); Reading & Bates Corp. v. United States, 40 Fed. Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration, or, otherwise stated, in favor of the non-moving party. See First Commerce Corp. v. United States, 335 F.3d 1373, 1379 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); see also DeMarini Sports, Inc. v. Worth, Inc., 239 F.3d 1314, 1322 (Fed. Cir. 2001); Gart v. Logitech, Inc., 254 F.3d 1334, 1338–39 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001), cert. denied, 534 U.S. 1114 (2002); Oswalt v. United States, 85 Fed. Cl. 153, 158 (2008); Telenor Satellite Servs., Inc. v. United States, 71 Fed. Cl. 114, 119 (2006).

Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. See B.F. Goodrich Co. v. United States Filter Corp., 245 F.3d at 593; Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d at 1148; Allstate Ins. Co. v. Occidental Int'l, Inc., 140 F.3d at 2; Rogers v. United States, 90 Fed. Cl. at 427; Reading & Bates Corp. v. United States, 40 Fed. Cl. at 748.

"Questions of law are particularly appropriate for summary judgment." Oenga v. United States, 91 Fed. Cl. 629, 634 (2010) (citing Dana Corp. v. United States, 174 F.3d 1344, 1347 (Fed. Cir. 1999) ("Summary judgment was appropriate here [in Dana Corp.] because no material facts were disputed, many being stipulated, and the only disputed issues were issues of law. Moreover, on each issue one party or the other is entitled to

judgment as a matter of law.")); see also Santa Fe Pac. R.R. v. United States, 294 F.3d 1336, 1340 (Fed. Cir. 2002) ("Issues of statutory interpretation and other matters of law may be decided on motion for summary judgment.").

Takings

The Takings Clause of the Fifth Amendment to the United States Constitution provides in pertinent part: "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V.  The purpose of this Fifth Amendment provision is to prevent the government from "'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Palazzolo v. Rhode Island, 533 U.S. 606, 618 (2001) (quoting Armstrong v. United States, 364 U.S. 40, 49 (1960)), abrogated on other grounds by Lingle v. Chevron U.S.A. Inc., 544 U.S. 528 (2005), recognized by Hageland Aviation Servs., Inc. v. Harms, 210 P.3d 444 (Alaska 2009); see also Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 123-24, reh'g denied, 439 U.S. 883 (1978); Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 536 (2005); E. Enters. v. Apfel, 524 U.S. 498, 522 (1998); Rose Acre Farm, Inc. v. United States, 559 F.3d 1260, 1266 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2009), cert. denied, 130 S. Ct. 1501 (2010); Janowsky v. United States, 133 F.3d 888, 892 (Fed. Cir. 1998); Res. Invs., Inc. v. United States, 85 Fed. Cl. 447, 469-70 (2009); Pumpelly v. Green Bay & Miss. Canal Co., 80 U.S. (13 Wall.) 166, 179 (1871) (citing to principles which establish that "private property may be taken for public uses when public necessity or utility requires" and that there is a "clear principle of natural equity that the individual whose property is thus sacrificed must be indemnified").

Therefore, "a claim for just compensation under the Takings Clause must be brought to the Court of Federal Claims in the first instance, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute." E. Enters. v. Apfel, 524 U.S. at 520 (citing Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1016-19 (1984)); see also Acceptance Ins. Cos. v. United States, 503 F.3d 1328, 1336 (Fed. Cir. 2007); Morris v. United States, 392 F.3d 1372, 1375 (Fed. Cir. 2004) ("Absent an express statutory grant of jurisdiction to the contrary, the Tucker Act provides the Court of Federal Claims exclusive jurisdiction over takings claims for amounts greater than $10,000."). The United States Supreme Court has declared: "If there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the [United States Court of Federal Claims] to hear and determine." Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 12 (1990) (quoting United States v. Causby, 328 U.S. 256, 267 (1946)); see also Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1368 (Fed. Cir. 2005); Narramore v. United States, 960 F.2d 1048, 1052 (Fed. Cir. 1992); Perry v. United States, 28 Fed. Cl. 82, 84 (1993).

To succeed under the Fifth Amendment Takings Clause, a plaintiff must show that the government took a private property interest for public use without just compensation.  See Adams v. United States, 391 F.3d 1212, 1218 (Fed. Cir. 2004), cert. denied, 546 U.S. 811 (2005); Arbelaez v. United States, 94 Fed. Cl. 753, 762 (2010); Gahagan v. United States, 72 Fed. Cl. 157, 162 (2006).  "The issue of whether a

taking has occurred is a question of law based on factual underpinnings." Huntleigh USA Corp. v. United States, 525 F.3d 1370, 1377-78 (Fed. Cir.), cert. denied, 555 U.S. 1045 (2008). The government must be operating in its sovereign rather than in its proprietary capacity when it initiates a taking. See St. Christopher Assocs., L.P. v. United States, 511 F.3d 1376, 1385 (Fed. Cir. 2008).

The United States Court of Appeals for the Federal Circuit has established a two-part test to determine whether government actions amount to a taking of private property under the Fifth Amendment. See Klamath Irr. Dist. v. United States, 635 F.3d 505, 511 (Fed. Cir. 2011); Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1372 (Fed. Cir.) (citing M & J Coal Co. v. United States, 47 F.3d 1148, 1153-54 (Fed. Cir.), cert. denied, 516 U.S. 808 (1995)), reh'g denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005). A court first determines whether a plaintiff possesses a cognizable property interest in the subject of the alleged takings. Then, the court must determine whether the government action is a "'compensable taking of that property interest.'" Huntleigh USA Corp v. United States, 525 F.3d at 1377 (quoting Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d at 1372).

To establish a taking, a plaintiff must have a legally cognizable property interest, such as the right of possession, use, or disposal of the property. See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982) (citing United States v. Gen. Motors Corp., 323 U.S. 373 (1945)); CRV Enters., Inc. v. United States, 626 F.3d 1241, 1249 (Fed. Cir. 2010), cert. denied, 131 S. Ct. 2459 (2011); Karuk Tribe of Cal. v. Ammon, 209 F.3d 1366, 1374-75 (Fed. Cir.), reh'g denied and en banc suggestion denied (Fed. Cir. 2000), cert. denied, 532 U.S. 941 (2001). "'It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation.'" Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (quoting Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001), cert. denied, 353 U.S. 1077 (2002) and citing Cavin v. United States, 956 F.2d 1131, 1134 (Fed. Cir. 1992)). Therefore, "[i]f the claimant fails to demonstrate the existence of a legally cognizable property interest, the courts [sic] task is at an end." Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (citing Maritrans Inc. v. United States, 342 F.3d 1344, 1352 (Fed. Cir. 2003) and M & J Coal Co. v. United States, 47 F.3d at 1154). The court does not address the second step "without first identifying a cognizable property interest." Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1213 (Fed. Cir.) (citing Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1381 and Conti v. United States, 291 F.3d 1334, 1340 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2002), cert. denied, 537 U.S. 1112 (2003)), reh'g denied and reh'g en banc denied (Fed. Cir. 2005). Only if there is to be a next step, "'after having identified a valid property interest, the court must determine whether the governmental action at issue amounted to a compensable taking of that property interest.'" Huntleigh USA Corp. v. United States, 525 F.3d at 1378 (quoting Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372).

With regard to its property interest in Kingman Reef, plaintiff KRAD argues that it has a vested property interest under its leasehold agreement with KRAI for the exclusive use of Kingman Reef which defendant took when it took Kingman Reef from

KRAI in 2001. Plaintiff contends that, at the core of this case lies a fundamental distinction between territorial sovereignty, or a nation's "right to exercise governmental authority within its territory to the exclusion of any other state," and private property rights, the ability to own and transfer a piece of land. Plaintiff asserts that, before Executive Order No. 6935 was issued in 1934, Kingman Reef was *terra nullius*, or a land without a sovereign. According to plaintiff, in 1922, Mr. Thurston validly claimed private property rights in Kingman Reef on behalf of KRAI's predecessor-in-interest, the Copra Co., but that Mr. Thurston's actions did not establish the United States' sovereignty over Kingman Reef. Instead, plaintiff maintains that the United States did not formally extend sovereignty over Kingman Reef until the issuance of Executive Order No. 6935 in 1934. Because the Copra Co.'s private property rights were established before United States sovereignty, plaintiff argues, defendant was required to recognize those rights when it claimed territorial sovereignty in 1934.

Plaintiff relies on international law principles, namely the natural right theory, to establish that defendant was required to recognize the preexisting property rights of KRAI's predecessors-in-interest in 1934. Plaintiff, citing to The Paquette Habana, 175 U.S. 677, 700 (1900) and Sosa v. Alvarez-Machain, 542 U.S. 692 (2004), argues that it is appropriate to rely on international law in this case because "there was no treaty or executive, legislative or judicial act or decision controlling Kingman Reef prior to 1934." According to plaintiff, the natural right theory holds that, where private property rights exist prior to a nation's acquisition of sovereignty, those private rights are to be preserved and protected by the acquiring nation state. Plaintiff argues that the United States has long recognized the natural right theory and has previously found that a private party "who discovered property may obtain title to said property when it has not been claimed previously by any country or its nationals." Plaintiff lists several examples of what it claims to be similar instances in which the United States has recognized preexisting private property rights upon exercising sovereignty over land that was previously *terra nullius*, specifically: the Swan Islands, Swains Island, the Spitsbergen Archipelago, Jan Mayen Island, Los Monges Islands, and Aves Islands.

Plaintiff asserts that Mr. Thurston's actions in 1922 were sufficient to establish ownership of Kingman Reef on behalf of the Copra Co. because they established both discovery and possession. Plaintiff, citing to Jones v. United States, 137 U.S. 202, 212 (1890), contends that sovereignty over land may only be established by discovery plus occupation, cession, or conquest. In this instance, plaintiff states, the United States can only claim sovereignty over Kingman Reef through occupation, which it did not establish until President Roosevelt signed Executive Order No. 6935 on December 29, 1934. Plaintiff points to the Office of the Legal Advisor, Department of State's, November 9, 1934 letter and memorandum regarding the status of certain guano islands, which stated:

> No other action appears to have been taken with respect to the incorporation of the Island [Kingman Reef] into the territory of Hawaii or the United States. While it does not appear that any other country has claimed Kingman's Reef, it might be well for this Government to take

some affirmative action to show definitively that it is a part of the territory of the United States.  The mere mention of it in an Act of Congress as American territory would be sufficient.

According to plaintiff, this indicates that defendant knew it did not have sovereignty over Kingman Reef as of November 1934.  Because the Copra Co.'s private property rights according to plaintiff, were vested in 1922, and were validly conveyed to the Fullard-Leo family, and because preceded defendant's sovereignty over Kingman Reef, which was not established until 1934, plaintiff maintains, under both international and United States law, defendant had to recognize those rights.

In response, defendant argues that it is a fundamental principle of property law that only discovering nations, not individuals, hold fee title to discovered lands and that only the sovereign can grant title to newly acquired lands. Defendant asserts that the principle articulated in Johnson v. McIntosh, 21 U.S. 543 (1823), that the sovereign has absolute power to grant title, applies to the above captioned case.  Moreover, defendant contends that Mr. Thurston did not discover Kingman Reef in 1922, as its location was already known in the nineteenth century.  According to defendant, when new territory is acquired by the sovereign, the sovereign alone determines whether to recognize claimed private property rights that predate the acquisition.  Defendant argues that typically a new sovereign will recognize private property rights that were granted by a prior sovereign, but that a mere claim to private property rights, absent such a grant, does not establish a property interest that is valid against the United States.  Citing to Grisar v. McDowell, 73 U.S. 363 (1867), defendant states that it is settled law that "a claim of private ownership that pre-dates the current sovereign's acquisition of the land requires recognition by the sovereign in order to convert a claim into a vested property interest. . . ."  According to defendant, plaintiff's argument that a claim that entry coupled with possession constitutes a vested property interest, a position which has been rejected by the United States Court of Appeals for the Federal Circuit in Cavin v. United States, 956 F. 2d 1131 (Fed. Cir. 1992). Defendant maintains that Mr. Thurston's actions in 1922 did not give KRAI's predecessors-in-interest any vested property rights in Kingman Reef because no sovereign authority provided authorization to claim the atoll.

Defendant also rejects plaintiff's argument that an individual or private entity can acquire *terra nullius*.  Defendant posits that only one federal case, New Jersey v. New York, 523 U.S. 767 (1998), has ever discussed *terra nullius* and in that case, albeit in dicta, the Supreme Court indicated that only a sovereign can assert a claim over *terra nullius*.[20]

---

[20]   The Supreme Court's decision in New Jersey v. New York addressed one state's territorial jurisdiction claims against another state.  Addressing New York's prescription argument, the Supreme Court noted that,

> [i]t is essential to appreciate the extent of this burden that a claimant by prescription must shoulder. Even as to *terra nullius*, like a volcanic island

Defendant also distinguishes each of the examples plaintiff put forth regarding ownership of land that was previously *terra nullius*, i.e., the Swan Islands, Swains Island, the Spitsbergen Archipelago, Jan Mayen Island, Los Monges Island, and Aves Islands.  According to defendant, "[n]ot a single one of Plaintiff's examples supports their novel theory."  In addition, defendant argues that plaintiff's claim over Kingman Reef fails because the acts of Mr. Thurston and KRAI's predecessors-in-interest never established possession over the atoll.

While defendant, therefore, argues that plaintiff does not have any vested interest in Kingman Reef at all, defendant also contends that ownership of submerged lands is a separate legal issue.  According to defendant, United States Supreme Court precedent establishes that submerged lands are owned by the sovereign and, while the sovereign can transfer ownership of submerged lands, it must do so through an express grant.  Because there has never been an express grant for any portion of Kingman Reef, including the submerged lands and ocean waters, defendant argues that plaintiff cannot establish an ownership interest in the submerged lands and ocean waters surrounding Kingman Reef.

Plaintiff's alleged interest in Kingman Reef relies on a chain of title going back to the Copra Co., which plaintiff claims gained fee simple title to the atoll upon Mr. Thurston's annexation on May 10, 1922.  The Copra Co. then allegedly passed that fee simple title to Ellen Fullard-Leo, who, by means of mesne conveyances, transferred title to the Fullard-Leo family collectively in trust.  The Fullard-Leo family conveyed title to KRAI on November 17, 2000, from which KRAD obtained a leasehold interest on the same date.  In order to determine if plaintiff has a cognizable property interest in Kingman Reef, therefore, the court must determine whether the Copra Co., the Fullard-Leo family, and KRAI had a valid interest in Kingman Reef that was the basis of the remaining plaintiff's claim.

Plaintiff correctly notes that the law recognizes a distinction between sovereignty over and private ownership of property.  The United States Supreme Court has held that the standard for what constitutes possession of property varies depending on the circumstances and nature of the property.  In <u>United States v. Pendell</u>, the Supreme Court stated:

---

> or territory abandoned by its former sovereign, a claimant by right as against all others has more to do than planting a flag or rearing a monument. Since the 19th century the most generous settled view has been that discovery accompanied by symbolic acts gives no more than "an inchoate title, an option, as against other states, to consolidate the first steps by proceeding to effective occupation within a reasonable time."

<u>New Jersey v. New York</u>, 523 U.S. at 787-88 (quoting I. Brownlie, Principles of Public International Law 146 (4th ed. 1990)).

> What constitutes such possession of a large tract of land depends to some extent upon circumstances, the fact varying with different conditions, such as the general state of the surrounding country, whether similar land is customarily devoted to pasturage or to the raising of crops, to the growth of timber or to mining, or other purposes. That which might show substantial possession, exclusive in its character, where the land was devoted to the grazing of numerous cattle, might be insufficient to show the same kind of possession where the land was situated in the midst of a large population, and the country devoted, for instance, to manufacturing purposes.

United States v. Pendell, 185 U.S. at 197.  The Supreme Court considered what might constitute possession of a remote island in  United States v. Fullard-Leo, noting:

> The sufficiency of actual and open possession of property is to be judged in the light of its character and location.  It is hard to conceive of a more isolated piece of land than Palmyra, one of which possession need by less continuous to form the basis of a claim.

United States v. Fullard-Leo, 331 U.S. 256, 279-80 (1947).[21]

---

[21]   Kingman Reef is even less susceptible to possession than Palmyra Island, as the atoll is uninhabitable and, likely, even entirely submerged at high tide.  Plaintiff argues, therefore, "an even lesser standard should apply" regarding the sufficiency of possession of Kingman Reef than applied to Palmyra Island. Defendant argues, however, that Mr. Thurston's acts in 1922 "fall far short of what is necessary to demonstrate possession."  Defendant argues that, in order to establish possession, a party must show some intent to remain on the property.  According to defendant, Mr. Thurston, on behalf of the Copra Co.,

> merely engaged in the bare minimum to demonstrate that they visited a known atoll for a few hours on a single day in 1922. Thurston did not return to Kingman Reef for more than four years.  When he did, it was with the assistance of the United States Navy and there is no evidence that he was acting at that time as an authorized agent of the Fullard-Leo family.

What constitutes possession of an uninhabitable atoll 33 nautical miles from the nearest island and about 900 nautical miles from Hawaii is difficult to determine.  Demonstrating an intent to remain does not seem like an appropriate standard for an atoll that cannot sustain human life and has no fresh water. The court acknowledges, however, defendant's point that a visit of several hours with nothing more may fall short of a demonstration of possession, even in such a remote location.  The court will assume for the current purposes, without finding, that Mr. Thurston's actions were sufficient to take possession of Kingman Reef for the Copra Co. because, as discussed below, the court finds that plaintiff's claim that it had a cognizable property interest in Kingman Reef at the time of the alleged taking fails for other reasons.

As discussed in the landmark property case <u>Johnson v. M'Intosh</u>, 21 U.S. 543 (1823), however, the governing principle under which newly-discovered lands have been claimed and divided up among nations in modern times was the principle of discovery, according to which "discovery gave title to the government by whose subjects, or by whose authority, it was made, against all other European governments, which title might be consummated by possession."  <u>Johnson v. M'Intosh</u>, 21 U.S. 543, 573 (1823).  In other words, the nation whose citizens discovered new territory gained both sovereignty over and ownership of the land, so long as the land remained under possession.  The United States Supreme Court found in <u>Johnson</u> that the United States had "unequivocally acceded to" the principle of discovery.  <u>See id.</u> at 587.  Thus, title to land in this country that was once held by the English crown passed to the colonies, then to the states and the government of the United States.  <u>See id.</u>  The title of the sovereign was "absolute" and "exclusive," such that no two entities, whether governments or individuals, could hold title for the same land at the same time.  <u>See id.</u> at 587-88.  Because title originates with the sovereign, the Court indicated, title could only pass to individuals by conveyance from the sovereign.  <u>See id.</u> at 593.

The Supreme Court in <u>Johnson v. M'Intosh</u> acknowledged that there were rare circumstances in which title to newly-discovered land could vest directly with the individual discoverers, but explained that that only occurred if the discoverers were unaffiliated with a sovereign nation when they discovered the land.  The Supreme Court stated:

> It is supposed to be a principle of universal law, that, if an uninhabited country be discovered by a number of individuals, who acknowledge no connexion with, and owe no allegiance to, any government whatever, the country becomes the property of the discoverers, so far at least as they can use it. They acquire a title in common. The title of the whole land is in the whole society. It is to be divided and parcelled out according to the will of the society, expressed by the whole body, or by that organ which is authorized by the whole to express it.

<u>Id.</u> at 595.  The Supreme Court also emphasized, however, that if, as was typical at the time, and like in the above captioned case, land was claimed in the name of or on behalf of a government, the land then belonged to the nation and title would originate with the government. The Supreme Court found:

> If the discovery be made, and possession of the country be taken, under the authority of an existing government, which is acknowledged by the emigrants, it is supposed to be equally well settled, that the discovery is made for the whole nation, that the country becomes a part of the nation, and that the vacant soil is to be disposed of by that organ of the government which has the constitutional power to dispose of the national domains, by that organ in which all vacant territory is vested by law.

Id. According to the Supreme Court, therefore, unless land was discovered and possessed by individuals unaffiliated with any country, discovery of new land resulted in the discoverer's nation gaining both sovereignty over and title to the land and individuals would have to seek conveyance of title from the government in place.

One of plaintiff's examples of a case regarding *terra nullius* is also instructive on the question of private property rights versus sovereignty. In 1908, the Swan Islands Commercial Company wrote to the Department of State, seeking to perfect title to the Swan Islands. The Department of State referred the case to the United States Attorney General, who responded to the Secretary of the Navy with an opinion that addressed both the sovereignty and title of the islands. The opinion addressed the history of the islands, stating that, in an affidavit dated June 16, 1857, John Valentine White swore that he had discovered guano on the Swan Islands in April 1857 and, on the same date, "conveyed all his right, title, and interest in and to the said Swan Islands" to three individuals. See SOVEREIGNTY OVER SWAN ISLANDS, 31 U.S. Op. Atty. Gen. 216, 217, 1918 WL 613 (1918). A bond covering the Swan Islands was filed by the New York Guano Co. in 1863, and the islands were named on several lists of guano islands which were considered appertaining to the United States. The Attorney General found, however, that no executive action was ever taken to designate the Swan Islands as "appertaining to the United States." Id. at 219. The chain of title passed to several parties before it was passed by mesne conveyances to the Albion Chemical & Export Co. in 1902. The company became insolvent and directed its agent, Alonzo Adams, to abandon the islands, which he did by "actually, physically leaving the islands on February 5, 1904, and taking with him all the inhabitants who were at that time thereon." Id. Mr. Adams, however, returned the next day, February 6, 1904, and "took formal possession in the name of the United States, alleging 'The discovery, occupation, and possession by him of the said Swan Islands in the name of the United States.'" Id. On November 27, 1908, Mr. Adams conveyed his rights to the Swan Island Commercial Co., which then attempted to perfect its title to the islands.

The Attorney General concluded that "the United States has never acquired sover-eighty [sic] of any kind or to any extent over the Swan Islands by reason of the provisions of the Guano Islands act of August 18, 1856." Id. at 220. The Attorney General noted, however, that the islands had been claimed, occupied, and operated as guano islands by United States citizens continuously since 1857, excepting one day in 1904, and that no other government had ever attempted to assert sovereignty over the islands. The Attorney General stated, therefore, "that the United States Government may at any time assert its sovereignty over them by appropriate action," however, he indicated that it was up to the executive to determine what "form . . . that action should take." Id. at 222.

With regard to title to the Swan Islands, the Attorney General stated, "I do not find any specific cases in which the question of property rights arising from occupation and prescription have been directly passed upon," but reasoned that the situation "in all respects, is analogous to the rights of individuals in property upon territory which has been ceded." Id. at 223. He cited to several cases in which a claimant's property rights

had been recognized by a previous sovereign, but disputed when the territory was ceded to the United States, in which American courts had concluded that the United States government should recognize the property rights granted by the previous sovereign.[22] In these cases, the Attorney General said, the property owners were considered to have "inchoate title" or "imperfect rights" to the property, which the United States had a "duty of protecting" by perfecting title in the owner when the owner sought the protection of the government.   Id. (citing Delassus v. United States, 34 U.S. 117 (1835); Mitchell v. United States, 34 U.S. 711 (1835); Coffee v. Groover, 123 U. S. 1, 9–10 (1887).  With that principle in mind, the Attorney General concluded:

> The Swan Island Commercial Co. upon the facts set forth above unquestionably possesses certain imperfect or inchoate rights. These rights depended for their perfection upon the filing of the bond under the Guano Islands Act; but as has been shown, such rights would have been limited merely to the protection of the United States during the operation of the said islands. The property rights of said company, irrespective of the Guano Islands act, are dependent upon the assumption of sovereignty over the islands by the United States Government. Upon such assumption, there can be no doubt that the rights of the company in the lands occupied and improved by it will become at least so equitably fixed as to warrant some provision for compensation by the Government.

Id. at 224.   Therefore, the Attorney General found that an individual or, in this case a company, could possess "imperfect or inchoate rights" to land that was *terra nullius* when the individual took possession, but that perfection of those rights required recognition by the current sovereign.   See L. Benjamin Ederington, Property As A Natural Institution: The Separation of Property from Sovereignty in International Law, 13 Am. U. Int'l L. Rev. 263, 276 (1997) ("private individuals and corporations can acquire land that is 'not under the territorial supremacy of a member of the Family of Nations' (i.e., terra nullius), but in order to receive protection for the acquisition under

---

[22] Many of the cases cited in the Attorney General's opinion, in turn, cite to Chief Justice Marshall's opinion in the case of United States v. Percheman, 32 U.S. 51 (1833), which stated:

> It may not be unworthy of remark that it is very unusual, even in cases of conquest, for the conqueror to do more than to displace the sovereign, and assume dominion over the country. The modern usage of nations, which has become law, would be violated, that sense of justice and of right which is acknowledged and felt by the whole civilized world would be outraged, if private property should be generally confiscated and private rights annulled. The people change their allegiance; their relation to their ancient sovereign is dissolved; but their relations to each other and their rights of property remain undisturbed.

United States v. Percheman, 32 U.S. at 86-87.

international law, the individual or corporation 'must either declare a new state to be in existence. . .or must ask a member of the Family of Nations to acknowledge the acquisition as having been made on its behalf.'" (quoting 1 Lassa Oppenheim, Oppenheim's International Law 678 (Robert Jennings & Arthur Watts eds., 9th ed. 1992)).

It appears there is one case in which a court has ever concluded that a sovereign was required to recognize private property rights of its own citizen which preexisted the extension of sovereignty by that same country over the property, a Norwegian Supreme Court decision, Jacobsen v. Norwegian Government, 7 I.L.R. 109 (1933-1934 Ann. Dig.) (Nor. Sup. Ct. 1940).  See Ederington, Property As A Natural Institution: The Separation of Property from Sovereignty in International Law, 13 Am. U. Int'l L. Rev. at 280 ("Although numerous commentators have suggested the possibility of legally-cognizable private property rights in terra nullius, the only case in which a court has explicitly recognized such a property right is the Norwegian Supreme Court's opinion in Jacobsen v. Norwegian Government.").  Jan Mayen Island was proclaimed by the Norwegian government to be *terra nullius* as late as 1923, but a Norwegian citizen, Mr. Jacobsen, bought title to some land and a home on the island in 1902 and claimed more of the island as his property in 1921.  Norway claimed sovereignty over the island in 1929 and refused to recognize Mr. Jacobsen's claim to the property.  Mr. Jacobsen sued and, in 1940, the Norwegian Supreme Court found that "the government was obligated to respect Mr. Jacobsen's property claim as legally valid, even though established while Jan Mayen was still terra nullius, and that, consequently, the 'Norwegian Government was not entitled to proprietary rights in the part of the island which had been occupied by the plaintiff.'"  Id. at 281 (quoting Jacobsen v. Norwegian Government, 7 I.L.R. at 110).  While the Supreme Court of Norway concluded that a private citizen could establish a vested property interest in *terra nullius* which the government was obligated to recognize, the court is unaware of any case in the United States or any other jurisdiction which has held the same.  Id. at 280.

The parties largely gloss over the actions regarding Kingman Reef that took place before Mr. Thurston's annexation in 1922 and the question of whether any of those actions were sufficient to establish the United States' sovereignty over or title to the atoll.  Mr. Thurston did not discover Kingman Reef in 1922, but rather, it appears the atoll was first discovered by Captain Edmund Fanning in 1798, and was visited again in 1853 by Captain Kingman.  Both of these early visits to Kingman Reef, however, appear to have been very brief and there is no evidence that either Captain Fanning or Captain Kingman attempted to take possession of the atoll.  It does not appear these early visits to the atoll extended United States sovereignty over the land.

In 1858, Captain Taylor listed Kingman Reef, which also went by the name Dangers Rock, as a guano island and purported to assign the atoll to the United States Guano Company.  The United States Guano Company then claimed Kingman Reef as a United States Territory under the Guano Islands Act of 1860.  As indicated above, however, the Guano Islands Act was not intended to permanently extend United States sovereignty over or vest title to islands claimed under the law.  See 48 U.S.C. §§ 1411-

1419.  In 1934, an Office of the Legal Advisor letter indicated, "[t]his Department as well as the courts and the Attorney General have taken the position that the United States did not acquire sovereignty of, or title to, the guano islands under the Guano Islands Act of 1856."  A memorandum attached to the letter went on to explain that the position of both the Department of State and the Attorney General was that the United States would recognize and protect the island while its citizens were occupying the island for the purpose of obtaining guano, but that when that enterprise ended, the island once again became "'open again to discovery, possession, et cetera.'"  Title was never assumed to vest in either the individual discoverer or the United States.  Moreover, although the United States Guano Company apparently claimed Kingman Reef as a United States Territory under the Guano Islands Act, nothing in the record indicates that there was ever guano on Kingman Reef, or that any United States citizen attempted to occupy Kingman Reef for the purpose of extracting guano.  The Department of State's Office of the Legal Advisor stated in the 1933 report entitled The Sovereignty of Guano Islands in Pacific Ocean:

> There is no other mention of Dangers Rock on file in the State Department.  It is not by any means certain that there is or was any guano on this island, or even that there is such an island.  It is, however, practically certain that no guano was ever removed from it, at least by claimants under the Guano Act.  Moreover, Taylor's "discovery" may well have been fictitious, and he probably did not even land there.

The Sovereignty of Guano Islands in Pacific Ocean at 624-25.  The report later concluded that "the United States has no valid claim to Kingmans Reef arising under the Guano Act. . . ."  Id. at 875-76.  The record does not reflect that there was ever any guano on Kingman Reef, nor that the Guano Islands Act conferred sovereignty over or title to islands claimed under the Act for the United States, Kingman Reef's designation as a guano island in the late nineteenth century does not appear to have extended United States sovereignty over the atoll or to have vested title over the atoll to the United States or any citizen thereof.  Nor is there any evidence in the record that any other country had claimed sovereignty over Kingman Reef prior to 1922.  Plaintiff is, likely correct that Kingman Reef was terra nullius, at least, up to the time of Mr. Thurston's annexation of the atoll on May 10, 1922.

The question, therefore, is the legal consequence of Mr. Thurston's annexation of Kingman Reef in 1922, and the Fullard-Leo family's subsequent communications with the Department of State, in terms of establishing sovereignty over and ownership of the atoll.  The Copra Co., which commissioned Mr. Thurston, instructed him to "take formal possession" of Kingman Reef on behalf of the United States and "claim the same for Island of Palmyra Copra Company."  The Copra Co. did not, however, seek permission from either the United States government or the Territory of Hawaii before commissioning Mr. Thurston to annex the atoll.  When Mr. Thurston landed on Kingman Reef on May 10, 1922, he read aloud and signed a formal certificate of possession/annexation, which stated:

> BE IT KNOWN TO ALL PEOPLE – that on the Tenth day of May A.D. 1922, the undersigned, agent of the ISLAND OF PALMYRA COPRA CO., LTD. (an Hawaiian Corporation), landed from the motor-ship "Palmyra" doth. . .take formal possession of this Island called "Kingman's Reef". . .on behalf of the United States of America, and claim the same for said Company.

Mr. Thurston then built a cairn of coral slabs, flew an American flag from a pole supported by the cairn, and deposited a glass jar containing the formal certificate of possession, the flag, and a copy of two Hawaiian newspapers, The Honolulu Advertiser and The Honolulu Star-Bulletin, dated May 3, 1922, in the base of the coral cairn. This was not a case in which the discoverers of land were unaffiliated or had "no connexion with, and owe no allegiance to, any government whatsoever." See Johnson v. M'Intosh, 21 U.S. at 595. Johnson v. M'Intosh recognizes that, in the rare circumstances in which discoverers are unaffiliated with a nation, title in common would vest in the individual discoverers. See id. The record suggests that it was the intent of Mr. Thurston, however, to annex Kingman Reef on behalf of the United States. As discussed in Johnson v. M'Intosh,

> [i]f the discovery be made, and possession of the country be taken, under the authority of an existing government, which is acknowledged by the emigrants, it is supposed to be equally well settled, that the discovery is made for the whole nation, that the country becomes a part of the nation, and that the vacant soil is to be disposed of by that organ of the government which has the constitutional power to dispose of the national domains, by that organ in which all vacant territory is vested by law.

Johnson v. M'Intosh, 21 U.S. at 595. Following the logic of the Supreme Court, although the Copra Co. and their agent, Mr. Thurston, may have intended to claim fee simple title for the company, Mr. Thurston's annexation in the name of the United States had the effect of both extending United States sovereignty over Kingman Reef and vesting fee simple title to the atoll in the United States, not the Copra Co. or Mr. Thurston himself.

Following the Attorney General's logic in the case of the Swans Island, however, and considering Mr. Thurston's annexation of Kingman Reef analogous to cases in which land was ceded, but not yet recognized by the United States government as part of its territory, Mr. Thurston's annexation could have created "inchoate title" or "imperfect rights" to Kingman Reef to the Copra Co. See SOVEREIGNTY OVER SWAN ISLANDS, 31 U.S. Op. Atty. Gen. at 224. The Copra Co.'s "imperfect or inchoate rights, however, would have been "dependent upon the assumption of sovereignty over the islands by the United States Government," see id., and the Copra Co. would have had to have sought recognition of its title from the government before that title could be perfected. The best case scenario for plaintiff, therefore, would be a finding that, after Mr. Thurston's annexation on May 10, 1922, the Copra Co. held inchoate title to Kingman Reef, which was not yet under the Unites States' sovereignty.

After Mr. Thurston's annexation, and apparently upon instructions from a Mr. Huber, whom Mr. Thurston identified as "United States Attorney General" for the Territory of Hawaii, Ellen Fullard-Leo, acting as the Secretary-Treasurer of the Copra Co., wrote a letter to Secretary of State, Charles E. Hughes, informing him of the May 10, 1922 annexation of Kingman Reef

> in the name of the United States of America, and for [the Copra Co.'s] own use, an atoll island charted as "Kingman's Reef" but never before claimed. . . .  According to the United States Attorney here, this notification is all that is necessary in addition to listing the same in our local tax returns, as the Palmyra Islands are a part of the county of Honolulu. Hoping that this is sufficient evidence that the same will be recorded and due credit given this Company and Territory. . . .

Ellen Fullard-Leo's letter did not expressly request that the Department of State convey fee simple title to Kingman Reef to, or recognize title in, the Copra Co.  Instead, her letter requested that the Department of State register Kingman Reef as a United States territory and that "due credit [be] given" to the Copra Co. for annexing the atoll.  What she meant by "due credit" is ambiguous, although the letter put the United States on notice that the Copra Co. believed it had some claim to or interest in Kingman Reef. Based on the record before the court, the Department of State did not respond to this letter.

Nonetheless, on August 14, 1922, the Copra Co. conveyed its interest in Kingman Reef to Ellen Fullard-Leo.  Ten days later, Ellen Fullard-Leo again wrote to the Secretary of State, inquiring as to whether her July 15, 1922 letter had been received. Internal documents show that the Department of State believed that Ellen Fullard-Leo's letter was "intended as a notice of discovery under the Guano Acts," but the Department of State concluded that Kingman Reef "was not a guano island or a new discovery." The Department of State also noted that Kingman Reef was strategically "unimportant[t]" and that "it may be assumed that it has not sufficient value ever to have been claimed by" any nation.  On September 28, 1922, the Department of State acknowledged receipt of both of Ellen Fullard-Leo's letters, but neither disputed, nor explicitly recognized, any claim of private ownership regarding Kingman Reef, and unfortunately United States did not clarify the title to Kingman Reef in 1922. Nonetheless, the Fullard-Leo family began paying taxes on Kingman Reef in 1923, believing that they owned the atoll.  While the Fullard-Leo family's belief that they owned Kingman Reef was most likely a good faith belief, however, as indicated above, Ellen Fullard-Leo's interest in Kingman Reef, passed down from the Copra Co., was at best an "inchoate title" which had not been perfected by any sovereign.

Between 1922 and 1934, nothing in the record reflects that any definitive action was taken regarding the ownership of Kingman Reef.  It appears that there was some debate within the United States government, even after Mr. Thurston's annexation, as to whether Kingman Reef existed at all, with Mr. Thurston stating in a 1925 letter to Admiral R.E. Coontz, U.S.N., "Upon my return to Honolulu in 1922, seven weeks after

the annexation incident above-referred to, I found that the existence of the Island which I had reported, was questioned in Washington. . . ."   Mr. Thurston assured Admiral Coontz that Kingman Reef existed and suggested that the Navy secure both Palmyra Island and Kingman Reef as supply stations for naval ships.   The Navy surveyed Kingman Reef in both 1926 and 1927, and Leslie Fullard-Leo requested further Naval surveying of Palmyra Island and Kingman Reef in 1931.   Notably, while Mr. Thurston returned to Kingman Reef several times in the 1920s, there is no indication that any member of the Fullard-Leo family visited Kingman Reef until the 1940s, nor does plaintiff allege that Mr. Thurston was acting as an agent on behalf of the family on his later trips to Kingman Reef.

Beginning in 1933, the United States government issued several reports about the legal status of various Pacific Islands, including Kingman Reef, which demonstrate that legal advisors within the executive branch were unclear as to the United States' interest in Kingman Reef prior to President Roosevelt's issuance of Executive Order No. 6935 in December 1934.   A 1933 report issued by the Office of the Legal Advisor, Department of State and titled The Sovereignty of Guano Islands in Pacific Ocean, listed Kingman Reef under "ISLANDS TO WHICH THE UNITED STATES ONLY HAS A CLAIM," The Sovereignty of Guano Islands in Pacific Ocean at 875 (capitalization in original), and concluded:

> It is difficult to reach definite conclusions on the legal status of Kingmans Reef because of lack of information.  It is not known whether or not there has been any occupation or use of the Reef by American citizens; and it is not even certain that there is an island there which is dry at high tide. However, it may be said: first, the United States has no valid claim to Kingmans Reef arising under the Guano Act; and second, the United States has an inchoate right to the Reef, possibly because of its discovery by Captain Kingman, if he was an American, as seems probable, and because of the formal possession taken by the Island of Palmyra Copra Company, and its use by that company, if there has been any such use. As yet there has been no formal sanction of the company's act by the United States. However, no other Government appears to claim Kingmans Reef, and it would seem that the United States Government could extend its jurisdiction over the island (always supposing that an actual island exists) and that it could then be considered as a part of the territory of the United States.  Before any such action is taken, it might be adviseable [sic] to find out if Kingmans Reef is of any possible use to American citizens, or to the Government.

Id. at 875-76.  Similarly, in an October 16, 1934 letter, Secretary of the Navy wrote to President Roosevelt regarding the legal status of twelve Pacific Islands, indicating that Kingman Reef was under the "Jurisdiction" of the United States.  The Secretary's letter did not specify whether that meant the United States exercised ownership, sovereignty or both over the atoll.  See Secretary of the Navy letter, Oct. 16, 1934, encl. (B) at 6. On November 9, 1934, R.W.S. Hill of the Department of State's Office of the Legal

Advisor wrote a letter and memorandum concerning the same twelve islands as the Secretary letter.  The Legal Advisor commented on guano islands generally, stating that:

> This Department as well as the courts and the Attorney General have taken the position that the United States did not acquire sovereignty of, or title to, the guano islands under the Guano Islands Act of 1856. . . . This Department has in the past stated that it has been the course of the Department to recognize such islands only while occupied for the purpose of procuring guano, and therefore upon the cessation of such occupancy they may become open again to discovery, possession, et cetera.

Referring specifically to Kingman Reef, Mr. Hill's memorandum indicated:

> On July 15, 1922, the Island of Palmyra Copra Company, a Hawaiian Corporation, notified the State Department that it had annexed Kingman's Reef in the name of the United States and for its own use on May 10, 1922.

> No other action appears to have been taken with respect to the incorporation of the Island into the territory of Hawaii or the United States. While it does not appear that any other country has claimed Kingman's Reef, it might be well for this Government to take some affirmative action to show definitively that it is a part of the territory of the United States. The mere mention of it in an Act of Congress as American territory would be sufficient.

On December 13, 1934, the Secretary of the Navy transmitted to President Roosevelt a "draft of [the] executive order [Executive Order No. 6935] placing Wake Island, Kingman Reef and Johnston and Sand Islands under the control and jurisdiction of the Secretary of the Navy." Sec. of the Navy letter, Dec. 12, 1934. With regard to Kingman Reef, the Secretary of the Navy wrote that Kingman Reef was "first seen and reported by Captain Kingman on the American ship SHOOTING STAR. It was claimed for the United States by L. A. Thurston of Honolulu in 1922 and it is recognized by the Department of State as being under the sovereignty of the United States." Id. The Secretary concluded, regarding the President's authority to issue the Executive Order, that the "sovereignty of the United States over said islands is well recognized and further inquiry respecting the questions of title and jurisdiction need not be made." Id. at 2-3. The Secretary apparently based the claim of United States sovereignty over Kingman Reef on Mr. Thurston's actions in 1922, see id. at 2, but the Secretary stopped short of asserting that the United States held fee title ownership to Kingman Reef. Prior to the issuance of Executive Order No. 6935, it appears that the United States government was uncertain as to whether or not it held title to Kingman Reef, variously asserting sovereignty or jurisdiction over the atoll, and had taken no action to clarify the Fullard-Leo family's claimed interest in the atoll.

On December 29, 1934, President Franklin D. Roosevelt issued Executive Order No. 6935, which ordered that "Kingman Reef, Wake Island, and Johnston and Sand Islands, together with their surrounding reefs, in the Pacific Ocean" be

> reserved, set aside, and placed under the control and jurisdiction of the Secretary of the Navy for administrative purposes, subject, however, to the use of the said Johnston and Sand Islands by the Department of Agriculture as a refuge and breeding ground for native birds as provided by Executive Order No. 4467 of June 29, 1926.

Exec. Order No. 6935 (Dec. 29, 1934).[23]   Two days later, on December 31, 1934, President Roosevelt sent a memorandum to the Secretary of the Navy in which he stated:

> In relation to Navy jurisdiction over these Pacific Islands, I think it is highly adviseable [sic] that the Navy exercise that jurisdiction in some tangible form at the earliest possible moment.  You might consult with the State Department and ask them if the establishment of a small supply base or the fixing up of a landing place would be adequate to sustain sovereignty.

Roosevelt Papers (Box 32): Memorandum of December 31, 1934.

Plaintiff does not dispute President Roosevelt's authority to issue the Executive Order, but argues that the Executive Order did not affect the Fullard-Leo family's ownership of Kingman Reef, instead extending United States sovereignty over the atoll for the first time.  The Hawaii District Court stated in KRAI's quiet title action that Executive Order No. 6935 made clear that Kingman Reef "was considered public land and that jurisdiction was given to the Navy." Kingman Reef Atoll Investments, L.L.C. v. United States, 545 F. Supp. 2d at 1111.  Executive Order No. 6935 was issued pursuant to the President's authority to withdraw and reserve public lands for public purposes under the Pickett Act, and explicitly set aside Kingman Reef as federal public land under the jurisdiction of the Navy.  Admittedly, Executive Order No. 6935 did not state that the United States was taking "possession" or "ownership" of Kingman Reef, instead speaking of "control and jurisdiction."  Exec. Order No. 6935.  It appears that the intent of issuing Executive Order No. 6935 was not only to extend United States sovereignty over the atoll, but ownership, as well.  See United States v. Gossett, 416 F.2d 565, 568 (9th Cir. 1969) ("The fact that the Executive Orders, withdrawing this land from public entry, were issued in 1929 and 1931 is convincing evidence that the Government was claiming ownership and exercising dominion over the property in those years."), cert.

---

[23] In their various deeds and licensing agreements, the Fullard-Leo family, KRAI, KRAD, and KRE recognize that the December 29, 1934 Executive Order No. 6935 placed Kingman Reef "under the jurisdiction of the Secretary of the Navy," but do not regard Executive Order No. 6935 as asserting or placing title ownership with the Navy or any entity of the United States.

denied, 397 U.S. 961 (1970).

The Fullard-Leo family did not object to the issuance of Executive Order No. 6935 or seek to clarify what effect the Executive Order had on their alleged property interest, instead waiting several years to contact the United States government, during which time the federal government took a more active role in administering Kingman Reef.  In December 1935, the Navy granted Pan Am a "Revocable Permit" "to operate its commercial trans-Pacific airplane service into and over and to land on the waters of Kingman Reef and Pago Pago Harbor, American Samoa; to use certain areas at Kingman Reef and to moor a company barge and station ship of American Registry at Kingman Reef."  Pan Am's Clipper airplane made several overnight stops at Kingman Reef in 1937 and 1938.  This prompted Leslie and Ellen Fullard-Leo to write to the Hawaii congressional delegate in Washington, D.C., Samuel Wilder King, on April 20, 1937.  The Fullard-Leo family wrote that Kingman Reef's "ownership presumably rests with the State or Navy Department, since by one of these, use of it has been given to Pan-American Airways, and has on two occasions been used during their trial flight this month to Auckland, N.Z."  The Fullard-Leo family also requested that Delegate King "interest[] the Government in the purchase of the Palmyra group" for the then materializing air "route to the South Pacific."  The Fullard-Leo family pointed out that they had been paying taxes on Kingman Reef since 1923, and presented a claim for $40,000.00, including accrued interest, to cover the costs incurred in "annexing Kingman's Reef," as well as to cover the taxes paid from 1922 to 1937.  Although the Fullard-Leo family indicated that they sought first to pursue their claim through their congressional delegate, they did not rule out the possibility of making a "formal claim through legal channels," for which the award of anticipated legal fees would be requested.

Delegate King forwarded the Fullard-Leo family's letter to the Secretary of the Navy on May 19, 1937, and requested the Navy's comment on their claim.  The Secretary of the Navy responded on May 29, 1937, stating that "[t]he records of the Navy Department do not indicate that there were any vested rights on Kingman Reef in favor of private interests on the date of the issuance of" President Roosevelt's December 29, 1934 Executive Order.  On October 15, 1937, the Navy TJAG wrote to the Commandant, Fourteenth Naval District, United States Navy, requesting "information as to the private ownership of or interest in Kingman Reef and Palmyra Island as disclosed by the records of the Fourteenth Naval District," along with "documents bearing thereon."  The Commandant responded on December 6, 1937, describing the 1922 annexation by Mr. Thurston and the Copra Co., and noting that receipt of the 1922 letters sent by Ellen Fullard-Leo to the Secretary of State regarding the Copra Co.'s annexation of Kingman Reef was "acknowledged by the Secretary of State but no mention was made of the [Copra Co.'s] claim to Kingman Reef for its own use."  The Commandant further noted that the Territory of Hawaii had continued to collect taxes on Kingman Reef from Ellen and Leslie Fullard-Leo since 1923.  The Commandant concluded: "It is understood that Mr. L. Fullard-Leo is preparing to submit a claim for ownership to Kingman Reef in the near future, based upon the original claim of the [Copra Co.], which was financed largely by himself and his wife."  On February

11, 1938, the Navy TJAG acknowledged receipt of the Commandant's letter and stated, "[t]he information contained therein will be placed on file for future reference in the event a claim is made for ownership by private parties.  No such claim has been filed with the Navy Department to date."

On March 29, 1938, Mr. Townsend and Mr. Lewis, attorneys for the Fullard-Leo family, wrote to the Secretary of the Navy to discuss the Fullard-Leo family's claim of fee title ownership in Kingman Reef.  In that letter, Mr. Townsend and Mr. Lewis wrote:

> As indicated in our letter of January 25th to the Secretary of State, it would seem that, as a result of the Executive Order of December 29, 1934, the Secretary of the Navy apparently concluded that the Department of State had denied the existence of the private property interests in Kingman's Reef claimed by Mrs. Ellen Fullard-Leo.  We trust that the letters now in your possession will clarify the position and remove any question as to Mrs. Fullard-Leo's legal rights, which we propose to protect, so far as possible, by appropriate legal proceedings.  It seems unnecessary to restate the costs incurred by Mrs. Fullard-Leo in connection with the annexation of Kingman's Reef for and in behalf of the United States, or to recount the steps taken by her to establish her presently existing legal rights to the private property interests in the atoll.

On April 26, 1938, the Navy TJAG, by direction of the Secretary of Navy, responded to Mr. Townsend and Mr. Lewis' letter of March 29, 1938.  In that letter, the Navy TJAG, for the first time, but unequivocally, rejected the Fullard-Leo family's claim of ownership of Kingman Reef, stating:

> The records show that Kingman Reef, otherwise known as 'Dangers Rock,' is a bonded guano island, it having been listed by affidavit of Captain W.W. Taylor on February 12, 1858, and his right through several assignments, were transferred to the United States Guano Company, and the island was bonded on February 8, 1860 (Moore's <u>Digest of International Law</u>, Vol. 1, pp. 667-668).  It will be noted that the island, including its reefs and tide and submerged lands, was under the control and jurisdiction of the United States long before the claim of Mrs. Fullard-Leo arose, and by Executive Order No. 6935, dated December 29, 1934, it was placed under the control and jurisdiction of the Navy Department.  Under the circumstances, the showing made is not sufficient to uphold the claim of Mrs. Fullard-Leo.

The issuance of Executive Order No. 6935, followed by this set of correspondence between the Fullard-Leo family, and later, their agents, and the United States was critical.  Executive Order No. 6935 claimed Kingman Reef as public land and set is aside for jurisdiction by the Navy.  The Fullard-Leo family's 1937 letter to Delegate King did not challenged the basis for the Executive Order, nor was it a request to the proper authorities for the United States government to recognize the Fullard-Leo

family's alleged fee simple title to Kingman Reef.   Instead, the Fullard-Leo family asserted that Kingman Reef's "ownership presumably rests with the State or Navy Department," attempted to sell Kingman Reef and Palmyra Island to the government, and asserted a claim for $40,000.00 for the cost of "annexing Kingman's Reef." Delegate King forwarded the Fullard-Leo family's letter to the Secretary of the Navy, however, the Fullard-Leo family did not communicate directly with the Navy, the branch of the government which had authority over Kingman Reef after 1934, until their lawyers, Mr. Townsend and Mr. Lewis, wrote to the Secretary of the Navy on March 29, 1938.  Mr. Townsend and Mr. Lewis' letter again did not so much request recognition of the Fullard-Leo family's asserted property interest in Kingman Reef as it threatened legal action if the Navy did not renounce its "deni[al] of existence of the private property interests in Kingman's Reef claimed by Mrs. Ellen Fullard-Leo."   The Navy chose, however, to explicitly reject the Fullard-Leo family's claim to a private ownership interest in Kingman Reef.

The Navy TJAG's conclusion that Kingman Reef "was under the control and jurisdiction of the United States long before the claim of Mrs. Fullard-Leo arose" is debatable.  As noted above, the Department of State had concluded in a January 9, 1933 report, just five years before, that "it [was] difficult to reach definite conclusions on the legal status of Kingmans Reef because of lack of information," that "the United States has no valid claim to Kingmans Reef arising under the Guano Act," and that the United States had an "inchoate right to the reef," but had not extended jurisdiction over the island.  The United States could have chosen to recognize the Fullard-Leo family's claim to ownership of Kingman Reef and to perfect the Fullard-Leo family's inchoate title to the atoll.   Unlike the Norwegian Supreme Court in <u>Jacobsen</u>, however, American courts have never held that the government has a legal obligation to recognize claims of preexisting ownership rights by its own citizens. In the case of the Swans Island, the Attorney General indicated that the plaintiff's rights to the land had "become at least so equitably fixed as to warrant some provision for compensation by the Government," <u>see SOVEREIGNTY OVER SWAN ISLANDS</u>, 31 U.S. Op. Atty. Gen. at 224, stressing that recognizing the plaintiff's claim by providing compensation would be the equitable thing for the government to do.  The Attorney General stopped short of saying that the United States was legally obligated to recognize the plaintiff's claim to the Swan Islands.  In the above captioned case, although the United States could have decided to recognize the Fullard-Leo family's claim to own Kingman Reef, instead, President Roosevelt declared the atoll public land in Executive Order No. 6935, and the Navy unequivocally rejected the Fullard-Leo family's claim to the atoll in 1938.

The Fullard-Leo family and their attorneys stated in their letters to both Delegate King and the Secretary of the Navy that, should their claim to Kingman Reef be rejected, they would make "a formal claim through legal channels" or pursue the "appropriate legal proceedings" to perfect their title.  Instead, the record shows that communication between the Fullard-Leo family and the federal government ceased after 1938 and was not initiated again until the 1990s, when FWS got involved in negotiations between the Fullard-Leo family and TNC to sell Palmyra Island and Kingman Reef.  The Fullard-Leo family never objected to the issuance of Executive Order No. 6935, never

responded to the Navy's 1938 letter, and never sought to further perfect title to Kingman Reef.

Nearly five years after the Fullard-Leo family quitclaimed their interest in Kingman Reef to KRAI on November 17, 2000, KRAI filed a quiet title suit against the United States in the United States District Court for the District of Hawaii. See Kingman Reef Atoll Investments, L.L.C. v. United States, 545 F. Supp. 2d at 1103. The District Court explained that, under the Quiet Title Act, 28 U.S.C. § 2409a, a plaintiff's quiet title claim against the United States "is barred if it or its predecessor failed to commence the action within 12 years of the date they knew or should have known of the claim of the United States," id. at 1110 (citing United States v. Beggerly, 524 U.S. 38, 48 (1998)), and that the Quiet Title Act is "retroactive," such that "if the passage of 12 years from the date of accrual occurred before October 25, 1972, when Congress passed the QTA, the action is foreclosed." Id. at 1111 (citing Donnelly v. United States, 850 F.2d 1313, 1318 (9th Cir. 1988); Stubbs v. United States, 620 F.2d 775 (10th Cir. 1980)).

The District Court found that the Fullard-Leo family "knew or should have known of the United States' claim" to Kingman Reef "as a result of the 1934 Executive Order and based on the correspondence between the Fullard–Leos and the government in 1937 and 1938." Id. The court reasoned that the 1934 Executive Order, which plaintiff did not dispute, was published and made public, announced that Kingman Reef "was considered public land and that jurisdiction was given to the Navy." Id. at 1111-12 (citing United States v. Gossett, 416 F.2d 565, 568 (9th Cir.1969) ("The fact that the Executive Orders, withdrawing this land from public entry, were issued in 1929 and 1931 is convincing evidence that the Government was claiming ownership and exercising dominion over the property in those years."); Guam v. United States, 744 F.2d 699, 701 (9th Cir.1984); Warren v. United States, 234 F.3d 1331, 1335–36 (D.C. Cir. 2000). The District Court for the District of Hawaii also emphasized that the Fullard-Leo family "appear[ed] to acknowledge the government's 'ownership' of Kingman Reef" in their letter to Congressional Delegate King. Kingman Reef Atoll Investments, L.L.C. v. United States, 545 F. Supp. 2d at 1112. Finally, the court stated that the Navy's 1938 letter to the Fullard-Leo family's attorneys clearly stated "[t]he government's position that the Fullard–Leos had no private interest in Kingman Reef." Id. Because the Fullard-Leo family knew or should have known that the government claimed an interest in Kingman Reef by 1938 at the latest, the court found that KRAI's quiet title claim "expired—at the latest—by 1949 or 1950 (12 years after the 1937 and 1938 correspondence with the government)," and was, therefore, untimely as it was filed in 2005. Id. The District Court also found no evidence that the United States had ever abandoned its claim to Kingman Reef, which would have given KRAI a new cause of action under the Quiet Title Act. The District Court concluded that the United States' original claim to Kingman Reef arose from the 1934 Executive Order, which had never been revoked and remained in effect, and the underlying legislation for which remained in force. See id. at 1116. The District Court, therefore, granted defendant's motion to dismiss KRAI's quiet title action for lack of subject matter jurisdiction, see id. at 1116, and the United States Court of Appeals for the Ninth Circuit affirmed that decision. See Kingman Reef Atoll Investments, L.L.C. v. United States, 541 F.3d at 1189.

Although the Quiet Title Act had not yet been enacted in 1938, when the Navy rejected the Fullard-Leo family's ownership claim regarding Kingman Reef,[24] it was incumbent upon the Fullard-Leo family, however, to "protect" their asserted ownership interest in Kingman Reef "so far as possible, by appropriate legal proceedings," as they stated they intended to do in their correspondence with both Congressional Delegate King and, on their behalf, with the Navy in 1937.   The Fullard-Leo family could not ignore Executive Order No. 6935 and the Navy's 1938 letter and continue to put themselves forward as private owners of Kingman Reef in the hopes that their claim eventually would be recognized.  What apparently began in 1922 as a good faith belief that they had established an ownership interest in Kingman Reef by way of Mr. Thurston's 1922 activities cased to be so after Executive Order No. 6935 set Kingman Reef aside as public land and the Navy explicitly rejected the Fullard-Leo family's claim in 1938.  The Fullard-Leo family's failure to take any action to perfect title in Kingman Reef, especially after 1938, is fatal to any takings claim today by plaintiff.  Because the Fullard-Leo family never perfected title to Kingman Reef, they had no interest to convey to KRAI on November 17, 2000, KRAI had no interest to convey to plaintiff KRAD through their November 17, 2000 leasehold agreement, and plaintiff had no interest to convey to KRE in any subsequent license agreement.

Between 1938 and November 17, 2000, when the Fullard-Leo family quitclaimed "[a]ll of Grantor's rights, title and interest in" Kingman Reef to KRAI, plaintiff alleges that the Fullard-Leo family continued to act as though they owned Kingman Reef and defendant did nothing to interfere with their use or dominion over the atoll.  The Fullard-Leo family continued to pay taxes on Kingman Reef until 1959, when, after Hawaii received statehood, taxes ceased being levied because Palmyra Atoll and Kingman Reef were not incorporated as a part of the lands of the State of Hawaii.   Plaintiff alleges that the Fullard-Leo family accessed Kingman Reef numerous times since the 1940s, answered requests from various individuals who sought access to Kingman Reef, including HAM radio operators, scuba divers, and photographers, some of whom

---

[24] As noted by the Ninth Circuit,

> [a]n action brought under the QTA "accrues when the landowner or his predecessors-in-interest knew or should have known of the United States' claim." Shultz [v. Dep't of Army], 886 F.2d [1157,] 1158 [(9th Cir. 1989)]; see 28 U.S.C. § 2409a(g). The QTA's "statute of limitations applies retroactively," so it is irrelevant whether KRAI's predecessors in interest, the Fullard–Leo family, was put on notice of the United States's interest before or after the enactment of the QTA. Donnelly v. United States, 850 F.2d 1313, 1318 (9th Cir. 1988) (citing Block [v. North Dakota], 461 U.S. [273], 284 [(1983)]).

Kingman Reef Atoll Investments, L.L.C. v. United States, 541 F.3d at 1197.

were allegedly referred to the family by the United States Navy,[25] and stopped unauthorized uses of the atoll when they were discovered.

Unfortunately for plaintiff, while all of these alleged activities can be indicia of property ownership, none can establish a valid property interest against the United States when the government has explicitly refused to grant title to a claimant and the claimant has failed to take legal action.  It is well established that occupation of public lands, even if long-lasting and paired with improvement of the land, does not give the occupant any vested interest against the United States.  In Frisbie v. Whitney, the United States Supreme Court recounted the opinions of several Attorneys General, which demonstrated a clear consensus that "[i]t is not to be doubted that settlement on the public lands of the United States, no matter how long continued, confers no right against the government. . . ."  Frisbie v. Whitney, 76 U.S. 187, 195 (1869) (quoting 11 U.S. Op. Atty. Gen. 462 (1866) (citing 8 U.S. Op. Atty. Gen. 72 (1856) and 10 U.S. Op. Atty. Gen. 57).  Because the federal government clearly indicated to the Fullard-Leo family that it considered Kingman Reef public land in 1934 and, again, in 1938, any continued access and use of the atoll between 1938 and 2000 by the Fullard-Leo family did not convey any ownership interest to the Fullard-Leo family.  Nor did the Fullard-Leo family's granting of permission to third parties to access or use Kingman Reef confer upon them any property interest.

President Roosevelt issued Executive Order No. 8682 on February 14, 1941, creating a Naval Defensive Sea Area over Kingman Reef and the surrounding waters and a Naval Airspace Reservation in the airspace over the atoll.  Executive Order 8682 also made it impermissible for "any person" to enter these areas "unless authorized by the Secretary of the Navy."  Executive Order No. 8682.  The Naval Defensive Sea Area and Naval Airspace Reservation remained in force until 1976, and the Navy developed a regulatory framework for individuals to seek permission to enter the waters and airspace surrounding Kingman Reef.  Members of the Fullard-Leo family or any other person who accessed Kingman Reef without permission from the Navy between 1941 and 1976, therefore, were violating the terms of the Executive Order and corresponding regulations.  And while Executive Order No. 8682 was suspended in 1976, Executive Order No. 6935, placing Kingman Reef under the "control and jurisdiction" of the Navy has never been revoked and the record shows no other indication that, between 1938 and 2000, the United States took any action which evidenced an intent to relinquish its asserted ownership of Kingman Reef.

Plaintiff emphasizes that the Fullard-Leo family paid taxes on Kingman Reef from 1923 to 1959, when Hawaii received statehood and Kingman Reef was not incorporated into the State of Hawaii.  The United States Supreme Court has recognized that payment of taxes on a property is strong circumstantial evidence of ownership.  See Ewing's Lessee v. Burnet, 36 U.S. 41, 54 (1837) ("the uninterrupted payment of taxes on the lot for twenty-four successive years . . . is powerful evidence of a claim of right to

---

[25] Plaintiff alleges that the United States Navy forwarded at least ten third-party requests for permission to access Kingman Reef to the Fullard-Leo family.

25

the whole lot"); see also Fletcher v. Fuller, 120 U.S. 534, 552-53 (1887) (considering payment of taxes by defendant and his ancestors for ninety-seven years "circumstances of great significance, taken in connection with their constantly asserted ownership" that supported quieting title in the defendant); Holtzman v. Douglas, 168 U.S. 278, 284 (1897) ("Payment of the taxes . . . is very important and strong evidence of a claim of title. . . ."). Payment of taxes alone, however, does not establish an ownership interest. See Oregon & C.R. Co. v. Grubissich, 206 F. 577, 582-83 (9th Cir. 1913) ("The mere fact of the payment of these taxes is certainly no ground on which to presume a conveyance to the taxpayer."); see also Dolbear v. Gulf Prod. Co., 268 F. 737, 740 (5th Cir. 1920) (stating that "[i]t cannot plausibly be contended that the payment, for 3 years in 20, of taxes on vacant and unused land" by other than the record title holder was reason to find that title was conveyed from the owners of the land to the taxpayer), cert. denied sub. nom. Shannon v. Prod. Co., 255 U.S. 569 (1921). The Fullard-Leo family initiated the payment of taxes on Kingman Reef to the Territory of Hawaii in 1923, allegedly at the direction of Mr. Huber, despite the fact that there is no evidence that Kingman Reef was ever considered part of the Territory of Hawaii. The Fullard-Leo family continued to pay taxes on Kingman Reef after the issuance of Executive Order No. 6935, which set aside the atoll as public land under the jurisdiction of the Navy, and after the Navy rejected the family's ownership claim in 1938. The Fullard-Leo family's decision to continue paying taxes to the Territory of Hawaii for land which the United States government had declared federal public land, and despite the fact that there is no evidence in the record that Kingman Reef was ever considered part of the Kingdom or Territory of Hawaii, does not establish that the Fullard-Leo family ever obtained an ownership interest in Kingman Reef.

Finally, plaintiff alleges that between 1938 and 2000 the federal government recognized the Fullard-Leo family's ownership interest in Kingman Reef, never restricted their access to Kingman Reef, and was involved in negotiations to purchase Kingman Reef from the family in the 1990s. Officials from the FWS were involved in meetings regarding the potential sale of Kingman Reef, along with Palmyra Island, to TNC in the 1990s, and plaintiff alleges that those officials never "questioned the Fullard-Leo family's title to Kingman Reef or suggested that the government owned Kingman Reef." In addition, plaintiff points to a 1997 report from NOAA, which stated:

> The Fullard-Leo family owns Palmyra Island and Kingman Reef, and may claim ownership or jurisdiction over ocean resources and/or submerged lands seaward of the low-water mark.

> The exact extent of the Fullard-Leo claims is not clear, probably extending to the lagoons and reefs surrounding the islands, and perhaps extending to the "territorial" waters. Federal submerged lands around these areas were not conveyed to the Fullard-Leo family. It is the position of the Federal Government that the EEZ [Exclusive Economic Zone] around Palmyra and Kingman extends to the low-water mark.

According to plaintiff, the United States government's acquiescence with the Fullard-Leo family's use of Kingman Reef, statements indicating that the Fullard-Leo family were the owners of Kingman Reef, and involvement in a potential sale of the atoll by the Fullard-Leo family demonstrate that the Fullard-Leo family held title to Kingman Reef until they conveyed it to KRAI on November 17, 2000.

Although the United States government's inconsistent position on the ownership of Kingman Reef is regrettable, the record does not demonstrate that the United States ever conveyed title of the atoll to the Fullard-Leo family, or officially recognized the Fullard-Leo family as owners of Kingman Reef.  Moreover, there is some evidence in the record that the Navy, which maintained jurisdiction over Kingman Reef until 2000, attempted to notify FWS that the Fullard-Leo family did not own Kingman Reef.  For example, on December 15, 1992, Lieutenant Commander Rick Russell, United States Navy, Pearl Harbor, contacted P. Ha and Andy Yuen at FWS regarding the granting of access to Kingman Reef.  The record of the telephone conversation stated:

> Lt. Commander Russell called to let us know that he is the person to talk to regarding permission to go to Kingman Reef.
>
> He called with respect to the Ham Radio expedition to Kingman that is being planned.  There seems to have been a mix-up with the information about who has jurisdiction over Kingman Reef.  It is not Peter Savio.  The Navy (COMNAVBASE Pearl Harbor) has administrative jurisdiction over Kingman Reef by delegated authority under [Executive Order] 6935[,] 29 December 1934.  (Kingman is "reserved reefs").  Lt.  Commander Russell just wanted to clarify the issue.  He will call Peter Savio to inform him.

Nonetheless, defendant acknowledges that several reports produced by the FWS in the 1990s, as well as the 1997 NOAA report, alluded to the Fullard-Leo family's ownership of Kingman Reef, although defendant now argues that these reports were "preliminary" and subsequent investigations confirmed that the United States holds fee simple title to Kingman Reef.  Robert P. Smith, Pacific Islands Manager for FWS, stated in a 2007 deposition related to KRAI's quiet title suit in the Hawaii District Court, <u>Kingman Reef Atoll Investments, L.L.C. v. United States</u>, 545 F. Supp. 2d 1103, that "[f]rom '91 until certainly '97. . .certainly [he] believed that the Fullard-Leo family owned Kingman Reef," and that no one in his presence stated that the Fullard-Leo family did not own Kingman Reef.   Mr. Smith, however, indicated that, in 1998, he had changed his position regarding the claim of fee title ownership by the Fullard-Leo family in Kingman Reef, and that between 1997 and 1998:

> The Nature Conservancy's attorney, Suzanne Case, had done extensive research on the ownership of Kingman; because [Mr. Smith] was then and probably continued to be. . .a cheerleader for getting both properties and both nearby marine environments. . . . [Ms. Case's] research revealed that the Fullard-Leo family, at least in her view, did not own Kingman Reef.

Mr. Smith further stated that following the 1998 expedition, the Realty Division at FWS decided that, "in the view of the government," Ms. Case's research was correct and that the Fullard-Leo family did not hold title to Kingman Reef.  Similarly, a March 30, 2000, Briefing Statement prepared for the Director of FWS, titled "Kingman Reef Ownership Status and Federal Jurisdictions," stated:

> Kingman Reef is an unorganized and unincorporated U.S. possession.  The U.S. acquired sovereignty over Kingman Reef pursuant to the Guano Act of 1856.  Fee title interest rests with the Federal Sovereign.  It is currently under the jurisdiction of the U.S. Navy.

> The Fullard-Leo family is claiming private ownership.  In 1922, the American flag was hoisted over Kingman Reef at the request of the Fullard-Leo family for the purpose of taking formal possession.  This is the same family that owns Palmyra Atoll, and whose ownership was confirmed by the Supreme Court decision, United States v. Fullard-Leo, 331 U.S. 256 (1947) - the case did not address Kingman Reef.  Recently, The Nature Conservancy obtained a purchase agreement for Palmyra Atoll.

> People wishing to visit Kingman Reef must secure permission from the Fullard-Leo family.  However, the U.S. government does not recognize the family's imputed right to act in this manner.

By the time of the alleged taking, the FWS was consistently advancing the position that Kingman Reef was federally owned, stating in its Draft EA for the proposed wildlife refuge that, whether no action was taken or Kingman Reef NWR was established, "[b]oth alternatives would continue the Federal ownership of Kingman Reef."  Defendant denies that the Fullard-Leo family or any of their agents, associates, or representatives were ever authorized to grant access to Kingman Reef, block access to Kingman Reef and its surrounding waters, survey and inspect Kingman Reef, or sell Kingman Reef.  Nothing in the record contradicts defendant's position, nor indicates that an authorized representative of the United States ever conveyed title to Kingman Reef to the Fullard-Leo family prior to November 17, 2000, when they tried to quitclaim their interest in the atoll to KRAI and KRAI entered a lease agreement with plaintiff.  In addition, the license agreement between plaintiff and KRE, one of the instruments on which plaintiff relies for establishing its alleged property interest, acknowledged that ownership of Kingman Reef was uncertain, stating:

**Section 1.08**          **Agreement Subject to Rights and Reservations of Others.**

(1) Licensor [KRAD] hereby discloses, and Licensee [KRE] acknowledges, that the federal government may have asserted or may assert claims regarding the ownership of Kingman Reef and its lagoons and territorial waters, which claims the Master

Lessor [KRAI] disputes.   Licensee acknowledges and agrees that Licensor has not made and does not hereby make any representations or warranties, express or implied, regarding the nature or extent of Licensor's or Master Lessor's interest in Kingman Reef or in the lagoons or territorial waters thereof. Without limiting the generality of the foregoing, Licensor hereby discloses and Licensee hereby acknowledges, that while the Master Lessor believes that the Master Lessor has rights to Kingman Reef, the nature of the Master Lessor's interest in Kingman Reef has not been determined.  All of Licensee's rights under this Agreement shall be solely as specified in this Agreement, and Licensee acknowledges and agrees that this Agreement is subject to the extent of Master Lessor's interest in Kingman Reef. . . .

(first emphasis in original). While plaintiff now advances the position that KRAI had a valid ownership interest in Kingman Reef, conveyed by the Fullard-Leo family, when plaintiff entered into a license agreement with KRE, it conceded that KRAI's interest in Kingman Reef was unresolved.

Therefore, the court finds that, at best, plaintiff's predecessors-in-interest had inchoate rights to Kingman Reef between 1922 and 1934, but that title was never perfected.  Instead, the United States government proclaimed Kingman Reef public land in 1934 and unequivocally rejected the Fullard-Leo family's ownership claim in 1938. The Fullard-Leo family did not take legal action at either point and waited many years to take any legal action.   Under the circumstances, the court finds that the Fullard-Leo family, plaintiff's predecessors-in-interest, never had a vested ownership right in Kingman Reef and, therefore, no valid property interest was ever conveyed to plaintiff.

The court notes that the history of Kingman Reef is distinguishable from that of Palmyra Island, such that a different outcome with regards to the Fullard-Leo family's ownership of the two atolls is warranted.  Unlike the Copra Co., which commissioned Mr. Thurston to annex Kingman Reef without notifying or seeking the permission of either the United States or the Territory of Hawaii, Mr. Wilkerson and Mr. Bent sought the permission of the King of Hawaii before taking possession of Palmyra Island, and the King of Hawaii "consent[ed] to the taking of possession of the island of Palmyra" in his name.  See United States v. Fullard-Leo, 66 F. Supp. at 775.  Once Palmyra Island had been claimed, Mr. Bent informed the King and the Minister of the Interior of his actions at Palmyra and the Minister of Interior issued a proclamation stating that Palmyra Island "was taken possession of, with the usual formalities, by Captain Zenas Bent, he being duly authorized to do so, in the name of Kamehameha IV, King of the Hawaiian Islands."  Id. at 776.  Mr. Wilkerson's and Mr. Bent's annexation of Palmyra Island was, therefore, sanctioned by the government of the Kingdom of Hawaii. The District Court for the Territory of Hawaii concluded, and the Ninth Circuit, and Supreme Court agreed, that the record suggested that the King of Hawaii had granted title to Palmyra Island to Mr. Wilkerson and Mr. Bent.  See United States v. Fullard-Leo, 66 F.

Supp. at 787; <u>see</u> <u>also</u> <u>United States v. Fullard-Leo</u>, 156 F.2d at 767, <u>United States v. Fullard-Leo</u>, 331 U.S. at 261.  The District Court for the Territory of Hawaii stressed:

> There is not a scintilla of evidence that the Hawaiian monarchy, the Provisional Government or the Republic of Hawaii at any time claimed that Palmyra was public land. There is no record evidence of any kind that either of those governments ever regarded Palmyra as public property. Uncontradicted evidence shows that the claim of private ownership of the island had been continuously maintained through the years to the knowledge of the Department of State, the Department of the Interior and officers of the United States navy as well as of the prior governments of Hawaii.

<u>Id.</u> at 786.  Instead, the United States' first effort to quiet title to Palmyra Island came nearly eighty years after Messrs. Wilkerson and Bent took possession of the island. <u>See</u> <u>United States v. Fullard-Leo</u>, 66 F. Supp. at 774.  By contrast, Executive Order No. 6935, which placed Kingman Reef under the "control and jurisdiction of the United States Secretary of the Navy," was issued just twelve years after Mr. Thurston's annexation of the atoll, and four years later the United States explicitly rejected the Fullard-Leo family's ownership claim.  There was nothing like an eighty-year period of undisturbed possession and use of Kingman Reef by plaintiff's predecessors-in-interest, like there was with respect to Palmyra Island.  <u>See</u> <u>United States v. Fullard-Leo</u>, 66 F. Supp. 786.  In addition, when title to Palmyra Island passed to Henry Cooper in 1912, Mr. Cooper filed a petition in the Land Court of the Territory of Hawaii, claiming ownership of Palmyra Island in fee simple and requesting registration of his title.  <u>See</u> <u>id.</u> at 777-78.  The Territory of Hawaii was summoned as a party respondent in the proceedings, but disclaimed any interest in Palmyra Island.  The Land Court then filed a decree declaring Henry Cooper to be the owner of Palmyra Island in fee simple.  <u>See</u> <u>id.</u> The Fullard-Leo family, therefore, purchased their interest in Palmyra Island from the party declared by a legitimate court to be the rightful owner of the atoll.  <u>See</u> <u>id.</u>  Unlike Mr. Cooper, neither the Copra Co. nor the Fullard-Leo family ever filed a petition in the Land Court of the Territory of Hawaii, nor in federal court, to perfect their claim to Kingman Reef.  The evidence of a lost grant from the King of Hawaii to Messrs. Wilkerson and Bent and Mr. Cooper's action to perfect title to Palmyra Island are material distinctions from the above captioned case which justify the court's decision that the Fullard-Leo family never obtained a valid property interest in Kingman Reef, although they were found to hold title to Palmyra Island.

Plaintiff also lists several other examples in which, plaintiff asserts, the United States has recognized preexisting private property rights upon exercising sovereignty over land that was previously *terra nullius*, including Swains Island, the Spitsbergen Archipelago, Los Monges Islands, and Aves Islands.  Each of plaintiff's examples is distinguishable from Kingman Reef.  Plaintiff alleges that Swains Island was

> discovered in 1856 by a British citizen who subsequently gave the island to an American citizen.  That American citizen later provided the island, through inheritance, to Eli H. Jennings.  When Jennings died, his estate

> was disputed by two parties who asked that the United States extend sovereignty over Swains Island. Congress did so through a joint resolution on March 4, 1925.  Once sovereignty was extended, however, the United States treated Swains Island as privately owned, though subject to governmental jurisdiction and protection.  *See* S. Treaty Doc. 97-5, 97th Cong., 1st Sess., Letter of Transmittal at vi (1982) (noting that the Executive Branch had negotiated to keep "Swains, a privately owned island.").

(internal citation omitted).  What distinguishes Swains Island from Kingman Reef is that individuals who wished to establish title to Swains Island petitioned the United States to extend sovereignty to the island and, once it did, the United States chose to recognize property rights in those individuals. Like Kingman Reef, until the United States extended sovereignty over Swains Island, Jennings' heirs likely had only an inchoate title to the island.  Unlike the above captioned case, however, that title was perfected by the sovereign, which chose to treat Swains Island as privately owned.  Once the federal government extended sovereignty over Kingman Reef, by contrast, it chose to treat Kingman Reef as public land and dispute the Fullard-Leo family's private ownership interest.

Plaintiff also alludes to several examples in which the United States has asserted its citizens preexisting interests in *terra nullius* against foreign governments.  For example, the Spitsbergen Archipelago, a group of islands in the Arctic Ocean, was considered *terra nullius* and was uninhabited until coal was discovered on the island in the early 1900s.  At that point, an American coal company and coal companies from several other nations all made claims on the islands.  The "Spitsbergen Question," as it became known, was resolved by treaty in 1920, which recognized Norway's sovereignty over the island, but required that Norway respect the rights of "Occupiers of land" already present.  A tribunal was appointed to resolve conflicting property claims and, ultimately, Norway recognized the claims of citizens or companies of various countries.  See Ederington, Property As A Natural Institution: The Separation of Property from Sovereignty in International Law, 13 Am. U. Int'l L. Rev. at 284-85.  The Los Monges Islands and Aves Islands were both guano islands, which were *terra nullius* when they were claimed by Americans for the purpose of harvesting guano. Venezuela subsequently claimed sovereignty over both island groups and ejected the Americans. The United States demanded compensation from Venezuela in both cases and, in both cases, the Venezuelan government paid the Americans damages.  See id. at 288-89. Plaintiff argues that the Spitsbergen Archipelago and guano island examples demonstrate that "the United States has defended private property rights of American citizens in *terra nullius* as against other nations."  Accepting plaintiff's assertion as true, however, these examples do not establish that the United States was obligated to recognize the claimed private property rights of American citizens in *terra nullius* as against the United States government.  The United States' decision to protect its citizens from interference by a foreign government is unrelated to its decision regarding whether to recognize private property claims to federal public lands on the part of its own citizens.

As mentioned above, the only case of which this court is aware in which a court has indicated that a government is obligated to recognize the preexisting private property rights of its own citizen was Jacobsen v. Norwegian Government.  See id. at 280 (citing Jacobsen v. Norwegian Government, 7 I.L.R. 109).   Decisions of the Norwegian Supreme Court obviously are not binding on this court.   Moreover, the Jacobsen case is also distinguishable from the above captioned case because Mr. Jacobsen pursued a legal remedy against the sovereign when the government rejected his ownership claim and sought to have his title to Jan Mayen Island perfected.  Plaintiff's predecessors-in-interest failed to take appropriate legal action to perfect their inchoate title to Kingman Reef, resulting in plaintiff having no valid property interest in the atoll when the Kingman Reef NWR was created on January 18, 2001.

The court does not condone the United States' failure to resolve the title dispute surrounding Kingman Reef decades ago when the Fullard-Leo family first sought federal recognition of their ownership claim over the island.  Nor is it good practice that, even after the Navy disputed the Fullard-Leo family's ownership claim in 1938, different agencies within the federal government took inconsistent positions on ownership of the atoll.  Despite the foregoing, the Fullard-Leo family had the legal obligation to seek perfection of their inchoate title to Kingman Reef and failed to do so, despite clear indication from the United States government in 1938 that it did not accept Fullard-Leo family's claim of ownership.  The court must conclude, therefore, that the Fullard-Leo family never established a vested property interest in Kingman Reef, and no valid property interest was ever conveyed to plaintiff, but rather, title to the atoll lies with the United States government.  Because the court concludes that plaintiff has failed to establish a cognizable property interest in Kingman Reef as a whole, it need not address defendant's separate argument regarding submerged lands and the waters surrounding Kingman Reef.

As indicated above, "'[i]t is axiomatic that only persons with a valid property interest at the time of [an alleged] taking are entitled to compensation.'" Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (quoting Wyatt v. United States, 271 F.3d at 1096 (citing Cavin v. United States, 956 F.2d at 1134)).  Therefore, "[i]f the claimant fails to demonstrate the existence of a legally cognizable property interest, the courts [sic] task is at an end." Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (citing Maritrans Inc. v. United States, 342 F.3d at 1352 and M & J Coal Co. v. United States, 47 F.3d at 1154).  Because the court has determined that plaintiff did not have a cognizable property interest at the time of the alleged taking, the inquiry ends here and the court also will not address the second step of the takings analysis, i.e., whether the creation of the Kingman NWR constituted a taking of private property for the public interest.

Estoppel

In its motion for summary judgment plaintiff advances several alternative arguments, in the event that this court finds that KRAI's predecessors-in-interest did not

establish title to Kingman Reef in 1922 as a consequence of Mr. Thurston's actions. Plaintiff first argues that defendant should be estopped from claiming that KRAI does not have legal title to Kingman Reef because defendant treated the Fullard-Leo family as the owner of Kingman Reef for decades. Plaintiff states that defendant knew that the Fullard-Leo family had made a claim for ownership of Kingman Reef in 1922, when Ellen Fullard-Leo sent a letter to the Secretary of State. Between 1922 and 1937, plaintiff claims, the government was silent about ownership of Kingman Reef.  It was not until 1938 that defendant disputed the Fullard-Leo family's ownership of Kingman Reef, in the form of a Navy TJAG's letter to the Fullard-Leo family's attorneys.  Plaintiff argues, however, the Navy TJAG's position was inconsistent with an internal Navy memorandum which stated that the Fullard-Leo family had been paying taxes on Kingman Reef and could make an ownership claim on the island.  Moreover, according to plaintiff, after the Navy TJAG's 1938 letter, the United States continued to treat the Fullard-Leo family as the owner of Kingman Reef by assessing property taxes through 1959 and later attempting to buy the atoll from the Fullard-Leo family.  Plaintiff analogizes the facts of this case to two Ninth Circuit cases in which the United States was estopped from asserting title, United States v. Georgia-Pacific Co., 421 F.2d 92, 96 (9th Cir. 1970) and United States v. Wharton, 514 F.2d 406, 412 (9th Cir. 1978).  In sum, plaintiff argues that estoppel should bar defendant from asserting title to Kingman Reef because defendant knew of Mr. Thurston's' actions in 1922, never notified KRAI or its predecessors-in-interest that the United States was claiming title to Kingman Reef, and treated the Fullard-Leo family as the owners of Kingman Reef after 1938, and plaintiff relied on the fact that it owned Kingman Reef by paying taxes on the atoll and overseeing and maintaining the atoll.

Defendant argues that all of plaintiff's alternative theories, including their estoppel, lost grant, and adverse possession arguments, amount to a request for declaratory relief on plaintiff's title claim, over which this court has no jurisdiction. Defendant asserts that, "[a]lthough wrapped in the cloak of the Fifth Amendment, the core of Plaintiff's claim is one to quiet title against the United States."  Specifically with regard to estoppel, defendant argues that KRAI raised the exact same argument in its quiet title action, which both the United States District Court of the District of Hawaii and the Ninth Circuit rejected, such that plaintiff should be precluded from re-litigating the issue in this court.  In addition, citing Gregory v. United States, 37 Fed. Cl. 388, 396 (1997), defendant argues that plaintiff cannot use estoppel to establish a required element of a claim, namely plaintiff's property interest in Kingman Reef.

The elements for establishing equitable estoppel are:

(1) the party to be estopped must know the facts; (2) the party to be estopped must intend, or act in a manner that the other party has reason to believe it intends, for its conduct to be acted on; (3) the party asserting estoppel must be ignorant of the true facts; and (4) the party asserting estoppel must rely on the other party's conduct to its injury

Ebeyer v. United States, 114 Fed. Cl. 538, 550-51 (2014) (citing Am. Airlines, Inc. v. United States, 77 Fed. Cl. 672, 679 (2007), aff'd, 551 F.3d 1294 (Fed. Cir. 2008)).  The

United States Supreme Court has indicated that "[e]quitable estoppel 'operates to place the person entitled to its benefit in the same position he would have been in had the representations been true." CIGNA Corp. v. Amara, 131 S. Ct. 1866, 1880 (2011) (quoting J. Eaton, Handbook of Equity Jurisprudence § 62, p. 176 (1901)). The Supreme Court also has held that estoppel may run against the government, but that "the Government may not be estopped on the same terms as any other litigant." Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc., 467 U.S. 51, 60-61 (1984); see also New Hampshire v. Maine, 532 U.S. 742, 756, reh'g denied, 553 U.S. 968 (2001). A plaintiff "also must show that the government engaged in 'affirmative misconduct.'" SUFI Network Servs., Inc. v. United States, Nos. 2013–5039, 2013–5040, 2014 WL 2210851, at *17 (Fed. Cir. May 29, 2014) (quoting Zacharin v. United States, 213 F.3d 1366, 1371 (Fed. Cir. 2000)); see also Hanson v. Office of Pers. Mgmt., 833 F.2d 1568, 1569 (Fed. Cir. 1987) (citing generally Heckler v. Community Health Serv., 467 U.S. 51) ("It is now settled that to estop the Government there must at least be affirmative misconduct, leading to unfairness, on the part of a Government official."); Vane Minerals (US), LLC v. United States, 116 Fed. Cl. 48, 68 (2014).

Plaintiff alleges that defendant was silent about the ownership of Kingman Reef until 1938, or sixteen years after Mr. Thurston's annexation of the island.  The court disagrees.  In 1934, twelve years after Mr. Thurston's arrival at the atoll, President Roosevelt issued Executive Order No. 6935, which made clear that the government considered Kingman Reef public land, and "reserved, set aside, and placed" the atoll "under the control and jurisdiction of the Secretary of the Navy for administrative purposes."  As the District Court of Hawaii held in KRAI's quiet title action, "[t]he Fullard–Leos (Plaintiff's predecessors-in-interest) knew or should have known of the United States' claim as a result of the 1934 Executive Order. . . ." Kingman Reef Atoll Investments, L.L.C. v. United States, 545 F. Supp. 2d at 1111.  The Fullard-Leo family waited several more years to take action, however, and then only writing to Congressional Delegate King in 1937 and stating in that letter "ownership [of Kingman Reef] presumably rests with the State or Navy Department."  When the Fullard-Leo family's attorneys reached out for the first time to the Secretary of the Navy, the official within the United States government who had been granted jurisdiction over Kingman Reef four years earlier, the Navy responded within less than one month, clarifying the United States' position that the Fullard-Leo family did not have a valid ownership claim to Kingman Reef.

Plaintiff also alleges that after 1938 the United States continued to treat the Fullard-Leo family as the owner of Kingman Reef by assessing property taxes through 1959 and later attempting to buy the atoll from the Fullard-Leo family.  As discussed above, however, the Fullard-Leo family's payment of taxes was not dispositive proof of an ownership interest under the circumstances, and perhaps only a self-declaration of the Fullard-Leo family's own unwarranted belief they were the owners of Kingman Reef. With regard to the negotiations to buy Kingman Reef in the 1990s, the record indicates that Mr. Savio, the Fullard-Leo family's agent, represented to TNC and FWS that the Fullard-Leo family owned Kingman Reef, which in fact was not the case.  Defendant acknowledges that someone in the FWS may have mistakenly temporarily believed that

the Fullard-Leo family held title to Kingman Reef at some point in the 1990s, but that after further research by TNC's attorney, FWS concluded that Kingman Reef was not privately owned. See also Kingman Reef Atoll Investments, L.L.C. v United States, 541 F.3d at 1201 ("The district court found that KRAI presented evidence only 'of confusion and mistake on the part of some government employees,' as to whether the United States ultimately possessed an ownership interest in Kingman Reef."). The record has not established that a duly authorized person in the federal government ever acknowledged the Fullard-Leo family's claim of title to Kingman Reef.

As noted above, the amount of uncertainty regarding ownership of Kingman Reef and the many years of uncertainty or resolution of the matter by the federal government is unfortunate.  Blame does not lie solely with the United States government, as the Fullard-Leo family could have, and should have, taken appropriate action to perfect title or quiet title to Kingman Reef decades ago and, certainly, after Executive Order No. 6935 was issued in 1934 and the Navy explicitly rejected the family's ownership claim in 1938.  Regardless, plaintiff cannot establish the four elements necessary for the court to apply equitable estoppel against defendant.  Plaintiff has not demonstrated that any government employee knew that the defendant owned the atoll, but acted with an intention to deceive plaintiff or any of its predecessors-in-interest, nor that plaintiff's predecessors-in-interest were ignorant of the true facts regarding ownership of Kingman Reef, and relied on any government employee to their injury.  See Ebeyer v. United States, 114 Fed. Cl. at 550-51.  Nor does the record include evidence of conduct on the part of the government that would rise to the level of "affirmative misconduct," so as to warrant the application of equitable estoppel against the government in this case.  For these reasons, plaintiff's equitable estoppel argument fails.

Lost Grant

Plaintiff further argues that if defendant extended sovereignty over Kingman Reef in 1922, and assuming that Kingman Reef then became public lands of the Territory of Hawaii, the lost grant doctrine should apply in favor of KRAI's predecessors-in-interest. Citing United States v. Fullard-Leo, 66 F. Supp. at 786 and United States v. Chavez, 175 U.S. 509, 522 (1899), plaintiff asserts that, under the lost grant doctrine, plaintiff must show only a "legal possibility of the issuance of a grant," in addition to "'proof of an adverse, exclusive, and uninterrupted possession for the statutory period.'"  Plaintiff argues, albeit without citation, that fee title to Kingman Reef "was in the Territory [of Hawaii] in fee, subject to its being defeated, by the taking for federal purposes." Plaintiff maintains that there was certainly a legal possibility of a grant conveying Kingman Reef from the Territory of Hawaii to KRAI's predecessors-in-interest, and that KRAI's predecessors-in-interest occupied Kingman Reef, as well as paid taxes on it. Under similar circumstances, plaintiff argues, the lost grant doctrine has been applied against the State.

With respect to the lost grant doctrine, defendant argues, again, that the court lacks jurisdiction to consider this equitable claim and that plaintiff's argument is premised on an assumption that Kingman Reef became public lands of the Territory of

Hawaii in 1922, an assumption which defendant claims has no valid basis.  According to defendant, Kingman Reef has never been considered part of Hawaii, either when it was a Territory or a State.  Defendant cites an 1898 report to Congress from the Hawaiian Commission, which listed all of the islands considered to be part of Hawaii's territory at the time, and which included Palmyra Atoll, but not Kingman Reef.  (citing U.S. Senate, Report of the Hawaiian Commission, S. Doc. No. 16, 55th Cong., at 4 (3d Sess. 1898) (available    at    http://archive.org/stream/reportofhawaiian00unit#page/n7/mode/2up)).  Defendant also emphasizes that, when Hawaii became a state in 1959, Congress stated expressly that the State "shall not be deemed to include . . . Kingman Reef, together with [its] appurtenant reefs and territorial waters." Act of March 18, 1959, Pub. L. No. 86-3, 73 Stat. 4, sec. 2.  According to defendant, these documents demonstrate that Kingman Reef never was considered part of Hawaii.  In addition, defendant argues that the lost grant doctrine requires possession of the property for at least twenty years, which plaintiff cannot establish because their claim originates from Mr. Thurston's activities in 1922, but the United States had taken possession over Kingman Reef by 1934, or at the least, 1938.

        As indicated above, the lost grant doctrine is a means for a petitioner to quiet title to land that has been held adversely to the sovereign for a long period of time, by "recogniz[ing] that lapse of time may cure the neglect or failure to secure the proper muniments of title, even though the lost grant may not have been in fact executed." United States v. Fullard-Leo, 331 U.S. at 270 (citing United States v. Chavez, 159 U.S. 452 (1895)).  The Supreme Court has held that

        it is the general rule of American law that a grant will be presumed upon
        proof of an adverse, exclusive, and uninterrupted possession for twenty
        years, and that such rule will be applied as a *presumptio juris et de jure*,
        wherever, by possibility, a right may be acquired in any manner known to
        the law.

United States v. Pendell, 185 U.S. at 199-200 (citations omitted).  Thus, if a party can demonstrate adverse, exclusive, and uninterrupted possession for twenty years against the sovereign, a conclusive presumption applies that the party has title to the property. The Ninth Circuit indicated in the United States' quiet title action regarding Palmyra Atoll that "[t]he presumption of a lost grant is not necessarily restricted to situations in which a court or jury may believe there actually was a grant. Grants are often presumed for the mere purpose and from a principle of quieting possession."  United States v. Fullard-Leo, 156 F.2d at 758 (citing generally to United States v. Chavez, 175 U.S. 509 and Fletcher v. Fuller, 120 U.S. 534).

        The court agrees with defendant, however, that the lost grant doctrine is not applicable in the above captioned case.  Plaintiff acknowledges that its lost grant argument is premised on the assumption that Kingman Reef became part of the public lands of the Territory of Hawaii when Mr. Thurston annexed the atoll in 1922.  There is no evidence in the record to support that assumption.  A 1934 memorandum from the

Department of State title "Status of Certain Guano and Other Islands in the Pacific" addressed sovereignty over Kingman Reef and stated:

> On July 15, 1922, the Island of Palmyra Copra Company, a Hawaiian Corporation, notified the State Department that it had annexed Kingman's Reef in the name of the United States and for its own use on May 10, 1922.
>
> No other action appears to have been taken with respect to the incorporation of the Island into the territory of Hawaii or the United States. . . .

This memorandum suggests that Kingman Reef had not been recognized as part of the Territory of Hawaii as of 1934. Documents cited to by the defendant also show that Kingman Reef was not considered part of Hawaii immediately before its annexation by the United States as a Territory in 1898, nor was it considered part of Hawaii when it was admitted as a State in 1959. U.S. Senate, Report of the Hawaiian Commission, S. Doc. No. 16, 55th Cong., at 4 (3d Sess. 1898) (available at http://archive.org/stream/reportof hawaiian00unit#page/n7/mode/2up); Act of March 18, 1959, Pub. L. No. 86-3, 73 Stat. 4, sec. 2. In fact, it appears that the Fullard-Leo family attempted to sell Kingman Reef to the State of Hawaii in the 1990s, an indication that Kingman Reef was not already considered part of the State. Plaintiff's best argument that Kingman Reef ever became part of the Territory of Hawaii is that the Fullard-Leo family paid taxes on the atoll to the Territory of Hawaii from 1923 until 1959, and that the Territory of Hawaii apparently accepted the payments. Even if title to Kingman Reef was in fee to the Territory of Hawaii, it was "subject to its being defeated, by the taking for federal purposes." The federal government took Kingman Reef for a federal purpose, however, in 1934 with the issuance of Executive Order No. 6935. Even assuming that the Territory of Hawaii ever held title to Kingman Reef, plaintiff acknowledges that the United States clearly asserted federal sovereignty over the atoll in 1934, just twelve years after plaintiff claims its predecessors-in-interest took possession of the atoll.

Moreover, plaintiff cannot establish that its predecessors-in-interest held adverse, exclusive, and uninterrupted possession of Kingman Reef for twenty years against the sovereign. Assuming that Mr. Thurston's annexation of the atoll in 1922 established possession for the Copra Co., which conveyed its interest to Ellen Fullard-Leo shortly thereafter, the United States proclaimed Kingman Reef under its "control and jurisdiction" twelve years later and, in 1938, or sixteen years after the annexation, explicitly rejected the Fullard-Leo family's claim to own the atoll. In addition, the United States granted Pan Am a permit to use Kingman Reef for its trans-Pacific flights in 1935 and Pan Am's Clipper seaplane made three overnight stops at the atoll in 1937 and 1938. The Fullard-Leo family's use of the island, therefore, was not exclusive for a twenty-year period, but rather a United States permittee also made use of Kingman Reef before twenty years had run. The court finds no support for applying a presumption that the Territory of Hawaii conveyed title in Kingman Reef to plaintiff's predecessors-in-interest. Plaintiff's lost grant argument also fails.

Adverse Possession

Finally, plaintiff argues that, if the court finds that defendant held title to Kingman Reef beginning in 1922, KRAI has established full title through adverse possession. Plaintiff asserts that adverse possession was permitted against the United States in territories, like Hawaii, prior to March 27, 1934, as evidenced by 48 U.S.C. § 1489, which states, "[o]n and after March 27, 1934, no prescription or statute of limitations shall run, or continue to run, against the title of the United State to lands in any territory or possession or place or territory under the jurisdiction or control of the United States. . . ." 48 U.S.C. § 1489 (1934).  According to plaintiff, the statute of limitations for an adverse possession claim in the Territory of Hawaii from 1898 to 1972 was ten years, and possession had to be "'actual, notorious, exclusive, and continuous'" for the statutory period in order for adverse possession to apply. According to plaintiff, because KRAI and its predecessors-in-interest can establish each of those elements, KRAI should be found to have title to Kingman Reef through adverse possession.

Defendant responds that plaintiff's adverse possession claim fails for three reasons.  First, plaintiff's adverse possession claim amounts to a quiet title claim over which this court lacks jurisdiction.  Second, KRAI has already lost a quiet title claim in the District Court of Hawaii and, therefore, KRAD should not be able to circumvent that decision by asserting adverse possession over Kingman Reef in this court.  Third, defendant argues that the United States cannot lose title to property through adverse possession and, while plaintiff attempts to get around this limitation by arguing that its predecessors in interest had acquired title to Kingman Reef from the Territory of Hawaii, defendant maintains that Kingman Reef was never part of the Territory of Hawaii.

Like its lost grant argument, plaintiff's adverse possession claim also depends on accepting the premise that Kingman Reef was part of the Territory of Hawaii in 1922 and, as discussed above, the court finds no support for that assumption.  Moreover, the court would be hard-pressed to find that the Copra Co.'s and Fullard-Leo family's possession of Kingman Reef between 1922 and 1932 was "actual, notorious, exclusive, and continuous."  As discussed above, the standard for what constitutes possession is flexible depending on the nature of the property.  See United States v. Fullard-Leo, 331 U.S. at 279-80 ("The sufficiency of actual and open possession of property is to be judged in the light of its character and location.").  There is no evidence in the record, however, that the Fullard-Leo family visited, surveyed, or made any use of Kingman Reef in the decade after Mr. Thurston's annexation.  Mr. Thurston visited the atoll again in 1924, and as a guest of the United States Navy in 1926, but plaintiff has not alleged that he was acting as the agent of the Copra Co. or Fullard-Leo family on those later visits.  Leslie Fullard-Leo requested that a United States Captain survey Kingman Reef in 1931, but it does not appear that the Captain acquiesced or that Leslie Fullard-Leo intended to go along for the surveying visit.  The first documented use of Kingman Reef appears to be that of Pan Am in 1937 and 1938, as a stopover point for the Clipper.  Mr. Savio, the Fullard-Leo family's agent, alleges that he and members of the Fullard-Leo family have accessed the island numerous ties in order to survey it, but not before the

1940s.  Because there is no evidence that Kingman Reef was part of the Territory of Hawaii in 1922, nor that the Fullard-Leo family's use of the atoll would constitute "'actual, notorious, exclusive, and continuous'" possession, plaintiff's adverse possession claim also fails.

<u>Statute of Limitations</u>

In its cross-motion for summary judgment, defendant reasserts its argument that plaintiff's takings claim is barred by 28 U.S.C. § 2501, which establishes a six-year statute of limitation for actions brought against the United States in this court.  <u>See</u> 28 U.S.C. § 2501.  Defendant argues that plaintiff's takings claim accrued between 1934 and 1938, falling well outside of the six-year statute of limitations.

Pursuant to 28 U.S.C. § 2501, suits against the United States are subject to a general six-year statute of limitations:

Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues. . . .  A petition on the claim of a person under legal disability or beyond the seas at the time the claim accrues may be filed within three years after the disability ceases.

<u>Id.</u>  "The six-year statute of limitations set forth in section 2501 is a jurisdictional requirement for a suit in the Court of Federal Claims."  <u>John R. Sand & Gravel Co. v. United States</u>, 457 F.3d 1345, 1354 (Fed. Cir.), <u>reh'g en banc denied</u> (Fed. Cir. 2006), <u>aff'd</u>, 552 U.S. 130 (2008); <u>see also</u> <u>Mildenberger v. United States</u>, 643 F.3d 938, 945 (Fed. Cir. 2011) ("Claims for compensation under the Tucker Act, which waived the sovereign immunity of the United States, are subject to a strict statute of limitations provision." (citing <u>Lehman v. Nakshian</u>, 453 U.S. 156, 161 (1981) ("[L]imitations and conditions upon which the Government consents to be sued must be strictly observed, and exceptions thereto are not to be implied."))); <u>Schnell v. United States</u>, 115 Fed. Cl. 102, 104-05 (2014); <u>Ram Energy, Inc. v. United States</u>, 94 Fed. Cl. 406, 409 (2010).

The United States Court of Appeals for the Federal Circuit has indicated that a claim accrues "'"when all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money."'"  <u>San Carlos Apache Tribe v. United States</u>, 639 F.3d 1346, 1358-59 (Fed. Cir.) (quoting <u>Samish Indian Nation v. United States</u>, 419 F.3d 1355, 1369 (Fed. Cir. 2005) (quoting <u>Martinez v. United States</u>, 333 F.3d 1295, 1303 (Fed. Cir. 2003), <u>cert. denied</u>, 540 U.S. 1177 (2004))), <u>reh'g en banc denied</u> (Fed. Cir. 2011); <u>see also</u> <u>FloorPro, Inc. v. United States</u>, 680 F.3d 1377, 1381 (Fed. Cir. 2012); <u>Mildenberger v. United States</u>, 643 F.3d at 944-45; <u>Hopland Band of Pomo Indians v. United States</u>, 855 F.2d 1573, 1577 (Fed. Cir. 1988); <u>see also</u> <u>Eden Isle Marina, Inc. v. United States</u>, 113 Fed. Cl. 372, 481 (2013); <u>Brizuela v. United States</u>, 103 Fed. Cl. 635, 639, <u>aff'd</u>, 492 F. App'x 97 (Fed. Cir. 2012), <u>cert. denied</u>, 133 S. Ct. 1645 (2013)

Like other claims brought under the Tucker Act, takings claims typically accrue "'only when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence.'" Casitas Mun. Water Dist. v. United States, 708 F.3d 1340, 1359 (Fed. Cir. 2013) (emphasis in original) (quoting Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988)); see also Navajo Nation v. United States, 631 F.3d 1368, 1273-74 (Fed. Cir. 2011) ("In general, a takings 'claim first accrues when all the events have occurred which fix the alleged liability of the [government] and entitle the plaintiff to institute an action.'" (quoting Hopland Band of Pomo Indians v. United States, 855 F.2d at 1577 (citing Fallini v. United States, 56 F.3d 1378, 1380 (Fed. Cir. 1995), cert. denied, 517 U.S. 1243 (1996))); John R. Sand & Gravel Co. v. United States, 457 F.3d at 1355-56. "'Therefore, a claim under the Fifth Amendment accrues when [the] taking action occurs.'" Navajo Nation v. United States, 631 F.3d at 1273-74 (brackets in original) (quoting Goodrich v. United States, 434 F.3d 1329, 1333 (Fed. Cir.), reh'g denied (Fed. Cir. 2006) (citations and internal quotation marks omitted)). For a physical taking, the act that causes the taking also causes the accrual of a takings claim. See Casitas Mun. Water Dist. v. United States, 708 F.3d at 1359 (citing Ingrum v. United States, 560 F.3d 1311, 1314 (Fed. Cir.) ("[A] claim alleging a Fifth Amendment taking accrues when the act that constitutes the taking occurs."), cert. denied, 558 U.S. 878 (2009)).

In the above captioned case, plaintiff has the burden of proving that this court has subject matter jurisdiction over the takings claim and that the claim is timely. See McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936); Sanders v. United States, 252 F.3d 1329, 1333 (Fed. Cir. 2001); Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).

Plaintiff alleges that the taking of its property interest without just compensation occurred on January 18, 2001, when the Secretary of the Interior signed Secretarial Order No. 3223, establishing the Kingman Reef National Wildlife Refuge. Plaintiff filed its original complaint in the above captioned case on December 2, 2006, within six years of the alleged taking. Defendant's argument seems to be that, if any taking ever occurred regarding Kingman Reef, it happened in the 1930s. A claim accrues for the purposes of Section 2501, however, "'"when all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money."'" See, e.g., San Carlos Apache Tribe v. United States, 639 F.3d at 1358-59 (quoting Samish Indian Nation v. United States, 419 F.3d at 1369 (quoting Martinez v. United States, 333 F.3d at 1303)). Plaintiff, KRAD, which only could have gained its alleged property interest to Kingman Reef on November 17, 2000, would not have been entitled to demand payment from defendant for any action which took place in the 1930s. The "events" which plaintiff argues "fix[ed] the Government's alleged liability" in this case were those surrounding the creation of the Kingman Reef National Wildlife Refuge on January 18, 2001. Because plaintiff's claim was filed within six years of that date, the statute of limitations had not expired and plaintiff's claim was timely, albeit baseless. Because plaintiff has failed to put forth evidence suggesting that it had a cognizable property interest in Kingman Reef at the time of the alleged taking,

however, the court finds that defendant is entitled to judgment as a matter of law.  <u>See</u> RCFC 56(a).

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is **DENIED**. Defendant's cross-motion for summary judgment is **GRANTED** in its entirety.  Plaintiff's complaint is **DISMISSED** with prejudice.  The Clerk of Court shall enter **JUDGMENT** consistent with this opinion.


**IT IS SO ORDERED**.


<u>s/Marian Blank Horn</u>
**MARIAN BLANK HORN**
**Judge**